## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

        Plaintiff,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America,

        Defendant.

Civil Action No.

## COMPLAINT

LAURENCE H. TRIBE*
Carl M. Loeb University Professor and
Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ERWIN CHEMERINSKY*
Dean of the School of Law
University of California, Irvine
401 East Peltason Drive
Irvine, CA 92697
(949) 824-7722

ZEPHYR TEACHOUT*
Associate Professor of Law
Fordham Law School
150 West 62nd Street
New York, NY 12580
(646) 312-8722

*Affiliations noted for identification
purposes only

AMBASSADOR (RET.) NORMAN L. EISEN
Chair, Board of Directors
RICHARD W. PAINTER
Vice Chair, Board of Directors
NOAH BOOKBINDER
ADAM J. RAPPAPORT
STUART C. MCPHAIL
Citizens for Responsibility and
Ethics in Washington
455 Massachusetts Avenue, N.W., 6th Floor
Washington, DC 20001
(202) 408-5565

DEEPAK GUPTA
JONATHAN E. TAYLOR
RACHEL S. BLOOMEKATZ
MATTHEW SPURLOCK
Gupta Wessler PLLC
1735 20th Street, N.W.
Washington, DC 20009
(202) 888-1741

Attorneys for Plaintiff Citizens for Responsibility and
Ethics in Washington

## TABLE OF CONTENTS

I.   Nature of the Action ........................................................................................... 1

II.   Parties, Jurisdiction, and Venue........................................................................ 4

III.   Legal Background .............................................................................................. 6

IV.   Relevant Facts.................................................................................................... 9

    A.   Defendant's Foreign Emoluments Clause Violations ........................... 9

    B.   CREW's Primary Injuries...................................................................... 23

    C.   Other Injuries........................................................................................ 32

V.   Claims ................................................................................................................ 33

VI.   Prayer for Relief................................................................................................. 36

Citizens for Responsibility and Ethics in Washington, for its complaint against Donald J. Trump, in his official capacity as President of the United States, alleges as follows:

## I.
## NATURE OF THE ACTION

1.      Never before have the people of the United States elected a President with business interests as vast, complicated, and secret as those of Donald J. Trump.  Now that he has been sworn into office as the 45th President of the United States, those business interests are creating countless conflicts of interest, as well as unprecedented influence by foreign governments, and have resulted and will further result in numerous violations of Article I, Section 9, Clause 8 of the United States Constitution, the "Foreign Emoluments Clause."

2.      These violations of the Foreign Emoluments Clause pose a grave threat to the United States and its citizens.  As the Framers were aware, private financial interests can subtly sway even the most virtuous leaders, and entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic.  The Foreign Emoluments Clause was forged of the Framers' hard-won wisdom.  It is no relic of a bygone era, but rather an expression of insight into the nature of the human condition and the preconditions of self-governance.  And applied to Donald J. Trump's diverse dealings, the text and purpose of the Foreign Emoluments Clause speak as one: this cannot be allowed.[1]

3.      Ultimately, the theory of the Foreign Emoluments Clause—grounded in English history and the Framers' experience—is that a federal officeholder who receives something of value from a foreign power can be imperceptibly induced to compromise what the Constitution

---

[1]   Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* (Dec. 16, 2016), *available at* https://www.brookings.edu/wp-content/uploads/2016/12/gs_121616_emoluments-clause1.pdf.

insists be his or her exclusive loyalty: the best interest of the United States of America.  And rather than guard against such corruption by punishing it after-the-fact, the Framers concluded that the proper solution was to write a strict rule into the Constitution itself, thereby ensuring that shifting political imperatives and incentives never undo this vital safeguard of freedom.[2]

4.      Plaintiff Citizens for Responsibility and Ethics in Washington (CREW) is a nonprofit, nonpartisan organization founded in 2002 that works on behalf of the public to foster an ethical and accountable government and reduce the influence of money in politics.  CREW brings this action to stop and prevent the violations of the Foreign Emoluments Clause that Defendant Donald J. Trump has committed and will commit, which have already injured—and, without a remediable order from this Court, will continue to injure—CREW in the form of a significant diversion and depletion of its time, resources, and efforts.  CREW has standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), because there has been a "concrete and demonstrable injury to the organization's activities[,] with the consequent drain on the organization's resources."  *See also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904-05 (2d Cir. 1993).  CREW seeks declaratory relief determining the meaning of the Foreign Emoluments Clause and stating that Defendant's present and future conduct violates this provision, as well as injunctive relief ordering Defendant to refrain from violating the Foreign Emoluments Clause.

5.      The Foreign Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  Though courts have not had many occasions to interpret this constitutional provision, it

---

[2]      *Id.*; *see also* Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994) ("Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty.  That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government.").

is widely understood—and CREW agrees—that this clause covers the President of the United States and prevents him or her from accepting anything of value, monetary or nonmonetary, from any foreign government or its agent or instrument without congressional consent. The Framers inserted this clause into the Constitution to prevent any type of foreign influence or corruption from infiltrating the United States government.

6. Defendant, however, has repeatedly stated the misguided refrain that "the President can't have a conflict of interest," and his attorney, just nine days before his inauguration, stated that "the so-called Emoluments Clause has never been interpreted . . . to apply to fair value exchanges that have absolutely nothing to do with an office holder" and that the "Constitution does not require President-elect Trump to do anything here."

7. As a direct result of Defendant's articulated view of the Foreign Emoluments Clause—which is legally unsupportable and stands in stark contrast to CREW's view of the Foreign Emoluments Clause—Defendant has violated the Constitution during the opening moments of his presidency and is poised to do so continually thereafter for the duration of his administration. Specifically, Defendant has committed and will commit Foreign Emoluments Clause violations involving at least: (a) leases held by foreign-government-owned entities in New York's Trump Tower; (b) room reservations and the use of venues and other services and goods by foreign governments and diplomats at Defendant's Washington, D.C. hotel; (c) hotel stays, property leases, and other business transactions tied to foreign governments at other domestic and international establishments owned, operated, or licensed by Defendant; (d) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign versions of the television program "The Apprentice" and its spinoffs; and (e) property interests or other business dealings tied to foreign governments in numerous other countries.

8.      As a direct result of Defendant's refusal to address these and other violations of the Foreign Emoluments Clause, CREW has been significantly injured.  CREW has been forced to divert essential and limited resources—including time and money—from other important matters that it ordinarily would have been handling to the Foreign Emoluments Clause issues involving Defendant, which have consumed the attention of the public and the media. Moreover, without declaratory and injunctive relief from this Court, CREW will continue to suffer this diversion and depletion of resources for the remainder of Defendant's administration. CREW will essentially be forced into the role of litigating and educating the public regarding Defendant's Foreign Emoluments Clause violations, rather than continuing its mission of serving as a watchdog with respect to all ethical issues involving all parts of our government.

9.      Accordingly, CREW requests that this Court: (a) enter a declaratory judgment resolving the actual controversy between the parties over the meaning of the Foreign Emoluments Clause and stating that Defendant's conduct violates the Foreign Emoluments Clause; and (b) enjoin Defendant from violating the Foreign Emoluments Clause.

