**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,
RESTAURANT OPPORTUNITIES
CENTERS (ROC) UNITED, INC., JILL
PHANEUF, and ERIC GOODE,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America,

     *Defendant*.

---

Civil Action No. 1:17-cv-00458-RA

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ................................................................................ 1

II. PARTIES, JURISDICTION, AND VENUE .................................................. 8

III. LEGAL BACKGROUND ............................................................................ 11

IV. RELEVANT FACTS ................................................................................... 14

    A. Defendant's Foreign Emoluments Clause Violations ........................... 14

        New York's Trump Tower ............................................................. 16

        Washington, D.C.'s Trump International Hotel ......................... 18

        Trump World Tower ..................................................................... 23

        Gratuitous Chinese Trademarks .................................................. 26

        International Versions and Distribution of "The Apprentice" and Its Spinoffs ...................................................................................... 28

        Other Foreign Connections, Properties, and Businesses ............ 28

        Other Domestic and International Properties and Businesses ............ 30

    B. Defendant's Domestic Emoluments Clause Violations ......................... 30

    C. Post-Inauguration Premium for Defendant's Goods and Services ...................... 34

    D. CREW's Injuries ................................................................................... 34

        Diversion of CREW's Communications Resources ..................... 35

        Diversion of CREW's Legal Resources ....................................... 36

        Diversion of CREW's Research Resources .................................. 39

        Perceptible Impairment of CREW's Programmatic Functions and Fundamental Services ................................................................... 43

    E. ROC United's Members' Injuries ......................................................... 45

        Injuries to ROC United's Restaurant Members .......................... 47

        Injuries to ROC United's Worker Members ................................ 50

        Injuries to ROC United's COLORS Restaurants ......................... 52

    F. Jill Phaneuf's Injuries ......................................................................... 53

    G. Eric Goode's Injuries ........................................................................... 54

    I. Plaintiffs' Injuries Warrant an Equitable Remedy ............................... 56

    J. Other Injuries ....................................................................................... 58

V. CLAIMS ..................................................................................................... 59

VI. PRAYER FOR RELIEF .............................................................................. 66

i

Citizens for Responsibility and Ethics in Washington, Restaurant Opportunities Centers (ROC) United, Inc., Jill Phaneuf, and Eric Goode ("Plaintiffs"), bring this action against Donald J. Trump, in his official capacity as President of the United States, and allege as follows:

# I.
## NATURE OF THE ACTION

1.      This case arises out of an unprecedented threat to two critical, and closely related, anti-corruption provisions in the Constitution aimed at ensuring that the President of the United States faithfully serves the people—free from the compromising effects of financial inducements from foreign nations, foreign leaders, individual states in the Union, Congress, or other parts of the federal government.  Never before have the people of the United States elected a President with business interests as vast, complicated, and secret as those of President Donald J. Trump.  Now that he has been sworn into office as the 45th President of the United States, Defendant's business interests are creating countless conflicts of interest, as well as unprecedented influence by foreign governments, and have resulted and will further result in numerous violations of Article I, Section 9, Clause 8 of the United States Constitution, the "Foreign Emoluments Clause," and Article II, Section 1, Clause 7 of the United States Constitution, the "Domestic Emoluments Clause."

2.      The Foreign Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  Congress has not consented to Defendant's receipt of the presents or emoluments at issue here.

3.      Defendant's violations of the Foreign Emoluments Clause pose a grave threat to the United States and its citizens.  As the Framers were aware, private financial interests can

1

subtly sway even the most virtuous leaders, and entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic. The Foreign Emoluments Clause was forged of the Framers' hard-won wisdom. It is no relic of a bygone era, but rather an expression of insight into the nature of the human condition and the essential preconditions of self-governance. And applied to Defendant's diverse dealings, the text and purpose of the Foreign Emoluments Clause speak as one: this cannot be allowed.

4.    Ultimately, the theory of the Foreign Emoluments Clause—grounded in English history and the Framers' experience—is that a federal officeholder who receives something of value from a foreign power can be imperceptibly induced to compromise what the Constitution insists be his or her exclusive loyalty: the best interest of the United States of America. And rather than guard against such corruption by punishing it after-the-fact, the Framers concluded that the proper solution was to write a strict prophylactic rule into the Constitution itself, thereby ensuring that shifting political imperatives and incentives never undo this vital safeguard of freedom.[1]

5.    The Domestic Emoluments Clause, which is narrower than the Foreign Emoluments Clause, provides: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from

---

[1] Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* (Dec. 16, 2016), http://brook.gs/2hGIMbW; *see also* Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994) ("Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government.").

the United States, or any of them."[2]

6.      Like the Foreign Emoluments Clause, the Domestic Emoluments Clause arose to protect the government from corruption.  The Founders intended that the Domestic Emoluments Clause guarantee that Congress, other parts of the federal government, and the states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[3]  The Founders further intended the Clause to protect against self-dealing:  insuring the President could not receive any benefit from his Office other than as the fixed compensation prescribed in advance by Congress.

7.      Defendant has violated the Constitution since the opening moments of his presidency and is poised to do so continually for the duration of his administration.  Specifically, Defendant has committed and will commit violations of both the Foreign Emoluments Clause and the Domestic Emoluments Clause, involving at least: (a) leases held by foreign-government-owned entities in New York's Trump Tower; (b) room reservations, restaurant purchases, the use of facilities, and the purchase of other services and goods by foreign governments and diplomats, state governments, and federal agencies, at Defendant's Washington, D.C. hotel and restaurant; (c) hotel stays, property leases, restaurant purchases, and other business transactions tied to foreign governments, state governments, and federal agencies at other domestic and international establishments owned, operated, or licensed by Defendant; (d) property interests or other business dealings tied to foreign governments in numerous other countries; (e) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign versions of the

---

[2]  This provision is also referred to as the "Presidential Emoluments Clause."  Although it was originally designated as Article II, Section 1, Clause 7, it is now sometimes referred to as Article II, Section 1, Clause 6, because the original third clause of Article II, Section 1 was superseded by the Twelfth Amendment.

[3]  The Federalist No. 73 (Alexander Hamilton).

television program "The Apprentice" and its spinoffs; and (f) continuation of the General Services Administration lease for Defendant's Washington, D.C. hotel despite Defendant's breach, and potential provision of federal tax credits in connection with the same property.

8.      Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a nonprofit, nonpartisan organization founded in 2002 that works on behalf of the public to foster an ethical and accountable government and reduce the influence of money in politics.  CREW has continuously sought to advance its mission through educating the public, advocacy, and enforcement.

9.      CREW brings this action to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit.  As a direct result of Defendant's refusal to avoid these and other violations of the Emoluments Clauses, CREW has been significantly injured and will continue to be injured unless this Court orders relief.  CREW has been forced to divert essential and limited resources—including time and money—from other important matters that it ordinarily would have been addressing to the Emoluments issues involving Defendant.  Defendant's conduct is in direct conflict with CREW's mission.  CREW's work on its core mission has been rendered more difficult, time consuming, and expensive due to the ongoing Emoluments violations.  Moreover, without declaratory and injunctive relief from this Court, CREW will continue to suffer this diversion and depletion of resources for the remainder of Defendant's administration.  CREW will essentially be forced into the role of combatting and educating the public regarding Defendant's Emoluments violations, rather than continuing its mission of serving as a watchdog with respect to all ethical issues involving all parts of our government.

10.     CREW is further injured because Defendant's activities impair the ability of CREW to carry out its mission through its prior core activities:  exposing the corrupting

influence of money through research, public education, and, where necessary, litigation. Defendant's novel use of an opaque and sprawling business organization to collect funds creates a dangerous new avenue for corruption that resists detection. While CREW previously performed important work by relying on official filings, public disclosures, and other readily available documents, Defendant's activities deny CREW the information such sources provide, and that CREW uses to raise public awareness, further impeding and inhibiting CREW's daily activities and operations. To carry out its mission and continue its work, CREW must engage in more time consuming, more expensive, and less effective research to continue bringing corruption to light, diverting resources from its other projects.

11.     Plaintiff Restaurant Opportunities Centers (ROC) United, Inc. ("ROC United") is a nonprofit, nonpartisan organization founded in 2008. ROC United has nearly 25,000 restaurant-employee members; through its project Restaurants Advancing Industry Standards in Employment ("RAISE"), it has over 200 restaurant members; and through its project Diners United, it has about 3,000 diner members. ROC United engages workers, employers, and consumers to improve wages and working conditions in the restaurant industry, including by providing job training, placement, leadership development, civic engagement, legal support, and policy advocacy. In addition, ROC United owns and operates a restaurant in New York City, and is opening another one soon in Washington, D.C.

12.     ROC United brings this action on behalf of its members to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit. As a direct result of Defendant's refusal to avoid these and other violations of the Emoluments Clauses, ROC United members have been significantly injured and will continue to be injured unless this Court grants relief.

13.     ROC United's members include restaurants and the employees of restaurants that compete with restaurants owned by Defendant and with restaurants located in hotels and other properties owned by Defendant or in which Defendant has a financial interest, including in Washington, D.C. and New York City.  In violation of the Foreign and Domestic Emoluments Clauses, Defendant has received gifts or emoluments from foreign states or instrumentalities and emoluments from the United States and state and local governments in the form of payments to Defendant's hotels, restaurants, and other properties and to restaurants located in Defendants' hotels and other properties.  As competitors and employees of competitors of restaurants located in Defendant's hotels and other properties, including restaurants owned by Defendant, ROC United's members have been injured by these payments due to lost business, wages, and tips.

14.     ROC United also brings this action on its own behalf to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit that impact ROC United's own restaurant.  ROC United's "COLORS" restaurant competes with restaurants owned by Defendant and with restaurants located in hotels and other properties owned by Defendant or in which Defendant has a financial interest.  In violation of the Foreign and Domestic Emoluments Clauses, Defendant has received gifts or emoluments from foreign states or instrumentalities and emoluments from the United States and state and local governments in the form of payments to Defendant's hotels, restaurants, and other properties and to restaurants located in Defendants' hotels and other properties.  As a competitor of restaurants located in Defendant's hotels and other properties, including restaurants owned by Defendant, ROC United has been injured by these payments due to lost business, and will continue to be injured by such payments unless this Court grants relief.

15.     Plaintiff Jill Phaneuf is an individual resident of Washington, D.C. She has worked for hotel owners in Washington, D.C. for several years and has held various roles

relating to the performance of those hotels. In her current position, she works with a hospitality company to book events for two hotels that are flagged as Kimptons: the Carlyle Hotel, situated just north of Dupont Circle, and the Glover Park Hotel, situated near Massachusetts Avenue, NW, which is colloquially referred to as "Embassy Row." She specifically seeks to book embassy functions, political functions involving foreign governments, and functions for organizations that are connected to foreign governments, in addition to other events in the Washington, D.C. market. Her compensation is directly tied to a percentage of the gross receipts of the events that she books for the hotels.

16.     Ms. Phaneuf brings this action to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit. As a direct result of Defendant's refusal to avoid violations of the Emoluments Clauses, Ms. Phaneuf will be injured without relief from this Court.

17.     The hotels for which Ms. Phaneuf seeks to book embassy functions and other events compete with hotels owned by Defendant or in which Defendant has a financial interest. Defendant has received payments from foreign states or instrumentalities and from the United States and state and local governments, through Defendant's hotels, restaurants, and other properties. As an individual working to book events at competitor hotels, Ms. Phaneuf will be injured due to loss of commission-based income.

18.     Plaintiff Eric Goode resides in New York, New York. Mr. Goode is the owner of several celebrated hotels, restaurants, bars, and event spaces in New York. These include the Maritime Hotel located in Chelsea; the Bowery Hotel and Ludlow Hotel, both in the Lower East Side; and the Jane Hotel in the Meatpacking District. Among the restaurants that Mr. Goode owns—several of which are located in hotels—are the Park, Waverly Inn, and Gemma, the last of which is located in the Bowery Hotel. Mr. Goode's hotels and restaurants have attracted

multiple foreign government clients and events, and have also hosted U.S. government officials and state officials traveling on official business and thus paying with government funds.

