**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

               *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United States,

               *Defendant*.

No. 17 Civ. 458 (RA)

**MEMORANDUM OF LAW
<u>IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................4

I.     The Plaintiffs.............................................................................................................4

II.    The Alleged Constitutional Violations ....................................................................4

III.   Plaintiffs' Alleged Injuries......................................................................................6

ARGUMENT .......................................................................................................................7

I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS ......................7

      A.     The Requirement of Article III Standing Is Especially Rigorous in the Context of Constitutional Challenges ..................................................................7

      B.     Plaintiffs Do Not Allege Any Injury in Fact.............................................................8

            1.     CREW has alleged only an abstract injury .................................................8

            2.     *Havens Realty Corp. v. Coleman* is inapposite.........................................11

            3.     ROC United, Phaneuf, and Goode have failed to establish an injury in fact ...............................................................................15

            4.     The competitor standing theory is inapplicable ........................................20

      C.     ROC United, Phaneuf, and Goode Have Not Met the Traceability or Redressability Prongs of Standing..........................................................................22

      D.     ROC United Does Not Have Associational Standing..........................................23

II.    PLAINTIFFS' ASSERTED INJURIES DO NOT FALL WITHIN THE ZONE OF INTERESTS OF THE EMOLUMENTS CLAUSES ..................................................25

III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE EMOLUMENTS CLAUSES .................................................................................26

      A.     The Emoluments Clauses Prohibit Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment ................27

1.      The text of the Emoluments Clauses ............................................................27

2.      Adoption and historical interpretation of the Clauses.............................32

    i.   Adoption of the Emoluments Clauses ..................................................32

    ii.  Historical interpretation of the Clauses ...............................................36

3.      Application of the Clauses since the Founding Era ...................................40

B.      Plaintiffs' Arguments in Support of Their Interpretation Have No Merit ............45

IV.   THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.......48

CONCLUSION.................................................................................................................51

# TABLE OF AUTHORITIES

**CASES**                                                                                        **PAGE(S)**

*Air Courier Conference of America v. Postal Workers,*
   498 U.S. 517 (1991)..................................................................................................... 25

*Allco Fin. Ltd. v. Klee,*
   805 F.3d 89 (2d Cir. 2015)............................................................................................ 19

*Allen v. WestPoint-Pepperell, Inc.,*
   945 F.2d 40 (2d Cir. 1991)............................................................................................. 5

*Allen v. Wright,*
   468 U.S. 737 (1984)..................................................................................................... 22

*Am. Legal Found. v. FCC,*
   808 F.2d 84 (D.C. Cir. 1987)......................................................................................... 9

*Am. Med. Ass'n v. United Healthcare Corp.,*
   00-cv-2800, 00-cv-7246 (LMM), 2001 WL 863561 (S.D.N.Y. July 31, 2001)...................... 15

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015).......................................................................................... 26, 31

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................... 15

*Bano v. Union Carbide Corp.,*
   361 F.3d 696 (2d Cir. 2004) ......................................................................................... 23

*Baur v. Veneman,*
   352 F.3d 625 (2d Cir. 2003) ......................................................................................... 15

*Beecham v. United States,*
   511 U.S. 368 (1994)..................................................................................................... 29

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................................... 15

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n,*
   768 F.3d 183 (2d Cir. 2014).......................................................................................... 25

*Citizens United v. FEC,*
   558 U.S. 310 (2010)....................................................................................................... 9

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) ................................................................................. 7, 9, 18

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) ............................................................................................. 25

*Clinton v. Jones,*
    520 U.S. 681 (1997) ............................................................................................. 49

*Ctr. for Law & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) .......................................................................... 14

*Ctr. for Reprod. Law & Policy v. Bush,*
    304 F.3d 183 (2d Cir. 2002) ................................................................................ 25

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................................................... 7

*DEK Energy Co. v. FERC,*
    248 F.3d 1192 (D.C. Cir. 2001) .......................................................................... 21

*Delta Air Lines, Inc. v. Export-Import Bank,*
    85 F. Supp. 3d 250 (D.D.C. 2015) ...................................................................... 22

*Doe v. Vill. of Mamaroneck,*
    462 F. Supp. 2d 520 (S.D.N.Y. 2006) ................................................................ 14

*Dole v. United Steelworkers of Am.,*
    494 U.S. 26 (1990) ............................................................................................... 29

*E.M. v. N.Y.C. Dep't of Educ.,*
    758 F.3d 442 (2d Cir. 2014) ................................................................................ 12

*El Paso Nat. Gas Co. v. FERC,*
    50 F.3d 23 (D.C. Cir. 1995) ................................................................................ 21

*Ex parte Levitt,*
    302 U.S. 633 (1937) ...................................................................................... 10, 13

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................................... 3, 48, 49

*Garelick v. Sullivan,*
    987 F.2d 913 (2d Cir. 1993) ................................................................................ 23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................... 11, 12, 13, 14

*Holmes v. Jennison*,
    39 U.S. 540 (1840) .............................................................................................. 31

*Hoyt v. United States*,
    51 U.S. 109 (1850) ......................................................................................... 27, 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................................ 24

*Int'l Refugee Assistance Project v. Trump*,
    No. 17-1351, 2017 WL 2273306 (4th Cir. May 25, 2017) .................................... 49

*Investment Co. Inst. v. Camp*,
    401 U.S. 617 (1971) ............................................................................................ 20

*Jarecki v. G.D. Searle & Co.*,
    367 U.S. 303 (1961) ............................................................................................ 30

*Johnson v. Comm'n on Presidential Debates*,
    202 F. Supp. 3d 159 (D.D.C. 2016) .................................................................... 20

*Jones v. Deutsch*,
    715 F. Supp. 1237 (S.D.N.Y. 1989) .................................................................... 14

*Keepers, Inc. v. City of Milford*,
    807 F.3d 24 (2d Cir. 2015) .................................................................................. 24

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ............................................................................. 14

*Leonard F. v. Israel Disc. Bank of N.Y.*,
    199 F.3d 99 (2d Cir. 1999) .................................................................................... 5

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ................................................................................ 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ........................................................................................ 25

*Loving v. United States*,
    517 U.S. 748 (1996) ......................................................................................... 3, 49

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..................................................................................... 8, 12

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000)............................................................................... 7

*Marbury v. Madison,*
    5 U.S. 137 (1803)............................................................................................ 31

*McConnell v. FEC,*
    540 U.S. 93 (2003)............................................................................................ 9

*McCulloch v. Maryland,*
    17 U.S. 316 (1819).......................................................................................... 26

*McLean v. United States,*
    226 U.S. 374 (1912)........................................................................................ 28

*Mississippi v. Johnson,*
    71 U.S. 475 (1866)..................................................................................... 3, 48

*Michigan Corr. Org. v. Michigan Dep't of Corr.,*
    774 F.3d 895 (6th Cir. 2014) .......................................................................... 26

*Mistretta v. United States,*
    488 U.S. 361 (1989)........................................................................................ 26

*Nat'l Congress for Puerto Rican Rights v. City of New York,*
    75 F. Supp. 2d 154 (S.D.N.Y. 1999) .............................................................. 14

*Nat'l Taxpayers Union, Inc. v. United States,*
    68 F.3d 1428 (D.C. Cir. 1995)........................................................................ 13

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996)........................................................................ 9

*New York Civil Liberties Union v. New York City Transit Authority,*
    684 F.3d 286 (2d Cir. 2011)........................................................................... 13

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010)...................................................................... 49

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)................................................................................. 48, 49

*Nixon v. United States*,
   506 U.S. 224 (1993) ............................................................................ 30

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014) ....................................................................... 26

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) ......................................................... 13, 14

*Olsen v. Stark Homes, Inc.*,
   759 F.3d 140 (2d Cir. 2014) ............................................................... 12

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993) ............................................................... 9, 12

*Raines v. Byrd*,
   521 U.S. 811 (1997) .............................................................................. 8

*Robinson v. Gov't of Malay.*,
   269 F.3d 133 (2d Cir. 2001) ................................................................. 7

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ............................................................................ 45

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ................................................................. 10, 11, 12

*Sea-Land Serv., Inc. v. Dole*,
   723 F.2d 975 (D.C. Cir. 1983) ........................................................... 20

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010) ........................................................ 20, 21

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) .............................................................................. 9

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ..................................................................... 9, 10, 22

*Small v. United States*,
   544 U.S. 385 (2005) ............................................................................ 45

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................. 8, 12, 19

*State Nat'l Bank of Big Spring v. Lew,*
  795 F.3d 48 (D.C. Cir. 2015) ................................................................. 20

*Steel Co. v. Citizens for Better Environment,*
  523 U.S. 83 (1998) .............................................................................. 10

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ............................................................. 49

*Town of Babylon v. Federal Hous. Fin. Agency,*
  699 F.3d 221 (2d Cir. 2012) ................................................................ 23

*In re U.S. Catholic Conference,*
  885 F.2d 1020 (2d Cir. 1989) ............................................................... 21

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
  484 U.S. 365 (1988) ............................................................................ 31

*United States v. Hartwell,*
  73 U.S. 385 (1867) ............................................................................. 27

*United States v. Hill,*
  120 U.S. 169 (1889) ........................................................................... 28

*United States v. Palmer,*
  16 U.S. 610 (1818) ............................................................................ 45

*United States v. Ripley,*
  32 U.S. 18 (1833) .............................................................................. 28

*United States v. Stevens,*
  559 U.S. 460 (2010) ........................................................................... 30

*United Transp. Union v. ICC,*
  891 F.2d 908 (D.C. Cir. 1989) ............................................................. 21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) .................................................................... 8, 23, 25

*Virginia Office for Protection & Advocacy v. Stewart,*
  563 U.S. 247 (2011) ........................................................................... 26

*Virginia v. Tennessee,*
  148 U.S. 503 (1893) ..................................................................... 30, 31

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ................................................................. 22

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................... 8, 12, 25

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ......................................................................... 18

*Williams v. Taylor*,
   529 U.S. 362 (2000) ......................................................................... 31

**STATUTES**

1 Stat. 130 .................................................................................................. 38

5 U.S.C. § 115 ......................................................................................... 41

5 U.S.C. § 7342 ....................................................................................... 41

10 U.S.C. § 1060 ..................................................................................... 44

22 U.S.C. § 3641 note ............................................................................. 44

37 U.S.C. § 908 ....................................................................................... 44

Act of Oct. 12, 1982,
   Pub. L. No. 97-295, 96 Stat. 1287 ....................................................... 44

Act of Sept. 6, 1966,
   Pub. L. No. 89-554, § 7341, 80 Stat. 378, 526–27 ............................... 41

An act authorizing the persons therein named to accept of certain decorations and
   presents therein named, from foreign governments, and for other purposes,
   21 Stat. 603 (1881) .............................................................................. 41

An Act for allowing a Compensation to the President and Vice President of the United States,
   1 Stat. 72 (1789) .................................................................................. 28

National Defense Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 ............................. 44

Panama Canal Commission Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, § 3504, 107 Stat. 1547, 1965 ............................. 44

Thirty-Day Embargo,
  1 Stat. 400 (1794)....................................................................................... 37


**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 3, cl. 6............................................................................. 30

U.S. Const. art. I, § 6, cl. 2............................................................................. 29

U.S. Const. art. I, § 9, cl. 8.................................................................. 1, 27, 50

U.S. Const. art. I, § 10, cl. 3........................................................................... 30

U.S. Const. art. II, § 1, cl. 7 ................................................................. 1, 27, 29


**CONGRESSIONAL MATERIALS**

1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802)
  https://memory.loc.gov/ammem/amlaw/lwsplink.html ......................... 27

2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818)
  https://memory.loc.gov/ammem/amlaw/lwsplink.html ......................... 39

8 Annals of Cong. 1582–93 (1798)................................................................. 40

20 Annals of Cong. 672 (1810)....................................................................... 39

21 Annals of Cong. 2050–51 (1810) .............................................................. 39

*Confirmation of Nelson A. Rockefeller as Vice President of the United States*,
  H.R. Rep. No. 93-1609 (1974)............................................................... 47

H.R. Rep. No. 23-302 (1834)......................................................................... 40

*Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*,
  S. Exec. Doc. No. 93-34 (1974)............................................................. 47

Proposing an Amendment to the Constitution,
  S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ........................................... 39

S. Exec. Doc. No. 23-49 (1834)..................................................................... 40

S. Exec. Doc. No. 37-23 (1862) .................................................................... 41

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*Assistant Comptroller General Weitzel to the Attorney General*,
   34 Comp. Gen. 331 (1955) .................................................................................. 43

*Dr. R. Edward Bellamy, USPHS, Ret.*,
   B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978) ....................................... 43

*Major Stephen M. Hartnett, USMC, Ret.*,
   65 Comp. Gen. 382 (1986) .................................................................................. 43

*Retired Marine Corps Officers*,
   B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) ..................................... 42

*The Honorable George J. Mitchell U.S. Senate*,
   B-207467, B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ..................... 42

*To C.C. Gordon, USCG*,
   44 Comp. Gen. 130 (1964) .................................................................................. 43

*To Mr. Harvey E. Ward, USCG, Ret.*,
   B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964) ..................................... 43

*To N.R. Breningstall, Dep't of the Air Force*,
   53 Comp. Gen 753 (1974) ................................................................................... 43

*To the Secretary of Health, Education and Welfare*,
   51 Comp. Gen. 780 (1972) .................................................................................. 43

*To the Secretary of the Air Force*,
   49 Comp. Gen. 819 (1970) ............................................................................ 42, 43

## ATTORNEY GENERAL OPINIONS

*Foreign Diplomatic Commission*,
   13 Op. Att'y Gen. 537 (1871) ......................................................................... 41, 43

*Marshal of Florida*,
   6 Op. Att'y Gen. 409 (1854) ........................................................................... 41, 43

