**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CITIZENS FOR RESPONSIBILITY AND ETHICS IN
WASHINGTON, RESTAURANT OPPORTUNITIES
CENTER (ROC) UNITED, INC., JILL PHANEUF, AND
ERIC GOODE,

                         *Plaintiffs*,

            – v –

DONALD J. TRUMP,
IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
STATES OF AMERICA,

                    Defendant.

17 Civ. 458 (RA)

---

## BRIEF FOR SCHOLAR SETH BARRETT TILLMAN AS *AMICUS CURIAE* IN SUPPORT OF THE DEFENDANT

Robert W. Ray
Thompson & Knight LLP
900 Third Avenue
20th Floor
New York, NY 10022
212-751-3001

Josh Blackman
   Admission *pro hac vice* pending
Josh@JoshBlackman.com
1303 San Jacinto Street
Houston, TX 77002
202-294-9003
*Counsel of Record*

## Table of Contents

Table of Authorities ......................................................................................................... iii

Introduction ..................................................................................................................... 1

I.   The Term "Emoluments" as used in the Constitution's Emoluments Clauses Does
     Not Extend To Business Transactions For Value .................................................. 4

     A.   "Emoluments" Are Pecuniary Benefits That Derive from The Discharge of the
          Duties of an Office ......................................................................................... 4

     B.   Courts Follow The "Heritage Which Comes . . . Straight from George Washington" .... 9

     C.   Benefits from Washington's "Public Sale of Lots" Were Not "Emoluments" .............. 10

II.  The Foreign Emoluments Clause Does Not Encompass the Presidency ........................... 13

     A.   President Washington Accepted Diplomatic Gifts Without Requesting
          Congressional Consent ................................................................................... 14

     B.   President Jefferson Accepted Diplomatic Gifts Without Requesting
          Congressional Consent ................................................................................... 15

     C.   Presidents Madison and Monroe's Accepted a Diplomatic Gift Without
          Requesting Congressional Consent ................................................................... 17

     D.   Secretary Hamilton Excluded The President From A List of "Every Person
          Holding Any Office or Employment *Under* the United States" .................................. 18

     E.   The First Congress's Narrow Usage of "Officer under the United States" Mirrors
          That Of Hamilton ......................................................................................... 21

     F.   George Mason and Edmund Randolph's Overly-Broad Understanding of "Officer"
          Was Idiosyncratic, and Ultimately Rejected ...................................................... 22

III. The Washington-Era Precedents Are Superior to Post-Jackson Evidence ........................ 25

     A.   Post-Jackson Presidents Depart from Washington-Era Precedents ............................. 26

     B.   Purported Defiance By Washington Is More Probative Than Voluntary Surrender By
          Jackson ..................................................................................................... 28

Conclusion ...................................................................................................................... 30

Certificate of Service ........................................................................................................ 32

## Table of Authorities

**Cases**

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998) ............................................................... 9, 29

*Clinton v. Jones*, 520 U.S. 681 (1997) ............................................................................... 9

*D.C. v. Heller*, 554 U.S. 570 (2008) ................................................................................ 27

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) ............................................................. 28

*De Veau v. Braisted*, 363 U.S. 144 (1960) ....................................................................... 22

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ............................................................. 21

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) .................................................... 9, 29

*Freytag v. C.I.R.*, 501 U.S. 868 (1991) ............................................................................ 10

*Hoyt v. U.S.*, 51 U.S. (10 How.) 109 (1850) ............................................................. 2, 4, 5

*I.N.S. v. Chadha*, 462 U.S. 919 (1983). .......................................................................... 26

*In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) ..................................................................... 25

*Lamar v. United States*, 241 U.S. 103 (1916) ............................................................ 3, 23

*Lewis v. Clarke*, 137 S. Ct. 1285 (2017) ......................................................................... 30

*McPherson v. Blacker*, 146 U. S. 1 (1892) ..................................................................... 28

*Myers v. U.S.*, 272 U.S. 52 (1926) ................................................................ 1, 9, 25, 27

*NASA v. Nelson*, 562 U.S. 134 (2011) .............................................................................. 9

*N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550 (2014) .................................................... 9, 28

*N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ............................................................. 9

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ...................................................................... 30

*Powell v. McCormack*, 395 U.S. 486 (1969) ................................................................... 21

*R v. Obeid (No 2) [*2015], New South Wales Supreme Court 1380 ................................ 20

*Re Legislative Council Election, 22nd Sept. 1988,* [1989] 2 H.K.L.R. 194, 217 ........................... 5

*Schell v. Fauche*, 138 U.S. 562 (1891) ........................................................................... 27

*State ex rel. Anaya v. McBride*, 539 P.2d 1006 (N.M. 1975) .......................................... 5

*State ex rel. Benson v. Schmahl*, 145 N.W. 794 (Minn. 1914) ......................................... 5

*State ex rel. Todd v. Reeves*, 82 P.2d 173 (Wash. 1938) ................................................. 5

*Steinbach v. BOP*, 339 F. Supp. 2d 628 (D.N.J. 2004) ................................................... 18

*Stuart v. Laird*, 5 U.S. 299 (1803) ................................................................................ 28

*SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67 (D.C. Cir. 2015), aff'd, 137 S. Ct. 929 (2017) .............. 18

*The Pocket Veto Case*, 279 U.S. 655 (1929) ................................................................... 28

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)..............................................9

*U.S. v. Curtiss-Wright Exp. Corp.,* 299 U.S. 304 (1936).............................................9

*U.S. v. Mead Corp.,* 533 U.S. 218 (2001).....................................................................18

*U.S. v. Burr,* 25 F. Cas. 187 (C.C.D. Va. 1807)............................................................30

*Van Orden v. Perry*, 545 U.S. 677 (2005) ......................................................................9

*Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265 (1888)...................................................26

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...........................10, 28

*Zivotofsky v. Kerry*, 135 S.Ct. 2076 (2015) ...............................................................30

*Zucker v. Menifee*, No. 03 CIV. 10077 (RJH), 2004 WL 102779 (S.D.N.Y. Jan. 21, 2004) .......18

## Constitutional Provisions

Articles of Confederation of 1781, art. VI, para. 1 ......................................................20

Georgia Const. § 18 (1777)...........................................................................................20

Penn. Const. § 10 (1775).............................................................................................20

Penn. Const. § 40 (1775).............................................................................................20

U.S. Const. art. I, § 6 cl. 2...........................................................................................6

U.S. Const. art. I, § 9, cl. 8.....................................................................................1, 8

U.S. Const. art. II, § 1, cl. 7 .......................................................................................1

Vt. Const. § 12 (1786).................................................................................................20

Vt. Const. § 26 (1786).................................................................................................20

## Statutes

21 Stat. 603 (1881)......................................................................................................28

5 U.S.C. § 7342...........................................................................................................28

Act of Sept. 6, 1966, 80 Stat. 378, ..............................................................................28

An Act for the Punishment of certain Crimes, 1 Stat. 112 (1790)................................21

An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25 (1707).....20

Treasury Act, 1 Stat. 65 (1789)....................................................................................22

## Other Authorities

1 Joseph Story, *Commentaries on the Constitution of the United States* (reprint 1891) (1833)... 24

1 Journal of the Senate of the U.S.A (1820) (May 7, 1792 entry)................................18

1 *The Writings of James Monroe 1778–1794* (1788) ..................................................23

2 Esther Singleton, *The Furniture of our Forefathers* (1906) ....................................14

3 *The Debates in the Several State Conventions* (1836).................................11, 22, 23

8 Annals of Cong. 1582-1595 (1798) ................................................................ 14

8 Annals of Cong. 2319 (1799) .............................................................. 3, 23

11 Journal of the Continental Congress (May 15, 1778) ............................. 20

14 Abridgment of the Deb. of Cong. (1860) ................................................. 26

*A Complete History Of The Marquis De Lafayette* (1826) ............................ 14

Akhil Reed Amar, *America's Unwritten Constitution* (2012) ......................... 9

*Alexander I (Sculpture)*, Monticello ............................................................. 16

André Maurois, *Adrienne: The Life of the de La Fayette* (Gerard Hopkins trans., 1961) ........... 14

Andy S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*,
   102 Minn. L. Rev. __ (2017) .................................................................... 5

Anne Twomey, *The Constitution of New South Wales* (2004) ..................... 20

*Bastille Key*, Mount Vernon ......................................................................... 14

*Biographical Directory of the U.S. Cong*. .................................................... 12

Bob Arnebeck, *Through a Fiery Trial: Building Washington, 1790–1800* (1991) ........................ 11

Brian Kalt, *Constitutional Cliffhangers* (2012) .......................................... 30

*Carroll, Daniel (1730–1796)*, Biographical Directory of the U.S. Cong. .................................. 11

Certificate for Lots Purchased in the Dist. of Col. (Sept. 18, 1793), Founders Online .......... 11, 12

Columbian Gazetteer, Sept. 30, 1793 .......................................................... 10

Columbian Herald, Oct. 12, 1793 ................................................................. 10

Commission by the President (Jan. 22, 1791) ............................................... 10

Constitutional Provision Fixing or Limiting Salary of Public Officer as Precluding
   Allowance for Expenses or Disbursements, 5 A.L.R.2d 1182 (1949) ....................... 9

David A. McKnight, *The Electoral System of the United States*
   (Fred B. Rothman reprint 1993) (1878) ................................................... 24

Elizabeth Chew, *Tokens of Friendship*, Monticello ..................................... 16

Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark ................... 16

*Establishing Precedents*, PBS (2002) ......................................................... 9

Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790 at 2 ......................... 14

George Washington Lays the Cornerstone of the Capitol, U.S. Senate ....... 10

*Gifts from Foreign Dignitaries*, Monticello ................................................. 15

*Hamilton's Opinion as to Constitutionality of the Bank of the U.S.*, The Avalon Project ............. 1

