# THE DEFINITION OF "EMOLUMENT" IN ENGLISH LANGUAGE AND LEGAL DICTIONARIES, 1523-1806

## John Mikhail[*]

*In its motion to dismiss in CREW et al. v. Trump, the Department of Justice (DOJ) defines the word "emolument" as "profit arising from office or employ." DOJ claims that this "original understanding" of "emolument" is both grounded in "contemporaneous dictionary definitions" and justifies an "office-and-employment-specific construction" of that term. On this basis, it argues that the Emoluments Clauses of the Constitution "do not prohibit any company in which the President has any financial interest from doing business with any foreign, federal, or state instrumentality."*

*Unfortunately, DOJ's historical definition of "emolument" is inaccurate, unrepresentative, and misleading. Particularly because the government might seek to rely on its flawed definition in subsequent court filings, this Article seeks to correct the historical record. It does so based on a comprehensive study of how "emolument" is defined in English language dictionaries published from 1604 to 1806, as well as in common law dictionaries published from 1523 to 1792.*

*Among other things, the Article demonstrates that every English dictionary definition of "emolument" from 1604 to 1806 relies on one or more of the elements of the broad definition DOJ rejects in its brief: "profit," "advantage," "gain," or "benefit." Furthermore, over 92% of these dictionaries define "emolument" exclusively in these terms, with no reference to "office" or "employment." By contrast, DOJ's preferred definition—"profit arising from office or employ"—*

[*] Associate Dean for Research & Academic Affairs, Professor of Law, and Agnes N. Williams Research Professor, Georgetown University Law Center. An early version of this paper was presented at a conference on Historical Semantics and Legal Interpretation sponsored by the Neubauer Collegium for Culture and Society at the University of Chicago. I wish to thank Alison LaCroix and Jason Merchant for inviting me to speak at this stimulating gathering of historians, linguists, and legal scholars working at the intersections of these fields. Thanks also to Alison, Jason, Jill Anderson, Will Baude, Elizabeth Coppock, Anastasia Giannakidou, Neal Goldfarb, Brian Slocum, Lawrence Solan, Lea VanderVelde and the other conference participants for their questions and feedback. Emily Kadens, Matthias Mahlmann, Simon Stern, and Georgia Strati gave generously of their time and expertise at an early stage of this research, for which I am grateful. Mary Sarah Bilder, Jud Campbell, Irv Gornstein, Andy Grewal, Greg Klass, Marty Lederman, Richard Primus, Jack Rakove, Gautham Rao, Jed Shugerman, Lawrence Solum, and David Vladeck also provided helpful feedback and encouragement. Two images of B.N. Defoe's *Compleat English Dictionary* (1st ed. 1735) are reproduced here courtesy of the Folger Shakespeare Library; I thank Abbie Weinberg for her assistance in providing these images and the library for its permission to use them. Hannah Mikhail and Andrew Mikhail kindly helped me proofread tables and tabulate definitions. Finally, I wish to thank Georgetown law student Genevieve Bentz for her truly extraordinary assistance with the design and execution of this project. She deserves the lion's share of credit for locating, transcribing, and assembling many of the documentary records included in the appendices, as well as for other outstanding contributions too numerous and varied to mention.

*appears in less than 8% of these dictionaries.  Moreover, even these outlier dictionaries always include "gain, or advantage" in their definitions, a fact obscured by DOJ's selective quotation of only one part of its favored definition from Barclay (1774). The impression DOJ creates in its brief by contrasting four historical definitions of "emolument"—two broad and two narrow—is, therefore, highly misleading.*

*The suggestion that "emolument" was a legal term of art at the founding, with a sharply circumscribed "office-and-employment-specific" meaning, is also inconsistent with the historical record. A vast quantity of evidence already available in the public domain suggests that the founding generation used the word "emolument" in broad variety of contexts, including private commercial transactions. This Article adds to that emerging historical consensus by documenting that none of the most significant common law dictionaries published from 1523 to 1792 even includes "emolument" in its list of defined terms. In fact, this term is mainly used in these legal dictionaries to define other, less familiar words and concepts. These findings reinforce the conclusion that "emolument" was not a term of art at the founding with a highly restricted meaning.*

*Finally, the Article calls attention to the fact that the government's dictionary-based argument is flawed in another, more fundamental respect. Little or no evidence indicates that the two historical dictionaries—Barclay (1774) and Trusler (1766)—on which DOJ relies in its brief to defend its "office-and-employment-specific" definition of "emolument" were owned, possessed, or used by the founders, let alone had any impact on them or on the American people who debated and ratified the Constitution. For example, neither of these dictionaries is mentioned in the more than 178,000 searchable documents in the Founders Online database, which makes publicly available the papers of the six most prominent founders. Nor do these volumes appear in other pertinent databases, such as the Journals of the Continental Congress, Letters of Delegates to Congress, Farrand's Records, Elliot's Debates, or the Documentary History of the Ratification of the Constitution. By contrast, all of the dictionaries that the founding generation did possess and use regularly—e.g., Johnson, Bailey, Dyche & Pardon, Ash, and Entick—define "emolument" in the broad manner favoring the plaintiffs: "profit," "gain," "advantage," or "benefit."*

*To document its primary claims, the Article includes over 100 original images of English and legal dictionaries published between 1523 and 1806, as well as complete transcripts and easy-to-read tables of the definitions contained therein. A second study is currently underway of dictionaries from 1806 to the present, which seeks to determine how and why definitions of "emolument" may have changed over time.  Collectively, these inquiries are designed to accomplish more than simply aiding judges and holding lawyers' feet to the fire in the emoluments cases now pending in three federal courts. They also provide a basis for educating members of Congress, government officials, journalists, scholars, and the broader public about the historical meaning of this important yet obscure constitutional term.*

INTRODUCTION………………………………………………………………………..5
I.      FINDINGS AND DISCUSSION……………………………………………8
II.     THE FOUNDERS' DICTIONARIES……………………………………13
III.    OTHER HISTORICAL ARGUMENTS…………………………............18
IV.     SOURCES, METHODS, AND DOCUMENTATION……………………… 24
CONCLUSION…………………………………………………………………………26

APPENDIX A: "EMOLUMENT" IN ENGLISH LANGUAGE DICTIONARIES, 1604-1806 …………A-1

    A.  Definitions of "Emolument" in English Dictionaries…………………………A-2
    B.  Statistical and Longitudinal Analyses…………………………………A-5
    C.  Transcripts…………………………………………………………A-6
    D.  Original Images …………………………………………………A-10
        1.   Cawdrey (1604;1617)……………………………………A-10
        2.   Bullokar (1616;1719)……………………………………A-12
        3.   Cockeram (1623;1623)……………………………………A-14
        4.   Blount (1656;1661)……………………………………A-16
        5.   Philips (1658;1720……………………………………A-18
        6.   Coles (1676;1679)……………………………………A-20
        7.   Kersey (1702;1713)……………………………………A-22
        8.   Cocker (1704;1724)……………………………………A-24
        9.   [anon] (1707;1707)……………………………………A-26
        10.  Bailey (1721;1724)……………………………………A-28
        11.  Bailey (1730;1730)……………………………………A-30
        12.  Manlove (1735;1741)……………………………………A-32
        13.  Defoe (1735;1735)……………………………………A-34
        14.  Dyche & Pardon (1735;1754)…………………………A-36
        15.  Martin (1749;1749)……………………………………A-38
        16.  [anon](1753;1758)……………………………………A-40
        17.  Wesley (1753;1777)……………………………………A-42
        18.  Johnson (1755;1783)……………………………………A-44
        19.  Scott (1755;1755)……………………………………A-46
        20.  Buchanan (1757;1757)……………………………………A-48
        21.  Rider (1759;1759)……………………………………A-50
        22.  Bellamy (1760;1764)……………………………………A-52
        23.  Fenning (1761;1775)……………………………………A-54
        24.  Donaldson (1763;1763)……………………………………A-56
        25.  Allen (1765;1765)……………………………………A-58
        26.  Entick (1765;1780)……………………………………A-60
        27.  Barlow (1772;1772)……………………………………A-62
        28.  Kenrick (1773;1773)……………………………………A-64
        29.  Fisher (1773;1788)……………………………………A-66
        30.  Barclay (1774;1774)……………………………………A-68

31.   *Ash (1775;1775)* ................................................................... A-70
32.   *Perry (1775;1775)* ................................................................. A-72
33.   *Walker (1775; 1791)* ............................................................ A-74
34.   *Sheridan (1780;1790)* ......................................................... A-76
35.   *Lemon (1783;1783)* ............................................................. A-78
36.   *Scott (1786;1810)* ................................................................ A-80
37.   *Jones (1798; 1812)* .............................................................. A-82
38.   *Browne (1800;1822)* ............................................................ A-84
39.   *Fulton (1802;1823)* ............................................................. A-86
40.   *Webster (1806;1806)* ........................................................... A-88

APPENDIX B: "EMOLUMENT" IN LEGAL DICTIONARIES, 1523-1792 ..................... A-90

A.   *Definitions of "Emolument" in Legal Dictionaries* ............................. A-91
B.   *Other Uses of "Emolument" in Legal Dictionaries* ............................. A-92
C.   *Transcripts* ......................................................................... A-93
D.   *Original Images*
       1.   *Rastell (1523;1523)* ...................................................... A-95
       2.   *Cowell (1607;1607)* ...................................................... A-97
       3.   *Leigh (1652;1658)* ....................................................... A-99
       4.   *Sheppard (1656;1656)* ................................................. A-101
       5.   *Spelman (1664; 1664)* ................................................. A-103
       6.   *Blount (1670; 1691)* .................................................... A-105
       7.   *Jacob (1729; 1729)* ..................................................... A-108
       8.   *Cunningham (1764; 1764)* ............................................ A-112
       9.   *Kelham (1779;1779)* .................................................... A-116
       10.  *Burn (1792;1792)* ....................................................... A-118

APPENDIX C: "EMOLUMENT" IN SYNONYMY DICTIONARIES, 1748-1813 ................ A-121

A.   *Explanations of "Emolument" in Synonymy Dictionaries* ..................... A-122
B.   *Side-by-side Comparison of Girard (1748) and Trusler (1766)* ............. A-123
C.   *Original Images* .................................................................. A-125
       1.   *Girard (1718;1748)* ..................................................... A-125
       2.   *Trusler (1766;1766)* .................................................... A-127
       3.   *Piozzi (1794;1794)* ..................................................... A-130
       4.   *Taylor (1813;1813)* ..................................................... A-131

## INTRODUCTION

On June 9, 2017, the U.S. Department of Justice (DOJ) filed a brief in support of President Donald Trump's Motion to Dismiss in *CREW et al. v. Trump*,[1] one of three emoluments lawsuits currently pending against the President.[2]   In its brief, DOJ argues *inter alia* that:

- "Plaintiffs' expansive reading of the Emoluments Clauses is contrary to the original understanding of the Clauses and to historical practice.   The term 'Emolument' in this context refers to benefits arising from personal service in an employment or equivalent relationship."[3]
- "Neither the text nor the history [of the Emoluments Clauses] shows that they were intended to reach benefits arising from a President's private business pursuits having nothing to do with his office or personal service to a foreign power."[4]
- "At the time of the Nation's founding . . . an 'emolument' was a common characteristic of a federal office and comprehensively described 'every species of compensation or pecuniary profit derived from a discharge of the duties of the office.'"[5]
- In light of "common usage" at the time of the founding, "the term 'Emolument' in the Emoluments Clauses should be interpreted to refer to a 'profit arising from an office or employ.'"[6]
- "The history and purpose of the [Emoluments Clauses] is devoid of concern about private commercial business arrangements."[7]

---

[1] Memorandum of Law in Support of Defendant's Motion to Dismiss, Citizens for Responsibility and Ethics in Washington et al., v. Donald J. Trump (S.D.N.Y., June 9, 2017) (Case 1:17-cv-00458-RA) (henceforth "DOJ Brief").

