## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,
RESTAURANT OPPORTUNITIES
CENTERS (ROC) UNITED, INC., JILL
PHANEUF, and ERIC GOODE,

    *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America,

    *Defendant.*

Civil Action No. 1:17-cv-00458-GBD

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

NORMAN L. EISEN
RICHARD W. PAINTER
NOAH BOOKBINDER
ADAM J. RAPPAPORT
STUART C. MCPHAIL
Citizens for Responsibility and Ethics in
Washington
455 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 408-5565

*Attorneys for Plaintiff Citizens for Responsibility
and Ethics in Washington (CREW)*

LAURENCE H. TRIBE*
Carl M. Loeb University Professor
and Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

DEEPAK GUPTA**
JONATHAN E. TAYLOR
JOSHUA MATZ
MATTHEW W.H. WESSLER
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

ZEPHYR TEACHOUT*
Associate Professor of Law
Fordham Law School
150 West 62nd Street
New York, NY 12580
(646) 312-8722

ERWIN CHEMERINSKY*
Dean of the School of Law
University of California, Berkeley
215 Boalt Hall
Berkeley, CA 92697
(510) 642-6483

JOSEPH M. SELLERS**
DANIEL A. SMALL**
CHRISTINE E. WEBBER
GEORGE F. FARAH
ROBERT A. BRAUN
ELIZABETH ANISKEVICH
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, DC 20005
(202) 408-4600
*jsellers@cohenmilstein.com*

*Attorneys for Plaintiffs Citizens for Responsibility
and Ethics in Washington (CREW), Restaurant
Opportunities Centers (ROC) United, Inc., Jeff
Phaneuf, and Eric Goode*

*Affiliations noted for identification purposes only    **Admitted pro hac vice

# TABLE OF CONTENTS

Table of contents..................................................................................................... i

Table of authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Background ............................................................................................................. 3

      A.      The origins and purposes of the Emoluments Clauses ..................... 3

      B.      The continued vitality of the Emoluments Clauses, and previous presidents' efforts to comply with them ........................................ 4

      C.      President Trump's disregard of conflicts-of-interest principles........................ 6

      D.      President Trump's violations of the Emoluments Clauses.............................. 7

Argument ............................................................................................................... 9

    I.      The plaintiffs have standing. ............................................................ 9

      A.      Goode, Phaneuf, and ROC United have competitor standing. .................... 10

            1.      Goode, Phaneuf, and ROC United have shown injury in fact........... 14

            2.      Goode, Phaneuf, and ROC United have shown traceability and redressability. ................................................................... 25

      B.      CREW has organizational standing. ................................................ 26

    II.      The defendant's cramped interpretation of the Emoluments Clauses contradicts their text, purposes, history, and settled practice. .................... 30

      A.      Text and original public meaning.................................................... 32

      B.      Purpose............................................................................................ 39

      C.      OLC and Comptroller General precedent ...................................... 44

      D.      History ............................................................................................ 48

    III.      The defendant's motion fails to justify dismissal even on his own flawed interpretation of the Emoluments Clauses.................................................. 49

    IV.      The defendant's other arguments for evading judicial review are meritless.............. 53

      A.      The plaintiffs have a cause of action to seek equitable relief. ......................... 53

      B.      The declaratory and equitable relief sought is permissible and does not run afoul of *Mississippi v. Johnson*.................................................. 56

      C.      The defendant's backdoor political-question argument should be rejected out of hand. ...................................................................... 58

Conclusion ............................................................................................................. 59

Appendix: Definitions of "emolument"

# TABLE OF AUTHORITIES

## Cases

*Adams v. Watson,*
    10 F.3d 915 (1st Cir. 1993) ............................................................................. 11, 12, 13, 17

*Al-Marri v. Rumsfeld,*
    360 F.3d 707 (7th Cir. 2004) ................................................................................................ 57

*American Institute of Certified Public Accountants v. IRS,*
    804 F.3d 1193 (D.C. Cir. 2015) ................................................................................ 11, 13, 17

*Armstrong v. Exceptional Child Center, Inc.,*
    135 S. Ct. 1378 (2015) ......................................................................................................... 54

*Arnold Tours, Inc. v. Camp,*
    400 U.S. 45 (1970) ............................................................................................................... 16

*Association of Data Processing Service Organizations, Inc. v. Camp,*
    397 U.S. 150 (1970) ............................................................................................................... 9

*Bank of America Corp. v. City of Miami,*
    137 S. Ct. 1296 (2017) ......................................................................................................... 55

*Bond v. United States,*
    564 U.S. 211 (2011) ....................................................................................................... 55, 56

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ....................................................................................................... 56, 57

*Building & Construction Trades Council v. Downtown Development, Inc.,*
    448 F.3d 138 (2d Cir. 2006) ................................................................................................. 25

*Canadian Lumber Trade Alliance v. United States,*
    517 F.3d 1319 (Fed. Cir. 2008) ....................................................................................*passim*

*Carter v. HealthPort Technologies, LLC,*
    822 F.3d 47 (2d Cir. 2016) ............................................................................................. 10, 11

*Center for Reproductive Law & Policy v. Bush,*
    304 F.3d 183 (2d Cir. 2002) ................................................................................................. 14

*Cherichel v. Holder,*
    591 F.3d 1002 (8th Cir. 2010) .............................................................................................. 44

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ............................................................................................................. 32

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ................................................................................................ 12, 29

*Clark v. City of Washington*,
   25 U.S. (12 Wheat.) 40 (1827) ........................................................................................ 36

*Clarke v. Securities Industry Association*,
   479 U.S. 388 (1987) ........................................................................................................ 55

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ........................................................................................................ 11

*Cooper v. Texas Alcoholic Beverage Commission*,
   820 F.3d 730 (5th Cir. 2016) ............................................................................... 16, 25, 26

*Correctional Services Corp. v. Malesko*,
   534 U.S. 61 (2001) .......................................................................................................... 53

*Danvers Motor Co. v. Ford Motor Co.*,
   432 F.3d 286 (3d Cir. 2005) ............................................................................................ 18

*DEK Energy Co. v. FERC*,
   248 F.3d 1192 (D.C. Cir. 2001) ...................................................................................... 14

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................................... 33, 34, 35, 40

*El Paso National Gas Co. v. FERC*,
   50 F.3d 23 (D.C. Cir. 1995) ............................................................................................ 12

*Equal Rights Center v. Post Properties, Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011) ...................................................................................... 30

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................................................ 57

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
   561 U.S. 477 (2010) ................................................................................................... 48, 54

*Fulani v. League of Women Voters Education Fund*,
   882 F.2d 621 (2d Cir. 1989) ................................................................................... 9, 11, 26

*Griffin v. United States*,
   935 F. Supp. 1 (D.D.C. 1995) ......................................................................................... 44

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ............................................................................................. 26, 28, 30

iii

*Hill v. Wallace,*
    259 U.S. 44 (1922) .................................................................................. 54

*Hills v. Ross,*
    3 U.S. (3 Dall.) 331 (1796) ...................................................................... 36

*Himley v. Rose,*
    9 U.S. (5 Cranch) 313 (1809) ................................................................. 36

*Hoyt v. United States,*
    51 U.S. (10 How.) 109 (1850) ................................................................ 35

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977) ................................................................................ 25

*In re McCormick & Co., Inc., Pepper Products Marketing & Sales Practices Litigation,*
    215 F. Supp. 3d 51 (D.D.C. 2016) .................................................... 12, 13

*In re U.S. Catholic Conference,*
    885 F.2d 1020 (2d Cir. 1989) ........................................................ *passim*

*INS v. Chadha,*
    462 U.S. 919 (1983) .......................................................................... 54, 55

*International Brotherhood of Teamsters v. U.S. Department of Transportation,*
    724 F.3d 206 (D.C. Cir. 2013) ........................................................ 14, 26

*John v. Whole Foods Market Group, Inc.,*
    858 F.3d 732 (2d Cir. 2017) ................................................................... 10

*Knife Rights, Inc. v. Vance,*
    802 F.3d 377 (2d Cir. 2015) ................................................................... 12

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ............................................................... 29

*LaRoque v. Holder,*
    650 F.3d 777 (D.C. Cir. 2011) ............................................................... 54

*Lexmark International, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014) ........................................................................... 55

*Liquid Carbonic Industries Corp. v. FERC,*
    29 F.3d 697 (D.C. Cir. 1994) ................................................................. 13

*Louisiana Energy & Power Authority v. FERC,*
    141 F.3d 364 (D.C. Cir. 1998) ........................................................ 12, 26

iv

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................................. 10

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ............................................................. 56, 57

*McConnell v. FEC,*
  40 U.S. 93 (2003) ..................................................................................... 29

*McDonnell v. United States,*
  136 S. Ct. 2355 (2016) ............................................................................. 43

*McLean v. United States,*
  226 U.S. 374 (1912) ................................................................................. 35

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ......................................................... 14, 22

*Mental Disability Law Clinic v. Hogan,*
  519 F. App'x 714 (2d Cir. 2013) ....................................................... 27, 29

*Mississippi v. Johnson,*
  71 U.S. 475 (1867) ............................................................................. 56, 57

*National Credit Union Administration v. First National Bank & Trust Co.,*
  522 U.S. 479 (1998) ................................................................................. 16

*National Taxpayers Union v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ................................................................ 29

*New World Radio, Inc. v. FCC,*
  294 F.3d 164 (D.C. Cir. 2002) ................................................................ 14

*New York Civil Liberties Union v. New York City Transit Authority,*
  684 F.3d 286 (2d Cir. 2012) .......................................................... 2, 9, 27

*New York Times Co. v. U.S. Department of Justice,*
  138 F. Supp. 3d. 462 (S.D.N.Y. 2015) .................................................... 44

*NicSand, Inc. v. 3M Co.,*
  507 F.3d 442 (6th Cir. 2007) ............................................................ 12, 13

*Nixon v. Sampson,*
  389 F. Supp. 107 (D.D.C. 1975) ............................................................. 43

*NLRB v. Noel Canning,*
  134 S. Ct. 2550 (2014) ................................................................ 34, 39, 44

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) ................................................................ 27, 28, 29, 30

*Olsen v. Stark Homes, Inc.*,
    795 F.3d 140 (2d Cir. 2014) ................................................................ 28

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925) ................................................................ 54

*Public Citizen v. Burke*,
    655 F. Supp. 318 (D.D.C. 1987) ................................................................ 44

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) ................................................................ 27, 28

*Ross v. Bank of America, N.A. (USA)*,
    524 F.3d 217 (2d Cir. 2008) ................................................................ 12, 13

*Schlesinger v. Reservists Committee to Stop the War*,
    418 U.S. 208 (1974) ................................................................ 30

*Schulz v. Williams*,
    44 F.3d 48 (2d Cir. 1994) ................................................................ 11

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ................................................................ *passim*

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................ 9

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ................................................................ 12

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ................................................................ 26

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ................................................................ 12, 13

*Trustees of Dartmouth College v. Woodward*,
    17 U.S. (4 Wheat.) 518 (1819) ................................................................ 36

*U.S. Steel Corp. v. Multistate Tax Commission*,
    434 U.S. 452 (1978) ................................................................ 54

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) ................................................................ 44

*United States v. Hill,*
   120 U.S. 169 (1887) ...................................................................................... 35

*United States v. Nixon,*
   418 U.S. 683 (1974) ...................................................................................... 56

*United States v. Ripley,*
   32 U.S. (7 Pet.) 18 (1833) ........................................................................... 35

*United States v. Stanley,*
   483 U.S. 669 (1987) ...................................................................................... 54

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...................................................................................... 25

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...................................................................................... 55

*Zivotofsky v. Clinton,*
   132 S. Ct. 1421 (2012) .................................................................................. 58

**Statutes and Constitutional Provisions**

3 U.S.C. § 102 ................................................................................................... 39

5 U.S.C. § 7342(a)(1)(E) .................................................................................... 31

U.S. Const. art. I, § 9, cl. 8 ........................................................................ *passim*

U.S. Const. art. II, § 1, cl. 7 ...................................................................... *passim*

U.S. Const. art. II, § 3 ...................................................................................... 15

U.S. Const. art. II, § 6 cl. 2 ............................................................................. 37

**Office of Legal Counsel Opinions**

Memorandum for S.A. Andretta, Administrative Assistant Attorney General,
   from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Payment of*
   *Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954),
   http://bit.ly/2vgexzo ..................................................................................... 37

*President Reagan's Ability to Receive Retirement Benefits from the State of California,*
   5 Op. O.L.C. 187 (1981) ............................................................................. 5, 47

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act,*
   6 Op. O.L.C. 156 (1982) ........................................................................... 42, 46

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*,
    10 Op. O.L.C. 96 (1986)................................................................................................ 39, 40

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from
    Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel,
    *Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement*
    *with the University of New South Wales* (May 23, 1986), http://politi.co/2us47bu................ 41, 47

*Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission*
    *of International Historians*,
    11 Op. O.L.C. 89 (1987)................................................................................................ 42, 43

*Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*,
    12 Op. O.L.C. 67 (1988)..................................................................................................... 40

*Applicability of the Emoluments Clause to Non-Gonverment Members of ACUS*,
    17 Op. O.L.C. 114 (1993).............................................................................................*passim*

*Applicability of the Emoluments Clause to Employment of Government Employees*
    *by Foreign Public Universities*,
    18 Op. O.L.C. 13 (1994)................................................................................................ 39, 42

*Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*,
    2010 WL 2516024 (June 3, 2010) ..................................................................................... 45

Memorandum for the Counsel to the President, Office of Legal Counsel,
    *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the*
    *President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082 (Dec. 7, 2009).......................... 5, 31

## Office of Comptroller General Opinions

49 Comp. Gen. 819 (1970) ................................................................................................. 40

62 Comp. Gen. 432 (1983) ............................................................................................ 32, 46

Comp. Gen. B-207467, 1983 WL 27823 (Jan. 18, 1983) ........................................................ 47

*Retired Marine Corps Officers*, Comp. Gen. B-217096, 1985 WL 52377 (Mar. 11, 1985) ............... 46

## Historical Materials

Nathan Bailey, *An Universal Etymological English Dictionary* (20th ed. 1763),
    http://bit.ly/2rFFhrW ...................................................................................................... 34

*Blackstone's Commentaries: with Notes of Reference* (St. George Tucker ed., 1803)............................... 40

*Texts of Carter Statement on Conflicts of Interest and Ethics; Appointees' Guidelines*,
    New York Times, Jan. 5, 1977, http://nyti.ms/2fV5Pwz ........................................................ 5

*Donald Trump's New York Times Interview: Full Transcript*,
New York Times, Nov. 23, 2016, http://nyti.ms/2nAOfDc ................................... 7

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the
Federal Constitution* (2d ed. 1891) .................................................................... 53

*The Federalist* No. 73 (Alexander Hamilton) ............................................... 4, 43

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785), http://bit.ly/2tCFt85 .......... 34

Letter from George Washington to the Commissioners for the District of Columbia
(Mar. 23, 1794), http://bit.ly/2vrox5Q ............................................................. 49

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...................................... 35

Joseph Story, *Commentaries on the Constitution of the United States* (1833) ........................................ 3, 40

**Books, Articles, and Other Sources**

Philip Bump, *Trump has visited a Trump-branded property every 2.8 days of his presidency*,
Washington Post, Apr. 8, 2017, http://wapo.st/2vhyy96 ................................ 6, 15

Jane Chong, *Reading the Office of Legal Counsel on Emoluments: Do Super-Rich Presidents
Get a Pass?*, Lawfare, July 1, 2017, http://bit.ly/2uMotRd ............................. 42, 48

Sherri Dillon, et al., *White Paper: Conflicts of Interest and the President*,
Morgan, Lewis & Bockius LLP (Jan. 11, 2017), http://bit.ly/2ijVxFq ............................ 7, 31

Pamela Engel, *State Department website promotes Trump's Mar-a-Lago as the 'winter
White House'*, Business Insider, Apr. 24, 2017, http://read.bi/2tPrGLV ................................ 6

Eric Lipton & Susan Craig, *With Trump in White House, His Golf Properties Prosper*,
New York Times, Mar. 9, 2017, http://nyti.ms/2n5mJi9 ...................................... 6

Jessica Sidman, *The Cheapest Cocktail at the Trump Hotel is Now $24*,
Washingtonian, Jan. 5, 2017, http://bit.ly/2igEOE5 ............................................. 6

Joshua Matz, *Will Trump's Lawyers Rewrite and Invert the Emoluments Clause?*,
Take Care, Apr. 18, 2017, http://bit.ly/2tELYLx ................................................ 58

John Mikhail, *"Emoluments" in Blackstone's Commentaries*,
Balkinization, May 28, 2017, http://bit.ly/2rwBGIw ........................................ 35

John Mikhail, *A Note on the Original Meaning of "Emolument"*,
Balkinization, Jan. 18, 2017, http://bit.ly/2vuk4zE ............................................ 36

John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries,
1523–1806* (June 30, 2017), https://ssrn.com/abstract=2995693 ................................. 34, 35

Kevin Miller & Scott Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*,
Portland Press Herald, July 23, 2017, http://bit.ly/2umjtRQ ................................................ 52

Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*,
Washington Post, Nov. 18, 2016, http://wapo.st/2uM0lNv ..................................................... 8

Michael Shear & Eric Lipton, *Ethics Office Praises Donald Trump for a Move He*
*Hasn't Committed To*, N.Y. Times, Nov. 30, 2016, http://nyti.ms/2spZcdj ............................ 48

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*,
97 Colum. L. Rev. 1612 (1997) ................................................................................................ 56

Zephyr Teachout,
*Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* (2014) ........................ 3

Laurence H. Tribe, Deepak Gupta, Joshua Matz & Jonathan Taylor,
*The Courts and the Foreign Emoluments Clause*,
Casetext, Jan. 30, 2017, http://bit.ly/2kMh2Ve ..................................................................... 58

Karen Yourish & Troy Griggs, *Tracking the President's Visits to Trump Properties*,
New York Times, July 26, 2017, http://nyti.ms/2uILVxL ...................................................... 6

## INTRODUCTION

The President of the United States asks this Court to embrace an extreme view of the law that would allow him to accept all manner of payments and benefits from foreign and domestic governments—exactly what the Emoluments Clauses are designed to prevent. He urges the Court to read the Constitution's ban on emoluments and presents to permit all profits from his private transactions, and to reach only payments overtly "based on official position" or framed as "compensation" for "services" that he has personally rendered. *See* Def. Br. 27.

