**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,
RESTAURANT OPPORTUNITIES
CENTERS (ROC) UNITED, INC.,
JILL PHANEUF, and ERIC GOODE,

        *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity
as President of the United States,

        *Defendant*.

Civil Action No. 17-458 (GBD)

**BRIEF OF SENATOR RICHARD BLUMENTHAL
AND REPRESENTATIVE JOHN CONYERS, JR.,
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Brian R. Frazelle
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
david@theusconstitution.org

*Counsel for Amici Senator Richard Blumenthal
and Representative John Conyers, Jr.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... iii

INTEREST OF *AMICI CURIAE* ................................................................................... 1

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 4

I.    Enforcing the Constitutional Requirement that Federal Officials Obtain
Congressional Consent Before Accepting Any Foreign Emolument Is Essential
to Preventing Corruption and Divided Loyalty Among American Leaders ......... 4

II.   The "Consent of the Congress" Provision Offers a Simple Process that Enables
Officials To Accept Foreign Emoluments in a Manner that Ensures
Accountability and Transparency ........................................................................ 8

III.   Presidents May Own Businesses that Conduct Lucrative Transactions with
Foreign States—So Long As They Obtain Congressional Consent ..................... 14

IV.   Nothing About the Congressional Consent Provision Suggests that Only
"Political Means" Are Available To Remedy Violations of the Foreign
Emoluments Clause ............................................................................................ 18

CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Baker v. Carr*,
369 U.S. 186 (1962) ...................................................................... 4, 19

*Cohens v. Virginia*,
19 U.S. 264 (1821) ...................................................................... 17, 18

*Marbury v. Madison*,
5 U.S. 137 (1803) ........................................................................ 19

*Mistretta v. United States*,
488 U.S. 361 (1989) ...................................................................... 13

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ...................................................................... 24

*Nixon v. United States*,
506 U.S. 224 (1993) ...................................................................... 19

*Rodriguez v. United States*,
480 U.S. 522 (1987) ...................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...................................................................... 13

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ...................................................................... 18-19

<u>CONSTITUTIONAL PROVISIONS</u>

Articles of Confederation of 1781, art. VI, para. 1 ....................................... 6

U.S. Const. art. I, § 7, cl. 2.................................................................. 23

U.S. Const. art. I, § 9, cl. 8.................................................................. *passim*

U.S. Const. art. II, § 2, cl. 1 ................................................................ 19

<u>EXECUTIVE BRANCH MATERIALS</u>

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the
President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (2009) ................... 13

*Applicability of Emoluments Clause to Employment of Government Employees by Foreign
Public Universities*, 18 Op. O.L.C. 13 (1994).................................................... 8, 14, 16, 17

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Applicability of the Emoluments Clause to Non-Government Members of ACUS*,
  17 Op. O.L.C. 114 (1993) ..................................................................... 3, 8, 16

*Applicability of Emoluments Clause to Proposed Service of Government Employee on
  Commission of International Historians*, 11 Op. O.L.C. 89 (1987)......................... 15

*Application of Emoluments Clause to Part-Time Consultant for the
  Nuclear Regulatory Commission*, 10 Op. O.L.C. 96 (1986) ..................................... 6, 14-15

*Gifts from Foreign Prince - Officer - Constitutional Prohibition*
  24 Op. Att'y Gen. 116 (1902) ................................................................. 16

Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary
  Irish Citizenship: Memorandum Opinion for the Special Assistant to the President*
  (May 10, 1963) ................................................................................ 13

STATUTES AND LEGISLATIVE MATERIALS

14 *Abridgment of the Debates of Congress from 1789 to 1856* (Thomas Hart Benton ed.,
  1860).......................................................................................... 11-12

An Act to authorize the sale of two Arabian horses, received as a present by the
  Consul of the United States at Zanzibar, from the Imaum of Muscat,
  Mar. 1, 1845, 5 Stat. 730 .................................................................... 12

5 Annals of Cong. (1798) (Joseph Gales ed., 1834) ..................................... *passim*

4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution*
  (Jonathan Elliot ed., 1836) .................................................................. 6-7

Joint Resolution No. 4, A Resolution to authorize the President to dispose of certain
  presents from the Imaum of Muscat and the Emperor of Morocco, July 20, 1840, 5 Stat.
  409 ............................................................................................ 12

Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts
  from the King of Siam, Mar. 15, 1862, 12 Stat. 616................................... 13

Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to
  accept certain medals presented to him while President of the United States,
  Apr. 2, 1896, 29 Stat. 759.................................................................. 13

1 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............... 4, 7

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............... 4, 6

3 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)............... 6

iv

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152 .................................................................................. 17

5 U.S.C. § 7342(c)(1)(B) ................................................................................... 17

37 U.S.C. § 908(a) ............................................................................................ 17

<u>BOOKS, ARTICLES, AND OTHER MATERIALS</u>

Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*, Forbes (Mar. 22, 2017).................................... 22

Complaint, *Blumenthal, Conyers, et al. v. Trump*, No. 17-1154 (D.D.C. June 14, 2017) ... 1

*Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017) ....................................................................... 21, 23

*The Federalist No. 10* (Clinton Rossiter ed., 1961)......................................... 11

*The Federalist No. 22* (Clinton Rossiter ed., 1961)......................................... 1

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ...................... 15

Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* (1775).......................................................................... 15

Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790)............... 5

Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862) ................. 12-13

