# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

        *Plaintiffs*,

         v.

DONALD J. TRUMP, in his official capacity as
President of the United States,

        *Defendant.*

17 Civ. 458 (GBD)

**BRIEF OF SCHOLARS OF ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, AND
FEDERAL JURISDICTION AS *AMICI CURIAE* IN SUPPORT OF THE PLAINTIFFS**

Andrea Likwornik Weiss
Gregory P. Feit
Levi Lubarsky Feigenbaum & Weiss LLP
655 Third Avenue, 27th Floor
New York, NY 10017
(212) 308-6100
aweiss@llfwlaw.com
gfeit@llfwlaw.com
*Counsel of Record for Amici Curiae*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

SUMMARY OF THE ARGUMENT ..............................................................................2

ARGUMENT ..................................................................................................................4

I.      PLAINTIFFS SATISFY THE REQUIREMENTS FOR ARTICLE III STANDING ........4

        A.      Hotel and Restaurant Industry Plaintiffs Have
                Established Competitor Standing..............................................................4

                1.      Hotel and restaurant industry plaintiffs have
                        demonstrated injury in fact. ............................................................5

                2.      Plaintiffs' competitive injuries are traceable to
                        defendant's illegal actions.............................................................10

                3.      Plaintiffs' competitive injuries would be redressed
                        by a court order. ............................................................................12

        B.      CREW Has Established Organizational Standing. .................................14

II.     PLAINTIFFS' CLAIMS COME WITHIN THE EMOLUMENTS CLAUSES'
        ZONE OF INTERESTS........................................................................................19

CONCLUSION..............................................................................................................22

APPENDIX A ................................................................................................................24

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                    <u>Page</u>

*Adams v. Watson*,
   10 F.3d 915 (1st Cir. 1993) ................................................................................. 11

*Allen v. Wright*,
   468 U.S. 737 (1984) ................................................................................... 10-11

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
   No. 11 CIV. 6746 RJH, 2011 WL 5865296 (S.D.N.Y. Nov. 22, 2011) ..................................... 1

*Becker v. FEC*,
   230 F.3d 381 (1st Cir. 2000) ................................................................................ 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 18

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................ 19

*Bond v. United States*,
   564 U.S. 211 (2011) ............................................................................. 3, 21, 22

*Bristol-Myers Squibb Co. v. Shalala*,
   91 F.3d 1493 (D.C. Cir. 1996) ....................................................................... 10, 11

*Canadian Lumber Trade Alliance v. United States*,
   517 F.3d 1319 (Fed. Cir. 2008) ............................................................................ 9

*Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*,
   471 F. Supp. 2d 295 (W.D.N.Y. 2007) ..................................................................... 2

*Citizens for Responsibility & Ethics in Wash. v. SEC*,
   858 F. Supp. 2d 51 (D.D.C. 2012) ........................................................................ 18

*Citizens for Responsibility & Ethics in Wash. v. Exec. Office of the President*,
   587 F. Supp. 2d 48 (D.D.C. 2008) ........................................................................ 18

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013) ................................................................................... 19

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ................................................................... 5, 6, 8 n.6, 9, 20

*Clinton v. Jones,*
   520 U.S. 681 (1997) ................................................................................ 14

*Cohens v. Virginia,*
   19 U.S. (6 Wheat.) 264 (1821) .................................................................. 4

*Col. River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976) .................................................................................. 4

*Cooper v. Tex. Alcoholic Beverage Comm'n,*
   820 F.3d 730 (5th Cir. 2016) ................................................................... 9

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   96 F.3d 1152 (D.C. Cir. 2005) ............................................................... 17

*Ctr. for Reprod. Law v. Bush,*
   304 F.3d 183 (2d Cir. 2002) ............................................................. 2, 5-6

*DEK Energy Co. v. FERC,*
   248 F.3d 1192 (D.C. Cir. 2001) .............................................................. 7

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ........................................................................ 21, 22

*Gottlieb v. FEC,*
   143 F.3d 618 (D.C. Cir. 1998) ................................................................ 6

*Hafer v. Melo,*
   502 U.S. 21 (1991) .................................................................................. 14

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ................................................... 14, 16, 18 n.14, 19

*In re U.S. Catholic Conf.,*
   885 F.2d 1020 (2d Cir. 1989) .................................................................. 6

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
   724 F.3d 206 (D.C. Cir. 2013) ........................................................... 4, 10

*Inv. Co. Inst. v. Camp,*
   401 U.S. 617 (1971) ..................................................................... 5, 8 n.6, 20

*Knife Rights, Inc. v. Vance,*
   802 F.3d 377 (2d Cir. 2015) .................................................................. 18

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ........................................................ 17

*La. Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998) ........................................................ 6

*LaRoque v. Holder*,
650 F.3d 777 (D.C. Cir. 2011) ........................................................ 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ........................................................ 3, 5, 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................ 4

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................ 5

*Mental Disability Law Clinic v. Hogan*,
519 F. App'x 714 (2d Cir. 2013) ........................................................ 16 & n.11, 17

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ........................................................ 2, 12, 13

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ........................................................ 21

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998) ........................................................ 5, 6, 8 n.6, 9

*Nat'l Taxpayers Union v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) ........................................................ 17

*Nat'l Treasury Employees Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ........................................................ 13

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002) ........................................................ 7, 11

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........................................................ 12

*Nnebe v. Daus*,
644 F.3d 147 (2d Cir. 2011) ........................................................ 3, 15, 16, 17 & n.12, 18 n.14, 19

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2011) ................................................................ 3, 16, 17, 19

*Oliver Sch., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991) ...................................................................... 14 n.10

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ........................................................................................ 21

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) ............................................... 3, 15, 16, 18 & n.14, 19

*Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*,
    466 F.3d 88 (2d Cir. 2006) ............................................................................... 4

*Schlesinger v. Reservists Committee To Stop The War*,
    418 U.S. 208 (1974) ................................................................................... 17 n.13

*Sherley v. Sebelius*,
    610 F.3d 69 (D.C. Cir. 2010) ....................................................................... 9, 10

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ......................................................................................... 11

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................................. 2, 4

