# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> *Defendant*. | No. 17 Civ. 458 (GBD) |

**BRIEF OF AMICUS CURIAE BY CERTAIN LEGAL HISTORIANS**
**ON BEHALF OF PLAINTIFFS**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  "EMOLUMENTS" IN FOUNDING-ERA DICTIONARIES AND TREATISES ................. 2

    A.   DOJ's Narrow Definition of "Emolument" is Inaccurate, Unrepresentative, and Misleading ............................................................................... 2

    B.   "Emolument" Had a Broad Commercial Meaning in Eighteenth Century Legal and Economic Treatises ................................................................. 4

        1.   "Emolument" in Blackstone's *Commentaries* ............................................ 4

        2.   "Emolument" in Pufendorf's *Law of Nature and of Nations* and Smith's *Wealth of Nations* ...................................................................... 5

III. HISTORY OF THE EMOLUMENTS CLAUSES .................................................... 6

    A.   Historical Background from the English and Dutch to the Articles of Confederation Era ............................................................................. 7

    B.   Federal Constitutional Convention .................................................... 12

    C.   The Ratification Debates .................................................................. 15

    D.   The Founding Generation Used the Word "Emolument" Broadly ...................... 18

IV.  CLAIMS ABOUT PRESIDENTIAL PRACTICES .............................................. 21

V.   CONCLUSION ............................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Baker v. State*,
   744 A.2d 864, 170 Vt. 194 (Vt. 1999) .................................................................................. 10

*Ellis v. Marshall*,
   2 Mass. 269 (1807) ............................................................................................................... 20

*Hite v. Fairfax*,
   4 Call 42, 8 Va. 42 (1786) .................................................................................................... 19

*Hoyt v. United States*,
   51 U.S. 109 (1850) ............................................................................................................... 20

*Marbury v. Madison*,
   5 U.S. 137 (1803) ................................................................................................................. 23

*Opinion of the Justices*,
   190 A. 425, 88 N.H. 484 (1937) .......................................................................................... 10

*Opinion of the Justices (Municipal Tax Exemptions for Electric Utility Personal Property)*,
   746 A.2d 981 (N.H. 1999) .................................................................................................... 10

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................................................... 23

*President of Portland Bank v. Apthorp*,
   12 Mass. 252 (1815) ............................................................................................................. 20

*Stuart v. Laird*,
   5 U.S. 299 (1803) ................................................................................................................. 23

*Virginia v. Tennessee*,
   148 U.S. 503 (1893) ............................................................................................................. 14

*Yancey v. Hopkins*,
   15 Va. 419 (1810) ................................................................................................................. 20

**Statutes and Constitutional Provisions**

Act to Establish the Treasury Department, 1 Stat. 65 (1789-1799) ............................................. 12

American Colonies Act, the "Declaratory Act," of 1766, 6 Geo. 3 c. 12 ..................................... 8

1 Stat. 400-01 (1794) .................................................................................................................... 21

1 Stat. 565 (1798) .......................................................................................................................... 21

ii

1 Stat. 611 (1798) ........................................................................................................... 21

1 Stat. 613 (1799) ........................................................................................................... 21

2 Stat. 379 (1806) ........................................................................................................... 21

2 Stat. 451 (1807) ........................................................................................................... 21

2 Stat. 473 (1808) ........................................................................................................... 21

2 Stat. 506 (1809) ........................................................................................................... 21

2 Stat. 528 (1809) ........................................................................................................... 21

2 Stat. 605 (1810) ........................................................................................................... 21

2 Stat. 700 (1812) ........................................................................................................... 21

2 Stat. 778 (1812) ........................................................................................................... 21

3 Stat. 88 (1813) ............................................................................................................. 21

3 Stat. 123 (1814) ........................................................................................................... 21

3 Stat. 195 (1815) ........................................................................................................... 21

2 Stat. at Large, 172, § 3 (April 30, 1802). ................................................................... 20

N.H. Const. art. 10 (1784) ............................................................................................. 10

U.S. Const. art. 1, § 9, cl. 8 ..................................................................................... *passim*

U.S. Const. art. 2, § 1, cl. 7 ..................................................................................... *passim*

Vt. Const. Ch. 1, art. 7 (1793) ...................................................................................... 10

**Historical Materials**

*The Papers of John Adams, vol. 2, December 1773-April 1775* (Robert J. Taylor ed., 1977) ....... 6

John Ash, *The New and Complete Dictionary of the English Language* (1st ed. 1775) ............... 3

Nathan Bailey, *A Universal Etymological Dictionary* (2d ed. 1724) ............................................ 3

William Blackstone, *Analysis of the Laws of England* (1756) ................................................... 5

William Blackstone, *Commentaries on the Laws of England,* vol. 1
    (D. Lemmings ed., 2016) (1765) ................................................................................... 4-5

William Blackstone, Commentaries on the Laws of England, vol. 2
(S. Stern ed., 2016) (1765) ........................................................................................ 4

William Blackstone, *Commentaries on the Laws of England*, vol. 4
(R. Paley ed., 2016) (1769) ....................................................................................... 5

*Boston Evening Post and the General Advertiser*, May 3, 1783 (front page) ............................. 11

Letter from Landon Carter to George Washington, May 9, 1776, cited in Gordon S. Wood, *The
Creation of the American Republic, 1776-1787* (1969) .......................................... 24

Thomas Dyche & William Pardon, *A New General English Dictionary* (8th ed. 1754) ............... 3

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution in
1787* (Jonathan Elliot ed., 1836) ("Elliot") .......................................................... 3, 16

John Entick, *The New Spelling Dictionary* (1st ed. 1772) ......................................................... 3

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ("Farrand") ....... *passim*

*Journals of the Continental Congress 1774-1789*
(Worthington C. Ford et al, eds 1904-1937) ("JCC") ....................................... 3, 9, 10

*The Papers of Benjamin Franklin,* (William B. Willcox ed., 1983) ........................................... 6

THE FEDERALIST No. 73 (Alexander Hamilton) ........................................................... 15, 16

THE FEDERALIST No. 75 (Alexander Hamilton) ................................................................... 7

Letter from Alexander Hamilton to George Washington, Jan 24, 1795, U. of Va. Rotunda
Documentary History of the Ratification of the Constitution ("DHRC") Database ................ 24

Letter from Alexander Hamilton to the Vice President of the United States and President of the
Senate, Feb. 27, 1793, RG 46, Box 10, Folder X, National Archives and Records
Administration ....................................................................................................... 22

*The Papers of Alexander Hamilton,vol. 15, June 1793-January 1794*
(Harold C. Syrett ed., 1969) ..................................................................................... 6

Giles Jacob, *Law Dictionary* (1729) .................................................................................... 5

*The Papers of Thomas Jefferson*, vol. 1, 1760-1776 (Julian P. Boyd ed., 1950) ........................ 19

Thomas Jefferson, First Inaugural Address (1801) ................................................................. 7

Letter from Thomas Jefferson to William Short, Oct. 3, 1801, *Memoir, Correspondence and
Miscellanies from the Papers of Thomas Jefferson,* vol. 3
(Thomas Jefferson Randolph ed., 1829). ...................................................................... 7

*Documentary History of the Ratification of the Constitution*
(Merrill Jensen et al. eds., 1976) ("DHRC") ................................................................. *passim*

Samuel Johnson, *A Dictionary of the English Language* (1st ed. 1755) ....................................... 3

Francis Lewis, *New York Packet* (January 5, 1787) .................................................... 5

Letter from John Marshall to Carey and Lea, June 2, 1832,
U. of Va. Rotunda DHRC Database ........................................................................ 19

*The Papers of James Madison,* (W. T. Hutchinson & W. M. E. Rachel eds., 1969) .................... 6

Letter from Robert Morris to George Washington, May 23, 1783*, The Papers of Robert Morris,
1781-1784* (E. James Ferguson ed., 1989)............................................................... 11

Adam Smith, *An Inquiry Into the Nature and Causes of the Wealth of Nations,*
(Robert Maynard Hutchins ed., 1952) (1776)............................................................ 6

*Letters of Delegates to Congress 1774-1789* (Paul H. Smith et al eds*,* 1976-2000) ..................... 3

Letter from George Washington to Elias Boudinot, 17 June 1783, *Founders Online*, National
Archives, last modified June 29, 2017, http://bit.ly/2fwDVL5 ................................... 24

Letter from George Washington to Colonel Josias Carvil Hall, Feb. 3, 1778, U. of Va. Rotunda
DHRC Database.......................................................................................... 24

George Washington, Farewell Address (Sept. 17, 1796)............................................... 7

Letter from George Washington to Patrick Henry, Oct. 29, 1785, U. of Va. Rotunda DHRC
Database................................................................................................. 24

Letter from George Washington to William Livingston, April 11, 1778, U. of Va. Rotunda
DHRC Database.......................................................................................... 24

Letter from George Washington to James Madison, Oct. 29, 1785, U. of Va. Rotunda DHRC
Database................................................................................................. 24

Letter from George Washington to James McHenry, July 7, 1797 U. of Va. Rotunda DHRC
Database................................................................................................. 24

Letter from George Washington to John Price Posey (August 7, 1782), *The Papers of George
Washington 8 April–31 May 1779* (Edward G. Lengel ed., Univ. of VA Press 2010)............. 24

Letter from George Washington to Friedrich von Poellnitz, March 23, 1790, U. of Va. Rotunda
DHRC Database.......................................................................................... 24

Letter from George Washington to Samuel Vaughn, Aug. 5, 1791, U. of Va. Rotunda DHRC
Database................................................................................................. 24

*Collected Works of James Wilson* (K.L. Hall & M.D Hall, eds., 2007) ........................................ 6

Consular Convention between His Most Christian Majesty and the Thirteen United States of
North America, *The Diplomatic Correspondence of the American Revolution* (1829) ........... 11

Convention Defining and Establishing the Functions and Privileges of Consuls and
Vice Consuls between the United States and France, *The American Diplomatic Code,
Embracing a Collection of Treaties and Conventions Between The United States and
Foreign Powers* (1834) ................................................................................................ 12

