# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2016

No. 15-2914-cv

CENTRO DE LA COMUNIDAD HISPANA DE LOCUST VALLEY, AND THE
WORKPLACE PROJECT,
*Plaintiffs-Counter-Defendants-Appellees*,

*v.*

THE TOWN OF OYSTER BAY, AND JOHN VENDITTO, Town Supervisor of
the Town of Oyster Bay,
*Defendants-Counter-Claimants-Appellants.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 10-cv-02262 (DRH) — Denis R. Hurley, *Judge.*

————

Argued: September 12, 2016
Decided: August 22, 2017

————

Before: JACOBS and PARKER, *Circuit Judges*, and RESTANI, *Judge.*[*]

————

---

[*]   Judge Jane A. Restani, of the United States Court of International Trade, sitting by
designation.

Defendants-Appellants The Town of Oyster Bay and Oyster Bay Town Supervisor John Venditto appeal from a judgment of the United States District Court for the Eastern District of New York (Hurley, *Judge*).   The district court held that an ordinance of the Town of Oyster Bay ostensibly designed to regulate the solicitation of work by day laborers in the Town violated the First Amendment. We affirm.

Judge Jacobs dissents in a separate opinion.

_____

JONATHAN SINNREICH, Sinnreich Kosakoff & Messina LLP, Central Islip, NY, *for Defendants-Counter-Claimants-Appellants The Town of Osyter Bay and John Venditto.*

ARTHUR EISENBERG, JORDAN WELLS, MARIKO HIROSE, New York Civil Liberties Union Foundation, New York, NY; ALAN LEVINE, JACKSON CHIN, Latino Justice PRLDEF, New York, NY, *for Plaintiffs-Counter-Defendants-Appellees Centro de la Comunidad Hispana de Locust Valley and The Workplace Project.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

This appeal requires us to determine whether an ordinance passed by the Town of Oyster Bay to regulate the road-side solicitation of employment complies with the First Amendment. The district court concluded it did not and granted injunctive relief to Plaintiffs-Appellees the Workplace Project ("Workplace") and Centro de La Comunidad de Hispana de Locust Valley ("Centro"), two entities that work to advance the interests of day laborers in the area. We affirm.[**]

In 2009, the Town of Oyster Bay's board passed an ordinance titled "Solicitation from Streets and Sidewalks Prohibited" (the "Ordinance"), which principally imposed the following restriction:

> It shall be unlawful for any person standing within or adjacent to any public right-of-way within the Town of Oyster Bay to stop or attempt to stop any motor vehicle utilizing said public right-of-way for the purpose of soliciting employment of any kind from the occupants of said motor vehicle.

Joint Appendix on Appeal ("App'x") 466–67.[1]   The Ordinance exempts the solicitation of a wide variety of "[s]ervice related activities such as taxicabs, limousine service, public transportation vehicles, towing operations, ambulance service and similar uses." App'x 467.

The Ordinance's stated objective is to protect residents from "the dangers of obstruction, distraction and delays of traffic caused by the solicitation of employment by pedestrians." App'x 466. The record reflects that the actual impetus for the Ordinance was a desire to regulate day laborers seeking employment in Oyster Bay.

---

[**] Also on appeal is the district court's entry of a protective order, which we resolve in a summary order issued simultaneously with this opinion.

[1] Except as otherwise noted, the facts recounted here are undisputed.

3

Specifically, the Town of Oyster Bay sought to restrict the effects of daily gatherings of usually 20–30, but sometimes 50, day laborers soliciting employment along a four-block stretch of Oyster Bay's Forest Avenue (known as the "Forest Avenue shape-up site"). At an initial public meeting, Oyster Bay residents complained that the day laborers were causing dangerous, congestive, unhygienic, and unsightly conditions. *See* App'x 734. At a subsequent public hearing, residents spoke both in favor of and against a proposed version of the Ordinance. Certain residents discussed traffic problems created by the laborers' solicitation, *see* App'x 801, while others premised their objections on their views as to the laborers' immigration status, *see* App'x 826.

Prior to the Ordinance's enactment, an investigation was conducted at the direction of Oyster Bay Town Supervisor and Defendant John Venditto. In furtherance of that investigation, Oyster Bay's Commissioner of Public Safety visited the Forest Avenue shape-up site "between 15 and 20" times, and, among the "numerous and repeated" issues he observed caused by the day laborers' activities were: (i) automobile and pedestrian traffic congestion leading to hazards, delays, and noise disturbance; (ii) 20 to 30 day laborers "swarm[ing]" passing cars; and (iii) impeding and forced re-routing of school busses. App'x 1029–33.

The Ordinance was unanimously adopted by the town board in September 2009. However, it has never been enforced and no person has been charged with violating it. App'x 1035.

In May 2010, Plaintiffs sued the Town of Oyster Bay and Town Supervisor Venditto (together, the "Town") under 42 U.S.C. § 1983 to enjoin the Ordinance on the ground that it violated the First and Fourteenth Amendments. App'x 128. The District Court found that the Ordinance likely violated the First Amendment and entered a temporary restraining order that was converted into a preliminary injunction. The Town appealed to this Court contending that Plaintiffs' members who were subject to the Ordinance were illegal immigrants engaging in illegal speech that was not protected by the

First Amendment and, alternatively, that the Ordinance was narrowly tailored and therefore complied with the First Amendment.  We affirmed on the ground that the district court had not abused its discretion in converting the temporary restraining order into a preliminary injunction and remanded to the District Court because the record on appeal contained no factual development.  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 420 F. App'x 97 (2d Cir. 2011).

On remand, the Town moved for partial summary judgment on the ground that Centro lacked standing.  The court denied the motion, concluding that Centro adequately established that the Ordinance would impose actionable injuries to Centro as an organization.  *Centro de La Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 135-36 (E.D.N.Y. 2013). Subsequently, Plaintiffs moved for summary judgment, which the district court granted.  *Centro de La Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597 (E.D.N.Y. 2015). That ruling rejected the Town's argument that Workplace lacked standing, and, after finding that the Ordinance violated the First Amendment, permanently enjoined the Town from enforcing it.  The district court's basis for finding the Ordinance unconstitutional was that although the Ordinance served a legitimate Town interest, it was insufficiently narrow to serve that interest and consequently could not pass muster under the First Amendment commercial speech framework of *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  This appeal followed.

# I

"We review de novo both a district court's grant of summary judgment and its determination of standing."  *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013). Summary judgment is proper only where "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

## II

The Town's main argument on appeal is that Workplace and Centro lack standing because they are essentially disorganized ad-hoc interest groups that aim to vindicate generalized grievances rather than redress concrete and imminent harms. The district court concluded that both organizations have standing to challenge the Ordinance because they both established that enforcement of the Ordinance would pose a "perceptible impairment" to their activities. 954 F. Supp. 2d at 134–37 (Centro); 128 F. Supp. 3d at 607–09 (Workplace).