## II.
## PARTIES, JURISDICTION, AND VENUE

10.      CREW is a nonprofit, nonpartisan corporation organized under the laws of Delaware and exempt from taxation under 26 U.S.C. § 501(c)(3).  CREW is committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics.  CREW seeks to empower citizens to have an influential voice in government decisions and in the governmental decision-making process through the dissemination of information about public officials and their conduct.  CREW works to advance reforms in the areas of ethics, campaign finance, lobbying, and transparency, and

seeks to ensure the proper interpretation and enforcement of government ethics laws and other laws related to corruption and money in politics.

11.     To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information about public officials, their actions, and the outside influences that have affected those actions.  A core part of this work is examining and exposing special interests that have influenced public officials and elections, and then using that information to educate the public and voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

12.     Toward this end, CREW monitors the activities of public officials and candidates, as well as businesses and others that financially support them, including support received through campaign contributions, gifts, and businesses or other entities associated with public officials. CREW regularly reviews public records that disclose the financial benefits provided to public officials and their business interests, including personal financial-disclosure forms, campaign-finance reports, travel records, and lobbying reports.  CREW further conducts independent research to uncover financial support for public officials and candidates, reviewing business records, tax returns, property records, and news reports.  CREW's research also regularly includes filing federal and state public-records requests and reviewing the records obtained.

13.     A part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between financial benefits received by public officials and their subsequent conduct.

14.     Using the information obtained from public records and independent research, CREW—through its website, press releases, reports, and other methods of distribution—publicizes the roles of individuals, groups, and businesses attempting to use financial support to exert influence on politics and public policy, and of the public officials and candidates who accept

that support.  In particular, CREW publicizes violations of ethics, campaign finance, and other anti-corruption laws and rules by those public officials and candidates.  CREW also regularly files complaints with government agencies when it discovers violations of these laws and rules.  In addition, CREW regularly files lawsuits to compel government agencies to properly interpret and enforce anti-corruption, accountability, and transparency laws and rules, and participates as an amicus in related civil and criminal litigation.

15.     By publicizing violations and filing complaints and lawsuits, CREW advances its mission of keeping the public informed about public officials and candidates and deterring future violations of these laws and rules.

16.     Defendant is the President of the United States of America.  He is being sued here in his official capacity as President.

17.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

18.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1).  Defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the Southern District of New York is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and where "a substantial part of property that is the subject of the action is situated."  For example, New York's Trump Tower and Defendant's "Trump Organization"—both key components of CREW's claims—are based in the Southern District of New York.

## III.
## LEGAL BACKGROUND

19.     Article I, Section 9, Clause 8 of the U.S. Constitution provides as follows: "No Title of Nobility shall be granted by the United States: And no Person holding any Office of

Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."

20.     The origins of this provision, the "Foreign Emoluments Clause," date back as far as 1651, when the Dutch broke with classic European diplomatic customs and prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any manner or way whatever."   Impressed, the early Americans included similar text—the predecessor for the Foreign Emoluments Clause—in Article 6, Section 1 of the Articles of Confederation: "[N]or shall any person holding any office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."

21.     The anti-emolument provision from the Articles of Confederation initially was not included at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U. S. independent of external influence."[3]   Edmund Jennings Randolph echoed the anti-corruption purpose of the Foreign Emoluments Clause included in the Constitution: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[4]   The Framers recognized the dangers of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and thus they created a broad constitutional prophylactic applicable to anything of value given by any foreign government to any officer of the United States.

22.     Since the inception of the Foreign Emoluments Clause, it has been widely and expressly acknowledged that a "Person holding any Office of Profit or Trust" includes the

---

[3]   2 Farrand, *The Records of the Federal Convention of 1787*, at 389.
[4]   3 Farrand, *The Records of the Federal Convention of 1787*, at 327.

President.  Indeed, Randolph confirmed as much at the Virginia Ratifying Convention: "There is another provision against the danger mentioned by the honorable member, of the president receiving emoluments from foreign powers. . . .  I consider, therefore, that he is restrained from receiving any present or emoluments whatever.  It is impossible to guard better against corruption."[5]  The Office of Legal Counsel has continually adhered over time to that widely accepted interpretation, reaffirming as recently as 2009 that "[t]he President surely 'hold[s] an[] Office of Profit or Trust.'"[6]  And Defendant's own attorneys noted before Defendant became President that "the President-Elect will be bound by . . . his obligations under the Constitution," which "includes the obligations created by . . . the Foreign Emoluments Clause."[7]

23.    Consistent with the Framers' intent, the definition of a "present" or "Emolument" under the Foreign Emoluments Clause also is properly interpreted in a broad manner, to cover anything of value, monetary or nonmonetary.  The text of the clause itself prohibits the receipt of *both* a "present," which, presumably, an officer would receive without necessarily doing or giving anything in return, *and* an "Emolument," which could cover anything else of value, including remuneration at, above, or below market rates.  The Foreign Emoluments Clause also explicitly prohibits the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of the things of value covered under the provision.  The exclusion of arm's length transactions or dealings involving nonmonetary benefits from the scope of the Foreign Emoluments Clause would run counter to the provision's text, history, and underlying purpose, since such conduct could give rise to foreign influence and corruption.

---

[5]    David Robertson, Debates and other Proceedings of the Convention of Virginia 345 (2d ed. 1805) (1788).

[6]    David J. Barron, Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. 1, 4 (2009).

[7]    Morgan, Lewis & Bockius LLP, *White Paper: Conflicts of Interest and the President*, at 3-4, *available at* https://assets.documentcloud.org/documents/3280261/MLB-White-Paper-1-10-Pm.pdf.

24.     With respect to determining which entities fall within the definition of a "foreign State" under the Foreign Emoluments Clause, the Office of Legal Counsel has consistently examined three non-dispositive factors, always with an eye toward the underlying purpose of preventing corruption and foreign influence: (a) "whether a government is the substantial source of funding for the entity"; (b) "whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument"; and (c) "whether a government has an active role in the management of the entity."[8] It is widely accepted—and has been reaffirmed by the Office of Legal Counsel as recently as 2009—that a "foreign State" under the Foreign Emoluments Clause includes agents and instrumentalities of foreign nations.[9]

## IV.
## RELEVANT FACTS

### A.     Defendant's Foreign Emoluments Clause Violations

25.     Defendant owns and controls hundreds of businesses throughout the world, including hotels and other properties.  His business empire is made up of hundreds of different corporations, limited-liability companies, limited partnerships, and other entities that he owns or controls, in whole or in part, operating in the United States and 20 or more foreign countries.[10] Defendant's businesses are loosely organized under an umbrella known as the "Trump Organization."  However, Defendant's interests include not only Trump Organization LLC d/b/a The Trump Organization and The Trump Organization, Inc., both of which are owned solely by Defendant, but also scores of other entities not directly owned by either "Trump Organization" entity but that Defendant personally owns, owns through other entities, and/or

---

[8]   Barron, Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. at 8.

[9]   *Id.* at 7.