19.     Mr. Goode brings this action to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit.  Mr. Goode's hotels and restaurants compete with hotels and restaurants owned by Defendant, and with restaurants located in hotels and other properties owned by Defendant, or in which Defendant has a financial interest.  As a direct result of Defendant's refusal to avoid violations of the Emoluments Clauses, Mr. Goode will be injured without relief from this Court.

20.     Accordingly, Plaintiffs request that this Court: (a) enter a declaratory judgment declaring that Defendant has violated and will continue to violate the Foreign Emoluments Clause and the Domestic Emoluments Clause; (b) enjoin Defendant from violating both Emoluments Clauses; and (c) enter an injunction requiring Defendant to release financial records sufficient to confirm that Defendant is not engaging in any further transactions that would violate either Emoluments Clause.

## II.
## PARTIES, JURISDICTION, AND VENUE

21.     CREW is a nonprofit, nonpartisan corporation organized under the laws of Delaware and exempt from taxation under 26 U.S.C. § 501(c)(3).  CREW is committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics.  CREW advances that mission through education, advocacy, and enforcement.  Among other activities, CREW educates the public on ethics and the impact of money in politics by producing reports, publishing blog posts, and issuing press releases.  CREW seeks to empower citizens to have an influential voice in

government decisions and in the governmental decision-making process through the dissemination of information about public officials and their conduct.  CREW also works to advance reforms in the areas of ethics, campaign finance, lobbying, and transparency, and seeks to ensure the proper interpretation and enforcement of government ethics laws and other laws related to corruption and money in politics.

22.     To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information about public officials, their actions, and the outside influences that have affected those actions.  A core part of this work is examining and exposing special interests that have influenced public officials and elections, and then using that information to educate the public and voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

23.     Toward this end, CREW monitors the activities of public officials and candidates, as well as businesses and others that financially support them, including support received through campaign contributions, gifts, and businesses or other entities associated with public officials.  CREW regularly reviews public records that disclose the financial benefits provided to public officials and their business interests, including personal financial-disclosure forms, campaign-finance reports, travel records, and lobbying reports.  CREW further conducts independent research to uncover financial support for public officials and candidates, reviewing business records, tax returns, property records, and news reports.  CREW's research also regularly includes submitting federal and state public-records requests and reviewing the records obtained.

24.     A part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between financial benefits received by public officials and their subsequent conduct.

25.     Using the information obtained from public records and independent research, CREW—through its website, press releases, reports, and other methods of distribution—publicizes the roles of individuals, groups, and businesses attempting to use financial support to influence politics and public policy, and the public officials and candidates who accept that support.  In particular, CREW publicizes violations of ethics, campaign finance, and other anti-corruption laws and rules by those public officials and candidates.  CREW also regularly files complaints with government agencies when it discovers violations of these laws and rules.  In addition, CREW regularly files lawsuits under the Freedom of Information Act, Federal Election Campaign Act, Administrative Procedures Act, and other statutes to compel government agencies to properly interpret and enforce anti-corruption, accountability, and transparency laws and rules, and participates as an amicus curiae in related civil and criminal litigation.

26.     By publicizing violations and filing complaints and lawsuits, CREW advances its mission of keeping the public informed about public officials and candidates and deterring future violations of these laws and rules.

27.     CREW provides services to the public by disseminating the results of CREW's extensive investigations, advocating for public access to information about the government and public officials, and enforcing the right to public access to information, through litigation when necessary.  CREW further provides advice to public officials and reporters on how to expose government corruption and what legislative reforms are required to combat it.

28.     ROC United is a nonprofit, nonpartisan corporation organized under the laws of New York.  ROC United includes its project RAISE, which is its organization of restaurant members, and its project Diners United, which is its organization of diner members.  ROC United also owns and operates the restaurant COLORS in New York City and Detroit, and will be opening a location in Washington, D.C. soon.

10

29.     Jill Phaneuf is an individual citizen of Washington, D.C.

30.     Eric Goode is an individual citizen of New York, New York.

31.     Defendant is the President of the United States of America.  He is being sued here in his official capacity as President.

32.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

33.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1).  Defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the Southern District of New York is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and where "a substantial part of property that is the subject of the action is situated."  For example, New York's Trump Tower and Defendant's "Trump Organization"—both key components of Plaintiffs' claims—are based in the Southern District of New York.

### III.
### LEGAL BACKGROUND

34.     The origins of the "Foreign Emoluments Clause" date back as far as 1651, when the Dutch broke with classic European diplomatic customs and prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any manner or way whatever." Impressed, the early Americans included similar text—the predecessor for the Foreign Emoluments Clause—in Article 6, Section 1 of the Articles of Confederation: "[N]or shall any person holding any office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."

35.     The foreign anti-emolument provision initially was not included at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U. S.

11

independent of external influence."[4]   Edmund Jennings Randolph echoed the anti-corruption purpose of the Foreign Emoluments Clause included in the Constitution: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[5]   The Framers recognized the dangers of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and thus they created a broad constitutional prophylactic applicable to anything of value given by any foreign government to any officer of the United States.

36.     The Presidency of the United States is an "Office of Profit or Trust under the United States."

37.     Consistent with the Framers' intent, the definition of a "present" or "Emolument" under the Foreign Emoluments Clause is properly interpreted in a broad manner, to cover anything of value, monetary or nonmonetary.   The text of the clause itself prohibits the receipt of *both* a "present," which, presumably, is provided without a return of anything of equal value, *and* an "Emolument," which could cover anything else of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost.   The Foreign Emoluments Clause also explicitly prohibits the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of the things of value covered under the provision.

38.     The Foreign Emoluments Clause covers not only a transfer from a king, prince, or foreign State individually, but also any transfer from their instrumentalities and controlled entities.   Though not a body with authority to provide controlling interpretations of this

---

[4]  2 Farrand, *The Records of the Federal Convention of 1787*, at 389.

[5]  3 Farrand, *The Records of the Federal Convention of 1787*, at 327.

constitutional text, the U.S. Department of Justice's Office of Legal Counsel has consistently examined three non-dispositive factors with respect to determining which entities fall within the definition of a "foreign State" under the Foreign Emoluments Clause, always with an eye toward the underlying purpose of preventing corruption and foreign influence: (a) "whether a government is the substantial source of funding for the entity"; (b) "whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument"; and (c) "whether a government has an active role in the management of the entity."[6]  It is widely accepted—and has been reaffirmed by the Office of Legal Counsel as recently as 2009—that a "foreign State" under the Foreign Emoluments Clause includes agents and instrumentalities of foreign nations, including local government units within a foreign country.[7]

39.     Just as the Framers sought to stem foreign influence with the Foreign Emoluments Clause, they too sought to stem the system of patronage, influence, and rent-extraction that predominated the colonial governors' offices by means of a Domestic Emoluments Clause specifically targeting the President.  The clause provides that the President's "Compensation" shall not be increased or decreased, and that he may not receive any "other emolument from the United States, or any of them," during his term of office.   Though the clause permits presents from states and the federal government—unlike the Foreign Emoluments Clause—it nonetheless works to ensure that neither can "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."  The ban on other emoluments, Alexander Hamilton explained, would ensure that the President would have "*no pecuniary*

---

[6]  Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. 8 (2009).

[7]  *Id.* at 7; Major James D. Dunn, B-251084, 1993 WL 426335, at *3 (Comp. Gen. Oct. 12, 1993).

*inducement to renounce or desert the independence intended for him by the Constitution.*"   Further, as recognized by judicial authorities, the ban "addressed the Framers' concern that the President should not have the ability to convert his or her office for profit."

40.     The Domestic Emoluments Clause proscribes the receipt of additional emoluments only by the President and, unlike the Foreign Emoluments Clause, does not apply to any other federal official.  It therefore reflects the Framers' special concern about ensuring that the Nation's powerful Chief Executive remains free from the distorting and corrupting influences that might impair his ability to faithfully execute his office.

41.     Just as the Foreign Emoluments Clause bars payments not only from foreign states, but also their subdivisions and instrumentalities, the Domestic Emoluments Clause bars payments not only from the federal government and state governments, but also their respective instrumentalities and subdivisions.  The Supreme Court has long viewed local governments as "mere[]. . . departments" of the state.  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009).

## IV.
## RELEVANT FACTS

### A.     Defendant's Foreign Emoluments Clause Violations

42.     Defendant owns and controls hundreds of businesses throughout the world, including hotels and other properties.  His sprawling business empire is made up of hundreds of different corporations, limited-liability companies, limited partnerships, and other entities that he owns or controls, in whole or in part, operating in the United States and 20 or more foreign countries.[8]  Defendant's businesses are loosely organized under an umbrella known as the "Trump Organization."  However, Defendant's interests include not only Trump Organization

---

[8]  Marilyn Geewax & Maria Hollenhorst, *Trump's Businesses And Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016, 7:00 AM), http://n.pr/2g2xZDP.

LLC d/b/a The Trump Organization and The Trump Organization, Inc., both of which are owned solely by Defendant, but also scores of other entities not directly owned by either "Trump Organization" entity but that Defendant personally owns, owns through other entities, and/or controls.[9]  Defendant also has several licensing agreements that provide streams of income that continue over time.  Through these entities and agreements, Defendant personally benefits from business dealings, and Defendant is and will be enriched by any business in which they engage with foreign governments, instrumentalities, and officials.

43.     On January 11, 2017 Defendant announced a plan to turn "leadership and management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as well as a longtime company executive.[10]  But the plan did not include Defendant relinquishing *ownership* of his businesses or even establishing a blind trust.

44.     Defendant continues to own, and be well aware of the activities of, the Trump Organization, other corporations, limited-liability companies, limited partnerships, and other entities in which he retains an ownership interest.  Although Defendant established a trust to hold his business assets, Defendant is permitted to obtain distributions from his trust at any time.[11]  Additionally, Defendant's son Eric Trump (who is also an advisor to Defendant's trust) initially indicated that he would not communicate with Defendant concerning his business interests.

---

[9]  U.S. Office of Gov't Ethics, Donald J. Trump 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

[10]  *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8.

[11]  David Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (April 4, 2017, 5:53 PM), http://bit.ly/2o1OM1C.

Nevertheless, Eric Trump has acknowledged that he will provide business updates to Defendant on at least a quarterly basis.[12]

45.    Defendant has neither sought nor received "Consent of the Congress" with respect to his receipt of gifts and emoluments from government officials and entities.

**New York's Trump Tower**

46.    New York's "Trump Tower" is a mixed-use skyscraper located at 725 Fifth Avenue, New York, New York 10022.

47.    Through the use of various entities, Defendant owns and controls Trump Tower.

48.    Defendant, through entities he owns, receives payments made to Trump Tower by tenants.

49.    Among the largest tenants of Trump Tower is the Industrial and Commercial Bank of China ("ICBC"), which is a Chinese majority-state-owned enterprise.[13]   As such, ICBC is a foreign State or instrumentality of a foreign State.

50.    After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have received one or more payments from ICBC pursuant to its lease.   Trump Tower or its controlling entities will continue to receive regular payments from ICBC pursuant to its lease agreement.

51.    In discussing his views of U.S.-China relations, Defendant has repeatedly referenced the ICBC's Trump Tower lease.   For instance, Defendant stated during his

---

[12] Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (March 24, 2017), http://for.tn/2n2MRXa.

[13] Caleb Melby et al., *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg (Nov. 28, 2016, 7:00 AM), https://bloom.bg/2oQ07T4.

presidential campaign in June 2015, "I love China!  The biggest bank in the world is from China. You know where their United States headquarters is located?   In this building, in Trump Tower."[14]

52.      Additionally, in March 2016, when asked about China's territorial claims in the South China Sea, Defendant told the *Washington Post*, "I do deals with them all the time.  The largest bank in the world, 400 million customers, is a tenant of mine in New York, in Manhattan."[15]

53.      The term of ICBC's Trump Tower lease runs until October 2019, while Defendant is President, and any negotiations for an extension will occur while Defendant is in office.[16]

54.      The Abu Dhabi Tourism & Culture Authority, an entity owned by the foreign nation of the United Arab Emirates, leases office space in Trump Tower.[17]  The Abu Dhabi Tourism & Culture Authority is a foreign State or instrumentality of a foreign State.