## OFFICE OF LEGAL COUNSEL OPINIONS

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
   and Decorations Act*,
   6 Op. O.L.C. 156 (1982) ...................................................................................... 42

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission,*
10 Op. O.L.C. 96 (1986) ................................................................ 42

*Applicability of Emoluments Clause Employment of Government Employees by Foreign Public Universities,*
18 Op. O.L.C. 13 (1994) ................................................................ 46

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS,*
17 Op. O.L.C. 114 (1993) .............................................................. 43

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954), https://www.justice.gov/olc/page/file/935721/download ............................. 43

*President Reagan's Ability to Receive Retirement Benefits from the State of California,*
5 Op. O.L.C. 187 (1981). ............................................................... 42

## HISTORICAL MATERIALS

*A Complete Dictionary of the English Language* (2d ed. 1789) .................................. 30

1 *A Digest of the International Law of the United States*
(Francis Wharton ed., 1886) ......................................................... 33, 40

*A New General English Dictionary* (18th ed. 1754) ........................................ 30

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ........... 28, 30, 32

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
http://founders.archives.gov/documents/Washington/05-14-02-0074 ..................... 38

4 *Revolutionary Diplomatic Correspondence of the United States*
(Francis Wharton ed., 1889) ......................................................... 34

George Cochrane Hazelton, *The National Capitol* (1894) ................................. 38

George Taylor, Arrangements between English and Southern Merchants (June 1790),
http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003 ................. 37

James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America*
(Gaillard Hunt & James Brown Scott eds., 1920) .............................. 33, 34, 35, 38

1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* (1766) ................................ 30

1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891) ......................................................................... 35, 38

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891) ............................................................ 33, 35, 38, 50

18 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1910) ....................... 34

23 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1914) ....................... 28

30 *Journals of the Continental Congress, 1774–1789* (John C. Fitzpatrick ed., 1934) ............... 34

Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 ........ 38

Letter from George Washington to Bushrod Washington (July 27, 1789), http://founders.archives.gov/documents/Washington/05-03-02-0189 .................................... 38

Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790), http://founders.archives.gov/documents/Washington/05-04-02-0363 ............. 39

Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 .......... 38

Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159 .................................... 36

Letter from George Washington to James Madison (May 5, 1789), http://founders.archives.gov/documents/Washington/05-02-02-0157 .................................... 38

Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050 .................................... 36

Letter from George Washington to William Pearce (Apr. 20, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0488 .................................... 37

Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331 ................................... 38

Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111 .................................... 36

Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790),
http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003 ............................... 34

President George Washington, Inaugural Address of 1789 (Apr. 30, 1789),
https://www.archives.gov/exhibits/american_originals/inaugtxt.html ................................... 28

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961) ............................................................. 34, 35

5 *The Papers of James Monroe* (Daniel Preston ed., 2014) ....................................................... 37

Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign
Governments, ca. 1791,
http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004 ............................... 34

## SECONDARY AUTHORITIES

Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* (1991) ................................... 37

Bruce Chadwick, *James & Dolley Madison* (2014) ................................................... 37

Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and
Bibliographic Nightmare*, 88 L. Lib. J. 121 (1996) ................................................ 39

David O. Stewart, *Madison's Gift* (2015) .................................................................. 37

6 Douglas Southall Freeman, *George Washington: A Biography* (1954) ..................... 36

Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. &
Biography 251 (1993) .................................................................................... 37

Leonard D. White, *The Federalists: A Study in Administrative History* (1st ed. 1948) ......... 27, 36

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American
Government, 1780-1940* (2013) ................................................................... 34

Restatement (Third) of the Law Governing Lawyers § 123, cmt. b ............................ 44

Robert A. Nowlan, *The American Presidents, Washington to Tyler* (2012) ............... 37

Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National
Experience*, 32 The Historian 376 (1970) .............................................. 33, 34, 40

Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic
Site Historic Resource Study* (Aug. 2000),
https://www.nps.gov/chpi/learn/historyculture/ upload/CHPI_HRS.pdf ............................... 36

11 *The Works of Thomas Jefferson* (Paul Leicester Ford ed., 1905) ........................................... 37

**OTHER AUTHORITIES**

AAA, *AAA/CAA Five Diamond Hotels* (Jan. 27, 2017),
   http://www.aaa.biz/Travel_Information/Diamonds/Awards/2017/
   January%202017%20-%205D%20Hotels.pdf ........................................................ 17

Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/ .................................. 46

Black's Law Dictionary (10th ed. 2014) .................................................................. 30

COLORS NY, http://www.colorsrestaurantnyc.com (last visited June 9, 2017) ........................ 16

Chris Crowley, *Koi, in the Trump SoHo, Will Close, Citing a Sharp Drop in Business*,
   Grub Street (Apr. 26, 2017, 5:43 PM),
   http://www.grubstreet.com/2017/04/trump-soho-koi-closing.html ........................................ 16

Donald Trump's News Conference: Full Transcript and Video,
   N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8) ............................................... 5

Form 10-K of Hyatt Hotels Corporation (2016), *available at*
   http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/
   Hyatt-Q4-2016-Form-10-K.pdf ...................................................................... 47

*Meetings + Events: Capacities*, Carlyle Hotel,
   http://www.carlylehoteldc.com/event-space-floor-plans/ (last visited June 9, 2017).............. 18

*Meeting + Events: Capacities*, Glover Park Hotel,
   http://www.gloverparkhotel.com/meeting-space-washington-dc/capacities
   (last visited June 9, 2017) ...................................................................... 18

*Meetings & Events: Venues*, Trump International Hotel, Washington, DC,
   https://www.trumphotels.com/washington-dc/venues (last visited June 9, 2017)................... 18

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983)........................................... 44

National Park Service, Ash Lawn-Highland,
   https://www.nps.gov/nr/travel/journey/hig.htm (last visited June 9, 2017)............................ 37

National Park Service, *Historic Jamestown, Tobacco: Colonial Cultivation Methods*,
   https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-
   methods.htm (last visited June 9, 2017)................................................................. 37

National Register of Historic Places Registration Form, George Washington's
Gristmill, § 8, p. 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/
029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf............................ 36

Oxford English Dictionary, Oxford University Press, *Emolument*, OED Online
(Dec. 2016), http://www.oed.com/view/Entry/61242............................................... 30

Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016),
http://www.oed.com/view/Entry/150677................................................................ 32

Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en ............................ 46

Press Release, ROC United, COLORS Restaurant-New York Moves to 178
Stanton Street (Jan. 4, 2017), http://rocunited.org/2017/01/12490............................ 16

*Report: Michelin Guide 2017: New York's Best Restaurants*, Michelin,
https://travelguide.michelin.com/north-america/united-states/new-york/
new-york/reportage/michelin-guide-2017-new-yorks-best
(last visited June 9, 2017) ............................................................................ 17

*Restaurant Grades*, New York City Department of Health and Mental Hygiene,
http://www1.nyc.gov/site/doh/services/restaurant-grades.page
(last visited June 9, 2017) ...................................................................... 16, 17

Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics,
Financial Disclosure, https://www.oge.gov ................................................... 47

Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016,
*available at* Office of Government Ethics, Financial Disclosure,
https://www.oge.gov/ ............................................................................... 47

*Ten Facts about the Gristmill*, George Washington's Mount Vernon, at Fact 9,
http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill
(last visited June 9, 2017) ........................................................................ 36

The City of N.Y. Dep't of Finance Division of Tax Policy, *Statistical Profile of the
New York City Hotel Room Occupancy Tax* 5 (Tax Year 2015), https://www1.nyc.gov/
assets/finance/downloads/pdf/reports/reports_htx/2015_htx_report.pdf................................ 17

*The Jane Hotel*, Guest Reservations, http://www.guestreservations.com/the-jane-hotel/booking
(last visited June 9, 2017) ........................................................................ 17

The Jane Hotel, http://www.thejanenyc.com/ (last visited June 9, 2017) ..................... 17

*The President and Vice President's 2015 Financial Disclosure Forms*,
  President Barack Obama White House (May 16, 2016),
  https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-
  presidents-2015-financial-disclosure-forms ........................................................... 46

*Trump Grill*, Trump Tower N.Y.,
  http://www.trumptowerny.com/midtown-nyc-lunch-restaurant (last visited June 9, 2017)..... 17

University of Melbourne, Library Catalog, http://library.unimelb.edu.au/ ................................. 46

University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en ........................................... 46

*WARN Details*, N.Y. State Dep't of Labor (Mar. 23, 2017),
  https://labor.ny.gov/app/warn/details.asp?id=5870 ................................................................ 16

*Washington, DC Fact Sheet*, DC Press,
  https://washington.org/DC-information/washington-dc-fact-sheet
  (last visited June 9, 2017) ................................................................................................ 18, 21

**INTRODUCTION**

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW"), Restaurant Opportunities Centers United, Inc. ("ROC United"), Jill Phaneuf, and Eric Goode bring this suit seeking the extraordinary relief of a declaration and an injunction against the sitting President of the United States for alleged violations of the Foreign and Domestic Emoluments Clauses of the Constitution.  The Foreign Emoluments Clause prohibits federal officials holding "Office[s] of Profit or Trust" from "accept[ing] of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without the consent of the Congress.  U.S. Const. art. I, § 9, cl. 8.  The Domestic Emoluments Clause provides that the President shall receive "for his Services" a fixed compensation during his tenure and not "any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.

Plaintiffs read these Emoluments Clauses expansively to cover any benefit derived from any business dealings with a foreign, federal, or state instrumentality by an entity in which the President has a financial interest.  According to Plaintiffs, impermissible "emoluments" would include, among other things, payments by a foreign or domestic government instrumentality for goods, food, hotel stays, licensing agreements, real estate leases, and condominium common charges, or an instrumentality's grant of trademarks, licenses, permits, approvals, tax credits, and real estate leases.  Plaintiffs' broad-brush claims effectively assert that the Constitution disqualifies the President from serving as President while maintaining ownership interests in his commercial businesses.

Those claims falter on threshold grounds: no Plaintiff has alleged an injury that would support Article III standing and, thus, this Court's exercise of Article III jurisdiction.  As the Supreme Court has emphasized, no principle is more fundamental to the judiciary's proper role in our system of government than the requirement of an actual case or controversy.  Plaintiffs' allegations of injury do not meet this bedrock requirement.  CREW, which avers that the President's conduct is in conflict with its mission of preventing official corruption, has proffered

only an abstract injury of the sort long held insufficient to confer standing.  Although CREW asserts that it has had to divert resources to address the President's alleged constitutional violations, that asserted injury is purely self-inflicted and lacks any of the hallmarks of organizational standing.

Plaintiffs ROC United (an organization of restaurants and restaurant employees), Goode (an owner of several hotels and restaurants in New York City), and Phaneuf (an individual who books events for two Washington, D.C., hotels) likewise lack standing.  These self-proclaimed competitors have failed to allege sufficient facts to support any non-speculative loss of business due to competition with restaurants and hotels in which the President has financial interests—let alone the non-speculative loss of government-affiliated and funded patrons.  In metropolitan areas like New York City and Washington, D.C., there are hundreds of hotels and thousands of restaurants.  For that reason, and because these Plaintiffs' asserted injuries are necessarily dependent on the actions of third parties not before the Court, they are neither certainly impending nor traceable to the President's financial interests, let alone redressable by the requested injunctive and declaratory relief.

The Second Amended Complaint is also deficient in several other respects.  First, Plaintiffs' claims are outside the Emoluments Clauses' zone of interests because their asserted injuries—diversion of an advocacy organization's resources and loss of restaurant or hotel business—are not what the Clauses are intended to protect.  Rather, as Plaintiffs themselves concede, the Clauses are designed to prevent official corruption and foreign influence and to ensure Presidential independence.  They do not confer any right on an organization to advocate on one issue as opposed to another, or to avoid commercial competition from businesses in which the President holds a financial interest.  They accordingly cannot provide the basis for judicial relief here.

Second, Plaintiffs' expansive reading of the Emoluments Clauses is contrary to the original understanding of the Clauses and to historical practice.  The term "Emolument" in this context refers to benefits arising from personal service in an employment or equivalent

2

relationship.  Thus, under the Foreign Emoluments Clause, the prohibited foreign benefit must be conferred on the covered official in his or her official capacity or must arise from services rendered to a foreign state by the covered official.  And under the Domestic Emoluments Clause, the federal or state benefit must arise from the President's service as President.  Similarly, a "present" under the Foreign Emoluments Clause is a gift offered to a U.S. official because of his or her status as a U.S. official, and does not include legal entitlements accruing to the U.S. official by operation of law or pursuant to a private commercial transaction.  This construction accords not only with relevant historical sources, but also with the practices of public officials ranging from George Washington to Nelson Rockefeller.  What is more, it is consistent with interpretations of the Emoluments Clauses by government components charged with determining their applicability and with Congress' interpretation of the Foreign Emoluments Clause, as evidenced by the various laws by which Congress provided advance consent to arrangements it perceived to be covered by the Clause.

Finally, the relief sought by Plaintiffs is unconstitutional.  Suing the President in his official capacity, Plaintiffs seek an injunction ordering the President to divest his business interests in order to comply with Plaintiffs' interpretation of the Constitution.  However, the Supreme Court has long held that courts have no power to issue such injunctions against the President in an official-capacity suit.  *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) (finding "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  Moreover, the requested relief would "distract [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring), when "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving v. United States*, 517 U.S. 748, 757 (1996).  Given the President's unique status in the constitutional scheme, the Framers envisioned only political means to ensure a President's compliance with constitutional provisions such as the Emoluments Clauses, not official-capacity injunctions against the President.