*House Documents* (May 10, 1844) ............................................................... 26

Independent Chronicle, Oct. 7, 1793 ............................................................ 10

v

J.L. De Lolme, *The Constitution Of England* (1775) ................................................. 20

Jack Maskell, CRS, *Conflict of Interest and "Ethics" Provisions That May Apply to the President* (Nov. 22, 2016)................................................................... 18

Jack Maskell, CRS, *Gifts to the President of the United States* (Aug. 16, 2012)........................ 18

James Thomas Flexner, *George Washington: Anguish and Farewell, 1793–1799* (1972) .... 10, 11

*Jefferson's Opinion on the Constitutionality of a National Bank*, The Avalon Project ................. 1

John Spencer Bassett, *The Life of Jackson* (new ed. 1925) ........................................... 27

*Johnson, Thomas (1732–1819)*, Biographical Directory of the U.S. Cong. ............................. 11

Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC News (May 26, 2008)........................ 17

Joseph Ellis, *His Excellency: George Washington* (2004) .............................................. 9

*July 7, 1797, the Impeachment of Senator Blount*, This Day in History ................................. 23

Laurence H. Tribe, *American Constitutional Law* (2000) .............................................. 21

Lawrence A. Peskin, *Can Donald Trump Profit from Businesses with Connections to Foreign Governments Once He's President?*, History News Network (Dec. 18, 2016).......... 13

Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791) ................................... 14

Letter from Commissioners for the Dist. of Col. to G. Washington (Sept. 16, 1793)............ 10, 11

Letter from G. Washington to Bushrod Washington (July 27, 1789)...................................... 12

Letter from G. Washington to the Commissioners for the Dist. of Col. (March 14, 1794).......... 11

Letter from T. Jefferson to Levett Harris (April 18, 1806)............................................ 15

Letter from T. Jefferson to Meriweather Lewis (Oct. 26, 1806) ....................................... 16

Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816) ..................................... 17

Letter to J. Madison from John Graham (Aug. 8, 1816)................................................. 17

Letter to T. Jefferson from Levett Harris (Aug. 7, 1804) ............................................. 15

*List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792*, 1 American State Papers/Miscellaneous (1834) .............. 19

*Louis Seize, Roi Des Français, Restaurateur De La Libert*, Mt. Vernon ................................... 14

Mem. from Antonin Scalia, Asst Att'y Gen, Re: Applicability of 3 C.F.R. Part 100 to the Pres. and V.P., OLC (Dec. 19, 1974)................................................................... 24

Mem. from David J. Barron, Act. Asst. Att'y Gen., Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, OLC (Dec. 7, 2009). ................................................................... 17

Mem. from David J. Barron, Act. Asst. Att'y Gen., Validity of Statutory Rollbacks as a Means of Complying with the Ineligibility Clause, OLC (May 20, 2009)................................ 6

Mem. from Samuel A. Alito, Jr., Dep'y Asst. Att'y Gen., Emoluments Clause Questions Raised by NASA Scientist's Proposed Consulting Arrangement, OLC, (May 23, 1986).......... 5

Mem. from Randolph D. Moss, Asst. Att'y Gen., *A President's Amenability to Indictment*, OLC (Oct. 16, 2000) ................................................................................ 30

Mem. from William H. Rehnquist, Assistant Attorney General, Re: Closing of Government Offices, OLC (Apr. 1, 1969) ..................................................................... 24

Mem. of the U.K. Attn'y General (May 1, 1941) ................................................. 20

Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830).................. 26

Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump*, Goverance Studies at Brookings (Dec. 16, 2016) ..................................................................................... 15, 26

Pa. Packet, & Daily Advertiser, Aug. 13, 1790 .................................................. 14

*Pistols*, James Monroe 3D ............................................................................ 17

*Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the United States (Feb. 26, 1793)*, *The Papers of Alexander Hamilton* (1969) ............ 19

Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 Ga. L. Rev. __ (2017), ssrn.com/abstract=2911871 ....................................... 5

Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure, Titles of Nobility and the Foreign Emoluments Clause* (5th ed. Supp. 2017) ....... 13

*Russia*, Monticello, ................................................................................... 16

Seth Barrett Tillman & Calabresi, Debate, *The Great Divorce: The Current Understanding of Separation of Powers and the Original Meaning of the Incompatibility Clause*, 157 U. Pa. L. Rev. PENNumbra 134 (2008). ..................................................... 21

Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759 (2017) ......................................................... 4

Seth Barrett Tillman, Citizens United *and the Scope of Prof. Teachout's Anti-Corruption Principle*, 107 Nw. U. L. Rev. 399 (2012) ................................................... 21

Seth Barrett Tillman, *Originalism & the Scope of the Constitution's Disqualification Clause*, 33 Quinnipiac L. Rev. 59 (2014) ............................................................. 21

Seth Barrett Tillman, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Prof. Zephyr Teachout*, 107 Nw. U. L. Rev. Colloquy 180 (2013) ............ 21

Seth Barrett Tillman, *Who Can Be President of the United States?: Candidate Hillary Clinton and the Problem of Statutory Qualifications*, 5 Brit. J. Am. Legal Stud. 95 (2016)................................................................ 12, 21

S.W. Jackman, *A Young Englishman Reports on the New Nation: Edward Thornton to James Bland Burges, 1791–1793*, 18 Wm. & Mary Q. (3d ser.) (1961) ..................... 14

The Honorable George J. Mitchell U.S. Senate, B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ...................................................................... 5

The Federalist No. 60 (Hamilton) ................................................................. 21

The Federalist No. 69 (Hamilton) ................................................................. 29

The Federalist No. 77 (Hamilton) ................................................................. 1

*The Pacificus-Helvidius Debates: Toward the Completion of the American Founding* (2007) ..... 1

Thomas Jefferson, *Notes on the State of Virginia* (1784) ............................. 29

*Tyler, John, (1790-1862)*, Biographical Directory of the U.S. Cong. ......................................... 27

Zephyr Teachout & Tillman, *The Foreign Emoluments Claus*, National Constitution Center (2016) .................................................................................................. 13

Zephyr Teachout, *Rebuttal: Gifts, Offices, and Corruption*, 107 Nw. U. L. Rev. Colloquy 30 (2012) ...................................................................................................... 26

### Introduction

In the early days of our Republic, many constitutional questions divided Alexander Hamilton on one side from Thomas Jefferson and James Madison on the other. Could Congress charter a bank? Hamilton said yes,[1] and Jefferson said no.[2] Must the Senate consent to the removal of principal officers? Madison said no,[3] and Hamilton (according to most accounts) said yes.[4] Could the President declare neutrality unilaterally? In a series of pseudonymous essays, Hamilton said yes, while Madison said no.[5] In each case, the ultimate decision was made by President George Washington. Through their public and private debates, these three Presidents and Hamilton, another prominent Founder, played central roles in the resolution of critical constitutional questions. For over two centuries, courts have turned to their considered judgment when resolving disputes about the Constitution—even where they disagreed amongst themselves.

These Founders, however, did not dispute the issue before this Court. Plaintiffs' claim that the Presidential Emoluments Clause[6] and Foreign Emoluments Clause[7] prohibit the President from receiving "anything of value," whether "monetary or nonmonetary,"[8] from domestic or foreign governments. The words and deeds of Washington, Jefferson, Madison, and Hamilton teach a different lesson.

---

[1] *Hamilton's Opinion as to Constitutionality of the Bank of the U.S.*, The Avalon Project, perma.cc/VG3V-T54X.
[2] *Jefferson's Opinion on the Constitutionality of a National Bank*, The Avalon Project, perma.cc/HZ3C-7VUJ.
[3] *Myers v. U.S.*, 272 U.S. 52, 131 (1926).
[4] *See generally* The Federalist No. 77 (Hamilton).
[5] *The Pacificus-Helvidius Debates: Toward the Completion of the American Founding* (2007).
[6] U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other *Emolument* from the United States, or any of them." (emphasis added)).
[7] U.S. Const. art. I, § 9, cl. 8 ("[N]o Person holding any *Office of Profit or Trust* under them [i.e., the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." (emphasis added)).
[8] 2d Am. Compl. ¶¶ 249, 261, ECF No. 28.

First, Plaintiffs' understanding of the Presidential Emoluments Clause cannot be squared with the practices of George Washington, whose conduct helped to define the presidency. In 1793, our first President purchased several plots of government-owned land in the nation's new capital at a public auction. The auction was managed by federal officers, widely publicized, and these valuable plots were acquired in broad daylight. If Plaintiffs are correct, then Washington openly committed impeachable offenses under the watchful eyes of prominent members of the Founding generation, political opponents, and commercial rivals. This Court should reject Plaintiffs' novel construction, and instead adopt one consistent with this formative history: the prohibition on the President's receipt of "emoluments" from domestic governments is limited to "compensation or pecuniary profit derived from a *discharge of the duties of the office*."[9] Financial gain arising from private business transactions are not emoluments.

Second, Plaintiffs' reading of the Foreign Emoluments Clause cannot account for the fact that our Founding-era presidents openly received diplomatic gifts from foreign governments. President Washington received a portrait of King Louis XVI from the French Ambassador to the United States. President Jefferson received a bust of Czar Alexander I. President Madison received two pistols from a revolutionary South American government. Congress's consent was not sought for any of these gifts. If Plaintiffs are correct, three Presidents central to the American Founding openly committed impeachable offenses, or worse, were ignorant of the Constitution they helped draft and define. This Court should reject Plaintiffs' argument, and instead follow the example set by these Presidents, as well as that illustrated by Secretary of the Treasury Alexander Hamilton's 1792 report to the Senate. His report lists all who hold *office under the United States*, but not the President, implying the latter is not subject to the Foreign Emoluments Clause.

---

[9] *Hoyt v. U.S.*, 51 U.S. (10 How.) 109, 135 (1850) (Nelson, J., for a unanimous Court) (emphasis added).