[2] *See* Citizens for Responsibility and Ethics in Washington et al., v. Donald J. Trump (S.D.N.Y., May 10, 2017) (Case 1:17-cv-00458-RA); The District of Columbia and The State of Maryland v. Donald J. Trump (D.C. MD, June 12, 2017) (Case 8:17-cv-01596-PJM); Senator Richard Blumenthal et al., v. Donald J. Trump (D.D.C., June 14, 2017) (Case 1:17-cv-01154). All three cases turn on the application of two constitutional provisions to President Trump, the Foreign Emoluments Clause and the Domestic Emoluments Clause.   The first clause provides that:

> [N]o Person holding any Office of Profit or Trust under them [i.e., the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, §9, cl. 8.   The second clause provides that:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

U.S. Const. art. II, §1, cl. 7.

[3] DOJ Brief, *supra* note 1, at 2-3

[4] *Id.* at 26.

[5] *Id.* (quoting Hoyt v. United States, 51 U.S. 109, 135 (1850) (emphasis omitted)).

[6] *Id.* at 28 (quoting JAMES BARCLAY, A COMPLETE AND UNIVERSAL ENGLISH DICTIONARY ON A NEW PLAN (1774)).

[7] *Id.* at 34.

To defend these and other historical claims,[8] DOJ leans on two founding-era dictionaries: *A Complete and Universal English Dictionary on a New Plan* by James Barclay[9] and *The Difference between Words, Esteemed Synonymous, in the English Language* by John Trusler.[10]   According to DOJ, Barclay defines "emolument" as "profit arising from an office or employ,"[11] while Trusler explains that the term "relates to commissions and employments; intimating, not only the salaries, but, all other perquisites."[12]   Repeatedly invoking these definitions in support of President Trump's Rule 12(b)(6) motion,[13] DOJ argues that they justify what it calls an "office-and-employment-specific construction"[14] of "emolument," which, it claims, categorically precludes the possibility that any of the profits, gains, or advantages President Trump or his businesses receive from foreign, federal, or state governments constitute violations of the Emoluments Clauses.[15]

DOJ concedes that "the plaintiffs' definition of ['emolument'] as encompassing 'anything of value' resembles a broader definition that also existed at the time of the founding."[16]   It insists, however, that "common usage"[17] at the time reflects Barclay's narrower definition.[18]   DOJ also argues that if the term "emolument" is ambiguous, that ambiguity ought to be resolved in favor of Barclay's definition.[19]   For these and other reasons, DOJ maintains, the plaintiffs fail to state a valid claim upon which relief can be granted.[20]

---

[8] *See, e.g., id.* at 27 ("The Emoluments Clauses Prohibit Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment"); *id.* ("[T]he Emoluments Clauses apply only to the receipt of compensation for personal services and to the receipt of honors and gifts based on official position"); *id.* ("[T]he Emoluments Clauses . . . do not prohibit any company in which the President has a financial interest from doing business with any foreign, federal, or state instrumentality").  DOJ does not identify these additional claims as originalist, but their context implies that it regards them as such.

[9] JAMES BARCLAY, A COMPLETE AND UNIVERSAL ENGLISH DICTIONARY ON A NEW PLAN (1774).

[10] JOHN TRUSLER, THE DIFFERENCE BETWEEN WORDS, ESTEEMED SYNONYMOUS, IN THE ENGLISH LANGUAGE (1766).

[11] DOJ Brief, at 28 (quoting BARCLAY).

[12] *Id.* at 29-30 (quoting TRUSLER).

[13] *See, e.g., id.* at 28 (quoting BARCLAY); *id.* at 30 (quoting BARCLAY); id. at 31 (paraphrasing BARCLAY); id. at 29-30 (quoting TRUSLER).

[14] *Id.* at 32.  *See also id.* (arguing that "the term 'Emolument' . . . should be understood as office-and-employment specific"); *id.* at 40 ("For over two centuries, the Emoluments Clauses have been interpreted and applied in an office-and-employment specific manner").

[15] *Id.* at 27-32; *see generally id.* at 26-48.  As Marty Lederman observes, DOJ's conclusion does not necessarily follow from its premises.  Even if one accepts the government's narrow definition of the term "emolument," at least some of the conduct alleged by the CREW plaintiffs in their complaint appears to violate the Foreign Emoluments Clause.  *See* Marty Lederman, *How the DOJ Brief in CREW v. Trump Reveals that Donald Trump is Violating the Foreign Emoluments Clause*, TAKE CARE BLOG (June 12, 2017).

[16] *Id.* at 30.

[17] *Id.* at 28.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 51.

There are significant problems with these arguments and other aspects of the government's brief, several of which have been identified by other commentators.[21] The core problem I wish to highlight in these remarks concerns the government's historical definition of "emolument." Simply put, that definition is inaccurate, unrepresentative, and misleading. Particularly because DOJ might seek to utilize this flawed definition in subsequent court filings, this Article seeks to correct the historical record. It does so on the basis of a comprehensive study of how "emolument" is defined in both English language dictionaries published from 1604 to 1806 and English legal dictionaries published from 1523 to 1792.

In what follows, I first summarize the main findings of this investigation (Part I), followed by some brief remarks about the dictionaries we have good reason to believe the founding generation of Americans actually owned, used, and relied upon (Part II). Next, I consider some of DOJ's other historical arguments (Part III), before turning to a summary of the sources, methods, and documentation used in this study (Part IV). Finally, I conclude. The bulk of the Article consists of three appendices, which reproduce over one hundred images of English language and legal dictionaries published from 1523 to 1806, along with easy-to-read tables and transcripts of the definitions contained therein. The first appendix also contains some modest statistical and longitudinal analyses of this database of definitions. A second inquiry is currently underway of English dictionaries from 1806 to the present, which seeks to determine how and why definitions of "emolument" may have changed over time. Comparable investigations of case reports, abridgments, treatises, and other historical materials are also in progress.

Collectively, these investigations are designed to accomplish more than simply aiding judges and holding lawyers' feet to the fire in the emoluments cases now pending in three federal courts. They also provide a basis for educating members of Congress, government officials, journalists, and the wider public about the historical meaning of this important yet obscure constitutional term. Finally, these inquiries also seek to contribute to a growing body of research in historical semantics and legal interpretation, an emerging field that seeks to determine more precisely how lexical shifts have occurred over time and to evaluate their implications for constitutional and statutory interpretation. Among other things, the studies undertaken here illustrate how a more thorough and systematic investigation

---

[21] *See, e.g.*, Jane Chong, *Reading the Office of Legal Counsel on Emoluments: Do Super-Rich Presidents Get a Pass?* LAWFARE (July 1, 2017); Michael C. Dorf, *Trump Emoluments Argument Mirrors His "Just a Hope," Comey Defense*, TAKE CARE BLOG (June 14, 2017); Andy Grewal, *Three Reactions to the DOJ's Brief in CREW v. Trump*, NOTICE & COMMENT (June 10, 2017); Lederman, *supra* note 15; Leah Litman, *The Two Sides of Donald Trump, As Reflected in The Government's Motion to Dismiss the CREW Emoluments Case*, TAKE CARE BLOG (June 12, 2017); Richard Primus, T*wo Thoughts on the Government's Motion to Dismiss in the CREW Emoluments Case*, BALKINIZATION (June 10, 2017); Simon Stern, *Presents, Emoluments, and Corruption*, BALKINIZATION (June 21, 2017).

of historical dictionaries and other documentary records can be used to assist in these broader endeavors.

## I. FINDINGS AND DISCUSSION

With respect to English language dictionaries, this Article makes at least four specific contributions.  First, it demonstrates that one or more elements of the broad definition of "emolument" DOJ rejects in its brief—"profit," "advantage," "gain," or "benefit,"—can be found in *every* known English language dictionary definition of "emolument" published between 1604 (when the first English language dictionary was published)[22] and 1806 (when Noah Webster published his first American dictionary).[23]  Second, it demonstrates that over 92% of these dictionaries define "emolument" *exclusively* in these terms, with no reference to "office" or "employment."[24]  By contrast, DOJ's preferred definition—"profit arising from an office or employ"—appears in less than 8% of these dictionaries.[25]  Third, this research documents that even these outlier dictionaries always include "gain, or advantage" in their definitions, a finding obscured by DOJ's selective quotation of Barclay in its brief.[26]  Finally, this report highlights the fact that Trusler's volume

---

[22] ROBERT CAWDREY, A TABLE ALPHABETICALL (1604).  The only surviving copy of the first printing of this book is owned by the Bodleian Library at Oxford University.  Oxford University Press has published a modern scholarly edition of Cawdrey's dictionary with an introduction by John Simpson, Chief Editor of the Oxford English Dictionary.  See THE FIRST ENGLISH DICTIONARY 1604: ROBERT CAWDREY'S A TABLE ALPHABETICAL (2007) (introduction by John Simpson).  For additional background, see DE WITT T. STARNES & GERTRUDE E. NOYES, THE ENGLISH DICTIONARY FROM CAWDREY TO JOHNSON 1604-1755 (2nd ed. 1999) (introduction by Gabriele Stein); REBECCA SHAPIRO, FIXING BABEL: AN HISTORICAL ANTHOLOGY OF APPLIED ENGLISH LEXICOGRAPHY (2016) (introduction by Jack Lynch).

[23] NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806).  For discussion of Webster's contributions to English lexicography, see DAVID MICKLETHWAIT, NOAH WEBSTER AND THE AMERICAN DICTIONARY (2005).  For support of the proposition asserted in the text, see Table 1: Definitions of "Emolument" in English Dictionaries, 1604-1806, *infra* at A-2 to A-4 (henceforth "Table 1").

[24] *See* Figure 1: Statistical and Longitudinal Analyses of Lexical Definitions, 1604-1806, *infra* at A-5 (henceforth "Figure 1").  *See also* Table 1, *infra* at A-2 to A-4.

[25] *See* Table 1, *infra* at A-2 to A-4; Figure 1, *infra* at A-5.

[26] *Compare* DOJ Brief, *supra* note 1, at 28, 30 (defining "emolument" as "profit arising from profit or employ" and attributing that definition to BARCLAY) *with* Appendix A, *infra* at A-3, A-5 (documenting that BARCLAY's full definition of "emolument" is "profit arising from profit or employ; *gain or advantage*") (emphasis added).  In addition to this definition, Barclay also includes an explanation of how "emolument" differs from synonyms such as "profit" and "lucre" that appears to have been copied from Trusler without attribution.  *Compare* BARCLAY, *infra* at A-8 *with* TRUSLER, *infra* at A-122.  The only other dictionaries from 1604 to 1806 that lend support to DOJ's definition of "emolument" also include "gain, or advantage" in their definitions.  *See* Appendix A, *infra* at A-3 and A-8 (recording definitions in WILLIAM RIDER, A NEW UNIVERSAL ENGLISH DICTIONARY (1st ed. 1759) and Daniel Fenning, The Royal English Dictionary (5th ed. 1775)).  Except for minor differences in punctuation, the definitions given by Barclay, Rider, and Fenning are identical, suggesting that Rider (1759) was probably the first English lexicographer to use this definition and that Barclay copied his definition directly from either Rider or Fenning.

is not a standard dictionary at all, but rather a thesaurus, which presumes that "gain," "profit," "lucre," and "emolument" are synonyms, albeit words with subtly different connotations.[27]  Moreover, Trusler's account of these words was copied directly from a French thesaurus, Abbe Girard's *Synonymes François*.[28]  His odd volume has long been viewed skeptically by scholars because "this book, including its preface, is for the most part an acknowledged translation"[29] of Girard's French text and because it "lacked the integrity of a work originally conceived with the problems of the English language in mind."[30]  In short, Trusler's explanation of "emolument" was not even reliably grounded in an investigation of the English lexicon, let alone its "common usage."[31]

The suggestion that "emolument" was a legal term of art at the founding, with a sharply circumscribed "office-and-employment-specific"[32] meaning, is also inconsistent with the historical record.[33]  A large quantity of evidence already

---

[27] *See infra* at A-122 to A-129.

[28] ABBÉ GIRARD, SYNONYMES FRANÇOIS, LEURS DIFFERENTES SIGNIFICATIONS; ET LE CHOIX QU'IL EN FAUT FAIRE POUR PARLER AVEC JUSTESSE (1748).  *See infra* at A-122 to A-124.

[29] SHAPIRO, FIXING BABEL, *supra* note 22, at 280 (quoting Gertrude E. Noyes, *The Beginnings of the Study of Synonyms in England*, 66 PMLA 951, 954 (1951)).

[30] *Id.*

[31] DOJ Brief, *supra* note 1, at 28.