This gerrymandered reading contradicts the text of the Clauses. It ignores the original public meaning of "emolument" (defined in *every* Founding-era dictionary to mean "profit" or "gain") and fails to grapple with the parallel ban on foreign "presents." It is also at odds with two centuries of history and a robust body of precedent—from the Office of Legal Counsel and the Comptroller General—administered by government ethics lawyers every day. The defendant's novel reading would gut a rule aimed at "every kind of influence by foreign governments," 24 Op. Att'y Gen. 116–17 (1902), allowing those very governments to send massive payments to the president in his "private" capacity, or launder them through his businesses. That is untenable.

The facts alleged here fall squarely within the settled, and more natural, understanding of these Clauses. The Foreign Emoluments Clause prohibits federal officeholders from accepting profits or gains from a foreign state unless Congress consents. And the Domestic Emoluments Clause bars the president from accepting profits or gains, beyond his fixed compensation, from states or the federal government. Both rules apply when the president accepts profits directly *and* when he does so through an entity he owns, which "would in effect be a conduit." 17 Op. O.L.C. 114, 119 (1993). Of course, there are limits—pensions, mutual funds, publicly traded stock—but this case is at the heart of the Clauses, not at their margins. So the case does not present the Court with a choice between the defendant's cramped reading and a broad, unbounded one.

1

In any event, dismissal would be unfounded even on the defendant's narrow view. Our complaint alleges, for example, that diplomats openly claim that they patronize the president's hotels to curry favor with him *as president*—a blatant violation on any reading. But the full extent of his violations cannot be ascertained because he has gone to great lengths to keep his finances secret. They are hidden not only from the public and Congress but even from his own Justice Department lawyers, who are thus in no position to assure the Court that he is not currently violating the Emoluments Clauses. And, in fact, they offer no such assurances.

Instead, the lead argument in the defendant's brief attacks the plaintiffs' standing to sue. To be sure, the defendant's constitutional violations affect *all* Americans because they create a risk of corruption and foreign influence that threatens our democracy. But, under settled Supreme Court and Second Circuit precedent, those violations also give rise to Article III standing because they injure the plaintiffs in distinct and concrete ways that are specific to them:

*First*, the defendant's conduct causes direct economic injury to Eric Goode, Jill Phaneuf, and Restaurant Opportunities Center (ROC) United, who "personally compete[] in the same arena" with Mr. Trump's hotels and restaurants. *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). These plaintiffs are able to offer their customers meals and rooms on a competitive basis, but they can't offer the opportunity to gain favor with the president.

*Second*, Citizens for Responsibility for Ethics in Washington (CREW) has organizational standing because the defendant's conduct makes it more difficult and costly for CREW to carry out its activities. Under Second Circuit precedent, "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact satisfying the requirements of standing." *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

Because all four plaintiffs have standing, and have stated claims under the Emoluments Clauses, dismissal at this early stage of the case is unwarranted.

## BACKGROUND

### A.     The origins and purposes of the Emoluments Clauses

When the Framers gathered in Philadelphia in 1787, they were profoundly concerned with protecting our new government from corruption—the risk of "private interests influencing the exercise of public power." Teachout, *Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United* 38 (2014). Keen students of history and human nature, the Framers knew that corruption can take many forms, and posed a grave danger to the republic if allowed to take root. The Framers also recognized the subtle, varied, and even unthinking ways in which virtuous officials could be swayed by private financial interests. Two sources of potential corruption were seen as so intolerable that they required strict rules written into the Constitution itself.

The first was the risk of foreign influence. At the Founding, it was common for European sovereigns to bestow gifts, money, and other things of value on foreign officials, including Americans. *See id.* at 19–20. Although this practice was condoned, even encouraged, across the ocean, the Framers took a very different view. Breaking sharply with European diplomatic customs, they considered the practice to present a creeping, insidious threat to our new nation. *Id.* at 20. Most famously, Benjamin Franklin's acceptance of a diamond-encrusted snuff box from the King of France stoked public fears that he might be unconsciously corrupted, prompting Franklin to ask for (and receive) congressional approval to keep the present. *Id.* at 1–5.

So, when the Framers drafted the Constitution, they included the Foreign Emoluments Clause—a flat ban on officials "accept[ing] any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. With this broad language, the Framers sought to prophylactically guard against "foreign influence of every sort." 3 Story, *Commentaries on the Constitution of the United States* 202 (1833). At the same time, they gave Congress the power to consent to the receipt of any "present" or "emolument," thereby

3

transforming private and secretive transfers of wealth from foreign to federal officials into matters of vital public inquiry. Ultimately, the theory of the Foreign Emoluments Clause—grounded in English history and the Framers' experience—is that a federal officeholder who receives something of value from a foreign power can be imperceptibly induced to compromise what the Constitution insists be his exclusive loyalty: the best interest of the United States of America.

A second concern was the risk of corruption from within. Having spent years dissecting the King's use of gifts, offices, and other inducements to manipulate Parliament, the Framers were obsessed with the many species of influence and figuring out the best way to combat them. They worried that the nation's new, powerful chief executive would be tempted to use his office to enrich himself, and that other parts of government—state or federal—could seek to "corrupt his integrity by appealing to his avarice." *The Federalist* No. 73 (Hamilton).

To ensure that the president would not put his own financial interest above the good of the nation, the Framers added the Domestic Emoluments Clause. It entitles the president to receive a salary and benefits fixed by Congress ahead of time, but prevents his compensation from being altered and forbids him from receiving "any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. This Clause applies only to the president.

## B.    The continued vitality of the Emoluments Clauses, and previous presidents' efforts to comply with them

Although the word "emolument" is no longer in common parlance, these Clauses are no relic of a bygone era. To the contrary, their central insight is as important now as ever, and their rules have been regularly enforced since the Founding. It is no exaggeration to say that the constitutional prohibition on "emoluments" and "presents" is administered by ethics officials across the federal government every day. And it is fleshed out in a deep body of precedent from the Office of Legal Counsel (OLC) and the Comptroller General. The Foreign Emoluments

4

Clause, in particular, is the subject of dozens of formal legal opinions. These opinions make clear that the Clause applies to the president and functions as a prophylactic rule that broadly prohibits "any" gain or advantage "of any kind whatever" from any foreign government. This rule, in combination with the Domestic Emoluments Clause, helps ensure that the president serves the American people, and the American people only—no one else.

Given their importance, previous presidents have taken great care to ensure compliance with these Clauses as well as other ethics rules. They have publicly disclosed their tax returns and other financial information, divested themselves of assets presenting even the slightest potential for conflicts of interest, and sought OLC's formal advice before accepting anything that might qualify as a prohibited present or emolument. President Carter, for example, put his family's peanut farm and warehouse into an independent trust, so that the warehouse could be sold without his consent during his presidency, and to guarantee that "the Carter family [would] not be affected financially from profits or losses of any of the farm operations." *Texts of Carter Statement on Conflicts of Interest and Ethics; Appointees' Guidelines*, N.Y. Times, Jan. 5, 1977, http://nyti.ms/2fV5Pwz. President Reagan exercised no less care, seeking out a formal OLC opinion on whether he could accept, consistent with the Domestic Emoluments Clause, the pension to which he was legally entitled as the former California governor. *See* 5 Op. O.L.C. 187 (1981). And President Obama would not accept the Nobel Peace Prize and its accompanying prize money without first securing an OLC opinion on whether he could do so consistent with the Foreign Emoluments Clause. *See* Memorandum for the Counsel to the President, Office of Legal Counsel, *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipts of the Nobel Peace Prize*, 2009 WL 6365082 (Dec. 7, 2009).

### C.   President Trump's disregard of conflicts-of-interest principles

President Trump, however, has refused to continue the tradition of his predecessors. No previous president has come to office with such disregard for conflicts-of-interest principles, or presented remotely the same risk of financial entanglement, foreign and domestic.

Rather than divest himself of ownership of his business, or establish a blind trust, President Trump has retained ownership while installing his sons as brand ambassadors who proudly declare that the Trump "brand is the hottest it has ever been." Lipton & Craig, *With Trump in White House, His Golf Properties Prosper*, N.Y. Times, Mar. 9, 2017, http://nyti.ms/2n5mJi9; *see also* SAC ¶ 43. He has consistently used the presidency as a platform from which to advertise his properties, visiting one every three days—taxpayer-funded visits that "amount to free publicity for the company and blur the line between his family business and presidential duties." Yourish & Griggs, *Tracking the President's Visits to Trump Properties*, N.Y. Times, July 26, 2017, http://nyti.ms/2uILVxL; *see also* Bump, *Trump has visited a Trump-branded property every 2.8 days of his presidency*, Wash. Post, Apr. 8, 2017, http://wapo.st/2vhyy96.

President Trump has also managed to directly profit from his electoral victory by sharply raising the prices at his businesses since the election. Cocktails at the Trump International Hotel in Washington, D.C.—now a watering hole for foreign dignitaries, *see* SAC ¶¶ 57–89—sold for between $16 and $20 when the hotel opened in September 2016, and then spiked to a range of $24 to $100. Sidman, *The Cheapest Cocktail at the Trump Hotel is Now $24*, Washingtonian, Jan. 5, 2017, http://bit.ly/2igEOE5. Similarly, the initiation fee at Trump's Mar-a-Lago Club—which his State Department has publicly promoted as the "winter White House"—doubled from $100,000 to $200,000 overnight. *See* SAC ¶ 152; Engel, *State Department website promotes Trump's Mar-a-Lago as the 'winter White House'*, Bus. Insider, Apr. 24, 2017, http://read.bi/2tPrGLV.

Mr. Trump's policy of disregarding settled substantive norms has been accompanied by a practice of disregarding settled procedural norms. Rather than secure a written opinion from OLC[1]—much less inform Congress of his financial arrangements and seek its consent—President Trump has steadfastly refused even to release his tax returns, and enlisted his private law firm to produce a six-page "white paper" on the eve of his inauguration. *See* Sherri Dillon, et al., *White Paper: Conflicts of Interest and the President*, Morgan, Lewis & Bockius LLP 3–4 (Jan. 11, 2017), http://bit.ly/2ijVxFq. After conceding that the Foreign Emoluments Clause applies to the president, the paper advanced a novel view of the Clause that is so squarely at odds with OLC precedent that his private lawyers made no attempt to distinguish, reconcile, or even cite any of that precedent. *Id.* This paper came on the heels of Mr. Trump's assertion that his financial ties around the world, including to enemy foreign powers, are of no public concern—and indeed are ungoverned by law or ethical requirements—because "the president can't have a conflict of interest." *Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times, Nov. 23, 2016, http://nyti.ms/2nAOfDc.

**D.    President Trump's violations of the Emoluments Clauses**

Having staked out his claimed right to do so, President Trump has wasted no time continuing—and even expanding—his financial entanglements with foreign and domestic governments since taking office. As a result, he has received (and will continue to receive) "presents" and "emoluments" prohibited by the Foreign and Domestic Emoluments Clauses.

To name just a handful here: After Mr. Trump's election, the Embassy of Kuwait moved its National Day celebration from the Four Seasons to the Trump International Hotel D.C.,

---

[1] *See* Letter from Paul P. Colborn, Special Counsel, Office of Legal Counsel, to Isaac Arnsdorf (July 20, 2017), *available at* http://bit.ly/2eWNlz9 (letter stating that there are "no documents responsive" to a FOIA request for any OLC opinions on the Foreign Emoluments Clause since Trump took office).

paying an estimated $40,000 to $60,000 to the business that Trump owns—and reportedly did so under pressure from the Trump Organization. SAC ¶¶ 72–76. Numerous other foreign and domestic government officials have patronized his hotel and restaurant while staying in Washington, as well as his properties in New York City, and many have done so because he is now president and they have much to gain from being in his good graces. *See, e.g.*, *id.* at ¶¶ 57–89.

Mr. Trump has also specifically sought out their business. While he still actively ran the Trump Organization, the Trump International Hotel D.C. held a post-election event pitching itself to roughly 100 foreign diplomats—after hiring a new "director of diplomatic sales" whose sole duty is to generate profits from foreign governments. *Id.* at ¶¶ 60–61; *see also* O'Connell & Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post, Nov. 18, 2016, http://wapo.st/2uM0lNv. Diplomats and their agents have expressed an intention to book rooms at or hold events at the hotel to curry favor with Trump. As one "Middle Eastern diplomat" told the *Washington Post*: "Believe me, all the delegations will go there." SAC ¶ 62. An "Asian diplomat" likewise explained: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'" *Id.*

The financial benefits that the president has accepted from foreign states since taking office have not been limited to direct monetary payments. After ten years of trying and being repeatedly rejected, in February 2017 he finally received valuable trademark protection from China. But he received this protection only after he became president, had spoken directly with Taiwan's president, threatened to end America's longstanding "One China" policy, and then had a phone call with China's president in which he pledged to honor the policy after all. *Id.* at ¶¶ 111–18. When asked why Trump had abruptly changed his position on the "One China"

policy, then-White House Press Secretary Sean Spicer answered, without elaborating: "The President always gets something." *Id.* at ¶ 118.

Finally, the Trump International Hotel D.C. is in clear violation of its lease with the General Services Administration (GSA). The lease's terms expressly forbid any elected federal official from benefiting from it. *Id.* at ¶¶ 130–45. And yet one week after President Trump released a proposed budget increasing GSA's funding while cutting nearly all other non-defense-related spending, GSA issued a letter allowing the Trump International Hotel to continue with the lease, despite the obvious (and very substantial) benefit to its owner. *Id.*

## ARGUMENT

### I.    **The plaintiffs have standing.**

The defendant's acceptance of emoluments and presents violates rules that protect our constitutional order, and thereby affects each and every American. But his conduct also directly inflicts concrete and particularized injury on the plaintiffs, who have been injured in two distinct ways—both cognizable under Article III. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) (holding that an injured party "may be a reliable private attorney general to litigate [ ] issues of the public interest"). First, the defendant's conduct has tilted the marketplace, resulting in competitor injury to the plaintiffs in the hotel and restaurant industries. *See Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989). Second, the defendant has inflicted organizational injury on CREW by making it more costly to carry out its established mission. *See N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (*NYCLU*). The plaintiffs thus have standing.

To demonstrate Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

9

This injury must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Second Circuit has emphasized that the injury requirement is "a low threshold" meant only to ensure that "the plaintiff has a personal stake in the outcome of the controversy." *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017).

On a motion to dismiss, "general factual allegations of injury may suffice" because the court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. When a Rule 12(b)(1) motion is based solely on the complaint, the Court assesses whether it "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). And when the defendant proffers evidence beyond the pleading, the plaintiff may introduce evidence of its own, or rely on the pleading "if the evidence proffered by the defendant . . . does not contradict plausible allegations that are themselves sufficient to show standing." *Id.* at 57.

### A. Goode, Phaneuf, and ROC United have competitor standing.

The doctrine of competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact" when the defendant's unlawful conduct increases competition or aids the plaintiff's competitors. *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008). Here, the facts alleged easily demonstrate that Goode, Phaneuf, and ROC United have standing on that basis:

> *First*, the defendant has adopted an unlawful policy and practice of accepting presents and emoluments from government officials, including through his hotels and restaurants;

> *Second*, as evidenced by their public statements, some officials wish to confer presents and emoluments on the defendant—and to do so through his hotels and restaurants;

> *Third*, the defendant's hotels and restaurants are now more attractive to those officials;

10

> *Finally*, the plaintiffs—who compete with the defendant's hotels and restaurants—are placed at a competitive disadvantage with respect to this set of potential customers.