Letter from James Madison to David Humphreys (Jan. 5, 1803)................................. 10

Letter from Martin Van Buren to Syed Bin Sutan, Imaum of Muscat (May 8, 1840) .. 12

Letter from Martin Van Buren to the Senate (May 21, 1840) ....................................... 12

*Message from the President of the United States* (Jan. 22, 1834), *in* Message from the President of the United States to the Two Houses of Congress at the Commencement of the First Session of the Twenty-Third Congress (1833) ............................................ 11

4 John Bassett Moore, *A Digest of International Law* (1906) ....................................... 5, 10, 12

*Oxford English Dictionary* (2d ed. 1989) ........................................................ 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Steve Reilly, *Oversight Committee Asks Trump Attorney for Foreign Profit Documents*,
USA Today (Apr. 21, 2017)...................................................................... 22

David Robertson, *Debates and other Proceedings of the
Convention of Virginia* (2d ed. 1805) (1788)............................................ 7, 15

James D. Savage, *Corruption and Virtue at the Constitutional Convention*,
56 J. Pol. 174 (1994) ................................................................................ 5

Joseph Story, *Commentaries on the Constitution of the United States* § 1352
(5th ed. 1891) .......................................................................................... 15

Trump Organization, *Donation of Profits from Foreign Government Patronage* (undated
pamphlet)................................................................................................. 22

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* Senator Richard Blumenthal and Representative John Conyers, Jr., are the lead plaintiffs in *Blumenthal, Conyers, et al. v. Trump*, the lawsuit brought by nearly 200 members of Congress against President Donald J. Trump for his violations of the Foreign Emoluments Clause.[2]  *Amici* have a strong interest in ensuring that the President complies with the Foreign Emoluments Clause, which was adopted to guard against foreign influence on our nation's leaders and ensure that those leaders put the interests of the American people ahead of their own self-interest.  Moreover, as members of Congress, *amici* also have a strong interest in ensuring that their unique constitutional role in determining when federal officials may accept foreign emoluments is respected.  Because President Trump has been accepting prohibited emoluments without first obtaining the consent of Congress, he has denied members of Congress the ability to play the role that the text of the Constitution mandates.  Accordingly, *amici* have a strong interest in this case.

## INTRODUCTION

"In Republics," Alexander Hamilton warned, "persons elevated from the mass of the community by the suffrages of their fellow-citizens to stations of great pre-eminence and power may find compensations for betraying their trust, which, to any but minds actuated by superior virtue may appear . . . to overbalance the obligations of duty."  *The Federalist No. 22*, at 149 (Clinton Rossiter ed., 1961).  Mindful of this threat, the Framers included numerous safeguards against foreign influence and self-dealing in our national charter.  Among the most important is

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] *See* Complaint, *Blumenthal, Conyers, et al. v. Trump*, No. 17-1154 (D.D.C. June 14, 2017), *available at* https://www.theusconstitution.org/sites/default/files/Congress_Emoluments_ Complaint_ FINAL.pdf.

1

the Foreign Emoluments Clause, which prohibits federal officials from accepting any benefits from foreign states "without the Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8.  President Donald J. Trump has brazenly violated this prohibition by accepting untold financial benefits from foreign governments through his vast business empire, without ever obtaining "the Consent of the Congress."  *See* Second Am. Compl. ¶¶ 42-128.

*Amici* submit this brief to explain why it is so important to our constitutional structure that federal officials obtain "the Consent of the Congress" before accepting any "present, Emolument, Office, or Title, of any kind whatever," from a foreign state.  Enforcing that simple requirement is essential to preventing the corruption and divided loyalty among American leaders that the Framers feared—and that still threatens our nation today.

The Foreign Emoluments Clause's "consent" provision establishes a simple process that enables federal officials to accept benefits from foreign states in a manner that ensures accountability and transparency.  By providing a lawful avenue through which federal officials may accept such benefits—one that is open to public scrutiny and that incorporates safeguards derived from the separation of powers—the "consent" provision discourages federal officials from accepting those benefits illicitly and in secret.  This, in turn, reduces the threat that receiving them will compromise an official's loyalty or judgment.  As explained by one member of Congress more than two centuries ago, the consent provision requires officials "to make known to the world whatever presents they might receive from foreign Courts and to place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents."  5 Annals of Cong. 1583 (1798) (Joseph Gales ed., 1834) (Bayard).  Historically, presidents have obeyed the Constitution by adhering to this mandate, declining to accept benefits from foreign states without congressional consent, even when those benefits were trivial compared with the

riches that President Trump is reaping from his business dealings with foreign governments. Examining this tradition of compliance illustrates the simplicity of the process the Framers set forth in the Constitution, while highlighting President Trump's gross departure from it.

The availability of congressional consent also undermines arguments that President Trump now makes in defense of his actions.  According to President Trump, the Plaintiffs' claims regarding the scope of the word "emolument" cannot be correct because they "effectively assert that the Constitution disqualifies the President from serving as President while maintaining ownership interests in his commercial businesses."  Mem. Law in Supp. Def.'s Mot. to Dismiss, at 1 ("Mot.").  But this argument falls entirely flat with respect to President Trump's acceptance of benefits from foreign governments.  Under the "Consent of the Congress" provision, presidents and other officials may conduct whatever business with foreign governments they like, and accept whatever benefits they wish to receive from those transactions, without violating the Foreign Emoluments Clause—so long as they obtain congressional consent to do so.  As the Department of Justice's Office of Legal Counsel has explained, "The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause."  *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 121 (1993) (emphasis added by OLC).