*Sprint Commc'ns, Inc. v. Jacobs*,
    134 S. Ct. 584 (2013) ....................................................................................... 4

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ................................................................................... 14

*United States v. Carroll*,
    667 F.3d 742 (6th Cir. 2012) ........................................................................ 12

*United States v. McIntosh*,
    833 F.3d 1163 (9th Cir. 2016) ...................................................................... 21

*United States v. Payne*,
    591 F.3d 46 (2d Cir. 2010) ..................................................................... 16 n.11

*United States v. Tejeda*,
    824 F. Supp. 2d 473 (S.D.N.Y. 2010) ................................................... 16 n.11

v

*United Transp. Union v. ICC*,
   891 F.2d 908 (D.C. Cir. 1989) ............................................................... 11

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................. 5

*Ying Jing Gan v. City of N.Y.*,
   996 F.2d 522 (2d Cir. 1993) ........................................................... 14 n.10


Statutes and Rules

Fed. R. Civ. P. 56(c)(1) .................................................................... 17 n.12

U.S. Const. art. I, § 9, cl. 8 ..................................................................... *passim*

U.S. Const. art. II, § 1, cl. 7 .................................................................... *passim*

U.S. Const. art. III ....................................................................... 4, 7, 19


Other Authorities

AAA, AAA FOUR DIAMOND HOTELS (Jan. 27, 2017), bit.ly/2swH4v7 .................................... 7 n.2

Zachary Clopton, *Emoluments and Justiciability*, Dorf On Law (June 26, 2017),
   http://www.dorflaw.org/2017/06/emoluments-and-justiciability.html ........................... 13 n.8

Robert Delahunty, *Compensation, in* The Heritage Guide to the Constitution 251 (2d ed., David
   F. Forte & Matthew Spalding eds., 2014) ............................................... 21

*Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times (Nov. 23, 2016),
   https://www.nytimes.com/2016/11/23/us/politics/trump-new-york-times-interview-
   transcript.html .......................................................................... 9

Michael C. Dorf, *Why Won't Trump Forgo The Corruption Premium?*, Dorf on Law
   (Nov. 30, 2016), http://www.dorflaw.org/2016/11/why-wont-trump-
   forgo-corruption-premium.html .......................................................... 14 n.9

Google Maps, bit.ly/2snWEK3 (last visited Aug. 10, 2017) .................................. 8 n.5

Google Maps, bit.ly/2tH4lPJ (last visited Aug. 10, 2017) .................................. 8 n.7

Google Maps, bit.ly/2tOV9ZM (last visited Aug. 10, 2017) ................................. 7 n.1

Neil Harris, Business Economics: Theory and Application (Routledge 2001) ............................. 9

Stephanie Kanowitz, *Hotels Step Up Their Game To Attract Embassy Business*,
   Wash. Diplomat (Mar. 31, 2016), bit.ly/2tw5cCk ............................................. 8 n.4

David Robertson, Debates and Other Proceedings of the Convention of Virginia
   (2d ed. 1805) (1788) .................................................................................................. 20

Zephyr Teachout, *The Anti-Corruption Principle*,
   94 Cornell L. Rev. 341 (2009).................................................................................. 20

*The Federalist No. 73*, The Federalist Papers 358
   (Jim Miller ed., Dover Publications 2014) (1788).................................................... 20

*Top Hotels in New York City: Readers' Choice Awards 2016*, Condé Nast Traveler
   (Oct. 18, 2016) http://www.cntraveler.com/readers-choice-awards/united-states/new-
   york-city-top-hotels ............................................................................................. 7 n.3

Adrian Vermeule, *The Constitutional Law of Official Compensation*,
   102 Colum. L. Rev. 501 (2002)................................................................................ 20

## PRELIMINARY STATEMENT

This case concerns the application of the Foreign and Domestic Emoluments Clauses to the President of the United States—an issue that is rarely litigated in federal court. But it also involves the justiciability of constitutional claims brought by individuals and organizations—and in this respect, it implicates thousands of cases that are filed and resolved each year. *Amici* are concerned that the defendant's motion to dismiss misconstrues Supreme Court and Second Circuit case law regarding competitor standing, organizational standing, and the zone-of-interests test, and that the defendant's arguments—if accepted—would curtail access to the federal courts for plaintiffs seeking to enforce the Constitution's guarantees.

*Amici* are scholars of administrative law, constitutional law, and federal jurisdiction who teach these and related subjects to students at law schools across the country. They take a professional interest in the proper construction of constitutional and prudential limits on justiciability in federal courts. They bring a perspective informed by more than 370 combined years of teaching, research, and writing focused on questions related to those posed by this case. A full list of *amici* is contained in Appendix A.

While the parties' submissions naturally focus on the immediate implications of this Court's decision for the claims asserted here, *amici* seek to shed light on the ramifications of the Court's decision for other litigants potentially affected. With this brief, they seek to alert the Court to relevant legal arguments and precedents that bear on threshold questions of justiciability. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 CIV. 6746 RJH, 2011 WL 5865296, at *2 (S.D.N.Y. Nov. 22, 2011) ("An *amicus* brief should normally be allowed when . . . the *amicus* has an interest in some other case that may be affected by the decision in the present case . . . , or when the *amicus* has unique information or perspective that

can help the court beyond the help that the lawyers for the parties are able to provide." (quoting *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007))).

## SUMMARY OF THE ARGUMENT

On the merits, this case presents questions of first impression regarding the scope of the Foreign and Domestic Emoluments Clauses. The threshold question of standing, by contrast, is answered by Supreme Court and Second Circuit precedent, which together establish that the plaintiffs have standing to pursue their claims. The plaintiffs likewise pass the prudential "zone of interests" test, as the Supreme Court has long allowed individuals and organizations to enforce structural provisions of the Constitution in justiciable cases and controversies.