The Foreign Emoluments Clause: Evidence from the National Archives,
https://sites.google.com/view/foreignemolumentsclause  ........................................................ 23

Military Order, Jan. 15, 1777, U. of Va. Rotunda DHRC Database ............................................. 24

**Books, Articles, and Other Sources**

Kathryn Abrams, *Law's Republicanism*, 97 Yale L.J. 1591 (1988) ............................................... 7

Akhil Reed Amar, *America's Constitution: A Biography* (2005) .................................................... 7

Joyce O. Appleby, *Republicanism and Ideology,* 37 American Q. 461 (1985) ............................... 7

Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967) ........................... 6, 7

Jack M. Balkin, *The Construction of Original Public Meaning,* 31 Const. Comm. 71 (2016) .... 24

William Baude and Stephen E. Sachs, *The Law of Interpretation,*
130 Harv. L. Rev. 1079 (2017). ................................................................................................ 24

Samuel Flagg Bemis, "Washington's Farewell Address: A Foreign Policy of Independence,"
2 *American Historical Review* 250 (1934) ................................................................................. 7

Douglas Bradburn, *The Citizenship Revolution:Politics and the Creation of the American Union,
1774-1804* (2009) ..................................................................................................................... 7

Steven Calabresi, *The Great Divorce: The Current Understanding of Separation Of Powers and
the Original Meaning of the Incompatibility Clause,*
157 U. Pa. L. Rev. PENNumbra 134 (2008) ......................................................................... 22

Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The
Intellectual History Alternative to Originalism*, 82 Fordham L.R. 721 (2013-2014) ............... 24

Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in America,
1788-1828* (2012) ..................................................................................................................... 7

Stanley Elkins & Eric McKitrick, *The Federalists* (1992) ........................................................... 7

vi

E. James Ferguson, *The Power of the Purse: A History of American Public
Finance, 1776-1790* (1961) ..................................................... 11

Eric Foner, *Tom Paine and Revolutionary America* (1976) ........................................... 6

Jonathan Gienapp, *Making Constitutional Meaning:The Removal Debate and the Birth of
Constitutional Essentialism*, 35 J. Early Rep. 375 (2015) ........................................ 24

Brianne Gorod, "A Little More on Alexander Hamilton and the Foreign Emoluments Clause,"
Take Care, August 1, 2017, http://bit.ly/2vQBN7S .............................................. 22

Brianne Gorod,"What Alexander Hamilton Really Said,"
Take Care, August 1, 2017, http://bit.ly/2vnrQNF .............................................. 22

Gideon Hart, *The 'Original' Thirteenth Amendment: The Misunderstood Titles of Nobility
Amendment*, 94 Marquette Law Rev.311 (2010) ...................................................... 21

H. James Herderson, *Party Politics in the Continental Congress* (1974) .................................... 10

Morton Horwitz, *Republicanism and Liberalism in American Constitutional Thought*,
29 Wm. & Mary L.R. 75 (1987) ................................................................... 5

Cecilia M. Kenyon, *Men of Little Faith: The Anti-Federalists on the Nature of Representative
Government,* 21 William & Mary Q. 3 (1955) ........................................................ 7

James T. Kloppenberg, *The Virtues of Liberalism: Christianity, Republicanism, and Ethics in
Early American Political Discourse*, 74 J. Am. Hist. 9 (1987) .................................. 7

Larry D. Kramer, *Two (More) Problems with Originalism*,
31 Harv. J.L. & Pub. Pol'y 907 (2008) ........................................................ 24

*The Founders' Constitution* (Philip Kurland and Ralph Lerner eds., 2000) ................................ 11

David Lefer, *The Founding Conservatives* (2013) ...................................................... 6

Joshua Matz, *Foreign Emoluments, Alexander Hamilton, and a Twitter Kerfuffle,*
Take Care, July 12, 2017, http://bit.ly/2vkEEUZ .................................................. 22

Forest McDonald & Ellen Shapiro McDonald*, Requiem: Variations on Eighteenth-Century
Themes* (1988)................................................................................... 6-7

John Mikhail, *The Definition of 'Emolument' in English Language and Legal Dictionaries,
1523-1806*, June 30, 2017, https://ssrn.com/abstract=2995693 ............................... 3, 4

John Mikhail, *"Emoluments" in Blackstone's Commentaries*,
Balkinization, May 28, 2017, http://bit.ly/2rwBGIw ............................................... 4

John Bassett Moore and Francis Wharton, *A Digest of International Law* (1906)........................ 8

Edmund S. Morgan, *The Puritan Ethic and the American Revolution*,
    24 William & Mary Q. 3 (1967) .................................................................... 7

J.G.A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic
    Republican Tradition* (1975)......................................................................... 6

Samuel Pufendorf, *De Jure Naturae et Gentium,
    (On the Law of Nature and of Nations*) ( Basil Kennett, translator, 3d ed. 1717) (1672) ...... 5, 6

Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental
    Congress* (1979)........................................................................................ 11

Jack N. Rakove, *Original Meanings: Politics and Ideas in the
    Making of the Constitution* (1996)................................................................. 24

Gautham Rao, *National Duties: Custom Houses and the
    Making of the American State* (2016) ............................................................ 7

Gautham Rao and Jed H. Shugerman, *Presidential Revisionism, The New York Times published
    the flimsiest defense of Trump's apparent emoluments violations yet,*
    Slate, July 17, 2017, *http://slate.me/2vvunCL* ............................................... 22

Charles Rappleye, *Robert Morris: Financier of the American Revolution* (2010)..................... 11

Daniel T. Rodgers, *Republicanism: the Career of a Concept*,
    79 J. Am. Hist. 11 (1992).............................................................................. 7

James D. Savage, *Corruption and Virtue at the Constitutional Convention,*
    56 J.of Politics 174 (1994) ........................................................................... 7

Antonin Scalia and Bryan A. Garner, *Reading Law, The Interpretation of Legal Texts* (2012) .... 3

Bernard Schwartz, *Thomas Jefferson and Bolling v. Bolling: Law and the Legal Profession in
    Pre-Revolutionary America* (1997).................................................................. 6

Robert E. Shalhope, *Toward a Republican Synthesis: The Emergence of an Understanding of
    Republicanism in American Historiography*, 29 William & Mary Q. 49 (1972)..................... 7

Jed H. Shugerman, *Marbury and Judicial Deference: The Shadow of Whittington v. Polk and
    Maryland Judiciary Battle*, 5 U. Pa. J. Con. L. 58 (2002)......................................... 23

Lawrence B. Solum, *Originalist Methodology*, 84 U. Chi. L. Rev. 269 (2017)........................... 24

Joseph Story, *Commentaries on the Constitution*, vol. 3 (1833) .............................. 7, 15

Zephyr Teachout, *Corruption in America: From Franklin's Snuff Box to
    Citizens United* (2014) ............................................................................ 7, 8, 14

Charles P. Whittemore, *A General of the Revolution: John Sullivan of New Hampshire* (New York, 1961) ................................................................................................ 15

Keith Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (1999) ............................................................................. 24

Keith E. Whittington, *The New Originalism,* 2 Geo. J. L. & Pub. Pol'y 599 (2004) ................... 24

Gordon S. Wood*, The Creation of the American Republic, 1776-1787* (1969) ................ 7, 22, 24

## I.      INTRODUCTION

The Foreign Emoluments Clause ("FEC") of the U.S. Constitution states that "no person holding any office of profit or trust under [the United States], shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state."[1] The Domestic Emoluments Clause ("DEC") states that "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."[2] The framers adopted these clauses to protect against corruption, foreign entanglements, and other threats to republican government and federalism. Both clauses are written broadly to accomplish these purposes.

In its memorandum of law in support of the President's motion to dismiss,[3] the Department of Justice ("DOJ") maintains that the original public meaning of the Constitution permits a president to engage in private commercial transactions with foreign governments without violating the FEC. DOJ makes essentially the same claim about the DEC, arguing that the profits and other benefits received by the President and his businesses from federal and state governments do not contravene the original understanding of that provision.

These historical claims are flawed for at least three overlapping reasons. First, DOJ's definition of "emolument" is inaccurate, unrepresentative, and misleading. The word "emolument" was not a term of art in the eighteenth century; it was used, in both legal and non-legal contexts, in a much broader sense than the unduly narrow and artificial one defended by the government. In particular, "emolument" encompassed profits or advantages arising from private commercial transactions. Second, DOJ's interpretation is at odds with historical understandings of the Emoluments Clauses and of similar prohibitions adopted from 1776 to 1789. Third, DOJ's

---

[1] U.S. Const. art. 1, § 9, cl. 8.
[2] U.S. Const. art. 2, § 1, cl. 7. Both clauses together shall be referred to herein as "Emoluments Clauses."
[3] *Memorandum of Law in Support of Defendant's Motion to Dismiss*, Citizens for Responsibility and Ethics in Washington, *et al.* v. Donald J. Trump (S.D.N.Y., June 9, 2016) (Case 1:17-cv-00458-RA) (henceforth "DOJ Brief").

interpretation of these clauses is inconsistent with the founders' purposes of preventing corruption and conflicts of interest, avoiding dangerous foreign entanglements, and preserving a careful balance of state and federal power.

Part II of this brief clarifies the linguistic background, based on a study of founding-era dictionaries and influential treatises. Part III surveys historical development of the clauses in European and American history, as well as the founders' use of the word "emolument." Part IV addresses the claim that the later practices of presidents are determinative of the Constitution's meaning.

## II.    "EMOLUMENTS" IN FOUNDING-ERA DICTIONARIES AND TREATISES

### A.    DOJ's Narrow Definition of "Emolument" is Inaccurate, Unrepresentative, and Misleading

In its brief, DOJ defines the word "emolument" as "profit arising from office or employ," contending that this "original understanding" of "emolument" is grounded in "contemporaneous dictionary definitions" and justifies an "office-and-employment-specific construction" of that term.[4] On that basis, DOJ argues that the Emoluments Clauses "do not prohibit any company in which the President has any financial interest from doing business with any foreign, federal, or state instrumentality."[5] DOJ relies on two founding-era dictionaries to justify what it calls an "office-and-employment-specific construction" of "emolument." However, the government's linguistic evidence is weak and cannot withstand scrutiny.