We conclude that the district court correctly held that Workplace has standing. Because this conclusion is a sufficient predicate for federal jurisdiction, we are not called on to consider, and therefore do not reach, the question of whether Centro has standing. It is well settled that where, as here, multiple parties seek the same relief, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also Doe v. Bolton*, 410 U.S. 179, 189 (1973); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

It is undisputed that Workplace is an incorporated membership organization based in Nassau County, New York, the same county in which Oyster Bay is located. App'x 990. Its mission is to "end the exploitation of Latino immigrant workers on Long Island and to achieve socioeconomic justice by promoting the full political, economic and cultural participation of those workers in the communities in which they live." App'x 990. Workplace furthers its mission "with the participation of Latino immigrant workers on

6

Long Island through community organizing, legal support, education, leadership development, and building worker cooperatives."  App'x at 990.

To establish standing, Workplace, as an organization, bore the burden of showing: (i) an imminent "injury in fact" to itself as an organization (rather than to its members) that is "distinct and palpable"; (ii) that its injury is "fairly traceable" to enforcement of the Ordinance; and (iii) that a favorable decision would redress its injuries.  *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2342 (2014) ("The party invoking federal jurisdiction bears the burden of establishing standing" (internal quotation marks omitted)).  The Supreme Court has held that an organization establishes an injury-in-fact if it can show that it was "perceptibly impaired" by defendant's actions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Consequently, we have repeatedly held that "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe*, 644 F.3d at 157 (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011); *N.Y. State Citizens' Coal. for Children v. Velez*, 629 F. App'x 92, 94 (2d Cir. 2015).  Moreover, we have held that where, as here, a party seeks review of a prohibition prior to its being enforced, "somewhat relaxed standing" rules apply.  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

The Town challenges only the district court's determination as to the first standing prong, arguing that Workplace failed to establish injuries that  were  concrete or imminent.  We disagree.

## A.    Workplace Established Concrete Injuries

Workplace asserted that enforcement of the Ordinance will injure it in three ways.  First, enforcement will adversely impact its ability to organize day laborers because the Ordinance will

necessarily disperse and reduce the number of day laborers gathering in Oyster Bay.    Second, enforcement will require Workplace to divert resources from other of its activities to combat the effects of the Ordinance. And third, enforcement will expose its advocates to risk of arrest because those enforcing the Ordinance cannot differentiate between advocacy activities and the day laborers' solicitation.   Tellingly, the Town essentially concedes that those injuries could confer standing, but argues primarily that Workplace has not shown they have occurred.

But the Supreme Court has been clear that in a pre-enforcement action such as this "the injury required for standing need not be actualized.   A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct."   *Davis v. F.E.C.*, 554 U.S. 724, 734 (2008).   Workplace has met this standard.   It presented evidence identifying the concrete and particularized injuries that the Ordinance will impose.

The record demonstrates that Workplace's activities include traveling to day laborer sites in Oyster Bay to speak with laborers and if the Ordinance achieves one of its principal objectives—disbursement of day laborers—Workplace will inevitably face increased difficulty in meeting with and organizing those laborers.   App'x 991.   We have held that an organization shows injury-in-fact where, as here, a "policy has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]." *N.Y. Civil Liberties Union*, 684 F.3d at 295; *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011).

Relatedly, it is also clear that the Ordinance will force Workplace to divert money from its other current activities to advance its established organizational interests (*i.e.*, if the laborers are dispersed, it will be more costly to reach them).   In fact, Workplace offered unrebutted testimony that it has already had to devote attention, time, and personnel to prepare its response to the Ordinance.   App'x 956–57.   And, where an organization diverts its

resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing. *See Havens Realty Corp.*, 455 U.S. at 379 (a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests"); *see also Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014); *Nnebe*, 644 F.3d at 157; *Ragin*, 6 F.3d at 905. Significantly, the Supreme Court has recently reaffirmed *Havens Realty*'s holding that a nonprofit organization establishes an injury-in–fact if, as here, it establishes that it "spent money to combat" activity that harms its organization's core activities. *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1303 (2017).

Finally, Workplace offered evidence that those responsible for enforcing the Ordinance are likely to confuse the conduct of Workplace's activists with that of the day laborers. *See* App'x 727–78 (testimony from a Town law enforcement officer that he is unable to distinguish day laborers from activists in a photo taken at a shape-up site); App'x 958–60 (testimony from Workplace activist that she fears her activism will be mistaken for conduct prohibited by the Ordinance). As the district court concluded, not only might this create a risk of erroneous arrest, it makes it "perceptible that enforcement of the Ordinance would prevent Workplace from engaging in counseling at shape-up sites within the Town and thus impair its advocacy activities." 128 F. Supp. 3d at 609.

As discussed, each of Workplace's demonstrated injuries are sufficient to constitute an injury-in-fact. In light of these considerations, we conclude that Workplace has shown that the Ordinance threatens the requisite "perceptible impairment" of its activities and thus imposes concrete injuries for purposes of federal jurisdiction.

**B.     Workplace Established Imminent Injuries**

The Town next argues that even if the Ordinance could affect advocates working on behalf of day laborers in the ways Workplace asserts, Workplace has not shown that it will conduct such work within the relevant area of Oyster Bay.   Br. of Appellants 33–34. Consequently, according to the Town, any potential injury to Workplace is not imminent.  We disagree.

The record establishes that Workplace had substantially more than an imminent intention to engage in the activity that would subject it to the injuries it asserted.  Workplace has actively worked in Oyster Bay and actively campaigned against the Ordinance on behalf of its members.  This conduct amounted to much more than a "'some day' intention" or a "vague desire" to engage in the activities that will subject it to its asserted injuries.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).   The case law makes clear that Workplace's injuries are sufficiently imminent.  In *Davis*, 554 U.S. at 734, for example, Justice Alito, writing for a majority of the court, held that a political candidate faced injury sufficiently imminent to challenge campaign disclosure requirements by simply declaring his intention to run for office and to spend more than the amount for which disclosure was  required.  Here, Workplace has done at least as much as what passed muster in *Davis* and, as a consequence, has established imminent injuries.  In sum, Workplace established its standing.

## III

We now turn to the constitutionality of the Ordinance under the First Amendment.  Our preliminary task is to determine if the Ordinance is even subject to the First Amendment by asking if it restricts speech based on its content.   We conclude that the Ordinance is a content-based restriction, specifically, a restriction on commercial speech.  So finding, we then assess whether the

Ordinance survives the *Central Hudson* test applicable to commercial speech restrictions.