[10]   Marilyn Geewax & Maria Hollenhorst, *Trump's Businesses And Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016).

controls.[11]  Defendant also has several licensing agreements that provide streams of income that continue over time.  Through these entities and agreements, Defendant personally benefits from business dealings, and Defendant is and will be enriched by any business in which they engage with foreign governments and officials.

26.     Since Defendant began running for President, the media has widely reported on these businesses and the conflicts of interest they pose.  Significant portions of the coverage have focused on the secrecy surrounding Defendant's business holdings, in part because Defendant has continuously refused to release his tax returns.[12]  After Defendant's election on November 8, 2016, media reports about conflicts of interest intensified—countless articles explained the specifics of these conflicts in the run-up to Defendant's inauguration.

27.     Defendant, however, has denied the existence of these conflicts of interest.  In an interview with *The New York Times* on November 22, 2016, Defendant stated that "the law is totally on my side, meaning, the president can't have a conflict of interest."[13]  At a press conference on January 11, 2017, nine days before his inauguration, Defendant again reiterated his belief that "I have a no-conflict situation because I'm president" and "I have a no conflict of interest provision as president."[14]  Defendant's attorney, at the same press conference, stated that "the so-called Emoluments Clause has never been interpreted . . . to apply to fair value exchanges that have absolutely nothing to do with an office holder" and, therefore, the

---

[11]  Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), *available at* https://assets.documentcloud.org/documents/2838696/Trump-2016-Financial-Disclosure.pdf.

[12]  David Barstow et al., *Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found*, N.Y. Times (Oct. 1, 2016).

[13]  *Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times (Nov. 23, 2016).

[14]  *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017).

"Constitution does not require President-elect Trump to do anything here."[15]  There is no law or constitutional provision that exempts the President from the Foreign Emoluments Clause.

28.     While announcing at his January 11, 2017 press conference that he has a "no-conflict situation" as President, Defendant nevertheless explained a plan to turn "leadership and management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as well as a longtime company executive.[16]  But the plan did not include Defendant relinquishing *ownership* of his businesses or establishing a blind trust.  The plan also did not include any intention of seeking "the Consent of the Congress" with respect to Defendant's business dealings, and Defendant has never received "the Consent of the Congress" with respect to any of his business transactions.  In response to this plan, the director of the Office of Government Ethics immediately asserted that Defendant's plan was inadequate: "[T]he plan does not comport with the tradition of our Presidents over the past 40 years.  This isn't the way the Presidency has worked since Congress passed the Ethics in Government Act in 1978 in the immediate aftermath of the Watergate scandal."[17]

29.     As a direct result of Defendant's purposeful refusal to acknowledge that he is submerged in conflicts of interest and his purposeful refusal to take precautions necessary to avoid those conflicts, Defendant is now committing and is poised to continue to commit many violations of the Foreign Emoluments Clause—some documented, and others not yet apparent due to the complex and secretive nature of Defendant's business holdings—during the opening moments of his presidency and continually thereafter.  For example:

---

[15]  *Id.*
[16]  *Id.*
[17]  *Remarks of Office of Government Ethics Director Walter M. Shaub, Jr.*, N.Y. Times (Jan. 11, 2017).

**New York's Trump Tower**

30.     New York's "Trump Tower" is a mixed-use skyscraper located at 725 Fifth Avenue, New York, New York 10022.  Through the use of various entities, Defendant owns and controls Trump Tower.  Among the largest tenants of Trump Tower is the Industrial and Commercial Bank of China (ICBC), which is owned by a foreign nation, China.[18]  The ICBC's lease is set to expire during Defendant's term as President.  In addition, the Abu Dhabi Tourism & Culture Authority, an entity owned by the foreign nation of the United Arab Emirates, leases office space in Trump Tower.[19]

31.     Defendant regularly receives money—and, without judicial intervention, will continue to receive money during his presidency—through the leases that the ICBC and the Abu Dhabi Tourism & Culture Authority hold in Trump Tower.  Now that he is President, Defendant's acceptance of any such payments without congressional consent constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."  Moreover, the expected negotiation of a new lease in Trump Tower with the ICBC—or of any other lease in Trump Tower with a state-owned entity—presents an additional opportunity for Defendant to violate the Foreign Emoluments Clause.

**Washington, D.C.'s Trump International Hotel**

32.     The Trump International Hotel Washington, D.C. recently opened and is located at 1100 Pennsylvania Avenue N.W., Washington, D.C. 20004, just blocks from the White

---

[18]  Caleb Melby et al., *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg (Nov. 28, 2016).
[19]  Abu Dhabi Tourism & Culture Authority, *Our Offices, available at* http://tcaabudhabi.ae/en/who.we.are/our.offices.aspx; María Villaseñor, *Trump's Comments Cost Him Money in Middle East*, NBC News (Dec. 9, 2015).

House.  Defendant owns and controls this hotel through the use of various entities, and thus receives money each time someone stays in a room or pays for a venue or other goods or services in this hotel.

33.    According to media reports, since the November 8, 2016 election, foreign diplomats have been flocking to Defendant's D.C. hotel, eager to curry favor with Defendant and afraid of what Defendant may think or do if they send their business elsewhere in Washington.[20] One week after the election, the hotel held a special event for the diplomatic community.[21] About 100 foreign diplomats attended; they were greeted with champagne, food, a tour, a raffle for overnight stays at properties belonging to Defendant around the world, and a sales pitch about the new D.C. hotel.[22]  The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competitor hotel in Washington.[23]  One "Middle Eastern diplomat" told *The Washington Post* about the hotel: "Believe me, all the delegations will go there."[24]  An "Asian diplomat" explained: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!'  Isn't it rude to come to his city and say, 'I am staying at your competitor?'"[25]

34.    The Embassy of Kuwait is scheduled to hold its National Day celebration at Defendant's Washington, D.C. hotel on February 25, 2017.[26]  A portion of the funds to pay for

---

[20]  Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post (Nov. 18, 2016); *see also* Eric Lipton & Susanne Craig, *At Trump Hotel in Washington, Champagne Toasts in an Ethical 'Minefield'*, N.Y. Times (Jan. 19, 2017).

[21]  O'Connell & Jordan, *For foreign diplomats, Trump hotel is place to be*.

[22]  *Id.*

[23]  *Id.*

[24]  *Id.*

[25]  *Id.*

[26]  Jonathan O'Connell, *Kuwaiti Embassy is latest to book Trump D.C. hotel, but ambassador says he felt 'no pressure'*, Wash. Post (Dec. 20, 2016).

this Kuwaiti celebration will go directly to Defendant while he is President.  According to one media report, the Embassy of Kuwait moved the event from a competitor hotel under pressure from the Trump Organization (though Kuwait's ambassador to the United States denied being pressured).[27]   Bahrain also booked a venue at Defendant's D.C. hotel for a National Day celebration in December 2016,[28] and Azerbaijan co-hosted a Hanukkah party at the hotel in December 2016.[29]

35.     Defendant regularly receives money—and, without judicial intervention, will continue to receive money during his presidency—each time a foreign state, a foreign diplomat, some other agent of a foreign state, or some other instrumentality of a foreign nation stays in a room or pays for a venue or other service in Defendant's D.C. hotel.  Now that he is President, Defendant's acceptance of any such payments without congressional consent, including for inauguration-related reservations, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from an agent or instrumentality of, or directly from, a "foreign State," without "the Consent of the Congress."