55.      After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have received one or more payments from the Abu Dhabi Tourism & Culture Authority pursuant to its lease.  Trump Tower or its controlling entities will continue to receive regular payments from the Abu Dhabi Tourism & Culture Authority pursuant to its lease agreement.

56.      Trump Grill is located inside of Trump Tower.  Defendant, through various

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Abu Dhabi Tourism & Culture Authority, Supplement Statement Pursuant to Foreign Agents Registration Act of 1938, as amended (Oct. 4, 2016), http://bit.ly/2prSZNb; María Villaseñor, *Trump's Comments Cost Him Money in Middle East*, NBC News (Dec. 9, 2015, 10:51 AM), http://nbcnews.to/1PZxTNA.

business entities, owns Trump Grill.  Upon information and belief, tenants of Trump Tower, including officials of China and Abu Dhabi, have dined at Trump Grill due to their tenancy in the Tower and the states themselves may host events there.  Accordingly, foreign states or the instrumentalities have paid or are likely to pay for services at Trump Grill.  Defendant has and will continue to receive payments from various foreign states through Trump Grill.

### Washington, D.C.'s Trump International Hotel

57.      The Trump International Hotel Washington, D.C. recently opened and is located at 1100 Pennsylvania Avenue N.W., Washington, D.C. 20004, just blocks from the White House.  Defendant owns and controls this hotel through various entities.

58.      Defendant, through entities he owns, receives payments made to the Trump International Hotel by guests who stay in hotel rooms or pay for a venue or other goods or services in this hotel.

59.      The restaurant BLT Prime is located in Trump International Hotel. Defendant, through various business entities, owns the restaurant and licenses the name from BLT Prime and pays BLT Prime to operate it.[18]

60.      Since the election, Trump International Hotel has specifically marketed itself to the diplomatic community.[19]  Subsequent to Defendant's election, the Trump International Hotel held an event where it pitched the hotel to about 100 foreign diplomats.

61.      The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competitor hotel in

---

[18]  Jessica Sidman, *How Donald Trump Lost His DC Restaurants*, Washingtonian (Oct. 23, 2016), http://bit.ly/2htYzq9.

[19]  Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post (Nov. 18, 2016), http://wapo.st/2oPYggX.

Washington.[20]

62.     Diplomats and their agents have expressed an intention to stay at or hold events at the Trump International Hotel.  One "Middle Eastern diplomat" told the *Washington Post* about the hotel: "Believe me, all the delegations will go there."[21]   An "Asian diplomat" explained: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!'  Isn't it rude to come to his city and say, 'I am staying at your competitor?'"[22]

63.     Since his election, Defendant has appeared at the hotel on multiple occasions. Several figures in Defendant's administration have also lived or continue to live in the Trump International Hotel, including Treasury Secretary Steve Mnuchin and Small Business Administration Administrator Linda McMahon.

64.     The Kingdom of Bahrain held its National Day celebration at the Trump International Hotel on December 7, 2016.[23]

65.     The Kingdom of Bahrain is a foreign State.

66.     Upon information and belief, Bahrain paid the Hotel no less than its stated customary rates for the venue, food, and other services provided in connection with its National Day celebration.

67.     After November 8, 2016, Trump International Hotel or its controlling entities have received one or more payments from Bahrain.

---

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

[23]  Nolan D. McCaskill & Madeline Conway, *Bahrain to host event at Trump's D.C. hotel, raising ethical concerns*, POLITICO (Nov. 29, 2016, 3:37 PM), http://politi.co/2gtWGLd.

68.     The Embassy of Azerbaijan co-hosted a Hanukkah party at the Trump International Hotel on December 14, 2016.[24]

69.     Upon information and belief, Azerbaijan paid the Hotel no less than its stated customary rates for the venue, food, and other services provided in connection with the Hanukkah party.

70.     The Embassy of Azerbaijan is a foreign state or instrumentality of a foreign State.

71.     After November 8, 2016, Trump International Hotel or its controlling entities received one or more payments from Azerbaijan.

72.     The Embassy of Kuwait held its National Day celebration at Trump International Hotel on February 22, 2017.[25]

73.     Upon information and belief, Kuwait paid no less than the Hotel's stated customary rates for the venue, food, and other services provided in connection with its National Day celebration.  The cost has been estimated at $40,000 to $60,000.[26]

74.     Prior to the election, a "save the date" reservation had been made with the Four Seasons hotel, where the event had been held previously.[27]  According to one media report, the Embassy of Kuwait moved the event from a competitor hotel under pressure from the Trump

---

[24] *Azerbaijan's Embassy To Co-Host Hanukkah Party At Trump's DC Hotel*, The Jerusalem Post (Dec. 4, 2016), http://bit.ly/2g4o9S0.

[25] Jonathan O'Connell, *Kuwaiti Embassy is latest to book Trump D.C. hotel, but ambassador says he felt 'no pressure'*, Wash. Post (Dec. 20, 2016), http://wapo.st/2pKC4BS; Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*, NPR (Feb. 25, 2017, 6:33 AM), http://n.pr/2lavPoB.

[26] Julia Harte, *Kuwait could pay up to $60,000 for party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017, 4:29 PM), http://reut.rs/2oFztKa.

[27] Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*, NPR (Feb. 25, 2017, 6:33 AM), http://n.pr/2lavPoB.

Organization (though Kuwait's ambassador to the United States denied being pressured).[28]

75.    After 12:01 pm on January 20, 2017, Trump International Hotel or its controlling entities have received one or more payments from Kuwait.

76.    Kuwait is a foreign State.

77.    Between January 23 and 26, 2017, the Kingdom of Saudi Arabia, through its agent, rented at least one and likely several rooms at the Trump International Hotel.[29]

78.    Upon information and belief, Saudi Arabia paid at least $300 per night for the rooms, and paid the Hotel's usual and customary rates for meals and other services provided in connection with the stay.

79.    Saudi Arabia paid for individuals to have dinner at the hotel on January 23 and both breakfast and dinner on January 24, 2017.   Upon information and belief, at least one of the meals was provided by BLT Prime.[30]

80.    After 12:01 pm on January 20, 2017, Trump International Hotel or its controlling entities have received one or more payments from Saudi Arabia, through its agent.

81.    Saudi Arabia is a foreign State.

82.    On or about April 6, 2017, Kaha Imnadze, the Ambassador & Permanent Representative of Georgia to the United Nations, stayed at Trump International Hotel.[31]

---

[28]   Judd Legum & Kira Lerner, *Under political pressure, Kuwait cancels major events at Four Seasons, switches to Trump's D.C. hotel*, ThinkProgress (Dec. 19, 2016), http://bit.ly/2hBOHhP.

[29]   Isaac Arnsdorf, *Saudis foot tab at Trump hotel*, POLITICO (Feb. 9, 2017, 8:50 PM), http://politi.co/2kZa6mS.

[30]   Operations Order from Jason E. Johns, President of NMLB Veterans Advocacy Group, to Fly-In Veterans regarding the Justice Against Sponsors of Terrorism Act (Jan. 23-26, 2017), http://bit.ly/2oiBdIp.

[31]   Kaha Imnadze (@kahaimnadze), Twitter (April 6, 2017, 8:49 AM), http://bit.ly/2oiF8Fd.

83.     Upon information and belief, the government of Georgia paid no less than the Hotel's stated customary rates for his room and other services provided in connection with his stay.

84.     Ambassador Imnadze then tweeted his complements about the Hotel.

85.     After 12:01 pm on January 20, 2017, Trump International Hotel or its controlling entities have received one or more payments from Georgia.

86.     Georgia is a foreign State.

87.     After 12:01 pm on January 20, 2017, Trump International Hotel or its controlling entities have received and will continue to receive payments from other foreign states.

88.     On January 20, 2017, Trump Old Post Office LLC, the entity leasing the building in which Trump International Hotel is located and in which Defendant has a beneficial interest, amended its governing agreement to provide that, during Defendant's presidency, the company will not make any distributions of profits to any entity in which Defendant has a beneficial interest and will credit these undistributed profits to an unrecovered capital contribution account held for the benefit of the designated entities that Defendant controls.  This amendment is immaterial to whether Defendant has violated the Foreign Emoluments Clause. Defendant remains owner of approximately 77.5% of the Trump Old Post Office LLC (the remaining shares are owned by three of his children), and Defendant thereby benefits from any amounts deposited into the unrecovered capital contribution account, and may receive distribution of those amounts once he is no longer in office.

89.     Additionally, the amendment provides that Defendant's contributions will be used by Trump Old Post Office LLC for business purposes, thereby increasing the value of one of Defendant's assets.

**Trump World Tower**

90.      Trump World Tower is a skyscraper located at 845 United Nations Plaza, New York, New York containing condo units.

91.      Through the use of various entities, Defendant owns and controls Trump World Tower.

92.      Defendant, through entities he owns, receives payments made by residents of the Trump World Tower for common charges.

93.      The World Bar is located in Trump World Tower.

94.      In 2001, the Kingdom of Saudi Arabia paid $4.5 million to purchase a floor of Trump World Tower.[32]

95.      At the time of the sale, yearly common charges for building amenities for the floor totaled $85,585.   As of 2003, the most recent year for which information is publicly available, Saudi Arabia paid monthly common charges of approximately $7,398, amounting to $88,781 per year.   The floor currently belongs to the Kingdom of Saudi Arabia for use by the Saudi Mission to the United Nations, which upon information and belief still pays common charges to Defendant.[33]

96.      In 2015, Trump said about Saudi Arabia, "I get along great with all of them. They buy apartments from me."   Trump further noted, "They spend $40 million, $50 million. Am I supposed to dislike them?  I like them very much."[34]

---

[32] Stephen R. Brown, *Donald Trump made millions from Saudi Arabia, but trashes Hillary Clinton for Saudi donations to Clinton Foundation*, N.Y. Daily News (Sept. 4, 2016, 4:00 AM), http://nydn.us/2bNEAq2.

[33] *Id.*

[34] *Id.*

97.     The Kingdom of Saudi Arabia is a foreign State, and the Saudi Mission to the United Nations is an instrumentality of a foreign State.

98.     In 2002, the Permanent Mission of India to the United Nations paid $5.1 million to purchase two units in Trump World Tower from Defendant.[35]

99.     As of 2003, the most recent year for which information is publicly available, the Permanent Mission of India to the United Nations paid monthly common charges of approximately $3,639, amounting to $43,670 per year.  The units continue to belong to the Permanent Mission of India to the United Nations, which upon information and belief still pays common charges to Defendant.

100.     The Permanent Mission of India to the United Nations is an instrumentality of a foreign State.

101.     In 2009, the Permanent Mission of Afghanistan to the United Nations paid $4.235 million to purchase a unit in Trump World Tower.[36]

102.     As of 2003, the most recent year for which information is publicly available, the common monthly charges for the unit purchased by the Permanent Mission of Afghanistan to the United Nations were approximately $2,090 per month, amounting to approximately $25,085 per year.  The unit continues to belong to the Permanent Mission of Afghanistan to the United Nations, which upon information and belief still pays common charges to Defendant.

103.     The Permanent Mission of Afghanistan to the United Nations is an instrumentality of a foreign State.

---

[35]   N.Y.C. Dep't of Finance, Office of the City Registrar, Condo. Unit Deed: 845 U.N. Ltd. P'ship To The Permanent Mission of India to the U.N. (Dec. 23, 2002), http://on.nyc.gov/2pb8Obx.

[36]   Max Abelson, *Afghanistan Buys $4.2 M. Trump Condo (with 'Peacefulness and Views')*, Observer (Sept. 11, 2009, 4:48 PM), http://bit.ly/2oQ74n3.

24

104.    In 2004, the Permanent Mission of Qatar to the United Nations paid $1,995,000 to purchase a unit in Trump World Tower, and in 2012, it paid $8.375 million to purchase two additional units in Trump World Tower.