3

## BACKGROUND

### I.     The Plaintiffs

CREW is an advocacy organization whose stated mission is "protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics." 2d Am. Compl. ¶ 154, ECF No. 28.  CREW alleges that it advances this mission through research, litigation, advocacy, and public education.  *Id.* ¶ 22. ROC United is an organization that "engages workers, employers, and consumers to improve wages and working conditions in the restaurant industry." *Id.* ¶ 180.  It allegedly has 25,000 restaurant employee members and over 200 restaurant members throughout the United States. *Id.* ¶¶ 11, 180.  It also owns a restaurant in New York City and will soon own one in Washington, D.C.  *Id.* ¶ 191.  Eric Goode owns several hotels and restaurants in New York City. *Id.* ¶ 18.  Jill Phaneuf books events for two hotels in Washington, D.C.  *Id.* ¶ 15.

### II.    The Alleged Constitutional Violations

Plaintiffs allege that the President owns and controls hundreds of businesses throughout the world, including some doing business as The Trump Organization.  *Id.* ¶ 42.  They allege that the President violates the Emoluments Clauses whenever such businesses receive "anything of value, monetary or nonmonetary" from an instrumentality of a foreign, federal, state, or local government.  *Id.* ¶¶ 7, 37.  In Plaintiffs' view, a "present" is anything of value "provided without a return of anything of equal value," while "an 'Emolument' . . . could cover anything else of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost."  *Id.* ¶ 37.  Plaintiffs accordingly assert that the Emoluments Clauses prohibit rental payments for units in the Trump Tower by China and the United Arab Emirates, *id.* ¶¶ 49–56; foreign-government payments for the purchase of goods, food, and services at hotels and restaurants run by businesses in which the President has financial interests, *id.* ¶¶ 64–87; Chinese trademarks issued to such businesses, *id.* ¶¶ 111–18; royalty payments from foreign-government-owned broadcast stations for television programs produced by

4

businesses in which the President has financial interests, *id.* ¶¶ 119–21; a lease of the Old Post Office Building in Washington, D.C. from the federal government for the site of the Trump International Hotel, *id.* ¶¶ 130–49; permits, approvals, and licenses provided to businesses in the United Arab Emirates and Indonesia in which the President has financial interests, *id.* ¶¶ 122–27; and condominium common charges for units in the Trump World Tower owned by the governments of Saudi Arabia, India, Afghanistan, and Qatar, *id.* ¶¶ 94–110.

According to Plaintiffs, "no proposed plan announced by [the President] or his attorneys can make [the President's] conduct constitutional or otherwise remedy the[] constitutional violations." *Id.* ¶¶ 254, 267.  Plaintiffs cite the then-President-elect's announcement on January 11, 2017, that he had disposed of his publicly traded or easily liquidated investments; that his illiquid investments and business assets—such as golf clubs, commercial rental property, resorts, and hotels—had been or would be conveyed to a trust; and that he would resign from all official positions he held with The Trump Organization and related entities and would relinquish leadership and management of those entities to his adult sons and another Trump Organization executive.  *See id.* ¶ 43 (citing *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8).[1]  Among other measures designed to avoid even the appearance of conflicts of interest, the then-President-elect also pledged during the news conference to donate all profits from foreign governments' patronage of his hotels and similar businesses to the U.S. Treasury.  Plaintiffs contend that this plan, despite all of the protections noted above, was insufficient because it "did not include [him] relinquishing *ownership* of his businesses or even establishing a blind trust."  *Id.*

---

[1] In determining whether a plaintiff has stated a claim, the Court may consider "documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)).

### III.     Plaintiffs' Alleged Injuries

CREW asserts that the President's alleged constitutional violations "directly impede CREW's ability to fulfill its mission," *id.* ¶ 175, because CREW "has been forced to divert essential and limited resources . . . from other important matters that it ordinarily would have been addressing to the Emoluments issues involving [the President]," *id.* ¶ 9.  CREW complains that it has had to conduct legal research about the Emoluments Clauses and factual research about the President's businesses; field inquiries from the public, media, and policymakers; issue press releases and other publications to educate the public; and work on this litigation and other contemplated legal proceedings.  *Id.* ¶¶ 157–62.  The activities CREW otherwise would have pursued include researching potential campaign finance and ethics violations by government officials and instituting legal and other proceedings to redress such violations.  *Id.* ¶¶ 156, 171.

ROC United alleges in a conclusory fashion that it and its members have "lost business, wages, and tips" because business from foreign and domestic government actors using government funds has been diverted from ROC United's members and its restaurant COLORS to restaurants owned by the President or in which the President has a financial interest.  *Id.* ¶¶ 13, 195, 199–200, 206, 208–209, 213, 216–17.

Goode and Phaneuf allege only future injuries.  Goode alleges that he "will be injured" by the loss of hotel and restaurant business in New York City to competitors in which the President has financial interests, *id.* ¶¶ 18–19, while Phaneuf alleges that she "will be injured" in the form of "loss of commission-based income" because foreign states will choose to host events at the Trump International Hotel in Washington, D.C., *id.* ¶¶ 15–17, 221–27, instead of at the two Washington, D.C., Kimpton hotels for which Phaneuf secures event bookings, *id.* ¶ 221.

Plaintiffs request that this Court declare that the President has violated the Emoluments Clauses, enjoin the President from such violations, and order the President to "release financial records sufficient to confirm that [he] is not engaging in any further transactions that would violate [these constitutional provisions]."  *Id.* ¶ 20.

**ARGUMENT**

## I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

This case should be dismissed for lack of jurisdiction because Plaintiffs have not met

their burden to establish Article III standing.  Neither CREW's allegations that it has diverted

advocacy resources nor the other Plaintiffs' conclusory allegations of past or future loss of

foreign-government business to hotels and restaurants in which the President has a financial

interest demonstrate a concrete, judicially cognizable injury that is both traceable to any alleged

violation of the Emoluments Clauses, and redressable through the relief Plaintiffs seek.

### A.     The Requirement of Article III Standing Is Especially Rigorous in the Context of Constitutional Challenges.

A district court may properly dismiss a complaint under Rule 12(b)(1) when the court

"lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201

F.3d 110, 113 (2d Cir. 2000).  Plaintiffs "ha[ve] the burden of proving by a preponderance of the

evidence that [jurisdiction] exists," and a district court "may refer to evidence outside the

pleadings" in resolving a Rule 12(b)(1) motion.  *Id.*; *Robinson v. Gov't of Malay.*, 269 F.3d 133,

140 n.6 (2d Cir. 2001) ("A district court 'may' consult evidence to decide a Rule 12(b)(1) motion

in contrast with a Rule 12(b)(6) motion . . . where it may not.  It 'must' do so if resolution of a

proffered factual issue may result in the dismissal of the complaint for want of jurisdiction.").

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and

"Controversies."  The Supreme Court has explained that "[n]o principle is more fundamental to

the judiciary's proper role in our system of government than the constitutional limitation of

federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 133 S.

Ct. 1138, 1146 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  One

element of this constitutional limitation is that a plaintiff must have standing to sue, a

requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial

process from being used to usurp the powers of the political branches."  *Id.*  Because its

"[r]elaxation . . . is directly related to the expansion of judicial power," *id.* at 1147, the standing

inquiry is "especially rigorous" when reaching the merits would force the judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)).

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of alleging facts that establish the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)). Plaintiffs here have failed to establish any of these elements.

### B.      Plaintiffs Do Not Allege Any Injury in Fact.

"To establish injury in fact, a plaintiff must show that he or she has suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). Specifically, the injury must affect the plaintiff in "a personal and individual way" and must be "real" not "abstract." *Id*. This is to ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). None of the Plaintiffs has established an injury in fact.

### 1.      CREW has alleged only an abstract injury.

CREW alleges that it is injured by the President's alleged constitutional violations because such violations are in "direct conflict" with CREW's mission to prevent corruption and reduce the influence of money in politics, 2d Am. Compl. ¶¶ 9, 154, and because CREW has devoted a portion of its resources to educating itself and the public about the alleged violations

and to bringing this litigation, all at the expense of its other advocacy activities. *Id.* ¶¶ 153–56. But CREW's voluntary decision to focus on its opposition to the President's financial holdings does not constitute a concrete, judicially cognizable Article III injury in fact.

CREW's allegations of injury amount to little more than CREW's own value judgment about what issues warranted its advocacy. CREW's asserted injury, therefore, is entirely "self-inflicted." *Cf. Clapper,* 133 S. Ct. at 1150–52 (no standing where plaintiffs' costly measures to avoid government surveillance they believed reasonably likely were "self-inflicted"); *McConnell v. FEC*, 540 U.S. 93, 228 (2003) (plaintiffs had no standing to challenge a statutory increase in political contribution limits because the inability to compete in fundraising arose from plaintiffs' "own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

At most, CREW's diversion of resources reflects an "interest in 'seeing' the law obeyed or a social goal furthered." *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987). But it is well established that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976); *accord Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) ("[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'"). As the Supreme Court explained in *Sierra Club v. Morton*, 405 U.S. 727, 739–40 (1972), "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem" does not give rise to a legally protected interest or a concrete injury. *Id.* at 739. This is so, the Court reasoned, because if any group with a bona fide special interest could sue, then "it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so." *Id.* at 739–40; *see, e.g., id.* at 739 (organization's "historic commitment" to environmental protection not enough to confer

standing to challenge approval of plan to develop ski resort); *Simon*, 426 U.S. at 39–40 (organization's "dedicat[ion] to promoting access of the poor to health services" did not confer standing to challenge tax treatment of nonprofit hospital that offered only emergency room services to indigents).  Accordingly, an organization seeking to advance one of its policy goals would not acquire standing simply because it had devoted resources to that goal at the expense of its other interests.  Nor could an organization circularly acquire standing to sue simply by expending the resources necessary to do so.  *See, e.g.*, *Steel Co. v. Citizens for A Better Env't*, 523 U.S. 83, 107 (1998) ("Obviously . . . a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit.").

CREW's theory of standing in this case is also foreclosed by *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974).  There, an association of members of the Armed Forces Reserve brought suit alleging that Members of Congress who also were members of the Armed Forces Reserve were violating the constitutional prohibition against serving in Congress while "holding any Office under the United States."  *Id.* at 210–11.  The Supreme Court held that the organization lacked standing because its asserted injury—deprivation of "faithful discharge of the [Members'] legislative duties" because of potential "undue influence by the Executive Branch" on the Members—was "an abstract injury" that reflected "only the generalized interest of all citizens in constitutional governance."  *Id.* at 212, 217.  The Court expressly "recognized the continued vitality" of its similar holding in *Ex parte Levitt*, 302 U.S. 633 (1937), which involved the prohibition against a Member of Congress being appointed to a civil office that was created, or the "emoluments" of which were increased, during the Member's tenure.  *Schlesinger*, 418 U.S. at 219–20.  In *Levitt*, a member of the Supreme Court bar was held to lack standing to challenge then-Senator Hugo Black's appointment to the Supreme Court because he had "merely a general interest common to all members of the public."  302 U.S. at 633.

Moreover, the *Schlesinger* Court explained that the requirement of concrete injury "is particularly applicable" where the plaintiff seeks "an interpretation of a constitutional provision

which has never before been construed by the federal courts" and where "the relief sought would, in practical effect, bring about conflict with two coordinate branches."  418 U.S. at 221–22.  "To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract," the Court said, "would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"  *Id.* at 222.  Those considerations apply with equal force here.

CREW's allegation that it has expended resources at the expense of its other activities in an effort to express its disapproval of the President's conduct does not change the analysis.  It is implausible that the organizational plaintiff in *Schlesinger* would have had standing had it only artfully pleaded that its advocacy was at the expense of its other activities.  All organizations' resources are limited, and anytime an organization pursues one of its advocacy priorities, it can always be said that it is doing so at the expense of some other advocacy activities it otherwise could pursue.  Allowing an organization to bootstrap its standing through its choices about where to expend resources would disregard *Schlesinger* and effectively eviscerate Article III's case-or-controversy requirement.

## 2. *Havens Realty Corp. v. Coleman* is inapposite.

CREW's apparent attempt to rely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is unavailing.  *Havens Realty* involved claims arising under the Fair Housing Act, which provides a private right of action to redress various forms of discriminatory housing practices. HOME, an organization that provided counseling and referral services to help individuals find housing, and its "testers"—"individuals who, without an intent to rent or purchase a home or apartment, pose[d] as renters or purchasers for the purpose of collecting evidence of [discrimination]," *id.* at 373—brought suit to challenge the defendants' racial steering practices. The Supreme Court held that a tester plaintiff who was given false information about the availability of housing had standing to sue because Congress has conferred on all "persons" a legal right to truthful information about available housing.  *Id.* at 373–74.  As the Court

explained, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* at 373.

The Court further held that HOME had standing because the defendants' practices made it more difficult for HOME to assist its clients in obtaining equal access to housing and because HOME had "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices." *Id.* at 379 (alteration in original). The Court reasoned that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*; *see also Ragin*, 6 F.3d at 905 (organization had standing to sue in Fair Housing Act case where defendant discriminated against the organization's clients, forcing the organization to divert resources from its counseling services to counteract the discriminatory practice); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 143–44 (2d Cir. 2014) (same).

*Havens Realty* does not advance CREW's claim to standing here. As a threshold matter, the case arose under a statutory private right of action to enforce a federal statute, the Fair Housing Act. *See Spokeo*, 136 S. Ct. at 1549 ("Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'") (quoting *Lujan*, 504 U.S. at 578). Congress's intention to allow private enforcement of discriminatory housing practices thus drove the Court's standing analysis. *See Havens Realty*, 455 U.S. at 373–74. Indeed, the Second Circuit has recognized that "whether a plaintiff has standing to assert a claim in federal court depends on 'the nature and source of the claim asserted'" and, "[i]n essence, the standing question is determined by 'whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (quoting *Warth*, 422 U.S. at 500). Here, however, Congress has not authorized private rights of action to enforce the Emoluments Clauses at all, much less to do so against the

President.  CREW, thus, is like the plaintiffs in *Schlesinger* and *Levitt*, not those in *Havens Realty*.