Plaintiffs counter this body of evidence with statements from George Mason and Edmund Randolph, who argued during Virginia's ratification convention that the Foreign Emoluments Clause applies to the President. This evidence is problematic, however, because under their view— that everyone in the federal government is an "officer"—members of Congress could be impeached. These idiosyncratic views were rejected by the Senate in 1799 following an impeachment trial,[10] and that rejection was ratified by the Supreme Court a century later.[11] Mason and Randolph's office-related intentions ought not prevail over the understandings and public practices established by Washington, Jefferson, Madison, and Hamilton, particularly where, as here, the views of the former have been considered and actively rejected.

Plaintiffs' attorneys' recent publications also cite examples of antebellum Presidents who asked Congress to dispose of diplomatic gifts. This evidence is not persuasive. First, unlike the Washington-era evidence, which was contemporaneous with the Constitution's ratification, Plaintiffs' evidence occurred many decades after the Framing. Second, there is no evidence Presidents Jackson, Van Buren, and Tyler were aware of the practices of Washington, Jefferson, and Madison. Third, voluntary surrender by Jackson of disputed presidential powers to Congress is far less probative than Washington's public refusal to seek consent and Congress's acquiescence. When considering competing streams of historical precedent in the separation of powers context, courts favor precedents established via open defiance over mere surrender, even if willful.

The most weighty historical evidence demonstrates that the Presidential Emoluments Clause only concerns compensation that is authorized by Congress or authorized by the states in regard to state positions, and that the Foreign Emoluments Clause is inapplicable to the President,

---

[10] *See* 8 Annals of Cong. 2319 (1799), bit.ly/2t8dwFF (recording Senate adoption of a resolution on January 11, 1799).
[11] *Lamar v. U.S.*, 241 U.S. 103 (1916).

because the President does not hold an *office . . . under the United States*. For these reasons, this Court should reject Plaintiffs' attempt to redefine long-standing constitutional meaning to meet the purported demands of the moment.

I.      **The Term "Emoluments" as used in the Constitution's Emoluments Clauses Does Not Extend To Business Transactions For Value**

Since 1850, all three branches of our government have agreed that the phrase "emoluments" refers to "pecuniary profit derived from a discharge of the duties of the office."[12] Only in light of the recent election have the Plaintiffs sought to redefine this term, and read the Presidential Emoluments Clause to prohibit the President from receiving "anything of value" through business transactions with the federal or state governments. Their position conflicts with a precedent set by George Washington during a public land auction in the nation's new capital while he was President. The Supreme Court has instructed that the precedents set by our first President are entitled to special solicitude. Plaintiffs can do little more than charge Washington as incompetent, or worse, crooked. Plaintiffs cannot satisfy the lofty burden needed to supplant the body of evidence showing that these two constitutional provisions do not prohibit business transactions with the federal government, state governments, or even foreign governments.[13]

A.      **"Emoluments" Are Pecuniary Benefits That Are Derived from The Discharge of the Duties of an Office**

Article 2, Section 1, Clause 7 provides "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other

---

[12] *Hoyt*, 51 U.S. at 135.
[13] *See generally* Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 Harv. J.L. & Pub. Pol'y 759 (2017), ssrn.com/abstract=2957162.

Emolument from the United States, or any of them." Although the term "emoluments" is now somewhat archaic, at the time of the Framing, it was widely used, and it had a settled meaning. As the Supreme Court explained in *Hoyt v. U.S.*, the term "emoluments" "embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of the office."[14] The *Hoyt* Court's definition has been cited approvingly by the Executive Branch[15] and the Legislative Branch.[16] To put it in its simplest terms, an "emolument" is the lawfully authorized compensation[17] that flows from holding an office or employment. The Presidential Emoluments Clause does not prevent the President from holding a second federal office, or even a state office. However, he cannot accept any compensation, that is, emoluments, from that second office. He can only receive the emoluments associated with the presidency. In other words, the President can hold a second government (domestic) position (there is no incompatibility), but he cannot take the compensation associated with that second position.

Emoluments should be understood as the compensation which is to be fixed by law by the body that creates the office or position under discussion, or by the body charged with fixing the office's or position's regular compensation.[18] Pursuant to Article II, Section I, Clause 7, the emoluments for the Presidency are established by Congress. Congress, and *only* Congress, has the power to determine the emoluments of each and every federal position and office, including the

---

[14] *Hoyt*, 51 U.S. at 135.

[15] *See, e.g.*, Mem. from Samuel A. Alito, Jr., Dep'y Asst. Att'y Gen., Emoluments Clause Questions Raised by NASA Scientist's Proposed Consulting Arrangement, OLC, at 3 n.4 (May 23, 1986), politi.co/2sgX1H7.

[16] *See, e.g.*, The Honorable George J. Mitchell U.S. Senate, B-207467, 1983 WL 27823, at *2-3 (Comp. Gen. Jan. 18, 1983); *see also* Andy S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. __ (2017), ssrn.com/abstract=2902391; Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 Ga. L. Rev. ___ (2017), ssrn.com/abstract=2911871.

[17] *State ex rel. Anaya v. McBride*, 539 P.2d 1006, 1012 (N.M. 1975); *State ex rel. Benson v. Schmahl*, 145 N.W. 794, 795 (Minn. 1914); *State ex rel. Todd v. Reeves*, 82 P.2d 173, 176 (Wash. 1938) (Blake, J., dissenting) (citing *Hoyt*, 51 U.S. (10 How.) 109 (1850)).

[18] *Re Legislative Council Election*, 22nd Sept. 1988, [1989] 2 H.K.L.R. 194, 217, bit.ly/2syBpZX (explaining that "emoluments of office [are that which are] received by a person who is an employee *from his employer* and as a payment arising out of or in connection with duties performed in the course of that employment" (emphasis added)).

presidency. Voluntary actions by third parties, or even by the President, cannot change a position's emoluments. With or without the cooperation of the President, a foreign power cannot change the "emoluments" of the presidency: only Congress can do that. Where the Foreign Emoluments Clause precludes those holding *office . . . under the United States* from receiving emoluments from foreign states, it precludes such U.S. officers from taking emoluments associated with *foreign* government positions, *foreign* government offices, and *foreign* government employments (e.g., civil service positions).

Accepting Plaintiffs' contrary position leads to bizarre structural consequences. The Ineligibility Clause provides: "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the *Emoluments* whereof shall have been [i]ncreased during such time."[19] Under this provision, the President is barred from appointing a Senator to a cabinet position, if that cabinet post's "emoluments" were increased during his Senate term. To comply with this provision, in situations where Congress has raised a position's salary but wishes to proceed with a subsequent appointment, Congress has employed the so-called *Saxbe Fix*, whereby Congress simply repeals any pay raises for the position, such that the "emoluments" did not "increase[e]" during such time."[20] This option, however, is not possible if parties other than Congress can increase emoluments.

Imagine if a state legislature purports to raise the "emoluments" of a cabinet position by $100 per year by state statute. Have the emoluments been increased? Under the Ineligibility Clause if its "emoluments" have been increased, a Senator cannot take the position, even if the person

---

[19] U.S. Const. art. I, § 6, cl. 2 (emphasis added).
[20] Mem. from David J. Barron, Act. Asst. Att'y Gen., Validity of Statutory Rollbacks as a Means of Complying with the Ineligibility Clause, OLC (May 20, 2009), bit.ly/2s7C8Qi.

refrains from accepting the increase. If Plaintiffs are correct, and third-parties (like States) can change a public position's emoluments, then the emoluments have been increased, and the President cannot make the appointment. Plaintiffs' position would give every single state (and every foreign government) a veto power over presidential appointments. Plaintiffs' ahistorical position makes no structural sense. Such bizarre consequences go far to establish that the President's emoluments are compensation as determined by Congress, and *only* by Congress. A President's business transactions with third parties (the federal government, a state government, or a foreign government), cannot be constitutionally proscribed emoluments.

If the President engages in a business transaction with the federal government or with a state government, and if financial benefits flow that from the transaction, the Presidential Emoluments Clause does not in any way restrict the President. In those circumstances, the President remains free to receive the lawfully authorized compensation applicable to the presidency and is also free to receive the financial benefits flowing from any business transaction precisely because the latter are not "emoluments." It is simple: bribes are *illegal*, and are an enumerated ground for impeachment under Article II, Section 4. Emoluments are *lawfully authorized* by Congress. The two are mutually exclusive and governed by different constitutional provisions. Plaintiffs reject this long-settled understanding.

The Government states that the Foreign Emoluments Clause is implicated in two scenarios. First, the clause "prohibits benefits arising from services the President provides . . . in a capacity akin to an employee of a foreign state."[21] This view is correct. Second, the government asserts that the clause "prohibits benefits arising from services the President provides to the foreign state . . .

---

[21] Mem. of Law in Support of Def's Mot. to Dismiss at 29, ECF No. 35.

*as President.*"[22] According to this latter rationale, there need only be a connection between the compensation and the office. Respectfully, Amicus disagrees with this view. A benefit flowing from a foreign state to the President *qua* President, might be a bribe, where there is a *quid pro quo* in relation to official conduct as President. It could also be a gift, where there is no *quid pro quo*. Such benefits, however, cannot be emoluments. Only Congress, by statute, can fix or change the emoluments that the President receives associated with the *office of the president*.

For a foreign state to grant the President additional emoluments, the President must have a separate, second foreign office or employment. For a domestic state to grant the President additional emoluments, the President must have a separate, second state office or employment. If the President appoints himself to a second federal office, the Presidential Emoluments does not work an incompatibility, but it bars the President from taking the compensation associated with the second position. Simply put, emoluments always involve lawfully authorized compensation in connection with an employment relationship. President Trump's and President Washington's business transactions are and were constitutionally permitted precisely because they involved no such employment relationship.