[32] *Id.* at 32.

[33] Although DOJ does not clarify whether it thinks that "emolument" was a legal term of art at the founding, President-Elect Trump's lawyers at Morgan, Lewis & Bockius did rely on this claim in their white paper on presidential conflicts of interest, which they circulated in connection with his pre-inaugural press conference.  Moreover, they made this historical argument in the course of defending the very same "office-and-employment-specific" meaning of "emolument" to which DOJ subscribes in its brief.  *See* Sheri Dillon, Fred F. Fielding, Allyson N. Ho, Michael E. Kenneally, William F. Nelson & Judd Stone, *Conflicts of Interest and the President*, Morgan, Lewis & Bockius White Paper, at 4 (January 11, 2017) ("[A]n emolument was widely understood at the framing of the Constitution to mean any compensation or privilege associated with an office—then, as today, an "emolument" in legal usage was a payment or other benefit received as a consequence of discharging the duties of an office"); *id.* (observing that the Supreme Court "explained that 'the term emoluments . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of [an] office'" and noting that "'[o]ther legal experts early in the Nation's history used the word the same way") (quoting *Hoyt*, *supra* note 5); *id.* at 5 (discussing the "common legal use at the founding").  Other informed observers have also made similar claims.  *See, e.g.*, Trevor Burrus, *Sleep Well, President Trump—There are No Emoluments Under the Bad*, The Hill (June 16, 2017) ("Unless we believe that the Framers intended to prohibit any presidential secondary source of income that could, even incidentally, do business with a foreign government or official, then clearly "emolument" is a term of art that covers specific types of payments and gifts").  It is unclear to me whether Professor Natelson assumes that the definition of "emolument" he ultimately endorses ("all compensation with financial value received by reason of public office, including salary and fringe benefits") was a legal term of art, but his article could be read to imply this.  *See* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 GA. L. REV. __, at 57 (forthcoming).  Finally, Professor Tillman has submitted an amicus brief with an originalist orientation in CREW et al., v. Trump which also endorses an "office-and-employment-specific" definition.  *See* Brief for Scholar Seth Barrett Tillman as Amicus Curaie in Support of Defendant, CREW et al., v Trump, Case 1:17-cv-00458-RA Document 37-1 (Filed 06/16/17) (henceforth "Tillman Amicus Brief"),

available and easily searchable in the public domain suggests that the founders used the word "emolument" in wide variety of contexts, including private commercial transactions.[34]   This Article adds to that emerging historical consensus by documenting that none of the most prominent common law dictionaries published from 1523 to 1792 even includes "emolument" in its list of defined terms.[35]   In fact, the primary reason for which this term is used in these dictionaries is to define other, less familiar words and concepts.[36]   Together with the fact that none of the major abridgments appear to define or explain "emolument" either,[37] and that Blackstone and other influential writers of the period frequently used the word in comparably diverse contexts, including private business settings,[38] these findings reinforce the conclusion that "emolument" was not a legal term of art at the founding, which referred only to specific types of payments or benefits associated with discharging the duties of a government office.[39]

---

at 5 ("To put it in its simplest terms, an 'emolument' is the lawfully authorized compensation that flows from holding an office or employment"); *id.* ("Emoluments should be understood as the compensation which is to be fixed by law by the body that creates the office or position under discussion, or by the body charged with fixing the office's or position's regular compensation").

[34] *See, e.g.*, John Mikhail, *A Note on the Original Meaning of "Emolument,"* BALKINIZATION (January 18, 2017).

[35] *See* Table 3: Definitions of "Emolument" in Legal Dictionaries, *infra* at A-91.

[36] *See, e.g.*, THOMAS BLOUNT, NOMO-LEXICON (2d ed. 1691), *infra* at A-107 (characterizing "Maritima Angliae" as "the Emolument arising to the King from the [sea]"); GILES JACOB, A NEW LAW DICTIONARY (1st ed. 1729), *infra* at A-111 (same); TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1st ed. 1764), *infra* at 115 (same).  *See also* CUNNINGHAM, *infra* at A-113 (using "emolument" to define "Apportum"); RICHARD BURN, A NEW LAW DICTIONARY (1st ed. 1792), infra at A-120 (using "emoluments" to explain "Isle of Man").  Giles Jacob's influential *Law Dictionary* also includes a "Form of a Release and Conveyance of Lands" in which "A.B." conveys to "C.D." a property together with "all . . . Easements, Profits, Commodities, Advantages, *Emoluments*, and Hereditaments whatsoever." JACOB, *infra* at A-110 (emphasis added).  *See generally* Table 3: Other Uses of "Emolument" in Legal Dictionaries, *infra* at A-92; Transcript of Legal Dictionary Definitions and Uses, 1523-1792, *infra* at A-93.

[37] Although this Article focuses on definitions of "emolument," this should not be taken to imply that dictionaries are the only or best source for understanding how concepts were understood during the founding era.  Other sources, such as case reports, abridgments, treatises, and statutes, may be at least as relevant, if not more so.  A preliminary review by Simon Stern suggests that "emolument" does not appear in any of the major abridgments from the sixteenth century onward, such as those by Fitzherbert, Brooke, Rolle, Bacon, and Viner.  If this is correct, then it lends further support to the conclusion that lawyers did not think that the term "emolument" required any special explanation.  I am indebted to Simon Stern for these observations and findings.

[38] *See, e.g.*, John Mikhail, *"Emolument" in Blackstone's Commentaries*, BALKINIZATION (May 28, 2017); Jed Shugerman, *Mikhail's Blackstone Breakthrough: Emoluments Meant Private Benefits*, TAKE CARE BLOG (May 31, 2017).  The evidence to which these blog posts refer is just the tip of the iceberg.  There are many other comparable illustrations in the legal, political, and economic literature of the period.  *See, e.g., infra* notes 41-46 and accompanying text.

[39] Unlike the legal dictionaries investigated here, modern law dictionaries do often define "emolument" in terms of office- or employment-related compensation.  *See, e.g.,* DOJ Brief, supra note 1 at 30, n.26 (quoting the 2014 edition of Black's Law Dictionary).  *See also, e.g.,* BLACK'S LAW DICTIONARY 542 (17th ed. 1999) (Bryan A. Garner, Ed.) (defining "emolument" as "Any advantage, profit, or gain received as a result of one's employment or one's holding of office"); BLACK'S LAW DICTIONARY 616 (4th ed. 1951) (Henry Campbell Black, ed.) (defining

Because the fact that "emolument" was frequently used in private business settings is not widely appreciated and has been vigorously denied,[40] this point is worth elaborating at greater length.  For present purposes, two illustrations should suffice.  With the possible exception of Hugo Grotius, no early modern writer on the law of nations was more influential than Samuel Pufendorf.   His most significant work, *De Jure Naturae et Gentium* (*On the Law of Nature and of Nations*), was published in Latin in 1672 and soon translated into every major European language.  The first English translation was made by Basil Kennet in 1703, with successive editions appearing in 1710, 1717, 1729, and 1749.  The founders were intimately familiar with Pufendorf's masterpiece and often quoted Kennet's translation; for instance, George Wythe did so in his argument in *Bolling* v. *Bolling*; John Adams did so in his *Novanglus* essays; James Wilson did so in his *Law Lectures*; and Alexander Hamilton did so in his *Pacificus* essays.[41]   In Kennet's translation, the word "emolument" occurs twice, once in Book V, Chapter V ("Of Chargeable Contracts in particular; and, First, of Bartering, Buying, and Selling") and once in Book V, Chapter VII ("Of the Loan of a Consumable Commodity").  Both occasions involve private market transactions:

 "What they call *Lex Commissoria* makes void the Bargain, if the Price be not paid by such a Day.  And, in this Case, either the Seller may immediately deliver the Goods, and, in Default of the Payment, claim them again with the *Emolument*, or else the Goods maybe kept in Possession, till the Payment be actually be made; which last seems to be the safest Way, for generally this Clause is designed in Favour of the Seller, to save him from being put to any Trouble in the quest of his Money…."[42]

---

"emolument" principally as "The profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office as salary, fees, and perquisites; advantage; gain, public or private").  As this Article documents, however, the same was not true when the Constitution was framed and ratified.

[40] *See, e.g.*, Tillman Amicus Brief, *supra* note 33, at 2 ("Financial gain arising from private business transactions are not emoluments").  *See also* Seth Barrett Tillman, *Business Transactions and President Trump's "Emoluments" Problem*, 40 HARV. J. L. & PUB. POL. 759 (2017).

[41] *See* BERNARD SCHWARTZ, THOMAS JEFFERSON AND BOLLING V. BOLLING: LAW AND THE LEGAL PROFESSION IN PRE-REVOLUTIONARY AMERICA 417-418 (1997) (with Barbara Wilcie Kern & R.B. Bernstein) (reproducing Wythe's argument in *Bolling*, which in turn quotes Kennet's edition of Pufendorf's *Law of Nature and Nations*); "VI. To the Inhabitants of the Colony of Massachusetts-Bay, 27 February 1775," FOUNDERS ONLINE, National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Adams/06-02-02-0072-0007.  [Original source: *The Adams Papers*, Papers of John Adams, vol. 2, *December 1773–April 1775*, ed. Robert J. Taylor. Cambridge, MA: Harvard University Press, 1977, pp. 288–307.] (quoting Kennet's translation of Pufendorf); COLLECTED WORKS OF JAMES WILSON 478-479 (2007) (Kermit L. Hall & Mark David Hall, eds.) (same); "Pacificus No. III, [6 July 1793]," FOUNDERS ONLINE, National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Hamilton/01-15-02-0055.  [Original source: *The Papers of Alexander Hamilton*, vol. 15, *June 1793–January 1794*, ed. Harold C. Syrett. New York: Columbia University Press, 1969, pp. 65–69.] (same).

[42] OF THE LAW OF NATURE AND NATIONS 259-260 (3d. ed. 1717) (Translated by Basil Kennet) (original emphases deleted, spelling modernized, and emphasis on "emolument" added).

"A Man was Guilty of Usury properly so called, not only when he received back a Consumable Commodity with Increase, but if by reason of such a Loan, he lived in another's House Gratis till he was paid; or gave less Rent for it, than otherwise he would have done; or if he received any *Emolument* from a Pawn left with him upon Account of the Debt."[43]

Likewise, many of the founders were well-acquainted with Adam Smith and his economic theories.  For example, Benjamin Franklin requested a copy of *An Inquiry into the Nature and Causes of the Wealth of Nations* shortly after it was published in 1776; James Madison included Smith's book in his 1783 *Report on Books for Congress*; Robert Morris reportedly gave out copies of *The Wealth of Nations* to members of Congress in the 1780s; and James Wilson quoted Smith in defense of the Bank of North America in 1785.[44]  In *The Wealth of Nations*, "emolument" also occurs twice, once in Book I, Chapter VII ("Of the Natural and Market Price of Commodities") and once in Book IV, Chapter III ("Of the Extraordinary Restraints upon the Importation of Goods of Almost All Kinds from Those Countries with which the Balance is Supposed to be Disadvantageous").  Once again, both occasions involve private market transactions:

A monopoly granted either to an individual or to a trading company has the same effect as a secret in trade or manufactures. The monopolists, by keeping the market constantly under-stocked, by never fully supplying the effectual demand, sell their commodities much above the natural price, and raise their *emoluments*, whether they consist in wages or profit, greatly above their natural rate.[45]

The city of Amsterdam derives a considerable revenue from the bank…The bank is supposed, too, to make a considerable profit by the sale of the foreign coin or bullion which sometimes falls to it by the expiring of receipts, and which is always kept till it can be sold with advantage. It makes a profit likewise by

---

[43] *Id.* at 271.

[44] *See* "To Benjamin Franklin from Benjamin Vaughan, 27 January 1777," *Founders Online,* National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Franklin/01-23-02-0153. [Original source: *The Papers of Benjamin Franklin,* vol. 23, *October 27, 1776, through April 30, 1777,* ed. William B. Willcox. New Haven and London: Yale University Press, 1983, pp. 241–243.] (listing "Smith's Wealth of Nations" among the books sent to Franklin); DAVID LEFER, THE FOUNDING CONSERVATIVES: HOW A GROUP OF UNSUNG HEROES SAVED THE AMERICAN REVOLUTION 245-246 (2013) (relating that Morris "found Smith's thought so persuasive, in fact, that he gave out copies to members of Congress"); "Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Madison/01-06-02-0031. [Original source: *The Papers of James Madison,* vol. 6, *1 January 1783–30 April 1783,* ed. William T. Hutchinson and William M. E. Rachal. Chicago: The University of Chicago Press, 1969, pp. 62–115.] (including "Smith on the wealth of Nations" in his list of books); James Wilson, *Considerations on the Bank of North America,* in COLLECTED WORKS OF JAMES WILSON, *supra* at 60-79, 73-74 (quoting Smith's remarks on banking).