The defendant objects that the plaintiffs do not, in fact, compete with his properties. Def. Br. 15–18. But his arguments are based on a misstatement of the law and are factually unsupportable. Regardless, any doubt is dispelled by declarations that confirm direct competition.[2]

The concept of "competitors' standing" is "well-established." *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994). To demonstrate competitor injury, a plaintiff need only "show that he personally competes in the same arena" with the party to whom the defendant has unlawfully bestowed a benefit. *In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989). If that requirement is met, acts that confer "some competitive advantage" on a direct and current competitor—or that reshape the market in a manner harmful to the plaintiff—are held to satisfy Article III's injury-in-fact requirement. *Fulani*, 882 F.2d at 626; *see also Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1197–98 (D.C. Cir. 2015). This rule rests on fundamental principles of economics, as the Supreme Court explained in *Clinton v. City of New York*: "The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement." 524 U.S. 417, 432–33 (1998) (citation omitted).

On this basis, courts have repeatedly upheld competitor standing when the government has unlawfully tilted the marketplace to a plaintiff's disadvantage. *See, e.g.*, *Canadian Lumber*, 517 F.3d at 1332 (U.S. government's subsidization of only U.S. lumber); *Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) (state's unlawful milk-pricing order); *Fulani*, 882 F.2d at 626 (IRS's unlawful grant of tax-exempt status). Relying on similar logic, courts regularly uphold Article III

---

[2] The plaintiffs have established pleading-stage standing on the basis of the facts alleged in the complaint. They submit these materials to respond to the additional facts—from outside the complaint—included by the defendant in his brief. *See Carter*, 822 F.3d at 56–57.

standing when the illegal acts of private parties increase or distort competition against the plaintiff. *See, e.g., TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011) (unfair competition by website); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 223 (2d Cir. 2008) (banks' antitrust violations); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (sandpaper supplier's antitrust violation); *In re McCormick & Co. Pepper Prod. Mktg. & Sales Practices Litig.*, 215 F. Supp. 3d 51, 57 (D.D.C. 2016) (spice distributor's Lanham Act violations).

Not infrequently, as here, the defendant argues that a plaintiff has failed to show certain loss of business. Def. Br. 19, 21. But courts reject this requirement, holding that a plaintiff need only "show an actual or imminent increase in competition." *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *see also La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998); *El Paso Nat'l Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995). "[M]any cases uphold 'competitor standing' based on 'unadorned allegations' of latent economic injury." *Adams*, 10 F.3d at 921.[3]

By the same token, courts regularly reject contentions that market actors' behavior is too complex and dependent on third parties for intensified competition to injure the plaintiff. *See* Def. Br. 21. Countless times, courts have held that this asks more of plaintiffs than the law requires. For instance, as Judge Kozinski has explained, a plaintiff can demonstrate Article III injury by describing "probable market behavior" and "creating a chain of inferences showing how defendant's false advertising could harm plaintiff's business," since "proving a counterfactual is

---

[3] The defendant relies heavily on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), to argue that injury must be "*certainly* impending." Def. Br. 7, 18. The plaintiffs here meet that standard: accepting their allegations, exposure to intensified competition due to the defendant's acts is certain. Further, whereas *Clapper* addressed allegations of *future* injury, here the plaintiffs allege that they *have* suffered, *are* suffering, and *will* suffer injury in the form of increased direct competition. But given the extent to which the defendant banks his case on *Clapper*, it bears emphasis that he misstates the law. As the Supreme Court reaffirmed one year after *Clapper*, "an allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). This marked a return to the longstanding rule governing standing based on alleged future injury. *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015).

never easy," especially when "the injury consists of lost sales that are predicated on the independent decisions of third parties; *i.e.,* customers." *Trafficschool.com*, 653 F.3d at 825; *see also Adams*, 10 F.3d at 923 (explaining the basis for this rule).

Thus, where the defendant's unlawful conduct confers a benefit on a plaintiff's competitor, "*it is presumed* (i.e., without affirmative findings of fact) that a boon to some market participants is a detriment to their competitors." *Canadian Lumber*, 517 F.3d at 1334 (emphasis added); *see also Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) ; *Am. Inst.*, 804 F.3d at 1197–98; *Sherley*, 610 F.3d at 72. That's why statistical evidence going into great depth about every possible causal chain in the relevant market is unnecessary at the pleading stage. *See Canadian Lumber*, 517 F.3d at 1333. "Intensified competition" *is itself* "a cognizable Article III injury." *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 701 (D.C. Cir. 1994).

The defendant says that competitor standing exists only when the government controls access to the market in which a plaintiff competes. Def. Br. 20. That is mistaken. Courts have found Article III competitor injury in a wide array of unfair-competition and antitrust lawsuits between private parties. *See, e.g.*, *TrafficSchool.com*, 653 F.3d at 825; *Ross*, 524 F.3d at 223; *NicSand*, 507 F.3d at 449; *In re McCormick & Co.*, 215 F. Supp. 3d at 57. And they have likewise found it to exist when the government is a defendant but does not control the relevant market. *See, e.g.*, *Canadian Lumber*, 517 F.3d at 1334 (finding injury where government funded a trade group's promotional efforts, but did not control marketplace); *Sherley*, 610 F.3d at 72 (rejecting government's contention that only participants in a "strictly regulated economic market" may rely on theory of competitor standing). Ultimately, the defendant's rule would be an arbitrary limit on the generally applicable theory justifying competitor standing: that when a party acts unlawfully and thereby distorts competition, market participants who suffer harm may seek judicial redress. *See Cooper*, 820 F.3d at 738; *Adams*, 10 F.3d at 921–23.

13

Of course, the rule is not without limits. For example, competitor standing doesn't apply when two parties are located hundreds of miles away from each other and there is, at best, a "vague probability" that they will ever compete. *See DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001).[4] So too when a party has thought about competing in a market but lacks concrete plans to do so. *See New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).

But, in general, courts take a broad view of competition. In a dispute between the Canadian Wheat Board and U.S. Customs, for instance, the court held that federal funding of a trade group that promotes (but doesn't sell) competing goods can support competitor standing. *See Canadian Lumber*, 517 F.3d at 1334. More recently, the D.C. Circuit held that the Teamsters had standing to challenge a program allowing Mexico-domiciled trucks to operate in this nation, since the program would generally cause increased competition "throughout the United States." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013). And many other cases have warned against too narrow a view of "what qualifies as participation in the . . . [relevant] market." *Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014); *see also Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002) (Sotomayor, J.).

### 1. *Goode, Phaneuf, and ROC United have shown injury in fact.*

Applying all of these principles, there can be no doubt that Goode, Phaneuf, and ROC United have plausibly shown that they "personally compete[] in the same arena with [parties] to whom the [president] has bestowed the assertedly illegal benefit." *USCC*, 885 F.2d at 1029.

The facts here are largely undisputed. The defendant has "used his official position as President to generate business to his hotel properties and their restaurants from officials of foreign

---

[4] This case—about gas operators located several hundred miles apart—is apparently the best precedent the defendant could muster to support his counter-intuitive argument that elite hotels and restaurants located within 15 minutes of each other should not be considered competitors. *See* Def. Br. 21.

states, the United States, and/or state and local governments." SAC ¶ 202. To facilitate such patronage, the defendant's properties have hired staff solely to obtain governmental business. *See id.* at ¶¶ 60–61. Partly as a result, many officials have recently visited and hosted events at the defendant's properties—in which he has a financial interest—in New York and Washington. *Id.* at ¶¶ 64–86; 109. In some instances, those officials effectively paid a premium rate for his goods and services, which now "provide a unique benefit: access to, influence on, and the good will of the President." *Id.* at ¶¶ 150–52. That "unique benefit" is available specially to those who contribute to the president's net worth, which he may easily learn of from news reports, private remarks, business updates given by his son, or encountering an official during frequent visits to his own properties. *See id.* at ¶¶ 44, 62. And, as several officials have admitted, it is this "unique benefit"—the chance to feather the president's nest and display their loyalty to his brand—that has led them to favor and patronize his properties. *See id.* at ¶ 62; *see also* O'Connell & Jordan, *For foreign diplomats, Trump hotel is place to be* ("In interviews with a dozen diplomats . . . some said spending money at Trump's hotel is an easy, friendly gesture to the new President.").

In sum, although bound by the Emoluments Clauses—and sworn to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3—the defendant has adopted a policy and practice of accepting presents and emoluments from government officials, including through his hotels and restaurants. In some instances, he has done so openly and notoriously, ensuring that officials keen to confer financial benefits on the President of the United States know how (and where) to do so. *See* SAC ¶ 42-152. At the same time, he has closely linked his presidency to his properties, visiting them regularly and ostentatiously conducting official business there. *See* Bump, *Trump has visited a Trump-branded property every 2.8 days of his presidency*. The defendant has thus not only violated the Emoluments Clauses, but has done so in an exceptionally public manner,

adopting policies and practices that powerfully incentivize government officials to patronize his properties in hopes of winning his affection.

The defendant's illegal conduct thereby tilts the competitive field in favor of his properties and against their competitors. Because the plaintiffs here compete "in the same arena" as the defendant's hotels and restaurants, he has injured them. *USCC*, 885 F.2d at 1029; *see also Cooper*, 820 F.3d at 738 (explaining that it is a "'basic law of economics' that increased competition leads to actual economic injury").

The defendant notes that there are thousands of restaurants and hotels in New York and D.C., and mentions many factors that might affect competition. *See* Def. Br. 19–21. Unpacking this claim, the defendant opines that top-tier, equivalently rated luxury hotels within 15 minutes of each other (and with similar price points) do not compete because one is a Four Diamond Hotel and the other is a Five Diamond Hotel. *See* Def. Br. 17. Elsewhere, the defendant insists that two versus three Michelin stars is an insurmountable difference, *see id.* at 18, and that it is speculative to think that a boon to direct competitors might reduce total tips at a restaurant, *see id.* at 19. Ultimately, he asserts that no "law of economics" sheds any light here. *See id.* at 21.

The defendant's hypergranular theory of competition defines competition away into nothingness. That is not the law. Under Rule 12(b)(1), the question is whether it's plausible to conclude that highly elite restaurants and hotels within 5 to 30 minutes of each other—and surrounded by government offices—compete for government business. Given the many and varied circumstances under which courts have found competition in much larger and more diffuse markets, the answer to that question is yes. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 488 & n.4 (1998) (finding injury where the challenged conduct allowed persons in a national market who "might otherwise" patronize the plaintiff to instead patronize a competitor); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46 (1970) (allowing travel agents to challenge

a rule allowing national banks to provide travel services, despite many other differences between banks and travel agencies); *Am. Inst. of Certified Pub. Accountants*, 804 F.3d at 1198 (applying "basic economic logic" to ascertain whether the plaintiffs competed with specific market participants, but not requiring proof that they offered identical services or even had the same customers).

Whereas those cases involved national or even international markets, here the plaintiffs have focused their claims on two *city-level* markets for particular goods or services. This makes establishing competition far more straightforward: "[T]he narrower the relevant marketplace . . . the greater the likelihood that a plaintiff will experience future economic loss as a consequence of the competitive advantage bestowed on its direct competitor." *Adams*, 10 F.3d at 922.

In fact, this case ultimately drills all the way down to competition in specific and adjoining *neighborhoods*. And as anyone who has ever chosen a restaurant in New York knows, while there are 24,000 options in the *whole city*, the universe of potential choices shrinks dramatically once a price point, neighborhood, and quality level have been selected. That is why these criteria are at the heart of most online reservation-booking systems, like hotels.com and opentable.com, and why properties similar to each other in these respects inevitably compete.

This commonsense understanding of how competition works is confirmed by two experts on the hotel and restaurant industry, respectively—Rachel Roginsky[5] and Dr. Christopher Muller[6]—who have provided detailed declarations explaining why the plaintiffs' businesses compete with the defendant's businesses. As Dr. Muller explains, "[w]ithin a given restaurant

---

[5] Ms. Roginsky has 30 years of experience in hospitality consulting and is an adjunct professor at the Boston University School of Hospitality Administration (where she teaches Hospitality Market Feasibility and Valuation). She has been certified as an expert, and regularly writes and lectures on the hotel industry. *See* Roginsky Decl. ¶¶ 1–10.

[6] Dr. Muller is Professor and former Dean of the Boston University School of Hospitality Administration, with more than 30 years of experience in restaurant management, consulting, and teaching. He has been certified as an expert and consults for leading restaurants. *See* Muller Decl. ¶¶ 1–8.

category and geographic area in New York City and D.C. (or in any city), only a small fraction of the total restaurants in the city compete with each other." Muller Decl. ¶ 18; *see also* Roginsky Decl. ¶ 15 (explaining similar dynamic in hotel industry). "[If] demand for meals at a restaurant increases, that will result in more customers from the pool of potential customers patronizing that restaurant, and will result in fewer customers from the pool patronizing its competitors' restaurants." Muller Decl. ¶ 17.

Especially at the pleading stage, "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005). To establish competitor injury, the plaintiffs need only show that the defendant's acts—here, his policy and practice of accepting emoluments and presents—have caused an "actual or imminent increase in competition." *Sherley*, 610 F.3d at 73. Each plaintiff has met that requirement through particularized allegations and declarations amply demonstrating that they compete in "the same arena." *USCC*, 885 F.2d at 1029.

**a. *Eric Goode*.** Eric Goode owns several celebrated hotels in New York, including the Maritime Hotel in Chelsea and the Bowery Hotel in the Lower East Side. Goode Decl. ¶¶ 1, 10–11, 21–22. He also owns numerous restaurants, including The Park, Waverly Inn, and Gemma. *Id.* These properties are frequented by diplomats, other foreign officials, and state and federal officials. *See id.* at ¶¶ 3, 47–50. Goode is a savvy businessman with intimate knowledge of his market. On that basis, Goode has concluded that "[s]ome of my hotels and restaurants compete with some of Defendant's hotels and restaurants because they have similar prices, quality and reputations that make both attractive to a common set of customers, and they are just a short cab ride away from one another." *Id.* at ¶ 2; *see also* SAC ¶¶ 228–34. Goode's declaration is consistent with detailed allegations in the complaint and is confirmed by the expert declarations of Rachel Roginsky and Dr. Muller, who have provided detailed declarations explaining why Goode's properties compete with the defendant's.

18

As Roginsky explains, "hotels compete with each other if they market to and attract customers from a common set of visitors." Decl. ¶ 14. Hotels are "[p]rimary competitors" if they "market to and attract customers from essentially the same pool of visitors," which "occurs among lodging facilities that are similar with respect to the following criteria: location, facilities, services, amenities, class, image, and price." *Id.* at ¶ 15. Hotels engage in secondary competition when they "market to and attract customers from pools of visitors that overlap only in part," which occurs "with lodging facilities that have similar locations but share only some of the other major qualities, including particularly class and image." *Id.* By definition, exposure to either form of competition can result in a hotel losing business and suffering economic injury. *See id.* at ¶ 14.

Applying these criteria to the Bowery Hotel, it is clear that this property competes with both Trump SoHo and Trump International Hotel New York. Start with Trump SoHo. These hotels are located less than a ten-minute cab ride apart and are similarly accessible to customers drawn to landmarks in the neighborhood. *Id.* at ¶ 18. The hotels are both "full-service, higher-end" properties with comparable facilities, services, and amenities, *id.* at ¶ 19, and they are "of [a] similar class and image," with "services typically found in higher-end hotels," *id.* at ¶ 20. Finally, both hotels offer rooms in similar price ranges ($395 to $850 at the Bowery, $300 to $1,000 at Trump SoHo). *Id.* at ¶ 22. Given these similarities with respect to the main criteria for primary competition, Roginsky concludes that "the Bowery Hotel competes with the Trump SoHo Hotel." *Id.* at ¶ 23. Much of this analysis holds true of Trump International Hotel New York, which is a 20-minute ride from the Bowery and equidistant from many New York landmarks. *Id.* at ¶ 24. There are significant similarities between these two hotels, and for that reason it is certain that they compete for the same customers. *See id.* at ¶¶ 25–29.

Similarly, Goode's Maritime Hotel competes with Trump SoHo. These hotels are both in downtown Manhattan, within 15 minutes of each other. *See id.* at ¶ 30. They are "similarly

accessible for the market area's demand generators"; they offer "similar facilities" and qualify as "full-service hotels"; they "are of similar class and image" and "[b]oth hotels receive high online ratings"; and there is material overlap in their room rates ($725 to $1,500 for penthouse rooms at the Maritime, $300 to $1,000 at Trump SoHo). *Id.* at ¶¶ 30–34.

It is reasonable to further conclude that these properties compete for the relevant group of potential customers: government officials. Goode's facilities have historically received significant government patronage. *See* Goode Decl. ¶¶ 47–50. That is consistent with the fact that there are many reasons "for higher rated government visitors to travel to New York City and stay at high-end hotels." Roginsky Decl. ¶¶ 42–50. Assessing the market, Roginsky therefore concludes that "government travelers . . . rent rooms and suites at the Trump SoHo, the Trump International New York, the Bowery, [and] the Maritime." *Id.* at ¶ 50. It follows that competition between Goode properties and Trump properties includes competition for government business.