Finally, nothing about the congressional consent provision supports President Trump's suggestion that only "political means" are available to remedy a president's Foreign Emoluments Clause violations.  The President maintains that this Court should not evaluate whether his acceptance of benefits from foreign governments is unconstitutional, because Congress is "better equipped . . . to address whether particular arrangements violate the Clause."  Mot. 50.  But the

3

judiciary, not Congress, is the "ultimate interpreter of the Constitution."   *Baker v. Carr*, 369 U.S. 186, 211 (1962).  And far from honoring Congress's role under the Foreign Emoluments Clause, the President's argument, if accepted, would eviscerate the requirement that federal officials obtain congressional consent before accepting benefits from foreign governments.  If *post hoc* action by Congress were the only remedy available when an official violates the Clause, that Clause would cease functioning as the Framers provided:  No longer would a majority of Congress be needed to approve of any foreign emolument, as the Constitution's plain language demands.  Instead, a majority would be required to *disapprove* of such an emolument—and even that would be possible only when Congress, through its own efforts, manages to discover an official's violation of the Clause.

By failing to go to Congress and disclose the "particular arrangements" through which he wishes to accept benefits from foreign governments, Mot. 50, President Trump has prevented Congress from playing the role that the Foreign Emoluments Clause actually entrusts to it: deciding when it is appropriate to consent to a federal official's acceptance of prohibited emoluments.  In doing so, the President has thwarted the accountability and transparency that the Framers believed were vital whenever an American official seeks to accept benefits, "of any kind whatever," from a foreign state.

## ARGUMENT

### I.   Enforcing the Constitutional Requirement that Federal Officials Obtain Congressional Consent Before Accepting Any Foreign Emolument Is Essential to Preventing Corruption and Divided Loyalty Among American Leaders

Recognizing that "[f]oreign powers will intermeddle in our affairs, and spare no expence to influence them," 2 *The Records of the Federal Convention of 1787*, at 268 (Max Farrand ed., 1911) (Elbridge Gerry) [hereinafter "*Convention Records*"], and that "if we do not provide against corruption, our government will soon be at an end," 1 *id.* 392 (George Mason), the Framers

included numerous safeguards against foreign influence and self-dealing in our national charter. While the Framers' goal was ambitious—establishing a government whose leaders serve the public instead of themselves—the means they employed were pragmatic.  To ward off "dependency, cabals, patronage, unwarranted influence, and bribery," the Framers relied on "procedural devices and organizational arrangements."  James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (1994); *see id*. at 177-82 (describing how fear of corruption influenced the structure of the electoral college, Congress's power to impeach, the prohibition on members of Congress holding additional offices, and the prohibition on acceptance of foreign emoluments).   Among the most important of these procedural safeguards is the Foreign Emoluments Clause, which states that no person holding an office of profit or trust under the United States may "accept of any present, Emolument, Office, or Title, of any kind whatever," from a foreign state or monarch, "without the Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8.

The Framers' adoption of this measure was a repudiation of the corruption and foreign intrigue they perceived as arising from the European practice of diplomatic gift-giving, in which ambassadors and ministers were bestowed lavish presents by the sovereigns with whom they dealt, often consisting of "jewels, plate, tapestry, or porcelain, or sometimes of money."  4 John Bassett Moore, *A Digest of International Law* 578 (1906) (quoting Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790)); *see* 5 Annals of Cong. 1589 (1798) (Bayard) ("in Holland, it was customary to give a gold chain and medal; in France, a gold snuff-box; and in Spain, a picture"); *id*. at 1587 (Venable) ("these presents were sometimes made in pictures, sometimes in snuff-boxes, and sometimes in money").  Seeking to cultivate undivided loyalty on the part of public officials, America's Founders made a clean break from such customs as soon as they

established their own national government, by including in the Articles of Confederation a nearly identical precursor to the Foreign Emoluments Clause. *See* Articles of Confederation of 1781, art. VI, para. 1 (prohibiting "any person holding any office of profit or trust under the United States, or any of them" from "accept[ing] any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state"). That measure was one of the few to be transferred from the Articles to the new Constitution in 1787, reflecting its importance to the Founding generation. *See* 2 *Convention Records* 384, 389.

While "the possibility of corruption and foreign influence of foreign ministers apparently was of particular concern to the Framers, they expressly chose not to limit the prohibition on accepting emoluments from foreign governments to foreign ministers." *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986). Instead, to guard against corruption in the highest reaches of the nation's government, the Framers "drafted the Clause to require undivided loyalty from *all* persons holding offices of profit or trust under the United States." *Id.* As Edmund Jennings Randolph later explained at the Virginia Ratifying Convention: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit *any one in office* from receiving or holding *any* emoluments from foreign states." 3 *Convention Records* 327 (emphasis added).