For plaintiffs Eric Goode, Jill Phaneuf, and ROC United, justiciability is based on the well-settled doctrine of competitor standing. They have suffered cognizable injuries caused by the defendant's violations of the Emoluments Clauses because they "personally compete[] in the same arena" as the defendant's hotels and restaurants. *See Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). Their injuries are also "fairly traceable to the challenged conduct of the defendant" because their injuries arise directly out of increased competition from the defendant's businesses. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). And the equitable relief they request lies entirely within this Court's power: the plaintiffs seek to prevent the defendant from receiving payments from government clients through his *personal* businesses, not to "enjoin the President in the performance of his official duties." *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867).

For the remaining plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"), justiciability is based on a clear line of Second Circuit case law articulating the

doctrine of organizational standing. Under these cases, an organization suffers a cognizable injury when the defendant's conduct makes it more difficult and costly for the organization to carry out its established mission. *See Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904–05 (2d Cir. 1993); *Nnebe v. Daus*, 644 F.3d 147, 156–58 (2d Cir. 2011); *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294–96 (2d Cir. 2011). Though other circuits may have different views of organizational standing, the Second Circuit's precedents control the outcome here. *See Nnebe*, 644 F.3d at 157 (acknowledging differences among circuits).

Finally, the plaintiffs' claims comfortably satisfy the test for the "zone of interests" protected by the Emoluments Clauses. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388–90 (2014). The Emoluments Clauses are designed to combat corruption: they prevent the President (or, in the case of the Foreign Emoluments Clause, any federal officeholder) from using his position of power in ways that enrich himself personally while making the citizenry worse off. The plaintiffs argue that they have been made worse off individually because the President has used his position of power for self-enrichment. Their interests thus are among those that the Emoluments Clauses secure. The Emoluments Clauses, moreover, serve structural purposes: their restrictions on the receipt of emoluments by the President from foreign, federal, state, and local governments undergird both the separation of powers and our system of federalism. Plaintiffs who suffer cognizable harms caused by violations of the Constitution's structural provisions may enforce those provisions in court. *See Bond v. United States*, 564 U.S. 211, 223 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.").

Both the Supreme Court and Second Circuit have repeatedly recognized that federal courts have a "'virtually unflagging obligation to exercise the jurisdiction given them.'" *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (quoting *Col. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (alteration omitted)); *see Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590–91 (2013) ("Federal courts . . . have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))). Having met the requirements for constitutional standing and satisfied the zone-of-interests test, the plaintiffs are entitled to the resolution of their claims on the merits.

## ARGUMENT

## I.   PLAINTIFFS SATISFY THE REQUIREMENTS FOR ARTICLE III STANDING

A suit under the Emoluments Clauses is like any other: the plaintiffs must demonstrate that they meet the "irreducible constitutional minimum of standing" required by Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs Eric Goode, Jill Phaneuf, and ROC United do so because they have "competitor standing," and plaintiff Citizens for Responsibility and Ethics in Washington does so because it has "organizational standing." *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013) (distinguishing "competitor standing" and "organizational standing").

### A.   Hotel and Restaurant Industry Plaintiffs Have Established Competitor Standing.

Plaintiffs claiming competitor standing must show that they meet the three conditions for constitutional standing: that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Spokeo*, 136 S. Ct. at 1547. The hotel and restaurant industry plaintiffs

satisfy all three requirements. This Court need not presume, as it may on a motion to dismiss, "that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint."). Here, the plaintiffs have satisfied all three requirements with particularity.

### 1. Hotel and restaurant industry plaintiffs have demonstrated injury in fact.

The plaintiffs have alleged that their businesses compete for government customers with hotels, restaurants, and other properties that President Trump owns. They have also alleged that President Trump has violated the Emoluments Clauses by accepting payments from governmental clients at those competitor properties. The violation of the Emoluments Clauses thus causes the plaintiffs competitive injury.

It is well settled that businesses have standing to challenge illegal actions that provide a competitive advantage to other businesses in the same market. *See, e.g.*, *Lexmark*, 134 S. Ct. at 1391 (finding business competitor has standing to sue for harms caused by false advertising); *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co. ("NCUA")*, 522 U.S. 479, 488 (1998) (reaffirming that "competitors of financial institutions have standing to challenge agency action relaxing statutory restrictions on the activities of those institutions"). To establish competitor standing, a plaintiff must show that she is "sufficiently injured by the competition . . . to create a case or controversy." *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.13 (1987); *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971). Courts of appeals have interpreted this requirement to mean that a plaintiff must show that she "personally competes in the same arena" with the party who has received an illegal benefit or whose presence in the market is unlawful. *See Ctr. for*

5

*Reprod. Law*, 304 F.3d at 197; *Becker v. FEC*, 230 F.3d 381, 387 n.5 (1st Cir. 2000); *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998); *In re U.S. Catholic Conf.*, 885 F.2d 1020, 1029 (2d Cir. 1989).

The Supreme Court's competitor standing cases confirm that a plaintiff need not show that she and her competitor offer identical goods and services to the exact same customers. For example, in *National Credit Union Administration*, the Court held that plaintiff banks had standing to challenge a regulator's ruling that allowed AT&T Family Federal Credit Union to enroll members who were employees of companies other than AT&T. The Court did not ask whether any of the plaintiff banks' customers worked for a company whose employees the AT&T credit union sought to enroll. It was enough that the AT&T credit union competed in the same market as the banks. *See NCUA*, 522 U.S. at 488 n.4 (explaining that banks "have suffered an injury-in-fact because the NCUA's interpretation allows persons who *might* otherwise be their customers to be members, and therefore customers" of the AT&T credit union (emphasis added)). Likewise, in *Clarke*, the Court held that a trade association of securities brokers, underwriters, and investment bankers had standing to challenge a regulatory decision allowing Security Pacific National Bank of Los Angeles to offer discount brokerage services to the public at nonbranch offices. The Court did not ask whether any members of the trade association sold discount services in close proximity to Security Pacific's locations; again, it was enough that the association's members offered services similar to Security Pacific's nationwide. *See Clarke*, 479 U.S. at 392–393 & n.5; *see also La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (Garland, J.) ("[P]etitioners establish their constitutional standing by showing that the challenged action authorizes allegedly illegal transactions that have the clear and immediate *potential* to compete with the petitioners' own sales. They need not wait for specific, allegedly

illegal transactions to hurt them competitively." (emphasis in original; internal quotation marks omitted)).