First, the government's dictionary-based argument is flawed in a fundamental respect. Little or no evidence indicates that the two obscure dictionaries—Barclay (1774) and Trusler (1766)—on which DOJ relies for its "office-and-employment-specific" definition of "emolument"—were owned, possessed, or used by the founders, let alone had any impact on them or on those who debated and ratified the Constitution. For example, neither of these dictionaries is mentioned in the more than 178,000 searchable documents in the *Founders Online* database, which

---

[4] DOJ Brief at 2, 28-29, 32.
[5] *Id.* at 27.

makes publicly available the papers of the six most prominent founders. Nor do these volumes appear in other pertinent databases, such as *Journals of the Continental Congress*,[6] *Letters of Delegates to Congress*,[7] *Farrand's Records*,[8] *Elliot's Debates*,[9] or the *Documentary History of the Ratification of the Constitution*.[10] By contrast, all of the dictionaries that the founding generation did possess and use regularly define "emolument" in the broad manner favoring the plaintiffs: "profit," "advantage," or "benefit."[11]

Second, a careful review of English language dictionaries from 1604 to 1806 shows that *every* definition of "emolument" published during this period relies on one or more of the elements of the broad definition DOJ rejects in its brief: "profit," "advantage," "gain," or "benefit." Furthermore, over 92% of these dictionaries define "emolument" *exclusively* in these terms, with no reference to "office" or "employment." By contrast, DOJ's preferred definition—"profit arising from office or employ"—appears in less than 8% of these dictionaries. Even those outlier dictionaries always include "gain, or advantage" in their definitions, a fact obscured by DOJ's selective quotation of only one part of its favored definition from Barclay. Finally, Trusler's volume is not a standard dictionary, but rather a thesaurus, which presumes that "gain," "profit," and "emolument" are synonyms; moreover, its explanation of "emolument" was copied directly from a French thesaurus, hence it is not even reliably grounded in English usage. The impression DOJ creates in its brief by contrasting four historical definitions of "emolument"—two broad and two narrow—is, therefore, highly misleading.[12]

---

[6] *See Journals of the Continental Congress 1774-1789* (Worthington C. Ford et al. eds., 1904-37) [JCC].

[7] *See Letters of Delegates to Congress 1774-1789* (Paul H. Smith et al. eds., 1976-2000).

[8] *See* Max Farrand, *The Records of the Federal Convention of 1787* (1911). [Farrand]

[9] *See The Debates in the Several State Conventions on the Adoption of the Federal Constitution in 1787* (Jonathan Elliot ed., 1836). [Elliot].

[10] *See Documentary History of the Ratification of the Constitution* (Merrill Jensen et al. eds., 1976-present) [DHRC].

[11] *See, e.g.,* Samuel Johnson, A Dictionary of the English Language (1st ed. 1755) ("Profit; advantage"); Nathan Bailey, A Universal Etymological Dictionary (2d ed. 1724) ("Advantage, Profit"); Thomas Dyche & William Pardon, A New General English Dictionary (8th ed. 1754) ("Benefit, advantage, profit"); John Ash, The New and Complete Dictionary of the English Language (1st ed. 1775) ("An advantage, a profit"); John Entick, The New Spelling Dictionary (1st ed. 1772) ("Profit, advantage, benefit"). Cf. Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 419 (2012) (identifying Johnson, Bailey, Dynche & Pardon, and Ash as "the most useful and authoritative" English dictionaries from 1750 to 1800).

[12] *See* John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries*, 1523-1806 (June 30, 2017). Available at SSRN: https://ssrn.com/abstract=2995693

Third, the suggestion that "emolument" was a legal term of art at the founding, with a sharply limited "office-and-employment-specific" meaning, is also inconsistent with the historical record. The founding generation used the word "emolument" in a broad variety of contexts, including private commercial transactions. Moreover, none of the most significant common law dictionaries published from 1523 to 1792 even includes "emolument" in its list of defined terms. In fact, this term is only used in these legal dictionaries to define or explain other, less familiar words and concepts. These findings reinforce the conclusion that "emolument" was not a term of art at the founding with a highly restricted meaning.[13]

### B.   "Emolument" Had a Broad Commercial Meaning in Eighteenth Century Legal and Economic Treatises

#### 1.   "Emolument" in Blackstone's *Commentaries*

In William Blackstone's *Commentaries on the Laws of England*—probably the best-known legal treatise when the Constitution was adopted—the word "emolument" occurs on sixteen occasions.[14] Although some of these occasions involve government officials, the majority of Blackstone's usages of "emolument" refer to benefits other than public salaries or perquisites.

For example, Blackstone uses "emolument" in the context of family inheritance, private employment, and private ownership of land. He refers to "the power and emoluments" of monastic orders; to "the rents and emoluments of the estate" managed by ecclesiastical corporations; and to the "pecuniary emoluments" which the law of bankruptcy assigns to debtors. Blackstone describes the advantages to third-party beneficiaries of a gift as "the emolument of third persons." He uses "emolument of the exchequer" to refer to an increase in the national treasury. Finally, in explaining the law of corporations, he characterizes "parish churches, the freehold of the church, the churchyard, the parsonage house, the glebe, and the tithes of the parish" as among the "emoluments" vested in the church parson.[15]

---

[13] *Id.*
[14]   *See* John Mikhail, "Emolument in Blackstone's Commentaries," Balkinization (May 28, 2017), at https://balkin.blogspot.ca/2017/05/emolument-in-blackstones-commentaries.html
[15] *See* William Blackstone, 2 *Commentaries on the Laws of England* 18, 23, 50, 185, 318 (2016) (S. Stern, ed.) (third persons, private employment, inheritance, estates, and bankruptcy); 1 *Commentaries* 75, 247, 304 (2016) (D.

A further illustration of Blackstone's broad understanding of emoluments can be found in the forms of "Conveyance by Lease and Release" that appear at the end of Book II of the *Commentaries*. In the first of these forms ("Lease, or Bargain and Sale, for a year"), Blackstone lists "emoluments" among the benefits that are transferred when conveying parcels of land. Blackstone uses the same language in his second form ("Deed of Release"). Both forms can also be found in his *Analysis of the Laws of England* (1756). In fact, many form books and other legal manuals of the period included similar templates. In Giles Jacob's *Law Dictionary* (1729), for instance, one finds a "Form of a Release and Conveyance of Lands" with similar language, in which "A.B." conveys to "C.D." a piece of property together with "all … Easements, Profits, Commodities, Advantages, Emoluments, and Hereditaments whatsoever."[16]

When Americans bought and sold property during the founding era, they frequently referred to emoluments in their deeds and conveyances. To take one pertinent illustration, on January 5, 1787, Francis Lewis, a prominent New Yorker who signed the Declaration of Independence and Articles of Confederation, placed a notice in *The New-York Packet* announcing the sale of land at a public auction, together with "all buildings, ways, paths, profits, commodities, advantages, emoluments and hereditaments whatsoever...." Lewis' advertisement ran throughout the spring and summer of 1787. As with Blackstone's form contracts, the emoluments to which he referred were not government salaries, but rather private benefits that ran with the land.[17]

### 2. "Emolument" in Pufendorf's *Law of Nature and of Nations* and Smith's *Wealth of Nations*

With the possible exception of Hugo Grotius, no early modern writer on the law of nations was more influential than Samuel Pufendorf. His most significant work, *De Jure Naturae et Gentium* (*On the Law of Nature and of Nations*), was published in Latin in 1672 and soon translated into every major European language. The founders were familiar with Pufendorf's treatise and often quoted Basil Kennet's English translation. For instance, George Wythe did so in his

---

Lemmings, ed.) (land, monastic orders, and corporations); 4 *Commentaries* 277 (2016) (R. Paley, ed.) (exchequer).

[16] *See* Mikhail, "Emolument" in Blackstone's Commentaries, *supra* note 14.

[17] *Id*.

argument in *Bolling v. Bolling*; John Adams did so in his *Novanglus* essays; James Wilson did so in his *Law Lectures*; and Alexander Hamilton did so in his *Pacificus* essays.[18] In Kennet's translation, the word "emolument" occurs twice, both referring to private market transactions.[19]

Likewise, many of the founders were well-acquainted with Adam Smith and his economic theories. For example, Benjamin Franklin requested a copy *of An Inquiry into the Nature and Causes of the Wealth of Nations* shortly after it was published in 1776; James Madison included Smith's book in his 1783 *Report on Books for Congress*; Robert Morris reportedly gave out copies of *The Wealth of Nations* to members of Congress in the 1780s; and James Wilson quoted Smith in defense of the Bank of North America in 1785.[20] The word "emolument" also occurs twice in *The Wealth of Nations*. Once again, both instances involve private market transactions (monopolistic profits and bank interest).[21]

In sum, Blackstone, Pufendorf, and Smith did not understand "emolument" in the restricted fashion advocated by the DOJ in its brief. In their usage, "emolument" was not a rigid term of art, but rather a broad and flexible word used to refer to a wide range of profits and benefits.

## III.   HISTORY OF THE EMOLUMENTS CLAUSES

The framers adopted the Emoluments Clauses to advance several core republican goals: to protect against corruption and the appearance of corruption,[22] to avoid foreign entanglements

---

[18] *See* Bernard Schwartz, *Thomas Jefferson and Bolling v. Bolling: Law and the Legal Profession in Pre-Revolutionary America* 417-418 (1997) (reproducing Wythe's argument in *Bolling*, which quotes Kennet's edition of Pufendorf's *Law of Nature and Nations*); 2 *The Papers of John Adams* 288-307 (1977) (R. Taylor, ed.) (quoting Kennet's translation of Pufendorf); 1 *Collected Works of James Wilson* 478-79 (2007) (K. L. Hall & M.D. Hall eds.) (same); 15 *The Papers of Alexander Hamilton*, 65-69 (1969) (same).