The district court, applying *Central Hudson*, concluded that the Ordinance is a content-based commercial speech restriction that was not narrowly drawn and, as a consequence, violated the First Amendment. Specifically, it concluded that the Ordinance targets speech concerning lawful activity; that the Town's interest is substantial; that the Ordinance directly advances that interest; but that the Ordinance was not narrowly tailored to serve that interest. *See Central Hudson*, 447 U.S. at 566.

We arrive at essentially the same conclusion as the district court. Specifically, we agree that: (i) the Ordinance restricts speech based on its content and is therefore subject to the First Amendment; and (ii) the Ordinance fails the *Central Hudson* test because it is an overbroad commercial speech prohibition.

## A.     The Ordinance Is a Content-Based Restriction

Workplace is correct that the Ordinance implicates the First Amendment because it restricts speech based on its content. Although the Ordinance has a conduct component—the attempted stopping of a vehicle—the Ordinance only punishes such conduct if done "for the purpose of soliciting employment." Consequently, Town officials must monitor and evaluate the speech of those stopping or attempting to stop vehicles and they may sanction the speaker only if a suspect says the wrong thing, for example, "hire me" as opposed to "tell me the time." This is a content-based restriction and it is well settled that such restrictions implicate the First Amendment. For example, in *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), the Supreme Court assessed a city ordinance which prohibited peaceful picketing unless it was

aimed at a school labor-management dispute.  The Court invalidated the ordinance as content-based because "it describe[d] permissible picketing in terms of its subject matter," in that, as here, the "operative distinction [between the permissible and impermissible conduct] is the message."  *Id.*

## B.   *Central Hudson* Test for Commercial Speech

The district court correctly concluded that, because the Ordinance restricts speech only if it constitutes soliciting of employment, the speech targeted by the Ordinance is commercial speech.  It is well settled that speech that is no more than a proposal of possible employment is a "classic example" of commercial speech.  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973); *see also Moldonado v. Holder*, 763 F.3d 155, 173 (2d Cir. 2014) (Lynch, J., dissenting).   Because the Ordinance targets commercial speech, which is afforded less protection than other constitutionally safeguarded forms of expression, it is subject to the *Central Hudson* analysis, to which we now turn.[2]

In contrast to the strict scrutiny applied to, for example, core political speech restrictions, the *Central Hudson* test for commercial speech restrictions is a form of intermediate scrutiny.   *See Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014).  It requires us to ask: (i) if the Ordinance restricts speech that concerns lawful activity; (ii) if the Town's asserted interest is substantial; (iii) if the Ordinance directly advances that interest; and (iv) if the Ordinance is more extensive than necessary to serve that interest?  *Central Hudson*, 447

---

[2] Workplace argues that the speech restricted by the Ordinance is "ideological advocacy and political speech," rather than commercial speech.  Br. of Appellees at 19–24.  Because we conclude that the Ordinance fails even assuming the restricted speech is commercial speech, which is "afford[ed] less protection" than political speech, *Connecticut Bar Association v. United States*, 620 F.3d 81, 93 (2d Cir. 2010), we need not resolve this question.

U.S. at 566.   The government bears the burden of justifying the restriction.   *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983).

### i.      The Restricted Speech Concerns Lawful Activity

"For commercial speech to come within [the protection of the First Amendment], it at least must concern lawful activity and not be misleading."   *Central Hudson*, 447 U.S. at 566. The district court concluded that the speech targeted by the Ordinance—the solicitation of employment—"is not in and of itself illegal," and therefore the speech prohibited by the Ordinance is protected by the First Amendment.  128 F. Supp. 2d at 614.  We too conclude that the Ordinance restricts First Amendment protected speech that "concern[s] lawful activity."

The Supreme Court has offered guidance on what it means for speech to "concern lawful activity."   Notably, in *Pittsburgh Press*, it held a prohibition against gender-based placement of help-wanted ads restricted speech that did not concern lawful activity, concluding that the ads were entitled to no First Amendment protection because "[d]iscrimination in employment . . . is illegal commercial activity." 413 U.S. at 388; *see also id.* ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes.").  The basis for stripping such speech of all First Amendment protection was that "the commercial activity itself is illegal." *Id.* at 389.  Our cases decided after *Pittsburgh Press* offer additional clarity.

In *Swedenburg v. Kelly*, 358 F.3d 223 (2d Cir. 2004), *rev'd on unrelated grounds*, 544 U.S. 460 (2005), we assessed a New York statute prohibiting unlicensed persons from sending into the state "publication[s] of any kind containing an advertisement or a

13

1    solicitation of any order for any alcoholic beverages."  *Id.* at 240.
2    New York law prohibited unlicensed persons from shipping alcohol
3    into the state, and New York argued that it interprets its prohibition
4    to apply only to the solicitation of such illegal orders.  However, we
5    affirmed invalidation of the statute because its "broad language"
6    also restricted the *advertisement* (and not just solicitation) of alcoholic
7    beverages.  *Id.* at 240–41.  Consequently, because the statute could be
8    applied to restrict speech promoting lawful activity, we held the
9    restricted speech "concerns lawful activity" per *Central Hudson*.  *Id.*

10       In *Alexander v. Cahill*, 598 F.3d 79 (2d Cir. 2010), we interpreted
11   the "not be misleading" component of *Central Hudson*'s first prong.
12   There, we held attorney advertising restrictions that prohibited
13   "potentially misleading ads" were subject to *Central Hudson*.  *Id.* at
14   89.  We noted that "'States may not place an absolute prohibition on
15   certain types of potentially misleading information . . . if the
16   information also may be presented in a way that is not deceptive.'"
17   *Id.* at 89 (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)).  Although not
18   addressing *Central Hudson*'s "concern[s] lawful activity" language,
19   *Alexander* shows that commercial speech is not categorically
20   removed from the First Amendment on a specified basis if that basis
21   is not applicable to all manifestations of the restricted speech.  *See id.*
22   at 90.

23       The Fourth Circuit's decision in *Educational Media Co. at*
24   *Virginia Tech, Inc. v. Swecker*, 602 F.3d 583 (4th Cir. 2010) is also
25   instructive.  To combat underage drinking, Virginia's Alcoholic
26   Beverage Control Board prohibited "college student publications"
27   from advertising alcoholic beverages.  Two student newspapers
28   sued.  The Fourth Circuit concluded that the prohibition was a
29   restriction on commercial speech that concerned lawful activity.  It
30   concluded as such because even though the newspapers' readers

were *primarily* under the legal drinking age, the restriction applied to ads that could be viewed by those who were of age:

> On its face, § 5-20-40(B)(3) does not restrict commercial speech *solely* distributed to underage students; rather, it applies to commercial speech that, though *primarily* intended for underage students, also reaches of-age readers.  Therefore, the commercial speech regulated by § 5-20-40(B)(3) concerns lawful activity.