36.     During Defendant's January 11, 2017 press conference, Defendant's attorney announced that Defendant "is going to voluntarily donate all profits from foreign government payments made to his hotel to the United States Treasury."[30]   But this proposal, if realized, would not remedy Defendant's Foreign Emoluments Clause violations; the Constitution provides for no such exception or remedy to this clause.  And, even if such an exception or remedy were

---

[27] Judd Legum & Kira Lerner, *Under political pressure, Kuwait cancels major events at Four Seasons, switches to Trump's D.C. hotel*, ThinkProgress (Dec. 19, 2016).

[28] Nolan D. McCaskill & Madeline Conway, *Bahrain to host event at Trump's D.C. hotel, raising ethical concerns*, Politico (Nov. 29, 2016).

[29] Brent Griffiths & Kenneth P. Vogel, *Embassy of Azerbaijan to co-host event at Trump's D.C. hotel*, Politico (Dec. 5, 2016).

[30] *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017).

included in the Constitution (it is not), Defendant's plan would be insufficient in that: (a) it contains no monitoring or enforcement mechanism; (b) it calls merely for turning over *profits*, not *all funds* received from foreign governments; and (c) it does not address Defendant's continuing ownership of the hotel, and thus does not aid the underlying purpose of the Foreign Emoluments Clause, preventing foreign influence and corruption.

**Other Domestic And International Properties And Businesses**

37.     As noted in Defendant's financial-disclosure report, Defendant owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs.[31]  Defendant regularly receives money—and, without judicial intervention, will continue to receive money during his presidency—through transactions involving these many other properties and businesses.  Now that he is President, Defendant's acceptance of any such payments from foreign states or their instrumentalities or agents without congressional consent constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

**International Versions And Distribution Of "The Apprentice" And Its Spinoffs**

38.     Defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which Defendant is still an executive producer), as well as from international versions of the programs produced in other countries.  In some instances, these payments originate from foreign governments or their agents or

---

[31]   Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report, *available at* https://assets.documentcloud.org/documents/2838696/Trump-2016-Financial-Disclosure.pdf.

instrumentalities.  For instance, there are iterations of the program "The Apprentice," for which Defendant is paid, in the United Kingdom and Vietnam,[32] and in both countries those programs air on foreign-government-owned broadcast stations.

39.     Defendant regularly receives money—and, without judicial intervention, will continue to receive money during his presidency—through transactions involving the television programs "The Apprentice" and its spinoffs and international versions.  Now that he is President, Defendant's acceptance of any such payments from foreign states or their agents or instrumentalities without congressional consent constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

**Other Foreign Connections, Properties, And Businesses**

40.     **China:**  Defendant's company has plans to build 20 to 30 luxury hotels in China,[33] which will require obtaining benefits from the Chinese government, such as permits and approvals.  Defendant also is part owner of an office building located at 1290 Avenue of the Americas in New York, New York, which carries a $950 million loan, part of which is held by the Chinese-government-owned Bank of China.[34]  Now that Defendant is President, his company's acceptance of any benefits from the Chinese government—including permits or approvals for property in China, or additional money or a renegotiation or forgiveness of a loan from the Bank of China—or anything else of value from that or any other foreign government in connection

---

[32]   Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice'*, Forbes (Dec. 13 2016).

[33]   Rob Schmitz, *Trump's Hotels In China Could Be A Conflict For The President-Elect*, NPR (Nov. 24, 2016); Simon Denyer & Jonathan O'Connell, *Trump Hotels has had its eye on China—but the door hasn't opened*, Wash. Post (Dec. 26, 2016).

[34]   Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016).

with Defendant's Chinese business interests, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

41.   **India:**   Defendant's company is engaged in many real-estate projects in India, which will require benefits from the Indian government, such as permits and approvals.[35]   Now that Defendant is President, his company's acceptance of any such benefits from the Indian government, or anything else of value from that or any other foreign government in connection with Defendant's Indian business interests, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

42.   **United Arab Emirates:**   Defendant's company is engaged in several real estate projects in the United Arab Emirates (UAE), including Dubai's Trump International Golf Club, which is set to open in February 2017.   All services for the golf club, including electricity, water, and roads, "come at the discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."[36]   Now that Defendant is President, his company's acceptance of any permits or approvals from the UAE's government, or anything else of value from that or any other foreign government in connection with Defendant's UAE business interests, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is

---

[35]   Richard C. Paddock et al., *Potential Conflicts Around the Globe for Trump, the Businessman President*, N.Y. Times (Nov. 26, 2016).

[36]   Jon Gambrell, *Trump's New Dubai Golf Club Shows Pitfalls of His Presidency*, Associated Press (Jan. 3, 2017).

"accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

43. **Indonesia:** Defendant's company is engaged in at least two real estate projects in Indonesia. As part of this effort, Defendant reportedly has "forged relationships with powerful political figures in Indonesia, where such connections are crucial to pushing through big projects."[37] Now that Defendant is President, his company's acceptance from the Indonesian government of any permits, approvals, or other benefits as part of "pushing through big projects," or his company's acceptance of anything else of value from that or any other foreign government in connection with Defendant's Indonesian business interests, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

44. **Turkey:** Defendant's company is involved in a major licensing deal in Turkey for the Trump Towers Istanbul. Defendant himself has admitted that his business interests in Turkey present ethical problems: "I have a little conflict of interest 'cause I have a major, major building in Istanbul."[38] Already, that deal has entered the political arena—Turkey's president called for Defendant's name to be removed from towers in Istanbul last year after Defendant proposed a Muslim ban, but there has been no mention of the threat since Defendant publicly defended Turkey's president one month later.[39] Now that Defendant is President, his company's acceptance of any permits, approvals, or other benefits from the Turkish government as part of Defendant's ongoing licensing deal, or his company's acceptance of anything else of value from

---

[37] Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016).
[38] Pema Levy, *Trump Admitted to a Conflict of Interest in Turkey*, Mother Jones (Nov. 15, 2016).
[39] Tim Mak, *Donald Trump's Huge Conflict of Interest in Turkey*, Daily Beast (Dec. 7, 2016).

that or any other foreign government in connection with Defendant's Turkish business interests, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

45.    **Scotland:**   Defendant owns Trump Turnberry, a golf course and resort in Turnberry, Scotland, and Trump International Golf Links – Scotland, a golf course and resort in Aberdeenshire, Scotland.    Defendant's golf courses and resorts receive support from VisitScotland, Scotland's official tourism agency.[40]   Shortly after the November 2016 election, Defendant met with Nigel Farage, an English politician who is a member of the European Parliament and former leader of the UK Independence Party, and asked him to help oppose the type of offshore wind turbines that, according to Defendant, spoil the views at his Aberdeenshire golf course.[41]   In January 2017, reports came out that Defendant's Aberdeenshire golf operation was expanding, with a second 18-hole golf course and a new 450-room five-star hotel, timeshare complex and private housing estate.[42]    Now that Defendant is President, his company's acceptance from the Scottish or United Kingdom governments of any permits, approvals, or other benefits in connection with his golf operations, or his company's acceptance of anything else of value from those or any other foreign government in connection with Defendant's business interests in Scotland, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

---

[40]   Severin Carrell, *Trump could use UK trade deal to boost golf resorts, say former ethics officials*, Guardian (Jan. 17, 2017).