105.    As of 2003, the most recent year for which information is publicly available, the common monthly charges for the units purchased by the Permanent Mission of Qatar to the United Nations, 14A, 55B, and 49B, were a total of approximately $5,660 per month, amounting to approximately $67,920 per year.  The units continue to belong to the Permanent Mission of Qatar to the United Nations, which upon information and belief still pays common charges to Defendant.

106.    The Permanent Mission of Qatar to the United Nations is an instrumentality of a foreign State.

107.    Defendant, through entities he owns, receives payments made to Trump World Tower by tenants, and owners of units in the building, through their payment of common charges. On information and belief, these payments more than cover the costs intended to be covered by the common charges.

108.    Trump World Tower or its controlling entities will continue to receive regular common charge payments from Saudi Arabia, India, Afghanistan, and Qatar, and those payments will flow to Defendant.

109.    Tenants of the Trump World Tower—including officials from Saudi Arabia, India, Afghanistan, and Qatar—have dined or will dine at the World Bar.  Further, foreign states or instrumentalities of these or other foreign states have hosted and will host events at the World Bar, as it is located near the United Nations.  By reason of his financial stake in Trump World Tower, Defendant will either receive payments from foreign states made to the World Bar; or the revenue that the World Bar receives, including from foreign states, affects the amount of rent that

Defendant is able to charge the World Bar.

110.    Neither Saudi Arabia, India, Afghanistan, nor Qatar is one of the countries included in Defendant's Executive Order or Defendant's revised Executive Order barring visitors from six predominantly Muslim countries.   None of the six countries included in the order has the financial relationships with Defendant that Saudi Arabia, India, Afghanistan, or Qatar has.

**Gratuitous Chinese Trademarks**

111.    Defendant began to seek trademark protection in China for the use of his name in connection with building construction services in 2006.   His application was rejected by the Trademark Office.   He lost his appeals to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court.[37]   Trump's most recent defeat occurred in May 2015—the month before he declared his candidacy for president.

112.    Following the election, on December 2, 2016, Defendant spoke directly with Taiwan President Tsai Ing-wen.[38]   That conversation broke long-standing protocol, and suggested Defendant might end the "One China" policy that the United States had observed for decades.   Before taking office, Defendant suggested that he might end the One China policy unless some benefit were received in exchange.[39]

113.    On February 9, 2017, Defendant spoke with Chinese President Xi Jinping, and

---

[37]   Erika Kinetz, *With Trump's win in China, will Trump toilets get flushed?*, Associated Press (Feb. 14, 2017), http://apne.ws/2mfcK9N.

[38]   Jordan Fabian & Neetzan Zimmerman, *Trump makes history with phone call to Taiwan leader*, The Hill (Dec. 2, 2016, 4:52 PM), http://bit.ly/2prWnYu.

[39]   Jordan Fabian & Evelyn Rupert, *Trump promises Chinese president he'll honor 'one China' policy*, The Hill (Feb. 9, 2017, 11:11 PM), http://bit.ly/2pbgZUW; Laurel Raymond & Judd Legum, *Trump's trademark tests Chinese law*, Think Progress (Feb. 18, 2017), http://bit.ly/2oPTD6q.

pledged to honor the One China policy.[40]

114.    Five days later, on February 14, 2017, China reversed its prior course and gave Defendant trademark protection.

115.    Chinese law prohibits awarding trademarks that are "the same as or similar to the name of leaders of national, regional, or international political organizations."[41]

116.    Despite denying Defendant trademark protection for over ten years, including in a ruling from an appellate court, and despite China's law barring the use of foreign leaders' names as trademarks, China gave Defendant the trademark he had requested and valued. However, China only gave the trademark protection to Defendant after he had been elected President, questioned the One China policy, was sworn in, and re-affirmed the One China policy.

117.    The trademarks have considerable value by giving the Trump Organization the sole right to profit from the Trump brand in China.    China's granting of these trademarks constitutes a present or emolument provided to the Defendant.

118.    When asked why Defendant changed his position on the One China policy, and whether he had gotten something in exchange from China, White House Press Secretary Sean Spicer answered: "The President always gets something," but did not specify what concession was obtained from China.[42]

---

[40]  Jordan Fabian & Evelyn Rupert, *Trump promises Chinese president he'll honor 'one China' policy*, The Hill (Feb. 9, 2017, 11:11 PM), http://bit.ly/2pbgZUW.

[41]  Laurel Raymond & Judd Legum, *Trump's trademark tests Chinese law*, Think Progress (Feb. 18, 2017), http://bit.ly/2oPTD6q.

[42]  Madeline Conway, *Spicer on Trump's 'One China' agreement: 'The president always gets something'*, POLITICO (Feb. 27, 2017, 3:11 PM), http://politi.co/2prZpf7.

**International Versions and Distribution of "The Apprentice" and Its Spinoffs**

119.     Defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which Defendant is still an executive producer), as well as from international versions of the programs produced in other countries.  In some instances, these payments originate from foreign governments or their agents or instrumentalities.  For instance, there is an iteration of the program "The Apprentice," for which Defendant is paid, in the United Kingdom.[43]

120.     The network which broadcasts The Apprentice and spinoff shows in the United Kingdom is an instrumentality of a foreign State.

121.     After 12:01 pm on January 20, 2017, Defendant has received and will continue to receive payments from foreign states via their payments for "The Apprentice" or its spinoffs and international versions.

**Other Foreign Connections, Properties, and Businesses**

122.     **United Arab Emirates:**  Defendant's company is engaged in several real estate projects in the United Arab Emirates (UAE), including Dubai's Trump International Golf Club, which opened on February 18, 2017.[44]  Upon information and belief, Defendant, through various business entities, has a branding and management contract with the property, and thereby possesses a financial interest in the Trump International Gold Club.

123.     All services for the golf club, including electricity, water, and roads, "come at the

---

[43]   Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice'*, Forbes (Dec. 13 2016, 12:49 PM), http://bit.ly/2pKQTom.

[44]   Sudarsan Raghavan, *Trump's sons get red carpet treatment at Dubai golf club opening*, Wash. Post (Feb. 18, 2017), http://wapo.st/2oGGaO1.

discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."[45]   In light of the government's complete discretion to grant or deny these services and license, the government's granting of these approvals constitutes a present or emolument.

124.    Permits, utility and other services, and approvals are of substantial economic value to the Golf Club and other projects and thus to those with a financial interest in the Golf Club and other projects, since these facilities cannot be built or operated without them. Defendant will receive value from the permits, services and approvals through his financial stake in the company receiving them, and thereby will accept a present or emolument from UAE, a foreign State.

125.    **Indonesia:**  Defendant's company is engaged in at least two real estate projects in Indonesia, including redeveloping a resort in Bali.[46]   Upon information and belief, Defendant, through various business entities, has a licensing and management agreement with these projects, through which he possesses a financial interest in them.

126.    As part of this effort, Defendant reportedly has "forged relationships with powerful political figures in Indonesia, where such connections are crucial to pushing through big projects."[47]  Because the granting of necessary permits and approvals for these real estate projects

---

[45]  Jon Gambrell, *Trump's New Dubai Golf Club Shows Pitfalls of His Presidency*, Associated Press (Jan. 3, 2017), http://apne.ws/2iyX6B9.

[46]  Ian Jarrett, *Pan Pacific makes way for Trump in Bali*, Travel Weekly (Feb. 17, 2017), http://bit.ly/2nU3ANN; Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), http://nyti.ms/2pbahyo; Russ Choma, *Trump's Indonesian Business Partner Brags About His Access*, Mother Jones (Feb. 10, 2017, 1:09 PM), http://bit.ly/2kujqMC.

[47]  Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), http://nyti.ms/2pbahyo.

was or will be facilitated by Defendant's personal relationships with government officials in Indonesia, these existing or forthcoming permits and approvals constitute gifts or emoluments.

127.    Completing the projects required or will require obtaining benefits from the Indonesian government, such as permits and approvals.  Permits and approvals are of substantial economic value to the resort and other projects and thus to the those with a financial interest in the resort and other projects, since the projects cannot be built or operated without them. Defendant will receive value from the permits and approvals through his financial stake in the company receiving the permits and approvals, and thereby will accept a present or emolument from Indonesia, a foreign State.

**Other Domestic and International Properties and Businesses**

128.    Defendant owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs.[48]  Each of those hotels, golf clubs, or other businesses sets rates that far exceed the marginal cost of providing the associated services and products.  These revenues then flow to Defendant.  After 12:01 pm on January 20, 2017, Defendant, through at least one of his various businesses, properties, and other entities, has received one or more payments in excess of marginal costs from foreign states and will continue to do so.

**B.    Defendant's Domestic Emoluments Clause Violations**

129.    As alleged above, Defendant owns and controls hundreds of businesses throughout the country, including hotels and other properties.  Through these entities and agreements, Defendant personally benefits from their business dealings, and Defendant is and

---

[48]   U.S. Office of Gov't Ethics, Donald J. Trump 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

will be enriched by any business in which they engage with state governments or agencies of the U.S. government.

130.    On August 5, 2013, a business entity ultimately owned primarily by Defendant—Trump Old Post Office LLC—signed a 60-year lease with the General Services Administration—an independent agency of the United States, whose administrator is appointed by the President—to open a hotel in the "Old Post Office" Building in Washington, D.C.

131.    More than 76% of Trump Old Post Office LLC is owned by DJT Holdings LLC, which is in turn owned almost entirely by the Donald J. Trump Revocable Trust, of which Defendant is the sole beneficiary.  The hotel opened at this site is The Trump International Hotel Washington, D.C.  Defendant has not divested his interest in the lease since becoming President.

132.    Section 37.19 of the Old Post Office lease states: "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom."

133.    Section 27.1 of the Old Post Office lease outlines what constitutes a "tenant's default."  A "non-monetary breach" includes "any breach by the Tenant of any other terms, obligations, conditions, agreements or covenants under this Lease," if that breach continues for 30 days after the tenant is given notice of it.

134.    A violation of Section 37.19 is a non-monetary breach and a default unless it is remedied within 30 days after notice from the General Services Administration ("GSA").

135.    Accordingly, Defendant has been in breach of the lease with the GSA since 12:01 pm on January 20, 2017, when he became President.

136.    Prior to Defendant's inauguration, the Deputy Commissioner of the GSA indicated to Representatives Elijah Cummings, Peter DeFazio, Gerald Connolly, and André

Carson that Defendant would be in violation of lease unless he "fully divests himself of all financial interests in the lease" for the Trump International Hotel.

137.     Shortly after Defendant's inauguration, Norman Dong, a GSA official appointed by former President Barrack Obama, became acting administrator.

138.     Defendant enjoys the power to fire the head of the GSA.

139.     Less than a day later after Mr. Dong assumed his role as acting GSA administrator, Defendant replaced him with Tim Horne, who had coordinated the GSA's transition with Defendant's campaign.[49]

140.     On March 16, 2017, Defendant released a proposed 2018 budget.  The proposed budget increases the funding available to the GSA, whereas it cuts all or nearly all other non-defense-related agencies' budgets.[50]

141.     The GSA issued a letter on March 23, 2017 stating that Trump Old Post Office LLC "is in full compliance with Section 3719 [of the Lease] and, accordingly, the Lease is valid and in full force and effect." [51]

142.     This determination by the GSA is contrary to the plain meaning of the lease terms.

143.     A significant portion of the GSA's March 23, 2017 letter reviews the purported financial benefits of the Lease to the GSA and tax payers.  This discussion is immaterial to whether Lease's terms were breached when Defendant became President.

---

[49]  Isaac Arnsdorf, *Trump picks leader for federal agency overseeing his D.C. hotel*, POLITICO (Jan. 26, 2017, 2:55 PM), http://politi.co/2psgMfU.

[50]  Office of Mgmt. & Budget, Exec. Office of the President, Fiscal Year 2018 (2017), http://bit.ly/2nvjrBO.

[51]  Letter from Kevin M. Terry, Contracting Officer, United States Gen. Servs. Admin., to Donald J. Trump, Jr., (March 23, 2017), http://bit.ly/2nhKfaB.