Havens Realty is inapposite for other reasons as well.  The defendants' racial steering practices at issue there made it more difficult for HOME to help its clients find housing, thus requiring HOME to divert more resources to prevent a distinct and palpable injury to its clients.  CREW's alleged diversion of resources is not analogous; it has chosen to spend limited resources not to prevent any concrete injuries, but rather to advance "only the generalized interest of all citizens in constitutional governance."  *Schlesinger*, 418 U.S. at 217.  In that circumstance, the organization lacks standing.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1430–34 (D.C. Cir. 1995) (organization devoted to "promote fair, responsible, and legal revenue-raising practices" by the government had no standing to challenge a particular tax provision, despite claim that it had expended resources to educate its members and others regarding the provision; the tax provision did "not force[] [the organization] to expend resources in a manner that keeps [it] from pursuing its true purpose of monitoring the government's revenue practices").

Under Second Circuit precedent, the existence of such distinct harm is a prerequisite to organizational standing under the *Havens Realty* rationale.  For example, in *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286 (2d Cir. 2011), an organization challenged a city tribunal's access policy for administrative hearings involving violations of transit authority rules by individuals, some of whom were the organization's clients.  Pursuant to the policy, the organization itself was denied access to observe the hearings, and it alleged that the policy impaired its ability to serve clients slated to appear before the tribunal.  *Id.* at 293, 295.  The Court held that the organization itself had standing because the policy threatened the organization's ability to assist its clients.  *Id.* at 295.  And in *Nnebe v. Daus*, 644 F.3d 147, 157–58 (2d Cir. 2011), a taxi drivers' organization brought suit to challenge the city's policy of summarily suspending the licenses of taxi drivers accused of certain crimes.  The Court held that the organization had standing because it was obligated to expend resources counseling the

summarily suspended members, including assisting them in obtaining attorneys.  *Id.*  As the Court noted, the case "[wa]s not an instance of 'manufactured' litigation"; rather, the organization "allocated resources to assist drivers only when another party—the City—has initiated proceedings against one of its members," thereby causing the members a distinct, individualized injury.  *Id.*

In short, to allege standing under the *Havens Realty* rationale, the organization must establish, at a minimum, "that it would have suffered *some other injury* if it had not diverted resources to counteracting the problem."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (emphasis added).  CREW does not satisfy that requirement here.  It has not pointed to any independent injury caused by the President's financial interests that necessitated CREW's diversion of resources.  The only "injury" CREW claims here is its expenditure of resources to advocate that the President is acting inconsistently with CREW's own interpretation of the Emoluments Clauses—advocacy activities that CREW regards as at the core of its mission.[2]  This is "pure issue-advocacy"—the "very type of activity distinguished by *Havens*," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161–62 (D.C. Cir. 2005), and routinely held to be insufficient to constitute cognizable injury.  *See, e.g.*, *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 542 (S.D.N.Y. 2006) ("[Plaintiff's] entire reason for being is to pursue the sort of advocacy . . . that it has pursued in this case . . . . [Plaintiff] simply made a choice about where and how to spend its limited resources."); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 159, 165 (S.D.N.Y. 1999) (organization expended resources advocating for police reform in response to allegedly unlawful police practices), *reconsideration granted on other grounds*, 191 F.R.D. 52 (S.D.N.Y. 1999); *Jones v. Deutsch*, 715 F. Supp. 1237, 1241–42, 1247 (S.D.N.Y. 1989) (organizations

---

[2] *See* 2d Am. Compl. ¶ 155 (CREW responds to public inquiries about the Emoluments Clauses "as [its] mission requires"); *id.* ¶ 170 ("[a]s part of its mission, CREW will need to research and monitor [the President's] businesses"); *id.* ¶ 157 (CREW conducts its emoluments-related activities "as part of [its] advocacy in support of its mission").

diverted resources to lobby for public housing project in opposition to defendant's campaign to stop or modify the project); *Am. Med. Ass'n v. United Healthcare Corp.*, 00-cv-2800, 00-cv-7246 (LMM), 2001 WL 863561, at *13–14 (S.D.N.Y. July 31, 2001) (organization's devotion of resources to countering the challenged practices impaired the organization's ability to pursue other issues). If CREW's allegations were sufficient to establish standing, then virtually all organizations could assert the same injury CREW alleges, in order to bring suit against the President and other government officials based simply on abstract disagreements with their official conduct.

### 3. ROC United, Phaneuf, and Goode have failed to establish an injury in fact.

The remaining plaintiffs—ROC United, Phaneuf, and Goode—also have not established standing because the complaint lacks sufficient factual allegations to satisfy the injury-in-fact requirement. Although the Federal Rules' pleading standard does not require detailed factual allegations, it still "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that offers only "'naked assertion[s]' devoid of 'further factual enhancement'" is insufficient to overcome a motion to dismiss. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).[3] The plaintiff must do more than "offer[] 'labels and conclusions,'" *id.* (quoting *Twombly*, 550 U.S. at 555), and "cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing," *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003). Any inferences in Plaintiffs' favor must be "reasonable" and based on "more than a sheer possibility" that particular facts are true. *Iqbal*, 556 U.S. at 678.

Here, ROC United alleges in a conclusory fashion that it and its members have been injured and will continue to be injured by the President's conduct because they are, or work for

---

[3] Although *Twombly* and *Iqbal* set forth the standard for considering the plausibility of allegations pursuant to Rule 12(b)(6), the same standard applies in assessing the sufficiency of allegations of injury for purposes of a Rule 12(b)(1) challenge to standing. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).

restaurants that are, competitors of restaurants affiliated with the President's businesses—
namely, Jean-Georges, Nougatine at Jean-Georges, Trump Grill, the World Bar (which is not a
restaurant), and Koi SoHo in New York City, as well as BLT Prime in Washington, D.C.  2d
Am. Compl. ¶¶ 195, 199–200, 206, 208–09, 213, 216–17.  Beyond those bare assertions, ROC
United identifies by name only its own restaurant, COLORS in New York City, as a competitor
of a restaurant located in the Trump SoHo hotel (Koi SoHo).  *Id.* ¶ 214.  But the complaint offers
no facts to allow the Court to infer that in a city with 24,000 restaurants,[4] COLORS, a 100%
gluten-free American restaurant located south of the East Village with a pending application for
a liquor license,[5] is a direct competitor of Koi SoHo, a Japanese restaurant located in West
SoHo.  The complaint also does not provide any specific allegations to clarify how COLORS,
which only opened in its current location in February this year,[6] has lost or will lose to Koi SoHo
customers who are diplomats and government officials paying with government funds—
particularly given that Koi SoHo is slated to close this month, reportedly due to poor
performance following the Presidential election.[7]

　　　　Plaintiff Goode's allegations that he "*will be* injured" or "*will be* harmed due to loss of
revenue" by the restaurants in which the President has financial interests suffer from the same
defect.  *Id*. ¶¶ 19, 230, 232, 234 (emphasis added).  Goode identifies three of his restaurants—the
Park (American cuisine) in Chelsea, Waverly Inn (American) in the West Village, and Gemma
(Italian) near the East Village—as competitors of Jean-Georges (French), Nougatine at Jean-

---

[4] *See Restaurant Grades*, New York City Department of Health and Mental Hygiene,
http://www1.nyc.gov/site/doh/services/restaurant-grades.page (last visited June 9, 2017).

[5] *See* COLORS NY, http://www.colorsrestaurantnyc.com (last visited June 9, 2017).

[6] Press Release, ROC United, COLORS Restaurant-New York Moves to 178 Stanton Street (Jan.
4, 2017), http://rocunited.org/2017/01/12490/.

[7] *See WARN Details*, N.Y. State Dep't of Labor (Mar. 23, 2017),
https://labor.ny.gov/app/warn/details.asp?id=5870 (Koi closing June 19, 2017); Chris Crowley,
*Koi, in the Trump SoHo, Will Close, Citing a Sharp Drop in Business*, Grub Street (Apr. 26,
2017, 5:43 PM), http://www.grubstreet.com/2017/04/trump-soho-koi-closing.html.

Georges (French), and Trump Grill (American), which are all in Midtown, and Koi SoHo.[8]  *Id.*
¶¶ 18, 228, 231.  In addition to the general differences in their locations and cuisines, there are
other factors that would affect competition, such as the fact that Jean-Georges is one of only six
restaurants in New York City awarded three Michelin stars,[9] that Trump Grill is not open for
dinner,[10] and that Koi SoHo is closing soon.  Far more concrete allegations would be needed to
allow the Court to infer direct loss of business from diplomats and government officials paying
with government funds.

Equally deficient are Goode's allegations of direct competition between his hotels—the
Maritime Hotel in Chelsea, the Bowery Hotel and Ludlow Hotel in the Lower East Side, and the
Jane Hotel in the Meatpacking District, *id.* ¶¶ 18, 228, 231—and the Trump International Hotel
and Tower next to Central Park and the Trump SoHo Hotel in West SoHo.  Both of the Trump-
named Hotels are AAA five-diamond hotels,[11] whereas Goode's hotels are not.  They are,
instead, boutique hotels or in the case of the Jane Hotel, a hostel that offers many rooms
featuring bunk-beds and communal bathrooms.[12]  In a city with 881 hotels,[13] Goode would need
to offer far more concrete facts to allow the Court to infer that he will lose business from foreign

---

[8] For each restaurant's cuisine, *see Restaurant Grades*, New York City Department of Health and
Mental Hygiene, http://www1.nyc.gov/site/doh/services/restaurant-grades.page (last visited June
9, 2017).

[9] *Report: Michelin Guide 2017: New York's Best Restaurants*, Michelin (last visited June 9,
2017), https://travelguide.michelin.com/north-america/united-states/new-york/new-
york/reportage/michelin-guide-2017-new-yorks-best.

[10] *Trump Grill*, Trump Tower N.Y., http://www.trumptowerny.com/midtown-nyc-lunch-
restaurant (last visited June 9, 2017).

[11] AAA, *AAA/CAA Five Diamond Hotels* 2 (Jan. 27, 2017),
http://www.aaa.biz/Travel_Information/Diamonds/Awards/2017/January%202017%20-
%205D%20Hotels.pdf.

[12] *See* The Jane Hotel, http://www.thejanenyc.com/ (last visited June 9, 2017) and *The Jane
Hotel*, Guest Reservations, http://www.guestreservations.com/the-jane-hotel/booking (last visited
June 9, 2017).

[13] The City of N.Y. Dep't of Finance Division of Tax Policy, *Statistical Profile of the New York
City Hotel Room Occupancy Tax* 5 (Tax Year 2015),
https://www1.nyc.gov/assets/finance/downloads/pdf/reports/reports_htx/2015_htx_report.pdf.

and domestic government actors using government funds to frequent the Trump-named, five-diamond hotels.

Phaneuf alleges in a similarly conclusory fashion that she "*will be* injured" by the President's conduct "due to loss of commission-based income," *id.* ¶ 225 (emphasis added); *see also id.* ¶¶ 16–17, because she works with a hospitality company to book events at two Washington, D.C., Kimpton hotels—the Carlyle Hotel in the Dupont Circle area and Glover Park Hotel in upper Northwest D.C.—that allegedly compete with the Trump International Hotel in downtown D.C. for events. *Id.* ¶¶ 221–27. Other than her self-serving assertion that she "specifically seeks to book embassy" and other foreign government functions, *id.* ¶ 15, Phaneuf does not allege that she has booked embassy or foreign government events in the past. Nor does she provide any other concrete allegations to allow the Court to infer that she will lose commissions from such bookings in the future to the Trump International Hotel. Phaneuf's conclusory allegation of direct competition is insufficient because, among other things, the two Kimpton hotels are boutique hotels that have significantly smaller facilities for events than does the Trump International Hotel.[14] Moreover, a foreign government looking to book events has many options in that market, as there are roughly 130 hotels in Washington, D.C. and close to 700 hotels in the Greater Washington, D.C., metropolitan area.[15]

Missing in all these allegations of future injuries is any showing that the supposed injuries are certainly impending. The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 133 S. Ct. at 1147 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). It is not enough that there is an "objectively

---

[14] *See Meetings & Events: Capacities*, Carlyle Hotel, http://www.carlylehoteldc.com/event-space-floor-plans/ (last visited June 9, 2017); *Meeting & Events: Capacities*, Glover Park Hotel, http://www.gloverparkhotel.com/meeting-space-washington-dc/capacities/ (last visited June 9, 2017); *Meetings & Events: Venues*, Trump International Hotel, Washington, D.C., https://www.trumphotels.com/washington-dc/venues (last visited June 9, 2017).

[15] *Washington, DC Fact Sheet*, DC Press, https://washington.org/DC-information/washington-dc-fact-sheet (last visited June 9, 2017).

reasonable likelihood" of future injury.  *Id.*  Nor can a plaintiff establish "certainly impending"
injury when the asserted injury is based on a "speculative chain of possibilities," *id.* at 1148, or
on "speculation about the decisions of independent actors," *id.* at 1150.

ROC United's, Phaneuf's, and Goode's allegations of future injuries are premised upon a
speculative chain of possibilities, including the decisions of third parties not before the Court.
For ROC United's member restaurants or Goode's restaurants to be injured, for example, a
government-affiliated and funded actor would first need to be a potential customer at their
restaurants as well as at a restaurant affiliated with the President's businesses, after eliminating
other similar restaurants as possible choices.  The actor would then need to specifically decide to
dine at a restaurant affiliated with the President instead of at a ROC United member restaurant or
a Goode-owned restaurant.  The alleged future injuries of ROC United's members who are
restaurant employees are even more conjectural, because they are premised on additional
speculation that the restaurants where these workers are employed will lay them off or reduce
their wages, or that they will receive fewer tips, because of the potential future loss of
government business to restaurants affiliated with the President.  This is "far too speculative" to
support standing.  *Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 94 n.3 (2d Cir. 2015) (allegations of
lower profits based on future sales "far too speculative to serve as the basis for an Article III
injury-in-fact" because the sales were not imminent).  Uncontrollable and unpredictable
decisions by third parties are also a necessary part of any claim that Phaneuf and Goode will
suffer any injuries in their hotel or hotel-events businesses.  For example, there is no reason to
assume that any prospective government customer deciding to book an event with one of the two
Kimpton hotels for whom Phaneuf books events will choose to employ Phaneuf or the hospitality
company affiliated with her for that booking.  In sum, ROC United's, Goode's, and Phaneuf's
alleged future injuries are merely "conjectural or hypothetical," *Spokeo*, 136 S. Ct. at 1548, and
do not establish injury in fact.