It is worth stressing that the phrase "emoluments" in the Presidential Emoluments Clause is arguably even narrower than its usage in the Foreign Emoluments Clause. The latter refers to "any present, Emolument, Office, or Title, of *any kind whatever.*"[23] Though this issue has never been addressed by any court, Amicus submits that the clause's "any kind whatever" language does not turn a non-emolument (e.g., a business transaction) into an emolument. Rather, this provision is best read to extend the force of the Foreign Emolument Clause's *emoluments*-language to

---

[22] *Id.* (emphasis added).
[23] U.S. Const. art. I, § 9, cl. 8 (emphasis added).

ambiguous cases. To illustrate this principle, courts have long divided on whether pensions and other perquisites accruing to former officeholders are "emoluments," and on whether reimbursing an officeholder's expenses are "emoluments."[24] The "of any kind whatever" language in the Foreign Emoluments Clause resolves this lingering question.

No court (of which Amicus is aware) has opined extensively on the Presidential Emoluments Clause. If there were any doubt that the *Hoyt* Court's narrow definition of "emoluments" applies to the Presidential Emoluments Clause, one need only consider that President Washington's conduct set the standard.

## B.    Courts Follow The "Heritage Which Comes . . . Straight from George Washington"

On April 30, 1789, George Washington was inaugurated at Federal Hall, less than a mile away from this Court. Recognizing the blank slate on which he was writing, Washington would remark "I walk on untrodden ground. There is scarcely any part of my conduct which may not hereafter be drawn into precedent."[25] Biographer Joseph Ellis observed that "Washington obviously meant that, as the first American president, everything he did set a precedent."[26] Time and again, the Supreme Court has looked to Washington's decisions and practice when interpreting the text and structure of the Constitution.[27] Justice Frankfurter fittingly "derive[d] consolation from the reflection that the President and the Congress between them will continue to safeguard

---

[24] *See generally* Constitutional Provision Fixing or Limiting Salary of Public Officer as Precluding Allowance for Expenses or Disbursements, 5 A.L.R.2d 1182, § 1–4 (1949).

[25] *Establishing Precedents*, PBS (2002), perma.cc/KF2M-6G3E.

[26] Joseph Ellis, *His Excellency: George Washington* 189 (2004); *see also* Akhil Reed Amar, *America's Unwritten Constitution* 290, 308 (2012) ("Washington defined the archetypical presidential role," and "[a]s America's first 'first man,' [he] set precedents from his earliest moments on the job.").

[27] *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017); *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2561 (2014); *NASA v. Nelson*, 562 U.S. 134, 149 (2011); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010); *Van Orden v. Perry*, 545 U.S. 677, 686–87 (2005); *Clinton v. City of N.Y.*, 524 U.S. 417, 440 (1998); *Clinton v. Jones*, 520 U.S. 681, 698 (1997); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 814 n.26 (1995); *U.S. v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936); *Myers v. U.S.*, 272 U.S. 52, 207 (1926).

the heritage which comes to them straight from George Washington."[28] Washington's conduct, particularly his public acts, are entitled to special solicitude when construing the Constitution. Parties bear a heavy burden in asserting that "President Washington did not understand" the Constitution he helped define.[29] Given that Plaintiffs are effectively alleging that Washington publicly violated the Constitution absent any noticeable opposition, the burden on them is even heavier.

### C.    Benefits from Washington's "Public Sale of Lots" Were Not "Emoluments"

September 18, 1793 was a "bright autumn day."[30] As he crossed the Potomac, President Washington was greeted with two brass bands, who escorted him on the first parade that was held in Washington D.C., travelling from the future site of the White House to the future site of the Capitol.[31] The *Columbian Gazetteer*, a New York newspaper, reported that upon his arrival, the master of ceremonies "deposited" the Capitol's cornerstone, adding that "the presence of Washington, gave magnificence to the scene, and brilliancy to the performance."[32] That very same day, historian James Thomas Flexner recounts, "there was to be an auction of lots,"[33] which had been actively advertised in newspapers as far as away as Philadelphia six months earlier.[34] The auction would be supervised by three commissioners that Washington had appointed in 1791: David Stuart, Daniel Carroll, and Thomas Johnson.[35] These prominent figures played important roles in the early years of our Republic. Stuart was a member of the Virginia convention that ratified the

---

[28] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 614 (1952) (Frankfurter, J., concurring).
[29] *Freytag v. C.I.R.*, 501 U.S. 868, 917–18 (1991) (Scalia, J., concurring).
[30] *See* James Thomas Flexner, *George Washington: Anguish and Farewell, 1793–1799*, 88 (1972).
[31] George Washington Lays the Cornerstone of the Capitol, U.S. Senate, perma.cc/ZMN7-R4JX.
[32] Columbian Gazetteer, Sept. 30, 1793, at 3, bit.ly/2rfN3IM; *see also* Independent Chronicle, Oct. 7, 1793, at 3, bit.ly/2rQ13YB (same, Boston newspaper); Columbian Herald, Oct. 12, 1793, at 3, bit.ly/2srEf2u (same, South Carolina newspaper).
[33] Flexner, *supra* note 30, at 88.
[34] Letter from Commissioners for the Dist. of Col. to G. Washington (Sept. 16, 1793), perma.cc/H8RE-54X9.
[35] *See* Commission by the President (Jan. 22, 1791), perma.cc/76HT-H4UV.

Federal Constitution.[36] Daniel Carroll was a member of the Federal Convention that drafted the Constitution and served in the First Congress.[37] Thomas Johnson was the first Governor of Maryland following independence, a member of the Maryland convention that ratified the Federal Constitution, and served as an Associate Justice of the Supreme Court during his tenure as a commissioner.[38]

As the lots in the new federal capital were put up for sale by the auctioneer's chants, "there were few raised hands, few shouting voices."[39] One account recalled that some eighteen buyers were present at the public auction.[40] Washington, who had "hoped [this auction] would be more successful than its predecessors . . . leaned forward in suspense."[41] And then, he "br[oke] the silence to buy four lots on the East Branch." Washington would later explain that the purchases were "more the result of incident than premeditation."[42] The certificates for the purchase of lots 5, 12, 13, and 14, preserved in Washington's papers, were recorded as the "Public Sale of Lots."[43]

George Washington received valuable plots of land from the federal government. To the Plaintiffs, our first President, under the watchful eye of three prominent members of our founding generation and in full public view in the new federal capital, willfully violated the Constitution. Washington, a trained surveyor of land, would have known that his purchases would be publicly recorded for all to see. This is not the model of a diabolical schemer, attempting to evade his constitutional duties through subterfuge. There was none: it was all done in public. Washington was acutely aware of how his every action would be scrutinized. In a letter to his nephew, and future

---

[36] 3 *The Debates in the Several State Conventions*, at 654 & 662 (1836).
[37] *See Carroll, Daniel (1730–1796)*, Biographical Directory of the U.S. Cong., perma.cc/6W36-WRLX.
[38] *See Johnson, Thomas (1732–1819)*, Biographical Directory of the U.S. Cong., perma.cc/5BK7-LX7W.
[39] Flexner, *supra* note 30, at 90
[40] Bob Arnebeck, *Through a Fiery Trial: Building Washington, 1790–1800*, at 173–74 (1991).
[41] Flexner, *supra* note 30, at 90.
[42] Letter from G. Washington to the Commissioners for the Dist. of Col. (March 14, 1794), perma.cc/ZSC2-RBZF.
[43] *See* Certificate for Lots Purchased in the Dist. of Col. (Sept. 18, 1793), Founders Online, perma.cc/9Z7N-MHKQ; *see also* Letter from Commissioners for the Dist. of Col. to G. Washington (Sept. 16, 1793), perma.cc/H8RE-54X9.

Supreme Court Justice, Bushrod Washington, the President explained that "my political conduct . . . must be exceedingly circumspect and proof against just criticism, for the Eyes of Argus [the all-seeing, many-eyed giant of Greek mythology] are upon me, and no slip will pass unnoticed that can be improved into a supposed partiality for friends or relatives."[44]

It is only now, two centuries after Philadelphia, that some are making the ahistorical claim that President Washington's business dealings with the Federal Government is and was prohibited by the Presidential Emoluments Clause. Are we really to believe that not only did the commissioners willingly, openly, and notoriously participate in a conspiracy to aid and abet the President in violating the Constitution's Presidential Emoluments Clause, but that they also left—for themselves and their posterity—a complete and signed documentary trail of their wrongdoing?[45]

Finally, Amicus knows of no contemporary opposition to Washington's participation in the land auction, even though he appointed and had supervisory power over the commissioners who presided over the auction. Even at that time, anti-administration officials could have seized upon any maladministration or unethical conduct.[46] That no opposition was registered strengthens the inference that his bids were not perceived by the public as anything other than perfectly legal and perfectly fair. Indeed, just as Washington's contemporaries failed to object to his doing business with the federal government, later commentators who had access to these historical records also failed to discuss such objections in regard to Washington's September 18, 1793 land purchases. The one historian to address the scope of the term "emoluments" and its applicability to business transactions has squarely

---

[44] Letter from G. Washington to Bushrod Washington (July 27, 1789), bit.ly/2srKKSP. *See generally* Seth Barrett Tillman, *Who Can Be President of the United States?: Candidate Hillary Clinton and the Problem of Statutory Qualifications*, 5 Brit. J. Am. Legal Stud. 95, 105–08 (2016).
[45] *Certificate*, *supra* note 43.
[46] In 1793, there were some 13 anti-administration Senators and some 40 anti-administration Representatives. *See Biographical Directory of the U.S. Cong.*, bit.ly/2s0ihke.

rejected Plaintiffs' position.[47] Attempts to paint Washington as a grossly negligent, if not a crooked dealer, are contrary to the overwhelming weight of evidence. The far simpler answer is that business transactions are beyond the scope of the phrase "emoluments" in both the Presidential and Foreign Emoluments Clause. Plaintiffs' attempt to redefine these provisions should fail as a matter of law.