[45] ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS 26, 208 (1952) (Robert Maynard Hutchins, Ed.) (emphasis added).

selling bank money at five per cent agio, and buying it in at four. These different *emoluments* amount to a good deal more than what is necessary for paying the salaries of officers, and defraying the expense of management.[46]

In the face of illustrations like these, which occur frequently in eighteenth-century literature and reinforce what is apparent from a cursory review of the founders' own writings, it seems difficult to understand why some respected scholars continue to insist that the original meaning of "emolument" did not encompass financial gains arising from private business transactions.

## II.   THE FOUNDERS' DICTIONARIES

Even if one sets aside the foregoing problems, the government's dictionary-based argument in its motion to dismiss is flawed in another, more fundamental respect.  Little or no evidence indicates that the two historical dictionaries—Barclay (1774) and Trusler (1766)—on which DOJ relies in its brief to defend its "office-and-employment-specific" definition of "emolument" were owned, possessed, or used by the founders, let alone had any impact on them or on the American people who debated and ratified the Constitution.  For example, neither of these dictionaries is mentioned in the more than 178,000 searchable documents in the *Founders Online* database, which makes publicly available the papers of the six most prominent founders.  Nor do these volumes appear in other pertinent databases, such as *Journals of the Continental Congress*,[47] *Letters of Delegates to Congress*,[48] *Farrand's Records*,[49] *Elliot's Debates*,[50] or the *Documentary History of the Ratification of the Constitution*.[51]  Finally, their role in constitutional adjudication appears to be negligible.[52]

---

[46] *Id.*

[47] *See* JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 (34 volumes, Washington, D.C., 1904-37) (Worthington C. Ford et al., Eds.).

[48] *See* LETTERS OF DELEGATES TO CONGRESS, 1774-1789. (25 volumes, Washington, D.C.: Library of Congress, 1976-2000) (Paul H. Smith et al., Eds.)

[49] *See* MAX FARRAND, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 (3 volumes, 1911).

[50] *See* THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION IN 1787 (5 volumes, 1836) (Jonathan Elliot, Ed.).

[51] *See* THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION (28 volumes, Madison, Wisconsin, 1976--___) (Merrill Jensen et al., Eds.).

[52] *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 GEO. WASH. L. REV. 358, 384 n. 143 (2014) (indicating that Barclay has been cited once by the Supreme Court, in a dissenting opinion by Justice Thomas).   Note that the generalizations in the text also apply to William Rider's *New Universal English Dictionary* (1759) and Daniel Fenning's *Royal English Dictionary* (1761), the only other founding-era dictionaries which even weakly support DOJ's arguments.  Little or no mention of either of these volumes can be found in any of the foregoing databases. One possible exception concerns an 1820 letter from Edmund Kelly to James Madison.  In that letter, however, Kelly apparently refers to Fenning's "Spelling Book" rather than his dictionary. *See* "To James

The contrast with the historical dictionaries DOJ ignores or dismisses in its brief could not be sharper.  Significantly, many of the founders actually owned and used these dictionaries.  Moreover, the US Supreme Court has often relied on these dictionaries to interpret the original public meaning of constitutional terms.  Here are five noteworthy illustrations:

    a.   *Johnson*

Samuel Johnson's *Dictionary of the English Language*[53] was probably the most famous and important eighteenth century dictionary.[54]  Many of the founders owned copies of it or referred to it in their correspondence and other papers.  Writing as "A Friend to America," Alexander Hamilton used Johnson's *Dictionary* to take verbal swipes at Samuel Seabury in *A Full Vindication*[55] and *The Farmer Refuted*.[56]  Benjamin Franklin eagerly ordered several copies of Johnson's *Dictionary* when it became available in 1755.[57]  James Madison included Johnson's *Dictionary* in his *Report on Books for Congress* in 1783,[58] and Thomas Jefferson did likewise in his *List of Books for the Library of Congress* in 1802.[59]  The Supreme Court has cited Johnson's *Dictionary* on numerous occasions, including *Morrison v. Olson,*[60] *District of Columbia v. Heller,*[61] and *Citizens United*.[62]

---

Madison from Edmond Kelly, 26 September 1820," Note 15, FOUNDERS ONLINE, National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Madison/04-02-02-0111.

[53] SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[54] *See, e.g.,* JOHN ALEGO, THE ORIGINS AND DEVELOPMENT OF THE ENGLISH LANGUAGE 158 (2009) ("The publication of Johnson's *Dictionary* was certainly the most important linguistic event of the eighteenth century")

[55] *See* Alexander Hamilton, "*A Full Vindication of the Measures of the Congress, &c.*, [15 December] 1774," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Hamilton/01-01-02-0054.

[56] See Alexander Hamilton, "*The Farmer Refuted*, &c., [23 February] 1775," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Hamilton/01-01-02-0057.

[57] "From Benjamin Franklin to Peter Collinson, 26 June 1755," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-06-02-0045.

[58] "Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Madison/01-06-02-0031.

[59] *The Papers of Thomas Jefferson*, vol. 37, *4 March–30 June 1802*, ed. Barbara B. Oberg. Princeton: Princeton University Press, 2010, pp. 229–233.

[60] Morrison v. Olson, 487 U.S. 654, 719 (1988) (using Johnson to interpret the original meaning of "inferior").

[61] District of Columbia v. Heller, 554 U.S. 570, 581 (2008) (using Johnson to interpret the original meaning of "arms").

[62] Citizens United v. FEC, 558 U.S. 310, 428 n.55 (2010) (using Johnson to interpret the original meaning of "speech").

In the first edition of his *Dictionary* and every subsequent edition thus far consulted, Johnson defines "emolument" as "Profit; advantage."[63]

b. *Bailey*

Another lexicographer well-known to the founders was Nathan Bailey. One scholar characterizes Bailey's commercial success as "staggering,"[64] and another describes his *New Universal Etymological Dictionary* as "the supreme popular dictionary of the 18th century, holding a position analogous to that of Webster in the 19th century."[65] Benjamin Franklin advertised Bailey's *New Dictionary* for sale on multiple occasions.[66] John Adams,[67] Thomas Jefferson,[68] and other founders also owned copies. When Franklin and his associates founded the Library Company of Philadelphia in 1731, their first book purchase included Bailey's *Dictionary Britannicum*.[69] The Supreme Court has cited Bailey in cases such as *US v. Lopez*,[70] *INS v. St. Cyr*,[71] *Bond v. United States*,[72] and *Arizona State Legislature v. Arizona Redistricting Commission*.[73]

In his *New Universal Etymological Dictionary*, Bailey defines "emolument" as "Advantage, Profit."[74] In his *Dictionary Britanicum*, he defines "emolument" as

---

[63] For transcripts and images of the eighth edition of *Johnson's Dictionary* (1783), see *infra* at A-2, A-7, A-44.

[64] Melissa Patterson, The Creators of Information in Eighteenth-Century Britain [page] (2015) (unpublished Ph.D. dissertation, University of Ontario) (on file with the University of Ontario libraries).

[65] Percy W. Long, *English Dictionaries before Webster*, 4 Papers (Bibliographical Society of America) 25, 31 (1909).

[66] *See, e.g.*, "Extracts from the Gazette, 1741," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-02-02-0079; "Extracts from the Gazette, 1744," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-02-02-0117.

[67] *See, e.g.*, "[April 1761]," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Adams/01-01-02-0006-0004.

[68] *See, e.g.*, "From Thomas Jefferson to James Eastburn, 2 April 1819," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Jefferson/98-01-02-0293; "From Thomas Jefferson to John Adams, 15 August 1820," *Founders Online*, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Jefferson/98-01-02-1458.

[69] *See* LIBRARY COMPANY OF PHILADELPHIA, THE CHARTER, LAWS, AND CATALOGUE OF BOOKS, OF THE LIBRARY COMPANY OF PHILADELPHIA 106 (1770).

[70] United States v. Lopez, 514 U.S. 549, 586 (1995) (used Bailey to interpret the original meaning of "commerce").

[71] INS v. St. Cyr, 533 U.S. 289, 337(2001) (using Baily to interpret the original meaning of "suspend").

[72] Bond v. United States, 134 S. Ct. 2077, 2104 (2014) (using Bailey to interpret the original meaning of "treaty").

[73] Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2671 (2015) (using Bailey to interpret the original meaning of "legislature").

[74] NATHAN BAILEY, A UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (1721), infra at A-26.

"Profit gotten by labour and cost."[75]  Finally, Bailey and Scott's *New Etymological Dictionary* defines "emolument" as "Profit."[76]

c.  *Dyche & Pardon*

Thomas Dyche & William Pardon's *A New General English Dictionary* was both the first English dictionary to include grammar and the first to be marketed to female as well as male readers.[77] This highly popular book went through eighteen editions by 1794.[78]  Benjamin Franklin advertised the book for sale on many occasions, including 1730,[79] 1741,[80] and 1744.[81] Franklin ordered seventy-two copies of Dyche & Pardon from his bookseller in September 1746,[82] followed by a second order in January 1747,[83] implying he may have sold up to one copy per day over this period.  John Adams mentioned Dyche & Pardon's *Dictionary* in a diary entry on board a ship in 1778.[84] The Supreme Court has cited Dyche & Pardon in cases such as *NFIB v. Sebelius*,[85] *Zivotofsky v. Kerry*,[86] and, most recently, *Manuel v. Joliet*.[87]

In their *New English Dictionary*, Dyche & Pardon define "emolument" as "Benefit, advantage, profit."[88]

---

[75] NATHAN BAILEY, DICTIONARIUM BRITANICUM (1730) (A-28).

[76] NATHAN BAILEY & JOSEPH SCOTT, A NEW ETYMOLOGICAL DICTIONARY (1755) (A-46).

[77] MERJA KYOTO, THE CAMBRIDGE HANDBOOK OF ENGLISH HISTORICAL LINGUISTICS 100-105 (2016).

[78] *See* 2 THE NEW CAMBRIDGE BIBLIOGRAPHY OF ENGLISH LITERATURE 1968 (George Watson et al. eds., 1971).

[79] *See* "Extracts from the *Gazette*, 1730," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-01-02-0057.

[80] *See* "Extracts from the Gazette, 1741," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-02-02-0079.

[81] *See* "Extracts from the *Gazette*, 1744," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-02-02-0117.

[82] *See* "From Benjamin Franklin to William Strahan, 25 September 1746," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-03-02-0038.

[83] *See* "From Benjamin Franklin to William Strahan, 4 January 1747," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Franklin/01-03-02-0047.

[84] *See* "[February 1778]," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Adams/01-02-02-0008-0001.

[85] Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 649 (2012) (using Dyche & Pardon to interpret the original meaning of "regulate").

[86] Zivotofsky v. Kerry, 135 S. Ct. 2076, 2104 (2015) (using Dyche & Pardon to interpret the original meaning of "naturalization").

[87] Manuel v. City of Joliet, 137 S. Ct. 911, 927 (2017) (using Dyche & Pardon to interpret the original meaning of "seizure").