Separately, Goode owns Gemma, the Waverly Inn, and The Park—premier restaurants located within 10 to 15 minutes of Trump SoHo and surrounded by government buildings (65 to 88 of them). *See* Goode Decl. at ¶¶ 1, 24–46. These restaurants each offer elite event spaces. *See id.* at ¶¶ 25–29 (Gemma), ¶¶ 30, 32–36 (Waverly Inn), ¶¶ 39–46 (The Park). So does Trump SoHo. *See* Muller Decl. ¶¶ 58, 67. And those properties compete. *See* Goode Decl. ¶ 2.

Dr. Muller explains that the restaurant industry can be divided into nine segments—from "snack" to "luxury" establishments. Muller Decl. ¶ 14. He adds that, regardless of whether they serve the same type of cuisine, "[r]estaurants within the same geographic area that fall within the same restaurant segment (or similar restaurant segments) will draw from a common or similar pool of customers, and thus compete with each other." *Id.* at ¶ 15. Such competition is common for event spaces: "Because the dining area and its location can be as important for private events

20

and meetings as food quality, or even more important, private rooms in desirable locations can compete with event spaces serving higher quality food." *Id.*

Applying this model—and considering factors including segment, location, and facility size—Dr. Muller concludes that the event spaces at each of Goode's restaurants compete with event spaces located nearby at Trump SoHo for government business, among other kinds of business. *Id.* at ¶¶ 67–70 (discussing each facility and explaining the basis for his conclusion that the Trump SoHo competes with Goode's restaurants). This opinion is, at the very least, plausible, particularly given the dense concentration of government clientele nearby. *See id.* at ¶ 76.

In sum, the evidence that many of Goode's properties compete with the defendant's hotels and restaurants is overwhelming, both as a matter of facts alleged in the complaint and Goode's testimony. If this Court concludes that even a single Goode property competes with a Trump property, he has Article III standing to maintain his claims against the defendant.

**b. *Jill Phaneuf.*** Phaneuf's job is to book events for the Kimpton Carlyle and Kimpton Glover Park Hotels in D.C., with a focus on embassy events and political functions involving foreign governments. SAC ¶ 221. Her compensation depends largely on payment of a percentage of gross receipts arising from events that she generates. *Id.* In other words, if she books less foreign government business, she makes less money. *Id.* And as a result of the defendant's illegal conduct, she now faces intensified competition from Trump International Hotel D.C., which has strongly promoted its properties and sought business from the diplomatic community. *Id.* at ¶¶ 60–63, 222–25. Of course, that is the very community most eager to solicit goodwill by conferring emoluments on the defendant through his hotel and its associated event spaces. These allegations more than suffice to show competitor injury.

The Phaneuf and Muller declarations further confirm her competitor standing. The Carlyle and Glover Park Hotels are surrounded by embassies and government buildings, and are

located within easy driving distance of Trump International Hotel D.C. *See* Phaneuf Decl. ¶¶ 2–3, 12–14. Both hotels have highly rated, top-tier restaurants: the Riggsby at the Carlyle, and Casolare at Glover Park. *Id.* at ¶¶ 5–7, 16. Each restaurant has numerous event spaces available. *Id.* at ¶¶ 8–11, 17–19. And these event spaces compete for government business with event spaces at Trump International Hotel D.C. *Id.* at ¶¶ 2, 12. Phaneuf, because her job is to book diplomatic business at these spaces, therefore suffers due to the competitive benefit that the defendant's unlawful acts have conferred on his own property. *See id.* at ¶ 1.[7]

Muller has carefully compared the Riggsby and Casolare restaurants to BLT Prime (the restaurant at Trump International Hotel D.C.). Decl. ¶¶ 88–90. He has also engaged in a thorough review of event spaces at these facilities—considering size, quality, location, and distance to embassies and government buildings. *See id.* at ¶¶ 89–91, 94. He concludes that the three event rooms at the Riggsby, and a ballroom at Casolare and its Cocktail Garden, compete with similar spaces at Trump International Hotel, D.C. *See id.* Muller thus confirms, in no uncertain terms, that the event spaces Phaneuf seeks to book for embassy events and political functions do, in fact, compete with the defendant's property. It follows that Phaneuf—whose paycheck hangs in the balance—has plausibly shown competitor injury.

c. ***ROC United.*** Finally, ROC United is a nonprofit organization dedicated to improving wages and working conditions in the restaurant industry. Jayaraman Decl. ¶ 2. It has

---

[7] The defendant describes Phaneuf's job description as "self-serving," apparently insinuating that she does not *really* seek to book embassy events. Def. Br. 18. But Phaneuf's allegation is hardly the sort of facially implausible statement that can be tossed aside for purposes of a Rule 12(b)(1) motion. To the contrary, Phaneuf can be presumed to know what kind of business she seeks to book. This is confirmed in her declaration. *See* Phaneuf Decl. ¶¶ 1, 21 (describing her ongoing work to secure embassy business). In any event, the law is clear that a plaintiff can bring a claim based on competitor standing even if she has only just entered a line of work—or even if she merely has a concrete plan to do so. *See Mendoza*, 754 F.3d at 1013 (upholding competitor standing "even though the plaintiffs have not worked as herders [in years] and may not have applied for specific herder jobs since that time," since "they have affirmed their desire to work as herders and stated their intention to do so if wages and working conditions").

nearly 25,000 restaurant-employee members and, through its RAISE project, over 200 restaurant members. *Id.* at ¶ 5. ROC United brings suit on behalf of itself and its members because increased competition from the defendant's properties, as a result of his Emoluments Clause violations, exposes ROC's restaurant and worker members to increased competition with respect to prospective government business. *See id.* at ¶ 6; SAC ¶¶ 195–220.

Celebrity chef Tom Colicchio—a ROC member—explains that his restaurants in New York compete with restaurants located in Mr. Trump's New York properties, since these businesses "market to, solicit, and attract similar customers, including foreign, federal, state, and local government officials." Colicchio Decl. ¶ 3. Drawing on three decades in New York's restaurant industry, he then describes, in detail, why he believes that his properties compete with Mr. Trump for government business. *See id.* at ¶¶ 8–29. James Mallios, managing partner of Amali and Amali Mou, similarly declares that "I consider certain of Defendant's restaurants in New York City to be competitors of [my restaurants] because his restaurants are located just a short cab ride [away], and have similar prices, quality and reputations as my two restaurants." Mallios Decl. ¶ 2. Mallios, too, regularly hosts officials. *Id.* at ¶ 3, 24–29. And Mallios adds that he has seen a loss of tax-exempt sales at Amali since the election, which "reflects a decline in government business" and that has led Mallios to take costly steps in response. *Id.* at ¶¶ 28–29.

Dr. Muller reviewed information about ROC United's members. Muller Decl. ¶11. Applying his expertise and the methodology described above, he concludes that numerous ROC United members compete with the defendant's properties, and do so in an environment brimming with foreign consulates and domestic government offices. To take a few examples:

- At least seven ROC restaurants compete with at least one of the restaurants at Trump Tower New York.[8]

- At least three ROC restaurants compete for government banquet business with Trump Tower event spaces.[9]

- At least five ROC restaurants compete with at least one of the restaurants at Trump International Hotel New York, Jean-Georges and Nougatine.[10]

- At least five of these ROC restaurants also compete with the event spaces at Trump International Hotel.[11] In addition, at least two ROC United worker member restaurants compete with them.[12]

- At least eight Goode and ROC restaurants compete directly for government banquet business with Trump SoHo Hotel spaces.[13]

- In addition, Fowler & Wells—a ROC restaurant owned by Tom Colicchio that provides room service and catering for private events for foreign, federal, and state officials in the Beekman Hotel—stands to lose business due to direct and indirect competition with the Trump SoHo.[14]

- At least three ROC United worker member restaurants compete with a restaurant or event space at Trump International Hotel D.C. (BLT Prime and the event spaces it caters).[15]

Given ROC United's extensive and particularized allegations of injury to its restaurant and worker members, SAC ¶¶ 195–220, as well as the analyses offered by Colicchio, Mallios, Muller, Jayaraman, and Roginsky, it is clear that ROC United has shown injury. Indeed, ROC

---

[8] *See* Muller Decl. ¶¶ 24–29; Mallios Decl. ¶¶ 4, 19 (Amali, Amali Mou, Café 2, Terrace 5, Espresso Bar, The Modern, and Riverpark).

[9] *See* Muller Decl. ¶¶ 29-34 (The Modern, Amali, and Riverpark).

[10] *See* Muller Decl. ¶¶ 43–49; Colicchio Decl. ¶¶ 14, 21; Mallios Decl. ¶ 4 (Amali, The Modern, The Grammercy Tavern, Craft, and Riverpark).

[11] Muller Decl. ¶¶ 50–56 (The Modern, The Gramercy Tavern, Craft, Amali, and Riverpark).

[12] *See* Jayaraman Decl. ¶¶ 24–25 (Breslin and Spotted Pig).

[13] *See* Muller Decl. ¶¶ 67–75 (Gemma, The Park, The Waverly Inn, Gramercy Tavern, Riverpark, Craft, Maialino, and The North End Grill).

[14] *See* Colicchio Decl. ¶¶ 28–29; Roginsky Decl. ¶ 17.

[15] *See* Muller Decl. ¶¶ 77–93 (Jaleo DC, Zaytinya, and Minibar).

United has associational standing so long as even *one* of its members has been injured by the defendant's distortion of competition. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975).[16]

### 2. *Goode, Phaneuf, and ROC United have shown traceability and redressability.*

The defendant's contention (at 22–23) that the plaintiffs cannot satisfy Article III's traceability and redressability requirements rests on an assertion that any benefit unlawfully conferred on the defendant's properties *might not* cause injury to the plaintiffs, since third parties still have other options about where to eat and sleep.

That reasoning simply reiterates, in different garb, the defendant's objections to a finding of injury. Further, it begins from a flawed premise. In a competitor-standing case, the injury *is* the exposure to intensified competition, which is presumed to result in harm. *See Sherley*, 610 F.3d at 73; *Canadian Lumber*, 517 F.3d at 1334; *Cooper*, 820 F.3d at 738. Logically, that presumption incorporates the causal chain necessary to satisfy traceability and redressability: since it is a basic law of economics that increased competition causes injury, exposure to increased competition as a result of unlawful acts will satisfy the Article III injury requirement, and a command to cease the unlawful acts that caused the increased competition in the first place will redress the injury.

In fact, for this very reason, courts rarely belabor traceability and redressability analysis in competitor cases (and indeed the defendant devotes a mere page to these points). *See Cooper*, 820

---

[16] ROC United also easily satisfies the requirements for associational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). *First*, as shown above, at least one (and indeed several) of its members have standing in their own right. *Second*, its interests are indisputably germane to its mission. *See* Jayaraman Decl. ¶ 7. *Finally*, individual participation isn't needed where "the organization seeks a purely legal ruling," with no "individualized relief." *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006). Citing no authority, the defendant argues (at 24) that individual participation is "the only way the Court can determine whether any member has been injured." But it is obviously not "the only way." As we show above, ROC has established injury through organization, member, and expert declarations.

F.3d at 738; *Sherley*, 610 F.3d at 72 ("[I]t is clear the alleged injury is traceable to [official acts] and redressable by the court."); *Int'l Bhd. of Teamsters*, 724 F.3d at 212 (emphasizing that the "causation and redressability requirements of Article III standing are easily satisfied" where, absent the defendant's actions, "members of these groups would not be subject to increased competition"); *La. Energy & Power Auth.*, 141 F.3d at 367; *Fulani*, 882 F.2d at 628. Here, if the Court concludes that one or more of the plaintiffs has been injured, that conclusion entails a determination that the plaintiff competes in the same arena as the defendant's properties, and that stopping the source of intensified competition would provide redress.

**B.  CREW has organizational standing.**

In addition to the hotel and restaurant plaintiffs' standing as competitors, CREW has organizational standing in its own right.[17] In *Havens Realty Corp. v. Coleman*, the Supreme Court held that when a defendant's allegedly illegal conduct "perceptibly impair[s]" an organizational plaintiff's ability to carry out its established mission by creating a "drain on the organization's resources," there "can be no question that the organization has suffered injury in fact." 455 U.S. 363, 379 (1982). In that case, an antidiscrimination organization had standing because its complaint "broadly alleged" that it "had to devote significant resources to identify and counteract" violations of the Fair Housing Act by an apartment complex. *Id.* This kind of "concrete and demonstrable injury to the organization's activities," the Supreme Court held, is "far more than simply a setback to the organization's abstract social interests." *Id.*

---

[17] Although the other plaintiffs' standing as competitors is enough to establish the existence of an Article III case or controversy and hence this Court's jurisdiction, the Court should also ascertain CREW's standing because it may affect the scope of relief. "[W]hen there are multiple plaintiffs," "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).

In an unbroken line of cases, the Second Circuit has held that organizations have standing under *Havens* in a variety of contexts. These cases establish a test: "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact satisfying the requirements of standing." *NYCLU*, 684 F.3d at 294; *see also Nnebe v. Daus*, 644 F.3d 147, 156–57 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904–05 (2d Cir. 1993). And, contrary to the defendant's suggestion (at 12), this test isn't limited to claims under the Fair Housing Act or other statutes; it applies with full force in constitutional cases too. *See, e.g.*, *Nnebe*, 644 F.3d at 156 (Due Process Clause); *NYCLU*, 684 F.3d at 289 (First Amendment); *Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (First Amendment and Equal Protection Clause).

Taking all allegations as true, the complaint in this case satisfies the "perceptible impairment" test. The complaint details many ways in which the defendant's Emoluments Clause violations have resulted in diversions of CREW's communications, legal, and research resources, SAC ¶¶ 155–73, and impairment of its programmatic functions, *id.* at ¶ 174–79, thus impeding its ability to fulfill its core anti-corruption mission, *id.* at ¶¶ 153–54. These diversions are not just "perceptible" but substantial.

*First*, by accepting "[p]ayments to his businesses [that] are rarely public," *id.* at ¶¶ 170, 177, the defendant has "deprive[d] CREW of information about financial support," *id.* at ¶ 174 necessitating "time consuming, more expensive, and less effective research" to maintain its work, *id.* at ¶¶ 10, 174, 177. In this respect, CREW's injuries are both more wide-ranging and extensive than those the court found sufficient in *NYCLU*, which held that a civil-liberties group had Article III standing because a challenged policy "has impeded, and will continue to impede" the group's ability to gather information necessary to carry out its mission. 684 F.3d at 295.

27

*Second*, CREW has "had to devote significant resources to identify and counteract the defendant's [alleged violations]." *Havens*, 455 U.S. at 379; *see also Olsen v. Stark Homes, Inc.*, 795 F.3d 140, 158 (2d Cir. 2014) (fact that an organization had "expended resources in investigating" the defendant's illegal conduct was enough, on its own, to support *Havens* standing); SAC ¶ 155 (describing diversion of CREW's communications resources); *id.* at ¶¶ 157–62 (describing diversion of CREW's legal resources); *id.* at ¶¶ 168–72 (describing diversion of CREW's research resources). CREW's expenditures—including devoting "[e]very member of CREW's research team" on a "near-daily basis" to work on tracking the defendant's business dealings and the hiring of "two additional senior attorneys," *id.* at ¶¶ 161, 168—are far more substantial than those that sufficed in other Second Circuit cases. CREW has also devoted its limited resources to "explaining" the violations to various stakeholders, and "assisting" and "counseling" others in counteracting the defendant's unlawful acts—all grounds for *Havens* standing recognized in *Nnebe*, 644 F.3d at 157, a case in which such allegations were significantly less detailed than they are here, SAC ¶¶ 155, 157–58, 169–70.

*Third*, all of these expenditures have come at "the detriment of [CREW's] efforts" to perform mission-critical work that it would otherwise perform, *Ragin*, 6 F.3d at 905, thus creating an "opportunity cost" as CREW expends resources "that could be spent on other activities," *Nnebe*, 644 F.3d at 157; *see, e.g.,* SAC ¶¶ 154, 156 (describing detriment to CREW's communications work and inability to respond to important inquiries); *id*. at ¶¶ 164–67, 172–73 (describing other such opportunity costs). In the Second Circuit, "some perceptible opportunity cost" alone is enough for standing. *Nnebe*, 644 F.3d at 157.

Faced with allegations that more than suffice under binding circuit precedent, the defendant's response is to rely on out-of-circuit cases and hyperbolic attacks on the Second Circuit's precedent. Def. Br. 8–11, 13–14. But the defendant's out-of-circuit cases are easily

distinguished on their facts. *See*, *e.g.*, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) ("Nowhere in the complaint" did plaintiff "assert a frustration of its purpose or diversion of its resources."); *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995) (plaintiff presented "no evidence" of increased "operational costs"). CREW would have standing in these circuits too. *See La Asociacion de Trabajadores*, 624 F.3d at 1089 (holding that another plaintiff had standing because the defendant's actions "frustrate the [organization's] mission and prompt the diversion of its limited resources to organize, educate, and otherwise assist the day laborers"). The Second Circuit has also reaffirmed that, even assuming that other courts may read *Havens* "differently," cases like *Ragin*, *Nnebe*, and *NYCLU* "remain[] good law in this Circuit." *Mental Disability Law Clinic*, 519 F. App'x at 717 (quoting *Nnebe*, 644 F.3d at 157). And this Court, of course, is bound by circuit law.