Indeed, even as delegates to the Constitutional Convention settled upon the need for a single president to serve as chief executive of the new government they were devising, they expressed deep concern that foreign states would give benefits and rewards to this president to subvert his loyalty. Among other precautions against that threat, the Framers rejected entrusting the treaty power solely to the president—susceptible as he was to foreign influence—and instead required Senate approval. *See* 4 *Debates in the Several State Conventions on the Adoption of the*

*Federal Constitution* 264-65 (Jonathan Elliot ed., 1836).  As Hamilton noted, the personal interest of a hereditary king was "so interwoven with that of the Nation . . . that he was placed above the danger of being corrupted from abroad."  1 *Convention Records* 289.  By contrast, Madison observed, an elected president would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption."  *Id.* at 138.  During the state debates over ratification of the Constitution, former delegate Charles Cotesworth Pinckney similarly explained that while "kings are less liable to foreign bribery and corruption . . . because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their dominions . . . . the situation of a President would be very different."  4 *Elliot's Debates* 264.  As a temporary officeholder, a president "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen."  *Id.*

By adopting the Foreign Emoluments Clause and its broad prohibition on accepting benefits from foreign states, the Framers confronted head-on the threat that corruption from abroad would undermine the integrity of American leaders, including the nation's president.  As Randolph would explain while urging ratification, "[t]here is another provision against the danger . . . of the president receiving emoluments from foreign powers. . . . I consider, therefore, that he is restrained from receiving any present or emoluments whatever.  It is impossible to guard better against corruption."  David Robertson, *Debates and other Proceedings of the Convention of Virginia* 345 (2d ed. 1805) (1788).

When the Framers added this provision to the Constitution, they made an important change to the language of its precursor in the Articles of Confederation—permitting officials to accept foreign emoluments if they obtained "the Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8.

That change reflected "practices that had developed during the period of the Confederation," in which officials sought and received permission from Congress to accept items of value from foreign states that otherwise would have been prohibited. *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 16 n.4 (1994) (citing instances under the Articles in which Congress consented to the acceptance of gifts from foreign monarchs, including miniature portraits and a horse); 5 Annals of Cong. 1585 (1798) (Otis) (citing officials who were offered gifts from foreign governments and "communicated the fact to Congress" for its approval).

By combining congressional power to approve foreign emoluments with an otherwise "sweeping and unqualified" prohibition on their acceptance, the Foreign Emoluments Clause "lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications." *ACUS*, 17 Op. O.L.C. at 121, 123 n.10. As discussed below, this arrangement furthers the Clause's vital purpose—ensuring that foreign powers do not interfere in America's internal affairs, compromise its republican institutions, and make its leaders subservient to foreign interests.

## II. The "Consent of the Congress" Provision Offers a Simple Process that Enables Officials To Accept Foreign Emoluments in a Manner that Ensures Accountability and Transparency

By providing a lawful avenue through which American officials may accept emoluments from foreign governments—one that is open to public scrutiny and incorporates safeguards derived from the separation of powers—the "Consent of the Congress" provision discourages officials from accepting emoluments illicitly and in secret, reducing the threat that receiving such benefits will compromise an official's loyalty or judgment.

When Congress was first asked to approve a foreign benefit under the Foreign Emoluments Clause, its members discussed at length the value of the "consent" provision in fostering

transparency and accountability that mitigate the risk of corruption.  In 1798, foreign envoy Thomas Pinckney was offered "the customary presents" by the kings of England and Spain, but in obedience to the Clause he "declined receiving them, saying, that he would lay the matter before Congress."  5 Annals of Cong. 1590 (1798) (Rutledge).  In the debate that followed, lawmakers echoed the views expressed a decade earlier about the dangers of foreign influence.  But they also emphasized that the very act of seeking and obtaining congressional consent in a public process helped minimize those dangers.

Representative William C.C. Claiborne described the Foreign Emoluments Clause as "intended to lock up every door to foreign influence," which "could not but prove baneful to every free country."  5 Annals of Cong. 1584 (1798).  Representative Matthew Lyon similarly declared that "he should not be willing to lay this country under an obligation to a foreign country by our Ministers accepting presents."  *Id.* at 1589.  And Representative Joseph McDowell stated that "he objected to the principle of these presents," asking: "What are they given for?  He supposed it was to gain their friendly offices and good wishes towards the country who gave them.  He thought this improper[.]"  *Id.* at 1583.

Lawmakers were particularly concerned that if American officials could accept foreign benefits at will, solely in their own discretion, the secrecy of their conduct would create the conditions most likely to foster corruption and divided loyalty.  Representative James Bayard expressed the point this way: "If presents were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors."  *Id.* at 1583.

At the same time, however, lawmakers emphasized that when officials obey the Constitution's mandate by seeking and obtaining congressional consent before accepting foreign

government benefits, the open and transparent process that ensues diminishes the risk of undue foreign influence. As Bayard explained, the Foreign Emoluments Clause requires officials "to make known to the world whatever presents they might receive from foreign Courts and to place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents." *Id.* at 1583. Representative Harrison Gray Otis similarly declared, "When every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents. For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged." *Id.* at 1585.

Thus, because "the Constitution of the United States has left with Congress the *exclusive* authority to permit the acceptance of presents from foreign governments by persons holding offices under the United States," Moore, *supra*, at 579 (quoting Letter from James Madison to David Humphreys (Jan. 5, 1803) (emphasis added)), any foreign benefits that are accepted in compliance with this process will necessarily be transparent and subject to public critique—reducing the danger of corruption that such transfers of wealth might otherwise pose. When every official wishing to accept such a benefit seeks congressional consent and thereby "comes before his country to be judged," 5 Annals of Cong. 1585 (1798) (Otis), the public has less need to fear that American leaders are sacrificing the national interest to their own self-interest when making critical policy decisions.