There are, to be sure, circumstances in which the allegedly illegal competition occurs in a market so far removed from the plaintiff's that the "same arena" standard is not satisfied. *See, e.g.*, *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (no standing where plaintiff sought to challenge agency action giving rise to "vague probability" that natural gas would "arrive at a point several hundreds of miles from [plaintiff]'s market"). But where government action "provides benefits to an existing competitor or expands the number of entrants in the [plaintiff]'s market," then the plaintiff "suffers cognizable injury under Article III." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).

Plaintiffs Goode, Phaneuf, and ROC United all clear that bar comfortably. Goode owns three hotels and three restaurants within a mile-and-a-half radius of Trump SoHo New York. 2d Am. Compl. ¶ 18.[1] The defendant contends that Goode's hotels do not directly compete with Trump's hotels because "the Trump-named Hotels are AAA five-diamond hotels, whereas Goode's hotels are not." Mot. to Dismiss 17. But no court has ever suggested that constitutional standing hinges upon how the American Automobile Association rates hotels.[2] Surely, two luxury hotels within four blocks of Houston Street both "compete in the same arena," and that fact is not negated by slight differences in ratings from various sources.[3]

---

[1] *See* Google Maps, bit.ly/2tOV9ZM (last visited Aug. 10, 2017).
[2] Goode's Bowery Hotel is an AAA Four Diamond Hotel. *See* AAA, AAA FOUR DIAMOND HOTELS (Jan. 27, 2017), bit.ly/2swH4v7; Goode Decl. ¶ 10.
[3] The Bowery Hotel is ranked two places above Trump SoHo on the *Condé Nast Traveler* Readers' Choice Awards 2016 list of top hotels in New York City. *Top Hotels in New York City: Readers' Choice Awards 2016*, CONDÉ NAST TRAVELER (Oct. 18, 2016), http://www.cntraveler.com/readers-choice-awards/united-states/new-york-city-top-hotels (ranking the Bowery Hotel 33rd and the Trump SoHo 35th).

Phaneuf, for her part, has alleged that she "specifically seeks to book embassy functions and political functions involving foreign governments" at the Kimpton Carlyle Hotel Dupont Circle and the Kimpton Glover Park Hotel in Washington, D.C. 2d Am. Compl. ¶ 221. This allegation is amply supported.[4] The Kimpton Carlyle Hotel is within five blocks of more than a dozen embassies,[5] while the Kimpton Glover Park Hotel is across the street from the Embassy of the Russian Federation. Phaneuf Decl. ¶ 22. These hotels "compete[] in the same arena" as the Trump International Hotel in Washington, D.C., which specifically markets itself to diplomatic clients. *See* 2d Am. Compl. ¶¶ 60–87.

Finally, plaintiff ROC United satisfies the injury-in-fact requirement based on the competitive harm to its member restaurants and restaurant employees, who directly compete with restaurants owned by or otherwise affiliated with the defendant.[6] ROC United's members include, among others, The Modern, located three-and-a-half blocks from Trump Tower in Midtown Manhattan, and Gramercy Tavern, located approximately equidistant from Trump Tower and Trump SoHo. Jayaraman Decl. ¶ 23.[7] To be sure, The Modern has only two Michelin stars, and Gramercy Tavern has only one, while Jean-Georges at Trump Tower—as the defendant emphasizes—has three. *See* Mot. to Dismiss 17. But even under the narrowest

---

[4] Indeed, the diplomatic press in Washington, D.C., has noted efforts by the Kimpton Carlyle and Glover Park Hotels to cater to embassy clients. *See* Stephanie Kanowitz, *Hotels Step Up Their Game To Attract Embassy Business*, WASH. DIPLOMAT (Mar. 31, 2016), bit.ly/2tw5cCk.

[5] *See* Google Maps, bit.ly/2snWEK3 (last visited Aug. 10, 2017).

[6] Courts have long allowed trade associations to litigate on their members' behalf when the members can demonstrate competitive injury and the relief they seek is an injunction preventing illegal competition from continuing. *See NCUA*, 552 U.S. at 483 (allowing American Bankers Association to litigate on behalf of members injured by assertedly illegal competition from credit unions); *Clarke*, 479 U.S. at 392 (allowing Securities Industry Association to litigate on behalf of members injured by assertedly illegal competition from bank discount brokerage services); *Inv. Co. Inst.*, 401 U.S. at 618-19 (allowing trade associations to litigate on behalf of members injured by assertedly illegal competition from banks offering collective investment funds).

[7] *See* Google Maps, bit.ly/2tH4lPJ (last visited Aug. 10, 2017).

definition of the relevant "arena," Michelin star restaurants in Lower and Midtown Manhattan with international reputations and similar price points are in competition with one another.

The fact that New York City and Washington, D.C., are home to thousands of hotels and restaurants does not undermine the plaintiffs' competitive injury claims. So too were there thousands of banks at the time of *NCUA*, and thousands of securities brokers at the time of *Clarke*. And though the defendant asserts that there is "[n]o law of economics" suggesting that hotels and restaurants affiliated with the plaintiffs will lose business to Trump-owned or Trump-affiliated enterprises, *see* Mot. to Dismiss 21, it is a fundamental principle of economics—and the premise underlying competitor standing—that a competitor's relative advantage will reduce profits for sellers in the same market. *See* Neil Harris, Business Economics: Theory and Application 93 (Routledge 2001) (noting that "greater competition will drive down prices," and "profits will fall" for previously profitable firms); *see also Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) ("It is a basic law of economics that increased competition leads to actual economic injury."); *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) ("increased competition almost surely injures a seller in one form or another"); *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) ("economic logic" suggests that "plaintiff will likely suffer an injury-in-fact" from increase in competition). This is especially true where, as here, the competitor enjoys an advantage available to no other market participant: access to the power of a national office. *See Donald Trump's New York Times Interview: Full Transcript*, N.Y. Times (Nov. 23, 2016), https://www.nytimes.com/2016/11/23/us/politics/trump-new-york-times-interview-transcript.html (noting that "because I'm president," the Trump brand "is certainly a hotter brand than it was before").