[19] Samuel Pufendorf, *Of the Law of Nature and of Nations* 259-260 (3d. ed. 1717) (Basil Kennet, trans.) (A "Seller" of goods may claim "Emolument"); *id.* at 271 (The benefits from a "Pawn" are an "Emolument.").

[20] *See* 23 *The Papers of Benjamin Franklin* 241-43 (1983) (W. B. Willcox, ed.) (noting that "Smith's Wealth of Nations" was sent to Franklin); 6 *The Papers of James Madison* 62-115 (1969) (W. T. Hutchinson & W. M. E. Rachal, eds.) (including "Smith on the wealth of Nations'' in his book list); David Lefer, *The Founding Conservatives* 245-246 (2013) (Morris "found Smith's thought so persuasive . . . that he gave out copies to members of Congress"); 1 *Collected Works of James Wilson*, *supra* note 18, at 60-79, 73-74 (quoting Smith's remarks on banking).

[21] "[M]onopolists, by keeping the market constantly under-stocked . . . sell their commodities much above the natural price, and raise their emoluments, whether they consist in wages or profit, greatly above their natural rate." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 26 (1952) (Robert Maynard Hutchins, ed.) "These different *emoluments* [from bank interest] amount to a good deal more than what is necessary for paying the salaries of officers, and defraying the expense of management." *Id.* at 208.

[22] The consensus among historians is that the fear of political corruption was a primary factor in seeking independence from Great Britain and in drafting the U.S. Constitution. *See* Bernard Bailyn, *The Ideological Origins*

with Europe,[23] and to maintain a balance of state and federal power. The framing and ratification of the Emoluments Clauses were not matters of great debate or disagreement in 1787-1788. The absence of controversy on these points reflects a broad consensus against the dangers of political corruption. The extant voluminous records of debates, particularly those tied to the ratification of the Constitution by the states, demonstrate that in ordinary usage the word "emolument" had a broad range of meanings. It was manifestly not reducible to a simple fee or salary.[24]

### A.   Historical Background from the English and Dutch to the Articles of Confederation Era

Within the framework of Anglo-American political thinking, a concern with emoluments was closely tied to the pervasive fear of political corruption. In the middle decades of the eighteenth century, this concern dominated Real Whig views of the insidious ways in which the British Crown had corrupted Parliament's vaunted independence and legal supremacy after the Glorious Revolution of 1688.[25] The concern was that the Crown could use an array of emoluments

---

*of the American Revolution* (1967); J.G.A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republican Tradition* (1975); Eric Foner, *Tom Paine and Revolutionary America* (1976); Forrest McDonald and Ellen Shapiro McDonald, *Requiem: Variations on Eighteenth-Century Themes* (1988); Stanley Elkins and Eric McKitrick, *The Federalists* (1992); Douglas Bradburn, *The Citizenship Revolution: Politics and the Creation of the American Union, 1774-1804* (2009); Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in America, 1788-1828* (2012); Zephyr Teachout, *Corruption in America: From Franklin's Snuff Box to Citizens United* (2014); Gautham Rao, *National Duties: Custom Houses and the Making of the American State* (2016); Cecilia M. Kenyon, "Men of Little Faith: The Anti-Federalists on the Nature of Representative Government," 21 *William & Mary Q.* 3 (1955); Edmund S. Morgan, "The Puritan Ethic and the American Revolution," 24 *William & Mary Q.* 3 (1967); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (1969); Robert E. Shalhope, "Toward a Republican Synthesis: The Emergence of an Understanding of Republicanism in American Historiography," 29 *William & Mary Q.* 49 (1972); Joyce O. Appleby, "Republicanism and Ideology," 37 *American Q.* 461 (1985); Daniel T. Rodgers, "Republicanism: The Career of a Concept," 79 *J. Am. Hist.* 11 (1992); Morton Horwitz, "Republicanism and Liberalism in American Constitutional Thought," 29 *Wm. and Mary L.R.* 75 (1987); Kathryn Abrams, "Law's Republicanism," 97 *Yale L.J.* 1591 (1988); James T. Kloppenberg, "The Virtues of Liberalism: Christianity, Republicanism, and Ethics in Early American Political Discourse," 74 *J. Am. Hist.* 9 (1987); James D. Savage, "Corruption and Virtue at the Constitutional Convention," 56 *J. of Politics* 174 (1994).

[23] *See* Joseph Story, 3 *Commentaries on the Constitution* 202 (1833) (the Foreign Emoluments clause was adopted to protect against "Foreign influence of every sort"). *See also* Federalist No. 75 (Hamilton) (specific concerns with the president having control over treaties and foreign relations unchecked by the Senate); Akhil Reed Amar, *America's Constitution; A Biography* 304-07 (2005). *See also* George Washington's Farewell Address (European wars show why Americans should tolerate as "little political connection as possible" with foreign nations"); Samuel Flagg Bemis, "Washington's Farewell Address: A Foreign Policy of Independence," 2 *American Historical Review* 250–68 (1934); President Thomas Jefferson, First Inaugural Address (1801); Letter from Thomas Jefferson to William Short, Oct. 3, 1801, in 3 *Memoir, Correspondence and Miscellanies from the Papers of Thomas Jefferson* 492 (Thomas Jefferson Randolph, ed., 1829).

[24] *See infra* at 24, n.86 for significance of original public meaning, as contrasted with the framers' original intent.

[25] *See generally* Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967).

(e.g., offices, pensions, grants of income, and other benefits) to make members of both houses docile tools of the reigning ministry. The American colonists were schooled to think that a power-seeking ministry was scheming to deprive them of their vested rights of self-government, leaving them to be governed by a supine Parliament that had the power to legislate for America "in all cases whatsoever."[26]

The use of emoluments to undermine self-governance was viewed as a significant problem. There was, however, another famous example in which an emolument conveyed from one king to another threatened the fundamental rights of the entire realm. This was the secret Treaty of Dover of 1670, when Louis XIV of France turned Charles II into his ally in his war against Holland, in part by giving him a young French mistress, but also by providing Charles with the additional funds he badly needed. This Treaty was well known to eighteenth-century readers. At the Federal Convention, Gouverneur Morris, regarded as a chief architect of the presidency, explicitly invoked it during the July 20, 1787 debate over impeachment:

> Our Executive was not like a Magistrate having a life interest, much less like one having an hereditary interest in his office. He may be bribed by a greater interest to betray his trust; and no one would say that we ought to expose ourselves to the danger of seeing the first Magistrate in foreign pay, without being able to guard agst. it by displacing him. One would think the King of England well secured agst. bribery. He has as it were a fee simple in the whole Kingdom. Yet Charles II was bribed by Louis XIV.[27]

Although Morris did not use the word "emolument" in this passage, this incident provides the paradigmatic historical explanation for why the framers of both the Articles of Confederation and the Constitution adopted a prohibition on foreign emoluments.

Several key constitutional documents reflect concern with the corrupting effect of both domestic and foreign emoluments. The Articles of Confederation adopted the text that would become the FEC. The drafters borrowed from the Dutch rule, adopted in 1651, prohibiting foreign ministers from taking "any presents, directly or indirectly, in any manner or way whatever."[28] The

---

[26] Declaratory Act of 1766 (6 Geo. 3 c. 12).

[27] 2 Farrand, *supra* note 8, 68-69.

[28] Zephyr Teachout, *Corruption in America* 20 (2014) (citing John Bassett Moore and Francis Wharton, *A Digest of International Law* 579 (1906). Americans continued to be aware of the Dutch rule later in the 1790s. John Quincy Adams asked a Dutch friend how they enforced their similar rule, and the friend replied that as long as the minister sought approval, the government would permit him to keep it. *Id*. at 27 (citing Letter from John Quincy Adams to

8

French practice of giving expensive diplomatic gifts was called *presents du roi* or *presents du congé*, so these rules stemmed initially from the problem of "presents."[29] The DOJ brief claims that a broad interpretation of "emolument" would produce a "surplusage" or redundancy, contending a broad definition of emoluments would include "presents," making the word "present" unnecessary.[30] The argument fails for at least two reasons. First, "presents" generally connotes gratuitous exchange, while "emoluments" encompasses benefits of commercial transactions. Second, the origin of this clause lies with the Dutch bar on "presents," which the Americans broadened by adding the term "emoluments," without deleting the earlier wording. As legal texts evolve, sometimes historical layers resist the logic of interpretive canons.

A draft of the Articles of Confederation in June 1776 prohibited the colonies from engaging in any diplomatic relations with Great Britain "or any Foreign Prince or State; nor shall any Colony or Colonies, nor any Servant or Servants of any Colony or Colonies, accept of any Present, Emolument, Office or Title of any kind whatever from the King or Kingdom of G.B. or any foreign Prince or State."[31] The clause was further modified during the debates of late July and August 1776. In the August 20 version, Article IV read: "nor shall any person holding any office of profit or trust under the United States or any [of] them, accept of any present, emolument, office, or title of any kind whatever, from any King, Prince or foreign State."[32]

The reference to "profit and trust" in the August 20 draft identified the two main satisfactions that eighteenth-century observers ascribed to public office: the financial rewards it would produce; and the prestige, status, and honor it would also provide. In the constitutional debates of 1787-1788, the phrase "profit and trust" was often replaced by "honor and emoluments" as the complementary benefits of public service, but the underlying conception remained constant. In the final text of the Articles that Congress submitted to the states in November 1777, this clause, now found in Article VI, remained unaltered. The DOJ overlooks this historical timeline when it

John Adams, June 7, 1797, in 2 Writings of John Quincy Adams 180 n. 1 (1913), 180.

[29] *Id.* at 19.

[30] DOJ Brief at 30-31.

[31] Dickinson, Draft of the Articles of Confederation, July 1776 (5 JCC, *supra* note 6, at 547).