*Id.* at 589.

The Ninth Circuit has addressed *Central Hudson*'s "concerns lawful activity" component specifically in the context of a day labor solicitation restriction.  *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013).  In *Valle*, the government argued that the speech concerned unlawful activity because the prohibition only applied to solicitation "when associated with the unlawful activity of blocking or impeding traffic." *Id.*  The Court rejected the argument, and held plaintiffs met their burden of demonstrating that their solicitation concerns lawful activity, "because it is legal to hire or be hired for day labor." *Id.*

In sum, the First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would *necessarily* constitute an illegal act.  However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction "concerns lawful activity" and is therefore protected commercial speech.

The Town argues that because each proposed employment transaction by a day laborer whom the Ordinance targets would be an under-the-table illegal employment arrangement, in violation of

15

immigration, tax, and labor laws, that solicitation of those transactions does not and cannot "concern lawful activity."  Br. of Appellants at 47.

This argument lacks merit. It is without question that the Ordinance could be applied to prohibit speech proposing no illegal transaction.  As the district court correctly noted:

> [The Ordinance] extends to any individual soliciting employment positioned on property "adjacent to" the Town's streets and sidewalks – even if that individual does not enter the roadway and is a U.S. citizen, who appropriately discloses all his income to federal, state and local income tax authorities, and is the only person in the immediate area on a lightly traveled road with ample parking spaces for any solicited vehicle to lawfully pull over.  In other words, it reaches speech that is potentially lawful.

128 F. Supp. 3d at 615.  We are in accord, and, consequently, we conclude that the Ordinance restricts speech concerning lawful activity.

### ii.    The Town's Asserted Interest is Substantial

The Town's asserted interest in the Ordinance "is to protect the health, safety and welfare of motorists and pedestrians using public rights-of-way in the Town of Oyster Bay from the traffic and other dangers brought about by street side solicitation." Dkt. 10-cv-02262, No. 132-1 at 32 (S.D.N.Y. Dec. 1, 2014).   This interest is substantial under *Central Hudson*.  *See, e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981).

### iii. The Ordinance Directly Advances That Interest

The third step of *Central Hudson* concerns the relationship between the harm underlying the Town's interest and the means identified by the Town to advance that interest. *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999) cautions that the speech restriction must "directly and materially advance[] the asserted government interest."  For good reason, this prong is largely unchallenged by Workplace.  Clearly, prohibiting individuals from stopping traffic to seek employment furthers the interest of traffic and pedestrian safety.  Moreover, the Town offered evidence of the hazards caused by laborers' congregation at the Forest Avenue shape-up site.  Although the Ordinance may be underinclusive, "in the commercial speech context, the Supreme Court has made clear that underinclusiveness will not necessarily defeat a claim that a state interest has been materially advanced." *Anderson v. Treadwell*, 294 F.3d 453, 463 (2d Cir. 2002).

### iv. The Ordinance is Not Narrowly Drawn

Under *Central Hudson*'s fourth prong, the Town bore the burden of establishing that the Ordinance is "narrowly drawn to further the interests served." *United States v. Caronia*, 703 F.3d 149, 167 (2d Cir. 2012).  The Town did not have to show that it chose the least restrictive means of advancing its asserted interests, nor that there was no conceivable alternative.  Rather, its obligation was to establish that the regulation not burden substantially more speech than necessary to further its legitimate interests. *Safelite Grp., Inc.*, 764 F.3d at 265; *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 104 (2d Cir. 2010).

The district court correctly concluded that the Town failed to meet this obligation.  It held that the Ordinance is "extremely far-

1 reaching," in that it prohibits speech that "pose[s] [no] threat to
2 safety on the Town's streets and sidewalks."  128 F. Supp. 3d at 618.
3 It then found that the Town had available to it "less burdensome
4 alternatives available to address street and sidewalk safety," citing
5 to numerous state and local public safety laws.  *Id.* at 619–20.  On
6 those bases, the district court concluded that the Ordinance fails
7 *Central Hudson*'s fourth prong.  We agree.

8     The Ordinance does not require any connection between the
9 prohibited speech—solicitation of employment—and the asserted
10 interest—traffic and pedestrian safety.  There are numerous ways in
11 which an individual, "adjacent to any public right-of-way," might
12 "attempt to stop [a] motor vehicle utilizing said public right-of-way
13 for the purpose of soliciting employment" that would cause no
14 threat whatever to public safety.  The district court offered several
15 apt examples:

16     [The Ordinance] reaches a lone person standing on the
17     sidewalk, away from the curb, who attempts to make
18     known to the occupants of vehicles his availability for
19     work even if it does not result in a car stopping in traffic
20     or double parking.  It reaches children selling lemonade
21     at the end of a neighbor's driveway (which is, after all,
22     "adjacent to" a public right of way), the veteran holding
23     a sign on a sidewalk stating "will work for food," and
24     students standing on the side of a road advertising a
25     school carwash.   Even a person standing on the
26     sidewalk holding a sign "looking for work - park at the
27     curb if you are interested in hiring me" would violate
28     the ordinance as it contains no specific intent element
29     and no requirement that the "attempt to stop" result in

1    traffic congestion, the obstruction of other vehicles, or
2    double parking.

3    *Id.* at 618.

4        The Town argues at the outset that this reasoning by the
5    district court was faulty because it erroneously assessed the impact
6    of the Ordinance on individuals not before the court (*i.e.*, day
7    laborers or lemonade stand vendors).  Specifically, the Town posits
8    that because Workplace only established organizational (rather than
9    representational) standing, it was error for the district court to
10   evaluate the impact of the Ordinance on anyone but Workplace as
11   an organization.  *See* Br. of Appellants at 6–7 (describing this as a
12   "bait-and-switch").  The Town's argument appears to depend on the
13   principle announced in *Village of Hoffman Estates v. Flipside, Hoffman
14   Estates, Inc.*, 455 U.S. 489, 497 (1982), that it "is irrelevant whether
15   [an] ordinance has an overbroad scope encompassing protected
16   commercial speech of other persons, because the overbreadth
17   doctrine does not apply to commercial speech."