[41]   Danny Hakim & Eric Lipton, *With a Meeting, Trump Renewed a British Wind Farm Fight*, N.Y. Times (Nov. 21, 2016).

[42]   Severin Carrell, *Trump's Scotland golf resort proceeds with expansion despite business pledge*, Guardian (Jan. 14, 2017).

46.     **Philippines:**  Defendant's business partner in the Philippines, Jose E.B. Antonio, was named a special envoy to the United States shortly before Defendant's election.  Defendant's name is on a new apartment building that Antonio's company is constructing in the Philippines, the Trump Tower at Century City.[43]   Now that Defendant is President, his company's acceptance from the Philippines' government of any permits, approvals, or other benefits as part of Defendant's ongoing interest in the Trump Tower at Century City, or his company's acceptance of anything else of value from that or any other foreign government in connection with Defendant's business interests in the Philippines, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

47.     **Russia:**   According to media reports, "[t]here is strong evidence that Trump's businesses have received significant funding from Russian investors."[44]   As Defendant's son Donald Trump Jr. stated in 2008: "Russians make up a pretty disproportionate cross-section of a lot of our assets. . . .  We see a lot of money pouring in from Russia."[45]   Defendant has been seeking business and development opportunities in Russia for at least three decades, including in 2013, when he wrote on Twitter: "TRUMP TOWER-MOSCOW is next."[46]   Now that Defendant is President, his company's acceptance of any investment money, benefits, or anything else of value from the Russian government or any agent or instrumentality thereof, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a

---

[43]   Richard C. Paddock, *Trump Business Partner Is Philippines' New Trade Envoy to U.S.*, N.Y. Times (Nov. 9, 2016).
[44]   Rosalind S. Helderman, *Here's what we know about Donald Trump and his ties to Russia*, Wash. Post (July 29, 2016).
[45]   Darren Samuelsohn, *Trump's vast web of conflicts: A user's guide*, Politico (Nov. 16, 2016).
[46]   Megan Twohey & Steve Eder, *For Trump, Three Decades of Chasing Deals in Russia*, N.Y. Times (Jan. 16, 2017).

"Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

48.   **Saudi Arabia:**  Defendant recently created several companies that appear to be designed to help develop real estate and hotels in Jeddah, the second-largest city in Saudi Arabia (though it is unclear how many of those companies remain in business).[47]   Moreover, in 2001, Defendant sold a floor of a building he owns, the Trump World Tower in New York, New York, to the Kingdom of Saudi Arabia.  At the time of the sale, yearly common charges for building amenities for the floor totaled $85,585.  The floor currently belongs to the Saudi Mission to the United Nations,[48] which presumably still must pay yearly common charges to Defendant's company.  Now that Defendant is President, his company's acceptance of any benefits, any money, or anything else of value from the Saudi Arabian government or any agent or instrumentality thereof, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" or its agent or instrumentality without "the Consent of the Congress."

49.   **Taiwan:**   In September 2016, Defendant's business reportedly sent a representative to Taiwan to discuss investment opportunities in a government-run development project, which would require government approval to complete.[49]   Less than three months later, Defendant made international news when he received a congratulatory call from Taiwan's president, in what is believed to be the first call in nearly four decades between a Taiwanese

---

[47]  Drew Harwell & Anu Narayanswamy, *A scramble to assess the dangers of President-elect Donald Trump's global business empire*, Wash. Post (Nov. 20, 2016).

[48]  Stephen Rex Brown, *EXCLUSIVE: Donald Trump made millions from Saudi Arabia, but trashes Hillary Clinton for Saudi donations to Clinton Foundation*, N.Y. Daily News (Sept. 4, 2016).

[49]  Michael Forsythe, *Taiwan City Planning a Makeover Says a Trump Agent Showed Interest*, N.Y. Times (Dec. 4, 2016).

leader and the U.S. President or President-Elect.   Now that Defendant is President, his company's acceptance of any permits or approvals from Taiwan's government, or anything else of value from that or any other foreign government in connection with Defendant's business interests in Taiwan, without congressional consent, constitutes a violation of the Foreign Emoluments Clause; Defendant, as a "Person holding any Office of Profit or Trust," is "accept[ing]" an "Emolument" from a "foreign State" without "the Consent of the Congress."

**Domestic Emoluments Clause**

50.     Many of the above-mentioned business interests also likely cause Defendant to run afoul of Article II, Section 1, Clause 7 of the U.S. Constitution, the "Domestic Emoluments Clause,"[50] which states: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."   This clause, which prevents Defendant from receiving any "Emolument" from the United States or any individual state, is violated as a result of Defendant's ownership interests in various properties and businesses, both foreign and domestic, for which Defendant receives some form of monetary or nonmonetary payment or benefit from the U.S. government or state governments.   In these situations, Defendant is "receiv[ing]," within "the Period for which he shall have been elected," an "Emolument from the United States, or any of them."

---

[50]   This provision is also referred to as the "Presidential Emoluments Clause."   Moreover, while it was originally designated as Article II, Section 1, Clause 7, it is now sometimes referred to as Article II, Section 1, Clause 6, due to the supersedure of the original third clause of Article II, Section 1 by the Twelfth Amendment.

**B.      CREW's Primary Injuries**

51.     Defendant's violations of the Foreign Emoluments Clause have required CREW to divert and expend its valuable resources specifically to counteract those violations, impairing CREW's ability to accomplish its mission.  CREW has had to counteract Defendant's violations because they are particularly harmful to CREW due to its status as a nonpartisan, nonprofit organization with the resources, board of directors, in-house legal team, and mission that it has.

52.     There is a direct conflict between Defendant's violations of the Foreign Emoluments Clause and CREW's mission of protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics.  Defendant's violations create a tremendous risk of foreign governments using money to improperly influence the President, create questions about the President's motives in making foreign-policy decisions, and will likely lead to numerous conflicts and violations that the public will have insufficient information to judge.

53.     CREW has expended a significant amount of time and resources since the election educating the public about the Foreign Emoluments Clause and Defendant's violations of it.  CREW has received hundreds of requests from the media about Defendant's conflicts of interest, including dozens regarding the Foreign Emoluments Clause and Defendant's violations of it.  Many of these media requests sought explanations of the clause and its applicability, and CREW has spent a substantial number of hours responding to them.  As a result of these efforts to educate the public, members of CREW's staff and its board of directors repeatedly have been interviewed by and quoted in the news media discussing the Foreign Emoluments Clause and Defendant's violations of it.  These media requests are certain to continue, and CREW will continue to need to expend time and resources to respond to them.