144.     The March 23, 2017 letter attaches an amendment to the agreement governing the business of Trump Old Post Office LLC.  This amendment is the basis of the GSA's position that the tenant is in compliance with the Lease, but the letter does not explain how the amendment brings the tenant into compliance.  In fact, as described above, the amendment does not prevent Defendant from receiving "any benefit" from the Lease, and Trump Old Post Office LLC remains in breach of the Lease.

145.     In forbearing from enforcement of the Old Post Office Lease's default and termination procedures, despite the tenant's breach of its terms, and in cooperating with the tenant in attempting to create the appearance of compliance with the Lease, the federal government has given Defendant something of great value.  Pursuant to this decision, Defendant has received an emolument.

146.     Additionally, Defendant, through entities he owns, is seeking a $32 million historic preservation tax credit for the Trump International Hotel.

147.     Approval of this substantial tax credit is at the discretion of the National Park Service, an instrumentality of the federal government under Defendant's authority.[52]   If approved, the tax credit would offset approximately 20% of the cost of rehabilitating the building in which the Trump International Hotel is operating.

148.     On November 14, 2016, Defendant received approval from the National Park Service,  for the second step of the three step-approval process for the tax credit.  If final approval is granted, it will constitute an emolument, as the decision is wholly committed to the discretion of the agency.

---

[52]  Eric Levitz, *Trump Won the Presidency, Then Approval on a Tax Subsidy for His Hotel*, N.Y. Mag. (November 30, 2016, 4:17 PM), http://nym.ag/2oFF1o9.

149. On information and belief, state and local governments have or will continue to make payments for the use of facilities owned or operated by Defendant for a variety of functions. The Defendant will receive a portion of those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause.

### C. Post-Inauguration Premium for Defendant's Goods and Services

150. Since Defendant's inauguration as President, goods and services sold by his various businesses have sold at a premium. Defendants' high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide a unique benefit: access to, influence on, and the good will of the President of the United States.

151. Thus, for example, the starting rate for guest rooms at Defendant's Old Post Office hotel increased to $500 on most nights, up hundreds of dollars from when the hotel first opened shortly before Defendant's election.[53]

152. Further, the annual rate for membership at Defendant's Mar-a-Lago resort doubled from $100,000 to $200,000 shortly after he was elected.[54]

### D. CREW's Injuries

153. Defendant's violations of the Emoluments Clauses have required CREW to divert and expend its valuable resources specifically to counteract those violations, impairing CREW's ability to accomplish its mission. CREW has had to counteract Defendant's violations because they are particularly harmful to CREW due to its status as a nonpartisan, nonprofit organization with the resources, board of directors, in-house legal team, and specific mission that

---

[53] Julie Bykowicz, *Trump Hotel May Be Political Capital of Nation's Capital*, Associated Press (Mar. 5, 2017), http://apne.ws/2pL6xQs.

[54] Robert Frank, *Mar-a-Lago membership fee doubles to $200,000*, CNBC (Jan 25, 2017, 12:41 PM), http://cnb.cx/2kjIc2j.

it has, and because Defendant's novel and opaque system for receiving payments perceptibly impairs CREW's daily operations.

154.     There is a direct conflict between Defendant's violations of the Emoluments Clauses and CREW's mission of protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics. Defendant's violations create a tremendous risk of foreign governments using money to improperly influence the President, create questions about the President's motives in making decisions, and will likely lead to numerous conflicts and violations that the public will have insufficient information to judge.

**Diversion of CREW's Communications Resources**

155.     CREW has expended a significant amount of time and resources since the election gathering information about the Emoluments Clause violations, and educating the public about the Emoluments Clauses and Defendant's violations of them. CREW has received hundreds of requests from the media about Defendant's conflicts of interest, including hundreds regarding the Emoluments Clauses and Defendant's violations of them. Many of these media requests sought explanations of the clauses and their applicability, and CREW has spent a substantial number of hours responding to them. As a result of these efforts to educate the public as CREW's mission requires, members of CREW's staff and its board of directors repeatedly have been interviewed by and quoted in the news media discussing the Emoluments Clauses and Defendant's violations of them. These media requests are certain to continue, and CREW will continue to need to expend time and resources to respond to them.

156.     CREW regularly issues press releases and statements, and responds to requests for information and comments from the media on a range of topics, including but not limited to

ethics, corruption, campaign finance, and accountability. Both before and after the election, CREW received hundreds of questions from the news media about Defendant's businesses and conflicts of interest, including hundreds related to the Emoluments Clauses. CREW has diverted its time and resources from its other public-education activities to respond to these questions. CREW normally responds to nearly every press request. However, due to the volume of requests from national news media about Defendant's conflicts of interest, including his violations of the Emoluments Clauses, CREW has not had the time and resources to respond to requests from many smaller and regional outlets regarding, for example, local money-in-politics issues and congressional ethics issues.

### Diversion of CREW's Legal Resources

157.    CREW's in-house attorneys have diverted their time and resources from other projects to counteract Defendant's violations of the Emoluments Clauses. Since the election, CREW has received numerous requests for information, guidance, and advice about the Emoluments Clauses from policymakers. To respond to those requests, and as part of CREW's advocacy in support of its mission of ensuring the integrity of government officials, CREW has expended significant resources conducting legal research regarding the history and scope of the Emoluments Clauses. Moreover, CREW's attorneys, including its executive director, have spent a significant amount of time on phone calls and in meetings responding to those inquires.

158.    CREW's attorneys also have conducted legal research to respond to many of the requests for information from the news media regarding the Emoluments Clauses. In addition, CREW's attorneys and researchers have assisted in researching and drafting publications educating the public about the clause and the impact of Defendant's violations of it.

159.    CREW also has conducted extensive legal research and analysis of potential legal actions to counteract Defendant's violations of the Emoluments Clauses. CREW's

36

attorneys have researched and analyzed potential lawsuits that could be used to enforce the clauses, drafted this complaint, and expended resources to file it. CREW's attorneys also have researched and analyzed the potential for filing complaints with government agencies.

160. CREW further has filed Freedom of Information Act requests to obtain records related to potential violations of the Emoluments Clauses. For example, on December 22, 2016, CREW sent two FOIA requests to the Department of Justice Office of Legal Counsel ("OLC"). One request sought all OLC opinions discussing the Domestic Emoluments Clause. The second sought all OLC opinions provided to the Office of Government Ethics or the GSA after November 8, 2016.

161. In addition, due in part to the volume of legal issues related to Defendant's conflicts of interest, including the need to counteract his violations of the Emoluments Clauses, CREW hired two additional senior attorneys in December 2016 and January 2017 to strengthen CREW's ability to address these issues.

162. This use of time and resources on legal matters related to Defendant's violations of the Emoluments Clauses is certain to continue in order for CREW to seek to fulfill its mission, despite the challenges posed by Defendant's violations of the Emoluments Clauses. In addition to needing to monitor Defendant's business interests for potential violations, CREW attorneys will, among other things, continue to need to evaluate payments to Defendant's hotels and other business interests to determine if they violate the Emoluments Clauses; research and analyze possible legal actions; and draft, file, and potentially litigate related Freedom of Information Act requests.

163. The time and resources CREW has used and will continue to use to counteract Defendant's violations of the Emoluments Clauses were and will continue to be diverted from other legal projects and activities in which CREW would have otherwise engaged.

37

164.     In the months immediately following elections, CREW regularly has drafted and filed complaints for violations of campaign finance and other laws related to political activity. In January 2013, for example, CREW filed complaints with the Federal Election Commission (FEC) and the Department of Justice (DOJ) alleging that several individuals, companies, and a super PAC made and accepted an illegal $1 million conduit contribution during the 2012 election.[55]  CREW also filed FEC and DOJ complaints in November 2012 against a section 501(c)(4) "dark money" organization for failing to disclose the identities of donors who contributed $6 million to fund campaign advertisements in Ohio during the 2012 campaign.[56] Similarly, in November 2014, CREW filed a complaint with the IRS against another section 501(c)(4) organization that violated its tax-exempt status by operating almost entirely for the private benefit of a political candidate and public official by spending nearly all of its money in 2013 and 2014 on advertisements that either directly supported the candidate's reelection or heaped praise on him in a transparent attempt to boost his political advancement and agenda.[57]

165.     During the 2016 election, CREW continued to track the spending and activities of candidates and outside groups engaged in politics, and intended to review campaign finance and tax records following the election.  CREW expected to continue conducting that research after the election and to file complaints against several organizations regarding their compliance with campaign finance and tax law.  Although CREW has been able to expend some resources on these activities and did file one complaint it drafted before the election, it has not been able to

---

[55]  *CREW Files DOJ, FEC Complaints Against Payday Lender For Illegal Conduit Contribution to Super PAC* (Jan. 8, 2013), http://bit.ly/2oQjriL.

[56]  *CREW Files FEC Complaint Against Crossroads GPS For Failing to Disclose Donors* (Nov. 15, 2012), http://bit.ly/2puYE28.

[57]   *CREW Files IRS Complaint Against the Kentucky Opportunity Coalition* (Nov. 24, 2014), http://bit.ly/2oiKXCr.

complete research for or draft and file other complaints in part because it needed to divert time and resources to counteract Defendant's violations of the Emoluments Clauses.

166.     In recent years, CREW has pursued a project related to campaign finance and ethics in the states.  Work on that project has included, among other things, monthly concentrated periods for CREW staff to conduct research and explore potential legal actions. CREW has not been able to conduct many aspects of this project, including the monthly staff work periods, since just after the 2016 election due to the need to divert its time and resources to responding to Defendant's conflicts of interests, including his violations of the Emoluments Clauses.  CREW does not expect to have the resources to conduct these activities in the foreseeable future.

167.     CREW also researches, drafts, and files comments with government agencies related to rulemakings and other regulatory actions.  For example, in the months following the 2014 elections, CREW drafted comments in response to an FEC rulemaking notice,[58] and filed the comments in January 2015.[59]   Following the 2016 elections, several FEC rulemaking comment periods were open.  CREW considered filing comments in these proceedings, but did not do so due to the need to divert its time and resources to responding to Defendant's conflicts of interests, including his violations of the Emoluments Clauses.

**Diversion of CREW's Research Resources**

168.     Defendant's violations of the Emoluments Clauses also have required CREW to expend a significant amount of time and resources to research and monitor Defendant's business

---

[58]  Advance Notice of Proposed Rulemaking, Earmarking, Affiliation, Joint Fundraising, Disclosure, and Other Issues, 79 Fed. Reg. 62361 (Oct. 17, 2014) (REG 2014-01).

[59]  *CREW to FEC: Comments on Addressing Corruption and Deficiencies in Disclosure* (Jan. 15, 2015), http://bit.ly/2nWEWiI.

interests.  Since the November 2016 election, CREW researchers have dedicated significant time and effort to developing a comprehensive understanding of Defendant's business empire and conflicts of interest, particularly regarding his business ties to foreign companies and governments that run a strong risk of resulting in a violation of the Emoluments Clauses.  For example, CREW researchers have compiled and analyzed data regarding the more than 500 business entities Defendant listed on his 2016 personal financial-disclosure form, developing that information for both internal and external uses.   As part of that project, CREW researchers devoted at least seventy hours to creating a series of infographics to explain the Defendant's businesses and income, emphasizing the Defendant's foreign businesses.[60]  This project began on November 28, 2016 and is not yet fully completed.  Every member of CREW's research team has worked on this project on a near-daily basis.

169.    This project was launched in part to aid in responding to questions from the news media about the extent of Defendant's business dealings.  As explained above, CREW has received hundreds of questions from the news media about Defendant's businesses, including his foreign businesses, and CREW determined that a comprehensive internal resource was necessary to help answer those questions.