### 4. The competitor standing theory is inapplicable.

Plaintiffs ROC United, Phaneuf, and Goode may seek to rely on the theory of "competitor standing" to establish injury in fact.  But that theory is plainly inapposite.  To be sure, where the government controls access to a market and takes an action that either allows new entrants to the market or otherwise alters competition, courts have sometimes assumed from the laws of economics that the market participants have a competitive injury.  *See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (competitor standing doctrine provides standing in "some circumstances" to "challenge the Government's allegedly illegal under-regulation of the plaintiff's competitor"); *see also, e.g.*, *Investment Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971) (investment company plaintiffs had standing to challenge rule permitting banks to operate collective investment funds); *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) (grant applicants competing for the same, limited pool of grant money have standing when the challenged government action increased the number of applicants); *Sea-Land Serv., Inc. v. Dole*, 723 F.2d 975, 977 (D.C. Cir. 1983) (operator of vessel had standing to challenge government approval of another company to operate in same routes in which the plaintiff already operated).  Here, however, the restaurants and hotels affiliated with the President are themselves market participants, rather than government agencies that can alter the market through regulation.  Because the "case does not involve government action" by an agency with regulatory authority over the relevant market, the "doctrine of competitor standing has no bearing on this lawsuit." *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 169 (D.D.C. 2016), *appeal pending*, No. 16-7107 (D.C. Cir.).[16]

In any event, Plaintiffs could never satisfy "the basic requirement common to all [competitor standing] cases," namely establishing that the challenged government regulation has

---

[16] Plaintiffs allege that the General Services Administration ("GSA"), a government agency, improperly found the President's business to be in compliance with the government lease for the site of the Trump International Hotel in Washington, D.C.  *See* 2d Am. Compl. ¶ 145.  GSA's finding, however, is irrelevant to the "competitor standing" inquiry because GSA does not regulate the market for private hotel services.

caused "an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact." *Sherley*, 610 F.3d at 73.  As the D.C. Circuit has explained, "[t]he nub of the 'competit[or] [*sic*] standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that *will almost surely* cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing." *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995)) (emphasis added).  By contrast, courts routinely reject claims to competitor standing that are "conjectural" or fail to demonstrate that an agency decision "will almost surely" cause a plaintiff competitive injury.  *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001); *see also United Transp. Union, v. ICC*, 891 F.2d 908, 913 n.7 (D.C. Cir. 1989) (in assessing competitor standing, court need not "accept allegations founded solely on the complainant's speculation").

ROC United's, Phaneuf's, and Goode's allegations of future injuries fall within the category of claims that are too speculative to give rise to competitor standing.  First, Plaintiffs have not sufficiently alleged that they "personally compete[ ]" with the hotels and restaurants associated with the President.  *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989).  Second, restaurant and hotel competition necessarily is dependent upon many factors, including the supply and demand conditions of the relevant markets, the quality and type of food and services offered, and the location of the businesses in question.  Here, the two relevant markets have large numbers of hotels and restaurants: roughly 24,000 restaurants and 900 hotels in New York City; and over 2,000 restaurants and 130 hotels in Washington, D.C. (even without counting competition from the immediately adjacent suburbs of Maryland and Virginia).[17]  No law of economics suggests that, in markets this diffuse and competitive, the restaurants and hotels affiliated with Plaintiffs will imminently lose business to the five restaurants and three hotels affiliated with the President in these two markets or will otherwise suffer a cognizable competitive injury because of those establishments.  Under such conditions, competitor standing

---

[17] For the number of restaurants in Washington, D.C., *see Washington, DC Fact Sheet*, DC Press, https://washington.org/DC-information/washington-dc-fact-sheet  (last visited June 9, 2017).

is a non-starter.  *See Delta Air Lines, Inc. v. Export-Import Bank*, 85 F. Supp. 3d 250, 266

(D.D.C. 2015) (no competitor standing where "numerous factual questions remain unresolved

and undeveloped, many of which are necessary for determining if and how Plaintiffs might

suffer an injury-in-fact from the [agency's] allegedly wrongful conduct").[18]

### C.   ROC United, Phaneuf, and Goode Have Not Met the Traceability or Redressability Prongs of Standing.

For similar reasons, ROC United, Phaneuf, and Goode have not satisfied the traceability

and redressability requirements for Article III standing.  As discussed above, these Plaintiffs'

alleged injuries depend on the actions of third parties not before the Court, which forecloses any

reasonable inference of traceability or redressability.

In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 33, the Court

found that the indigent plaintiffs did not have standing to challenge the government's grant of

favorable tax benefits to nonprofit hospitals that offered only emergency-room services to

indigents, notwithstanding the claim that such tax benefits were encouraging the hospitals to

deny full services to the indigent.  The Court reasoned that the hospitals could have decided to

deny services "without regard to the tax implications," *id.* at 42–43, and that even if the

requested relief were granted, it was "just as plausible" that the hospitals "would elect to forgo

favorable tax treatment to avoid the undetermined financial drain of an increase in the level of

uncompensated services," *id.* at 43–44.

Similarly, in *Allen v. Wright*, 468 U.S. 737, 739–40 (1984), *abrogated on other grounds*

*by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Court held

that parents of public school children had no standing to challenge the government's grant of tax-

exempt status to racially discriminatory private schools because the asserted injury of segregated

---

[18] Plaintiffs also allege injuries to "unknowing third parties," including consumers, workers, small businesses, and competitors of businesses in which the President owns interests.  2d Am. Compl. ¶¶ 244–46.  Plaintiffs, however, do not fall within the narrow set of circumstances that would permit third party standing:  (1) the plaintiff has "a close relationship to the injured party," and (2) there is "a barrier to the injured party's ability to assert its own interests."  *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109–10 (2d Cir. 2008).

public education was dependent upon the decisions of third parties not before the Court.  Among other things, the Court noted that it was speculative "whether withdrawal of [the] tax exemption from any particular school would lead the school to change its policies."  *Id.* at 758; *see also Garelick v. Sullivan*, 987 F.2d 913, 919–20 (2d Cir. 1993) (Medicare beneficiaries had no standing to challenge statutory cap on doctors' charges because the asserted injury—increase in charges for poorer beneficiaries who previously benefited from doctors charging richer beneficiaries at levels higher than the cap now permitted—"would be the product of independent choices by physicians from among a range of economic options"); *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 229–30 (2d Cir. 2012) (plaintiff had no standing to challenge bank regulators' policy bulletin that allegedly encouraged change in bank lending practices because even if the bulletin were vacated, "national banks would remain entirely free to treat [plaintiffs] on an unfavorable basis").

Here, it is pure speculation that third-party government consumers using government funds would necessarily stop patronizing restaurants and hotels affiliated with the President and switch their business to those affiliated with Plaintiffs if the President were to be ordered to divest his financial interests in the relevant hotels and restaurants.  *See* 2d Am. Compl. ¶¶ 196–97, 203, 205, 212, 214, 222–23, 231.  As noted above, these third-party actors have hundreds of other options, so they may choose to patronize businesses not affiliated with Plaintiffs or to continue patronizing the same establishments regardless of the President's financial interests.  In other words, there is no reason to believe that granting the requested relief would have any perceptible impact on the businesses of ROC United, its members, Goode, or Phaneuf.

D.      **ROC United Does Not Have Associational Standing.**

Nor has ROC United established that it has associational standing, which is a "narrow exception [to] the ordinary rule that a litigant 'must assert his own legal rights and interests.'" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714–15 (2d Cir. 2004) (quoting *Valley Forge Christian Coll.*, 454 U.S. at 474).  To establish associational standing, an organization must show not only that its members would have standing to sue, but also—among other requirements—that

"neither the claim asserted nor the relief requested require[s] the participation of individual members in the lawsuit." *Id.* at 713 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  This latter standard is not met "where the fact and extent of the injury that gives rise to the claims for injunctive relief 'would require individualized proof' or where 'the relief requested would require the participation of individual members in the lawsuit.'"  *Id.* at 714 (alterations omitted) (citations omitted).

ROC United cannot satisfy either requirement.  The standing of its members, as putative competitors of hotels and restaurants in which the President has a financial interest, is even less developed—and thus more implausible—than the standing of ROC United in its own right.  *See* 2d Am. Compl. ¶¶ 196–98.  Moreover, the participation of the injured members is needed to adjudicate this lawsuit because the only way the Court can determine whether any member has been injured is through a fact-specific determination about that member's competition with restaurants affiliated with the President.  That information would also be necessary to determine the precise scope of injunctive relief that would redress the injuries.  Without their participation, associational standing is improper here.

*     *     *

Finally, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 42 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 277 (2016).  Accordingly, even if the Court were to find that ROC United, Phaneuf, and Goode have standing to challenge the President's financial interests in the relevant restaurants and hotels, their standing would not encompass the many aspects of the Second Amended Complaint that are unrelated to those specific financial interests.

## II.   PLAINTIFFS' ASSERTED INJURIES DO NOT FALL WITHIN THE ZONE OF INTERESTS OF THE EMOLUMENTS CLAUSES.

This Court should also dismiss Plaintiffs' claims on the ground that their asserted injuries do not fall within the zone of interests of the Emoluments Clauses.[19]  The zone of interests test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth*, 422 U.S. at 500. Thus, even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint."  *Air Courier Conference of Am. v. Postal Workers*, 498 U.S. 517, 523–524 (1991) (emphasis in original) (internal quotation marks omitted); *Valley Forge Christian Coll.*, 454 U.S. at 475 (test applies to claims under the Constitution); *see, e.g.*, *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195–96 (2d Cir. 2002) (Sotomayor, J.) (plaintiffs' alleged injury did not fall within the zone of interests protected by the Due Process Clause because their "harm is derivative of" due process-type harms and concerns First Amendment interests).  The Supreme Court has indicated that the zone-of-interests test may be even more rigorous when a plaintiff is asserting an implied cause of action rather than relying on the "generous review provisions of the APA."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (internal quotation marks and citation omitted).

Here, as discussed further below, the Emoluments Clauses were intended to guard against the corruption of and foreign influence on federal officials and to ensure the independence of the President.  They do not confer any right for an organization to advocate on one issue as opposed to another, or for businesses to avoid commercial competition from businesses in which the

---

[19] Although previously analyzed as a "prudential standing" consideration, the Supreme Court has since clarified that "zone of interests" is more appropriately considered a question of whether "the plaintiff has adequately pled a claim."  *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 201 (2d Cir. 2014) (citing *Lexmark Int'l*, 134 S. Ct. at 1387–88).

President holds financial interests.  Plaintiffs' alleged injuries thus bear no relation to the core concerns of the Emoluments Clauses.  Accordingly, their claims should be dismissed as falling outside the Clauses' zone of interests.

Plaintiffs here likewise lack a cause of action to seek relief against Defendant under the Emoluments Clauses.  While the Supreme Court has indicated that an equitable cause of action can lie in some circumstances, *see Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384 (2015), this is not an appropriate case to infer the existence of such an action, nor is there any basis to recognize an implied cause of action under the Emoluments Clauses.  Plaintiffs are not asserting their own individual rights under the Emoluments Clauses, they are not preemptively asserting a defense to a potential enforcement action against them by the Government, *see Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014); *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring), and nothing warrants recognizing an equitable cause of action in these circumstances.  For this reason as well, Plaintiffs' claims should be dismissed.

## III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE EMOLUMENTS CLAUSES.

Plaintiffs also fail to state a claim upon which relief can be granted.  Plaintiffs' interpretation of the term "Emolument" as covering "anything of value" received by any business in which the President has a financial interest from any foreign, federal, or state government instrumentality exceeds the Clauses' intended scope and meaning.  Neither the text nor the history of the Clauses shows that they were intended to reach benefits arising from a President's private business pursuits having nothing to do with his office or personal service to a foreign power.  Were Plaintiffs' interpretation correct, Presidents from the very beginning of the Republic, including George Washington, would have received prohibited "emoluments."  *Cf. NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("in interpreting [a constitutional provision], the Court puts significant weight upon historical practice"); *Mistretta v. United States*, 488 U.S. 361, 401 (1989); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819).

A.    **The Emoluments Clauses Prohibit Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment.**

The Foreign Emoluments Clause of the Constitution provides:

> [N]o Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8.  And the Domestic Emoluments Clause provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

*Id.*, art. II, § 1, cl. 7.  Plaintiffs define the term "Emolument" in both Clauses and the term "present" in the Foreign Emoluments Clause to mean "anything of value, monetary or nonmonetary," except that a "present" is "provided without a return of anything of equal value." 2d Am. Compl. ¶ 37.  These overbroad definitions constitute Plaintiffs' core legal error.

As explained below, the Emoluments Clauses apply only to the receipt of compensation for personal services and to the receipt of honors and gifts based on official position.  They do not prohibit any company in which the President has any financial interest from doing business with any foreign, federal, or state instrumentality.