## II.   The Foreign Emoluments Clause Does Not Encompass the Presidency

Article I, Section 9, Clause 8 provides "No Title of Nobility shall be granted by the United States: *And no Person holding any Office of Profit or Trust under them*, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." The Foreign Emoluments Clause thus applies to any person "holding any Office of Profit or Trust under" the United States. (The phrase "them" refers back to "the United States" in the previous clause.) The sparse judicial authority, such as it is, has not touched upon the scope of the term *Office of Profit or Trust under the United States*, as used in this clause and in other provisions in the Constitution. Scholarly authority on this issue is divided.[48] Shortly prior to filing this litigation, Amicus writing with Zephyr Teachout, co-counsel for Plaintiffs, explained that "[t]he question whether this [*office . . . under the United States*] category, and therefore the Constitution's Foreign Emoluments Clause, reaches any or all federal elected positions—i.e., Representative, Senator, Vice President, President, and presidential elector—poses a difficult interpretive challenge."[49] Though difficult, the weight of historical practice from Washington, Jefferson, Madison, Hamilton, and the First Congress, demonstrates that the Foreign Emoluments Clause does not encompass the Presidency.

---

[47] *See* Lawrence A. Peskin, *Can Donald Trump Profit from Businesses with Connections to Foreign Governments Once He's President?*, History News Network (Dec. 18, 2016), perma.cc/6YB9-9P6G.
[48] *See, e.g.*, Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure, Titles of Nobility and the Foreign Emoluments Clause*–§ 9.18 n.12 (5th ed. Supp. 2017).
[49] Zephyr Teachout & Tillman, *The Foreign Emoluments Clause,* National Constitution Center (2016), bit.ly/2taFTlQ.

### A. President Washington Accepted Diplomatic Gifts Without Requesting Congressional Consent

As with the Presidential Emoluments Clause, President Washington's important public actions shed light on the Foreign Emoluments Clause. In 1791, Washington received, accepted, and kept a diplomatic gift—a framed full length portrait of King Louis XVI—from Jean-Baptiste, chevalier de Ternant, the French ambassador to the United States.[50] There is no evidence that Washington ever sought or received congressional consent to keep this valuable gift. Indeed, Congress would have no occasion to consider the propriety of a diplomatic gift until 1798.[51] In addition to the portrait, Washington also received the key to the Bastille along with a picture,[52] from the Marquis



Source: Mount Vernon

de Lafayette, who at the time was a French government official.[53] Both of these items were prominently displayed in the federal capital. The portrait and valuable ornate frame, which included the Washington family crest and the monogram of the French King to "embod[y] . . . amicable Franco-American relations,"[54] hung in Washington's principal room.[55] The key was on display in Washington's first home in New York at No. 3 Cherry Street,[56] and was "showcased in Philadelphia when the seat of government moved there in the fall of 1790."[57]

---

[50] *See* Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791), perma.cc/5F2V-G5GU.

[51] 8 Annals of Cong. 1582–1595 (1798), bit.ly/2ttpIA5 (noting that foreign gift to ambassador was a "new subject").

[52] Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790, at 2, bit.ly/2rlnKjP; Pa. Packet, & Daily Advertiser, Aug. 13, 1790, at 2, bit.ly/2r9bBiz (same).

[53] *See, e.g.,* André Maurois, *Adrienne: The Life of the Marquise de La Fayette* 178–82 (Gerard Hopkins trans., 1961); *A Complete History Of The Marquis De Lafayette* 193, 194 (1826), bit.ly/2tauZfC (same).

[54] *Louis Seize, Roi Des Français, Restaurateur De La Liberté*, Mt. Vernon, perma.cc/H328-NWWN.

[55] S.W. Jackman, *A Young Englishman Reports on the New Nation: Edward Thornton to James Bland Burges, 1791–1793*, 18 Wm. & Mary Q. (3d ser.) 85, 108, 121 (1961).

[56] *See* 2 Esther Singleton, *The Furniture of our Forefathers* 503 (1906).

[57] *Bastille Key*, Mount Vernon, perma.cc/W8H7-SZ7C. To this day, the key is on display at Mt. Vernon.

Their foreign provenance would have been immediately recognizable to anyone who saw them. Yet, there is no evidence that cabinet members, who certainly walked past both items, and would generally advise the President on constitutional matters, recorded any dissent. Nor did anti-administration members of Congress or the press raise any hackles. Indeed, the provenance of the key was widely reported in contemporaneous newspapers.[58] Those who argue that the Foreign Emoluments Clause extends to the presidency have made little effort to explain Washington's conduct. Prior to the commencement of this litigation, co-counsel for the Plaintiffs Eisen, Painter, and Tribe, characterized the Washington-era gifts as "ambiguous."[59] But how the Washington-era evidence is "ambiguous," they do not explain. If Plaintiffs' position is correct,[60] then it means President Washington was a lawbreaker and that the whole country remained strangely silent in the face of government lawlessness. The simpler explanation is Plaintiffs' position is wrong: The Foreign Emoluments Clause does not encompass the presidency.

### B. President Jefferson Accepted Diplomatic Gifts Without Requesting Congressional Consent

On or about August 1804, President Jefferson received a diplomatic gift from the Russian government; it was a bust of Emperor (Czar) Alexander I.[61] Jefferson received, accepted, and kept this diplomatic gift.[62] Jefferson's "particular esteem" for Alexander "convinced him to break his [personal] rule of



Sources: Monticello/Discovering Lewis & Clarke

---

[58] *Supra* note 52 (citing newspaper sources from New York, Boston, and South Carolina).

[59] Norman L. Eisen, Richard Painter, & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump*, Governance Studies at Brookings, at 9 n.33 (Dec. 16, 2016), brook.gs/2sizuZv.

[60] 2d Am. Compl. p. 64, ECF No. 28 ("Plaintiff respectfully requests that this Court [declare] that Defendant is a 'Person holding any Office of Profit or Trust' under the *Foreign Emoluments Clause*'" (emphasis added)).

[61] *See* Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7, 1804), perma.cc/4ATK-BWVN; *Gifts from Foreign Dignitaries*, Monticello, perma.cc/C26E-X23E.

[62] *See* Letter from T. Jefferson to Levett Harris (April 18, 1806), perma.cc/3FX8-Y5TG.

not accepting gifts while in public office."[63] There is no indication Jefferson felt his decision was controlled by the Foreign Emoluments Clause; rather, this was a decision governed only by his own personal conscience. Like with Washington, there is no evidence Jefferson ever sought or received congressional consent to keep the bust. Jefferson also received presents from foreign Indian nations, which he considered "diplomatic gifts."[64] During their great trek, Lewis & Clark exchanged many gifts from with the Indian tribes in "diplomatic and social contexts."[65] Lewis delivered these gifts to Jefferson, who viewed them as coming from foreign nations.[66] Jefferson did not seek congressional consent to keep the gifts, which are still on display at Monticello.[67]

Jefferson's practice of accepting gifts from foreign nations without seeking Congress's consent provides further support in regard to the meaning of the Foreign Emoluments Clause. Jefferson's acceptances of these presents is potentially more revealing than Washington's. Unlike Washington, who had a close personal friendship with Lafayette, Jefferson kept diplomatic gifts from the Czar and from foreign Indian leaders, all people he had never met. Further, while Washington had unique popularity—as reflected in his unanimous victory in the Electoral College—Jefferson had fierce political adversaries who could have attacked him for foreign corruption. What all these foreign-government presents had in common was that the presidential recipients believed (as best as we can tell) that their keeping the presents had no constitutional implications.

---

[63] *Russia*, Monticello, perma.cc/D69R-CEAT.
[64] Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, perma.cc/658Z-WN5S.
[65] Elizabeth Chew, *Tokens of Friendship*, Monticello, perma.cc/9BP2-565L.
[66] *See* Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806), perma.cc/QB6Z-SWSD (directing Lewis to tell a Mandane tribal leader that "I have arranged the tokens of friendship I have received from *his country*, as well as from other Indian friends [in] a kind of Indian Hall [in Monticello]." (emphasis added)).
[67] *Alexander I (Sculpture)*, Monticello, perma.cc/G8K9-LLL4; *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, perma.cc/WUT5-847L.

C.      **Presidents Madison and Monroe Accepted a Diplomatic Gift Without Requesting Congressional Consent**

The fourth and fifth Presidents continued the practices of Washington and Jefferson. General Ignacio Alvarez was a South American revolutionary head of government. In 1816, "to form a closer connexion with the United States," Alvarez gave President Madison two pistols manufactured in Buenos Aires "as an homage due to the chief Magistrate of the United States of North America."[68] The pistols were delivered to Madison via diplomatic channels.[69] The pistols, however, cannot be found today in the archives of the State Department, and it appears that James Madison gave the guns to his successor, President James Monroe, all absent any congressional consent.[70] If Plaintiffs are correct, then James Madison, another significant Framer, wrongfully converted government property. Furthermore, James Monroe, another Founder, connived with his predecessor to receive (what would amount to) stolen U.S. government property.

In 2009 the Office of Legal Counsel ("OLC") affirmed in a memorandum that "[t]he President *surely* 'hold[s] an[] Office of Profit or Trust' . . . ."[71] OLC offered no evidence whatsoever to support this conclusion, and did not reference the precedents established by Washington, Jefferson, Madison, and Monroe. An unexamined assumption should carry little weight. Indeed, this Court has explained that under *Skidmore* deference, an OLC opinion is entitled to "respect proportional to its power to persuade[, and] may claim the merit of its writer's

---

[68] Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816), perma.cc/D47U-V4H3.

[69] Letter to J. Madison from John Graham (Aug. 8, 1816), perma.cc/RD8B-2ASW.