[88] THOMAS DYCHE & WILLIAM PARDON, A NEW GENERAL ENGLISH DICTIONARY 1735 (A-36).

d. *Ash*

The influence of John Ash's *The New Complete Dictionary of the English Language* on the founders is less clear.  Still, his dictionary is often included in lists of founding era dictionaries.[89]  Ash is probably best known today for including vulgar words in his dictionary,[90] a decision for which he has been praised.[91]  His grammar book was purchased by Alexander Hamilton in 1796,[92] and George Wythe also owned a copy, which he bequeathed to Thomas Jefferson.[93]  The Supreme Court has cited Ash's dictionary in cases such as *NFIB v. Sebelius*[94] and *Burstyn v. Wilson*.[95]

In his *New General English Dictionary*, Ash defines "emolument" as "An advantage, a profit."[96]

e. *Entick*

Perhaps because it was pocket-sized, John Entick's *New Spelling Dictionary* was a primary means by which Americans communicated with one another in code during the founding era.  From 1777 to 1779, the Lee brothers used a cipher based on Entick's dictionary for this purpose.[97]  John Jay proposed a cipher based on Entick's dictionary to Robert Morris in 1780,[98] and John Adams used Entick in a similar fashion in 1781.[99]  In a 1781 letter to George Washington, James Lovell describes how British army officers did likewise.[100]  Philip Schuyler devised a

---

[89] *See, e.g.,* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 419 (2012); Maggs, "A Concise Guide," *supra* note 52, at 382-383.

[90] *See* Jesse Sheidlower, "Can a Woman "Prong" a Man?" SLATE, (October 2009), http://www.slate.com/articles/life/the_good_word/2009/10/can_a_woman_prong_a_man.html.

[91] For one example, see Joseph Crabtree, "The Crabtree Foundation 40th Oration" (2014), http://www.crabtreemelbourne.org/Oration2014.pdf.

[92] *See* "Account with Archibald Drummond, 4 October 1796," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Hamilton/01-20-02-0224.

[93] *See* "To Thomas Jefferson from George Jefferson, 22 July 1806," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Jefferson/99-01-02-4073.

[94] NFIB v. Sebelius, *supra* note 50 (using Ash to interpret the original meaning of "regulate").

[95] Joseph Burstyn v. Wilson, 343 U.S. 495, 537 (1952) (using Ash to interpret the historical meaning of "sacrilege" and "blasphemy").

[96] JOHN ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1775), *infra* at A-71.

[97] *See* Edmund C. Burnett, Ciphers of the Revolutionary Period, 22 AM. HIST. REV. 329, 330 (1909).

[98] "To John Jay (Jun. 5, 1781)" *collected in* THE PAPERS OF ROBERT MORRIS 115 (Elmer J. Ferguson ed. 1975).

[99] "Enclosure: Key for a Code System, 8 September 1781," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Adams/06-11-02-0355-0002.

[100] "To George Washington from James Lovell, 14 October 1781," FOUNDERS ONLINE, National Archives, last modified March 30, 2017,

cipher based on Entick's dictionary and shared it with Rufus King and Alexander Hamilton in 1798.[101]  During the first Congress, John Adams and Roger Sherman debated the meaning of "Republic" in light of Entick's definition of that term.[102]  While serving as President of the United States, Thomas Jefferson purchased a 1777 edition of Entick's dictionary.[103]

Entick's *New Spelling Dictionary* defines "emolument" as "Profit, advantage, benefit."[104]

Rightly emphasizing that all dictionaries are not created equal, Justice Antonin Scalia and Bryan A. Garner recommend four of these founding era dictionaries—Johnson, Bailey, Dyche & Pardon, and Ash—as "the most useful and authoritative" English dictionaries from 1750-1800.[105]  Scalia and Garner do not include Entick in their list, but they arguably should have, in light of the fact that the founders frequently used Entick's dictionary to communicate with another in cipher.[106]  In the present context, however, that issue seems largely beside the point, since DOJ's research was guided neither by Scalia and Garner's recommendations nor by Entick.[107]  All five of these dictionaries define "emolument" in the broad manner favoring the plaintiffs–"profit," "gain," "advantage," or "benefit."  None of them gives any hint of an "office-and-employment-specific"[108] definition.

## III.   OTHER HISTORICAL ARGUMENTS

In light the foregoing considerations, it seems clear that the impression DOJ creates in its brief by contrasting four historical definitions of "emolument"—two broad and two narrow—is highly misleading.[109]  So, too, is the government's

---

http://founders.archives.gov/documents/Washington/99-01-02-07158.

[101] "To Alexander Hamilton from Philip Schuyler, 11 June 1799," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Hamilton/01-23-02-0174.

[102] "To John Adams from Roger Sherman, 18 July 1789," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Adams/99-02-02-0684.

[103] "Memorandum Books, 1807," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Jefferson/02-02-02-0017.

[104] JOHN ENTICK, THE NEW SPELLING DICTIONARY (1765), infra at A-61.

[105] *See* SCALIA & BRYAN A. GARNER, supra note 89.

[106] *See* Burnett, *supra* note 97.  *See also* supra notes 97-101 and accompanying text.

[107] The government does refer to one of these five dictionaries in its brief; however, in both the text and table of authorities it neglects to state its authors. *See* DOJ Brief, *supra* note 1 at xii, 30 (citing *A New General English Dictionary* without noting its author was Dyche & Pardon). Moreover, on both occasions it mischaracterizes the 1754 edition as the "18th ed." when in fact it was the eighth edition. *See id.* at xii, 30.  DOJ also fails to indicate the author of the second *contra* dictionary it cites, *A Complete Dictionary of the English Language* (2d. 1789).  The careless indifference toward sources favoring the plaintiffs is striking.

[108] *Id.* at 32.

[109] *See* DOJ Brief at 29-31 (contrasting the "narrower" definitions of "emolument" given by

argument that any doubt or ambiguity arising from these competing definitions should be resolved in favor of its preferred definition by means of the doctrine of *noscitur a sociis*.[110]  Furthermore, a close examination of the government's other historical arguments reveals many of them also cannot withstand scrutiny:

- To support its preferred definition of "emolument," DOJ cites *Hoyt v. United States*, a case in which the Supreme Court wrote that "the term emoluments . . . embrac[es] every species of compensation or pecuniary profit derived from *a discharge of the duties of the office*."[111]  *Hoyt* was a statutory case, however, which required the Court to interpret an 1802 statute referring to "the annual emoluments of any collector of the customs."[112]  The Court's language makes perfect sense in that statutory context, but it has no constitutional implications.  It certainly did not purport to circumscribe the scope of "emolument" for constitutional purposes.[113]

- DOJ asserts that because of "common usage in the founding era . . . the term 'Emolument' in the Emoluments Clauses should be interpreted to refer to a 'profit arising from an office or employ.'"[114]  The paragraph that supposedly justifies this claim, however, contains only two examples of founding era usage: an 1802 statute and an address by President Washington.[115]  Neither is remotely sufficient to prove the point at issue—and they surely do not demonstrate any "common usage."[116]  Like other members of his generation, moreover, Washington frequently used the word "emolument" in private commercial contexts, or to convey a broader meaning.[117]

---

Barclay and Trusler with two "broader" definitions given by "A New English Dictionary (18th ed. 1754)" and "A Complete Dictionary of the English Language (2d. 1789)").

[110] *Id.* at 30-31.

[111] Hoyt v. United States, 51 U.S. 109, 135 (1850) (emphasis added by DOJ).

[112] 2 Stat. at Large, 172, § 3 (April 30, 1802).

[113] Jane Chong makes a similar point about *Hoyt* in her insightful commentary on DOJ's brief.  *See* Chong, *supra* note 21 (observing that *Hoyt* must be read "with an eye to [its] facts: [the case does] not assert that 'emoluments' must derive directly from discharge of duty; rather, the kind of emoluments at issue in [*Hoyt*] was the kind derived for discharge of duty").

[114] *Id.* at 28 (quoting BARCLAY, *supra* note 9).

[115] *Id.* at 28.

[116] At most, the two examples weakly support the claim that "emolument" was often used to refer to government salaries, something no one disputes or denies—since of course such salaries *are* emoluments on any plausible definition.  The point at issue is whether "emolument" was *always* used in this rigid manner; in other words, whether concepts such as "government salary" or "payment or other benefit received for discharging the duties of an office" were somehow built into the definition or semantic content of "emolument" at the time.  Convincing evidence for the latter proposition is noticeably lacking.  *See* Mikhail, supra note 34; John Mikhail, *Other Uses of "Emolument" in The Federalist (and the Fallacy of Affirming the Consequent),* BALKINIZATION (January 25, 2017).

[117] *See, e.g.,* "From George Washington to John Price Posey, 7 August 1782," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/99-01-02-09066 (criticizing Posey for "selling another Mans Negros for your own *emolument*") (emphasis added); "Proclamation on Intercourse with British Warships, 29 April 1776," FOUNDERS ONLINE, National Archives,

- DOJ claims that the prohibition on receiving foreign emoluments in the Articles of Confederation "was prompted by"[118] a series of events involving American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin, which occurred in connection with their "successfully negotiating the Franco-American alliance treaty of 1778."[119]  This causal claim is at odds with the fact that the prohibition on foreign emoluments in the Articles was initially drafted by John Dickinson at least two years before the events in question.[120]

---

last modified March 30, 2017, http://founders.archives.gov/documents/Washington/03-04-02-0132 (referring to "wicked Persons, preferring their own, present private *Emolument* to their Country's Weal") (emphasis added); "Virginia Nonimportation Resolutions, 22 June 1770," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Jefferson/01-01-02-0032 (calling for a boycott of sellers of British and European goods who "have preferred their own *emolument*" to "the dearest rights of the people of this colony") (emphasis added); "Washington's Memoranda on Indian Affairs, 1789," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/05-04-02-0333 ("Every Navigable River throughout the Territory shall be deemed a highway and no obstruction shall be placed therein for the *emolument* of any person whatsoever") (emphasis added); "General Orders, 8 August 1775," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/03-01-02-0173 (referring to men who send others "to work upon their Farms, for their own private *Emolument*") (emphasis added); "General Orders, 5 June 1778," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/03-15-02-0331 (observing that "nothing can justify the converting [of horses] as appears to have been intended to private *Emolument*, to the Injury of the Right Owner") (emphasis added); "General Orders, 22 April 1779," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/03-20-02-0138 ("he has purchased the rations of rum from the Artificers and sold them again for his own *emolument*") (emphasis added); "General Orders, 16 October 1780," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/99-01-02-03588 (referring to "selling a quantity of Rum . . . at an advanced price, the Profits of which it is presumed were then intended for his own private *emolument*") (emphasis added); "From George Washington to Colonel Josias Carvil Hall, 3 April 1778," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/03-14-02-0365 (referring to "Officers seduced by views of private interest and *emolument* to abandon the cause of their Country") (emphasis added); "From George Washington to Anthony Whitting, 2 June 1793," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/05-13-02-0005 ("for these things, if not lost or stolen, are frequently sold for their own *emolument*") (emphasis added); "From George Washington to Gilbert Simpson, 13 February 1784," Founders Online, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/04-01-02-0084 (observing that "something more than your own *emolument* was intended by the partnership") (emphasis added); "From George Washington to Elias Boudinot, 17 June 1783," FOUNDERS ONLINE, National Archives, last modified March 30, 2017, http://founders.archives.gov/documents/Washington/99-01-02-11469 (referring to "the *emoluments* which might be derived from the Peltry Trade at our Factories") (emphasis added).

[118] DOJ Brief at 33.

[119] *Id.* at 34.  *See generally id.* at 32-34.

[120] *See* 5 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, at 547 (July 1776).  The "Dickinson Draft" of the Articles of Confederation included a prohibition on foreign emoluments

- DOJ points out that four of the nation's first five presidents (Washington, Jefferson, Madison, and Monroe) continued to maintain active plantations while in office, and in the course of doing so at least two of them exported agricultural products to other countries.[121] DOJ speculates that these activities *might* have included commercial transactions with a foreign state, but it provides no direct evidence that any such transactions occurred.

- DOJ also calls attention to the fact that President George Washington purchased several lots of public land in what became the District of Columbia from the federal government in 1793. DOJ assumes that this transaction was constitutional, and it infers on that basis that the plaintiffs' broad definition of "emolument" must be mistaken.[122] The government's inference is highly debatable and arguably invalid. Unlike the Foreign Emoluments Clause, the Domestic Emoluments Clause appears to be concerned only with emoluments that the President receives "for his services" as President.[123] Because any benefits Washington received from

---

in Article IV, which read in pertinent part:

> No Colony or Colonies, without the Consent of the United States ~~in Congress~~ assembled, shall send any Embassy to or receive any Embassy from, or enter into any Treaty, Convention or Conference with the King or Kingdom of Great-Britain, or any foreign Prince or State; nor shall any Colony or Colonies, nor any Servant or Servants of the United States, or of any Colony or Colonies, accept of any Present, Emolument, Office, or Title of any Kind whatever, from the King or Kingdom of Great-Britain, or any foreign Prince or State; nor shall the United States assembled, or any Colony grant any Title of Nobility.