In any event, the defendant's criticisms are overblown. *Havens* standing here does not mean that "virtually all organizations" may sue over "abstract disagreements." Def. Br. 15. This case itself illustrates the limits. CREW is an established organization suffering harm to its mission—not some fly-by-night group concocted solely to bring a lawsuit. And its injury is real; it's neither "self inflicted," Def. Br. 2, 9, nor "manufactured," *Nnebe*, F.3d at 157. CREW didn't cause the defendant to take payments in violation of the Constitution. And, unlike the plaintiffs in *Clapper*, 568 U.S. at 414, CREW doesn't seek to counteract merely "speculative" actions. The defendant is *currently* profiting from office and accepting prohibited emoluments. Nor is CREW's inability to monitor and report on this profiteering the result of its "own personal 'wish,'" *cf.* *McConnell v. FEC*, 540 U.S. 93, 228 (2003); it stems from the defendant's decision to accept profits through a far-reaching business empire that eludes transparency. It does not matter that there is some voluntary element in CREW's response. "[S]tanding analysis [does not] depend on the

voluntariness or involuntariness of the plaintiff's expenditures." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011).

Ultimately, while a "general[ized] interest" in preventing lawbreaking cannot confer standing, *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974), CREW alleges far more: a concrete harm caused by the defendant's actions and a consequent diversion of its resources to combat them. "So long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is the organization's noneconomic interest in encouraging a particular policy preference." *Nnebe*, 644 F.3d at 157 (punctuation omitted). Just as an "interest in encouraging open housing" didn't "deprive the organization of standing" to challenge discriminatory housing practices in *Havens*, 455 U.S. at 1124 n.20, CREW's interest in enforcing anti-corruption norms doesn't deprive it of standing to challenge the violations of particular anti-corruption prohibitions here.

## II.  The defendant's cramped interpretation of the Emoluments Clauses contradicts their text, purposes, history, and settled practice.

When it comes to the merits, the defendant's conduct is indefensible. By maintaining ownership of his business empire—an empire that is actively seeking out, and profiting from, all manner of transactions with foreign and domestic governments—he has brought himself into direct, sustained conflict with the Foreign and Domestic Emoluments Clauses.

As to the Foreign Emoluments Clause: It provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8. The defendant does not deny that the presidency is an

"Office of Profit or Trust,"[18] or that his businesses have received (and will receive) money and other benefits from "foreign State[s]" since taking office. The sole merits question at this stage is whether the plaintiffs plausibly allege that any of these benefits constitutes "any present" or "any . . . Emolument" of "any kind whatever" that he has accepted without congressional consent.

The answer can only be yes. The defendant ventures just a single argument for why he thinks it could be anything else. He contends that the Clause does not actually prohibit "any" present or emolument "of any kind whatever," but only those benefits accepted in his official capacity or that arise from services he has personally rendered. This strained interpretation fails by every relevant measure. It contradicts the plain text of the Clause and ignores the original public meaning of "emolument" as any profit or gain. It would eviscerate the Clause's purpose, allowing foreign states to make unlimited payments to the president in his private capacity (or laundered through a company he owns). It clashes with longstanding precedent from OLC and the Comptroller General. And it finds no support in two centuries of history.

The far better reading of the Foreign Emoluments Clause—and the one that is most faithful to its text, purpose, precedent, and history—is that it prohibits federal officeholders from accepting any profits or gifts of any kind from any foreign state absent congressional consent. That rule holds true whether the profits or gifts are handed directly to the officeholder by a representative of the foreign government, or funneled to the officeholder through an entity that he owns and that bears his name. In the latter case, the officeholder would ultimately derive a

---

[18] Although an amicus advances the idiosyncratic argument that the president is not subject to the Foreign Emoluments Clause, the defendant does not embrace this outlier reading, nor did his private law firm in its white paper. *See* Dillon, *White Paper: Conflicts of Interest*, at 3–4 (conceding that the defendant, upon taking office, "will be bound by . . . his obligations under . . . the Foreign Emoluments Clause"). Such a reading would squarely conflict with OLC's and Congress's long-held position, and cannot be reconciled with the Clause's text, purpose, or history. *See* 2009 WL 6365082, at *4 ("The President surely holds an Office of Profit or Trust." (brackets omitted)); 5 U.S.C. § 7342(a)(1)(E) (recognizing that the bar on foreign presents covers "the President and Vice President" and consenting to certain presents).

share of "profits" from the entity, which "would in effect be a conduit for that government." 17
Op. O.L.C. 114, 119 (1993); *see also* 62 Comp. Gen. 432 (1983) (recognizing that, under the
Foreign Emoluments Clause, the "corporate entity will be disregarded" where "there is such
unity of interest and ownership that the separate personalities of the corporation and its
shareholders no longer exist"). As is true with any constitutional provision, hard cases may lurk at
the margins. But that is no reason not to give the Clause its most natural and settled meaning
when the facts of this case, as alleged, so plainly trigger its central concerns. So this case does not
require the Court to delineate the outer reaches of the Clause, or decide whether to adopt the
broadest conceivable interpretation of it. The defendant's conduct falls squarely in the Clause's
heartland.

The same goes for the plaintiffs' Domestic Emoluments Clause allegations. That Clause
entitles the president to "a Compensation" while in office (a fixed salary and benefits) and forbids
him from "receiv[ing] within that Period any other Emolument from the United States, or any of
them." U.S. Const. art. II, § 1, cl. 7. The defendant does not dispute that he has received (or will
receive) concrete benefits from state governments and federal agencies in the form of
discretionary tax credits, special treatment on his lease with GSA, and payments for the use of
facilities and other services at businesses that he owns. *See* SAC ¶¶ 129–49. Yet he claims that he
is entitled to accept these benefits based on the same flawed reading of "emolument" that infects
his interpretation of the Foreign Emoluments Clause: that "the federal or state benefit must arise
from the President's service as President." Def. Br. 3. That is incorrect. Under any plausible
interpretation, the complaint makes out a violation of the Domestic Emoluments Clause.

## A.  Text and original public meaning

In interpreting the Emoluments Clauses, this Court should "begin with [the] text." *City of
Boerne v. Flores*, 521 U.S. 507, 519 (1997). This textual inquiry is "guided by the principle" that

the Constitution's "words and phrases were used in their normal and ordinary" sense, rather than in some "technical" sense. *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008).

The defendant, however, grounds his *entire interpretation* in a restrictive, hyper-technical reading of the word "emolument," arguing that it "should be interpreted to refer to a 'profit arising from an office or employ'"—not the profits of "doing business with any foreign, federal, or state instrumentality." Def. Br. 27–31. But this blatantly gerrymandered definition cannot possibly withstand the weight that he places on it, and collapses for three independent textual reasons: (1) it does not account for the Foreign Emoluments Clause's separate prohibition on accepting "presents"; (2) it ignores the original public meaning of emolument (to mean any "profit" or "gain"); and (3) it defies the surrounding text, context, and design of the Clauses.

**1. *"Presents."*** The Foreign Emoluments Clause bars not just any "emolument," but also "any present"—a term that the defendant spends all of one paragraph discussing. *See* Def. Br. 31–32. He ignores that term because its plain meaning does not allow for his restrictive definition. Although he asserts that the word "should be understood as office- and employment-specific," he does not locate this limitation in any definition of the word "present." *Id.* Instead, he seeks to smuggle it in from his cramped reading of *emolument*. That is sheer sleight of hand. As his own definitions show, "present" encompasses gifts and donations of any kind. *See id.* (defining it to mean "[s]omething bestowed on another without price or exchange; the act of giving").

This means that the defendant's textual argument is completely non-responsive to one of the two theories that the plaintiffs have pled for why he is violating the Foreign Emoluments Clause. *See* SAC ¶ 37. The complaint highlights, in particular, the defendant's sudden receipt of valuable trademark protection from the Chinese government within a month of becoming president—after ten years of failure. *See* SAC ¶¶ 111–18. As alleged, this chain of events supports a plausible allegation that the trademarks are a present, and the defendant's only response

33

(buried in a footnote) comes nowhere near justifying dismissal. *See* Def. Br. 32 n.29 (musing about what "may be intended" by Chinese trademark policy). And many of the additional allegations—including that the defendant is receiving discretionary permits and approvals from foreign governments, as well as payments ostensibly made for hotel and restaurant services—have been properly pled as prohibited "presents." SAC ¶¶ 57–89, 122–27. The defendant has no coherent textual response. That failure, by itself, is sufficient reason to deny his motion to dismiss.

**2. *Original meaning of "emolument."*** Even as to the word emolument, the defendant's restrictive interpretation ignores the word's ordinary understanding, as reflected in both Founding-era dictionaries and contemporaneous sources. *See Heller*, 554 U.S. at 576; *see also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2561 (2014) (looking to Founding-era dictionaries).

According to a recent survey, "every English dictionary definition of 'emolument' from 1604 to 1806" gives the word a different meaning than the one pressed by the defendant. Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806*, 1–2 (June 30, 2017), *at* https://ssrn.com/abstract=2995693. Dr. Samuel Johnson defined it to mean simply "profit" or "advantage," as did Nathan Bailey. 1 Johnson, *A Dictionary of the English Language* (6th ed. 1785), http://bit.ly/2tCFt85; Bailey, *An Universal Etymological English Dictionary* (20th ed. 1763), http://bit.ly/2rFFhrW. Numerous other examples of dictionaries containing the same definition abound. *See generally* Mikhail, *The Definition of "Emolument"*. This definition would undoubtedly include the profits of private commercial transactions.[19]

---

[19] Attached to this brief is an excerpt from Mikhail, *The Definition of "Emolument"*: a table showing definitions in Founding-era English dictionaries, statistical and longitudinal analysis of lexical definitions, and transcripts of English dictionary definitions. In addition, we are separately filing with the Court the complete article and its appendix, consisting of over 100 original images of English and legal dictionaries published between 1523 and 1806. *See* Gupta Decl., Exh. 1-11.

So the defendant strenuously resists the ordinary definition. He concedes (at 30) that this definition "existed at the time of the founding," but tries to convey the impression that his narrower definition was the more common one. It was not. Whereas the usual definition ("profit" or "gain") appears in *every* Founding-era dictionary, the office-or-employment-only definition on which he rests his entire argument "appears in less than 8% of these dictionaries." *Id.* at 1–2. That is anything but "ordinary." *See Heller*, 554 U.S. at 576.

The defendant also fails to acknowledge the many Founding-era examples of the word being used in its usual sense. When discussing the Foreign Emoluments Clause at the Virginia ratifying convention, for example, Edmund Randolph emphasized that "[a]ll men have a natural inherent right of receiving emoluments from any one," but the Clause "restrained" this right "to prevent corruption." 3 *Records of the Federal Convention of 1787* 327 (Farrand ed., 1911). It is implausible that he would have said that "all men" have a natural right to receive emoluments "from any one" if that word were limited to "compensation or pecuniary profit derived from *a discharge of the duties of the office*." Def. Br. 27.[20] Rather, he was referring to private economic transactions.

This understanding of emolument is in keeping with contemporaneous usage in other contexts. "The majority of Blackstone's usages," for instance, "involve benefits other than government salaries or perquisites." *See* Mikhail, *"Emoluments" in Blackstone's Commentaries*, Balkinization, May 28, 2017, http://bit.ly/2rwBGIw ("family inheritance, private employment,

---

[20] The case that the defendant cites for this proposition, *Hoyt v. United States*, 51 U.S. (10 How.) 109, 135 (1850), must be understood in light of its context. It involved the meaning of a statute that covered the "emoluments of office" for Treasury Department collectors. *Id.* The Court did not have occasion to consider the very different question presented in this case: the meaning of "any" emoluments "of any kind whatever," as used in a broad prophylactic constitutional provision. The same is true for defendant's other cases. *See McLean v. United States*, 226 U.S. 374, 377 (1912) ("emoluments . . . due . . . as a major"); *United States v. Hill*, 120 U.S. 169, 172 (1887) ("emoluments of his office"); *United States v. Ripley*, 32 U.S. (7 Pet.) 18, 18 (1833) ("emoluments to which his rank entitled him").

and private ownership of land"). Innumerable early cases likewise reflect the term's normal meaning. *See, e.g.*, *Hills v. Ross*, 3 U.S. (3 Dall.) 331, 332 (1796) (per curiam) ("proceeds"); *Himley v. Rose*, 9 U.S. (5 Cranch) 313, 318-19 (1809) (Johnson, J.) ("profits and advantages"); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 688 (1819) (Story, J.) ("benefit"); *Clark v. City of Washington*, 25 U.S. (12 Wheat.) 40, 53 (1827) (Marshall, C.J.) ("profit" or "benefit" from the "proceeds," "funds or revenue" from a lottery); *see also* Mikhail, *A Note on the Original Meaning of "Emolument"*, Balkinization, Jan. 18, 2017, http://bit.ly/2vuk4zE (providing Founding-era examples of the Framers using word to refer to "the consequences of ordinary business dealings"). And when a narrower meaning was intended, it was accompanied by language signaling as much. *See id.* (listing examples from the Federalist Papers: "emolument . . . of the offices" and "emoluments annexed to their offices").

   **3. *Surrounding text*.** This leads to the defendant's third textual problem: the language surrounding the word "emolument" in both Clauses forecloses his hyper-narrow definition.

   Consider the Foreign Emoluments Clause. Reflecting its broad purpose, the text of this Clause is "sweeping and unqualified." 17 Op. O.L.C. at 121. It bars the acceptance of "any" present or emolument "of any kind whatever" from any foreign state absent congressional approval. And it contains "no express or implied exception." *Id.* Instead of admitting of any textual exceptions, the Clause makes clear that *Congress* is the entity with primary responsibility for creating pragmatic exceptions: "The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to Congress, which may give consent." *Id.* This design feature—in combination with the doubly broad use of "any" and "of any kind whatever"—yields a firm textual command: even borderline cases "should be resolved against" allowing acceptance of a benefit. Memorandum for S.A. Andretta, Admin. Assistant Att'y Gen., from J. Lee Rankin, Assistant Att'y Gen., Office of Legal

Counsel, *Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* 9 (Oct. 4, 1954), http://bit.ly/2vgexzo.

The defendant's reading disregards this command by selecting the narrowest possible definition, which appears in just one of out of every twelve Founding-era dictionaries. And although he tries to give some meaning to the phrase "of any kind whatever," saying (at 45) that it simply "reflects an emphasis that the Clause does not exempt any type of 'Emolument,'" that emphasis is *already* made clear by the separate use of the word "any." What the phrase "of any kind whatever" adds to the prohibition on "any" emolument, then, is a clear directive that the prohibition must include "emoluments" of "any kind"—including the ordinary kind.

Indeed, the word "emoluments" is used only two other times in the Constitution, and neither appears next to the phrase "of any kind whatever." The Incompatibility Clause, on which the defendant relies (at 29), expressly limits its scope to emoluments received as office-related compensation. U.S. Const. art. II, § 6, cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments *whereof* shall have been encreased during such time." (emphasis added)). And the Domestic Emoluments Clause, on the defendant's own reading, is similarly qualified by the phrase "for his Services." Def. Br. 29. Even accepting this restrictive reading (which is wrong for reasons explained below), the Foreign Emoluments Clause has no similar language, or any other qualifier.

Contrary to the defendant's contention (at 31), applying the ordinary definition does not create intolerable redundancies. The sole basis for this claim is the Foreign Emoluments Clause's prohibition on presents. But this prohibition was likely intended to ensure that the Clause would apply broadly, consistent with its purpose, and cover the acceptance of unreciprocated, possibly

37

unsolicited "gifts"—including tangible items like Franklin's snuff box. These items were (and are) most naturally thought of as presents, while emoluments often connote an exchange of sorts.[21]

Moreover, because the defendant similarly limits the meaning of "present" to only office-related presents, his theory arbitrarily reduces the reach of both "present" and "emolument," and does so without eliminating the potential for overlap. After all, he says that the Clause's ban on "presents" covers "gifts based on [his] official position," while the ban on "emoluments" covers "the receipt of value . . . for a position held." Def. Br. 27, 29. But he never explains why a thing "of value" that he receives because he is president cannot, on his theory, be *both* an emolument and a present. So his theory's rationale—solving overlap—is no point in its favor.

Turning to the Domestic Emoluments Clause, it provides that "[t]he President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. By its terms, the Clause prohibits the president from receiving "any" emolument from the federal government or any state government while in office (*i.e.*, "within that Period"). Even without the additional language "of any kind whatever," there is no textual indication that the ordinary original meaning of emolument should not be considered "any other Emolument."