Moreover, by giving Congress—and only Congress—the power to decide which emoluments may be accepted from foreign states, the Framers tried to ensure that federal officials would not be in a position of deciding for themselves whether particular emoluments were likely to jeopardize their independence or lead them to unduly favor the governments offering them. No

official, in short, would be the sole judge of his own integrity.  *See The Federalist No. 10*, at 79 (Clinton Rossiter ed., 1961) (Madison) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.").

In sum, the "consent" provision of the Foreign Emoluments Clause is meant to deter American officials from secretly and illicitly accepting the largesse of foreign nations, and to steer them toward a process in which transparency and the independent judgment of a coordinate government branch help reduce the risk of corrupting foreign influence.  Befitting this goal, compliance with the "consent" provision is simple, as illustrated by Thomas Pinckney's example: an official informs Congress of a foreign benefit he wishes to accept, and Congress votes on whether or not to consent to the official's acceptance of that benefit.

Past presidents have also demonstrated the simplicity of this process, declining to accept foreign benefits without congressional consent, even when those benefits were trivial next to the riches that President Trump is reaping from his business dealings with foreign governments.  For instance:

- President Andrew Jackson transmitted to Congress in 1830 a commemorative gold medal that Colombia's president Simón Bolívar had presented to him.  Congress directed that the medal be "deposited in the Department of State."  *See Message from the President of the United States*, at 3 (Jan. 22, 1834), *in* Message from the President of the United States to the Two Houses of Congress at the Commencement of the First Session of the Twenty-Third Congress, at 259 (1833).

- President Martin Van Buren in 1840 was offered two horses, a case of rose oil, five bottles of rose water, a package of cashmere shawls, a Persian rug, a box of pearls, and a sword by the Imam of Muscat.  14 *Abridgment of the Debates of Congress from 1789 to 1856*, at

11

140-41 (Thomas Hart Benton ed., 1860).  Writing to the Imam, Van Buren explained that "a fundamental law of the Republic which forbids its servants from accepting presents from foreign States or Princes, precludes me from receiving" the items.  *Id*. at 141 (reprinting Letter from Martin Van Buren to Syed Bin Sutan, Imaum of Muscat (May 8, 1840)).  Van Buren then apprised Congress of the gifts: "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it."  *Id.* at 140 (reprinting Letter from Martin Van Buren to the Senate (May 21, 1840)).  Congress directed him to deposit the items with the State Department, selling any items that could not "conveniently be deposited or kept" there and placing the proceeds with the U.S. Treasury.  Joint Resolution No. 4, A Resolution to authorize the President to dispose of certain presents from the Imaum of Muscat and the Emperor of Morocco, July 20, 1840, 5 Stat. 409.

- President John Tyler in 1843 was offered two horses by the Imam of Muscat.  He notified Congress, seeking direction regarding the disposition of the gifts.  Moore, *supra*, at 582. Congress directed Tyler to sell the horses at auction and place the proceeds with the U.S. Treasury.  *See* An Act to authorize the sale of two Arabian horses, received as a present by the Consul of the United States at Zanzibar, from the Imaum of Muscat, Mar. 1, 1845, 5 Stat. 730.

- President Abraham Lincoln wrote to the King of Siam in 1862 regarding gifts that the King had sent to the President—two decorative elephant tusks, an ornate sword, and a photograph of the King.  Lincoln wrote that "our laws forbid the President from receiving these rich presents as personal treasures. . . . Congress being now in session at this capital, I have had great pleasure in making known to them this manifestation of Your Majesty's munificence and kind consideration."  Letter from Abraham Lincoln, President of the

United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862). Congress directed that the items be deposited with the Department of the Interior. *See* Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, Mar. 15, 1862, 12 Stat. 616.

- President Benjamin Harrison had "certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States." Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Apr. 2, 1896, 29 Stat. 759. In 1896, Congress authorized him to personally accept the medals. *Id.*

This historical tradition of compliance illustrates the process by which presidents may legitimately accept foreign government benefits while serving in office. *See Mistretta v. United States*, 488 U.S. 361, 401 (1989) ("'traditional ways of conducting government . . . give meaning' to the Constitution" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952))).[3]

President Trump's conduct grossly departs from this tradition. Where the Framers established in the text of the Constitution the exclusive mechanism by which officials may accept foreign emoluments, President Trump has substituted rules of his own making. Where the Framers elevated the transparency that arises from the process of openly seeking congressional consent, President Trump has chosen to operate in secret. Where the Framers made use of the separation

---

[3] When it has been unclear whether accepting a particular type of benefit requires congressional consent, past presidents have obeyed the independent recommendations of the Justice Department's Office of Legal Counsel. *See, e.g.*, Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* (May 10, 1963); *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (2009).

of powers to call upon the independent judgment of a coordinate branch of government, President Trump has appointed himself the sole judge of his own integrity.

### III.    Presidents May Own Businesses that Conduct Lucrative Transactions with Foreign States—So Long As They Obtain Congressional Consent

President Trump disputes the Plaintiffs' interpretation of the word "emolument" by offering an unpersuasive account of that term's meaning at the Founding. *Compare* Mot. 26-32, *with* Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss at 32-39, *and* Historians' Brief. But he also contests the Plaintiffs' interpretation because of its supposed implication that "the Constitution disqualifies the President from serving as President while maintaining ownership interests in his commercial businesses." Mot. 1. This cannot be correct, President Trump says, because "the Framers . . . gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office." *Id*. at 45-46; *see id*. at 45 ("'[N]o legislation,' including the Constitution, 'pursues its purposes at all costs.'" (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam))).