## 2.    Plaintiffs' competitive injuries are traceable to defendant's illegal actions.

Once a plaintiff establishes an injury based on illegal competition, the causation prong of the constitutional standing test is "easily satisfied." *See Int'l Bhd. of Teamsters*, 724 F.3d at 212. And so it is here. The plaintiffs' injuries are directly traceable to the conduct of the defendant, who—in violation of the Emoluments Clauses—has continued to compete with the plaintiffs for the business of government clients.

The defendant suggests that the plaintiffs cannot satisfy the causation requirement because their injuries "depend on the actions of third parties not before this Court," i.e., customers that patronize Trump's hotels, restaurants, and other properties rather than plaintiffs' businesses. *See* Mot. to Dismiss 22. But that argument fails for two independent reasons. First, it mischaracterizes the plaintiffs' injuries as related only to the actions of customers, and thus ignores the fact that exposure to illegal competition itself constitutes an injury. *See Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996) (injury in competitor standing cases "is not lost sales, per se," but "exposure to competition" that the plaintiff alleges to be illegal); *Sherley*, 610 F.3d at 74 (plaintiffs experience "actual, here-and-now injury" when defendant's actions "have intensified the competition for a share in a fixed amount of money" and thus have compelled plaintiffs "to invest more time and resources").

Second, plaintiffs can and routinely do satisfy the causation requirement for constitutional standing even when their injuries depend in some sense on the actions of third parties. The relevant question is whether the plaintiff's injuries can be fairly traced through the third party's intervening action back to the defendant's conduct. In some circumstances, the "links in the chain of causation between the [defendant's] conduct and the asserted injury" will be "too weak for the chain of causation as a whole to sustain [the plaintiff's] standing." *See Allen*

10

*v. Wright*, 468 U.S. 737, 759 (1984); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) (causation requirement not satisfied where third party's action is "independent" of defendant's conduct). But in "'garden variety competitor standing cases,'" courts "simply acknowledge a chain of causation 'firmly rooted in the basic law of economics.'" *New World Radio*, 294 F.3d at 172 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)); *accord Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993); *cf. Lexmark*, 134 S. Ct. at 1391 (competitor may sue for injuries caused by false advertising, even though "[i]n a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising"; "intervening step of consumer deception" does not deprive competitor of ability to sue).

The plaintiffs ask this Court to acknowledge nothing more than that here. If the defendant ceases to accept business from government clients, or ceases to benefit personally from such business, the plaintiffs will no longer face a rival who enjoys the advantages attendant to occupying a national office when wooing customers. The plaintiffs will need to invest less time and energy to attract government clients; they will face a more level competitive playing field; and they will likely have more business in the end. But regardless of how many customers and how many sales the defendant diverts from the plaintiffs, the very fact that the defendant's illegal conduct causes the plaintiffs to face increased competition is sufficient to satisfy the causation prong for constitutional standing. *See Bristol-Myers Squibb*, 91 F.3d at 1499 (injury in competitor standing cases "is not lost sales, per se," but "exposure to competition" that is allegedly illegal).

### 3. Plaintiffs' competitive injuries would be redressed by a court order.

Just as the plaintiffs' injuries are caused by the defendant's illegal conduct, so too can they be redressed by a court order directed at the defendant. *See United States v. Carroll*, 667 F.3d 742, 745 (6th Cir. 2012) (noting that the causation and redressability elements of constitutional standing "often go hand in hand"). In addition to declaratory relief, the plaintiffs seek a court order enjoining the defendant from violating the Emoluments Clauses in the future. Because the relevant harm is illegal competition, an injunction stopping the defendant from continuing that illegal competition would straightforwardly redress the plaintiffs' injuries.

Such a remedy would also be consistent with the general rule that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) at 501. The defendant has no official duty to own and operate a global network of hotels, restaurants, and other businesses while he is President, and he certainly has no duty to accept emoluments from government clients while in office. The defendant's acceptance of payments as a business owner thus does not fall within even "the 'outer perimeter' of his official responsibility" as President. *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). Because the illegal conduct that the plaintiffs seek to stop lies outside the scope of the President's official duties, the holding of *Mississippi v. Johnson* does not apply here. *See also Nixon*, 457 U.S. at 759 (Burger, C.J., concurring) (Presidents "are not immune for acts outside official duties").

Moreover, the holding in *Mississippi v. Johnson*, by its own terms, only bars a court from enjoining the President with respect to matters that the law leaves to his discretion. Where there is "no room for the exercise of judgment" on the President's part, *Mississippi v. Johnson*'s limitation on the courts' equitable powers do not apply. *See Mississippi v. Johnson*, 71 U.S. (4

Wall.) at 499. The present case thus lies beyond the scope of *Mississippi v. Johnson*'s holding. The President cannot receive payments from foreign governments absent authorization from Congress, and under no conditions can he receive emoluments from the states or from the federal government (other than his statutory compensation).[8] These are not matters left to his discretion or to the exercise of his judgment. Thus, *Mississippi v. Johnson* does not stand in the way of a remedy. *See Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 611 (D.C. Cir. 1974) ("the Judicial power, by compulsory process or otherwise," includes the ability "to prohibit the Executive from engaging in actions contrary to law").

The captioning of the plaintiffs' complaint as a suit against the defendant in his "official capacity" does not alter this analysis. That caption accurately reflects the reality that the defendant's conduct is illegal by virtue of the fact that he is President. If he were not a federal official, he could continue to receive payments from foreign governments. And if he were not the President, he could continue to receive emoluments from federal, state, and local government clients—at least without running afoul of the Domestic Emoluments Clause.