[32] 5 JCC, *supra* note 6, at 675.

asserted that events limited to office-holding in 1778 led to the drafting of the FEC.[33]

Two other constitutional texts of 1776 illustrate the link between the concept of emolument and fundamental republican values. Article IV of the Virginia Declaration of Rights statesd "That no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services." Article V of the Pennsylvania Declaration of Rights similarly states "That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community." Later, New Hampshire's 1784 Constitution[34] and Vermont's 1793 Constitution[35] contained almost identical clauses using the word "emolument" broadly for general benefits, and their state courts have applied these clauses to general benefits with a "principle of equality." Article VII of the Massachusetts Declaration of Rights (1780) affirmed the same principle, but without the word "emolument": that "Government is instituted for the common good . . . and not for the profit, honor, or private interest of any one man, family, or class of men."[36] These state constitutions used

---

[33] DOJ claims that the prohibition on receiving foreign emoluments in the Articles of Confederation "was prompted by" a series of events involving American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin, which occurred in connection with their "successfully negotiating the Franco-American alliance treaty of 1778." DOJ Brief at 32-34. This causal claim is at odds with the fact that the prohibition on foreign emoluments in the Articles was initially drafted by John Dickinson at least two years before the events in question. 5 JCC, *supra* note 6, 547 (July 12, 1776). The reasons for adopting this prohibition speak more broadly to various sources of corruption besides those closely tied to the performance of official duties.

[34] "Government being instituted for the common benefit, protection, and security, of the whole community, and not for the private interest or emolument of any one man, family, or class of men…" N.H. Const. art. 10 (1784 text). The New Hampshire Supreme Court has interpreted the clause to embody a "principle of equality." *Opinion of the Justices (Municipal Tax Exemptions for Electric Utility Personal Property)*, 746 A.2d 981, 987 (N.H. 1999). It broadly reads "emolument" to include, for example, the benefit accruing to a private industry from a dam built with public funds. *See In re Opinion of the Justices*, 190 A. 425 (N.H. 1937) (interpreting the clause to prohibit all "appropriation[s] of public money for a private purpose"). *Id.*

[35] "That government is, or ought to be, instituted for the common benefit, protection, and security, of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community…" Vt. Const. Ch. 1, art. 7 (1793). The Vermont Supreme Court also interprets this clause—the Common Benefits Clause—expansively. *Baker v. State*, 744 A.2d 864 (Vt. 1999), that same-sex couples were entitled to the same legal rights as different-sex couples, was based on this clause. *Id.* at 867. In that case, "emolument or advantage" was held to include "the statutory benefits and protections afforded persons of the opposite sex who choose to marry." *Id.* The court noted that the Common Benefits Clause was intended to ensure "equal access to public benefits and protections for the community as a whole." *Id.* at 877. Obviously the Vermont Supreme Court's reading of "emolument" is significantly broader than one limited to office-related benefits.

[36] 5 *Founders' Constitution* 8 (Philip Kurland and Ralph Lerner, ed., 2000).

the word "emolument" broadly to mean a benefit or advantage. Moreover, these provisions, as antecedents to the Emoluments Clauses, reflected fundamental republican values: that government is a public trust derived directly from the people; that the material benefits it provides are to be regarded solely as a compensation for public duties, and not a means of personal enrichment and luxury; and that the idea of hereditary power, which is so closely linked to aristocracy, is anathema to a republican order.

In the years between the drafting of the Articles of Confederation and the first state constitutions in the 1770s and the calling of the Federal Convention of 1787, this principle was sorely tested. Because neither the Continental Congress nor the state governments had anything resembling an institutional bureaucracy, they necessarily relied on merchants and commissaries to obtain the goods and materiel needed to sustain the war effort. There were no mechanisms readily available to monitor these exchanges, and charges of corruption, which were often easy to offer but difficult to prove, flowed freely. Merchants like Robert Morris, who played a critical role in importing military supplies while also serving as Superintendent of Finance, frequently blended their public and private ventures. Drawing a manageable line between these activities proved both difficult and controversial.[37]

These events were part of the background motivating a separation between public service and international moneyed interests (again not limited to offices and salaries). Soon thereafter, an emoluments restriction was placed in the 1784 Consular Convention with France,[38] as well as the

---

[37] *See*, for example, E. James Ferguson, *The Power of the Purse: A History of American Public Finance, 1776-1790*, at 70-105 (1961); H. James Henderson, *Party Politics in the Continental Congress* 218-245 (1974); Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* 249-274 (1979); Charles Rappleye, *Robert Morris: Financier of the American Revolution* 149-197, 331-357 (2010). Morris's critics frequently attacked his conflicts of interest, often referring explicitly to his pursuit of personal "emoluments." See, e.g., *Boston Evening Post and the General Advertiser*, May 3, 1783 (front page) (printing one such criticism by "Lucius" a few weeks after the Newburgh controversy). See also Letter from Robert Morris to George Washington, May 23, 1783, in 8 *The Papers of Robert Morris, 1781-1784* 130-31 (1973) (E. J. Ferguson, ed.) (Morris explaining to Washington that others would have to decide "whether a sincere Regard to public Justice and public Interest or a sinister Respect to my own private Emolument were the influential Motives of my Conduct").

[38] *See* "Consular Convention between His Most Christian Majesty and the Thirteen United States of North America," in 4 The Diplomatic Correspondence of the American Revolution 198-208, 199-200 (1829).

1788 Consular Convention with France[39] and the 1789 Act to Establish the Treasury Department.[40] Remarkably, DOJ asserts that "[t]he history and purpose of the [Emoluments Clauses] is devoid of concern about private commercial business arrangements."[41] The example of Robert Morris, the emoluments prohibitions adopted by American governments from 1776 to 1789, and the constitutional debates themselves undercut the DOJ's claim.

      **B.**      **Federal Constitutional Convention**

As the legislative history indicates, the Emoluments Clauses were not controversial issues at the Federal Convention. Nevertheless, there is some difference in their evolution. The clause requiring the national executive (eventually the president) to receive a fixed salary that could be neither increased nor diminished by the legislature was included in Article 7 of the Virginia Plan that Edmund Randolph introduced on May 29. Its inclusion prompted one of the Convention's most famous speeches: a lengthy criticism, written by Benjamin Franklin but read for him by James Wilson on June 2, attacking the whole idea of granting salaries to the executive. Franklin's speech was listened to respectfully but otherwise ignored.[42] Thereafter the clause received minor modification. In the June 13 report of the committee of the whole, the executive, like the legislature, would "receive a fixed stipend by which he may be compensated for the devotion of his time to public service to be paid out of the national Treasury." At this point, however, the prohibition on an "increase or diminution" in compensation applied only to the judiciary, not to the executive.[43]

Although that restriction on the executive salary was mentioned anew in the New Jersey Plan in mid-June, it was *not* part of the resolutions that the Convention referred to the committee of detail on July 26, which simply said that the executive would receive "a fixed Compensation

---

[39] *See* "Convention Defining and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United States and France," in 1 *The American Diplomatic Code, Embracing a Collection of Treaties and Conventions between the United States and Foreign Powers* 70-82.
[40] *See* 1 Stat. 65 (1789-1799).
[41] DOJ Brief at 34.
[42] 1 Farrand, *supra* note 8, at 81-85.
[43] 1 *id.* at 230-231, 236-237.

for the Devotion of his Time to public Service—to be paid out of the public Treasury."[44] It was, instead, the work of the committee of detail to reinstate, after "compensation," the phrase "which shall neither be increased nor diminished during his continuance in office."[45]

      The possibility of a president (or other officials) receiving other forms of compensation while in office was not considered until Charles Pinckney proposed a domestic emoluments clause on August 20. As moved by Pinckney, the amendment declared that "No person holding the office of President of the U.S., a Judge of their Supreme Court, Secretary for the department of Foreign Affairs, of Finance, of Marine, of War, or of ___, shall be capable of holding at the same time any other office of Trust or Emolument under the U.S. or an individual State."[46] Pinckney's propositions were referred to the committee of detail. There is no further record of any deliberation on this provision until Saturday, September 15, the next-to-last day of business, when the Convention was discussing the nearly completed text proposed by the committee on style. At that point, John Rutledge and Benjamin Franklin moved to add Pinckney's proposal, now limited to the president alone, to the clause relating to compensation. Madison recorded no discussion of this motion, which carried, seven states to four.[47]

      The FEC of Article I, Section 9 has a less complicated history. Notwithstanding its prior version in Article VI of the Confederation, the Virginia Plan contained no comparable clause. Its first appearance came only with the work of the committee of detail, which convened on July 26 and reported on August 6, and even then it was restricted solely to a prohibition against the United States granting "any Title of Nobility."[48] On August 23, Pinckney again took the initiative, moving that "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State." Pinckney's rationale, as reported by Madison, was to urge "the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."

---

[44] 1 *id.* 244, 2 *id.* 121, 132.
[45] 2 *id.* 146, 172, 185.
[46] 2 *id.* 341-42.  The blank is intentional and appears in the original source.
[47] 2 *id.* at 626.
[48] 2 *id.* at 169, 183.

Pinckney's rationale tracks the Dutch rule's focus on "foreign ministers,"[49] but the FEC's wording went further, covering any office. This amendment was promptly approved unanimously (*nemine contradicente*).[50]

A narrow definition of "emolument" limited to official services is inconsistent with the FEC's basic purposes and with the text of the clause. The FEC seeks to prevent activities that have the potential to influence or corrupt the person who profits from them. That is why it prohibits "present[s]" as well as "emolument[s]." Nothing in the historical record suggests that the ban of foreign "present[s]" would extend only to gifts received for the performance of an official duty, or that titles of nobility would be permissible if they were not connected to a federal office. Similarly, nothing in the text or context of the FEC suggests that the Framers wanted a special unwritten exception for "emoluments" in the clause, to permit foreign states to give benefits so long as they were not for official services. Such an exception would open a loophole for foreign states (and for U.S. officials) to defeat the FEC's purposes.[51] Such a narrow reading is particularly in tension with the FEC's text: an emolument "of any kind whatever" would not be limited to official services.