18       This argument fails because the Supreme Court has been clear
19   that overbreadth challenges to commercial speech restrictions may
20   be brought if the prohibition "reach[es] some noncommercial
21   speech."  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482
22   (1989).  Here, it is without question that Workplace's activities
23   impacted by the Ordinance constitute core First Amendment
24   activity.  *See Vill. of Schaumburg v. Citizens for a Better Env't.*, 444 U.S.
25   620, 632 (1980) (basic First Amendment activities include
26   "communication of information, the dissemination and propagation
27   of views and ideas, and the advocacy of causes"); *see also N.A.A.C.P.
28   v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) (First
29   Amendment activities of advocacy groups are particularly sensitive

"where a group espouses dissident beliefs"). Because of the Town's restriction on commercial speech, Workplace's ability to engage in those core First Amendment activities will be directly and adversely impacted in the manners we previously described, *supra* 7–10. Accordingly, the Ordinance clearly "reach[es] some noncommercial speech," and the district court was free to assess its broader impact on hypothetical individuals.[3]  And we agree with the district court that the Ordinance's impact on the commercial speech of those hypothetical individuals is too broad to survive *Central Hudson*.

We also find it significant that the Ordinance does not apply to the most common forms of solicitation involving the stopping of vehicles on public rights of way, such as the hailing of a taxi or a public bus.  These exemptions strongly suggest that in the great majority of situations, stopping a vehicle on a public right of way creates no inherent safety issue.  Entirely prohibiting one speech-based subset of an activity that is not inherently disruptive raises the question whether the Town's actual motivation was to prevent speech having a particular content, rather than address an actual traffic and pedestrian congestion issue.  *See Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 493 (1997) (Souter, J. dissenting) ("'[E]xemptions and inconsistencies' in alcohol labeling ban 'bring into question the purpose of the . . . ban,' such that it does not survive the *Central Hudson* test") (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995)); *The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("[T]he facial underinclusiveness of § 794.03 raises serious

---

[3] That the Ordinance adversely impacts certain core First Amendment activity does not remove the Ordinance from the less-strict review of our commercial speech jurisprudence. A commercial speech prohibition that leads to coincident "restrictions on expressive speech," is still assessed under commercial speech doctrine if the restrictions on expression "properly are characterized as incidental to the primary congressional purpose of" the prohibition. *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 536-37 (1987).

1   doubts about whether Florida is, in fact, serving, with this statute,
2   the significant interests which appellee invokes.").   And, as
3   discussed below, it is relevant to the "narrowly drawn" analysis if
4   the Town was principally motivated in restricting a particular
5   category of speech, rather than the "traffic safety" interests it has
6   asserted.

7       The Town responds by arguing that the Ordinance is
8   narrowly drawn despite its broad exemptions because the
9   Ordinance is aimed at the specific situation at the Forest Avenue
10  shape-up site, which, unlike a singular taxi hailer for example,
11  involves large numbers of people gathered in groups to stop cars.
12  But the Ordinance does not limit solicitation of employment when
13  done in large groups, it broadly extends to all types of solicitation.
14  Therefore, the Ordinance is not "narrowly drawn."

15      Finally, it is an "important consideration" to the "narrowly
16  drawn" requirement if there existed "numerous and obvious less-
17  burdensome alternatives to the restriction on commercial speech"
18  *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995).  The district
19  court cited to "a number of less burdensome alternatives to address
20  street and sidewalk safety."  128 F. Supp. 3d at 619.  As one notable
21  example, Section 173-4 of the Town's Code prohibits a "solicitor"
22  from (i) "occupy[ing] any stationary location in any street or any
23  public property"; or (ii) "solicit[ing] in any congested place or an
24  area when or where such activity may impede or inconvenience the
25  public or add to the congestion of such place or area."  Section 173-4
26  is probative not only because it is an example of a less content-based
27  tool than the Ordinance to stop the precise harm the Town claims
28  motivated the Ordinance.  It also demonstrates how the Town could
29  have drawn the Ordinance such that it would advance its asserted
30  interest while limiting the impact on constitutionally protected

speech by tying the prohibition to a manifestation of the harm sought to be avoided.

The Town argues that the regulations identified by the district court do "not address the full panoply of dangers that have arisen and are concomitant with a bustling street-side labor market." Br. of Appellants at 60. Even assuming, *arguendo*, this to be true, it is of no moment. The Ordinance does not prohibit a "bustling street-side labor market"; it broadly prohibits any attempt to stop a vehicle to solicit employment anywhere in Oyster Bay irrespective of its effect.

It is therefore clear that the Ordinance simply adds a speech-based component to an already existing prohibition. This is another indication that the principal interest the Town aimed to serve was the suppression of that particular speech, rather than the interests in traffic and pedestrian safety that it asserted before the district court. We refuse to conclude that the Ordinance is narrowly drawn where it broadly impacts protected speech and only narrowly addresses the Town's stated interest. In *Edenfeld v. Fane*, 507 U.S. 761, 768 (1993), the Court cautioned that under *Central Hudson*, courts should not "turn away if it appears that the stated interests are not the actual interests served by the restriction."

For these reasons, we conclude that the district court correctly held that the Ordinance is an unconstitutional restriction of commercial speech in violation of the First Amendment.

Finally, we note that the dissent faults us for affirming the invalidation of the entire Ordinance, including subdivision D, rather than severing subdivision C. Dissenting op. at 15–19. This contention is the exclusive concern of our dissenting colleague, not of the parties. Plaintiffs have sought invalidation of the entire Ordinance since the inception of this litigation. During the seven years that this litigation has been pending, the Town has never

1    raised the prospect of severing the Ordinance, not in its pleadings,
2    not during extensive summary judgment proceedings, and not in the
3    two appeals taken to this Court.  If the Town wanted severance as an
4    alternative remedy it, presumably, would have said so.   In any
5    event, the law is well settled that arguments as to severability are
6    waived where, as here, a party fails to raise the issue.  *See*, *e.g.*,
7    *Redondo Beach*, 657 F.3d at 951 n.10; *Bishop v. Smith*, 760 F.3d 1070,
8    1095 (10th Cir. 2014); *Lozano v. City of Hazelton*, 620 F.3d 170, 182 &
9    n.13 (3d Cir. 2010), *rev'd on irrelevant grounds*, 563 U.S. 1030 (2011);
10   *Telecomm's Reg. Bd. of Puerto Rico v. CTIA-Wireless Ass'n*, 752 F.3d 60,
11   62 n.2 (1st Cir. 2014).

## CONCLUSION

13   The judgment of the district court is **AFFIRMED**.

DENNIS JACOBS, *Circuit Judge*, dissenting:

I respectfully dissent.