54.     CREW regularly issues press releases and statements, and responds to requests for information and comments from the media on a range of topics, including but not limited to ethics, corruption, campaign finance, and accountability.  Both before and after the election, CREW received hundreds of questions from the news media about Defendant's businesses and conflicts of interest, including dozens related to the Foreign Emoluments Clause.  CREW has diverted its time and resources from its public-education activities to respond to these questions. CREW normally responds to nearly every press request.  However, due to the volume of requests from national news media about Defendant's conflicts of interest, including his Foreign Emoluments Clause violations, CREW has not had the time and resources to respond to requests from many smaller and regional outlets regarding, for example, local money in politics issues and congressional ethics issues.

55.     CREW's in-house attorneys have diverted their time and resources from other projects to counteract Defendant's violations of the Foreign Emoluments Clause.  Since the election, CREW has received numerous requests for information and guidance about the Foreign Emoluments Clause from policymakers.  To respond to those requests, and as part of CREW's advocacy in support of its mission of ensuring the integrity of government officials, CREW has expended significant resources conducting legal research regarding the history and scope of the Foreign Emoluments Clause.  Moreover, CREW's attorneys, including its executive director, have spent a significant amount of time on phone calls and meetings responding to those inquires.

56.     CREW's attorneys also have conducted legal research to respond to many of the requests for information from the news media regarding the Foreign Emoluments Clause.  In addition, CREW's attorneys and researchers have assisted in researching and drafting publications educating the public about the clause and the impact of Defendant's violations of it.

57.     CREW also has conducted extensive legal research and analysis of potential legal actions to counteract Defendant's violations of the Foreign Emoluments Clause.  CREW's attorneys have researched and analyzed potential lawsuits that could be used to enforce the clause, drafted this complaint, and expended resources to file it.  CREW's attorneys also have researched and analyzed the potential for filing complaints with government agencies.  CREW further has filed Freedom of Information Act requests to obtain records related to potential violations of the Foreign Emoluments Clause.

58.     In addition, due in part to the volume of legal issues related to Defendant's conflicts of interest, including the need to counteract his violations of the Foreign Emoluments Clause, CREW hired a new senior attorney in December 2016 to strengthen CREW's ability to address these issues.

59.     This use of time and resources on legal matters related to Defendant's violations of the Foreign Emoluments Clause is certain to continue.  In addition to needing to monitor Defendant's business interests for potential violations, CREW attorneys will, among other things, continue to need to evaluate payments to Defendant's hotels and other business interests to determine if they violate the clause; research and analyze possible legal actions; and draft, file, and potentially litigate related Freedom of Information Act requests.

60.     The time and resources CREW has used and will continue to use to counteract Defendant's violations of the Foreign Emoluments Clause were and will continue to be diverted from other legal projects and activities in which CREW would have otherwise engaged.

61.     In the months immediately following elections, CREW regularly has drafted and filed complaints for violations of campaign finance and other laws related to political activity.  In January 2013, for example, CREW filed complaints with the Federal Election Commission (FEC) and the Department of Justice (DOJ) alleging that several individuals, companies, and a

super PAC made and accepted an illegal $1 million conduit contribution during the 2012 election.[51]   CREW also filed FEC and DOJ complaints in November 2012 against a section 501(c)(4) "dark money" organization for failing to disclose the identities of donors who contributed $6 million to fund campaign advertisements in Ohio during the 2012 campaign.[52] Similarly, in November 2014, CREW filed a complaint with the IRS against another section 501(c)(4) organization that violated its tax-exempt status by operating almost entirely for the private benefit of a political candidate and public official by spending nearly all of its money in 2013 and 2014 on advertisements that either directly supported the candidate's reelection or heaped praise on him in a transparent attempt to boost his political advancement and agenda.[53]

62.    During the 2016 election, CREW continued to track the spending and activities of candidates and outside groups engaged in politics, and intended to review campaign finance and tax records following the election.  CREW expected to continue conducting that research after the election and to file complaints against several organizations regarding their compliance with campaign finance and tax law.  Although CREW has been able to expend some resources on these activities and did file one complaint it drafted before the election, it has not been able to complete the research or draft and file other complaints in part because it needed to divert time and resources to counteract Defendant's violations of the Foreign Emoluments Clause.

63.    In recent years, CREW has pursued a project related to campaign finance and ethics in the states.   Work on that project has included, among other things, monthly

---

[51]  *CREW Files DOJ, FEC Complaints Against Payday Lender For Illegal Conduit Contribution to Super PAC* (Jan. 8, 2013), *available at* http://www.citizensforethics.org/legal-filling/crew-files-doj-fec-complaint-payday-lender-conduit-contribution-super-pac/.

[52]  *CREW Files FEC Complaint Against Crossroads GPS For Failing to Disclose Donors* (Nov. 15, 2012), *available at* http://www.citizensforethics.org/legal-filling/crew-files-fec-complaint-crossroads-gps-failing-to-disclose-donors/.

[53]  *CREW Files IRS Complaint Against the Kentucky Opportunity Coalition* (Nov. 24, 2014), *available at* http://www.citizensforethics.org/legal-filling/crew-files-irs-complaint-against-kentucky-opportunity-coalition/.

concentrated periods for CREW staff to conduct research and explore potential legal actions. CREW has not been able to conduct many aspects of this project, including the monthly staff work periods, since just after the 2016 election due to the need to divert its time and resources to responding to Defendant's conflicts of interests, including his violations of the Foreign Emoluments Clause.  CREW does not expect to have the resources to conduct these activities in the foreseeable future.

64.    CREW also researches, drafts, and files comments with government agencies related to rulemakings and other regulatory actions.  For example, in the months following the 2014 elections, CREW drafted comments in response to an FEC rulemaking notice,[54] and filed the comments in January 2015.[55]   Following the 2016 elections, several FEC rulemaking comment periods were open.  CREW considered filing comments in these proceedings, but did not do so due to the need to divert its time and resources to responding to Defendant's conflicts of interests, including his violations of the Foreign Emoluments Clause.

65.    Defendant's violations of the Foreign Emoluments Clause also have required CREW to expend a significant amount of time and resources to research and monitor Defendant's business interests.  Since the November 2016 election, CREW researchers have dedicated significant time and effort to developing a comprehensive understanding of Defendant's business empire and conflicts of interest, particularly regarding his business ties to foreign companies and governments that run a particularly strong risk of resulting in a violation of the Foreign Emoluments Clause.  For example, CREW researchers have compiled and analyzed data regarding the more than 500 business entities Defendant listed on his 2016

---

[54]   FEC, Advance Notice of Proposed Rulemaking, Earmarking, Affiliation, Joint Fundraising, Disclosure, and Other Issues, 79 Fed. Reg. 62361 (Oct. 17, 2014) (REG 2014-01).