170.    As a result of Defendant's decision to not divest himself from his properties and business interests, CREW will need to continue to expend significant time and resources to research and monitor Defendant's violations of the Emoluments Clauses.  As part of its mission, CREW will need to research and monitor Defendant's businesses to determine if he receives any foreign emoluments through them.  Payments to his businesses, however, are rarely public,

---

[60]  John Morgan, et al., *5 Graphics to Help You Understand President Trump's Conflict of Interest* (Feb. 22, 2017), http://bit.ly/2lKJ419.

requiring CREW to expend resources to uncover them.  Again, this will require significant time and resources as payments to hotels and other business entities are rarely public, and neither Defendant nor his attorney announced any system for transparency or accountability for these or any other foreign payments.  Further, Defendant has intentionally made it more difficult to obtain information about foreign payments.  Defendant, for instance, has refused to release his tax returns, contrary to the norm for the last forty-five years.  Further, according to media reports, the press was banned from his D.C. hotel at times during the week of the inauguration.[61]

171.    The time and resources CREW has used and will continue to use to research Defendant's business interests related to violations of the Emoluments Clauses were and will continue to be diverted from other research projects and activities in which CREW would have otherwise engaged.  In the months immediately following elections, CREW traditionally has produced research and reports looking back at money-in-politics issues and players in that election cycle.  In December 2012, for example, CREW published *Stealth Donors*, a report on donors who gave more than $1 million to super PACs trying to influence the 2012 election but whose efforts to sway voters were largely out of the public view.[62]  CREW similarly researched and published in December 2014 a series of blog posts on "dead-end disclosure," practices used to keep secret the identities of donors who give money to outside groups attempting to influence elections.[63]

172.    CREW intended to conduct similar research and analysis on campaign-finance

---

[61]  Daniel Lippman, *Trump's D.C. hotel bans press during inauguration week*, POLITICO (Jan. 18, 2017), http://politi.co/2jo2jw1.

[62]  *Stealthy Super PAC Donors Stay Under the Radar* (Dec. 3, 2012), http://bit.ly/2pbnuam.

[63]  Matt Corley & David Crockett, *CREW Series: Dead End Disclosure in the 2014 Elections* (Dec. 15, 2014), http://bit.ly/2oQ3glF.

issues in the aftermath of the 2016 election and expected to publish the results, but has not had time and resources to follow through on these plans or develop other evaluations of spending in the 2016 election.  Instead, CREW needed to divert its resources to research and analyze Defendant's business interests, particularly those related to violations of the Emoluments Clauses. In early 2016, for example, CREW published a report on the post-2014 election contributions to new members of Congress by special interest PACs.[64]  CREW intended to review similar post-election campaign contributions to newly elected members in December 2016 and likely would have published a follow-up report, but did not do so due to the need to commit resources to researching Defendant's business interests.

173.    CREW also normally obtains and analyzes tax returns of nonprofit groups engaged in political activities starting in the middle of November, when most of those tax returns are filed with the IRS.  In past years, that research and analysis regularly has resulted in reports to educate the public, and sometimes in complaints to the IRS.  In November and December 2014, for instance, CREW published two blog posts based on findings from new nonprofit tax returns filed that November,[65] and similarly published a blog post in November 2015 based on a nonprofit tax form filed that November.[66]  Although CREW was able to send requests to the IRS for nonprofit tax forms filed in November 2016, it has not been able to devote as much time or resources to analyzing and subsequently writing about the information in tax returns obtained

---

[64]  *Welcome to Washington: New Members of Congress Attract Special Interest Money* (May 9, 2016), http://bit.ly/2pvfkXh.

[65]  Matt Corley, *Crossroads GPS and Kentucky Opportunity Coalition Have, Word for Word, the Same Mission* (Nov. 20, 2014), http://bit.ly/2pv3gFr; *Dr. Evil Meets the Kochtopus: Americans for Prosperity Now Supporting Berman Group* (Dec. 2, 2014), http://bit.ly/2oGyv1T.

[66]  Matt Corley, *Freedom Partners Admits Issue Ads are Aimed at Influencing Elections* (Nov. 19, 2015), http://bit.ly/2oiTXYa.

and published by other sources.  As a result, for example, for the first time since 2013, CREW has not published any analysis of the annual tax form filed by Freedom Partners Chamber of Commerce, a critical component in a network of politically active nonprofit groups.

**Perceptible Impairment of CREW's Programmatic Functions and Fundamental Services**

174.    In addition to the diversion and depletion of CREW's resources, CREW is further injured because Defendant's violations of the Emoluments Clauses increase the costs to CREW to carry out its mission in the normal course of business.  By accepting presents and emoluments through nonpublic channels, Defendant's violations will deprive CREW of information about financial support Defendant will be receiving from foreign, state, and the federal governments, forcing CREW to expend resources to uncover his violations of the Emoluments Clauses.

175.    Defendant is the most powerful and most prominent official of the United States government.  If he is permitted to violate the Constitution or escape monitoring of his financial transactions for corruption—core evils CREW fights against—that would greatly undermine CREW's mission, making it harder to hold less senior officials accountable.  Thus, while it takes substantially greater resources to uncover Defendant's financial dealings and review them for violations of the Emoluments Clauses and conflicts of interest than it does to complete such work with respect to other federal officials, it is essential that CREW prioritize Defendant's violations of the Emoluments Clauses and conflicts of interest over those of lower level officials.  The difficulty in addressing Defendant's violations and conflicts, given lack of access to information, and the inability, with the resources available, to complete all of CREW's other usual work, means Defendant's violations of the Emoluments Clauses directly impede CREW's ability to fulfill its mission.

176.     In the course of CREW's normal activities and daily operations, and in order to carry out CREW's mission, CREW obtains information about financial support received by a public official or candidate from public records and filings such as campaign-finance reports and personal financial-disclosure forms.  Such disclosures allow CREW to monitor public corruption and inform the public about conflicts of interest.  As alleged above, CREW uses that information to craft reports and complaints and to advise policymakers and reporters as part of CREW's daily programmatic functions and its fundamental services.

177.     Presents and emoluments provided to Defendant through his businesses, however, will rarely be public—especially since Defendant has eschewed mechanisms for transparency, such as releasing tax returns—and CREW will need to expend significant resources to uncover those payments.  For example, a foreign country's payments for an opulent reception at one of Defendant's hotels, or the terms of a lease for a foreign-state-owned bank at one of his building, are not public information.  To try to determine if Defendant is receiving prohibited foreign emoluments that raise concerns of corruption and conflicts of interest, and in order for CREW to continue to carry out its mission through its daily operations and fundamental services, CREW has needed and will need to continue expending significant resources far in excess of those required if money transfers to Defendant occurred through more traditional and transparent means.

178.     Defendant's activities are at loggerheads and directly conflict with CREW's mission.

179.     Accordingly, Defendant's use of a novel and opaque method for receiving illicit and corrupting payments denies CREW information CREW would typically use to carry out its daily programmatic operations and fundamental services.   Defendant's activities therefore impede CREW's operations, to the injury of CREW.

44

### E.      ROC United's Members' Injuries

180.      ROC United, a nonprofit organization, has nearly 25,000 restaurant-employee members; through its project RAISE, it has over 200 restaurant members; and through its project Diners United, it has about 3,000 diner members.  ROC United engages workers, employers, and consumers to improve wages and working conditions in the restaurant industry, including by providing job training, placement, leadership development, civic engagement, legal support, and policy advocacy.

181.      A project of ROC United, RAISE seeks to work with restaurant owners to implement sustainable business models that champion living wages, basic benefits, fair promotion policies, environmental sustainability, safe and healthy workplaces, and other "high road" employer practices.

182.      Each category of ROC United members has its own leadership committee. Worker members are organized in ten local offices and as online members.  Those local offices send members to ROC United's National Leadership Network.  Restaurant members of RAISE, which include restaurants located in both Washington, D.C. and New York City, volunteer to serve on the RAISE steering committee.  Consumer members of Diners United volunteer to serve on the Diners United board of directors.  The National Leadership Network and RAISE steering committee elect worker and restaurant members to ROC United's Board of Directors.

183.      RAISE's steering committee holds regular meetings and is responsible for determining and implementing RAISE's agenda.

184.      The majority of the members of the board of directors of ROC United are members of ROC United, elected through the three membership leadership committees.

185.     ROC United's Board of Directors is responsible for determining and implementing its mission, monitoring its programs, strategic planning, fundraising, budgeting, and policy development and oversight.

186.     Each leadership entity—National Leadership Network, RAISE's steering committee, and Diners United's board—conducts monthly calls with ROC United's leadership and discusses campaigns and members' needs and concerns.

187.     Through their representation on the Board of Directors, and through the regular monthly calls between the three leadership committees and ROC United's leadership, ROC United's members play a substantial role in determining and implementing ROC United's mission and initiatives.

188.     Each RAISE member had an in-depth orientation prior to joining ROC United.  RAISE has regular quarterly meetings of its membership and an annual conference.

189.     About 16,000 of ROC United's worker members have been through an in-person orientation; the remaining 9,000 worker members signed up online.  Each of the ten local ROC United offices conducts monthly membership meetings for worker members, and there is an annual conference.

190.     ROC United emails a monthly newsletter that is distributed to all of its restaurant and worker members and keeps them informed concerning the status of ROC United's initiatives.  ROC United also sends email blasts to its full membership on a weekly basis.

191.     ROC United also owns and operates the restaurant COLORS in New York City and Detroit, and will soon be opening its Washington, D.C. location.

192.     ROC United brings this action on behalf of its members to stop and prevent the violations of the Emoluments Clauses that Defendant has committed and will commit.  As a direct result of Defendant's refusal to avoid these and other violations of the Emoluments

46

Clauses, ROC United's members have been significantly injured and will continue to be injured without relief from this Court.

193.    While many individual members of ROC United, including members of RAISE, could bring suit in their own right, it is more efficient for them to act as a group, through ROC United.  Since they seek only declaratory and injunctive relief, not damages, individual actions would be unnecessarily duplicative.

194.    It is consistent with ROC United's mission to protect its worker members from being deprived of wages or tips because they work for restaurants that are subject to loss of business due to foreign states, the United States, or state or local governments patronizing establishments with financial connections to Defendant rather than restaurants where ROC United members work.  It is further consistent with ROC United's mission and its RAISE project's purpose to protect restaurant members, who are committed to fair business practices, from being subject to loss of business due to foreign states, the United States, or state or local governments patronizing establishments with financial connections to Defendant rather than restaurant members of ROC United.

**Injuries to ROC United's Restaurant Members**

195.    ROC United's members through its project RAISE include award-winning and nationally renowned restaurants, including several that have earned prestigious Michelin stars. Diners at these restaurants—especially those located in Washington, D.C. and New York— frequently include diplomats and other officials of foreign states, the United States, and various state and local governments traveling on government business, and thus paying for their meals with government funds.  Several of ROC United's restaurant members also host and/or cater government events, including for officials and employees of foreign states, the United States, and various state and local governments.

196.     Hotels owned by Defendant and those in which he has a financial interest include restaurants that compete directly with restaurant members of ROC United by providing the same or similar services in the same marketplace.  For instance, Trump International Hotel & Tower New York includes restaurants Jean-George and Nougatine; Trump SoHo New York includes restaurant Koi SoHo; and Trump International Hotel, Washington, D.C. includes restaurant BLT Prime.  Moreover, Defendant owns the restaurant in the Washington, D.C. hotel through various business entities and merely licenses the name from BLT Prime and pays BLT Prime to operate it.[67]  Several of the restaurant members of ROC United are located near these hotels with restaurants and compete for the same clientele.

197.     Other properties owned by Defendant also include restaurants that directly compete with restaurant members of ROC United by providing the same or similar services in the same marketplace.  For example, the Trump Grill is located in Trump Tower, and the World Bar is located in Trump World Tower, both in New York City.  Further, Defendant, through various business entities, owns Trump Grill.

198.     ROC United's restaurant members have been harmed and will continue to be harmed by Defendant's ongoing financial interest in businesses which receive payments from foreign states, the United States, or state or local governments.

199.     Officials of foreign states and of the United States and various state and local governments have purchased and will use their government's funds to purchase food and services from one or more restaurants owned by Defendant, instead of from competing restaurants that are members of ROC United.

---

[67]  Jessica Sidman, *How Donald Trump Lost His DC Restaurants*, Washingtonian (Oct. 23, 2016), http://bit.ly/2htYzq9.