1.    **The text of the Emoluments Clauses**

At the time of the Nation's founding, and in the decades following, an "emolument" was a common characteristic of a federal office, *see United States v. Hartwell*, 73 U.S. 385, 393 (1867), and comprehensively described "every species of compensation or pecuniary profit derived from *a discharge of the duties of the office*," *Hoyt v. United States*, 51 U.S. 109, 135 (1850) (emphasis added).  At the time, most federal officials were not paid salaries in the modern sense.  Leonard D. White, *The Federalists: A Study in Administrative History* 298 (1st ed. 1948) (discussing compensation for federal officials in the early Republic).  Following English precedent and as dictated by contemporary convenience, most federal employees were compensated by fees for services rendered.  *See id.*; *see, e.g.*, 1 American State Papers, 7th

27

Cong., 1st Sess., Misc. 307–08 (1802) (schedule of diplomatic consuls' "fees and emoluments").[20]   Their compensation could also include commissions and other privileges and benefits.   *See, e.g.*, 23 *Journals of the Continental Congress, 1774–1789*, at 670 (Gaillard Hunt ed., 1914) (Postmaster General authorized by the Act of 1782, which continued in force after 1789, to fix the fees of postmasters and to allow commissions on the postage received); *Hoyt*, 51 U.S. at 135 (customs collector's "emoluments" included fees for services rendered, commissions on duties, and a share of the fines, penalties, and forfeitures); *United States v. Ripley*, 32 U.S. 18, 18 (1833) (determining whether the "pay and emoluments" to which a military officer's "rank entitled him" included commission on moneys that passed through his hands and were disbursed by him for the supplies of the troops).[21]   The term could also mean salary for the minority of officials who did receive one.   George Washington, for example, used the term to refer to his salary in his first inaugural address, when he declined "any share in the personal emoluments, which may be indispensably included in a permanent provision for the Executive Department."[22] *See also McLean v. United States*, 226 U.S. 374, 382 (1912) (army officer's emoluments included salary, pay for two servants, and forage for two horses).

In light of this common usage in the founding era and for many decades thereafter, the term "Emolument" in the Emoluments Clauses should be interpreted to refer to a "profit arising from an office or employ."[23]   This interpretation is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an "Office of Profit or Trust."

---

[20] *Available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[21] Federal employees were then required to account for the "fees and emoluments" they received from private individuals for whom they performed services and from the Government if any.  *See United States v. Hill*, 120 U.S. 169, 174 (1889) (reprinting form used to account for all receipts).

[22] President George Washington, Inaugural Address of 1789 (Apr. 30, 1789), https://www.archives.gov/exhibits/american_originals/inaugtxt.html.  Congress subsequently set the Presidential salary at $25,000 per year.  *See* An Act for allowing a Compensation to the President and Vice President of the United States, 1 Stat. 72 (1789).

[23] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).

*See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).  As relevant here, the Clause prohibits benefits arising from services the President provides to the foreign state either as President (*e.g.*, making executive decisions favorable to the paying foreign power) or in a capacity akin to an employee of a foreign state (*e.g.*, serving as a consultant to a foreign power).

The text of the Domestic Emoluments Clause bolsters that interpretation.  The term "Compensation" in the Domestic Emoluments Clause is qualified by "for his Services" as President.  U.S. Const. art. II, § 1, cl. 7.  That qualification must also apply to "any other Emolument"—as noted, compensation was long considered a species of emolument—and the Clause's usage of "other" between "for his Services" and "Emolument" confirms that "Compensation" and "Emolument" are intended to be read in parallel.  Thus properly construed, an "emolument" under the Domestic Emoluments Clause must arise from the President's service as President.  The Clause thus fulfills its natural purpose of ensuring that a President's compensation and other benefits remain unaltered during his tenure, but does not preclude a President from acting on the same terms as any other citizen in transacting business with a federal or state instrumentality, such as entering into a lease or applying for a tax credit.

Further textual support is found in the *only other* instance in which the term "emolument" is used in the Constitution, where it is likewise associated with an office and refers to compensation arising from that office.  The Incompatibility Clause prohibits a Senator or Representative from assuming "any civil Office . . . which shall have been created, or the Emoluments whereof shall have been encreased" during his or her tenure.  U.S. Const. art. I, § 6, cl. 2.  The Clause treats an "Emolument" as an aspect of an "Office" that may be "encreased" by Congress, expressly tying it to the official's employment and duties.

The use of the term "Emolument" to refer to the receipt of value for services rendered or for a position held is also consistent with contemporaneous dictionary definitions.  One source from 1766 explained that "[e]molument relates to commissions and employments; intimating,

not only the salaries, but, all other perquisites."[24]   Another source from 1774 defined the term to mean "profit arising from an office or employ."[25]   The Oxford English Dictionary, citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[26]

To be sure, Plaintiffs' definition of the term as encompassing "anything of value" resembles a broader definition that also existed at the time of the founding.  For example, one dictionary defined the term "emolument" to mean "benefit," "advantage," or "profit."[27]   But the law has long been clear that where a word is capable of different meanings or "[w]here any particular word is obscure or of doubtful meaning, taken by itself," the "obscurity or doubt may be removed by reference to associated words."  *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893); *see also United States v. Stevens,* 559 U.S. 460, 474 (2010) ("an ambiguous term may be given more precise content by the neighboring words with which it is associated").  "It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context."  *Virginia*, 148 U.S. at 519.  This doctrine (referred to as *noscitur a sociis*) thus "avoid[s] the giving of unintended breadth" to a statute, *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), or a constitutional provision, *see, e.g.*, *Virginia*, 148 U.S. at 519.[28]   As

---

[24] 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766) (emphasis omitted).

[25] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).

[26] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.  Today, the Black's Law Dictionary (10th ed. 2014) provides a single definition of "[a]ny advantage, profit, or gain received as a result of one's employment or one's holding of office."  Consideration of contemporary definitions can also be appropriate.  *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (considering both contemporary and late 18th century definitions in interpreting the term "try" in Art. I, § 3, cl. 6 of the Constitution).

[27] *A New General English Dictionary* (18th ed. 1754); *see also A Complete Dictionary of the English Language* (2d ed. 1789) (emolument means "[p]rofit, advantage").

[28] In *Virginia v. Tennessee*, for example, the Court applied the maxim to interpret the Compact Clause, which prohibits a State from entering into "any Agreement or Compact with another State" without the consent of Congress.  U.S. Const. art. I, § 10, cl. 3.  Although "[t]he terms

discussed above, the term "Emolument," when read harmoniously with the rest of the Clause, has the natural meaning of the narrower definition of profit arising from an office or employ.

Moreover, Plaintiffs' interpretation of the term "Emolument" to mean "*anything* of value" would subsume the term "present" in the Foreign Emoluments Clause and render it redundant.  The Supreme Court has long held that "[i]n expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added." *Holmes v. Jennison*, 39 U.S. 540, 570–71 (1840); *see also Marbury v. Madison*, 5 U.S. 137, 174 (1803) (rejecting interpretation of constitutional provision that would result in "surplusage"); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("[A] cardinal principle of statutory construction [is] that we must give effect, if possible, to every clause and word of a statute.") (citation and quotations omitted).  The Foreign Emoluments Clause treats an "Emolument" as something distinct from other potential types of benefits (a "present," an "Office," or a "Title"), indicating that it is not all-encompassing.

The Foreign Emoluments Clause's prohibition on the receipt of a "present" from a foreign government likewise cannot be understood to encompass any possible thing of value that an officeholder might receive in any capacity.  It would be unnatural to describe a public official's receipt of benefits from a business venture unrelated to his office as "accept[ing] of [a] present," and nothing indicates that the Framers would have intended the Clause to be applied in

---

'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects," *Virginia*, 148 U.S. at 517–18, the Court held that they must be given "the meaning naturally attaching to them from their context," *id.* at 519.  And, "[l]ooking at the clause in which the terms 'compact' or 'agreement' appear," the Court found it evident that the prohibition is directed to only those agreements and compacts tending to increase the States' political power, and not those having nothing to do with the interest of the national government. *Id.*; *cf. Armstrong*, 135 S. Ct. at 1383; *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear . . . .").

that way.  At the time of the Nation's founding (as it is now), a "present" was defined as "[s]omething bestowed on another without price or exchange; the act of giving."  *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); *see also* Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/150677 ("present" is cross-referenced as a "gift" meaning "[s]omething, the possession of which is transferred to another without the expectation or receipt of an equivalent; a donation, present").  Nor can the term "present" naturally be read to include benefits tendered to a U.S. official by operation of law, such as foreign trademarks, licenses, permits, and approvals granted to an official's private business, as Plaintiffs allege, *see* 2d Am. Compl. ¶¶ 111–18, 122–28.[29]  Furthermore, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present" would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies.  In order to avoid such redundancies—and to give effect to the *noscitur a sociis* canon—both the term "Emolument" and the term "present" should be understood as office- and employment-specific.

### 2.    Adoption and historical interpretation of the Clauses

The adoption and historical interpretation of the Emoluments Clauses are consistent with the office- and employment-specific construction of the terms "Emolument" and "present."

### i.    Adoption of the Emoluments Clauses

The Foreign Emoluments Clause has its origin in the sixth article of the Articles of Confederation of 1781, which contained the identical proscription, without the current Clause's

---

[29] Plaintiffs allege that the Chinese trademarks granted to the President's business organization were illegal and gratuitous because Chinese law allegedly prohibits awarding trademarks that are the same as or similar to the name of foreign leaders.  2d Am. Compl. ¶ 115.  But even the sources upon which Plaintiffs rely support the propositions that (1) the Chinese government had begun clearing the way for granting the trademarks as early as September 2016 after years of litigation, *see id.* at 26 n. 37, and (2) the Chinese trademark policy prohibiting the use of a political leader's name may be intended to apply to third-party applicants (so as not to disparage the political leader), not a political leader applying for his own name, *see id.* at 27 n. 41.

proviso authorizing a congressional waiver.  The prohibition was adopted against the backdrop of "[a] custom [then] prevail[ing] among the European sovereigns, upon the conclusion of treaties, of bestowing presents of jewelry or other articles of pecuniary value upon the minister of the power with which they were negotiated," with "[t]he same usage [being] repeated upon the minister's taking leave at the termination of his mission."[30]  The prohibition was prompted by an incident involving a foreign government's gift to a U.S. ambassador, and the concern that, as a result of such gifts, U.S. ministers could be subject to foreign influence.  *See* James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America* 455 (Gaillard Hunt & James Brown Scott eds., 1920) [hereinafter *Debates in the Federal Convention*] (noting that the Clause was proposed by Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence").  Edmund J. Randolph, who had attended the Constitutional Convention, explained at the Virginia ratification convention that:

> The [prohibition] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state . . . .  This restriction is provided to prevent corruption.  All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community.  An accident which actually happened operated in producing the restriction.  A box was presented to our ambassador by the king of our allies.  It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any *emoluments* from foreign states.  I believe that if, at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.[31]

---

[30] 1 *A Digest of the International Law of the United States* 757 (Francis Wharton ed., 1886) [hereinafter Wharton's Digest] (quoting letter from John Q. Adams, Secretary of State, to Richard Rush, Minister to Great Britain (Nov. 6, 1817)); *see also* Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National Experience*, 32 The Historian 376, 376–78 (1970).

[31] 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465–66 (2d ed. 1891) [hereinafter *Debates in the Several State Conventions*].

The "accident" noted by Randolph appeared to be related to gifts King Louis XVI of France bestowed on American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin for successfully negotiating the Franco-American alliance treaty of 1778.[32]  They each received a gold snuff box with the picture of Louis XVI set with diamonds.[33]  Upon Lee's return to the United States in 1780, he asked the Continental Congress whether he could keep the gift and was given permission to do so.[34]  Thomas Jefferson noted that this episode "formed the subsequent rule."[35]  When Franklin took leave of the French Court in 1785, he also received a miniature portrait of the King set with 408 diamonds,[36] which he later received permission to keep.[37]

The history and purpose of the Domestic Emoluments Clause, like the history and purpose of the Foreign Emoluments Clause, is devoid of concern about private commercial business arrangements.  Benjamin Franklin advocated that the President should not receive any "salary, stipend[,] fee or reward whatsoever" for his services.  *See Debates in the Federal Convention* at 43–46.  The delegates decided instead that the President would receive a fixed compensation during his tenure.  *Id.* at 103, 294, 326.  Franklin and John Rutledge then proposed that the President not receive "any other emolument" from the federal government or any of the States.  *Id.* at 571.  Alexander Hamilton wrote in *The Federalist* that the Clause's purpose was to

---

[32] Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791 [hereinafter Notes of Presents], http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004; Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 79 (2013); *id.* (noting also that the prohibition as contained in the Articles of Confederation had little effect).

[33] Jefferson, Notes of Presents, *supra*; Davis, *Diplomatic Gifts and Emoluments*, *supra*, at 379–80.

[34] Letter from Arthur Lee to the President of Congress (Oct. 7, 1780), *in* 4 *Revolutionary Diplomatic Correspondence of the United States* 85-86 (Francis Wharton ed., 1889); 18 *Journals of the Continental Congress, 1774–1789*, at 1114–15 (Gaillard Hunt ed., 1910) (consent of Continental Congress).

[35] Jefferson, Notes of Presents, *supra*.

[36] Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003.

[37] *See* 30 *Journals of the Continental Congress, 1774–1789*, at 95 (John C. Fitzpatrick ed., 1934).

ensure that the President can have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." *The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961).  Under the Clause, he explained, "[n]either the Union, nor any of its members, will be at liberty to give, nor will [the President] be at liberty to receive, any other emolument than that which may have been determined by the first act." *Id*. at 493–94.  In other words, the evils sought to be prevented by the Clause are inducements in the forms of pecuniary compensation and other benefits for the President's services *as President*, as such benefits would pose the greatest danger of undermining the President's independence.