[70] *See Pistols*, James Monroe 3D, perma.cc/T796-ED5B (on website of the James Monroe Museum); Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC News (May 26, 2008), perma.cc/4DJP-PUF4. There is no doubt as to the provenance of the Washington and Jefferson diplomatic gifts, but the provenance of the pistols is disputed.

[71] Mem. from David J. Barron, Act. Asst. Att'y Gen., Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, OLC, at 4 (Dec. 7, 2009), bit.ly/2rx6CfT (emphasis added).

thoroughness, logic and expertness, [and] its fit with prior interpretations."[72] With respect to the scope of the Foreign Emoluments Clause, the memorandum makes no effort to convince, and merely asserts a conclusion, without any discussion of any contrary Framing-era (or other) historical evidence. It lacks the "power to persuade," and is entitled to minimal deference.

While the Office of Legal Counsel has not revisited its unsupported conclusion, the Congressional Research Service ("CRS"), an institution with a reputation for probity and quality analysis, has changed course. As recently as 2012, CRS concluded that "The President and all federal officials are restricted by the Constitution, at Article I, Section 9, [C]lause 8 . . . ."[73] However, more recently, after becoming aware of the Washington-era precedents, CRS modified its position. Now the Service hedges, noting that Foreign Emoluments Clause "might technically apply to the President."[74] This change is not without significance.

### D. Secretary Hamilton Excluded the President from a List of "Every Person Holding Any Office or Employment *Under* the United States"

Alexander Hamilton sheds more light on the scope of the Foreign Emoluments Clause. In 1792, the Senate directed President Washington's Secretary of the Treasury, Hamilton, to draft a financial statement listing the "emoluments" of "*every* person holding *any civil office or employment under the United States*."[75] The Foreign Emoluments Clause's language is limited to *offices **of profit or trust** under the United States*. The broader language used in the Senate order, however, includes all *offices under the United States*, without the "of profit or trust" limitation.

---

[72] *Zucker v. Menifee*, No. 03 CIV. 10077 (RJH), 2004 WL 102779, at *5 (S.D.N.Y. Jan. 21, 2004) (Holwell, J.) (quoting *U.S. v. Mead Corp.*, 533 U.S. 218, 234–35 (2001)); *see also Steinbach v. BOP*, 339 F. Supp. 2d 628, 629–30 (D.N.J. 2004); *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 74 (D.C. Cir. 2015), aff'd, 137 S. Ct. 929 (2017).

[73] Jack Maskell, CRS, *Gifts to the President of the U.S.*, 4 (Aug. 16, 2012), bit.ly/2s7AVZu.

[74] Jack Maskell, CRS, *Conflict of Interest and "Ethics" Provisions That May Apply to the President*, 2 (Nov. 22, 2016), bit.ly/2teGovc.

[75] 1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry) (emphasis added), bit.ly/2rQswt8. As discussed in Part I, *supra*, even here, the language of "emoluments" is tied to "office" and "employment."

Hamilton took more than nine months to draft and submit a response, which spanned some ninety manuscript-sized pages. In it, he included appointed or administrative personnel in *each* of the three branches of the federal government, including the Legislative Branch (e.g., the Secretary of the Senate and Clerk of the House).[76] But Hamilton did *not* include the President, Vice President, Senators, or Representatives. In other words, Hamilton did not include *any* elected positions in *any* branch. Like Washington's acceptance of Ternant's gift of the framed portrait of Louis XVI, the Hamilton document is another probative Executive Branch construction of the



Source: NARA (Record Group #46)

Constitution's *office under the United States*-language, which was established during Washington's first term (and so contemporaneous with the ratification of the Constitution). This official and meticulous correspondence is not consistent with Plaintiffs' claim that the Foreign Emoluments Clause's "office . . . under the United States" language encompasses the presidency.

---

[76] *See Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the United States (Feb. 26, 1793)*, *in* 14 The Papers of Alexander Hamilton ("*PAH*"), 157, 157–59 (1969), perma.cc/49RT-TTGF. The editors of *PAH* marked this document "DS," meaning "document signed," which indicates that this document was the original signed by Hamilton. The original Hamilton-signed document, on which the *PAH* reproduction is based, remains in the vaults of the National Archives & Records Administration (Record Group #46). An excerpt of the original Hamilton-signed document is available at bit.ly/2rQCDxX. Amicus notes that an entirely different document (but bearing a similar name) can be found in *American State Papers* ("*ASP*"). *See List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792*, *in* 1 American State Papers/Miscellaneous 57 (1834). The document in *ASP* was not signed by Hamilton. The undated *ASP* document was drafted by an unknown Senate functionary. Unlike Hamilton's manuscript, the record in *ASP* includes the President and Vice President. Both documents are probative of the legal meaning of *Office . . . under the United States* as used in the Senate order. But the two documents are not equally probative. There is no reason to favor a document of unknown provenance over the Hamilton-signed original which was, in fact, an official communication from the Executive Branch responding to a Senate order.

Hamilton's usage is hardly surprising. The Constitution's *Office of Profit or Trust under the United States*-language is a term of legal art. Its historical progenitor was *Office under the Crown*, a phrase commonly used in British statutes prior to the Revolution.[77] This phrase did not extend to elected positions.[78] To this day, Commonwealth courts distinguish between (1) officers who are appointed to a position "under the Crown," and (2) officials who "hold their position by virtue of their election by the people."[79] After the Revolution, following British drafting practices, the Continental Congress made use of the phrase "office . . . under these states or any of them."[80] The Georgia Constitution of 1777 prohibited a person holding "any post or profit *under this State*" from "being elected a representative."[81] The Pennsylvania Constitution of 1775 distinguished between the oath for elected members of the state House of Representatives from the oath for an appointed "officer, whether judicial, executive or military, in authority *under this commonwealth*."[82] The Articles of Confederation contained a predecessor to the Constitution's Foreign Emoluments Clause, providing that no "person holding any office of profit or trust *under the United States*, or any of them [i.e., any state], [shall] accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State."[83]

Hamilton's roll of officers continued prior British and American legislative drafting practices, it goes far to establish that this term of art—*office . . . under the United States*—embraces

---

[77] *See, e.g.,* An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25 (1707), bit.ly/2riHlG1; J.L. De Lolme, *The Constitution Of England* 62 (1775), bit.ly/2sl1yeK.

[78] Mem. of the U.K. Att'y Gen., at 135–36 (May 1, 1941), bit.ly/2rjcw00 ("If the Crown [the Executive Government] has the power of appointment and dismissal, this would raise a presumption that the Crown controls, and that the office is *one under the Crown*. . . . If the duties are duties under and controlled by the Government, then the office is, *prima facie* . . . an office under the Crown . . . ." (emphasis added)); Anne Twomey, *The Constitution of New South Wales* 438 (2004).

[79] *R v. Obeid (No 2)* [2015] New South Wales Supreme Court 1380 [30], bit.ly/2rSRiZv.

[80] 11 Journal of the Continental Congress 502 (May 15, 1778), bit.ly/2sg5MDy.

[81] Georgia Const. § 18 (1777), perma.cc/C6ZY-RFHK (emphasis added).

[82] Penn. Const. §§ 10, 40 (1775), perma.cc/6RYD-Z8HC (emphasis added); *see also* Vt. Const. §§ 12, 26 (1786), perma.cc/Z5ZX-Z9SW (using identical language).

[83] *See* Articles of Confederation of 1781, art. VI, para. 1.

only *appointed* officers, but not constitutionally mandated, that is *elected*, federal positions.[84] The same principle applies in statutory interpretation: general *office*-language in a statute does not reach the presidency. The Supreme Court has recognized that "textual silence is not enough to subject the presidency to the provisions of" a statute; rather, an "express statement by Congress" is required before restricting the President's authority.[85]

### E. The First Congress's Narrow Usage of "Officer under the United States" Mirrors Hamilton's Understanding

The First Congress mirrored Hamilton's understanding of the usage of *office under the United States.* In a 1790 anti-bribery statute, Congress declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold any *office of honor, trust or profit under the United States.*"[86] A person convicted of bribery in a federal judicial proceeding would be permanently barred from holding an *office . . . under the United States*. The *office*-language here is substantively the same as that in the Foreign Emoluments Clause.

If the President holds an *office . . . under the United States*, as Plaintiffs argue, then this statute is deeply problematic because it purports to add, by statute, to the qualifications for constitutionally established elected federal positions. Congress has no such power to add qualifications for federal elected positions.[87] Moreover, at the time, statutes that imposed

---

[84] Amicus has developed this argument over the past decade. *See Who Can Be President of the United States?: Candidate Hillary Clinton and the Problem of Statutory Qualifications*, 5 Brit. J. Am. Legal Studies 95, 104–110 (2016); *Originalism & the Scope of the Constitution's Disqualification Clause*, 33 Quinnipiac L. Rev. 59, 97–100 (2014); *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Prof. Zephyr Teachout*, 107 NW. U. L. Rev. Colloquy 180 (2013); Citizens United *and the Scope of Prof. Teachout's Anti-Corruption Principle*, 107 NW. U. L. REV. 399 (2012); Tillman & Steven G. Calabresi, Debate, *The Great Divorce: The Current Understanding of Separation of Powers and the Original Meaning of the Incompatibility Clause*, 157 U. Pa. L. Rev. PENNumbra 134 (2008).

[85] *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *see infra* note 100 (collecting authority).

[86] An Act for the Punishment of Certain Crimes, 1 Stat. 112, 117 (1790), bit.ly/2rbNfVq (emphasis added).