*Id.* To the best of my knowledge, this passage, written in Dickinson's handwriting, constitutes the first occurrence of the language that eventually became the Foreign Emoluments Clause of the U.S. Constitution. Note that in Dickinson's draft, the prohibition on accepting emoluments extended not only to all colonial and federal officials, but also to "any Colony or Colonies" themselves. This fact appears to be yet another indication that the original understanding of "emolument" was not limited to "office-and-employment-specific" payments or benefits. The Dickinson Draft was modified by a committee of the whole on August 20, 1776, whereupon this reference to "any Colony or Colonies" was dropped and language identical to that found in the Articles of Confederation was adopted. *See id.* at 675.

[121] DOJ Brief, *supra* note 1, at 36-37 (noting that Washington "exported flour and cornmeal to 'England, Portugal, and the island of Jamaica,'" and that Jefferson "exported his tobacco crop to Great Britain").

[122] *Id.* at 38-39.

[123] *See, e.g.,* Andy S. Grewal, *The Foreign Emoluments Clause and the Chief Executive*, at 54-55, University of Iowa Legal Studies Research Paper Number 2017-15, available at http://ssrn.com/abstract= 2902391 (March 2017); Grewal, *supra* note 21; *Letter of Milton J. Socolar for Comptroller General of the United States to Senator George Mitchell*, B-207467 (Comp. Gen.), 1983 WL 27823 (Jan. 18, 1983). *See also* THE FEDERALIST NO. 73, at 493-494 (Alexander Hamilton) (Jacob E. Cooke, Ed.). If I understand Professor Grewal correctly, he assumes that the Domestic Emoluments Clause (DEC) should be interpreted to include a tacit repetition of the phrase "for his services" as a modification of the second occurrence of the verb "receive," so that in effect the clause should be read like this:

this purchase of public land were not received *for his services as President*, the Domestic Emoluments Clause was not violated by this transaction. The precise definition of "emolument" is immaterial to this analysis. On any definition, the constitutional outcome would be the same.

- Perhaps most remarkably, DOJ asserts that "[t]he history and purpose of the [Emoluments Clauses] is devoid of concern about private commercial business arrangements."[124] This assertion is false and inconsistent with the best explanation of the broad sweep of emoluments prohibitions adopted by American governments from 1776 to 1789, many of which were designed specifically to prevent corruption and restrain public officials from placing their private commercial interests over their public duties. Six prominent illustrations are the Virginia Declaration of Rights,[125] the Constitution of Pennsylvania,[126] the Articles of Confederation,[127] the 1784 Consular

---

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive [for his Services] within that Period any other Emolument from the United States, or any of them.

This reading of the DEC seems plausible to me – at least as plausible as one in which the second occurrence of "receive" is held to be entirely unmodified, or is construed very broadly, as if it read: "and he shall not receive [for any reason whatever] within that Period any other Emolument from the United States, or any of them." If the former and more focused reading is adopted, then the constitutional analysis of a Domestic Emoluments Clause violation in any given case may turn simply on whether the President received the emoluments in question "for his services" as President. In familiar cases such as President Washington's purchase of land from the federal government, President Kennedy's receipt of naval retirement pay, President Reagan's receipt of California retirement benefits, and President Obama's receipt of interest payments on US Treasury bonds, the answer is invariably no. In all of these cases, therefore, the definition of "emolument" can be as broad or as narrow as one likes, and the constitutional outcome would be the same -- because the payments or benefits at issue were not received by the president "for his services" as president. Note that the foregoing analysis implies that at least some of the specific allegations that have been made against President Trump's for Domestic Emoluments Clause violations may not be valid legal claims. On the other hand, the analysis appears to explain and justify many of the historical examples that are thought to pose the most difficult challenges to the broad meaning of "emolument" presupposed by plaintiffs' Foreign Emoluments Clause claims.

[124] *Id.* at 34.

[125] *See* Virginia Declaration of Rights (1776) ("That no man, or set of men, are entitled to exclusive or separate *emoluments* or privileges from the community, but in consideration of public services….") (emphasis added).

[126] *See* Constitution of Pennsylvania (1776) ("That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular *emolument* or advantage of any single man, family, or set of men, who are a part only of that community") (emphasis added).

[127] *See* Articles of Confederation (1781) ("[N]or shall any person holding any office of profit or trust under the United States, or any of them, accept any present, *emolument*, office or title of any kind whatever from any King, Prince or foreign State.") (emphasis added).

Convention with France,[128] the 1788 Consular Convention with France,[129] and the 1789 Act to Establish the Treasury Department.[130]  DOJ neglects to discuss any of these landmarks in early American public law, opting instead to focus attention on less significant matters.

In short, DOJ's fragile dictionary-based argument is symptomatic of a weak grasp of American constitutional history in general.  The bulk of the government's Rule 12(b)(6) motion to dismiss consists of an extended originalist argument that spans over twenty pages.[131]  The argument is remarkably flimsy, bearing many of the marks of "law office history" that make historians and sophisticated originalists wince.[132]  These deficiencies do not impugn originalism itself, of course, if for no

---

[128] *See Consular Convention between His Most Christian Majesty and the Thirteen United States of North America*, in 4 THE DIPLOMATIC CORRESPONDENCE OF THE AMERICAN REVOLUTION 198-208, 199-200 (1829) (Jared Sparks, Ed.) (authorizing the consuls and vice consuls of each nation "to establish agents in the different ports and places of their departments" who "may be chosen among the merchants, either national or foreign, and furnished with a commission from one of the said consuls" and declaring that it shall be the business of these agents "to render to their respective merchants, navigators, and vessels, all possible service, and to inform the nearest consul or vice consul of the wants of the said merchants, navigators, and vessels . . . without the power to extract from the said merchants any duty or *emolument* whatever, under any pretext whatever") (emphasis added).  Benjamin Franklin and Charles Gravier de Vergennes agreed to this provision and signed the convention on behalf of the United States and France on July 29, 1784.

[129] *See Convention Defining and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United States and France*, in 1 THE AMERICAN DIPLOMATIC CODE, EMBRACING A COLLECTION OF TREATIES AND CONVENTIONS BETWEEN THE UNITED STATES AND FOREIGN POWERS 70-82 (1834 (Jonathan Elliot, Ed.) (declaring that consular agents "shall confine themselves respectively to the rendering to their respective merchants, navigators, and vessels, all possible service . . . without power under any pretext whatever to exact from the said merchants any duty or *emolument* whatsoever") (emphasis added).  The language of this provision is nearly identical to its 1784 counterpart, from which it clearly was derived.  The convention itself, signed at Versailles by Thomas Jefferson and L.C. de Montmorin on November 14, 1788, was one of the first treaties ever submitted to the Senate of the United States.

[130] *See* 1 Stat. 65 (1789-1799) ("That no person appointed to any office instituted by this act, shall directly or indirectly be concerned or interested in carrying on the business of trade or commerce, or be owner in whole or in part of any sea-vessel, or purchase by himself, or another in trust for him, any public lands or other public property, or be concerned in the purchase or disposal of any public securities of any State, or of the United States, or take or apply to his own use, any *emolument* or gain for negotiating or transacting any business in the said department, other than what shall be allowed by law") (emphasis added).

[131] *See* DOJ Brief, *supra* note 1 at 26-48.

[132] For a series of thought-provoking essays on the vexed relationship between originalism and constitutional history, see Jonathan Gienapp, *Constitutional Originalism and History*, PROCESS: A BLOG FOR AMERICAN HISTORY (March 20, 2017); Randy Barnett, *Challenging the Priesthood of Professional Historians*, VOLOKH CONSPIRACY (March 28, 2017) (responding to Gienapp); Jonathan Gienapp, *Knowing How vs. Knowing That: Navigating the Past*, PROCESS: A BLOG FOR AMERICAN HISTORY (April 4, 2017) (replying to Barnett); Michael Ramsey, *Gienapp on Barnett on Gienapp on Originalism*, THE ORIGINALISM BLOG (April 5, 2017) (commenting on the exchange between Gienapp and Barnett); Lawrence B. Solum, *Some Reflections on Gienapp and Ramsey on Constitutional Originalism*, LEGAL THEORY BLOG (April 5, 2017) (commenting on Gienapp and Ramsey).  *See also, e.g.,* JACK BALKIN, LIVING ORIGINALISM (2012); ROBERT

other reason than *ab abusu ad usum non valet consequentia* ("a conclusion about the use of a thing from its abuse is invalid").[133]  They do suggest, however, that the government's historical arguments are inadequate and need more work, particularly if originalism continues to play a central organizing role in its legal briefs.

## IV.    SOURCES, METHODS AND DOCUMENTATION

This section describes the primary sources, methods, and documentation used in this study, all of which are relatively simple and straightforward.  Appendix A ("'Emolument' in English Language Dictionaries, 1604-1806") consists of several documents.  The first is a table ("Table 1: Definitions of 'Emolument' in English Dictionaries") which lists the core components of every known English dictionary definition of "emolument" published between 1604 and 1806.[134]   The list of dictionaries used in compiling this table was generated by drawing upon several authoritative works of dictionary scholarship, including *The English Dictionary from Cawdrey to Johnson, 1604-1755* by De Witt T. Starnes & Gertrude E. Noyes (new edition, with an introduction, chronological list of dictionaries, and select bibliography by Gabrielle Stein);[135] *English Dictionaries from 1604 Through 1900: The Warren N. and Suzanne B. Cordell Collection of Dictionaries* by Robert K. O'Niell;[136] and *Catalog of Dictionaries, Word Books, and Philological Texts, 1440-1900* by David Vancil.[137]

The second document in Appendix A ("Figure 1: Statistical and Longitudinal Analyses of Lexical Definitions") provides tabular and graphic representations of these findings, highlighting both the frequency with which specific words are used to define "emolument" and the fluctuation of these *definiens* over time.[138]  For the sake of comprehensiveness, a third document transcribes each component of the definitions excerpted in Table 1, including information on etymology, parts of speech, and other miscellany which were left out of that table, in order to keep it as simple and illuminating as possible.[139]  Finally, for the benefit of those readers who

---

W. BENNETT & LAWRENCE B. SOLUM, CONSTITUTIONAL ORIGINALISM: A DEBATE (2011); Mary Sarah Bilder, *The Constitution Doesn't Mean What You Think It Means*, THE BOSTON GLOBE (April 2, 2017); Alison L. LaCroix, *The Rooms Where It Happened*, THE NEW RAMBLER (May 23, 2016); Richard Primus, *Will Lin-Manuel Miranda Transform the Supreme Court?* THE ATLANTIC (June 4, 2016); Jack Rakove, *Tone Deaf to the Past: More Qualms About Public Meaning Originalism*, 84 FORDHAM L. REV. 969 (2015); Lawrence B. Solum, *Originalist Methodology*, 84 U. CHI. L. REV. 269 (2017).

[133] *Cf.* John Mikhail, *Law, Science, and Morality: A Review of Richard Posner's "The Problematics of Moral and Legal Theory,"* 54 STAN. L. REV. 1057, 1127 (2002).

[134] *See* Table 1, *supra* note 23.

[135] *See* STARNES & NOYES, *supra* note 22.

[136] *See* ROBERT K. O'NIELL, ENGLISH DICTIONARIES FROM 1604 THROUGH 1900: THE WARREN N. AND SUZANNE B. CORDELL COLLECTION OF DICTIONARIES (1988).

[137] *See* DAVID VANCIL, CATALOG OF DICTIONARIES, WORD BOOKS, AND PHILOLOGICAL TEXTS, 1440-1900 (1993).