Searching for some textual support to the contrary, the defendant latches onto the phrase "for his Services," which appears at the beginning of the Clause. He asserts that this phrase "must" be read to qualify the word "emolument" at the end of the Clause. Def. Br. 29. But the

---

[21] That said, there are certainly some examples of "emolument" being used to mean benefits obtained without any exchange, in a sense that approaches the meaning of present. But that potential overlap simply demonstrates the Framers' desire to ensure that *all types* of financial relationships with foreign states are captured by the Clause. It does not permit (let alone compel) courts to select the narrowest definition of each word, in the face of multiple textual indicators to the contrary, for the sake of achieving strict separation of terms, thus creating large holes in the Clause that thwart its purpose.

most natural reading of the phrase "for his Services" is that it simply describes *why* the president receives "Compensation"; it does not curtail the meaning of emolument. If it did, the phrase "within that period" would be superfluous. Why allow the president to receive other emoluments *after* leaving office if that word were limited to compensation for "his service as President"? *Id.* And the prohibition on "any other Emolument from the United States" would *itself* be redundant of the preceding text providing that the president's "Compensation" "shall neither be encreased nor diminished" while in office. The word "Compensation" includes not just salary, but fixed benefits. *See* 3 U.S.C. § 102 (providing the "Compensation" for the president). If "emolument" were limited to "compensation and other benefits" arising from his service as president, as the defendant argues (at 29), there would be no need to prohibit "any other Emolument from the Unites States," since the federal government is *already* barred from "encreas[ing]" the president's compensation. In short, the text of the Domestic Emoluments Clause is as clear as the Foreign Emoluments Clause: the ordinary definition applies, and covers profits from doing business with any federal or state instrumentality.

## B. Purpose

Even if the defendant's textual interpretation of the Emoluments Clauses were plausible, it would be foreclosed by considerations of purpose. *Cf. Noel Canning*, 134 S. Ct. at 2561. When we know what the Founding generation sought to achieve, we should interpret the Constitution to facilitate, not frustrate, that goal. Here, that means applying the Clauses to the defendant's business dealings with government entities, not creating gaping artificial loopholes.

1. ***The Foreign Emoluments Clause.*** This Clause "is a prophylactic provision." 10 Op. O.L.C. 96, 98 (1986). It seeks to protect against the possibility of "undue influence and corruption by foreign governments—a danger of which the Framers were acutely aware." 18 Op. O.L.C. 13, 15 (1994). The Clause thus reflects the Framers' insight that even the best among us

are susceptible to being influenced—in myriad, often imperceptible ways—when receiving gifts, money, offices, and titles. That is why the text is so sweeping: "the drafters intended the prohibition to have the broadest possible scope and applicability." 49 Comp. Gen. 819, 821 (1970); *see also* 10 Op. O.L.C. 98 (1986) ("Although no court has yet construed the Emoluments Clause, its expansive language and underlying purpose . . . strongly suggest that it be given broad scope."). The Clause "must be read broadly"—as it is written—"in order to fulfill that purpose." 12 Op. O.L.C. 67, 68 (1988).

The Clause's broad prophylactic purpose was aptly summarized by commentators at the time. In discussing the Clause in "the most important early American edition of Blackstone's Commentaries," *Heller*, 554 U.S. at 594, St. George Tucker wrote: "Corruption is too subtle a poison to be approached, without injury. Nothing can be more dangerous to any state, than influence from without, because it must be invariably bottomed upon corruption from within." 1 *Blackstone's Commentaries* 295–96 (Tucker ed., 1803). Joseph Story said much the same. *See* 3 Story, *Commentaries* 202 ("[The Clause] is founded in a just jealousy of foreign influence of every sort."). By laying down a clear rule, the Clause "puts it out of the power of any officer of the government" to decide for himself whether to accept gifts or money from foreign states. *Id.* The answer is *always* no—unless Congress says yes. In other words: the Clause does not contain an intent requirement, or prohibit emoluments only if they can later be proved corrupt on a case-by-case basis. Instead, it erects a preemptive categorical bar to best achieve its purpose.

That purpose is plainly implicated when the defendant profits from doing business with foreign states. At the risk of stating the obvious, when the president of the United States interacts with foreign nations, he does not do so as an "ordinary citizen." Def. Br. 36. When foreign states decide to spend thousands (or millions) of dollars at his businesses, no one can confidently say that these payments have "nothing to do with his office"—still less so when he is constantly using

the presidency as a way of publicizing his properties, and when diplomats from those nations tell us that their goal is to influence his conduct while in office. *Id.* at 26.

Indeed, the defendant does not even attempt to justify his constricted reading of the Clause by reference to its objectives. No wonder: the benefits he receives from foreign states, as alleged, unquestionably "raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional provision." *See* Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* at 5 (May 23, 1986), http://politi.co/2us47bu.

The proof is in the defendant's own words. In his public speeches, he has repeatedly demonstrated the enduring wisdom of the Clause's central insight: that our leaders "might be biased, and [their] loyalty divided, if they received financial benefits from a foreign government." 17 Op. O.L.C. at 122. He has said of Saudi Arabia: "I get along great with all of them. They buy apartments from me. . . . They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much." SAC ¶ 96. He's shared a similar sentiment about China: "I love China! The biggest bank in the world is from China. You know where their United States headquarters is located? In this building, in Trump Tower." *Id.* at ¶¶ 51–52.

If foreign governments could spend "$50 million" to "buy" things from the president so that he would "like them very much," the Clause's purpose would be obliterated. Under the defendant's interpretation, a village in Russia would be barred from making him an honorary dogcatcher (a "Title"), but the Russian government could give him millions of dollars to buy his products or services. That makes no sense as an account of why the Emoluments Clauses were included in the Constitution in the first place. Nor does this example: By the defendant's lights, a

federal officeholder would be prohibited from accepting $10 to personally shine the shoes of a foreign diplomat, *see* Def. Br. 27 (conceding that compensation for "personal services" is covered by the Clause), but he could accept unlimited amounts of money if he owned a business that sold those same services if performed by his employees. Allowing such "a constitutional free pass for super-rich presidents" may be good for *this* president, but it is hard to see how it would advance the aims of the Clause. Chong, *Reading the Office of Legal Counsel on Emoluments: Do Super-Rich Presidents Get a Pass?*, Lawfare, July 1, 2017, http://bit.ly/2uMotRd.

Or to take one more absurd consequence of the defendant's view: As noted above, he asserts (at 32) that the word "present," like emolument, is "office- and employment-specific"—a view that would allow a foreign state to give him a valuable gift so long as it did so in his *private* capacity (assuming he even has one). This would make a mockery of the Clause, and has been rejected by OLC. *See* 11 Op. O.L.C. 89, 90 (1987) (finding Clause "plainly applicable" when official accepts present or emolument "in his private capacity"); 6 Op. O.L.C. 156 (1982).

It is true, of course, that constitutional provisions, like legislation, do not pursue their purposes at all costs. *See* Def. Br. 45. But this constitutional provision, unlike most, has a safety valve: Congress can step in and authorize receipt of any (or even all) emoluments from foreign governments, as it has done "in appropriate cases" throughout our history. *See* 18 Op. O.L.C. at 18 n.10 (citing examples). Yet Congress has not done so here, and it has not even been *asked* to do so or been given the information that would allow it to intelligently make such a decision.

In any event, it is the *defendant's* rule that would be unworkable. Rather than apply a clean prohibition on foreign-government emoluments "of any kind whatever," the defendant would enlist courts (and OLC) in after-the-fact mind-reading exercises to assess whether a particular payment was provided in exchange for "decisions favorable to the paying foreign power." Def. Br. 29. Again, that view would annihilate the prophylactic structure of the Clause by requiring

proof of intent, which is often elusive. *See McDonnell v. United States*, 136 S. Ct. 2355 (2016) (illustrating difficulties of proof in the bribery context). And OLC has never imposed such a requirement, but has instead rejected it. *See* 11 Op. O.L.C. at 91 n.5 ("[T]he applicability of the Emoluments Clause" does not turn on whether an official is actually "subjected to improper foreign influence."). Constitutional purpose thus compels the conclusion that the defendant's business with foreign governments be prohibited by the Clause.

**2.** ***The Domestic Emoluments Clause.*** This Clause shares with its foreign companion an anti-corruption purpose. It too rests on the Framers' keen understanding of human nature and the potential of money to warp a person's judgment—that "power over a man's support is a power over his will." *The Federalist* No. 73 (Hamilton). The Framers worried that giving *any* official, federal or state, the ability to alter the president's financial circumstances could "tempt him by largesses" and cause him "to surrender" his "judgment to their inclinations," while forcing states to compete with each other for his affection. *Id.* The Framers knew from history that "examples would not be wanting, even in this country, of the intimidation or seduction of the Executive by the terrors or allurements of [] pecuniary arrangements." *Id.*

The Domestic Emoluments Clause sought to prevent these ends by preventing their beginnings. It intended, in Alexander Hamilton's words, to protect "the independence intended for [the president] by the Constitution," and to ensure that neither the federal government nor the states could "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice." *Id.* The president could have "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution," *id.*, for that would turn the presidency into "a position of both power and profit," *Nixon v. Sampson*, 389 F. Supp. 107, 137 (D.D.C. 1975). The Framers "feared that if the office offered both power and profit, the persons who sought the office would 'not be the wise and moderate,'" or "'the men fittest for trust.'" *Id.*;

*see also Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995) ("This provision addressed the Framers' concern that the President should not have the ability to convert his or her office for profit.").

As with the Foreign Emoluments Clause, there is no question that the purpose of this Clause is implicated here. The plaintiffs allege that the defendant receives or will receive numerous financial benefits from states and federal agencies—including special treatment from GSA as to the Old Post Office lease, discretionary tax credits, and payments from state and federal entities to businesses he owns. *See* SAC ¶¶ 129–49. These discretionary payments trigger the very concerns that gave rise to the Clause, and therefore must be covered by its scope.

**C.  OLC and Comptroller General precedent**

The "settled practice" and understanding of the federal government—as fleshed out in legal opinions from OLC and the Comptroller General—are also highly relevant to the inquiry. *Noel Canning*, 134 S. Ct. at 2564. And they too repudiate the defendant's position. Both OLC and the Comptroller General have rejected the argument that a federal officer must "personally" provide services to a government to violate the Emoluments Clauses, or that he can hide behind the corporate form by having an entity he owns accept profits from foreign governments.

Begin with the OLC opinions.[22] In a 1993 opinion that the defendant relegates to a footnote (at 43 n.62), OLC examined whether the Foreign Emoluments Clause applies to federal officers who are also partners in law firms that do business with foreign governments. 17 Op. O.L.C. at 117–19. As partners, the officers were entitled to receive a "proportionate share" of

---

[22]Although not binding on courts, OLC opinions are entitled to considerable weight because they "reflect[] the legal position of the executive branch" and "provid[e] binding interpretive guidance for executive agencies" (which could explain why the defendant did not secure an OLC opinion here). *United States v. Arizona*, 641 F.3d 339, 385 n.16 (9th Cir. 2011), *aff'd in part, rev'd in part*, 567 U.S. 387 (2012); *see also Cherichel v. Holder*, 591 F.3d 1002, 1016 & n.17 (8th Cir. 2010); *N.Y. Times Co. v. U.S. Dep't of Justice*, 138 F. Supp. 3d 462, 478 (S.D.N.Y. 2015); *Public Citizen v. Burke*, 655 F. Supp. 318, 321–22 (D.D.C. 1987).

"client revenues," including "any profits" earned from foreign governments. *Id.* The question was whether they could receive the profits without congressional consent, on the theory that the officers did "not personally represent foreign governmental clients and ha[d] no dealings with them," and were not "subject to the foreign government's 'control.'" *Id.*

OLC answered no. It expressly rejected the argument that the Clause is inapplicable simply because there was no "direct personal contact or relationship between the [federal officer] and a foreign government," finding that the lack of "control" was "not decisive." *Id.* at 119. "More important," OLC stressed, was that the profits "would be a function of the amount paid to the firm by the foreign government," making the partnership effectively "a conduit for that government." *Id.* Because an "identifiable portion" of the member's profits "could fairly be attributed to a foreign government," OLC concluded that "acceptance of that portion" would "constitute a prohibited emolument," requiring congressional consent. *Id.* at 119–20.[23]

The defendant does not even attempt to harmonize his position with the reasoning of this opinion, or to explain why the concerns of the Clause were triggered in that scenario but not in this one. And his attempts to shoehorn the opinion into the tailor-made category of "akin to an employment relationship" are unpersuasive, to say the least. Def. Br. 42–43 & n.62. The opinion itself distinguished OLC's "precedents in the employment area" as "not directly on point." 17 Op. O.L.C. at 119. And there is no plausible reason why the Clause would cover profits from foreign-government clients only as to one type of business (a law firm), but not another.

Other OLC opinions undercut the defendant's view. In 1982, for example, OLC found that the Clause prohibited a Nuclear Regulatory Commission employee from accepting $150 to

---

[23] Although OLC later reconsidered this opinion, it did so only as to whether a member of the Administrative Conference holds an "Office of Profit or Trust"—not as to what constitutes acceptance of an impermissible emolument. *See Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL 2516024 (June 3, 2010).

review a project while "on his leave time for an American consulting firm." 6 Op. O.L.C. at 156. OLC refused to "conclude that the interposition of the American corporation relieve[d] the NRC employee of the obligations imposed by the Emoluments Clause." *Id.* at 158–59.

The same reasoning applies here. If the corporate form does not immunize the defendant's acceptance of profits from foreign states, and he concedes that he cannot provide personal services to those governments, how can he be permitted to own a company that sells its services to them? On his view, the NRC employee would have been in the clear if, instead of being a mere employee, he *owned* the firm—in which case he could have earned unlimited profits from foreign states. That cannot be the law, and no OLC opinion suggests that it is.

Nor does any Comptroller General opinion. To the contrary, the Comptroller General's longstanding approach makes clear that the existence of a corporation does not immunize the receipt of profits from foreign governments where "there is such unity of interest and ownership that the separate personalities of the corporation and its shareholders no longer exist," or under other circumstances where "equity dictates." 62 Comp. Gen. 432; *accord Retired Marine Corps Officers*, Comp. Gen. B-217096, 1985 WL 52377, at *1 (Mar. 11, 1985).

This does not mean, however, that mutual funds or "mere stock holdings by a covered official in companies that conduct business globally would also violate the Foreign Emoluments Clause," as the defendant asserts. Def. Br. 46. Rather, what this precedent illustrates is that OLC and the Comptroller General take a more functionalist approach as to whether a particular emolument may be deemed "accepted" by a federal officeholder and given by a "foreign state," while consistently interpreting "emolument" to encompass any profits and gains of any kind. *See* 1985 WL 52377, at *3 ("[W]e base our determinations on the actual relationship involved and

not merely on form."); Alito Memo, at 3–5 (engaging in a pragmatic, purpose-driven inquiry into whether an emolument "can be said to be from a 'foreign state'").[24]

Nor does this precedent require reading the Clause to "encompass any possible thing of value that an officeholder might receive in any capacity," Def. Br. 31—including even non-discretionary benefits fixed long before a federal official took office and became subject to the Clause. That is neither OLC's position nor the Comptroller General's position, nor is it our contention. OLC has instead interpreted the word "emolument," for purposes of the Domestic Emoluments Clause, to exclude President Reagan's retirement benefits from his service as California's governor because they were "vested rights" rather than "gratuities which the state is free to withdraw." 5 Op. O.L.C. at 187–88; *see also* Comp. Gen. B-207467, 1983 WL 27823, at *3 (Jan. 18, 1983) (reaching same conclusion because pension was "previously earned," "fully vested," and "set by statute"). This conclusion is consistent with defining "emolument" to mean "profit" or "gain," because a legal entitlement that was fully vested *before* winning office is not a profit or gain "received" or "accepted" while *in* office. It is also consistent with the Clause's purpose.

And note what OLC did *not* say in its opinion: that President Reagan could accept the pension because it was not received "for his Services" as president. Def. Br. 29. If the defendant's reading were correct, this would have been the most straightforward way of resolving the issue.

---

[24] In passing, the defendant hypothesizes (at 46 & n.65) that some "foreign public universities" might have purchased a copy of a book by President Obama as part of "their library collection," and that this might have occurred while he was in office. But that possibility, even if true, would raise a very different question from any presented here: whether a payment from a foreign university to a foreign wholesaler who then pays an American publisher, who ultimately provides fractional royalties to an American officeholder, would constitute "acceptance" of an emolument by that officeholder from a "foreign state." *See* Alito Memo, at 3–5.

47

Instead, OLC implicitly rejected this interpretation by assuming that "any other Emolument" includes financial benefits not received as compensation for being president.

In summary, the defendant's office-or-employment-only interpretation "marks a decisive break from the more conscientious approach long espoused by both the Comptroller General and the Office of Legal Counsel," and thus finds no support in precedent. *See* Chong, *Reading the O.L.C. on Emoluments*.

### D. History

Finally, there is history. If OLC and the Comptroller General have not squarely confronted the scenario presented in this case, it is only because the defendant's actions are truly unprecedented. No president has ever had financial interests that even approach the scale and scope of the defendant's, or that remotely raise the risk of corruption that is so plainly present here. Nor has any president been so secretive about his financial dealings, including his dealings with foreign powers and domestic governments. And, in sharp contrast with the defendant, every other president "in the past four decades . . . has taken personal holdings he had before being elected and put them in a blind trust in which the assets were controlled by an independent party" or the equivalent. Shear & Lipton, *Ethics Office Praises Donald Trump for a Move He Hasn't Committed To*, N.Y. Times, Nov. 30, 2016, http://nyti.ms/2spZcdj. The defendant's inability to point to *any* comparable historical example is a clear mark against him, for sometimes "the most telling indication of [a] severe constitutional problem" with a novel assertion of authority by the Executive "is the lack of historical precedent." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (*PCAOB*) (internal quotation marks omitted). So it is here.