These arguments fall flat with respect to the Foreign Emoluments Clause when due regard is given to the "Consent of the Congress" provision. By empowering Congress to make exceptions to the Clause's prohibitions, the Framers enabled future lawmakers to permit the acceptance of foreign government benefits when, in their view, equitable considerations or other compelling factors justify doing so. The only reason that President Trump's business ownership has placed him outside the bounds of the Foreign Emoluments Clause is that he has refused to follow this constitutionally mandated process.

The language of the Foreign Emoluments Clause "is both sweeping and unqualified." *Foreign Public Universities*, 18 Op. O.L.C. at 17. In order to ensure "the undivided loyalty of individuals occupying positions of trust under our government," *Nuclear Regulatory Commission*,

10 Op. O.L.C. at 100, the Clause was designed to eliminate "foreign influence *of every sort*." Joseph Story, *Commentaries on the Constitution of the United States* § 1352 (5th ed. 1891) (emphasis added).  Its text makes this evident.  By prohibiting foreign "emoluments," the Framers chose a word that was then defined expansively as "profit," "advantage," "benefit," and "comfort." *See* Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining "emolument" as "Profit; advantage"); *Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for definition of "emolument" meaning "Advantage, benefit, comfort").   In the late eighteenth century, this term was used to refer to all manner of benefits, including financial profits accruing from private commerce.  *See, e.g.*, Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* 9 (1775) ("A merchant's desire is not of glory, but of gain; not of publick wealth, but of private emolument."); *see also* Historians' Brief.

    To this already broad term, the Framers added three others, followed by an emphatic modifier used nowhere else in the Constitution: "any present, Emolument, Office, or Title, *of any kind whatever*."  U.S. Const. art. I, § 9, cl. 8 (emphasis added).  By prohibiting these four distinct but overlapping types of benefits, followed by this categorical phrase, the Framers adopted a comprehensive ban on foreign benefits of *all* types.  Contrary to the notion that the Framers did not intend "redundancies" among the Clause's four listed terms, Mot. 32, such an exhaustive approach served the Framers' goal of making it "impossible to guard better against corruption," Robertson, *supra*, at 345 (statement of Randolph at Virginia Ratifying Convention).   Thus, "[c]onsistent with its expansive language and underlying purpose, the provision has been interpreted as being 'particularly directed against *every kind of influence by foreign governments* upon officers of the United States.'"  *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987)

(quoting *Gifts from Foreign Prince - Officer - Constitutional Prohibition*, 24 Op. Att'y Gen. 116, 117 (1902)) (emphasis added).  That interpretation prevents officeholders from accepting anything from a foreign state that might weaken their independence or cause them to act against the national interest—a danger the Founders perceived even in the "trifling presents," 5 Annals of Cong. 1587 (1798) (Bayard), of ornament and jewelry that motivated the adoption of the Clause.  *See supra* at 5-6.

The Framers recognized, however, that "in the course of events, a case might exist in which it might be proper for a citizen of the United States to receive a present from a foreign Government." 5 Annals of Cong. 1584 (W.C. Claiborne).  How they responded to that possibility is key.  The Framers entrusted the prerogative to make such exceptions to the peoples' representatives in Congress—and to them alone.  The Framers did not conclude, as President Trump suggests here, that the imperatives of the Foreign Emoluments Clause may be ignored when the executive branch or anyone else believes that those imperatives are unrealistic or extreme.  As the Department of Justice's own Office of Legal Counsel has explained, "The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause."  *ACUS*, 17 Op. O.L.C. at 121 (emphasis added by OLC).  In other words, the Clause "lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications." *Id.* at 123 n.10; *see Foreign Public Universities*, 18 Op. O.L.C. at 17 ("The Clause in terms prohibits . . . accepting '*any* present, Emolument, Office, or Title, *of any kind whatever*' from '*any* . . . foreign State' unless Congress consents." (emphasis added by OLC) (quoting U.S. Const., art. I, § 9, cl. 8 )).

Congress has made use of this discretionary power throughout American history.  In 1856, for instance, it passed a resolution allowing a Navy surgeon to accept a "token of thankfulness" from a foreign government for his services on behalf of one of its citizens.  *See* Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152.  Congress has exercised its power of consent "to create a limited exception for academic research at foreign public institutions of learning."  *Foreign Public Universities*, 18 Op. O.L.C. at 18 (citing 5 U.S.C. § 7342(c)(1)(B), which consents to "a gift of more than minimal value when such gift is in the nature of an educational scholarship").  And it has acted to permit retired military personnel and other officials to accept paid civil employment by foreign governments under certain circumstances.  *See* 37 U.S.C. § 908(a).

By empowering Congress to make exceptions like these to the otherwise unyielding rule of the Foreign Emoluments Clause, the Framers ensured that this rule would be workable and practicable, enabling it to last "for ages to come."  *Cohens v. Virginia*, 19 U.S. 264, 387 (1821). The availability of such exceptions and Congress's repeated granting of them undercut President Trump's arguments.  Presidents and other officials may conduct whatever business transactions with foreign governments they like, and accept whatever benefits they wish from those transactions, without violating the Foreign Emoluments Clause—so long as they obtain congressional consent to do so.  President Trump could have availed himself of that process.  He could have gone to Congress, disclosed the types of benefits from foreign governments he wished to accept, and explained to Congress why acceptance of those benefits would not compromise his loyalty to the American people and their best interests.  But he has not.