In any event, however the case is captioned, plaintiffs' prayer for relief by its terms does not seek to direct the defendant in his performance of his official duties, alter the actions of the Executive Branch of which he sits at the head, or constrain his successors in office. Although the defendant's status as President gives rise to the illegality at issue, a judicial remedy that redresses the plaintiffs' injuries would not require the President to take any action—or decline to take any

---

[8] The fact that the Foreign Emoluments Clause conditions the President's receipt of emoluments on the consent of Congress does not make the provision nonjusticiable. To be sure, if Congress permits the President to receive foreign emoluments, the courts cannot second-guess Congress's decision. But the courts have a role in ensuring that the President does not seek to bypass congressional consent. *See* Zachary Clopton, *Emoluments and Justiciability*, Dorf On Law (June 26, 2017), http://www.dorfonlaw.org/2017/06/emoluments-and-justiciability.html (noting that courts routinely enforce "consent of Congress" provisions in Article I that share the same structure as the Foreign Emoluments Clause).

action—in his official capacity. *Cf. Hafer v. Melo*, 502 U.S. 21, 25 (1991) (official-capacity relief binds the government and the defendant's successors in office). All he would have to do is to cease accepting emoluments from government clients.[9] These are not official acts. *See Clinton v. Jones*, 520 U.S. 681, 694 (1997) ("[W]e have never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity.").[10]

## B.    CREW Has Established Organizational Standing.

In addition to the plaintiffs who have standing based on competitive injuries, CREW has established standing based on organizational harms. While this Court's jurisdiction is secure as long as one plaintiff has standing, the Court should recognize CREW's standing because it may prove relevant to the scope of the remedy. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

As the Supreme Court held in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), an organization suffers a cognizable "injury in fact" when the defendant's conduct puts a "drain on the organization's resources" and thereby "perceptibly impair[s]" its ability to carry out its mission. CREW's mission is to "foster an ethical and accountable government" by—

---

[9] At this stage of the proceedings, of course, it would be premature for this Court to formulate a detailed order specifying exactly what steps the President would need to take to divest, if he chooses that option. *See* Michael C. Dorf, *Why Won't Trump Forgo The Corruption Premium?*, Dorf on Law (Nov. 30, 2016), http://www.dorfonlaw.org/2016/11/why-wont-trump-forgo-corruption-premium.html.

[10] Insofar as the defendant suggests that the plaintiffs should have sued the President in his personal capacity instead, we note that this claim—even if true—would not warrant dismissal of the plaintiffs' complaint. *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529–30 (2d Cir. 1993) (explaining that "the failure of a complaint to specify that claims against government officials are asserted against them in their individual capacities generally does not warrant an outright dismissal at the pleading stage"). Rather, the proper course is to "construe the complaint as asserting claims against the individual defendants in their personal capacities." *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 252 (2d Cir. 1991).

among other activities—monitoring and exposing the influence of money in politics. 2d Am. Compl. ¶¶ 8–10. That mission is more difficult and costly to carry out when the President receives payments from various governments through opaque channels and fails to seek congressional approval for those activities as required by law. *Id.* ¶¶ 10, 177. CREW has, moreover, identified specific projects that it has been unable to complete because of this drain on its resources. *Id.* ¶¶ 164, 166, 171–73. This diversion of CREW's resources will cease if this Court enjoins the defendant from receiving illegal emoluments.

Second Circuit case law confirms that CREW has organizational standing to pursue its claims. In its leading case on organizational standing, the Second Circuit held that a nonprofit organization had standing to bring housing discrimination claims against a leasing agent whose advertisements for luxury residential apartments in the *New York Times* featured only white models. *See Ragin*, 6 F.3d at 901–02, 904–05. The court found that the organization had demonstrated a cognizable injury based on the deputy director's testimony that "she and her small staff devoted substantial blocks of time to investigating and attempting to remedy the defendants' advertisements." *Id.* at 905; *see also id.* (noting that the deputy director "personally devoted 150 to 200 hours working on this case").

The Second Circuit has followed and reaffirmed *Ragin*'s holding in subsequent cases. For example, in *Nnebe*, the court held that the Taxi Workers Alliance had organizational standing to bring a due process challenge to the Taxi and Limousine Commission's procedure for suspending certain drivers because "the Alliance has expended resources to assist its members who face summary suspension." *Nnebe*, 644 F.3d at 157. The court acknowledged that the evidence of organizational injury in that case was "scant," but it went on to find standing because the organization bore "some perceptible opportunity cost" as a result of its efforts to address the

defendant's unconstitutional conduct. *See id.* The court added that "so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging a particular policy preference.'" *Id.* (quoting *Havens Realty*, 455 U.S. at 379 n.20) (alteration omitted).

Contrary to defendant's suggestion (Mot. to Dismiss 12), *Havens Realty* standing is not limited to cases where Congress has created statutory rights with a private right of action. In *New York Civil Liberties Union*, the court held that an organization had standing to bring a First Amendment challenge to a transit authority policy that excluded observers from certain hearings. 684 F.3d at 289–91. The court said that the organization had demonstrated a "cognizable" injury because "the access policy has impeded . . . the organization's ability to carry out [its professional] responsibility" to clients. *Id.* at 295. Most recently, in *Mental Disability Law Clinic v. Hogan*, 519 F. App'x 714 (2d Cir. 2013), the court held that a law school clinic had organizational standing to sue a state agency for First and Fourteenth Amendment violations "[i]n light of the Clinic director's affidavit stating that the Clinic has diverted resources from education and training in order to contest the [agency] practice at issue in this case." *Id.* at 717.[11]

CREW's standing claim is at least as strong as those in the above-cited Second Circuit cases. As in *Ragin*, CREW staff members have "devoted substantial blocks of time to investigating and attempting to remedy" the defendant's illegal conduct. *Cf. Ragin*, 6 F.3d at 905. As in *Nnebe*, the defendant's illegal conduct has diverted the organization's resources from other activities—and, indeed, CREW's allegations of diversion are substantially more detailed

---

[11] Although the decision in *Mental Disability Law Clinic* is an unpublished summary order, that "does not mean that the court considers itself free to rule differently in similar cases." *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010); *see also United States v. Tejeda*, 824 F. Supp. 2d 473, 475 (S.D.N.Y. 2010) (unpublished orders of the Second Circuit "constitute valuable appellate guidance").

than the claims found sufficient for standing in *Nnebe*. *Cf. Nnebe*, 644 F.3d at 156–58.[12] As in

*New York Civil Liberties Union*, the defendant's conduct has raised the cost to the organization

of gathering the information it needs to carry out its mission. *Cf. N.Y. Civil Liberties Union*, 684

F.3d at 295. And as in *Mental Disability Law Clinic*, the effort to stop the defendant's assertedly

illegal conduct has diverted the organization's attention and resources away from other activities.