In discussions about the allocation of treaty power, some of the framers focused on the possibility of foreign corruption of American officials. Nathaniel Gorham, for example, noted that such discussions "will be generally influenced by two or three men, who will be corrupted by the Ambassadors here."[52] He might have been contemplating the controversial negotiations that Secretary of Foreign Affairs John Jay had conducted with the Spanish emissary Don Diego de

---

[49] Teachout, *Corruption in America*, at 27.

[50] 2 Farrand, *supra* note 8, at 389.

[51] On DOJ's reading, the FEC extends to all gifts whatsoever, all honorary titles and offices, and all forms of income relating to the performance of official duties. This interpretation leaves out a large swath of arrangements that reliably and predictably create opportunities for influence—namely, commercial transactions. It would be even stranger to imagine that the framers sought to restrict the prohibition in this fashion, by using a term whose normal sense sweeps more widely, to permit so many profitable or beneficial arrangements generally. Hence there is no occasion to speak, as DOJ does in its Motion to Dismiss, of the ambiguities that arise "where a word is capable of different meanings or '[w]here…[a] word is obscure or of doubtful meaning, taken by itself,' [such that] the 'obscurity or doubt may be removed by reference to associated words.'" DOJ Brief, at 30, quoting *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). However, assuming *arguendo* that there is any ambiguity, the context shows that "emolument" cannot refer only to duties connected with an office, but must be understood to include commercial transactions, especially in light of the phrase "any kind whatever."

[52] 2 Farrand, *supra* note 8, 393.

14

Gardoqui the year before. Jay had not acted corruptly in 1786, but his actions indicated how much the conduct of diplomacy could pivot on individuals. Gorham and other framers probably knew about the allegations that swirled around John Sullivan of New Hampshire, who was widely suspected of having been bribed by the French minister, the Chevalier de la Luzerne, in 1781, to draft new instructions directing John Adams, the American peace commissioner in Paris, to accept French "advice and opinion."[53] This may have been the incident that George Mason, a framer turned Anti-Federalist, alluded to in the Virginia ratification convention, when he noted that "It is not many years ago, since the revolution, that a foreign power offered emoluments to persons holding offices under our Governments."[54]

The desire to insulate all national officials from improper foreign influence, though belatedly expressed, encountered no opposition. It became, in effect, a constitutional norm of American diplomacy. Nothing in the admittedly limited records of debate could be read to justify restricting this norm to official salaries or exempting the president. Indeed, the Convention's final decisions on presidential power, taken during its penultimate week of debate, would have emphasized rather than diminished the perceived importance of the FEC. Prior to late August and early September, it is by no means clear that the president would have enjoyed any significant role in directing or conducting American foreign relations. Joseph Story would later explain that the FEC was adopted to protect against "Foreign influence of every sort."[55]

### C.    The Ratification Debates

Once the Constitution was submitted to the state ratification conventions, the Emoluments Clauses were largely though not wholly neglected. Alexander Hamilton devoted a significant portion of Federalist No. 73 to the DEC:

> The legislature, with a discretionary power over the salary and emoluments of the Chief Magistrate, could render him as obsequious to their will as they might think proper to make him. They might, in most cases, either reduce him by famine, or tempt him by

---

[53] On Sullivan's collaboration with Luzerne, see Charles P. Whittemore, *A General of the Revolution: John Sullivan of New Hampshire* (New York, 1961), 165-179.
[54] 10 *DHRC, supra* note 10, at 1365-66.
[55] Joseph Story, 3 *Commentaries on the Constitution* 202 (1833).

largesses, to surrender at discretion his judgment to their inclinations… [I]n the main it will be found that a power over a man's support is a power over his will.[56]

Hamilton warned of the "intimidation or seduction of the Executive by the terrors or allurements of the pecuniary arrangements of the legislative body." Thus, once Congress set a president's salary prior to his entrance in office, "they will have no power to alter it, either by increase or diminution, till a new period of service by a new election commences." Hamilton emphasized that this clause was to be applied broadly to protect the President's independence and to guard against corruption:

> They can neither weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice. Neither the Union, nor any of its members, will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act. He can, of course, have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.[57]

A striking exchange on the FEC, involving two framers—George Mason and Edmund Randolph—took place in the Virginia ratification convention on June 17, 1788, in conjunction with a debate over presidential elections. Randolph first explained the purposes of the clause in terms of "greater security" in the context of war, diplomacy, and anti-corruption:

> This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states. I believe that if, at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.[58]

Two points deserve emphasis. First, Randolph used the word "emolument" in its broadest sense: All men have a "natural right" to receive emoluments "from anyone." The only limitation would be "the regulations of the community" (and not the appointment to a specific office). This

---

[56] Federalist No. 73. Note that Hamilton referred to "salary and emoluments," another indication that he did not think they were synonymous.
[57] *Federalist* No. 73.
[58] 3 Elliot's Debates 465-66; 3 Farrand, *supra* note 8, 327.

sentence only makes sense if one is referring to private market transactions. Second, Randolph emphasizes the problem of appearances of corruption: The "supposed" corruption or perception would have been enough to endanger the crucial French-American alliance during Revolution.

Mason was particularly concerned that the president might seek to stay in office "for life." Mason agreed that "the great powers of Europe" would have a deep interest in the selection and continuation of the president. "This very executive officer, may, by consent of Congress, receive a stated pension from European Potentates," Mason warned. It would also "be difficult to know, whether he receives emoluments from foreign powers or not." Moreover, the electors in the states might also "be easily influenced," again by foreign emoluments.[59] In reply, Randolph argued that the requirement that electors be appointed separately in the states and have to vote on the same day "renders it unnecessary and impossible for foreign force or aid to interpose." But should the president be charged with "receiving emoluments from foreign powers," Randolph continued, the Constitution provided a simple remedy: impeachment.[60]

This exchange between Mason and Randolph—the two Virginia delegates who refused to sign the Constitution before the Federal Convention adjourned—is certainly revealing, especially insofar as it refers to foreign intervention in presidential elections and the remedy of impeachment. But such exchanges on the Emoluments Clauses were rare. The two clauses were not sources of significant controversy. Yet the amply documented records of the ratification debates of 1787-88 remain important for another reason. They demonstrate that "emolument"—which today sounds archaic, but which was commonly used in the eighteenth century—had an array of uses. As one might expect in constitutional debates, the salary and fees one might earn from holding government office were among the most obvious uses of the word. But its common usage was hardly limited to that context. In general, "emolument" was synonymous with multiple forms of material benefits and enrichment that applied not only to individuals, but also to whole communities, classes, and

---

[59] 10 *DHRC*, *supra* note 10, at 1365-66. As holders of an office "of trust" under the United States, electors would also be subject to the clause.
[60] 10 *DHRC*, *supra* note 10, at 1367.

regions.

Consider these examples:

In the same convention where Mason and Randolph discussed undue foreign influence on the president, William Grayson, a senator in the First Congress, referring to the economic advantages to be enjoyed by merchants residing at the national capital: "The whole commerce of the United States may be exclusively carried on by the merchants residing within the seat of Government, and those places of arms, which may be purchased of the State Legislatures. How detrimental and injurious to the community, and how repugnant to the equal rights of mankind, such exclusive emoluments would be, I submit to the consideration of the Committee."[61]

Grayson, comparing the compensation of congressmen to members of Parliament: "The Members of the House of Commons, if I recollect rightly, get nothing for their services as such. But there are some noble emoluments to be derived from the Minister, and some other advantages to be obtained. Those who go to Parliament form an idea of emoluments. They expect something besides wages. They go in with the wishes and expectations of getting offices."[62]

Luther Martin of Maryland, referring to the western land claims of states like Virginia: "Let it be remembered that the State of Maryland was so deeply sensible of the injustice that these lands should be held by particular States for their own emolument . . . ."[63]

James Madison, alluding to the potential benefits of American neutrality in a future European war: "We need not expect in case of such a war, that we should be suffered to participate of the profitable emoluments of the carrying trade, unless we were in a respectable situation."[64]

### D.        The Founding Generation Used the Word "Emolument" Broadly

A search for the word "emolument" in one of the most comprehensive resources on the Founding Era, the University of Virginia's "Founders Early Access" site, produces numerous examples of the founders using the term to mean general benefits or advantages: statements by

---

[61] 10 *DHRC, supra* note 10, at 1191.
[62] 10 *DHRC, supra* note 10, at 1263.
[63] 11 DHRC, *supra* note 10, at 284.
[64] 10 DHRC, *supra* note 10, at 1206.

Hamilton, Madison, Washington, Adams, Jefferson, Jay, Gouverneur Morris, and John Marshall; by those writing to them; and by others in the Convention and ratifying debates—more examples than could possibly be cited here.[65] Here are some illustrations:

In response to the Townshend Acts, American colonists formed nonimportation associations, which pledged not to purchase British goods until their grievances were met. In 1770, one such group in Virginia retaliated against local merchants who refused to join the boycott. Denouncing these holdouts, George Washington, Thomas Jefferson, and other prominent Virginians vowed to "avoid purchasing any commodity … from any importer or seller of British merchandise or European goods, whom we may know or believe . . . to have preferred their own private *emolument*, by importing or selling articles prohibited by this association."[66]

John Marshall, in his successful argument as a lawyer in *Hite v. Fairfax* in 1786, described a property title dispute in these terms: "Again, the words are 'and where upon such grants, quit-rents have been reserved[,]' [p]lainly referring the word *such* to those grants, from the terms of which some advantages, profits and *emoluments* arose to the crown."[67]

In the spring of 1786, James Madison and James Monroe invited Jefferson to join them in a purchase of land in upstate New York. The terms of Madison's proposal called for Jefferson to borrow "four or five thousand louis" (*i.e.*, French coins) "on the obligation of Monroe and myself, with your suretyship to be laid out by Monroe and myself for our triple *emolument*: an interest not exceeding six per cent to be paid annually and the principal within a term not less than eight or ten years."[68] Washington also made similar statements, illustrations of which are given below.[69]

---

[65] See *infra* p. 24-25, n.87 (offering more examples of George Washington's frequent uses of "emolument" in a broad sense of benefit or profit from market transactions because the DOJ brief focuses on Washington's federal land purchase in 1793. There are more examples from Washington and the other founders listed above.
[66] *The Papers of Thomas Jefferson*, vol. 1, *1760–1776* at 43-48 (Julian P. Boyd ed. 1950).
[67] *Hite v. Fairfax* (Original Case Citation: 4 Call 42) 8 Va. 42, 76 (1786) (recording lawyers' full legal arguments); see also Letter from John Marshall to Carey and Lea, June 2, 1832, Rotunda DHRC (referring to "business" emoluments) (emphasis added).
[68] *The Papers of Thomas Jefferson*, *supra* note 66, at 229-36 (emphasis added).
[69] See *infra* p. 24-25, n.87.