This case was brought by two plaintiffs; one is an organization that seems not to exist except as a vehicle for this litigation; the other is an organization that claims standing by casting some of its own elective (and slight) conduct as injury, and by speculating about future harm that it is unlikely to incur. I would therefore order dismissal for lack of standing. Beyond that (if one can get beyond that), the injunction entered by the district court is more broad than the First Amendment violation found can justify, and is obviously formulated to remedy harms that were not found and were in any event not inflicted on these plaintiffs. The mess is unusually thick.

An Ordinance of the Town of Oyster Bay bars pedestrians from soliciting work from areas adjacent to a roadway and bars drivers from pulling over to pick them up. The complaint alleges that the Ordinance, which seems clearly aimed at conditions created by the recruitment of day laborers, violates rights of free speech, equal protection, and due process. The district court found that the bar on solicitation violates the First Amendment and declined to reach other claimed grounds for relief. Unaccountably, however, the district court enjoined

the enforcement of the entire Ordinance—including its regulation of drivers, which has no First Amendment ramification.  The majority on appeal affirms the injunction in whole, and finds jurisdiction on the basis that one of the organizations had standing (without reaching the standing of the other).  Because I would dismiss for lack of standing, I reach the standing question as to both plaintiff organizations.

## I

According to the complaint, plaintiff Centro de la Comunidad Hispana de Locust Valley ("Centro") is an "unincorporated membership organization."  That is a boast.  It has no organization to speak of: no charter, no bylaws, no bank accounts, no funding, no expenditures.  And it seems to have no members: anybody who shows up at a meeting (if there are any) is deemed a member; the only member identified in the record is one Luz Torres, who is the chairperson of whatever it is; and she conceded at deposition that "we don't have membership."

This supposed organization was formed (according to Torres) at a community meeting a few months after the Town of Oyster Bay adopted the challenged Ordinance.  Although Torres says that Centro has some other generalized reasons to exist, she admits that the Ordinance was "the principal

reason" it was formed. App. 529. That is easily demonstrated. There has been for twenty years an organization of similar name (Centro Cultural Hispano de Oyster Bay y Vecindades), of which Torres was a co-founder; Torres proposed that it sue the Town over the Ordinance; and only after at least some portion of the board disapproved did Torres think of creating a new organization.[1] A document memorializing a community meeting shortly before (new) Centro's supposed formation includes bullet points of items discussed: the first bullet point is "Create an organization that is responsible and will support us"; and the third bullet point is "File the lawsuit." (The second and fourth agenda items are "Be united to reach our goals" and "Attend Meetings.")[2] Aside from Torres, attendees of the formational meeting are described in the record only generically, and prominently among them are "the lawyers." App. 541. The record does not

---

[1] It is unclear whether the board formally declined to sue the Town or if Torres voluntarily withdrew the proposal after encountering opposition. Reasons for declining are not stated in the record, though they might be inferred from the fact that the organization has a long-standing (and apparently ongoing) relationship with the Town, which grants it free use of facilities and provides funds for its English classes and youth programs.

[2] This document and the portion of the deposition transcript that includes the admission that Centro has no membership are filed under seal as part of a "Confidential Appendix." The reason for confidentiality is obscure, and suppression is contrary to the public interest. Confidentiality was not required to preserve the privacy of members, who are not listed if indeed they exist.

say what the lawyers were doing there, but they were evidently not helping Centro to incorporate, since it is unincorporated.

Everything supports the inference that Centro is a special-purpose litigation vehicle, created to bring this lawsuit.  It is unclear whether it has done anything else in the seven years since it filed the complaint.[3]  This pretext does not satisfy Article III, which requires that "the decision to seek [judicial] review . . . be placed in the hands of those who have a direct stake in the outcome," and not "in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests."  *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (internal citation and quotation marks omitted).  Centro cannot suffer actual or threatened injury if it exists only as the vehicle for this litigation, or as the alter-ego of some concerned bystander.

## II

The second plaintiff, The Workplace Project, was apparently enlisted as a hedge against the court's realization that Centro lacks standing.  Workplace is a real organization that has existence and function outside this litigation.  But it is not based in the Town of Oyster Bay; it is in the Town of Hempstead, which is (of

---

[3]     A Google search for "Centro de la Comunidad Hispana de Locust Valley" returns about 250 results, *all of which* pertain to this litigation.

course) not subject to the challenged Ordinance.  It claims nevertheless that the scope of its mission encompasses all of Long Island, and it asserts standing on three grounds.  Of the three, the district court premised standing solely on the idea that the Ordinance might be (erroneously) enforced against Workplace or its agents if its organizing and counseling activities are mistaken for roadside employment solicitation.  The district court did not consider the other two other injuries claimed by Workplace as a pretext for standing: that the Ordinance harms its mission to serve day laborers by either dispersing them or reducing their number; and that its effort to fight the Ordinance diverts resources from its other activities.  The majority is convinced that each of these three purported injuries is real and independently sufficient to confer standing.  But none of them constitutes "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citation and quotation marks removed).

The risk of mistaken enforcement against the organization's advocates is a fine example of a conjectural and hypothetical harm—I suppose it could

materialize, but it has not, and it might never.  That is no "actual or imminent" injury.[4]

The supposed interference with the organizational mission of serving day laborers is conjectural, vague, and generalized.  Worse, if it were sufficient, a pop-up organization could gin up standing by alleging a mission to oppose any law it wished to challenge.  The majority is persuaded that by dispersing Oyster Bay's day laborers, the Ordinance will make it harder for Workplace to meet with them; but this would be an indirect and remote consequence, even assuming that Workplace operates in the Town of Oyster Bay. These arguments fail to establish "the irreducible constitutional minimum of standing."  *Id.*

The argument that the Ordinance injures Workplace by diverting its resources from other activities relies on a line of cases beginning with *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and culminating in *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011).  The thrust of those cases (as to organizational standing)

---

[4]    To show imminence, the majority cites *Davis v. F.E.C.*, 554 U.S. 724 (2008), which "held that a political candidate faced injury sufficiently imminent to challenge campaign disclosure requirements by simply declaring his intention to run for office and to spend more than the amount for which disclosure was required."  Op. 8.  The candidate in *Davis* thus challenged a law that would apply to him, whereas here, a law that does not apply to the plaintiff is challenged because the plaintiff thinks it might be enforced against it *by mistake.*

is that even the slight diversion of resources to remedy some harm or to fight some harmful conduct or policy can constitute an injury-in-fact sufficient to confer standing if the injury is perceptible, concrete, and demonstrable.  In those cases, however, the organizational plaintiff did not put itself in the way of harm as a pretext to achieve standing; rather, the challenged conduct or policy came unbidden to the organizational plaintiff, and diverted its limited resources.  The distinction raises the problem of "manufactured" standing that is identified by the court in *Nnebe*.  Synthetic standing was not found in that case; but it is present in this one, and the majority therefore distorts rather than applies those cases.