[55]   *CREW to FEC: Comments on Addressing Corruption and Deficiencies in Disclosure* (Jan. 15, 2015), *available at* http://www.citizensforethics.org/legal-filling/crew-to-fec-comments-on-addressing-corruption-and-deficiencies-in-disclosur/.

personal financial-disclosure form, developing that information for both internal and external uses.  This project began on November 28, 2016 and is not yet fully completed.  Every member of CREW's research team has worked on this project on a near-daily basis.

66.    This project was launched in part to aid in responding to questions from the news media about the extent of Defendant's business dealings.  As explained above, CREW has received hundreds of questions from the news media about Defendant's businesses, including his foreign businesses, and CREW determined that a comprehensive internal resource was necessary to help answer those questions.

67.    As a result of Defendant's decision to not divest himself from his properties and business interests, CREW will need to continue to expend significant time and resources to research and monitor Defendant's Foreign Emoluments Clause violations.  As part of its mission, CREW will need to research and monitor Defendant's businesses to determine if he receives any foreign emoluments through them.  Payments to his businesses, however, are rarely public, requiring CREW to expend resources to uncover them.  Also as part of its mission, CREW will need to monitor Defendant's attorney's pledge to "donate all profits from foreign government payments made to his hotel to the United States Treasury," even though, as noted above, that pledge is not an actual remedy for the Foreign Emoluments Clause violations taking place. Again, this will require significant time and resources as payments to hotels and other business entities are rarely public, and neither Defendant nor his attorney announced any system for transparency or accountability for these or any other foreign payments.  Further, Defendant has intentionally made it more difficult to obtain information about foreign payments.  Defendant,

for instance, has refused to release his tax returns, and, according to media reports, the press was banned from his D.C. hotel during the week of the inauguration.[56]

68.     The time and resources CREW has used and will continue to use to research Defendant's business interests related to violations of the Foreign Emoluments Clause were and will continue to be diverted from other research projects and activities in which CREW would have otherwise engaged.   In the months immediately following elections, CREW traditionally has produced research and reports looking back at money-in-politics issues and players in that election cycle.   In December 2012, for example, CREW published *Stealth Donors*, a report on donors who gave more than $1 million to super PACs trying to influence the 2012 election but whose efforts to sway voters were largely out of the public view.[57]   CREW similarly researched and published in December 2014 a series of blog posts on "dead-end disclosure," practices used to keep secret the identities of donors who give money to outside groups attempting to influence elections.[58]

69.     CREW intended to conduct similar research and analysis on campaign-finance issues in the aftermath of the 2016 election and expected to publish the results, but has not had time and resources to follow through on these plans or develop other evaluations of spending in the 2016 election.   Instead, CREW needed to divert its resources to research and analyze Defendant's business interests, particularly those related to violations of the Foreign Emoluments Clause.   In early 2016, for example, CREW published a report on the post-2014 election

---

[56] Daniel Lippman, *Trump's D.C. hotel bans press during inauguration week*, Politico (Jan. 18, 2017).

[57] *Stealth Donors* (Dec. 3, 2012), *available at* http://www.citizensforethics.org/stealth-donors-report-super-pac-under-the-radar/.

[58] Matt Corley & David Crockett, *CREW Series: Dead End Disclosure in the 2014 Elections* (Dec. 15, 2014), *available at* http://www.citizensforethics.org/crew-series-dead-end-disclosure-in-the-2014-elections/.

contributions to new members of Congress by special interest PACs.[59]   CREW intended to review similar post-election campaign contributions to newly elected members in December 2016 and likely would have published a follow-up report, but did not do so due to the need to commit resources to researching Defendant's business interests.

70.     CREW also normally obtains and analyzes tax returns of nonprofit groups engaged in political activities starting in the middle of November, when most of those tax returns are filed with the IRS.  In past years, that research and analysis regularly has resulted in reports to educate the public, and sometimes in complaints to the IRS.  In November and December 2014, for instance, CREW published two blog posts based on findings from new nonprofit tax returns filed that November,[60] and similarly published a blog post in November 2015 based on a nonprofit tax form filed that November.[61]  Although CREW was able to send requests to the IRS for nonprofit tax forms filed in November 2016, it has not been able to devote as much time or resources to analyzing and subsequently writing about the information in tax returns obtained and published by other sources.  As a result, for example, for the first time since 2013, CREW has not published any analysis of the annual tax form filed by Freedom Partners Chamber of Commerce, a critical component in a network of politically active nonprofit groups.

71.     In addition to the diversion and depletion of CREW's resources, CREW is further injured because Defendant's violations of the Foreign Emoluments Clause increase the costs to

---

[59]   *Welcome to Washington: New Members of Congress Attract Special Interest Money* (May 9, 2016), *available at* http://www.citizensforethics.org/press-release/crew-issues-major-report-special-interest-fundraising-freshman-congressmen/.

[60]   Matt Corley, *Crossroads GPS and Kentucky Opportunity Coalition Have, Word for Word, the Same Mission* (Nov. 20, 2014), *available at* http://www.citizensforethics.org/crossroads-gps-kentucky-opportunity-coalition-have-the-same-mission/; *Dr. Evil Meets the Kochtopus: Americans for Prosperity Now Supporting Berman Group* (Dec. 2, 2014), *available at* http://www.citizensforethics.org/dr-evil-meets-kochtopus-americans-for-prosperity-supporting-berman-group/.

[61]   Matt Corley, *Freedom Partners Admits Issue Ads Are Aimed At Influencing Elections* (Nov. 19, 2015), *available at* http://www.citizensforethics.org/freedom-partners-admits-issue-ads-are-aimed-at-influencing-elections/.

CREW to carry out its mission in the normal course of business.  By accepting foreign emoluments through nonpublic channels, Defendant's violations will deprive CREW of information about financial support Defendant will be receiving from foreign governments, forcing CREW to expend resources to uncover his Foreign Emoluments Clause violations.  In the course of CREW's normal activities and in order to carry out CREW's mission, CREW obtains information about financial support received by a public official or candidate from public records and filings such as campaign-finance reports and personal financial disclosure forms. Such disclosures allow CREW to monitor public corruption and inform the public about conflicts of interest.  Emoluments provided to Defendant through his businesses, however, will rarely be public—especially since Defendant has eschewed mechanisms for transparency, such as releasing tax returns—and CREW will need to expend significant resources to uncover those payments.  For example, a foreign country's payments for an opulent reception at a hotel owned by Defendant or the terms of a lease for a foreign-state-owned bank at a building he owns are not public information.  To try to determine if Defendant is receiving prohibited foreign emoluments that raise concerns of corruption and conflicts of interest, and in order for CREW to continue to carry out its mission in the normal course of business, CREW has needed and will need to continue expending significant resources far in excess of those required if money transfers to Defendant occurred through more traditional and transparent means.

72.    Except for those expenses involved in preparing for this specific litigation, CREW would have suffered the injuries described even if it had not filed this case.

73.    The declaratory and injunctive relief that CREW is seeking would provide a remedy for the many injuries described above.  If such relief is granted, resolving the disputes between CREW and Defendant over the Foreign Emoluments Clause and enjoining Defendant

from violating the Foreign Emoluments Clause, CREW would no longer suffer the diversion and depletion of resources described above.