200.     Officials of foreign states and of the United States and various state and local governments who stay at Defendant's hotels on official business or who are tenants in Defendant's properties have and will pay with government funds to dine at restaurants located in those hotels or properties—instead of at competing restaurants that are members of ROC United.

201.     Defendant also has benefitted and will benefit in several respects from payments made from foreign states and from the United States and state and local governments to restaurants located in hotels and properties owned by Defendant.  For some restaurants, such as BLT Prime and Trump Grill, Defendant owns the restaurants directly, and revenue to those restaurants from foreign states and from the United States and state and local governments, is revenue to Defendant.  As to other restaurants, the revenue that they receive, including from foreign states and from the United States and state and local governments, affect the amount of rent that hotels and properties in which Defendant is financially interested are able to charge the restaurants.

202.     Additionally, as alleged herein, Defendant has used his official position as President to generate business to his hotel properties and their restaurants from officials of foreign states, the United States, and/or state and local governments.  As set forth above at ¶¶ 60-63, Defendant has promoted his properties, including specifically Trump International Hotel in Washington, D.C., and the Hotel has specifically sought to generate business from the diplomatic community, members of which have specifically stated they are more likely to pay for goods and services at Defendant's properties because of his official position.

203.     Restaurant members of ROC United that compete with restaurants located in Defendant's hotels and other properties have been harmed and will be harmed due to loss of business by Defendant's receipt of benefits from foreign states, the United States, and various

state and local governments.

**Injuries to ROC United's Worker Members**

204.    ROC United's worker members have also been injured in connection with Defendant's receipt of payments from foreign states, the United States, and state and local governments, through his financial interest in businesses including hotels and restaurants.

205.    ROC United's worker members include employees at restaurants that compete directly with restaurants located in Defendant-owned restaurants and restaurants in hotels and other properties owned by Defendant or in which Defendant has a financial interest by providing the same or similar services in the same marketplace.  In particular, ROC United's worker members include employees of award-winning and nationally renowned restaurants located near restaurants in which Defendant has a financial interest.

206.    Diners at these restaurants—especially those located in Washington, D.C. and New York—frequently include diplomats and other officials of foreign states, the United States, and various state governments traveling on official business, and thus paying with their government's funds.  Restaurants at which ROC United worker members are employed also host and/or cater government events, including for officials and employees of foreign states, the United States, and various state and local governments.

207.    ROC United's worker members have been harmed and will continue to be harmed by Defendant's receipt of payments from foreign states, the United States, and state and local governments, through his financial interest in businesses including hotels and restaurants.

208.    Officials of foreign states and of the United States and various state and local governments have and will use their government's funds to purchase meals from one or more restaurants owned by Defendant or in which Defendant has a financial interest, instead of from competing restaurants that employ ROC United's members.

50

209.     Officials of foreign states and of the United States and various state and local governments who stay at Defendant's hotels have and will use their government's funds to pay to dine at restaurants located in Defendant's hotels, instead of at competing restaurants that employ ROC United's members.

210.     Defendant also has benefitted and will benefit in several respects from payments made from foreign states and from the United States and state and local governments to restaurants located in hotels and properties owned by Defendant.  For some restaurants, such as BLT Prime and Trump Grill, Defendant owns the restaurants directly, and revenue to those restaurants from foreign states and from the United States and state and local governments is revenue to Defendant.  As to other restaurants, the revenue that they receive, including from foreign states and from the United States and state and local governments, affect the amount of rent that Defendant's hotels and properties are able to charge the restaurants

211.     Additionally, as alleged herein, Defendant has used his official position as President to generate business to his hotel properties and their restaurants from officials of foreign states, the United States, and/or state and local governments.  As set forth above at ¶¶ 60-63, Defendant has promoted his properties, including specifically Trump International Hotel in Washington, D.C., and the Hotel has specifically sought to generate business from the diplomatic community, members of which have specifically stated they are more likely to pay for goods and services at Defendant's properties because of his official position.

212.     ROC United workers' members' pay, including the amount received in tips, depends on the amount of business that the restaurants that employ them are able to attract. Accordingly, worker members of ROC United who are employed by restaurants that compete with restaurants located in Defendant's hotels and other properties, including restaurants owned by Defendant, have been harmed and will be harmed, by loss of income, due to Defendant's

receipt of benefits from foreign states, the United States, and various state governments.

### Injuries to ROC United's COLORS Restaurants

213.     ROC United owns and operates the restaurant COLORS, which serves locally sourced foods.  Diners at COLORS include officials of foreign states or their subdivisions, the United States, and various state and local governments traveling on government business, and thus paying for their meals with government funds.

214.     Hotels owned by Defendant and those in which he has a financial interest include restaurants that compete directly with COLORS by providing the same or similar services in the same marketplace.  For instance, Trump SoHo New York includes restaurant Koi SoHo.   COLORS NY is located in Manhattan near Trump SoHo and competes with restaurants located there for clientele.

215.     COLORS has been harmed and will continue to be harmed by Defendant's ongoing financial interest in businesses which receive payments from foreign states, the United States, or state or local governments.

216.     Officials of foreign states and of the United States and various state and local governments have purchased and will use their government's funds to purchase food and services from one or more restaurants owned by Defendant, instead of from competing restaurants like COLORS.

217.     Officials of foreign states and of the United States and various state and local governments who stay at Defendant's hotels on official business or who are tenants in Defendant's properties have and will pay with government funds to dine at restaurants located in those hotels or properties—instead of at competing restaurants like COLORS.

218.     Defendant also has benefitted and will benefit in several respects from payments made from foreign states and from the United States and state and local governments to

restaurants located in hotels and properties owned by Defendant.  For some restaurants, such as BLT Prime and Trump Grill, Defendant owns the restaurants directly, and revenue to those restaurants from foreign states and from the United States and state and local governments is revenue to Defendant.  As to other restaurants, the revenue that they receive, including from foreign states and from the United States and state and local governments, affect the amount of rent that hotels and properties in which Defendant is financially interested are able to charge the restaurants.

219.    Additionally, as alleged herein, Defendant has used his official position as President to generate business to his hotel properties and their restaurants from officials of foreign states, the United States, and/or state and local governments.  As set forth above at ¶¶ 60-63, Defendant has promoted his properties, including specifically Trump International Hotel in Washington, D.C., and the Hotel has specifically sought to generate business from the diplomatic community, members of which have specifically stated they are more likely to pay for goods and services at Defendant's properties because of his official position.

220.    COLORS has been harmed and will be harmed by loss of business due to Defendant's receipt of benefits from foreign states, the United States, and various state and local governments.

### F.    Jill Phaneuf's Injuries

221.    Plaintiff Jill Phaneuf is an individual resident of Washington, D.C.  She has worked for hotel owners in Washington, D.C. for several years.  In her current position, she works with a hospitality company to book events for two hotels, the Kimpton Carlyle Hotel and the Kimpton Glover Park Hotel.  She specifically seeks to book embassy functions and political functions involving foreign governments, in addition to other events.  Her compensation depends

in large part on payment of a percentage of the gross receipts arising from events that she generates for the hotels.

222.     The hotels for which Ms. Phaneuf seeks to book embassy and political functions and other events compete with hotels owned by Defendant or in which Defendant has a financial interest.

223.     Hotels owned by Defendant and those in which he has a financial interest compete directly with hotels for which Ms. Phaneuf works to book events by providing the same or similar services in the same marketplace.   For example, as set forth above at ¶¶ 60-63, Defendant has promoted his properties, including specifically Trump International Hotel in Washington, D.C., and the Hotel has specifically sought to generate business from the diplomatic community.

224.     Foreign states have and will host events at hotels owned by Defendant, instead of at competing hotels.

225.     As an individual working to book events at competitor hotels, Ms. Phaneuf will be injured due to loss of commission-based income.

226.     Defendant has benefitted and will benefit in several respects from payments made from foreign states and from the United States and state and local governments to hotels owned by Defendant.

227.     Ms. Phaneuf will continue to be harmed by Defendant's ongoing financial interest in businesses which receive payments from foreign states, the United States, or state or local government.

### G.     Eric Goode's Injuries

228.     Plaintiff Eric Goode is an individual resident of New York, New York.   Mr. Goode is the owner of several celebrated hotels, restaurants, bars, and event spaces in New York.

These include the Maritime Hotel located in Chelsea; the Bowery Hotel and Ludlow Hotel, both in the Lower East Side; and the Jane Hotel in the Meatpacking District.  Among the restaurants that Mr. Goode owns are the Park, Waverly Inn, and Gemma, the last of which is located in the Bowery Hotel.

229.    Travel & Leisure has called Mr. Goode's hotels "downtown landmarks known for their stylish accommodations and nightlife" and his restaurants "buzzy."[68]  The Bowery Hotel has been referred to as an "essential New York hotel" and "neighborhood gamechanger,"[69] which offers "the quintessential New York experience."[70]  Its restaurant, Gemma, has been described as one of New York City's best hotel restaurants with "essential al fresco dining."[71]

230.    Diners at Mr. Goode's restaurants and guests at his hotels frequently include diplomats and other officials of foreign states, the United States, and various state governments traveling on official business, and thus paying with their government's funds.

231.    Mr. Goode's hotels and restaurants compete with hotels and restaurants owned by Defendant, and with restaurants located in hotels and other properties owned by Defendant, or in which Defendant has a financial interest, by providing the same or similar service in the same marketplace.

---

[68] Jacqueline Gifford, *Hotelier Eric Goode's New York City Hotspots*, Travel & Leisure (Nov. 10, 2016), http://tandl.me/2qUjUSx.

[69] Jessica Dailey, *The 18 Essential New York City Hotels*, Curbed New York (Nov. 4, 2014), http://bit.ly/2q6SPc2.

[70] Catherine Eade, *Where the Beckhams and Kardashians REALLY stay: Inside the Big Apple hotels hosting the A-list for New York Fashion Week*, Daily Mail (Sept. 11, 2014), http://dailym.ai/1oACWl2.

[71] Greg Morabito, *A Guide to New York City's Best Hotel Restaurants*, Eater New York (June 24, 2013), http://bit.ly/2qUqN6s.

232.     Foreign states have hosted and will host events at hotels and restaurants in which Defendant has financial interests, instead of at competing hotels and restaurants.

233.     Defendant has benefitted and will benefit in several respects from payments made from foreign states and from the United States and state and local governments to hotels and restaurants owned by Defendant.

234.     As a hotel and restaurant owner, Mr. Goode will be harmed due to loss of revenue by Defendant's ongoing financial interest in businesses which receive payments from foreign states, the United States, or state or local government.

**H.      Plaintiffs' Injuries Warrant an Equitable Remedy**

235.     Except for those expenses involved in preparing for this specific litigation, CREW would have suffered the injuries described even if it had not filed this case.

236.     So long as violations of the Emoluments Clauses are permitted to continue, CREW will continue to suffer from interference with its mission, and with diversion of resources to investigate, track, and educate around violations of the Emoluments Clauses.  Monetary relief could not make up for the frustration of CREW's mission that the emoluments violations cause.

237.     The declaratory and injunctive relief that CREW is seeking would provide a remedy for the many injuries described above.  If such relief is granted, resolving the disputes between CREW and Defendant over the Emoluments Clauses and enjoining Defendant from violating the Emoluments Clauses, CREW would no longer suffer the diversion and depletion of resources described above.

238.     So long as violations of the Emoluments Clauses are permitted to continue, ROC United's members will continue to suffer from unfair competition as foreign states, the United States, and state and local governments divert their business to restaurants in which Defendant has a financial interest.  The ongoing nature of the injury makes monetary relief an

inadequate remedy for the injuries that emoluments violations cause.

239.     The declaratory and injunctive relief that ROC United is seeking would provide a remedy for the many injuries described above.  If such relief is granted, resolving the disputes between ROC United and Defendant over the Emoluments Clauses and enjoining Defendant from violating the Emoluments Clauses, ROC United members would no longer suffer the injuries described above.