Historical context reinforces a bounded understanding of the Emoluments Clauses.  A theme throughout the Constitutional Convention and the ensuing debate over the ratification of the Constitution was the tension between the concern that public officials would be influenced by pecuniary inducements, on the one hand, and the need to adequately compensate capable persons who otherwise may not have sufficient means to assume public office, on the other.  *See, e.g.*, *Debates in the Federal Convention* at 43–46; *id*. at 402 ("the Legislature would make their own wages . . . too low, so that men ever so fit could not serve unless they were at the same time rich"); 3 *Debates in the Several State Conventions* at 371–72; *id.* at 388 (contrasting the President with the king of England, who "has a more permanent interest"; "His stock, his family, is to continue in possession of the same emolument."); *id.* at 484 ("it is not many years ago—since the revolution—that a foreign power offered emoluments to persons holding offices under our government"); 1 *id.* at 440 ("It is asserted that it will be very difficult to find men sufficiently qualified as legislators without the inducement of emolument.  I do believe that men of genius will be deterred, unless possessed of great virtues."); 3 *id.* at 368 ("the principal source of corruption in representatives is the hope or expectation of offices and emoluments").  The Framers settled on having fixed compensation and emoluments for the President for the duration of his office, restricting the legislators' ability to assume those offices whose emoluments were increased during the legislators' tenure, and prohibiting public officials' receipt of foreign gifts, emoluments, offices, or titles.  There was no discussion about constraints on private business

pursuits by public officials, and in fact, as discussed below, such pursuits were common at the time of the Nation's founding.

### ii.   Historical interpretation of the Clauses

Historical evidence confirms that the Emoluments Clauses were not designed to reach commercial transactions that a President (or other federal official) may engage in as an ordinary citizen through his business enterprises.  At the time of the Nation's founding, government officials were not given generous compensations, and many federal officials were employed with the understanding that they would continue to have income from private pursuits.  *See* White, *The Federalists*, *supra*, at 291–92, 296.  Charles Pinckney, who was credited with proposing the Foreign Emoluments Clause, maintained half a dozen plantations in South Carolina while holding various public offices.[38]  Presidents who were plantation owners similarly continued their agriculture businesses, exporting cash crops overseas.  George Washington, who had left his nephew in charge of his highly successful business,[39] required "weekly reports" from his farm managers at Mount Vernon,[40] and responded with detailed instructions.[41]  From his Presidential office, he wrote business plans, including those for his gristmill, from which he exported flour and cornmeal to "England, Portugal, and the island of Jamaica."[42]  Thomas

---

[38] *See* Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* 24–25 (Aug. 2000),
https://www.nps.gov/chpi/learn/historyculture/upload/CHPI_HRS.pdf.

[39] 6 Douglas Southall Freeman, *George Washington: A Biography* 160 (1954).

[40] *See, e.g.*, Letter from William Pearce to George Washington (Nov. 11, 1794),
http://founders.archives.gov/documents/Washington/05-17-02-0111.

[41] *See, e.g.*, Letter from George Washington to William Pearce (Jan. 12, 1794),
http://founders.archives.gov/documents/Washington/05-15-02-0050; Letter from George Washington to James Anderson (Jan. 8, 1797),
http://founders.archives.gov/documents/Washington/99-01-02-00159.

[42] *Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9,
http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill (last visited June 9, 2017); National Register of Historic Places Registration Form, George Washington's Gristmill, § 8, at 9 (2003),
http://www.dhr.virginia.gov/registers/Counties/Fairfax/029-

Jefferson maintained his farm and nail factory at Monticello and exported his tobacco crop to Great Britain.[43]  James Madison had a tobacco plantation in Montpelier,[44] and James Monroe's 3,500 acre Highland plantation grew timber, tobacco, and grain.[45]  While Madison's and Monroe's farm records apparently have not survived,[46] the export of farm products such as tobacco to England and elsewhere had been common since colonial times.[47]  Had the Framers intended the Emoluments Clauses to encompass benefits arising from a federal official's private commercial transactions with a foreign state, or in case of a President, with a foreign, federal, or state instrumentality, surely someone would have raised concerns about whether foreign governments or government-owned corporations may have been among the customers of the farm and other products regularly exported by early Presidents.  Yet, there is no evidence of these Presidents taking any steps to ensure that they were not transacting business with a foreign or domestic government instrumentality.

---

0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf; Letter from George Washington to William Pearce (Apr. 20, 1794) (asking Pearce not to grind any more wheat until instructed otherwise because of an embargo against ships sailing to foreign ports), http://founders.archives.gov/documents/Washington/05-15-02-0488; *see also* Thirty-Day Embargo, 1 Stat. 400 (1794).

[43] Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75–76 (Paul Leicester Ford ed., 1905); *see also* Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* 19, 57 (1991).

[44] Bruce Chadwick, *James & Dolley Madison* 167 (2014); Robert A. Nowlan, *The American Presidents, Washington to Tyler* 179 (2012).

[45] Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. & Biography 251, 262–63 (1993); National Park Service, *Ash Lawn-Highland*, https://www.nps.gov/nr/travel/journey/hig.htm (last visited June 9, 2017).

[46] *See* David O. Stewart, *Madison's Gift* 396 n.1 (2015); 5 *The Papers of James Monroe* xviii (Daniel Preston ed., 2014).

[47] *See, e.g.*, George Taylor, Arrangements between English and Southern Merchants (June 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003; National Park Service, *Historic Jamestowne, Tobacco: Colonial Cultivation Methods*, https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-methods.htm (last visited June 9, 2017).

Moreover, George Washington directly transacted business with the federal government while President.  For example, he bought several lots of public land in the then-Territory of Columbia in a public sale.[48]  Washington himself had authorized the public sale, and the sale was conducted by the Commissioners of the District of Columbia,[49] who were appointed by Washington, *see* 1 Stat. 130.[50]  In writing to the Commissioners to inquire about his prospect of being permitted to purchase more lots, Washington stated that he had "no desire . . . to stand on a different footing from every other purchaser."[51]  But no concern was raised that such transactions conferred a benefit, and thus a prohibited emolument, on Washington.  The absence of any such concern is especially telling because one of the three Commissioners had (like Washington himself) attended the Constitutional Convention,[52] and the other two had voted in the state ratification conventions.[53]  Washington was also careful about his conduct being beyond reproach in part because he recognized that his conduct could be precedent-setting.  *See* Letter from George Washington to Bushrod Washington (July 27, 1789) ("[m]y political conduct . . . must be exceedingly circumspect and proof against just criticism, for the Eyes of Argus are upon me, and no slip will pass unnoticed . . . .");[54] Letter from George Washington to James Madison

---

[48] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074.

[49] *See* Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068.

[50] *See also* George Cochrane Hazelton, *The National Capitol* 2–3 (1914).

[51] *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289.

[52]  *See* Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331; *Debates in the Federal Convention* at lxxxiv (Carroll).

[53] *See* 1 *Debates in the Several State Conventions* at 324 (Johnson); 3 *id.* at 654 (Stuart).

[54] *Available at* http://founders.archives.gov/documents/Washington/05-03-02-0189.

(May 5, 1789) ("As the first of everything, in *our situation* will serve to establish a Precedent, it is devoutly wished on my part, that these precedents may be fixed on true principles.").[55]

Plaintiffs' expansive construction of the Emoluments Clauses is further undermined by a proposed constitutional amendment that would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens.  In 1810, Congress passed a resolution to forward the following proposed amendment to the States for ratification:

> If any citizen of the United States shall accept, claim, receive or retain any title of nobility or honour, or shall, without the consent of Congress, accept and retain any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power, such person shall cease to be a citizen of the United States, and shall be incapable of holding any office of trust or profit under them, or either of them.

Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810).

Although no floor debates were recorded to shed light on the purpose of the proposed amendment, it is implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities.  Such a radical interpretation is all the more unlikely because the proposed constitutional amendment had overwhelming support in Congress,[56] and was only two States short of ratification.[57]  Even if the proposed amendment were a manifestation of an anti-foreign attitude also speculated to exist at that time,[58] it is inconceivable that Congress and

---

[55] *Available at* http://founders.archives.gov/documents/Washington/05-02-02-0157.  *See also* Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790) ("In our progress towards political happiness my station is new; and, if I may use the expression, I walk on untrodden ground. There is scarcely any action, whose motives may not be subject to a double interpretation.  There is scarcely any part of my conduct wch [sic] may not hereafter be drawn into precedent."), http://founders.archives.gov/documents/Washington/05-04-02-0363.

[56] 20 Annals of Cong. 672 (1810) (19 to 5 in the Senate); 21 Annals of Cong. 2050–51 (1810) (87 to 3 in the House).

[57] 2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818), *available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[58] Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and Bibliographic Nightmare*, 88 L. Lib. J. 121, 124 (1996).

nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds.

### 3.     Application of the Clauses since the Founding Era

For over two centuries, the Emoluments Clauses have been interpreted and applied in an office- and employment-specific manner, without infringing on the ability of Presidents or other officeholders to have private business interests.  In line with its drafting history, the Foreign Emoluments Clause was invoked most often, for the several decades following its adoption, in the context of foreign-government gifts tendered to U.S. diplomats or officials.  *See* Wharton's Digest at 757–59.  The first request made under the Constitution for congressional consent to retain such gifts was Thomas Pinckney's request in 1798 to keep gifts he received from the courts of Madrid and London on the termination of his missions to those places.[59]  The Senate gave its consent but the House refused for policy reasons.[60]  In 1817, Secretary of State John Quincy Adams instructed diplomats that "every offer of [a gift from a foreign sovereign] which may in future be made to any public minister or other officer of this Government abroad, will be respectfully but decisively declined."  Wharton's Digest at 757; *see also* H.R. Rep. No. 23-302, at 4 (1834) (Secretary of State Louis McLane giving the same instruction to U.S. diplomats in 1834).  But rather than always declining foreign gifts, U.S. diplomats sometimes accepted foreign presents on behalf of the United States so as not to cause offense or compromise the efficacy of their agency or their personal safety.  Wharton's Digest at 758 (citing a March 4, 1834 report from the Committee on Foreign Affairs).  "The presents in such cases, when not perishable, [were] deposited in the State Department, or, when not susceptible of such deposit (as with horses), sold, and the proceeds sent to the Treasury."  *Id*.  The practice by U.S.-based officials was similar.  *See, e.g.*, S. Exec. Doc. No. 23-49, at 2–3 (1834) (listing foreign gifts received by U.S. officials and deposited with the Department of State); H.R. Rep. No. 23-302, at

---

[59] *See* 8 Annals of Cong. 1582–93 (1798); Wharton's Digest at 757; Davis, *Diplomatic Gifts and Emoluments, supra*, at 379.

[60] *Id*.

2 (noting that Thomas Jefferson, while President, had received horses as presents from a foreign government, which he then sold, depositing the money into the Treasury); S. Exec. Doc. No. 37-23, at 6–7 (1862) (reprinting Abraham Lincoln's letter to the King of Siam accepting the King's gifts to him on behalf of the American people).

By 1881, Congress enacted the first law relating to the Foreign Emoluments Clause. *See* An act authorizing the persons therein named to accept of certain decorations and presents therein named, from foreign governments, and for other purposes, ch. 32, § 3, 21 Stat. 603 (1881). Consistent with preexisting practice, the focus of the law was on the issue of foreign gifts, and the law required that all presents, decorations, or other things "conferred or presented by any foreign government" to U.S. officials shall be tendered through the Department of State. *Id.* at 604; *see also* 5 U.S.C. § 115 (1925-26) (same); Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378, 526–27, (re-codifying same provision at 5 U.S.C. § 7341) ("A present, decoration, or other thing presented or conferred by a foreign government to an employee, a Member of Congress, the President, or a member of a uniformed service shall be tendered through the Department of State"); Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (providing advance Congressional consent for U.S. officials to accept "gifts and decorations" from foreign governments under certain limited circumstances).

While gifts from foreign governments dominated the early history of the Foreign Emoluments Clause, at least by the mid-19th century the Clause had also been invoked by the Attorney General to prohibit U.S. officials from accepting foreign "Offices" or compensation for personal services rendered directly to a foreign government. *See, e.g.*, *Marshal of Florida*, 6 Op. Att'y Gen. 409 (1854) (Marshal for the Southern District of Florida could not hold the office of commercial agent of France); *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537, 538 (1871) (American minister to one foreign power could not accept a diplomatic commission to the same foreign power from another foreign power). By way of contrast, the Government is not aware of any instance in this era where the Clause was applied to business transactions outside of government by private commercial entities in which a U.S. official had a financial interest.

More modern applications of the Emoluments Clauses by the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC")—the two government components charged with interpreting the Clauses' application—are to similar effect.  Both components have determined, for example, that while in office, President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "emoluments" from a State.  *See The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (President Reagan's pension from California could not "be construed as being in any manner received in consequence of his possession of the Presidency"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981) ("those [retirement] benefits are not emoluments in the constitutional sense" nor does their receipt "violate the spirit of the Constitution").

Indeed, in every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited emoluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government.  *See, e.g.*, *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 97 (1986) (agency consultant could not accept employment with a private corporation to perform work on a contract with a foreign government); *Application. of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158–59 (1982) (agency employee could not, on his leave time, work for an American consulting firm, which was under contract with a foreign government, to perform work on that contract); *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 819 (1970) (Air Force officer could not retain proceeds from the sale of contraband seized by the Republic of Colombia based upon information furnished by the officer while temporarily attached to the Colombian Air Force for training); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *4 (Comp. Gen. Mar. 11, 1985) (retired Marine Corps officers who were attorneys employed by or served as "of counsel" to a law firm could not serve as legal

42

counsel for the Office of the Saudi Military Attache without congressional consent); *Major Stephen M. Hartnett, USMC, Ret.*, 65 Comp. Gen. 382 (1986), *aff'd by* 69 Comp. Gen. 175 (1990); *To C.C. Gordon, USCG*, 44 Comp. Gen. 130 (1964), *aff'd by To Mr. Harvey E. Ward, USCG, Ret.*, B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964); *To the Secretary of the Air Force*, 49 Comp. Gen 819 (1970); *To the Secretary of Health, Education and Welfare*, 51 Comp. Gen. 780 (1972), *aff'd by Dr. R. Edward Bellamy, USPHS, Ret.*, B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978); *To N.R. Breningstall, Dep't of the Air Force*, 53 Comp. Gen 753 (1974); *see also Marshal of Florida*, 6 Op. Att'y Gen. at 409; *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. at 538.