[87] *See* The Federalist No. 60 (Hamilton); *see, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 527–547 (1969); Laurence H. Tribe, American Constitutional Law § 6–35 n.51 (2000) (explaining that *Powell* was a "largely historical inquiry").

disqualifications in relation to *office . . . under the United States*, were commonplace.[88] Plaintiffs' reading of the statute's *office*-language is tantamount to stating that the First Congress passed an unconstitutional statute in regard to *all the most significant federal positions*. That's a counter-intuitive result, and it is wholly unnecessary. A far better reading is that this statute is constitutional precisely because its *office . . . under the United States*-language does not apply to the presidency or other elected federal positions. Because statutory offices are creatures of Congress, Congress is free to create disqualifications—something Congress cannot do in regard to constitutionally mandated elected federal positions.

### F.     George Mason and Edmund Randolph's Overly-Broad Understanding of "Officer" Was Idiosyncratic, and Ultimately Rejected

Two Framers—George Mason and Edmund Randolph—took the position during the Virginia ratification convention, that the Foreign Emoluments Clause applies to the President.[89] Indeed, Randolph, who would serve as President Washington's Attorney General, said that the President "may be impeached" for violating the Foreign Emoluments Clause.[90] Their judgments ought to carry some weight. However, due to their idiosyncratic, and ultimately rejected views on who is as an "Officer," there is good reason to reject their views on the scope of the Foreign Emoluments Clause.

Article II, Section 4 of the Constitution provides that "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." During the Virginia

---

[88] *See* Treasury Act, 1 Stat. 65, 67 (1789), bit.ly/2suQuv9; *De Veau v. Braisted*, 363 U.S. 144, 158–59 (1960).
[89] *See, e.g.*, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 446 (2d ed. 1836) (Randolph's position); *id*. at 484 (Mason's position).
[90] *Id*. at 486. If Randolph is correct that the correct remedy for the President's violating the Foreign Emoluments Clause is impeachment (a view Amicus rejects), then Plaintiffs' grievances are being litigated in the wrong court.

ratification convention, Randolph and Mason argued that members of Congress are officers who are subject to impeachment.[91] The two Virginians read the word "office" without limitations: they believed that general *office*-language in the Constitution referred to appointed and *all* elected positions, including the President, the Vice President, Representatives, and Senators. Their idiosyncratic views did not pass unnoticed, and even at the time, some saw their view as inconsistent with the constitutional text. For example, James Monroe, objecting contemporaneously in 1788, observed "that the Senators are not impeachable, and therefore Governor Randolph's objection falls to the ground."[92] Monroe, the future president, concluded: "I am surprised that a man of that gentleman's abilities . . . should have fallen into this mistake." Further, Monroe's decision to accept the pistols from Madison was consistent with the position Monroe announced here in 1788. More importantly, a decade later, the Senate formally adopted Monroe's reading of the Constitution.

In 1797, the House of Representatives impeached Senator William Blount.[93] Adversarial Senate impeachment proceedings with counsel began in 1798 and concluded in 1799. The Senate, sitting as a court of impeachment, terminated the proceedings on a pure question of law, finding that "this Court ought not to hold jurisdiction."[94] A century later, the Supreme Court adopted this holding. In *Lamar v. United States*,[95] Chief Justice White explained that the "Blount Case" was a "ruling made at an early day . . . that a Senator of the United States was not a civil officer subject to impeachment."[96] In his *Commentaries,* Justice Story likewise observed that members of

---

[91] *See Debates*, *supra* note 89, at 201–02 (Randolph's view that members of Congress are impeachable); *id.* at 402 (Mason's same view).
[92] 1 *The Writings of James Monroe 1778–1794*, at 347, 361–62 (1788), perma.cc/2E8V-GVV8.
[93] *See July 7, 1797, the Impeachment of Senator Blount*, This Day in History, perma.cc/CP3B-W344.
[94] *See* 8 Annals of Cong. 2319 (1799), perma.cc/EB4H-TDE8 (adopting resolution on January 11, 1799).
[95] 241 U.S. 103 (1916).
[96] *Id.* at 113.

Congress were not "civil officers," and were not subject to impeachment.[97] In the very same passage, Story suggested that the Incompatibility Clause, which also uses the phrase "office under the United States," does not apply to the President. In other words, general *office*-language, standing alone and without more—such as *officer of the United States* and *office under the United States*—does not reach the presidency or other elected positions. Later scholarly authorities embraced this position that general *office*-language does not reach the presidency.[98] This was also the position of future-Justices William H. Rehnquist and Antonin Scalia, during their tenure at the Office of Legal Counsel.[99]

Mason and Randolph's view that the Constitution's general *office*-language extends to Representatives and Senators has been squarely rejected for over two centuries by our nation's two highest judicial authorities: the Supreme Court of the United States and the Senate (as a court of impeachment). Whatever merit the Mason & Randolph position arguably had in 1788, their view as to the scope of the Constitution's *office*-language is now foreclosed.

Mason and Randolph also believed all elected federal officials were *officers of* or *under the United States*. They believed that the President was an *officer* for the purposes of the Foreign Emoluments Clause and members of Congress were *officers* for the purposes of the Impeachment Clause. Their two positions here are not independent, separate, or distinguishable: both positions arise from their view of the scope of the Constitution's general *office of* or *under the United States*-language. Given that the Senate and Supreme Court have rejected their position in regard to their

---

[97] 1 Joseph Story, *Commentaries on the Constitution of the United States* 578 (reprint 1891) (1833).

[98] *See* David A. McKnight, *The Electoral System of the United States* 346 (Fred B. Rothman reprint 1993) (1878) ("[I]t is *obvious* that . . . the President is not regarded as 'an officer *of*, or *under*, the United States,' but as one branch of 'the Government.'" (emphasis added)).

[99] *See also* Mem. from Antonin Scalia, Asst. Att'y Gen, Re: Applicability of 3 C.F.R. Part 100 to the Pres. and V.P., OLC, at 2 (Dec. 19, 1974), ssrn.com/abstract=2889011; Mem. from William H. Rehnquist, Asst. Att'y Gen., Re: Closing of Government Offices, OLC, at 3 (Apr. 1, 1969), bit.ly/2sAa6xK.

view that members of Congress are *officers of the United States* under the Impeachment Clause, there is no principled way for a court to accept their view that that the President is an *officer under the United States* for purposes of the Foreign Emoluments Clause. As the former has been rejected by our highest legal authorities, the latter should also be rejected. Moreover, this view is consistent with the practices of Washington, Jefferson, Madison & Monroe, and Hamilton, whose credentials are every bit as good (if not better) than Randolph's and Mason's.

## III.    The Washington-Era Precedents Are Superior to Post-Jackson Evidence

Consider a hypothetical. In 1920, the Southern District of New York issued a rule providing that "all clerk employees must request vacation time two weeks in advance." Judge Learned Hand and his law clerks were involved in drafting the rule. Today, there is a debate about whether this provision covers law clerks in addition to employees of the clerk's office. There are two streams of precedents. First, throughout the 1920s, law clerks failed to request vacation time, and there were no negative repercussions—even from the notoriously strict Judge Hand. Second, following World War II, as institutional memory faded, both types of employees would request vacation time. Under Plaintiffs' view, today's law clerks are out of luck, because far too much credence is given to voluntary compliance by actors distant from the rule's drafting. Under Amicus's perspective, however, far more weight should be given to the practice of the original law clerks who had a hand in drafting the rule, and "violated" it with impunity without repercussions. Fortunately for the law clerks, courts routinely follow Amicus's approach, whether by applying the straightforward "prior panel" rule,[100] or by employing more complex separation of powers jurisprudence[101]—in both, first-in-time evidence controls or may control. This approach is especially appropriate where

---

[100] *In re Zarnel,* 619 F.3d 156, 168 (2d Cir. 2010).
[101] *See e.g., Myers v. U.S.*, 272 U.S. 52, 136 (1926).

purportedly unlawful conduct went unchecked. Likewise, in this case, there are two conflicting streams of legal and historical authority. There is the Washington-Jefferson-Madison-Monroe-Hamilton-First Congress stream and there is Plaintiffs' Post-Jackson stream. Under settled Supreme Court precedent and legal norms, the former should prevail.

## A.   Post-Jackson Presidents Depart from Washington-Era Precedents

Counsel for plaintiffs have written that the actions of Presidents Jackson, Van Buren, and Tyler suggest that they acted under the assumption that the Foreign Emoluments Clause applies to the President.[102] To the extent that they did so,[103] such practices would have represented a sharp break with the traditions of Washington, Jefferson, Madison, and Monroe. There is no indication that any of these later presidents were aware of the earlier precedents established by their predecessors—actors who took an active hand in framing the Constitution, ratifying it, and putting it into practice in the early Federalist period.[104] The Court might take the intuitive position that they are all Presidents (except Hamilton and the First Congress), and all Presidents have equal authority, so the latter Presidents ought to be preferred. But courts do not act this way: just consider the prior panel rule which favors older precedent over newer precedent, even between courts of the same authority. More importantly, the Supreme Court has taught a different lesson: modern practice does not automatically overcome earlier precedents.[105]

---

[102] *See, e.g.*, Zephyr Teachout, *Rebuttal: Gifts, Offices, and Corruption*, 107 Nw. U. L. Rev. Colloquy 30, 42 (2012) (discussing Van Buren and Tyler); *Brookings, supra* note 59, at 9 (discussing Jackson).

[103] The record suggests that Jackson and others misunderstood the Foreign Emoluments Clause, because they did not recognize that Congress could "consent" to a foreign gift. None of them actually asked to personally keep the gifts they received. *See e.g.,* Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830), bit.ly/2s9aO40 (Jackson referred to "provision of our Constitution forbidding the acceptance of presents from a foreign State," and *voluntarily* "placed [the medal] at the disposal of Congress."). *See e.g.,* 14 Abridgment of the Deb. of Cong. 141 (1860), bit.ly/2s21miX (Van Buren); *House Documents*, bit.ly/2rsttt9 (May 10, 1844) (Tyler). If they did not understand the *consent* provision of the Foreign Emoluments Clause, it might indicate that they also did not understand which positions were covered by it.