[138] *See* Figure 1, supra note 24

[139] *See* Transcript of English Dictionary Definitions, 1604-1806, infra at A-6.

would like to see the originals with their own eyes, Appendix A includes original images of each of these definitions, along with its corresponding title page.[140]

Appendix B ("'Emolument' in Legal Dictionaries, 1523-1792") also contains multiple documents. The first is a corollary to Table 1 ("Table 2: Legal Dictionary Definitions of 'Emolument'"), which documents the complete lack of entries for "emolument" in legal dictionaries published between 1523 and 1792.[141] The list of dictionaries used in this table was generated on the basis of the Tarlton Law Library's Law Dictionary Collection, part of the Jamail Center for Legal Research at the University of Texas.[142]

The second document in Appendix B is another table ("Table 3: Other Uses of 'Emolument' in Legal Dictionaries"),[143] which records every instance in which "emolument" is used in legal dictionaries as part of the definition or explanation of another term.[144] Once again, for the sake of comprehensiveness, a third document transcribes the definitions excerpted in Table 3.[145] Finally, for the benefit of readers who might like to see the originals, Appendix B includes a complete set of images for each of these dictionaries, including the pages on which "emolument" would have occurred if it had been defined, the pages where it is used to define other terms, and the corresponding title pages of these volumes.[146]

Appendix C ("'Emolument' in Synonymy Dictionaries, 1748-1813") is the last and the shortest of the four appendices to this Article. It provides background and context for evaluating the government's reference to John Trusler on pages 29-30 of its brief. The first document in Appendix C is a table (Table 4: "Explanations of 'Emolument' in Synonymy Dictionaries") which records usages of "emolument" in four synonymy dictionaries published from 1748 to 1813.[147] This list was compiled by drawing on Professor Hullen's scholarship on the history of Roget's Thesaurus, which includes an extensive discussion of Trusler and other British lexicographers responsible for bringing the thesaurus to Great Britain.[148] This table reveals that Trusler's explanation of "emolument" is entirely derivative of an earlier

---

[140] *See* Original Images, *infra* at A-10 to A-89.

[141] *See* Table 2: Legal Dictionary Definitions of "Emolument," *infra* at A-91.

[142] The Law Dictionary Collection comprises over two hundred legal dictionaries from the Americas, the British Isles, and Western Europe, including many Roman Law, Common Law, and Civil Law volumes. *See generally* "About the Collection," Law Dictionary Collection, University of Texas School of Law (tarlton.law.utexas.edu/law-dictionaries)). For the purposes of this study, I focused on the Tarlton Law Library's catalogue of historical common law dictionaries, leaving an investigation of its Roman Law and Civil Law volumes for another occasion. I am grateful to Emily Kadens for pointing me toward these marvelous resources.

[143] *See* Table 3, *infra* at A-91.

[144] *Id.*

[145] *See* Transcript of Legal Dictionary Definitions and Uses, 1604-1806, *infra* at A-93.

[146] *See* Original Images, *infra* at A-95 to A-120.

[147] *See* Table 4: Explanations of 'Emolument' in Synonymy Dictionaries, *infra* at A-122.

[148] *See* WERNER HULLEN, A HISTORY OF ROGET'S THESAURUS: ORIGINS, DEVELOPMENT, AND DESIGN 199-276 (2003).

volume by the French lexicographer, Abbé Girard, and therefore has little apparent grounding in English usage. The two other writers identified by Hullen in his discussion of Girard's followers in Britain, Hester Lynch Piozzi and William Taylor, do not offer synonyms for "emolument" in their volumes. The significance of this absence is unclear; although it could be taken to imply the relative lack of influence Trusler had for later British lexicographers, more research is necessary before drawing any firm conclusions concerning this issue.[149]

The second document in Appendix C juxtaposes images from Trusler's and Girard's accounts of "emolument" side-by-side in order to reveal the formal and substantive similarities between them.[150] Finally, the original images of these four synonymy dictionaries are reproduced.[151] For the two volumes with an entry on "emolument" (Girard and Trusler), images of those pages are provided, along with images of the corresponding title page.[152] For the two volumes without such an entry (Piozzi and Taylor), only an image of each volume's title page is provided.[153]

For all of the foregoing inquiries, the dictionaries themselves were located using various online databases, some freely available and others requiring a library or other subscription. The primary databases used for this purpose were British History Online (BHO), Early English Books Online (EEBO), Eighteenth Century Collections Online (ECCO), Google Books, HathiTrust Digital Library, HAMNET (Folger Shakespeare Library Catalog), Hein Online, JSTOR, The Making of American Law, the Oxford English Dictionary, and the Washington Research Library Consortium, a partnership of nine university libraries located in the greater Washington, D.C. area.

Finally, in order to focus attention on founding era dictionaries and stay within manageable bounds, the study undertaken here was limited to English dictionaries published between 1604 and 1806 and legal dictionaries published between 1523 and 1792. As indicated, a follow up study of more recent dictionaries is currently underway, which seeks to understand how and why meanings of "emolument" may have changed over time. A key figure in this history appears to be Noah Webster,

---

[149] Trusler's volume is not included in several authoritative catalogues of English dictionaries, and his preface suggests that his primary objectives may be prescriptive rather than descriptive. *See, e.g.*, O'NIELL, *supra* note 136 (excluding Trusler from his classification); STARNES & NOYES, *supra* note 22 (excluding Trusler from their list of English dictionaries); VANCIL, *supra* note 137 (same). *See also* TRUSLER, *supra* note 10, at 20-23 (explaining the aims and scope of his inquiry including "a thorough reform . . . [that] will go, a considerable way, towards the improvement of our tongue"). By contrast, Trusler's work plays a significant role in the origins of the modern English thesaurus. *See, e.g.*, HULLEN, *supra* note 148, at 213—33 (discussing Trusler's role in the evolution of the thesaurus in Great Britain); SHAPRIO, *supra* note 29, at 279-281 (same); Noyes, *supra* note 29 (same). For all these reasons, Trusler's book is not classified with the English language dictionaries in Appendix A, but rather with the English synonymy dictionaries in Appendix C. *See generally infra* at A-122 to A-129.

[150] *See* side-by-side comparison of Girard (1748) and Trusler (1766), *infra* at A-123.

[151] *See* Original Images, *infra* at A-123 to A-131.

[152] *See infra* at A-123 to A-129.

[153] *See infra* at A-130 to A-131.

who defined "emolument" in the standard fashion in 1806, but whose more influential 1828 dictionary lists two definitions for "emolument," the first of which involves office- or employment-related compensation.[154]  Webster thus represents a natural starting point for the next phase of research begun here.

CONCLUSION

In interpreting the Constitution, the Supreme Court is ostensibly "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'  Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[155]  If one applies this principle to the cases at hand, it follows that one should seek to determine how "emolument" was used in its normal or everyday sense by ordinary citizens during the founding era.

Contemporaneous dictionaries are not dispositive of original meaning, of course, but they normally are a reasonably accurate reflection of it.  That at least seems to be the premise underlying those parts of the government's brief to which this Article primarily responds.  DOJ's use of founding era dictionaries in its brief, however, leaves much to be desired.  At best, its historical research was shoddy and slapdash.  At worst, it may have misled the court by cherry-picking and selectively quoting its preferred definition, ignoring a vast amount of conflicting evidence.

English language dictionaries published between 1604 and 1806 define "emolument" in a remarkably uniform fashion, regularly consisting of one or more of the following terms: "profit," "gain," "advantage," and "benefit."  Every definition published during this period, in fact, falls under this sweeping generalization.  By contrast, fewer than 8% of the definitions published in the same time frame use the phrase DOJ seizes upon with such alacrity in its brief—"profit arising from office or employ."  Presumably, the government's eagerness to adopt this latter definition stems from the fact that it lends itself so easily to DOJ's "office-and-employment-specific construction" of "emolument," which, in turn, purportedly enables the President to avoid constitutional jeopardy.  Nevertheless, whether this definition actually *is* a favorable one for the president is far from clear.

---

[154] *See* NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Webster's two-part definition reads:

> 1. The profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office, as salary, feels and perquisites.
>
> 2. Profit; advantage; gains in general.

*Id.*  (Note: The 1828 edition of Webster's Dictionary is not paginated).

[155] District of Columbia v. Heller, 554 U.S. 570, 576 (2008) (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)).

On either a causal or functional analysis of the Emoluments Clauses, for instance, "profit arising from office or employ" might prove to be an exceedingly difficult test for him.[156]  For the moment, however, the more important lesson to take away from this investigation is simply this: the government's dictionary definition of "emolument" is demonstrably ahistorical and unreliable.

---

[156] A causal or "but-for" analysis considers "arising from" to be causal language and asks whether the president would have received particular emoluments but for the office he occupies. A functional analysis focuses on the purpose of the Emoluments Clauses—to prevent corruption or undue influence—and asks whether particular emoluments the president receives have the purpose or probable effect of producing corruption or undue influence. For further discussion of these frameworks, see the essays by Chong, Dorf, Lederman, and Litman, *supra* note 21.

# APPENDIX A:

# "EMOLUMENT" IN ENGLISH LANGUAGE DICTIONARIES, 1604-1806

**Table 1: Definitions of "Emolument" in English Dictionaries, 1604-1806**

| | Author | Title | 1st ed. | Image | Definition |
|---|---|---|---|---|---|
| 1 | **Cawdrey, Robert** | *A Table Alphabeticall* | 1604 | 4th ed. 1617 | "Profit or gaine" |
| 2 | **Bullokar, John** | *The English Expositor* | 1616 | 12th ed. 1719 | "Profit, gain, Advantage" |
| 3 | **Cockeram, Henry** | *The English Dictionarie* | 1623 | 1st ed. 1623 | "Profit, gaine" |
| 4 | **Blount, Thomas** | *Glossographia* | 1656 | 2d ed. 1661 | "Profit gotten by labor and cost" |
| 5 | **Philips, Edward** | *The New World of Words* | 1658 | 7th ed. 1720 | "Profit got by Labour and Cost; Benefit, Advantage" |
| 6 | **Coles, Elisha** | *A Dictionary* | 1676 | 2d ed. 1679 | "Profit" |
| 7 | **Kersey, John** | *A New English Dictionary* | 1702 | 2d ed. 1713 | "Gain properly by grist, profit got by labour and cost" |
| 8 | **Cocker, Edward** | *English Dictionary* | 1704 | 3d ed. 1724 | "Profit, Gain, Advantage" |
| 9 | **[anon]** | *Glossographia Anglicana Nova* | 1707 | 1st ed. 1707 | "Advantage, Profit" |
| 10 | **Bailey, Nathan** | *A Universal Etymological English Dictionary* | 1721 | 2d ed. 1724 | "Advantage, Profit" |
| 11 | **Bailey, Nathan** | *Dictionarium Britannicum* | 1730 | 1st. ed. 1730 | "Profit gotten by labour and cost" |
| 12 | **Manlove, James** | *New Dictionary* | 1735 | 2d ed. 1741 | "Advantage, Profit" |
| 13 | **Defoe, B.N.** | *A Compleat English Dictionary* | 1735 | 1st ed. 1735 | "Advantage, Profit" |
| 14 | **Dyche, Thomas & Pardon, William** | *A New General English Dictionary* | 1735 | 8th ed. 1754 | "Benefit, advantage, profit" |
| 15 | **Martin, Benjamin** | *Lingua Britannica Reformata* | 1749 | 1st ed. 1749 | "Profit, benefit, or advantage" |
| 16 | **[anon]** | *A Pocket Dictionary* | 1753 | 2d ed. 1758 | "Benefit, advantage" |
| 17 | **Wesley, John** | *The Complete English Dictionary* | 1753 | 3d ed. 1777 | "Profit, advantage" |
| 18 | **Johnson, Samuel** | *A Dictionary of the English Language* | 1755 | 7th ed. 1783 | "Profit; advantage" |
| 19 | **Scott, Joseph** | *A New Etymological Dictionary* | 1755 | 1st ed. 1755 | "Profit" |