Yet the defendant tries to use the absence of historical precedent to his advantage. He relies heavily on the fact that the historical record reveals little "discussion about constraints on private business pursuits by public officials," and that "such pursuits were common at the time of

the Nation's founding" because many officials owned slave plantations. Def. Br. 35–36. Perhaps so. But that's not the question. The question is whether any of those officials sold goods and services to foreign or domestic *governments*, not ordinary citizens. On this question—not the largely irrelevant question whether "officeholders [have had] private business interests," Def. Br. 40— the defendant offers nothing. Although he asserts (at 26) that "Presidents from the very beginning of the Republic, including George Washington, would have received prohibited 'emoluments'" under our view of the Clauses, he identifies no historical example of a president actually receiving profits from a foreign state. And the one historical example he gives of an arguable domestic emolument is easily distinguishable: It involved a *public sale at auction* of property from the Territory of Columbia purchased by George Washington, who later made clear that he had no desire to "stand on a different footing from every other purchaser," and was "ready to relinquish" the property if necessary. *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://bit.ly/2vrox5Q.

With no historical support, and nothing else to recommend his narrow interpretation, the defendant cannot prevail in his attempt to dismiss the case for failure to state a claim. Although he gestures toward a few contemporary examples that pose closer constitutional questions, those examples cannot save him here. The facts, as alleged, fall comfortably within the core of what the Emoluments Clauses prohibit, based on their text, purpose, practice, and history.

## III. The defendant's motion fails to justify dismissal even on his own flawed interpretation of the Emoluments Clauses.

Ultimately, this Court need not definitively resolve the exact scope or contours of the Emoluments Clauses to deny the defendant's motion to dismiss. Even accepting his cramped interpretation, he has failed to justify dismissal. That is because he makes absolutely no attempt

to show why the plaintiffs' allegations fail to give rise to a plausible violation under his own view. His silence on that question dooms his bid to dismiss this case for failure to state a claim.

A. **Foreign Emoluments Clause.** On the Foreign Emoluments Clause, the defendant repeatedly says that the benefit must be conferred on him in his capacity as president or must arise from services that he has rendered to a foreign state, and does not include benefits that "hav[e] nothing to do with his office." Def. Br. 26; *see also id.* at 3, 29. But here's what he does not say: that the factual allegations in the complaint fail to make out a plausible violation of the Clause even under this interpretation.

Is it any wonder why he defaults on this dispositive question? The complaint includes a bevy of allegations that easily clear the bar. It alleges that foreign diplomats have openly stated that now "all the delegations will go" to the defendant's properties as a way of currying favor with him in his capacity *as president*, and that his Washington, D.C. hotel has sought out their business by "hir[ing] a 'director of diplomatic sales" and "specifically market[ing] itself to the diplomatic community." SAC ¶¶ 60–62. The complaint also alleges that these statements have become reality. *See, e.g., id.* at ¶¶ 72–76 (Embassy of Kuwait moved National Day celebration from Four Seasons to Trump Hotel after election); *id.* at ¶¶ 77–86 (Saudi Arabia officials' hotel stays and meals). These benefits, as alleged, at least plausibly have something "to do" with the fact that he is now president, Def. Br. 26, and the defendant does not once argue otherwise.

And this is to say nothing of the profits that he has made by increasing his prices after gaining office. As the complaint alleges: "Since Defendant's inauguration as President, goods and services sold by his various businesses have sold at a premium," and his "high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide a unique benefit: access to, influence on, and the good will of the President of the United States."

SAC ¶ 150. The complaint also provides specifics: guest room rates at the D.C. hotel increased, *id.* at ¶ 151, and the Mar-a-Lago fee doubled to $200,000, *id.* at ¶ 152. All after the election.

What does the defendant have to say about these allegations? Nothing. It is hard to imagine a more striking omission from a motion to dismiss than this: any explanation of why the plaintiffs' allegations fail to satisfy the defendant's *own theory* of what the law requires. This failure, by itself, requires rejection of his argument that the plaintiffs do not state a claim under the Foreign Emoluments Clause.

Nor is this even all. The complaint alleges an independent theory of liability based on the defendant's acceptance of "presents" from foreign governments. To this separate allegation, he counters with a single legal point: that the term covers only gifts "offered to a U.S. official because of his or her status as a U.S. official." Def. Br. 3; *see also id.* at 27, 31–32. Here, too, the defendant fails to take the next step and explain why none of the factual allegations can possibly satisfy this test. And he cannot do so. To give just one concrete example, the complaint lays out a troubling sequence of events culminating in the Chinese government giving the defendant valuable trademark protection for his name, in connection with building-construction services— protection that he had sought (without success) for over a decade. SAC ¶¶ 111–18. China granted protection only "after he had been elected President, questioned [America's longstanding] One China policy, was sworn in, and re-affirmed the One China policy." *Id.* Once again, the defendant's only response to the allegations is to ignore them.

Taken together, these allegations are more than enough to make out a plausible claim under the Clause, even applying the defendant's own constricted definition. The plaintiffs allege that he has already generated hundreds of thousands of dollars—perhaps millions—from foreign governments or their instrumentalities as a direct result of his ascension to the presidency and their (unsurprising) desire to use "private" transactions to influence his conduct while in office.

51

Perhaps the defendant thinks that those allegations will turn out to be wrong. But that is a factual question requiring discovery, not a legal question that can be disposed of at the starting gate.

**B. *The Domestic Emoluments Clause*.** The same is true for the plaintiffs' claims under the Domestic Emoluments Clause. On this issue, the defendant offers a single rejoinder: "the federal or state benefit must arise from the President's service as President." Def. Br. 3. But yet again, he does not bother to actually apply this test to the allegations in the complaint. If he had done so, it would have shown why dismissal is unwarranted.

To see why, consider the lease for the Trump International Hotel D.C., under which the defendant is now both landlord and tenant. The complaint alleges that (1) the defendant, within days of assuming office, replaced the acting GSA administrator; (2) then, seven weeks later, the defendant released a proposed 2018 budget "increas[ing] the funding available to the GSA, whereas it cuts all or nearly all other non-defense-related agencies' budgets"; and (3) one week after that, the GSA issued a letter stating that the defendant's business is in "full compliance" with the lease—even though the lease, by its terms, forbids any "elected [federal] official" from sharing or benefiting from the lease. SAC ¶¶ 130–45. This alleged emolument—forgiving a clear breach of the lease, thus allowing the defendant's hotel to continue in operation—flows directly from the defendant's position as president. Indeed, the emolument could not have been provided if he were *not* president. And the other alleged benefits that he has received (or will soon receive) from federal agencies or state governments may likewise qualify as emoluments even under his own definition, depending on what discovery were to reveal, and hence dismissal is inappropriate. *See, e.g.*, *id.* at ¶¶ 146–49; *see also, e.g.*, Miller & Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*, Portland Press Herald, July 23, 2017, http://bit.ly/2umjtRQ (detailing thousands of dollars spent by Maine to stay at the defendant's hotels and dine in his restaurants as the state's governor attended meetings with top Trump Administration officials).

52

More broadly, what this exercise shows is that, from the perspective of foreign or domestic governments, it is impossible to disentangle the defendant's "official capacity" from his "private capacity" as owner of a sprawling business empire. He is, after all, *the president*. When government officials interact with him, or even do business with him, they cannot ignore that fact. And so this Court should not dismiss this case for failure to state a claim.

## IV. The defendant's other arguments for evading judicial review are meritless.

The defendant also urges this Court to dismiss the case—and thus immunize his conduct from judicial review—*even if* he is violating the Constitution and causing the plaintiffs cognizable harm. In support of this jarring contention, he tosses up a number of half-formed arguments touching on everything from the existence of a cause of action to the constitutionality of the relief sought. *See* Def. Br. 25–26, 48–50. He even makes an oblique reference, in a single paragraph, to the political-question doctrine, suggesting that the real remedy for his violations is with Congress. *See id.* at 50 (citing a passage from the Virginia ratifying convention in which Randolph noted that a president "may be impeached" for violating the Foreign Emoluments Clause, 3 Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 486 (2d ed. 1891)). None of these arguments comes close to requiring dismissal.

### A. The plaintiffs have a cause of action to seek equitable relief.

The defendant first contends (at 25–26) that the plaintiffs "lack a cause of action" because (as he would have it) this is "not an appropriate case" for "an equitable cause of action," and because their injuries supposedly "fall[] outside the [Emoluments] Clauses' zone of interests."

This contention has no basis in history or precedent. Injunctive actions have "long been recognized as the proper means for preventing entities from acting unconstitutionally." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Because such actions seek simply "to halt or prevent [a] constitutional violation rather than the award of money damages," they do "not ask the Court to

imply a new cause of action." *United States v. Stanley*, 483 U.S. 669, 683 (1987). Very much the contrary: "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) ("Prevention of impending injury by unlawful action is a well-recognized function of courts of equity."). Congress can change that default rule if it chooses, but it has not done so here.

The defendant doesn't dispute this general principle. Nor does he point to anything Congress has done to preclude an Emoluments Clause claim. Instead, he asks this Court (at 26) to carve out a new exception for cases involving constitutional provisions that do not create "individual rights." But the Supreme Court has already rejected this argument. *See PCAOB*, 561 U.S. at 491 n.2. Like the defendant here, the government in *PCAOB* asserted that the Court should not permit a "private right of action directly under the Constitution to challenge governmental action" that violates structural (rather than rights-conferring) provisions. *Id.* The Court disagreed. It found that there is "no reason" and "no authority" supporting the view that claims to enforce structural provisions "should be treated differently than every other constitutional claim." *Id.*; *see also LaRoque v. Holder*, 650 F.3d 777, 792–93 (D.C. Cir. 2011). That holding forecloses the defendant's argument here.

So do legions of other decisions. The Supreme Court has long allowed private parties to sue for injunctive relief to prevent the violation of a structural provision if they have standing to do so. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919 (1983) (bicameralism and presentment); *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452 (1978) (Compact Clause); *Hill v. Wallace*, 259 U.S. 44 (1922) (Commerce Clause). Indeed, these kinds of suits "have been the principal source of judicial decisions concerning separation of powers and checks and balances," *Bond v. United States*, 564

U.S. 211, 222 (2011)—underscoring the fact that the structure of the Constitution serves to protect *individuals* by defining the powers of the national government in a manner designed to ensure transparency, accountability, and integrity. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). As a result, when the president or Congress transgress the limits of their powers, a person who is injured as a result may sue to stop the violation and "vindicate her own constitutional interests." *Bond*, 564 U.S. at 220.

The defendant cannot avoid this conclusion by invoking the zone-of-interests test. First of all, the test is primarily used in statutory cases. Although it was "previously classified as an aspect of 'prudential standing,'" the Supreme Court has now "found that label inapt." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.3 (2014). The test is instead a question of statutory interpretation: "Whether a plaintiff comes within the 'zone of interests' is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* And even then, "[t]he test is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Plaintiffs need only show that they "arguably" fall within the zone of interests protected by the statute. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1301 (2017).

The test poses no barrier to review here. The defendant does not cite any case in which a court dismissed, on zone-of-interest grounds, an otherwise cognizable claim seeking to prevent the violation of a structural constitutional provision. That is not surprising. Because "individuals, too, are protected" by the Constitution's structure, "they are not disabled from relying on [structural provisions] in otherwise justiciable cases and controversies." *Bond*, 564 U.S. at 223; *see, e.g.*, *Chadha*, 462 U.S. 919 (allowing even a noncitizen to enforce the requirements of bicameralism and presentment). To argue otherwise, as the defendant does, is to miss the point of structural provisions: to protect individual liberty and dignity by creating a national government

that resists corruption and abuses. *Bond*, 564 U.S. at 222–26. Worse, the defendant's position in this case would render the zone of interests of the Emoluments Clauses a null set, offering no protection even to those—like the plaintiffs in this case—who suffer direct injury from flagrant violations of the Clauses. That result would run headlong into an unbroken, centuries-old wall of precedent: "If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object." *Id.*

## B. The declaratory and equitable relief sought is permissible and does not run afoul of *Mississippi v. Johnson.*

The defendant also tries to avoid review by challenging the relief sought. He argues (at 48–49) that "an injunction against the President in his official capacity" is "an unconstitutional remedy." But the Supreme Court has upheld injunctions against the president in his official capacity on multiple occasions since the 150-year-old case on which the defendant principally relies, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), including landmark decisions in *United States v. Nixon*, 418 U.S. 683 (1974), and *Boumediene v. Bush*, 553 U.S. 723 (2008). Many lower courts have done the same. *See generally* Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997). These cases cast considerable doubt on the continuing viability of *Mississippi v. Johnson*, which the defendant reads in its most extreme and absolute light.

But whatever its continuing force, *Mississippi* does not govern this case. It addressed only the exercise of a president's "purely executive and political" powers, and thus should not be read broadly to bar any injunction against a president, no matter the circumstances. *See* 71 U.S. at 499 (analyzing injunction's impact on duties to "assign generals" and "detail sufficient military force," which "must necessarily be performed under the supervision of the President as commander-in-chief"); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or

impropriety of issuing a mandamus, is to be determined."). In contrast to the discretionary question it faced, the Court expressly distinguished cases involving "a simple, definite duty" that is "imposed by law," and "to which nothing is left to discretion," where injunctive relief is appropriate. *Mississippi*, 71 U.S. at 498. That describes this case. The duty here is in no sense executive or political. The Foreign Emoluments Clause applies to every federal officer who occupies an "Office of Profit or Trust," not just the president. And both Clauses prohibit the receipt of benefits—a rule that leaves no room for discretion. Enforcing that rule here does not require the Court to superintend the defendant's discharge of his executive or political functions. And if his argument is that his unconstitutional acceptance of foreign and domestic governmental benefits *does* affect his executive decisions, that is all the more reason to put an end to it.

Moreover, the courts that have found it "improper" to issue relief running against the president have done so for a reason wholly inapplicable here: because "[s]uits contesting actions of the executive branch should be brought against the President's subordinates." *Al-Marri v. Rumsfeld*, 360 F.3d 707, 708 (7th Cir. 2004); *see also Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("[Denying relief against the President does not] in any way suggest[] that Presidential action is *unreviewable*. Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."). The president's violations in this case, however, are specific to him and involve no inferior officers who could be enjoined. So here, the defendant's position really does amount to an argument that his unconstitutional conduct is *unreviewable*. No court has embraced reasoning that supports that alarming conclusion, and doing so here "would permit a striking anomaly in our tripartite system of government," allowing "the President, not this Court, [to] say 'what the law is.'" *Boumediene*, 553 U.S. at 765 (quoting *Marbury*, 5 U.S. (1 Cranch) at 177)).

57

### C. The defendant's backdoor political-question argument should be rejected out of hand.

Finally, on the very last page of his brief, the defendant nods toward an argument that the plaintiffs' claims are barred by the political-question doctrine. But there might be a reason he does not mention that doctrine by name: he cannot satisfy its stringent standards. There is neither "a textually demonstrable constitutional commitment of the issue to a coordinate political department" nor "a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012). Thus, it does not fall within the tiny handful of cases that must be dismissed because they raise a political question, rather than a question with "political implications." *Id.* at 1428; *see* Matz, *Will Trump's Lawyers Rewrite and Invert the Emoluments Clause?*, Take Care, Apr. 18, 2017, http://bit.ly/2tELYLx; *see also* Tribe, Gupta, Matz & Taylor, *The Courts and the Foreign Emoluments Clause*, Casetext, Jan. 30, 2017, http://bit.ly/2kMh2Ve.

The real thrust of the defendant's argument is rhetorical—his assertion that Congress, if it thinks he is violating the Foreign Emoluments Clause, should "codify[] its preferred view by statute." Def. Br. 50. That is a nice try. Since before he took office, the defendant has gone to extraordinary and unprecedented lengths to conceal even the most basic information about his personal finances. He has even refused to publicly release his tax returns, as every modern president has done. And instead of seeking Congress's consent, he has stonewalled Congress, refusing to provide any financial details that would allow it even to evaluate (much less consent to) his "particular arrangements" with foreign governments, whatever they may be. *Id.* at 50. The notion that this unprecedented defiance—and Congress's *refusal* to provide consent to his unprecedented violations—would somehow redound to his benefit is nothing short of absurd.

That would turn the Emoluments Clause on its head: Rather than ban emoluments unless Congress permits them, the Clause would permit emoluments unless Congress bans them.

58

In our system, we have three branches of government. The most solemn obligation of the third branch is to police constitutional default rules in concrete cases and controversies. So, no, Congress is not "better equipped than the courts" to handle that very job here. Def. Br. 50. As the Supreme Court has repeatedly stressed, "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014). To dismiss this case, in the name of faux judicial restraint or whatever mysterious self-serving principle the defendant is invoking, would be an abdication of that responsibility. It would allow the defendant to slip the bonds of the Constitution, immunize his financial ties with foreign governments, and reward him for being secret about it. This Court should not permit that result.