17

**IV.     Nothing About the Congressional Consent Provision Suggests that Only "Political Means" Are Available To Remedy Violations of the Foreign Emoluments Clause**

Observing that Congress has "the power to waive Foreign Emoluments Clause violations," President Trump argues that "[a]ccordingly, Congress is far better equipped than the courts to address whether particular arrangements violate the Clause," and that "political means" are therefore the only remedy available for his constitutional violations.  Mot. 50.  This argument is stunning in its audacity.  By refusing to go to Congress and seek consent for any of the benefits he has been accepting from foreign governments—details of which have emerged, if at all, primarily from the work of journalists—the President has *prevented* Congress from exercising the authority granted to it by the Foreign Emoluments Clause: deciding whether to consent to an official's acceptance of prohibited emoluments.  His suggestion that only *post hoc* legislation can put a stop to his unlawful conduct is also unsupported by any recognized principles of constitutional law or federal court jurisdiction.  And far from demonstrating respect for Congress's role under the Foreign Emoluments Clause, President Trump's argument, if accepted, would eviscerate the clear textual requirement that congressional consent be obtained before accepting foreign emoluments—along with the vital safeguards that this requirement provides against corrupting foreign influence.

The most significant feature of the President's argument is what it lacks: an explicit invocation of the "political question" doctrine.  That omission is understandable because the doctrine's strict criteria are nowhere close to being met.  The political question doctrine is a "narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (quoting *Cohens*, 19 U.S. at 404).  A controversy "'involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a

coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  *Id.* at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993) (additional quotation marks omitted)).  Neither criterion is present here.

While it is true that "the Constitution vests in Congress the power to waive Foreign Emoluments Clause violations," Mot. 50, the ability to make that discretionary choice is entirely distinct from the power to authoritatively decide which actions violate the Clause in the first place. As to *that* question, a matter of constitutional interpretation, there is no "textually demonstrable constitutional commitment of the issue" to Congress, *id.*, any more than a president's ability "to grant Reprieves and Pardons for Offences against the United States," U.S. Const. art. II, § 2, cl. 1, commits to him the power to authoritatively interpret the federal criminal laws.  Determining what the Constitution means is the role of the courts.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). The Supreme Court, not Congress, is the "'ultimate interpreter of the Constitution,'" *Nixon*, 506 U.S. at 238 (quoting *Baker*, 369 U.S. at 211), and of whether a president has violated the Constitution, *id.* ("courts possess power to review . . . executive action that transgresses identifiable textual limits").  Interpreting the meaning of the Foreign Emoluments Clause "demands careful examination of the textual, structural, and historical evidence put forward by the parties . . . . This is what courts do." *Zivotofsky*, 566 U.S. at 201.  Moreover, President Trump does not even hint that the other basis on which to invoke the political question doctrine is satisfied—a "lack of judicially discoverable and manageable standards for resolving" the plaintiffs' claims. *Zivotofsky*, 566 U.S. at 195.  No such argument is plausible.  *Cf. Nixon*, 506 U.S. at 228-33 (providing an example of when such standards are lacking).

Instead of explicitly arguing that the political question doctrine applies, President Trump suggests more vaguely that "only political means" are available "for redressing a President's

19

violation" of the Foreign Emoluments Clause.  Mot. 50.  Congress, he says, could "provid[e] consent in specific cases" or "judg[e] whether alternative approaches, such as policies implemented to effectuate the then-President-elect's pledge to donate profits from foreign governments' patronage of his hotels and similar businesses, sufficiently address concerns related to the Foreign Emoluments Clause."  *Id*.

In other words, President Trump suggests that Congress should determine what foreign benefits he is allowed to accept.  Yet the President's own actions—or, rather, his inactions—prevent Congress from doing exactly that.  Because the President has failed to go to Congress and disclose the benefits he wishes to accept from foreign governments, Congress cannot decide which, if any, benefits to approve, or how the President might structure his arrangements in a way that would guard against the corruption concerns that gave rise to the Foreign Emoluments Clause. Congress cannot consent to what it does not know.

More concretely, if President Trump had obeyed the Constitution by approaching Congress with a proposal for his acceptance of foreign emoluments through his hotels and other businesses, and sought congressional consent for that proposal, then Congress might indeed have been in a position to judge whether his preferred course of action "sufficiently address[ed] [its] concerns." *Id*.  Congress could then have debated the matter and voted on whether to consent to his plan.  *See* Section II, *supra*.  But the President has not done that.  And significantly, the Constitution dictates that the President may not accept foreign emoluments pursuant to any such plan *unless and until Congress gives its affirmative consent*.  The text of the Foreign Emoluments Clause could not be clearer on this point.  That text establishes a blanket prohibition that remains in force until Congress acts to waive the prohibition: "no Person holding any Office of Profit or Trust under

them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.

President Trump therefore has the Foreign Emoluments Clause entirely backwards. The Clause does not obligate Congress to investigate and discover the circumstances under which federal officials are accepting prohibited foreign emoluments, and then take *post hoc* votes on whether or not it deems those circumstances acceptable, in light of whatever limited information it has been able to gather. Nor does the Clause authorize federal officials to accept prohibited foreign emoluments unless and until Congress affirmatively votes to disapprove of their acceptance. Instead, the Constitution's default rule is exactly the opposite: no consent, no acceptance.