*Cf. Mental Disability Law Clinic*, 519 F. App'x at 717.[13] Under Second Circuit case law, these

injuries go well beyond the bare minimum for organizational standing necessary to survive a

motion to dismiss.

The out-of-circuit cases cited by the defendant do not change this conclusion. None of

those cases involves concrete allegations of organizational injury similar to those advanced by

CREW. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d

1083, 1089 (9th Cir. 2010) (no standing because "[n]owhere in the complaint" does the plaintiff

organization "assert a frustration of its purpose or diversion of its resources"); *Ctr. for Law &*

*Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (no standing "when the only

'injury' arises from the effect of the regulations on the organizations' lobbying activities"); *Nat'l*

*Taxpayers Union v. United States*, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995) (no standing to

challenge estate tax increase where impact of tax increase on organization's fundraising is

---

[12] Indeed, *Nnebe* was decided on a motion for summary judgment, meaning that the burden on the plaintiff to support its allegations in that case was higher than it is here on a motion to dismiss. 644 F.3d at 155-56; *see* Fed. R. Civ. P. 56(c)(1).

[13] CREW's injury is thus based on specific harms to its particular mission of monitoring and publicizing the role of money in politics, rather than a generalized interest in securing compliance with the law, which was the injury the Court found insufficient in *Schlesinger v. Reservists Committee To Stop The War*, 418 U.S. 208, 216–17 (1974).

"entirely speculative" and "no evidence" supports claim that tax increase has resulted in higher operating costs).[14]

The defendant's concern that finding standing for CREW would allow "virtually all organizations" to sue government officials based on "abstract disagreements" is misplaced. Mot. to Dismiss 15. First, CREW is a 15-year-old organization with a well-documented history of monitoring and exposing the influence of money in politics. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. SEC*, 858 F. Supp. 2d 51, 57–61 (D.D.C. 2012); *Citizens for Responsibility & Ethics in Wash. v. Exec. Office of the President*, 587 F. Supp. 2d 48, 60–61 (D.D.C. 2008); 2d Am. Compl. ¶ 8. This is not a case of an organization springing up for the sole purpose of pursuing a particular suit or suddenly changing its mission for the same reason. Second, *Havens Realty* is a 35-year-old precedent, and *Ragin* has been on the books for almost a quarter century. If finding organizational standing in a case like this would open the floodgates, the flood would have long since washed over the courts in the Second Circuit. It hasn't. Third, and relatedly, there are a number of limits on organizational litigation aside from constitutional standing. To survive a motion to dismiss, an organization's claim of injury must be more than a "naked assertion" devoid of "further factual enhancement"; it must cross "the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). So too, an organizational plaintiff—like any other plaintiff—must show that it comes within the "zone of interests" protected by the relevant statutory or constitutional provision. *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388 n.9 (2d Cir. 2015). While CREW satisfies those requirements here, not every organizational plaintiff will.

---

[14] Out-of-circuit cases are of limited relevance here in any event, as the Second Circuit "recognize[s] that some circuits have read *Havens Realty* differently than we read it in *Ragin*," and yet "[n]evertheless, *Ragin* remains good law in this Circuit." *Nnebe*, 644 F.3d at 157.

The crucial point, in any event, is that, *Ragin*, *Nnebe*, and *New York Civil Liberties Union* all are binding on this Court. The organizational injuries found to be cognizable in those cases are not meaningfully distinguishable from CREW's. Unless and until the Second Circuit reconsiders *Ragin* and its progeny, CREW has organizational standing to pursue its claims.

Finally, the defendant's invocation of *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013), is unavailing. *See* Mot. to Dismiss 9. *Clapper* did not so much as cite *Havens Realty*, much less question that case's authoritative status. *Clapper* likewise did not mention or question the Second Circuit cases interpreting *Havens Realty*. *Clapper* held only that several organizational plaintiffs did not have standing to challenge a statute authorizing surveillance of non-U.S. persons believed to be outside the United States because the plaintiffs had "not establish[ed] that injury based on potential future surveillance [of their communications] is certainly impending or is fairly traceable" to the challenged statute. *Clapper*, 133 S. Ct. at 1150. *Clapper* thus rested on the Court's conclusion that the plaintiffs' fear of surveillance was too speculative, and not on any kind of wholesale restructuring of organizational standing. In contrast to the *Clapper* plaintiffs, CREW claims that the defendant's here-and-now violations of the Emoluments Clauses injure CREW in the here-and-now, and that these violations have led CREW to take numerous specific costly actions that CREW would not have undertaken otherwise. Unlike the plaintiffs' "fears of hypothetical future harm" in *Clapper*, 133 S. Ct. at 1151, CREW's injuries are neither hypothetical nor future.

## II.   PLAINTIFFS' CLAIMS COME WITHIN THE EMOLUMENTS CLAUSES' ZONE OF INTERESTS

Plaintiffs who meet the Article III standing requirements still must demonstrate that their claims "arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). This

"test is not meant to be especially demanding," *see Clarke*, 479 U.S. at 399, and the plaintiffs easily pass it here.

The Foreign Emoluments Clause is intended "to prevent corruption." David Robertson, Debates and Other Proceedings of the Convention of Virginia 330 (2d ed. 1805) (1788) (statement of Edmund Randolph). The Domestic Emoluments Clause likewise serves an anti-corruption function. As Alexander Hamilton explained in *The Federalist No. 73*, the clause serves to ensure that neither Congress nor the states can offer financial inducements to the President that "corrupt his integrity by appealing to his avarice." The Federalist Papers 358 (Jim Miller ed., Dover Publications 2014) (1788). The Emoluments Clauses, in other words, were intended to prevent the President from using his position of power in ways that enrich himself while making the citizenry worse off. The plaintiffs here argue that they have been made worse off (financially and otherwise) because the President has used his position of power in ways that enrich himself. Their interests thus are among those protected by both Clauses.