The U.S. Supreme Court[70] and state supreme courts[71] of the Early Republic era also used "emoluments" in the context of market transactions, profits, and general benefits. DOJ seeks refuge in an 1850 case, but it overlooks that the fact that the Court was not interpreting a constitutional provision, but a statute explicitly related to official compensation.[72]

One potential question about this interpretation arises from a proposed constitutional amendment in 1810: "If any citizen of the United States shall accept, claim, receive or retain, any title of nobility or honour, or shall, without the consent of Congress, accept and retain any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power, such person shall cease to be a citizen of the United States, and shall be incapable of holding any office of trust or profit under them, or either of them." The DOJ argues that Congress and the states taking away citizenship under a broad definition of emoluments would be "inconceivable."[73] We do not think that word means what they think it means. In 1810, Americans *conceived* precisely of this problem. The context of this moment clarifies why. On a war footing during the Napoleonic Wars and rising conflict with England, Americans on both sides of the French/British divide worried that these European powers were financing American newspapers to be partisan propaganda outlets on either side. Americans feared "a partisan press financially beholden to and

---

[70] *See* Plaintiffs' brief at p. 35-36.

[71] "If it be a private act, obtained at the solicitation of individuals, for their private emolument, or for the improvement of their estates, it must be construed, as to its effect and operation, like a grant." *Ellis v. Marshall*, 2 Mass. 269, 276 (1807); "He farther denied having received any profit or emolument whatever from the said land, except the money arising from the sale thereof . . . ." *Yancey v. Hopkins*, 15 Va. 419, 422 (1810); "But there are other sources of emolument and profit, not strictly called property, but which are rather to be considered as the means of acquiring property, from which a reasonable revenue may be exacted by the legislature, within the fair meaning of the other branches of the power above recited." *President of Portland Bank v. Apthorp*, 12 Mass. 252, 255 (1815).

[72] DOJ cites *Hoyt v. United States*, 51 U.S. 109, 135 (1850), a case in which the Supreme Court wrote that "the term emoluments . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of the office." *Hoyt* was a statutory case, however, which required the Court to interpret an 1802 statute referring to "the annual emoluments of any collector of the customs." 2 Stat. at Large, 172, § 3 (April 30, 1802). The Court's language makes perfect sense in that statutory context, but it has no constitutional implications. It certainly did not purport to circumscribe the scope of "emolument" for constitutional purposes. DOJ asserts that because of "common usage in the founding era . . . the term 'Emolument' in the Emoluments Clauses should be interpreted to refer to a 'profit arising from an office or employ.'" DOJ Brief, *supra* n. 3, at 28 (quoting BARCLAY). The paragraph that supposedly justifies this claim, however, contains only two examples of founding era usage: an 1802 statute and an address by President Washington. *Id.* Neither is remotely sufficient to prove the point at issue—and they surely do not demonstrate any "common usage." Like other members of his generation, moreover, Washington frequently used the word "emolument" in private commercial contexts or to convey a broader meaning.

[73] DOJ Brief at 39-40.

funded by European powers."[74] Like the FEC itself, the 1810 proposal only applied to foreign governments. To prevent this kind of financial influence, a broad meaning of "emolument" would have served as a barrier to subsidizing foreign propaganda. In this era of European conflict and war, strict prohibitions on foreign commerce were common. In 1794,[75] between 1798 and 1800,[76] and between 1806 and 1812, Congress imposed embargoes and restricted private commerce with foreign powers.[77] During the Quasi-War with France a decade previously, the 1799 Logan Act criminalized "any correspondence or intercourse with any foreign government or any officer or agent thereof, with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States."[78] In the 1790s and early 1800s, Congress was not troubled by overly broad restrictions on foreign entanglements.

A thorough examination of the relevant texts and context, from English dictionaries, legal treatises, the historical background in the 17th and 18th centuries, and convention and ratification debates, to the founders' own writings, makes this conclusion inescapable: For vital republican principles, the founders used "emolument" in these two clauses in a broad sense, which extended beyond salaries or payment for official services, and encompassed the fruits of private market transactions.

## IV.   CLAIMS ABOUT PRESIDENTIAL PRACTICES

DOJ calls attention to the fact that President Washington purchased several lots of public land in what became the District of Columbia from the federal government in 1793. DOJ assumes that this transaction was constitutional, and it infers on that basis that the plaintiffs' broad definition

---

[74] Gideon Hart, "The 'Original' Thirteenth Amendment: The Misunderstood Titles of Nobility Amendment," 94 *Marquette Law Rev*. 311, 344 n. 177-78 (2010) (for colorful quotations from newspapers in 1809-1811 making these allegations). Although Hart says there was a "complete absence of debate in both Congress and the state legislatures" about this amendment, our preliminary research has uncovered 57 newspaper articles that published stories about the Amendment between 1810 and 1814, some of which reported on Congressional and legislative debates. We continue to analyze these sources, but are not yet in a position to offer conclusion.

[75] 1 Stat 400-01 (1794).

[76] 1 Stat 565 (1798), 1 Stat 611 (1798), 1 Stat 613 (1799).

[77] 2 Stat 379 (1806), 2 Stat 451 (1807), 2 Stat 473 (1808), 2 Stat 506 (1809), 2 Stat 528 (1809), 2 Stat 605 (1810), 2 Stat 700 (1812), 2 Stat 778 (1812), 3 Stat 88 (1813), 3 Stat 123 (1814); 3 Stat 195 (1815).

[78] 1 Stat 613 (1799).

of "emolument" must be mistaken.[79] There are many reasons to reject DOJ's inference, as well as its ungrounded inferences about federal officials who owned plantations.[80]

First, an Amicus Brief for the defendant backfires by undermining this entire argument. It offers evidence that Washington, Jefferson, Madison, and Monroe kept "presents" from foreign states without notifying Congress, in order to support the authors' idiosyncratic claim that the FEC does not apply at all to the President, despite the text's plain meaning and purposes.[81] But its interpretation of the clause does not withstand scrutiny.[82] Notably, DOJ avoided this argument in

---

[79] DOJ Brief at 38-39.

[80] DOJ points out that four of the nation's first five presidents (Washington, Jefferson, Madison, and Monroe) continued to maintain active plantations while in office, and in the course of doing so, at least two of them exported agricultural products to other countries. DOJ Brief, *supra* n. 3, at 36-37. DOJ speculates that these activities *might* have included commercial transactions with a foreign state, but it provides no evidence that any such transactions occurred. The DOJ argues that there was a tacit understanding that government officials would continue their "private pursuits" because their salaries were low, but it is equally true that there was a strong countervailing current in the Founding, a skepticism of luxury as corrupting, and a deep concern about a governing class enriching itself while in office. Wood, *Creation*, *supra* note 22, at 33-36, 50-52, 64-65.

[81] Brief for Scholar Seth Barrett Tillman as Amicus Curiae in Support of Defendant, CREW, et al. v. Trump, Case 1:17-cv-00458-RA, at 14-17 (filed June 16, 2017) [hereinafter Tillman Amicus Brief].

[82] For contemporaneous evidence that the founders understood that the FEC applied to the president, see the exchange between Mason and Randolph *supra* Section II.C, at p. 17-18. The Tillman Amicus Brief claims that the office of the president is not an "Office of Profit or Trust under the United States" because in England, an "office under the Crown" referred to appointed offices and not the King himself. It offers no supporting historical evidence that the founders, whose criticism of the British monarchy is no secret, equated the president with the king in this way. The framers replaced the sovereignty of the crown with popular sovereignty, not presidential sovereignty. For detailed critiques of the substance of Amicus's argument, *see* Steven Calabresi, "The Great Divorce: The Current Understanding of Separation of Powers and the General Meaning of the Incompatibility Clause," 157 *U. Pa. L. Rev. PENNumbra* 134 (2008); Gautham Rao and Jed Shugerman, "Presidential Revisionism," July 17, 2017, http://www.slate.com/articles/news_and_politics/jurisprudence/2017/07/the_new_york_times_published_the_flims iest_defense_of_trump_s_apparent_emoluments.html. Others have questioned the research upon which this brief is based. *See* Brianne Gorod, "What Alexander Hamilton Really Said," https://takecareblog.com/blog/what-alexander-hamilton-really-said; and Joshua Matz, "Foreign Emoluments, Alexander Hamilton, and a Twitter Kerfuffle," https://takecareblog.com/blog/foreign-emoluments-alexander-hamilton-and-a-twitter-kerfuffle#_ftn1.