In *Havens Realty*, the organizational plaintiff provided housing counseling services to homeseekers of limited means, and investigated complaints of discrimination.  The Supreme Court held that if the defendants' alleged racial-steering practices "perceptibly impaired" the organization's ability to provide its counseling and referral services, then "there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's

7

resources—constitutes far more than simply a setback to the organization's abstract social interests." 455 U.S. at 379 (citation omitted).

In *Nnebe*, the organizational plaintiff was a taxi-drivers' union; it had standing to challenge a license-suspension policy of the Taxi and Limousine Commission because it counseled those of its own members who were potentially affected, helped them obtain lawyers, and impressed upon the lawyers the heightened stakes that resulted from the policy. 644 F.3d at 157. We reasoned that the union needed to allocate resources to assist its members once the city initiated proceedings against them, and that need—which the union did not invite, choose, or provoke—created an injury sufficient for standing.

The organizational plaintiffs in those cases had their activities perceptibly impaired by the conduct or policy they challenged, and they diverted at least some of their limited resources to remedy the harm that the conduct or policy imposed. That is, the challenged conduct or policy arrived at the organization's door and either created new work for it or burdened the work it was already doing.

In this case, the only evidence that the Ordinance touched Workplace in any way is: the testimony of two people who worked for Workplace and who

believe that some third employee visited day laborers in Oyster Bay at some time in the past, though they are vague about when and where and for what purpose, App. 937–38, 944–51; that some Workplace personnel attended a rally against the Ordinance, *id.* 947–48; and that Workplace "had to put some time into finding out about the ordinance" and tried "to support [Centro]" and "work on that issue to some degree," *id.* 956.

None of that is a cognizable injury to Workplace.  The crucial question is whether any of it required curtailing Workplace's normal work; but as to that, the testimony was "I don't remember."  *Id.* 957.  The Ordinance may represent "a setback to [Workplace]'s abstract social interests," *Havens Realty*, 455 U.S. at 379, but mere organizational opposition does not constitute organizational injury. Even if Workplace invokes the "perceptible impairment" standard of *Havens Realty* and *Nnebe*, those cases do not relieve plaintiffs of the constitutional requirement of showing injury that is "concrete and particularized" and "actual or imminent."  *Lujan*, 504 U.S. at 560.

In sum, the majority opinion premises standing on purported organizational injury that is speculative and generalized, and—to the extent that it exists—both elective and negligible.  Workplace has not shown that the

9

Ordinance inflicts unbidden injury on it as an organization, and it therefore does not have standing as an organization to bring this litigation.

III

This case, of course, is not about injury to any organization.  To the contrary, the complaint affirmatively alleges that this is "a civil rights action about the ability of predominantly Latino, immigrant day laborers to exercise their right to solicit work on the streets and sidewalks of their towns and villages without fear of being targeted because of their race and national origin."  App. 115.  In other circuits, an organization composed of members with standing (such as day laborers in Oyster Bay) can itself have standing in cases under the Civil Rights Act; but the precedent of this Circuit forecloses such representational standing.  Since we (and apparently we alone) prevent representational standing, we require that in such cases the organization show injury to itself *as* an organization.  The result has been an erosion over time of what constitutes institutional injury as we try to replicate representational standing by other means.  This distortion explains what has happened in this case, in which "perceptible" impairment is treated merely as the opposite of "imperceptible," and in which we dispense altogether with the constitutional requirement of

10

injury that is both "concrete" and "demonstrable," and either "actual" or "imminent."

The rule in this Circuit—that an organization lacks standing to sue under the Civil Rights Act for violations of the rights of its members—was adopted over forty years ago in a case that may have outlived its usefulness.  In *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973), this court reasoned that the statute "confers a cause of action on 'any citizen of the United States or other person within the jurisdiction thereof' who has been deprived under color of state law 'of any rights, privileges, or immunities secured by the Constitution and laws,'" and that "[n]either this language nor the history" of the statute suggests that organizations can sue in the place of others.  *Id.* at 1099.  The court cited *Hague v. CIO*, 307 U.S. 496 (1939), in which the Supreme Court dismissed organizational plaintiffs (while affirming a holding in favor of individual plaintiffs) on the ground that the Privileges and Immunities Clause, 307 U.S. at 514, and the liberty guarantee of the Due Process Clause, *id.* at 527, apply only to "natural, not artificial, persons."  *Id.*

*Hague* thus suggests that organizations cannot sue on their own behalf (because they lack the rights they would seek to vindicate);[5] but it says nothing about whether they can stand in the place of their members.  And two years after *Aguayo*, the Supreme Court observed (albeit in dicta) that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members" if its members are harmed.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  The Supreme Court later cited *Warth* when it formulated a three-part test for this "representational" or "associational" standing:

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

Did *Warth* and *Hunt* abrogate *Aguayo*?  *Hunt* was not a § 1983 case, though it relied on *Warth*, which was; and the relevant portion of *Warth* is dicta.  Nevertheless, several of our sister circuits, unburdened by *Aguayo*, have applied the *Hunt* test for representational standing in § 1983 cases.  *See, e.g., Nat'l Fed'n of*

---

[5]     The Supreme Court has lately taken a more expansive view of the rights of artificial persons.  *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *Citizens United v. FEC*, 558 U.S. 310 (2010).

*Blind of Mo. v. Cross*, 184 F.3d 973, 981 (8th Cir. 1999); *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 600–07 (7th Cir. 1993); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 945 F.2d 1260, 1264–66 (3d Cir. 1991); *Md. Highways Contractors Ass'n, Inc. v. State of Maryland*, 933 F.2d 1246, 1251–53 (4th Cir. 1991); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405–09 (9th Cir. 1991).  The Fifth and Sixth Circuits have expressly held that organizations possess standing to sue under § 1983 for violations of the rights of their members in such circumstances.  *See Church of Scientology v. Cazares*, 638 F.2d 1272, 1276–77 (5th Cir. 1981); *Memphis Am. Fed'n of Teachers v. Board of Educ.*, 534 F.2d 699 (6th Cir. 1976).[6]

This Circuit has adhered to *Aguayo* without ever expressly considering the impact of *Warth* or *Hunt*.  *See League of Women Voters v. Nassau County Board of Supervisors*, 737 F.2d 155, 160–61 (2d Cir. 1984) ("This Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured. . . .  Necessarily, we adhere to our prior

---

[6]     Additionally, one district court in this circuit held (in a decision that was evidently never appealed) that "[t]he premises upon which the *Aguayo* decision was based . . . are no longer viable in light of" *Warth* and *Hunt*.  *Huertas v. E. River Hous. Corp.*, 81 F.R.D. 641, 651 (S.D.N.Y. 1979) (Carter, *J.*).

decisions . . . .").  *Nnebe* likewise followed *Aguayo* (this time over the objection

that it had been cast into doubt by *Warth*), observing in a footnote that

> we reaffirmed the *Aguayo* rule in *League of Women Voters* nine years
> after *Warth* and have not since reconsidered it.  Accordingly, we are
> bound by the *implicit determination* of prior panels that the rule
> survives *Warth* 'until such time as [our prior decisions] are overruled
> either by an en banc panel of our Court or by the Supreme Court.'