## C.      Other Injuries

74.      Beyond the injuries described above that CREW would have suffered even if it had not filed this case, Defendant's unconstitutional conduct has caused added financial costs and greater logistical difficulties with respect to informing—and helping to protect from corrupt and unethical manipulation—innocent and unaware third parties, including consumers, workers, and small businesses.  As the Executive Branch, led by Defendant, shapes the strategy, substance, and timing of its trade and other commercial and financial negotiations with foreign governments, these third parties are at risk of having their economic interests and financial welfare bartered away, with Defendant rewarding foreign governments in connection with his own business interests.

75.      With CREW's efforts to educate these unknowing third parties obstructed, the consumers, workers, and small businesses will remain in the dark about the conflicting, dual roles that Defendant plays in negotiating with foreign governments, as President and businessman.

76.      Competitors of Defendant's hotels, golf courses, and other properties and businesses also are injured, financially, by the uneven and unfair playing field created by Defendant's unconstitutional conduct.  Those injuries occur both when the competitors lose business directly to Defendant's businesses and when the competitors' brands lose economic value in comparison with the enhanced value of Defendant's brands, all due to foreign governments and their agents and instrumentalities seeking to curry favor with Defendant by favoring his businesses.

## V.
## CLAIMS

### COUNT I
### Violations of the Foreign Emoluments Clause
### (Injunctive Relief)

77.     CREW realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

78.     Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause.

79.     Together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including money, permits, approvals, tax benefits, any other benefits, and anything else monetary or nonmonetary, regardless of whether it is given in exchange for goods or services, and regardless of whether it is part of a transaction at, above, or below market rates.

80.     The phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof.

81.     Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," constitutes a violation of the Foreign Emoluments Clause.

82.     As described more fully in paragraphs 25-49 herein, Defendant has committed violations of the Foreign Emoluments Clause and, without this Court's intervention, will continue to commit violations of the Foreign Emoluments Clause.  Defendant is and will be accepting "present[s]" or "Emolument[s]" directly from—or from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, India, Indonesia, Turkey, Scotland, the Philippines, Russia, Saudi Arabia, Taiwan, and other "foreign State[s]," without seeking or

obtaining "the Consent of the Congress."  As described more fully in paragraphs 25-49 herein, Defendant is committing or will commit these violations in connection with transactions involving New York's Trump Tower, the Trump International Hotel Washington, D.C., the television program "The Apprentice" and its spinoffs and international versions, and other business and property interests and transactions in the United States and abroad.

83.     No proposed plan announced by Defendant or his attorneys can make this conduct constitutional or otherwise remedy these constitutional violations.

84.     As a direct result of these violations of the Foreign Emoluments Clause, CREW has already suffered significant harm.  CREW also stands to suffer additional significant harm directly from the further occurrence of these violations.

85.     CREW is entitled to bring this action pursuant to this Court's inherent ability to award equitable relief where a federal official violates or is about to violate the U.S. Constitution or federal law.

86.     CREW is entitled to injunctive relief to stop and prevent the above-mentioned Foreign Emoluments Clause violations and any other Foreign Emoluments Clause violations. This Court has the power to grant such relief pursuant to its inherent ability to grant equitable relief and 28 U.S.C. § 1331.  Such relief would enjoin Defendant from violating the Foreign Emoluments Clause, as construed by this Court.  Without such relief, CREW will suffer significant injury.

## COUNT II
## Violations of the Foreign Emoluments Clause
## (Declaratory Relief)

87.     CREW realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

88.     There is an actual controversy between CREW and Defendant as to the meaning of the Foreign Emoluments Clause and its application to Defendant and his conduct. Specifically, CREW has taken the positions that: (a) Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause; (b) together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including money, permits, approvals, tax benefits, any other benefits, and anything else monetary or nonmonetary, regardless of whether it is given in exchange for goods or services, and regardless of whether it is part of a transaction at, above, or below market rates; (c) the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof; and (d) Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," constitutes a violation of the Foreign Emoluments Clause.  CREW also has taken the positions that Defendant, through the conduct described more fully in paragraphs 25-49 herein, is violating or will violate the Foreign Emoluments Clause, and that no proposed plan announced by Defendant or his attorneys can make this conduct constitutional or otherwise remedy these constitutional violations.  Defendant disagrees with each of these positions.

89.     CREW is entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between CREW and Defendant—as to the meaning of the Foreign Emoluments Clause and whether Defendant's conduct is violating and will violate the Foreign Emoluments Clause—will serve a useful purpose in settling the legal issues in this action and offering relief from uncertainty.  Without this relief, CREW will continue to suffer significant injury.

# VI.
# PRAYER FOR RELIEF

WHEREFORE, CREW respectfully requests that this Court enter a judgment in CREW's favor and against Defendant, consisting of:

(a)    A declaratory judgment, stating that:

    (1)    Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause;

    (2)    together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including money, permits, approvals, tax benefits, any other benefits, and anything else monetary or nonmonetary, regardless of whether it is given in exchange for goods or services, and regardless of whether it is part of a transaction at, above, or below market rates;

    (3)    the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof;

    (4)    Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," constitutes a violation of the Foreign Emoluments Clause;

    (5)    Defendant's conduct, as described more fully in paragraphs 25-49 herein, is violating or will violate the Foreign Emoluments Clause; and

    (6)    no proposed plan announced by Defendant or his attorneys can make this conduct constitutional or otherwise remedy these constitutional violations.

36

(b)      Injunctive relief, enjoining Defendant from violating the Foreign Emoluments

Clause, as construed by this Court;

(c)      Such other and further relief as this Court may deem just and proper, including

reasonable attorneys' fees and costs under 28 U.S.C. § 2412(a) and (d) or as

otherwise appropriate.


Dated:   New York, New York
          January 23, 2017

GUPTA WESSLER PLLC


By:  *s/Matthew Spurlock*
          Matthew Spurlock


LAURENCE H. TRIBE*
Carl M. Loeb University Professor and
Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ERWIN CHEMERINSKY*
Dean of the School of Law
University of California, Irvine
401 East Peltason Drive
Irvine, CA 92697
(949) 824-7722

ZEPHYR TEACHOUT*
Associate Professor of Law
Fordham Law School
150 West 62nd Street
New York, NY 12580
(646) 312-8722

*Affiliations noted for identification
purposes only

AMBASSADOR (RET.) NORMAN L. EISEN
Chair, Board of Directors
RICHARD W. PAINTER
Vice Chair, Board of Directors
NOAH BOOKBINDER
ADAM J. RAPPAPORT
STUART C. MCPHAIL
Citizens for Responsibility and
Ethics in Washington
455 Massachusetts Avenue, N.W., 6th Floor
Washington, DC 20001
(202) 408-5565

DEEPAK GUPTA
JONATHAN E. TAYLOR
RACHEL S. BLOOMEKATZ
MATTHEW SPURLOCK
Gupta Wessler PLLC
1735 20th Street, N.W.
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com
spurlock@guptawessler.com

*Attorneys for Plaintiff Citizens for Responsibility and
Ethics in Washington*