240.     So long as violations of the Emoluments Clauses are permitted to continue, Ms. Phaneuf will continue to suffer from unfair competition as foreign states, the United States, and state and local governments divert their business to hotels in which Defendant has a financial interest.  The ongoing nature of the injury makes monetary relief an inadequate remedy for the injuries that emoluments violations cause.

241.     The declaratory and injunctive relief that Ms. Phaneuf is seeking would provide a remedy for the injuries described above.  If such relief is granted, resolving the disputes between Ms. Phaneuf and Defendant over the Emoluments Clauses and enjoining Defendant from violating the Emoluments Clauses, Ms. Phaneuf would no longer suffer the injuries described above.

242.     So long as violations of the Emoluments Clauses are permitted to continue, Mr. Goode will continue to suffer from unfair competition as foreign states, the United States, and state and local governments divert their business to hotels and restaurants in which Defendant has a financial interest.  The ongoing nature of the injury makes monetary relief an inadequate remedy for the injuries that emoluments violations cause.

243.     The declaratory and injunctive relief that Mr. Goode is seeking would provide a remedy for the injuries described above.  If such relief is granted, resolving the disputes between Mr. Goode and Defendant over the Emoluments Clauses and enjoining Defendant from

violating the Emoluments Clauses, Mr. Goode would no longer suffer the injuries described above.

## I.       Other Injuries

244.     Beyond the injuries described above, Defendant's unconstitutional conduct has caused added financial costs and greater logistical difficulties with respect to informing—and helping to protect from corrupt and unethical manipulation—innocent and unaware third parties, including consumers, workers, and small businesses.  As the Executive Branch, led by Defendant, shapes the strategy, substance, and timing of its trade and other commercial and financial negotiations with foreign governments, these third parties are at risk of having their economic interests and financial welfare bartered away, with Defendant rewarding foreign governments in connection with his own business interests.

245.     With efforts to educate these unknowing third parties obstructed, the consumers, workers, and small businesses, who may not compete directly with the Defendant, but who will surely be impacted by his biased decision-making, will remain in the dark about the conflicting, dual roles that Defendant plays in negotiating with foreign governments, as President and businessman.

246.     Competitors of Defendant's hotels, golf courses, and other properties and businesses also are injured, financially, by the uneven and unfair playing field created by Defendant's unconstitutional conduct.  Those injuries occur both when the competitors lose business directly to Defendant's businesses and when the competitors' brands lose economic value in comparison with the enhanced value of Defendant's brands, including due to foreign and state governments and their agents and instrumentalities seeking to curry favor with Defendant by favoring his businesses.

# V.
# CLAIMS

### COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory and Injunctive Relief)

247.     Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

248.     Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause.

249.     Together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including without limitation, monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost.

250.     The phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof.

251.     Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," violates the Foreign Emoluments Clause.

252.     As described more fully in paragraphs 42 to 128 herein, Defendant has committed violations of the Foreign Emoluments Clause and, without this Court's intervention, will continue to commit violations of the Foreign Emoluments Clause.  Defendant is and will be accepting "present[s]" or "Emolument[s]" directly from—or from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, Indonesia, Saudi Arabia, Bahrain, Azerbaijan, Afghanistan, Qatar, India, Georgia, the United Kingdom, and other "foreign State[s]," without seeking or obtaining "the Consent of the Congress."  As described more fully in paragraphs 42 to

59

128 herein, Defendant is committing or will commit these violations in connection with transactions involving New York's Trump Tower, the Trump International Hotel Washington, D.C., Trump World Tower, restaurants Defendant owns or that are located in his hotels or other properties, the television program "The Apprentice" and its spinoffs and international versions, and other business and property interests and transactions in the United States and abroad.

253.    There is an actual controversy between Plaintiffs and Defendant as to the meaning of the Foreign Emoluments Clause and its application to Defendant and his conduct.

254.    Specifically, Plaintiffs allege that: (a) Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause; (b) together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including  above- or below-market rates; (c) the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof; and (d) Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," constitutes a violation of the Foreign Emoluments Clause.  Plaintiffs also allege that Defendant, through the conduct described more fully in paragraphs 42 to 128 herein, is violating or will violate the Foreign Emoluments Clause, and that no proposed plan announced by Defendant or his attorneys can make this conduct constitutional or otherwise remedy these constitutional violations.  Defendant disagrees with each of these positions.

255.    As a direct result of these violations of the Foreign Emoluments Clause, Plaintiffs have already suffered significant harm.  Plaintiffs stand to suffer additional significant harm directly from the further occurrence of these violations.

256.    Plaintiffs are entitled to bring this action pursuant to this Court's inherent ability to award equitable relief where a federal official violates or is about to violate the U.S.

Constitution or federal law.

257.    Plaintiffs are entitled to injunctive relief to stop and prevent the above-mentioned Foreign Emoluments Clause violations and any other Foreign Emoluments Clause violations.  This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. § 1331.  Such relief would enjoin Defendant from violating the Foreign Emoluments Clause, as construed by this Court, including requiring Defendant to release financial records sufficient to confirm that Defendant is not engaging in any further transactions that would violate the Foreign Emoluments Clause.  Without such relief, Plaintiffs will suffer significant injury.

258.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between Plaintiffs and Defendant—as to the meaning of the Foreign Emoluments Clause and whether Defendant's conduct is violating and will violate the Foreign Emoluments Clause—will serve a useful purpose in settling the legal issues in this action and offering relief from uncertainty.  Without this relief, Plaintiffs will continue to suffer significant injury.

## COUNT II
### Violations of the Domestic Emoluments Clause
### (Declaratory and Injunctive Relief)

259.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

260.    Defendant is the President of the United States.

261.    The phrase "any other Emolument" under the Domestic Emoluments Clause covers monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost, excluding presents and the President's "Compensation" as set by Congress.

61

262.     The phrase "the United States, or any of them" in the Domestic Emoluments Clause includes any part of the federal government, any state government, any local government, and any agent or instrumentality thereof.

263.     Defendant's acceptance of an "any other Emolument" from "the United States, or any of them" violates the Domestic Emoluments Clause.

264.     As described more fully in paragraphs 129 to 149 herein, Defendant has committed violations of the Domestic Emoluments Clause and, without this Court's intervention, will continue to commit violations of the Domestic Emoluments Clause.  Defendant has accepted and will accept "Emolument[s]" from the GSA and the National Park Service, instrumentalities of the United States.  As described more fully in paragraphs 129 to 149 herein, Defendant committed and will commit these violations in connection with transactions involving the Trump International Hotel, and other business and property interests and transactions in the United States.   Such emoluments are not part of Defendant's congressionally authorized "Compensation."

265.     As a direct result of these violations of the Domestic Emoluments Clause, Plaintiffs have already suffered significant harm.   Plaintiffs also stand to suffer additional significant harm directly from the further occurrence of these violations.

266.     Plaintiffs are entitled to bring this action pursuant to this Court's inherent authority to award equitable relief where a federal official violates or will violate the U.S. Constitution or federal law.

267.     There is an actual controversy between Plaintiffs and Defendant as to the meaning of the Domestic Emoluments Clause and its application to Defendant and his conduct. Specifically, Plaintiffs allege that: (a) the phrase "any other Emolument" under the Domestic Emoluments Clause covers monetary and non-monetary payments or transactions, transactions

granting special treatment, and transactions above marginal cost, excluding presents and the President's "Compensation" as set by Congress as of the time of the President's inauguration; (b) the phrase "the United States or any of them" under the Domestic Emoluments Clause includes any part of the federal government, any state government, and any agent or instrumentality thereof; and (c) Defendant's acceptance of an "Emolument" from "the United States, or any of them" constitutes a violation of the Domestic Emoluments Clause.  Plaintiffs have also has taken the positions that Defendant, through the conduct described more fully in paragraphs 129 to 149 herein, is violating or will violate the Domestic Emoluments Clause, and that no proposed plan announced by Defendant or his attorneys can make this conduct constitutional or otherwise remedy these constitutional violations.  Defendant disagrees with each of these positions.

268.    Plaintiffs are entitled to injunctive relief to stop and prevent the above-mentioned Domestic Emoluments Clause violations and any other Domestic Emoluments Clause violations.  This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. § 1331.  Such relief would enjoin Defendant from violating the Domestic Emoluments Clause, as construed by this Court, including requiring Defendant to release financial records sufficient to confirm that Defendant is not engaging in any further transactions that would violate the Domestic Emoluments Clause.  Without such relief, Plaintiffs will suffer significant injury.

269.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between Plaintiffs and Defendant—as to the meaning of the Domestic Emoluments Clause and whether Defendant's conduct is violating and will violate the Domestic Emoluments Clause—will serve a useful purpose in settling the legal issues in this action and offering relief from uncertainty.  Without this relief, Plaintiffs will continue to suffer significant injury.

# VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and against Defendant, consisting of:

(a)     A declaratory judgment, stating that:

(1)     Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause;

(2)     together, the phrases "present" and "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause cover anything of value, including without limitation, monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost;

(3)     the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof;

(4)     Defendant's acceptance of a "present" or "Emolument" from "any King, Prince, or foreign State," without "the Consent of the Congress," constitutes a violation of the Foreign Emoluments Clause;

(5)     the phrase "any other Emolument" under the Domestic Emoluments Clause covers monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost, excluding presents and the President's "Compensation" as set by Congress at the time of the President's inauguration;

(6)     the phrase "the United States or any of them" under the Domestic Emoluments Clause includes any part of the federal government, any state government,

64

any local government, and any agent or instrumentality thereof;

(7)     Defendant's acceptance of an "Emolument" from "the United States or any of them" violates the Domestic Emoluments Clause;

(8)     Defendant's conduct, as described more fully in paragraphs 42 to 128 herein, violates or will violate the Foreign Emoluments Clause; and

(9)     Defendant's conduct, as described more fully in paragraphs 129 to 149 herein, violates or will violate the Domestic Emoluments Clause.

(b)     Injunctive relief, enjoining Defendant from violating the Foreign and Domestic Emoluments Clauses, as construed by this Court, and requiring Defendant to release financial records sufficient to confirm that Defendant is not engaging in any further transactions that would violate the Emoluments Clauses;

(c)     Such other and further relief as this Court may deem just and proper, including reasonable attorneys' fees and costs under 28 U.S.C. § 2412(a) and (d) or as otherwise appropriate.

Dated: May 10, 2017

GUPTA WESSLER PLLC

By:   _s/ Deepak Gupta_
         Deepak Gupta

AMBASSADOR (RET.) NORMAN L. EISEN
Chair, Board of Directors
RICHARD W. PAINTER
Vice Chair, Board of Directors
NOAH BOOKBINDER
ADAM J. RAPPAPORT
STUART C. MCPHAIL
Citizens for Responsibility and
Ethics in Washington
455 Massachusetts Avenue, N.W., 6th Floor
Washington, D.C. 20001
(202) 408-5565

*Attorneys for Plaintiff Citizens For Responsibility And
Ethics In Washington*

LAURENCE H. TRIBE*
Carl M. Loeb University Professor
and Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ERWIN CHEMERINSKY*
Dean of the School of Law
University of California, Irvine
401 East Peltason Drive
Irvine, CA 92697
(949) 824-7722

ZEPHYR TEACHOUT*
Associate Professor of Law
Fordham Law School
150 West 62nd Street
New York, NY 12580
(646) 312-8722

*\*Affiliations noted for identification
purposes only*

DEEPAK GUPTA**
JONATHAN E. TAYLOR
RACHEL BLOOMEKATZ
MATTHEW SPURLOCK
Gupta Wessler PLLC
1735 20th Street, N.W.
Washington, D.C. 20009
(202) 888-1741
*deepak@guptawessler.com*

JOSEPH M. SELLERS**
DANIEL A. SMALL
CHRISTINE E. WEBBER
GEORGE F. FARAH
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W. Suite 500
Washington, DC  20005
202-408-4600
*jsellers@cohenmilstein.com*

*Attorneys For Plaintiffs Citizens for Responsibility and
Ethics in Washington, Restaurant Opportunities
Centers (ROC) United, Inc., Jill Phaneuf, and Eric
Goode*

*\*\*Admitted pro hac vice*

66