The issues in these opinions often revolved around the nature of compensation from the foreign government and the U.S. official's precise employment relationship with the foreign government. *Compare* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) [hereinafter *Payment of Compensation*] (concluding that annuity payments made by the German Government to a federal official that were payable to other former German civil servants were prohibited by the Foreign Emoluments Clause),[61] *with Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955) (acceptance of annuity payments made by the German Government to a federal official as damages for injuries inflicted by the Nazi regime while he was a former citizen and public official of Germany did not violate the Foreign Emoluments Clause).[62]   In none of these instances was the Emoluments Clauses

---

[61] *Available at* https://www.justice.gov/olc/page/file/935721/download.

[62] One published opinion interpreted the Foreign Emoluments Clause to reach beyond a U.S. official's own personal service to encompass an employment relationship between a foreign government and the U.S. official's law partners, in circumstances where the official and his law partners shared a "community of interest."  *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") prohibited from receiving a distribution from their law partnerships that included revenues from foreign governments),

interpreted to reach the ordinary commercial activities of entities in which a government official or a sitting President held interests.

Congress's recent exercise of its constitutional authority to exempt particular activities from the scope of the Foreign Emoluments Clause is likewise inconsistent with viewing the Clause to reach private business arrangements having nothing to do with an official's office or personal service to a foreign power.  In recent decades, Congress has enacted Foreign Emoluments Clause-related laws to allow retired members of the armed forces and Reservists— who are holders of "Office[s] of Profit or Trust" because they may be recalled to active duty—to accept certain foreign civil or military employment under specified conditions.  *See* Act of Oct. 12, 1982, Pub. L. No. 97-295, 96 Stat. 1287, *codified at* 37 U.S.C. § 908 (providing general consent to civil employment); National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834, *codified at* 10 U.S.C. § 1060 (providing general consent to employment by military forces of a newly democratic nation).  It also has enacted laws to provide consent to other government employees' employment by foreign governments. *See*, *e.g.*, Panama Canal Commission Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 3504, 107 Stat. 1547, 1965, *codified at* 22 U.S.C. § 3641 note (providing consent under the Foreign Emoluments Clause to civil employment, and compensation for that employment, of alien employees of the Panama Canal Commission by the Government of Panama).  Had Congress understood the Foreign Emoluments Clause to reach more broadly than compensation arising from personal services rendered to a foreign government, it surely would have exempted

---

*modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010) (non-paid, nongovernment members of ACUS not subject to the Emoluments Clause because they do not hold "Office[s] of Profit or Trust").  Situations involving law partners and their profit sharing are distinct from the financial interests at issue in this case.  *See* Restatement (Third) of the Law Governing Lawyers § 123, cmt. b; Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) (imputation of conflicts of interest within a law firm is based on the "premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated").

a wider range of activities.  Moreover, it is implausible that Congress would have exempted direct personal services to foreign governments yet left in place the prohibition on more attenuated interactions, such as holding a financial interest in a business that sells to foreign officials.

> **B.**     **Plaintiffs' Arguments in Support of Their Interpretation Have No Merit.**

In arguing that "Emolument" means "anything of value," Plaintiffs cite the Foreign Emoluments Clause's prohibition on accepting an "Emolument . . . of any kind whatever."  *See* 2d Am. Compl. ¶ 37.  Plaintiffs' reliance on that language is largely circular.  The phrase "of any kind whatever" does not expand the meaning of "Emolument," but instead reflects an emphasis that the Clause does not exempt any type of "Emolument."  *See Payment of Compensation* at 8 ("the phrase 'of any kind whatever' was intended to cover compensation of any sort arising out of an employment relationship with a foreign state").  That conclusion sheds no light on the antecedent question of what constitutes an "Emolument" in the first place.[63]

Plaintiffs' reliance on the purposes of the Emoluments Clauses is similarly misplaced.  Although the Clauses were intended to combat corruption and foreign influence and to ensure Presidential independence, *see* 2d Am. Compl. ¶¶ 35, 38–40, 154, the text, original understanding, and historical practice provide no support for Plaintiffs' inferential leap from the Clauses' purposes to a blanket prohibition on receiving "anything of value," regardless of context.  "[N]o legislation," including the Constitution, "pursues its purposes at all costs," *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).  Indeed, as noted above, even as the Framers confronted the competing concerns that public officials would be influenced by pecuniary inducements and that capable persons might not have sufficient means to assume

---

[63] *See Small v. United States*, 544 U.S. 385, 388 (2005) ("[t]he word 'any' considered alone cannot answer th[e] question" of how narrowly or broadly to interpret a statute); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.) ("general words," such as the word "'any,'" must "be limited" in their application "to those objects to which the legislature intended to apply them").

public office, they gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office.

Plaintiffs' definition also would create absurd consequences.  For example, under Plaintiffs' theory, a President could not hold United States Treasury bonds while in office because the accrued interest would be benefits "from the United States" under the Domestic Emoluments Clause.[64]  Likewise, royalties from foreign book sales received by a President or covered official while in office would offend the Foreign Emoluments Clause if any of them were attributable to purchase by a foreign government instrumentality, such as a foreign public university.  *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 15 (1994) (foreign public universities are "presumptively foreign states under the [Foreign] Emoluments Clause").[65]

And if the term "Emolument" means "anything of value" from a government instrumentality, then mere stock holdings by a covered official in companies that conduct business globally would also violate the Foreign Emoluments Clause, since some of those companies' earnings would be attributable to business with foreign governments.  Before this suit, that conclusion had never been contemplated.  For example, Vice President Nelson A. Rockefeller had stock holdings in major oil companies such as Exxon, Standard Oil of California and Indiana, and Texaco, as well as in other corporations that conducted business globally,

---

[64]  President Obama, for example, owned U.S. Treasury notes and bills during his tenure.  *The President and Vice President's 2015 Financial Disclosure Forms*, President Barack Obama White House (May 16, 2016), https://obamawhitehouse.archives.gov/blog/2016/05/16/president-and-vice-presidents-2015-financial-disclosure-forms (last visited June 9, 2017) (containing links to President Obama's financial disclosure reports from 2010 to 2015).

[65] For 2009, President Obama reported foreign income of approximately $1.6 million (*see* https://obamawhitehouse.archives.gov/sites/default/files/president-obama-2010-complete-return.pdf), which likely included royalties from the sale of his books.  Many foreign public universities have President Obama's books in their library collection.  *See, e.g.*, University of Melbourne, Library Catalog, http://library.unimelb.edu.au/; University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en; Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/; Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en.

including Dow Chemical, General Electric, and 3-M.  Although these companies surely received some benefit from business with foreign governments, no Foreign Emoluments Clause concern was raised in the Senate or House committee reports concerning his confirmation, despite extensive discussions of those holdings.[66]  Similarly, during her time in office, former Commerce Secretary Penny Pritzker owned a large quantity of stock in the Hyatt Hotels Corporation, which is substantially owned by her family and has hundreds of establishments throughout the world.[67]  No issue concerning the Foreign Emoluments Clause arose,[68] even though the Secretary surely derived benefits from foreign governments' patronage of Hyatt Hotels worldwide and from any permits, licenses, and approvals those governments granted to Hyatt Hotels to operate in their respective countries.  Under Plaintiffs' theory, such holdings would be in violation of the Foreign Emoluments Clause as well.

Moreover, if Plaintiffs were correct that permits, approvals, and licenses granted by a foreign government constitute "emoluments" or "presents," *see* 2d Am. Compl. ¶¶ 111–18, 122– 28, then a U.S. official with overseas property that is subject to foreign licensure requirements would violate the Foreign Emoluments Clause as well.  Retired members of the armed forces, who are subject to the Foreign Emoluments Clause, would face similar problems if they were to live or to do business abroad.  As noted, Congress has consented in specified conditions to foreign employment and receipt of compensation by retired military personnel, but not to receipt of licenses, permits, and other foreign-government "benefits" that retired military personnel might need to avail themselves of that consent.  And under Plaintiffs' theory, a retired military

---

[66] *See Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*, S. Exec. Doc. No. 93-34, at 28 (1974); *Confirmation of Nelson A. Rockefeller as Vice President of the United States*, H.R. Rep. No. 93-1609, at 39–40 (1974).

[67] *See* Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/; Hyatt Hotels Corporation, Form 10-K at F-41 (2016), http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/Hyatt-Q4-2016-Form-10-K.pdf.

[68] *See* Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/.

officer also would not be able to own stock in a company, such as a hospitality establishment, *in the United States*, unless the establishment turns away all foreign government customers.

## IV.   THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.

Finally, Plaintiffs seek an unconstitutional remedy: an injunction against the President in his official capacity.  In *Mississippi v. Johnson*, for example, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  71 U.S. at 500–01 ("The Congress is the legislative department of the government; the President is the executive department.  Neither can be restrained in its action by the judicial department.").[69]  A plurality of the Court later reiterated that principle in *Franklin v. Massachusetts*.  *See* 505 U.S. at 802–03 ("In general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Mississippi*, 71 U.S. at 501).  The plurality in *Franklin* found it "extraordinary" that the district court in that case had issued an injunction against the President and two other government officials.  *Id.* at 802, 806.  "At the threshold," it said, "the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable."  *Id.* at 803. Concurring in *Franklin*, Justice Scalia explained that, under *Mississippi*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity.  *Id.* at 827– 28 (noting that such principle is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history").  He reasoned that just as the President is absolutely immune from official capacity damages suits, so is he immune from efforts to enjoin him in his official capacity.  *Id.* at 827 ("[m]any of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for acknowledging an absolute Presidential immunity from civil damages for official acts apply with

---

[69] The Supreme Court has left open the question whether the President might be subject to an injunction requiring the performance of a purely "ministerial" duty.  *See Mississippi*, 71 U.S. at 500–01.  However, the relief sought in this case—forcing the President to restructure his financial affairs in order to comply with Plaintiffs' interpretation of the Constitution—cannot fairly be described as purely "ministerial."

equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions"). The lower courts have often applied this settled principle. *See*, *e.g.*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[w]ith regard to the President, courts do not have jurisdiction to enjoin him"); *Int'l Refugee Assistance Project v. Trump*, No. 17-1351, 2017 WL 2273306, at *27 (4th Cir. May 25, 2017) ("we find that the district court erred in issuing an injunction against the President himself"), *petition for cert. filed* (June 2, 2017).

The *Johnson* case is supported by the President's unique position atop the Article II hierarchy. Courts have "recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Fitzgerald*, 457 U.S. at 753. The President "occupies a unique position in the constitutional scheme" and is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 749–50; *Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (referring to the President and Congress as the "principals in whom the executive and legislative powers are ultimately vested"). Such restraint is particularly warranted in circumstances where, as here, Plaintiffs seek relief that would require detailed superintendence of the President's affairs. Plaintiffs challenge everything from a single diplomat's payment for hospitality services to any trademarks, permits, licenses, and approvals that may be granted by foreign governments in connection with the commercial activities of the President's business organization in numerous countries. Any relief directed at those activities would ensnare the President in prolonged litigation over any number of transactions, "distract[ing] [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *id.* at 828 (Scalia, J., concurring), even though "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving*, 517 U.S. at 757; *see also Clinton v. Jones*, 520 U.S. 681, 714 (1997) (Breyer, J., concurring) ("Article II implicitly

49

grants an official inviolability to the President while he is in the discharge of the duties of his office, and that this inviolability must be broad enough to permit him to perform his official duties without obstruction or impediment.").

Given the President's unique constitutional status, it is unsurprising that when discussing the Foreign Emoluments Clause at the Virginia ratifying convention, Edmund J. Randolph, who was the first Attorney General of the United States, mentioned only political means for redressing a President's violation.  *See* 3 *Debates in the Several State Conventions* at 486. Indeed, the Constitution vests in Congress the power to waive Foreign Emoluments Clause violations, U.S. Const. art. I, § 9, cl. 8, and, as explained above, Congress has exercised that power in deliberating whether to provide consent in specific circumstances.  Accordingly, Congress is far better equipped than the courts to address whether particular arrangements violate the Clause.  Likewise, Congress could weigh the potential for foreign influence and deploy a wide range of options available to it, ranging from providing consent in specific cases to judging whether alternative approaches, such as policies implemented to effectuate the then-President-elect's pledge to donate profits from foreign governments' patronage of his hotels and similar businesses, sufficiently address concerns related to the Foreign Emoluments Clause. Finally, if Congress disagrees with the President (or any other public official) regarding the applicability of the Clause in individual cases, it has ample means for pressing its view, including the enactment of legislation codifying its preferred view by statute.  Similarly, although Congress cannot consent to any perceived violation of the Domestic Emoluments Clause, it nevertheless could take steps to expand conflict-of-interest protections by statute.  This Court should not abrogate a centuries-long tradition of resolving emoluments-related issues through these political processes.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Dated:  June 9, 2017                              Respectfully submitted,

                                                  CHAD A. READLER
                                                  Acting Assistant Attorney General

                                                  JENNIFER D. RICKETTS
                                                  Director, Federal Programs Branch

                                                  ANTHONY J. COPPOLINO
                                                  Deputy Director

                                                  /s/ *Jean Lin*
                                                  JEAN LIN
                                                  Special Counsel
                                                  JAMES R. POWERS
                                                  Trial Attorney
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  20 Massachusetts Ave. NW
                                                  Washington, DC  20530
                                                  Phone: (202) 514-3716
                                                  Fax: (202) 616-8202
                                                  Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2017, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jean Lin*
JEAN LIN