[104] *See, e.g., Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888).

[105] *See, e.g., I.N.S. v. Chadha*, 462 U.S. 919 (1983).

In *District of Columbia v. Heller*, in order to interpret the Second Amendment, Justice Scalia's majority opinion looked not only to pre-ratification sources, but also to precedents from *after* the Bill of Rights was ratified.[106] In dissent, Justice Stevens found "particularly puzzling" the majority's reliance on "postenactment commentary."[107] To this, Justice Scalia countered that "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation."[108] Yet, not all post-enactment commentary is of equal weight. As time lapses from the framing, Justice Scalia observed, later sources do "not provide as much insight."[109] The most reliable sources are those most proximal to the framing.[110] Post-enactment commentary is useful, if at all, where it confirms earlier understandings.

More importantly, Plaintiffs' antebellum trio (Jackson, Van Buren, and Tyler) is not remembered for its deep commitment to the rule of law. During war time, Jackson arrested a federal district court judge who issued a writ of habeas corpus.[111] President Tyler does not fare much better. Tyler was a delegate to the Confederate Provisional Congress and was elected to the Confederate House of Representatives.[112] Van Buren was Vice President during Jackson's second term, and then he succeeded Jackson as President. Van Buren was more than a nonentity, but there is little reason to think he was doing anything more than following Jackson's practice. At bottom,

---

[106] *D.C. v. Heller*, 554 U.S. 570, 605–10, 614, 616 (2008).
[107] *Id.* at 662 n.28 (Stevens, J., dissenting).
[108] *Id.* at 605.
[109] *Id.* at 614.
[110] *Myers v. U.S.*, 272 U.S. 52, 136 (1926); *Schell v. Fauche*, 138 U.S. 562, 572 (1891).
[111] *See* John Spencer Bassett, *The Life of Jackson* 225–26 (new ed. 1925).
[112] *See Tyler, John, (1790–1862)*, Biographical Directory of the U.S. Cong., perma.cc/VJ7G-7S7N.

isolated contrary practices do not constitute a "long settled and established practice,"[113] and should not prevail over those of our founding presidents.

### B.    Purported Defiance by Washington is More Probative Than Voluntary Surrender by Jackson

The Washington-era precedents prevail for another reason: when considering competing streams of historical practice by the three branches, courts favor purported defiance over voluntary surrender.[114] In our separation of powers jurisprudence, where a branch of the federal government takes some action of doubtful constitutionality and in doing so arguably invades the constitutional sphere of another branch, if the latter acquiesces, such acquiescence (where pushback is to be expected) ratifies the propriety of the contested action.[115] On the other hand, where a branch of the federal government takes some action of dubious constitutionality and in doing so surrenders its

---

[113] *The Pocket Veto Case*, 279 U.S. 655, 689 (1929); *N.L.R.B. v. Noel Canning*, 134 S.Ct. 2550, 2559–2560 (2014). The Government notes that in "1881, Congress enacted the first law relating to the Foreign Emoluments Clause." Mem. of Law in Support of Def's Mot. to Dismiss at 41. That law applied only to "any officer of the United States civil, naval, or military." 21 Stat. 603–04 (1881), bit.ly/2rWM52X. The statute, which makes no reference to the Foreign Emoluments Clause, does not expressly apply to the President. Only in 1966 did Congress purport to place limitations on the President with respect to the receipt of a "present, decoration, or other thing." Act of Sept. 6, 1966, 80 Stat. 378, 526–27. The bill makes no reference to the Foreign Emoluments Clause. Further, the provision expressly extends to the "spouse[s]" of other federal officers. Spouses do not hold an office of any sort. 5 U.S.C. § 7342. These restrictions are best viewed as being enacted pursuant to some other constitutional authority, and not the Foreign Emoluments Clause standing by itself.

[114] *See, e.g., McPherson v. Blacker*, 146 U.S. 1, 35–36 (1892) ("The question before us is not one of policy but of power, and while public opinion had gradually brought all the states as matter of fact to the pursuit of a uniform system of popular election by general ticket, that fact does not tend to weaken the force of contemporaneous and long continued previous practice when and as different views of expediency prevailed. The prescription of the written law cannot be overthrown because the states have laterally exercised in a particular way a power which they might have exercised in some other way").

[115] *See Stuart v. Laird*, 5 U.S. 299, 309 (1803) ("[I]t is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, afford an irresistible answer and have indeed fixed the construction. It is a contempora[neous] interpretation of the most forcible nature."); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952) (noting that "Congress has taken no action" after President Truman's communications); *Dames & Moore v. Regan*, 453 U.S. 654, 688 (1981) ("We are thus clearly not confronted with a situation in which Congress has in some way resisted the exercise of Presidential authority" after claim suspensions).

own arguable powers, such self-abnegation is accorded little weight because surrender occasions no public discussion or pushback by the other branches.[116]

When Washington and the pre-Jackson presidents received diplomatic gifts, if that conduct was arguably unconstitutional, if it invaded Congress's authority to consent to such gifts under the Foreign Emoluments Clause's consent provision, then one would expect *someone* in the public to object. If there was no contemporaneous objection, then that ratifies the contested conduct. If the benefits from Washington's public auction purchases arguably amounted to emoluments, then it trespassed on Congress's power to determine the President's emoluments. The absence of congressional debate or public debate on the President's conduct ratifies the President's position. On the other hand, when Jackson and post-Jackson presidents surrendered their (arguable) power to receive diplomatic gifts absent congressional consent, such a surrender (or even a long standing modern pedigree of surrender) counts for something, but such surrender counts for a good deal less than the Washington and other pre-Jackson precedents. Distant post-ratification surrender starting a half century after the Constitution's ratification, and done in ignorance of the original practice of the Government,[117] is far less probative than purported open defiance by Washington, Jefferson, Madison, and Monroe. As Thomas Jefferson explained, "One precedent in favour of power is stronger than an hundred against it."[118]

---

[116] *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.' The President can always choose to restrain himself in his dealings with subordinates. He cannot, however, choose to bind his successors by diminishing their powers, nor can he escape responsibility for his choices by pretending that they are not his own."); *cf. Clinton v. City of N.Y.*, 524 U.S. 417, 451–52 (1998) (Kennedy, J., concurring) ("It is no answer, of course, to say that Congress surrendered its authority by its own hand . . . . Abdication of responsibility is not part of the constitutional design.").

[117] *See* The Federalist No. 69 (Hamilton) ("[I]t is always justifiable to reason from the practice of government till its propriety has been constitutionally questioned."). There is no evidence that Jackson and post-Jackson presidents questioned the propriety of Washington, Jefferson, Madison, and Monroe, if only because the former had no knowledge of the latter. Practice made in ignorance of prior precedents count for little.

[118] Thomas Jefferson, *Notes on the State of Virginia*, 121–29 (1784), perma.cc/4J8S-NZX3.

**Conclusion**

There is some intuitive appeal to Plaintiffs' position that the President, like all federal officers, is subject to the Constitution's anti-corruption provisions. Why would the Framers specifically exempt the President from these structures? The uncomfortable answer sheds light on why this case must be dismissed: due to his unique station in our separation of powers system, our laws often excuse the President from burdens that apply to others. The President generally cannot be sued for actions that arise in his official capacity, almost certainly cannot be subject to a criminal trial, and arguably can pardon himself.[119] As Chief Justice Marshall explained, "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual."[120] Pursuant to an unenumerated "recognition" power, the President can even disregard an act of Congress in order to maintain the government's foreign policy interests[121]

Is it unthinkable that the Framers permitted the President to accept foreign gifts, perhaps to support his enumerated power to "receive Ambassadors," without having to first seek the consent of a potentially hostile and slow moving Congress? The Constitution affords the President some potentially self-aggrandizing discretion. The Republic is better off if he does not use it, but if he does, there is no constitutional violation. The President does not hold an "Office of Profit or Trust under" the United States, so Count I must be dismissed.[122] The President's business transactions do not amount to emoluments, so Counts I and II must be dismissed. Defendant's business activities are less than ideal, but they are not redressable in court.

---

[119] *Nixon v. Fitzgerald*, 457 U.S. 731 (1982); Mem. from Randolph D. Moss, Asst. Att'y Gen., A President's Amenability to Indictment, OLC (Oct. 16, 2000), bit.ly/2sgSogv; Brian Kalt, *Constitutional Cliffhangers* 39-60 (2012).
[120] *U.S. v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807).
[121] *Zivotofsky v. Kerry*, 135 S.Ct. 2076 (2015).
[122] 2d Am. Compl. p. 64, ECF No. 28. Plaintiffs' Complaint is brought against the President in his "official capacity." *Id.* at caption, 1, ¶¶ 31, 33. Given that the case could not continue against the President's successor, this cannot be an "official capacity" suit. *See Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017).

Dated: New York, New York
         June 16, 2017

                                            Respectfully submitted,


                                            /s/ Robert W Ray
                                            Robert W. Ray
                                            Thompson & Knight LLP
                                            900 Third Avenue
                                            20th Floor
                                            New York, NY 10022
                                            Tel. No.: 212-751-3347
                                            Robert.ray@tklaw.com

                                            Josh Blackman
                                                Admission *pro hac vice* pending
                                            1303 San Jacinto Street
                                            Houston, TX 77002
                                            Tel. No.: 202-294-9003
                                            Josh@JoshBlackman.com
                                            *Counsel of Record*

31

**Certificate of Service**

On June 16, 2017, I caused a copy of this brief to be served on all counsel of record through the Court's CM/ECF system.

/s/ Josh Blackman
Josh Blackman
   Admission *pro hac vice* pending
Josh@JoshBlackman.com
1303 San Jacinto Street
Houston, TX 77002
Tel. No.: 202-294-9003
*Counsel of Record*