| 20 | Buchanan, James | *Lingue Britannicae Vera Pronunciatio* | 1757 | 1st ed. 1757 | "Benefit or advantage" |
|----|------------------|------------------------------------------|------|---------------|--------------------------|
| 21 | Rider, William | *A New Universal English Dictionary* | 1759 | 1st ed. 1759 | "Profit arising from an office or employ, gain, or advantage" |
| 22 | Bellamy, Daniel | *New Complete English Dictionary* | 1760 | 2d ed. 1764 | "Profit, advantage, benefit" |
| 23 | Fenning, Daniel | *The Royal English Dictionary* | 1761 | 5th ed. 1775 | "Profit arising from an office or employ; gain, or advantage" |
| 24 | Donaldson, Alexander | *A Universal Dictionary of the English Language* | 1763 | 1st ed. 1763 | "Profit; advantage; gain" |
| 25 | Allen, Francis | *A Complete English Dictionary* | 1765 | 1st ed. 1765 | "Profit; gain, or advantage" |
| 26 | Entick, John | *The New Spelling Dictionary* | 1765 | new ed. 1780 | "Profit, advantage, benefit" |
| 27 | Barlow, Frederick | *The Complete English Dictionary* | 1772 | 1st ed. 1772 | "Profit, gain, or advantage" |
| 28 | Kenrick, William | *A New Dictionary of the English Language* | 1773 | 1st ed. 1773 | "Profit; advantage" |
| 29 | Fisher, Anne | *An Accurate New Spelling Dictionary* | 1773 | 6th ed. 1788 | "Advantage, profit, benefit" |
| 30 | Barclay, James | *A Complete and Universal English Dictionary* | 1774 | 1st ed. 1774 | "Profit arising from an office or employ; gain or advantage" |
| 31 | Ash, John | *The New and Complete Dictionary of the English Language* | 1775 | 1st ed. 1775 | "An advantage, a profit" |
| 32 | Perry, William | *The Royal Standard English Dictionary* | 1775 | 1st ed. 1775 | "Advantage, profit" |
| 33 | Walker, John | *A Critical Pronouncing Dictionary* | 1775 | 1st ed. 1791 | "Profit, advantage" |
| 34 | Sheridan, Thomas | *A Complete Dictionary of the English Language* | 1780 | 3d ed. 1790 | "Profit, advantage" |
| 35 | Lemon, George | *English Etymology* | 1783 | 1st ed. 1783 | "…used to signify any advantage, or gain" |
| 36 | Scott, William | *Spelling, Pronouncing, Explanatory Dictionary* | 1786 | new ed. 1810 | "Profit, advantage, benefit" |

| | | | | | |
|---|---|---|---|---|---|
| 37 | **Jones, Stephen** | *A General Pronouncing and Explanatory Dictionary* | 1798 | new ed. 1812 | "Profit, advantage" |
| 38 | **Browne, Thomas** | *The Union Dictionary* | 1800 | 4th ed. 1822 | "Profit, advantage" |
| 39 | **Fulton, George & Knight, George** | *A Dictionary of the English Language* | 1802 | 3d ed. 1823 | "Profit; advantage" |
| 40 | **Webster, Noah** | *A Compendious Dictionary of the English Language* | 1806 | 1st ed. 1806 | "Profit, gain, advantage, benefit" |

# Figure 1: Statistical and Longitudinal Analyses of Lexical Definitions, 1604-1806

## Part A: Word Frequency (Bar Graph)



Number of Times a Word is Used to Define "Emolument" 1604-1806

## Part B: Word Frequency (Table)

| Word | # of Times Used | Percentage Frequency (n = 40) |
|------|-----------------|-------------------------------|
| Profit | 37 | 92.5% |
| Advantage | 33 | 82.5% |
| Gain | 13 | 32.5% |
| Benefit | 10 | 25.0% |
| Employ | 3 | 7.5% |
| Office | 3 | 7.5% |

## Part C: Definitions Over Time[Δ]

Definitions Over Time

| Year | Profit | Gain | Advantage | Office | Employ |
|------|--------|------|-----------|--------|--------|
| 1604 | ● | | ● | | |
| 1616 | ● | | ● | | |
| 1623 | ● | | ● | | |
| 1656 | ● | | | | |
| 1658 | ● | | | | |
| 1676 | ● | | | | |
| 1702 | ● | | ● | | |
| 1704 | ● | | | | |
| 1707 | ● | | ● | | |
| 1727 | ● | | ● | | |
| 1730 | ● | | | | |
| 1735 | ● | | ● | | |
| 1735 | ● | | ● | | |
| 1749 | ● | | ● | | |
| 1753 | | | ● | | |
| 1753 | ● | | ● | | |
| 1755 | ● | | ● | | |
| 1755 | ● | | | | |
| 1757 | | | ● | | |
| 1759 | ● | | | ● | ● |
| 1760 | ● | | | | |
| 1761 | ● | | | ● | ● |
| 1763 | ● | | | | |
| 1765 | ● | ● | ● | | |
| 1765 | ● | | ● | | |
| 1772 | ● | ● | ● | | |
| 1773 | ● | | ● | | |
| 1773 | ● | | ● | | |
| 1774 | ● | ● | ● | ● | ● |
| 1775 | ● | | ● | | |
| 1775 | ● | | ● | | |
| 1775 | ● | | | | |
| 1780 | ● | | ● | | |
| 1783 | | | ● | | |
| 1797 | ● | | ● | | |
| 1798 | ● | | ● | | |
| 1800 | ● | | ● | | |
| 1802 | ● | | ● | | |
| 1806 | ● | ● | ● | | |

● Profit   ● Gain   ● Advantage   ● Office   ● Employ

---

[Δ] Dates listed in Part C represent first editions.  A diagram showing all published editions would be more pronounced.

**Transcripts of English Dictionary Definitions, 1604-1806**

1)  ROBERT CAWDREY, A TABLE ALPHABETICALL (4th ed. 1617).

    **Emolument**, profit or gaine.

2)  JOHN BULLOKAR, THE ENGLISH EXPOSITOR (12th ed. 1719).

    **Emolument**, Profit, Gain, Advantage.

3)  HENRY COCKERAM, THE ENGLISH DICTIONARIE (1st ed. 1623).

    **Emolument**, Profit, gaine.

4)  THOMAS BLOUNT, GLOSSOGRAPHIA (1st ed. 1656).

    **Emolument**, (*emolumentum)* profit gotten by labor and cost.

5)  EDWARD PHILIPS, THE NEW WORLD OF WORDS (3d. ed. 1720).

    **Emolument**, Profit got by Labour and Cost; Benefit, Advantage. The word
    properly signifies Gain arising from the Grist of a Corn-mill.

6)  ELISHA COLES, A DICTIONARY, ENGLISH-LATIN, AND LATIN-ENGLISH (2d ed. 1679).

    **Emolument**, [profit] *emolumentum.*

7)  JOHN KERSEY, A NEW ENGLISH DICTIONARY (2d ed. 1713).

    **Emolument**, gain properly by grist, profit got by labour and cost.

8)  EDWARD COCKER, ENGLISH DICTIONARY (3d ed.1724).

    **Emolument**, 1. Profit, Gain, Advantage; also Mill-toll.

9)  [ANON], GLOSSOGRAPHIA ANGLICANA NOVA (1st ed. 1707).

    **Emolument**, Advantage, Profit.

10)  NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (21st. ed.
     1770).

     **Emolument**, [*Emolumentum,* L.] Advantage, Profit. F.

**A - 6**

11) NATHAN BAILEY, DICTIONARY BRITANICUM (1st ed. 1735).

> **Emolument**, properly gain arising from the grist of a corn-mill, also profit gotten by labour and cost.

12) JAMES MANLOVE, NEW DICTIONARY OF ALL SUCH ENGLISH WORDS (2d ed. 1741).

> **Emolument**, Advantage, Profit.

13) B. N. DEFOE, A COMPLEAT ENGLISH DICTIONARY (1st ed. 1735).

> **Emolument**, Advantage, Profit.

14) THOMAS DYCHE & WILLIAM PARDON, A NEW GENERAL ENGLISH DICTIONARY (8th ed. 1754).

> **Emolument**, (s) benefit, advantage, profit, & c.

15) BENJAMIN MARTIN, LINGUA BRITANNICA REFORMATA: OR, A NEW ENGLISH DICTIONARY (1st ed. 1749).

> **Emolument** (of *emolumentum*, 1. of *emole* to grind thoroughly): profit gotten properly by grist; hence, by any labor and cost. 2. benefit, or advantage.

16) [ANON], A POCKET DICTIONARY OR COMPLETE ENGLISH EXPOSITOR (2nd ed.1753).

> **Emolument**, (S.)' Benefit, advantage. *L.*

17) JOHN WESLEY, THE COMPLETE ENGLISH DICTIONARY (3d. ed. 1753).

> **Emolument**, profit, advantage.

18) SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (7th. ed. 1783).

> **Emolument**. *f*. [*emolumentum*, Latin.] Profit; advantage.

19) JOSEPH SCOTT, A NEW ETYMOLOGICAL DICTIONARY (1st ed. 1755)

> **Emolument**, Profit.

20) JAMES BUCHANAN, LINGUE BRITANNICAE VERA PRONUNCIATIO: OR A NEW ENGLISH DICTIONARY (1st ed. 1757).

> **Emolument**, (S.) Benefit or advantage.

21) WILLIAM RIDER, A NEW ENGLISH DICTIONARY (1st ed. 1759).

> **Emolument**, (S.) (*emolumentum*, Lat.) profit arising from an office or employ, gain, or advantage.

22) DANIEL BELLAMY, ENGLISH DICTIONARY (4th ed. 1764).

> **Emolument**, [S.] profit, advantage, benefit.

23) DANIEL FENNING, THE ROYAL ENGLISH DICTIONARY: OR, A TREASURY OF THE ENGLISH LANGUAGE (5th ed. 1775).

> **Emolument**, S. [*emolumentum*, Lat.] profit arising from an office or employ; gain, or advantage.

24) ALEXANDER DONALDSON, AN UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1763).

> **Emolument**, n. s. profit; advantage; gain.

25) FRANCIS ALLEN, A COMPLETE ENGLISH DICTIONARY (1st. ed. 1765).

> **Emolument**, S. profit; gain, or advantage.

26) JOHN ENTICK, THE NEW SPELLING DICTIONARY 143 (4th ed. 1780).

> **Emol'ument**, *f*. Profit, advantage, benefit.

27) FREDERICK BARLOW, THE COMPLETE ENGLISH DICTIONARY (1st ed. 1772).

> **Emolument**, S. [*emolumentum*, Lat.] profit, gain, or advantage.

28) WILLIAM KENRICK, A NEW DICTIONARY OF THE ENGLISH LANGUAGE (1st. ed. 1773).

> **Emolument**—E-MOL-U-MENT. N. f. [*emolumentum,* Lat.] Profit; advantage.

29) ANNE FISHER, AN ACCURATE NEW SPELLING DICTIONARY (6th. ed. 1788).

> **Emolument**, n. advantage, profit, benefit.

30) JAMES BARCLAY, A COMPLETE AND UNIVERSAL ENGLISH DICTIONARY ON A NEW PLAN (1st ed. 1774).

> **Emolument**, S. [lat.] profit arising from an office or employ; gain or advantage. SYNON. Some persons are so particularly rigid as to condemn all gain arising from play. Many will idly call that *profit* which has accrued by illicit means. It is low and sordid to be ever led by *lucre.* We do not always find the greatest honour in offices where there are the greatest *emoluments.*

31) JOHN ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1775).

> **Emolument** (s. *from the* Lat. emolumentum) an advantage, a profit.

32) WILLIAM PERRY, THE ROYAL STANDARD ENGLISH DICTIONARY (1st ed. 1775).

> **E-mol'u-ment**, *f*. advantage, profit.

33) JOHN WALKER, A CRITICAL PRONOUNCING DICTIONARY (1st ed. 1791).

> **Emolument**, f. Profit, advantage.

34) THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (3d. ed. 1792).

> **Emolument**, e-mol-u-ment. F. Profit, advantage.

35) GEORGE LEMON, ENGLISH ETYMOLOGY (1st ed. 1783).

> **Emolument**; mola ; a mill; mole; to grind; emole; to grind thoroughly; under *emolumentum*; profit gotten properly by grist, or whatever is ground at the mill: hence used to signify any advantage, or gain.

36) WILLIAM SCOTT, SPELLING, PRONOUNCING, EXPLANATORY DICTIONARY (new ed. 1810).

> **Emolument**, Profit, advantage, benefit.

37) STEPHEN JONES, A GENERAL PRONOUNCING AND EXPLANATORY DICTIONARY (4th ed. 1822).

> **Emolument**, Profit, advantage.

38) THOMAS BROWNE, UNION DICTIONARY (4th ed. 1822).

> **Emolument**, profit, advantage.

39) GEORGE FULTON & GEORGE KNIGHT, A DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1823).

> **Emolument**, Profit; advantage.

40) NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1806).

> **Emolument**, n. profit, gain, advantage, benefit.