## CONCLUSION

The defendant's motion to dismiss should be denied.

Respectfully submitted,

Dated: August 4, 2017

GUPTA WESSLER PLLC

By:   _/s/ Deepak Gupta_____
     Deepak Gupta

NORMAN L. EISEN
RICHARD W. PAINTER
NOAH BOOKBINDER
STUART C. MCPHAIL
ADAM J. RAPPAPORT
Citizens for Responsibility and Ethics in
Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 408-5565

*Attorneys for Plaintiffs Citizens for Responsibility
and Ethics in Washington (CREW)*

DEEPAK GUPTA**
JONATHAN E. TAYLOR
JOSHUA MATZ
MATTHEW W.H. WESSLER
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
(202) 888-1741
*deepak@guptawessler.com*

LAURENCE H. TRIBE*
Carl M. Loeb University Professor
and Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

ZEPHYR TEACHOUT*
Associate Professor of Law
Fordham Law School
150 West 62nd Street
New York, NY 12580
(646) 312-8722

ERWIN CHEMERINSKY*
Dean of the School of Law
University of California, Berkeley
215 Boalt Hall
Berkeley, CA 92697
(510) 642-6483

JOSEPH M. SELLERS**
DANIEL A. SMALL**
CHRISTINE E. WEBBER
ROBERT A. BRAUN
GEORGE F. FARAH
ELIZABETH ANISKEVICH
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, DC 20005
(202) 408-4600
*jsellers@cohenmilstein.com*

*Attorneys for Plaintiffs Citizens for Responsibility
and Ethics in Washington (CREW), Restaurant
Opportunities Centers (ROC) United, Inc., Jiff
Phaneuf, and Eric Goode*

*\*Affiliations noted for identification purposes only*

*\*\*Admitted pro hac vice*

60

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2017, I electronically filed a copy of the foregoing

Plaintiffs' Opposition to Defendant's Motion to Dismiss. Notice of this filing will be sent via email

to all parties by operation of the Court's electronic filing system. Parties may access this filing

through the Court's CM/ECF System.

*/s/ Deepak Gupta*
Deepak Gupta

**APPENDIX A**

Excerpted from John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523–1806*, at A2-A9 (July 12, 2017), https://ssrn.com/abstract=2995693:

Table 1: Definitions of "Emolument" in English Dictionaries, 1604–1806
Figure 1: Statistical and Longitudinal Analyses of Lexical Definitions, 1604–1806
Transcripts of English Dictionary Definitions, 1604–1806

**Table 1: Definitions of "Emolument" in English Dictionaries, 1604-1806**

| | Author | Title | 1st ed. | Image | Definition |
|---|---|---|---|---|---|
| 1 | **Cawdrey, Robert** | *A Table Alphabeticall* | 1604 | 4th ed. 1617 | "Profit or gaine" |
| 2 | **Bullokar, John** | *The English Expositor* | 1616 | 12th ed. 1719 | "Profit, gain, Advantage" |
| 3 | **Cockeram, Henry** | *The English Dictionarie* | 1623 | 1st ed. 1623 | "Profit, gaine" |
| 4 | **Blount, Thomas** | *Glossographia* | 1656 | 2d ed. 1661 | "Profit gotten by labor and cost" |
| 5 | **Philips, Edward** | *The New World of Words* | 1658 | 7th ed. 1720 | "Profit got by Labour and Cost; Benefit, Advantage" |
| 6 | **Coles, Elisha** | *A Dictionary* | 1676 | 2d ed. 1679 | "Profit" |
| 7 | **Kersey, John** | *A New English Dictionary* | 1702 | 2d ed. 1713 | "Gain properly by grist, profit got by labour and cost" |
| 8 | **Cocker, Edward** | *English Dictionary* | 1704 | 3d ed. 1724 | "Profit, Gain, Advantage" |
| 9 | **[anon]** | *Glossographia Anglicana Nova* | 1707 | 1st ed. 1707 | "Advantage, Profit" |
| 10 | **Bailey, Nathan** | *A Universal Etymological English Dictionary* | 1721 | 2d ed. 1724 | "Advantage, Profit" |
| 11 | **Bailey, Nathan** | *Dictionarium Britannicum* | 1730 | 1st. ed. 1730 | "Profit gotten by labour and cost" |
| 12 | **Manlove, James** | *New Dictionary* | 1735 | 2d ed. 1741 | "Advantage, Profit" |
| 13 | **Defoe, B.N.** | *A Compleat English Dictionary* | 1735 | 1st ed. 1735 | "Advantage, Profit" |
| 14 | **Dyche, Thomas & Pardon, William** | *A New General English Dictionary* | 1735 | 8th ed. 1754 | "Benefit, advantage, profit" |
| 15 | **Martin, Benjamin** | *Lingua Britannica Reformata* | 1749 | 1st. ed. 1749 | "Profit, benefit, or advantage" |
| 16 | **[anon]** | *A Pocket Dictionary* | 1753 | 2d ed. 1758 | "Benefit, advantage" |
| 17 | **Wesley, John** | *The Complete English Dictionary* | 1753 | 3d ed. 1777 | "Profit, advantage" |
| 18 | **Johnson, Samuel** | *A Dictionary of the English Language* | 1755 | 7th ed. 1783 | "Profit; advantage" |
| 19 | **Scott, Joseph** | *A New Etymological Dictionary* | 1755 | 1st ed. 1755 | "Profit" |

| 20 | Buchanan, James | *Lingue Britannicae Vera Pronunciatio* | 1757 | 1st ed. 1757 | "Benefit or advantage" |
|---|---|---|---|---|---|
| 21 | Rider, William | *A New Universal English Dictionary* | 1759 | 1st ed. 1759 | "Profit arising from an office or employ, gain, or advantage" |
| 22 | Bellamy, Daniel | *New Complete English Dictionary* | 1760 | 2d ed. 1764 | "Profit, advantage, benefit" |
| 23 | Fenning, Daniel | *The Royal English Dictionary* | 1761 | 5th ed. 1775 | "Profit arising from an office or employ; gain, or advantage" |
| 24 | Donaldson, Alexander | *A Universal Dictionary of the English Language* | 1763 | 1st ed. 1763 | "Profit; advantage; gain" |
| 25 | Allen, Francis | *A Complete English Dictionary* | 1765 | 1st ed. 1765 | "Profit; gain, or advantage" |
| 26 | Entick, John | *The New Spelling Dictionary* | 1765 | new ed. 1780 | "Profit, advantage, benefit" |
| 27 | Barlow, Frederick | *The Complete English Dictionary* | 1772 | 1st ed. 1772 | "Profit, gain, or advantage" |
| 28 | Kenrick, William | *A New Dictionary of the English Language* | 1773 | 1st ed. 1773 | "Profit; advantage" |
| 29 | Fisher, Anne | *An Accurate New Spelling Dictionary* | 1773 | 6th ed. 1788 | "Advantage, profit, benefit" |
| 30 | Barclay, James | *A Complete and Universal English Dictionary* | 1774 | 1st ed. 1774 | "Profit arising from an office or employ; gain or advantage" |
| 31 | Ash, John | *The New and Complete Dictionary of the English Language* | 1775 | 1st ed. 1775 | "An advantage, a profit" |
| 32 | Perry, William | *The Royal Standard English Dictionary* | 1775 | 1st ed. 1775 | "Advantage, profit" |
| 33 | Walker, John | *A Critical Pronouncing Dictionary* | 1775 | 1st ed. 1791 | "Profit, advantage" |
| 34 | Sheridan, Thomas | *A Complete Dictionary of the English Language* | 1780 | 3d ed. 1790 | "Profit, advantage" |
| 35 | Lemon, George | *English Etymology* | 1783 | 1st ed. 1783 | "…used to signify any advantage, or gain" |
| 36 | Scott, William | *Spelling, Pronouncing, Explanatory Dictionary* | 1786 | new ed. 1810 | "Profit, advantage, benefit" |

| 37 | **Jones, Stephen** | *A General Pronouncing and Explanatory Dictionary* | 1798 | new ed. 1812 | "Profit, advantage" |
|----|----|----|----|----|----|
| 38 | **Browne, Thomas** | *The Union Dictionary* | 1800 | 4th ed. 1822 | "Profit, advantage" |
| 39 | **Fulton, George & Knight, George** | *A Dictionary of the English Language* | 1802 | 3d ed. 1823 | "Profit; advantage" |
| 40 | **Webster, Noah** | *A Compendious Dictionary of the English Language* | 1806 | 1st ed. 1806 | "Profit, gain, advantage, benefit" |

# Figure 1: Statistical and Longitudinal Analyses of Lexical Definitions, 1604-1806

## Part A: Word Frequency (Bar Graph)



Number of Times a Word is Used to Define "Emolument" 1604-1806

## Part C: Definitions Over Time[Δ]

Definitions Over Time

Dates listed (first editions): 1604, 1616, 1623, 1656, 1658, 1676, 1702, 1704, 1707, 1727, 1730, 1735, 1735, 1749, 1753, 1753, 1755, 1755, 1757, 1759, 1760, 1761, 1763, 1765, 1765, 1772, 1773, 1773, 1774, 1775, 1775, 1775, 1780, 1783, 1797, 1798, 1800, 1802, 1806

Legend: ● Profit  ● Gain  ● Advantage  ● Office  ● Employ

## Part B: Word Frequency (Table)

| Word | # of Times Used | Percentage Frequency (n = 40) |
|---|---|---|
| Profit | 37 | 92.5% |
| Advantage | 33 | 82.5% |
| Gain | 13 | 32.5% |
| Benefit | 10 | 25.0% |
| Employ | 3 | 7.5% |
| Office | 3 | 7.5% |

---

[Δ] Dates listed in Part C represent first editions.  A diagram showing all published editions would be more pronounced.

**Transcripts of English Dictionary Definitions, 1604-1806**

1)  ROBERT CAWDREY, A TABLE ALPHABETICALL (4th ed. 1617).

    **Emolument**, profit or gaine.

2)  JOHN BULLOKAR, THE ENGLISH EXPOSITOR (12th ed. 1719).

    **Emolument**, Profit, Gain, Advantage.

3)  HENRY COCKERAM, THE ENGLISH DICTIONARIE (1st ed. 1623).

    **Emolument**, Profit, gaine.

4)  THOMAS BLOUNT, GLOSSOGRAPHIA (1st ed. 1656).

    **Emolument**, (*emolumentum)* profit gotten by labor and cost.

5)  EDWARD PHILIPS, THE NEW WORLD OF WORDS (3d. ed. 1720).

    **Emolument**, Profit got by Labour and Cost; Benefit, Advantage. The word properly signifies Gain arising from the Grist of a Corn-mill.

6)  ELISHA COLES, A DICTIONARY, ENGLISH-LATIN, AND LATIN-ENGLISH (2d ed. 1679).

    **Emolument**, [profit] *emolumentum.*

7)  JOHN KERSEY, A NEW ENGLISH DICTIONARY (2d ed. 1713).

    **Emolument**, gain properly by grist, profit got by labour and cost.

8)  EDWARD COCKER, ENGLISH DICTIONARY (3d ed.1724).

    **Emolument**, 1. Profit, Gain, Advantage; also Mill-toll.

9)  [ANON], GLOSSOGRAPHIA ANGLICANA NOVA (1st ed. 1707).

    **Emolument**, Advantage, Profit.

10)  NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (21st. ed. 1770).

    **Emolument**, [*Emolumentum, L.*] Advantage, Profit. F.

**A - 6**

11)  NATHAN BAILEY, DICTIONARY BRITANICUM (1st ed. 1735).

> **Emolument**, properly gain arising from the grist of a corn-mill, also profit gotten by labour and cost.

12)  JAMES MANLOVE, NEW DICTIONARY OF ALL SUCH ENGLISH WORDS (2d ed. 1741).

> **Emolument**, Advantage, Profit.

13)  B. N. DEFOE, A COMPLEAT ENGLISH DICTIONARY (1st ed. 1735).

> **Emolument**, Advantage, Profit.

14) THOMAS DYCHE & WILLIAM PARDON, A NEW GENERAL ENGLISH DICTIONARY (8th ed. 1754).

> **Emolument**, (s) benefit, advantage, profit, & c.

15) BENJAMIN MARTIN, LINGUA BRITANNICA REFORMATA: OR, A NEW ENGLISH DICTIONARY (1st ed. 1749).

> **Emolument** (of *emolumentum*, 1. of *emole* to grind thoroughly): profit gotten properly by grist; hence, by any labor and cost. 2. benefit, or advantage.

16)  [ANON], A POCKET DICTIONARY OR COMPLETE ENGLISH EXPOSITOR (2nd ed.1753).

> **Emolument**, (S.)' Benefit, advantage. *L.*

17) JOHN WESLEY, THE COMPLETE ENGLISH DICTIONARY (3d. ed. 1753).

> **Emolument**, profit, advantage.

18) SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (7th. ed. 1783).

> **Emolument**. *f*. [*emolumentum*, Latin.] Profit; advantage.

19) JOSEPH SCOTT, A NEW ETYMOLOGICAL DICTIONARY (1st ed. 1755)

> **Emolument**, Profit.

20) JAMES BUCHANAN, LINGUE BRITANNICAE VERA PRONUNCIATIO: OR A NEW ENGLISH DICTIONARY (1st ed. 1757).

> **Emolument**, (S.) Benefit or advantage.

A - 7

21) WILLIAM RIDER, A NEW ENGLISH DICTIONARY (1st ed. 1759).

> **Emolument**, (S.) (*emolumentum*, Lat.) profit arising from an office or employ, gain, or advantage.

22) DANIEL BELLAMY, ENGLISH DICTIONARY (4th ed. 1764).

> **Emolument**, [S.] profit, advantage, benefit.

23) DANIEL FENNING, THE ROYAL ENGLISH DICTIONARY: OR, A TREASURY OF THE ENGLISH LANGUAGE (5th ed. 1775).

> **Emolument**, S. [*emolumentum*, Lat.] profit arising from an office or employ; gain, or advantage.

24) ALEXANDER DONALDSON, AN UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1763).

> **Emolument**, n. s. profit; advantage; gain.

25) FRANCIS ALLEN, A COMPLETE ENGLISH DICTIONARY (1st. ed. 1765).

> **Emolument**, S. profit; gain, or advantage.

26) JOHN ENTICK, THE NEW SPELLING DICTIONARY 143 (4th ed. 1780).

> **Emol'ument**, *f*. Profit, advantage, benefit.

27) FREDERICK BARLOW, THE COMPLETE ENGLISH DICTIONARY (1st ed. 1772).

> **Emolument**, S. [*emolumentum*, Lat.] profit, gain, or advantage.

28) WILLIAM KENRICK, A NEW DICTIONARY OF THE ENGLISH LANGUAGE (1st. ed. 1773).

> **Emolument**—E-MOL-U-MENT. N. f. [*emolumentum,* Lat.] Profit; advantage.

29) ANNE FISHER, AN ACCURATE NEW SPELLING DICTIONARY (6th. ed. 1788).

> **Emolument**, n. advantage, profit, benefit.

30) JAMES BARCLAY, A COMPLETE AND UNIVERSAL ENGLISH DICTIONARY ON A NEW PLAN (1st ed. 1774).

> **Emolument**, S. [lat.] profit arising from an office or employ; gain or advantage. SYNON. Some persons are so particularly rigid as to condemn all gain arising from play. Many will idly call that *profit* which has accrued by illicit means. It is low and sordid to be ever led by *lucre.* We do not always find the greatest honour in offices where there are the greatest *emoluments.*

**A - 8**

31) JOHN ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1775).

    **Emolument** (s. *from the* Lat. emolumentum) an advantage, a profit.

32) WILLIAM PERRY, THE ROYAL STANDARD ENGLISH DICTIONARY (1st ed. 1775).

    **E-mol'u-ment**, *f*. advantage, profit.

33) JOHN WALKER, A CRITICAL PRONOUNCING DICTIONARY (1st ed. 1791).

    **Emolument**, f. Profit, advantage.

34) THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (3d. ed. 1792).

    **Emolument**, e-mol-u-ment. F. Profit, advantage.

35) GEORGE LEMON, ENGLISH ETYMOLOGY (1st ed. 1783).

    **Emolument**; mola ; a mill; mole; to grind; emole; to grind thoroughly; under *emolumentum*; profit gotten properly by grist, or whatever is ground at the mill: hence used to signify any advantage, or gain.

36) WILLIAM SCOTT, SPELLING, PRONOUNCING, EXPLANATORY DICTIONARY (new ed. 1810).

    **Emolument**, Profit, advantage, benefit.

37) STEPHEN JONES, A GENERAL PRONOUNCING AND EXPLANATORY DICTIONARY (4th ed. 1822).

    **Emolument**, Profit, advantage.

38) THOMAS BROWNE, UNION DICTIONARY (4th ed. 1822).

    **Emolument**, profit, advantage.

39) GEORGE FULTON & GEORGE KNIGHT, A DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1823).

    **Emolument**, Profit; advantage.

40) NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1806).

    **Emolument**, n. profit, gain, advantage, benefit.