Among other things, that rule puts the burden on officials to provide enough information about the emoluments they wish to accept that *Congress* is satisfied it is appropriate to consent to the emoluments. Thus, if Congress finds an official's proposed plan to be insufficiently informative about the foreign benefits he wishes to accept, the default state of affairs remains in place—and the official may not accept those benefits. Only by persuading a majority of Congress's members to consent can the official lawfully accept benefits from a foreign state.

The facts here amply demonstrate why this default constitutional rule is so essential. Before assuming the presidency, Donald Trump promised to "voluntarily donate all profits from foreign government payments made to his hotel[s] to the United States Treasury." *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017) (statement of Sheri A. Dillon, Partner, Morgan, Lewis & Bockius LLP). Notably, this pledge extended only to earnings from his hotels, not to the myriad other types of foreign emoluments he is now accepting. *See* Second Am. Compl. ¶¶ 42-128. Yet even in regard to his hotels, the President did not explain

how "profits" would be defined, how his hotels would calculate and track those profits, or how Congress and the public could be confident that his pledge was being honored.  Months into his presidency, the Trump Organization "would not disclose" to the press "the amount of profits earned from foreign governments," Steve Reilly, *Oversight Committee Asks Trump Attorney for Foreign Profit Documents*, USA Today (Apr. 21, 2017), and the co-owner of one of his hotels said there was no plan in place at that hotel to segregate the profits from foreign governments.  Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*, Forbes (Mar. 22, 2017).

When the Oversight and Government Reform Committee of the House of Representatives requested information from the Trump Organization about how the President's promise was being implemented, it received a sparse eight-page pamphlet making clear that the Trump Organization is not tracking all payments from foreign governments or calculating the profit that stems from any individual payment.  *See* Trump Organization, *Donation of Profits from Foreign Government Patronage* (undated pamphlet), *available at* https://democrats-oversight.house.gov/sites /democrats.oversight.house.gov/files/documents/Trump%20Org%20Pamphlet%20on%20Foreig n%20Profits.pdf.  Instead, the pamphlet directs Trump hotels to make only "commercially reasonable efforts" to identify foreign government payments, because identifying them "fully and completely" is "impractical" and "would impede upon personal privacy and diminish the guest experience of our brand."  *Id.* at 5, 4.  As for calculating profits from any payments that the hotels do track, the pamphlet says that attempting to "distinctly attribute certain business-related costs as specifically identifiable to a particular customer group is not practical," because it would require "an inordinate amount of time, resources and specialists."  *Id.* at 6.

Had the President gone to Congress with his plan and sought its consent, as the Constitution requires, members of Congress would have been able to scrutinize such details and withhold their consent if unsatisfied with the proposed arrangement.  Instead, defying the Constitution's clear mandate, President Trump unilaterally implemented his own favored protocols while asserting that "this approach is best from a conflicts and ethics perspective." *Donald Trump's News Conference*, *supra* (statement of Sheri A. Dillon).  And now that he has been sued for his constitutional violations, the President brazenly insists that this Court dismiss the Plaintiffs' claims because, he says, Congress must avail itself of political remedies to put a stop to his conduct—remedies that he has made it impossible for Congress to exercise.  This argument is as astonishing as it is wrong.

Finally, President Trump maintains that "if Congress disagrees with the President . . . regarding the applicability of the Clause in individual cases," it can "enact[] legislation codifying its preferred view by statute."  Mot. 50.  But again, members of Congress cannot meaningfully disagree with the President about "individual cases" in the absence of disclosure about those cases. When a federal official systematically conceals his financial transactions from Congress and the public, as President Trump continues to do, there is no way to stop him from accepting foreign emoluments that he successfully manages to keep secret.

This argument is flawed for another reason, as well.  Legislation requires a presidential signature.  And overriding a president's veto requires two-thirds of the House and Senate.  U.S. Const. art. I, § 7, cl. 2.  As a result, insisting on the use of that remedy for an emoluments violation, to the exclusion of judicial enforcement, would invert the Foreign Emoluments Clause.  Instead of requiring a majority of Congress to *approve* of any foreign emolument, as the Constitution's plain language demands, a two-thirds majority would be required to *disapprove* of such an emolument. In other words, the Foreign Emoluments Clause would be turned on its head.

23

This catch-me-if-you-can system is not the process set forth in the Constitution by the Framers.  Our democracy risks profound damage if the courts tolerate the use of such unlawful tactics by the President, "'the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity.'"  Mot. 49 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982)).  President Trump's motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the motion to dismiss be denied.

Dated:  August 11, 2017

> */s/ David H. Gans*
> David H. Gans
>
> Elizabeth B. Wydra
> Brianne J. Gorod
> David H. Gans
> Brian R. Frazelle
> CONSTITUTIONAL ACCOUNTABILITY CENTER
> 1200 18th Street, N.W., Suite 501
> Washington, D.C. 20036
> (202) 296-6889
> david@theusconstitution.org
>
> *Counsel for Amici Senator Richard Blumenthal
> and Representative John Conyers, Jr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2017, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: August 11, 2017

<u>*/s/ David H. Gans*</u>
David H. Gans