The Emoluments Clauses also serve structural purposes. The Foreign Emoluments Clause is a separation-of-powers provision in addition to an anti-corruption one. It allocates to Congress the power to decide whether and when federal officeholders can receive emoluments from foreign governments. *See* Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 361 (2009) (Foreign Emoluments Clause reflects Framers' view that "[i]f foreigners were to attempt to buy influence or access, or use small gifts to shift the sympathies of American agents, they needed the full consent of Congress"). The Domestic Emoluments Clause also protects the separation of powers: it ensures that Congress, through its control over the President's statutory compensation, is "the sole master" whom the President will serve. *See* Adrian Vermeule, *The Constitutional Law of Official Compensation*, 102 Colum. L. Rev. 501, 510 (2002). The

prohibition on state-granted emoluments likewise preserves our system of federalism, as it "helps to ensure presidential impartiality among particular members or regions of the Union." Robert Delahunty, *Compensation*, *in* The Heritage Guide to the Constitution 251, 251 (2d ed., David F. Forte & Matthew Spalding eds., 2014).

Because the Emoluments Clauses serve structural purposes, individuals whose interests are impaired by the violation of these provisions come within the zone of interests that the clauses protect. "[I]ndividuals, too, are protected by the operations of separation of powers and checks and balances; and they are not disabled from relying on those principles in otherwise justiciable cases and controversies." *Bond*, 564 U.S. at 223. Individuals likewise may sue for violations of provisions that safeguard our system of federalism. After all, "federalism protects the liberty of the individual from arbitrary power." *Id.* at 222; *see also United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016) ("[B]oth federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints 'when government acts in excess of its lawful powers'" (quoting *Bond*, 564 U.S. at 222) (alteration omitted)). And the Supreme Court has not distinguished between individuals and organizations in this regard: nonprofit and for-profit organizations that meet the constitutional standing requirements may sue to vindicate structural guarantees to the same extent as individuals. *See Bond*, 564 U.S. at 223 (citing, *inter alia*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995); and *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)).

In sum, the Supreme Court has defined the relevant "zone of interests" broadly with respect to provisions that protect the horizontal separation of powers (i.e., the separation among the branches) as well as the vertical separation of powers (i.e., federalism). Because the Foreign

and Domestic Emoluments Clauses are both such provisions, *Bond* controls this case. *See Bond*, 564 U.S. at 223 ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.").

The plaintiffs likewise have a cause of action to seek equitable relief for violations of the Emoluments Clauses. The Supreme Court has long recognized a cause of action for violations of constitutional provisions, and it has found "no reason" why a "separation-of-powers claim should be treated differently than every other constitutional claim." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Nor is there any reason for a different result with respect to claims that vindicate the federalism principles implicit in the Domestic Emoluments Clause. *See LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (noting that *Free Enterprise Fund* "recognized a nonstatutory cause of action" for separation-of-powers claims, and adding that "we fail to see why a different result would be required merely because vertical rather than horizontal separation of powers is at issue").

## CONCLUSION

The Foreign and Domestic Emoluments Clause questions in this case are novel. The questions related to standing and the zone-of-interests test are not. Under settled Supreme Court and Second Circuit case law, the plaintiffs easily clear the constitutional and prudential hurdles to the adjudication of their substantive claims. *Amici* respectfully urge this Court to hold that the plaintiffs' claims are justiciable and that they should be resolved on the merits.

Dated:     August 11, 2017

Respectfully submitted,

/s/ Andrea Likwornik Weiss

Andrea Likwornik Weiss
Gregory P. Feit
Levi Lubarsky Feigenbaum & Weiss LLP
655 Third Avenue, 27th Floor
New York, NY 10017
(212) 308-6100
aweiss@llfwlaw.com
gfeit@llfwlaw.com
*Counsel of Record for Amici Curiae*

**APPENDIX A**

*Amici* are scholars of administrative law, constitutional law, and federal jurisdiction. Their titles and institutional affiliations are listed for identification purposes only.

Bruce Ackerman
Sterling Professor of Law and Political Science
Yale University

Matthew D. Adler
Richard A. Horvitz Professor of Law and Professor of Economics, Philosophy and Public Policy
Duke Law School

Samuel Bagenstos
Frank G. Millard Professor of Law
University of Michigan Law School

Cary Coglianese
Edward B. Shils Professor of Law and Professor of Political Science
University of Pennsylvania Law School

Zachary D. Clopton
Assistant Professor of Law
Cornell Law School

Seth Davis
Assistant Professor of Law
University of California, Irvine School of Law

Michael C. Dorf
Robert S. Stevens Professor of Law
Cornell Law School

Daniel Farber
Sho Sato Professor of Law
University of California, Berkeley School of Law

Martha A. Field
Langdell Professor of Law
Harvard Law School

Daniel Hemel
Assistant Professor of Law
University of Chicago Law School

Pamela S. Karlan
Kenneth and Harle Montgomery Professor of Public Interest Law
Stanford Law School

Leah Litman
Assistant Professor of Law
University of California, Irvine School of Law

Jenny S. Martinez
Professor of Law and Warren Christopher Professor in the Practice of International Law and Diplomacy
Stanford Law School

Jonathan S. Masur
John P. Wilson Professor of Law
University of Chicago Law School

Jon D. Michaels
Professor of Law
University of California, Los Angeles School of Law

Richard Primus
Theodore J. St. Antoine Collegiate Professor of Law
University of Michigan Law School

Eli Savit
Adjunct Professor
University of Michigan Law School

Peter M. Shane
Jacob E. Davis and Jacob E. Davis II Chair in Law
Ohio State University Moritz College of Law

Scott J. Shapiro
Charles F. Southmayd Professor of Law and Professor of Philosophy
Yale Law School

David C. Vladeck
A.B. Chettle Chair in Civil Procedure
Georgetown University Law Center

Brian Wolfman
Associate Professor of Law and Director of the Appellate Courts Immersion Clinic
Georgetown University Law Center