Problematically, the brief overlooks a key Hamilton manuscript that undercuts its thesis and belies its description of archival material. *See* Brianne Gorod, "A Little More on Alexander Hamilton and the Foreign Emoluments Clause," https://takecareblog.com/blog/a-little-more-on-alexander-hamilton-and-the-foreign-emoluments-clause.     Gorod offers a persuasive explanation for why the 1792 document did not include the president: It was a preliminary list summarizing the letters providing the salary information, and there was no letter needed to provide the president's salary. We have confirmed these archival findings with a separate visit to the archive: the 1793 signed Hamilton manuscript was in the same box, in the folder immediately next to the folder holding the 1792 manuscript upon which they relied. Even before the discovery of this original manuscript, Amicus incorrectly described the ASP print as "unsigned" and "undated." See Tillman Amicus Brief at p. 19 n.76. The original manuscript confirms the print's date, its signature by Hamilton, and its reference to the president and vice president as "offices under the United States." We have identified a second signed document in the same folder, a cover letter for the condensed version, also dated Feb. 27, 1793, which appears to be drafted and signed by Hamilton. Letter from Hamilton to the Vice President of the United States and President of the Senate, Feb. 27, 1793, RG 46, Box 10, Folder X (unnamed introductory folder, the first in the box), National Archives and Records Administration. For images of both

its own brief. As it remains clear that the FEC does indeed apply to presidents, what amici seem to show is that early presidents sometimes violated the FEC's clear wording by accepting presents. If early presidents plainly violated the FEC's prohibition on presents, then they may also have violated the prohibitions on foreign and federal emoluments. Presidents make mistakes (even George Washington), and courts generally do not assume that Early Republic practices are dispositive of the Constitution's meaning. For example, courts do not typically treat the Alien and Sedition Acts of 1798 as a guide to interpreting the First Amendment, and in *Marbury v. Madison*, the Supreme Court did not defer to the First Congress when it reviewed the Judiciary Act of 1789.[83] The founders understood that they and the future leaders were flawed and would sometimes abuse their powers, whether for good intentions or bad. That is why they framed a Constitution, to establish a fundamental law to protect against such abuses.

Second, neither the DOJ brief nor the Amicus Brief offer any evidence that Washington's land purchase was reported in the press, even if the auction had been advertised beforehand and was attended by 18 people.[84] The three auctioneers were Federalists who had been appointed to their commissioner positions by George Washington himself in 1791. Even if they had remembered the Emoluments Clauses, they might have been reluctant to question their political benefactor.[85] And auctioneers do not usually discourage wealthy, high-profile, powerful bidders from bidding. In any event, it is difficult to understand how this isolated event constitutes

---

documents and others from the archive with transcriptions, see "The Foreign Emoluments Clause: Evidence from the National Archives," https://sites.google.com/view/foreignemolumentsclause.

[83] *But see Stuart v. Laird*, 5 U.S. 299 (1803) and *Myers v. United States*, 272 U.S. 52 (1926) (examples of the Supreme Court weighing founding-era institutional practices heavily). There is a significant difference between a land purchase with a small number of witnesses that was not discussed publicly, on the one hand, and on the other, *Laird* (a deliberate institutional practice of courts) or *Myers* (the "Decision of 1789," a major statute that was debated thoroughly). For more on both *Marbury* and *Laird*, *see* Jed Handelsman Shugerman, "*Marbury* and Judicial Deference: The Shadow of *Whittington v. Polk* and Maryland Judiciary Battle," 5 *U. Pa. J. Con. L. 58* (2002).

[84] Their amicus brief indicates that the auction was advertised six months earlier in Philadelphia, p. 10 n. 34, and it offers secondary sources describing the scene, perhaps drawing on attendees' accounts, but it offers no evidence that newspapers reported Washington's purpose or any of the events. *Id.* at 10-11. Even if an event occurred "in public," it does not automatically become legally significant in terms of original public meaning.

[85] *Id.* at 10-11. Their amicus brief does not mention the party affiliation, but the available records confirm that they were Federalists.

23

significant evidence of original intent or original public meaning.[86]

Third, Washington himself and other founders frequently used the word "emolument" in private commercial contexts or to convey a broader meaning of benefits and advantages.[87] His own use of the word "emolument" would include his 1793 land purchase.

---

[86] It is notable that the DOJ brief and the amicus brief by Tillman and Blackman ostensibly rely on originalist interpretation, but struggle to find original public meaning in overlooked and low-salience practices, when so much evidence drawn from text, context, and purpose weighs in the opposite direction. Original public meaning of the Constitution is significant because any constitutional provision becomes law through public debate and ratification, not the drafting process. At the same time, we caution against a narrowly linguistic approach to original public meaning if it ignores the historians' commitment to understanding the political and intellectual contexts of constitutional debate. For sophisticated discussions of these methodological questions, see Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 3-22 (1996); Keith Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (1999); Keith Whittington, "The New Originalism," 2 *Geo. J. L. & Pub. Pol'y* 599 (2004); Larry D. Kramer, "Two (More) Problems with Originalism," 31 *Harv. J.L. & Pub. Pol'y* 907 (2008); Saul Cornell, "Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism," 82 *Fordham L.R.* 721 (2013-2104), Jack M. Balkin, "The Construction of Original Public Meaning," 31 *Const. Comm.* 71 (2016); Jonathan Gienapp, "Making Constitutional Meaning: The Removal Debate and the Birth of Constitutional Essentialism," 35 *J. Early Rep.* 375 (2015); Lawrence B. Solum, "Originalist Methodology," 84 *U. Chi. L. Rev.* 269 (2017); William Baude and Stephen E. Sachs, "The Law of Interpretation," 130 *Harv. L. Rev.* 1079 (2017).

[87] *See*, for example, Letter from George Washington to Colonel Josias Carvil Hall, Feb. 3, 1778, in U. of Va. Rotunda DHRC Database [Rotunda DHRC], Washington Publications ("On the contrary from the Crisis at which our affairs have arrived and the frequent defection of Officers seduced by views of private interest and emolument to abandon the cause of their Country—I think every man who does not merely make profession of Patriotism is bound by indissoluble ties to remain in the Army"); Letter from Washington to William Livingston, April 11, 1778, Rotunda DHRC ("It is said that these Boats carry private ventures, often put into bye places to take in additional Cargoes to barter with the Enemy, are navigated by the most worthless fellows and bring back a variety of merchandize for the emolument of individuals."); Letter from George Washington to John Price Posey (August 7, 1782) in *The Papers of George Washington 8 April–31 May 1779* 181–82 (Edward G. Lengel ed., Univ. of VA Press, 2010) (criticizing Posey for "selling another Mans Negros [sic] for your own emolument"); Letter from George Washington to Elias Boudinot, 17 June 1783, *Founders Online,* National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Washington/99-01-02-11469 (referring to "the emoluments which might be derived from the Peltry Trade at our Factories"); Letter from Washington to Patrick Henry, Oct. 29, 1785, Rotunda DHRC, ("my private emolument"); Letter from Washington to Madison, Oct. 29, 1785, Rotunda DHRC; Letter from Washington to Friedrich von Poellnitz, March 23, 1790, Rotunda DHRC (describing the "public emoluments" of farming); Letter from Washington to Samuel Vaughn, Aug. 5, 1791, Rotunda DHRC (offering good wishes to an inventor "for his own emolument and the benefit of mankind"). Letter from Washington to James McHenry, July 7, 1797, Rotunda DHRC (condemning one who "seek[s] private emolument at the expence of Public Peace." See also Letter from Alexander Hamilton to George Washington, Jan. 24, 1795, Rotunda DHRC (describing bank charges on a loan as "the emolument being their own"); Military Order, Jan. 15, 1777, Rotunda DHRC ("The General understands, that some individuals are so lost to obedience, as to hold up and conceal, from the rest of the Army several valuable Horses, for their own private emolument taken in the Action of the 3rd Instant at Princeton, and on the march from thence…"); Landon Carter to George Washington, May 9, 1776, cited in Wood, *Creation, supra* note 22, at 50 (fearing that other revolutionaries were unlike Washington, who was "not so much in quest of praise and emolument to yourself as of real good to your fellow-creatures.").

## V.        CONCLUSION

An investigation of the English language dictionaries published from 1604 to 1806, of the influential writings of Blackstone, Pufendorf, and Adam Smith, and of the contemporary usage by the Founding generation in the constitutional debates and in their private writings all confirm a broad definition of the word "emolument": as "profit," "advantage," "gain," or "benefit." The DOJ cherry-picks from two insignificant dictionaries and from the historical sources, despite a mountain of evidence to the contrary. The history of these clauses from their European background through the Articles of Convention, the Philadelphia Convention, and the ratifying debates shows that they were meant to serve as a broad and robust protection against corruption and foreign entanglements, and to defend republican values and the delicate balance of federalism and state power. The founders feared that foreign governments, states, or Congress would use financial pressure and incentives to influence and corrupt the president, or create the appearance of corruption. Only a broad interpretation of these two clauses can guard against such improper influence and be true to the founders' republican purposes.

Dated:  August 11, 2017                          Respectfully submitted,


                                                 */s/ Daniel J. Walker*
                                                 Daniel J. Walker*
                                                 **Berger & Montague, P.C.**
                                                 2001 Pennsylvania Avenue, NW
                                                 Suite 300
                                                 Washington, DC 20006
                                                 Tel: (202) 559-9745
                                                 Email: dwalker@bm.net

H. Laddie Montague, Jr.
Eric L. Cramer
Candice J. Enders
**Berger & Montague, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Email:  hlmontague@bm.net
        ecramer@bm.net
        cenders@bm.net

*Counsel for Proposed Amicus Curiae Legal Historians*

*\*Admitted only in New York. District of Columbia practice is supervised directly by a shareholder of the firm who is a member of the District of Columbia Bar.*

Prof. Jed Handelsman Shugerman
**Fordham University School of Law**
150 W. 62d St.
New York, NY 10023
Tel: (646) 293-3955
Email: jshugerman@law.fordham.edu

Prof. John Mikhail
**Georgetown University Law Center**
600 New Jersey Ave., NW
Washington, D.C. 20001
Tel: (202) 662-9392
Email: mikhail@law.georgetown.edu

Prof. Jack N. Rakove
**Stanford University**
Lane History Corner 117
Stanford, CA 94305
Tel: (650) 723-4514
Email: rakove@stanford.edu

26

Prof. Gautham Rao
**American University**
4400 Massachusetts Avenue NW
Battelle Tompkins 157
Washington, DC 20016
Tel: (202) 885-6745
Email: grao@american.edu

Prof. Simon Stern
**University of Toronto, Faculty of Law**
84 Queen's Park Crescent
Toronto, ON M5S 2C5
Tel: (416) 978-0293
Email: simon.stern@utoronto.ca

Kal7744363