644 F.3d at 156 n.5 (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir.

2004)) (emphasis added).

 We continue to rely on that "implicit determination."  *Nnebe* posits that we

await Second Circuit in banc review to overrrule *Aguayo* (or, presumably, even to

consider for the first time explicitly whether its rule is abrogated by *Warth* and

*Hunt*).  But that may be a vain hope given the desuetude of our in banc practice.

In the meantime, our indulgence of increasingly tenuous and pretextual claims of

injury to organizations themselves now threatens to swallow Article III

limitations: the majority opinion holds, in essence, that an organization can

achieve standing to challenge a law relevant to its mission by "allocating

resources" to learning about the law and attending a protest rally.

 The plaintiffs preserve by footnote the argument that they have

representational standing, noting that "*Aguayo* is contradicted by subsequent

Supreme Court authority . . . and is inconsistent with the principles underlying § 1983." Appellee Br. 51 n.16. They may be right about *Aguayo*, and a time may come when we rethink organizational standing, or when the Supreme Court does an intervention.

## IV

Since on this record no plaintiff has shown standing, I would go no further. The majority does go further, however; and while there is appreciable merit to its analysis, it affirms a remedy considerably broader than that analysis can support.

The consistent focus of the majority opinion is the First Amendment rights of people soliciting work while standing at the roadside. The speakers whose rights are at issue are the people who are saying (as the majority puts it), "hire me," Op. 9, and the restriction on that commercial speech is the premise for all that follows (right up to the examples of a lemonade stand and the veteran who will work for food), Op. 16–17. This, it seems to me, is sound as far as it goes. Even the "conduct component" of attempting to stop vehicles is essentially expressive since all a pedestrian can do from the lawful vantage of a sidewalk is signal availability to passing drivers. The persuasive force of this analysis has bearing on subdivision C of the Ordinance, which restricts the conduct of

15

persons adjacent to the roadside.  It does not, however, support an injunction against enforcement of the Ordinance as a whole, which in subdivision D regulates traffic, and in particular the conduct of the truck-drivers, who are not engaged in speech.

"[T]he normal rule [is] that partial, rather than facial, invalidation is the required course," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985), and we therefore "should refrain from invalidating an entire statute when only portions of it are objectionable."  *Nat'l Advert. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991).  Severance is a question of state law, and New York follows the standard described by Justice Cardozo:

> The principle of division is not a principle of form.  It is a principle of function.  The question is in every case whether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether.  The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch, instead of at the roots.

*People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60 (1920).  The Ordinance contains separate commands, separately lettered, and the separate command of subdivision D can operate independently.  It can hardly be doubted

that the Town would wish to enforce this traffic rule: as the majority opinion

recognizes, the Town's asserted interest is substantial, Op. 14, and the Ordinance

directly advances that interest, Op. 15.

According to the Town, the goal of the Ordinance is to fix the traffic and

safety problems that arise when trucks stop along a roadway to pick up day

laborers.  This problem is addressed directly by subdivision D, which applies to

drivers only.  And since driving is not speech, subdivision D does not burden

speech—and it raises no thorny problems (arguably raised by subdivision C)

such as the uncertain scope of proscribed conduct or discriminatory enforcement.

This is fully consistent with the majority's analysis: the conclusion that the

Ordinance is overbroad would be strengthened by the observation that the Town

can advance its important governmental purpose just as well without the

offending subsection C.

True, the parties have not argued or briefed severability, but severance is

unlike ordinary defenses, which are abandoned unless raised; a severance issue

arises only when a court finds a statutory infirmity and must craft a remedy, and

the issue inheres in the judicial act of ordering a remedy.  Sua sponte invocation

of this prudential rule may be a case-by-case decision, but when a plaintiff seeks

17

an injunction more broad than necessary to remedy the wrong that is found, it is prudent to tailor the injunction (or revisit it) even if the defendant imprudently made all-or-nothing arguments.

Waiver is a prudential doctrine, and its invocation here would conflict with the "general rule [that] a court should refrain from invalidating an entire statute when only portions of it are objectionable." *Nat'l Advert. Co.*, 942 F.2d at 148. "Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert." *Alpha Portland Cement Co.*, 230 N.Y. at 62–63. The Supreme Court has instructed that, ordinarily, "partial, rather than facial, invalidation is the *required* course." *Brockett*, 472 U.S. at 504 (emphasis added). The appellees' brief in *Brockett* argued that the appellants should be precluded from raising severability because they failed to raise it below (*Brockett*, Appellees Br. at 44 (1984 WL 565782)); yet *Brockett* did not consider waiver, and held that "severability is no obstacle to partial invalidation, which is the course the Court of Appeals *should have pursued*." 472 U.S. at 507 (emphasis added).[7]

---

[7] The Supreme Court's decision in *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), is not to the contrary. In that case, the Second Circuit had invalidated only a portion of a statute, and because the parties did not discuss the severability determination at the Supreme Court, that Court "in the exercise of [its] discretion and prudential judgment . . . decline[d] to address it." *Id.* at 549. There is a difference, however, between an exercise of discretion and prudence that leaves in place part of a law, and one that invalidates more of a law than necessary.

If some plaintiff had standing, and if the majority were correct at every other point in its opinion, the proper remedy would be severance and an injunction limited to subdivision C of the Ordinance.  Of course, the overbreadth of the injunction here is no drafting error.  The transparent purpose of seeking an injunction to protect the expressive rights of day laborers is to enable the open-air traffic in day labor; and the complaint seeks to vindicate the Equal Protection and Due Process rights of those day laborers against what the plaintiffs allege is the discriminatory motive of the Town.  The enjoining of subsection C—which is the appropriate remedy for the First Amendment infirmity found—would be an insufficient means to those broader ends.  However, the district court did not rule on the Equal Protection or Due Process claims, and the majority now affirms an injunction suited to claims that were never reached.