**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON, *et al.*,

                *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United States,

             *Defendant*.

No. 17 Civ. 458 (GBD)

**DEFENDANT'S REPLY
<u>IN SUPPORT OF HIS MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................................................................1

ARGUMENT ................................................................................................................3

I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS .....................3

     A.     CREW Has Not Alleged Injury-in-Fact and *Havens Realty* is Inapposite .............3

     B.     ROC United, Phaneuf, and Goode Have Failed to Establish Standing .................5

          1.     The hospitality Plaintiffs' alleged injury is speculative.............................5

          2.     The hospitality Plaintiffs have no competitor standing ............................7

     C.     ROC United Has Failed to Show Associational Standing ....................................12

II.     PLAINTIFFS ARE OUTSIDE THE EMOLUMENTS CLAUSES' ZONE OF INTERESTS AND HAVE NO EQUITABLE CAUSE OF ACTION ............................13

III.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM ...................................................15

     A.     Plaintiffs' Interpretation of the Text of the Emoluments Clauses is Overbroad and Unreasonable.................................................................15

     B.     The Purposes of the Emoluments Clauses Do Not Compel Plaintiffs' Broad Reading of the Clauses.................................................................21

     C.     The President's Position is Consistent with Prior Interpretations of the Emoluments Clauses.................................................................23

     D.     History Refutes Plaintiffs' Interpretation of the Clauses.....................................25

     E.     Plaintiffs Do Not State a Claim Under The President's Interpretation.................27

IV.     THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.......29

CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993)...................................................................... 9, 10

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995)................................................................................... 9

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015)............................................................................. 14

*Arnold Tours, Inc. v. Camp*,
  400 U.S. 45 (1970).................................................................................... 11

*Bank of America Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017)............................................................................. 13

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004)..................................................................... 12

*Bond v. United States*,
  564 U.S. 211 (2011)................................................................................. 13

*Boumediene v. Bush*,
  553 U.S. 723 (2008)................................................................................. 29

*Canadian Lumber Trade All. v. United States*,
  517 F.3d 1319 (Fed. Cir. 2008)............................................................... 10

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
  ---F.3d---, No. 15-2914-cv, 2017 WL 3596995 (2d Cir. Aug. 22, 2017) .................. 5

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................................... 5

*Clarke v. Sec. Indus. Assn.*,
  479 U.S. 388 (1987)................................................................................. 13

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998)................................................................................. 11

*Cooper v. Tex. Alcoholic Beverage Comm'n*,
  820 F.3d 730 (5th Cir. 2016) .................................................................. 11

*Ctr. for Reproductive Law & Policy v. Bush*,
   304 F.3d 183 (2d Cir. 2002) ........................................................................... 9

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) ..................................................................................... 19

*E. Tenn. Nat. Gas Co. v. Sage*,
   361 F.3d 808 (4th Cir. 2004) ....................................................................... 14

*eBay, Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ..................................................................................... 14

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................................... 30

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................................... 14

*Fulani v. League of Women Voters Education Fund*,
   882 F.2d 621 (2d Cir. 1989) ........................................................................... 8

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .................................................................................. 1, 4

*Hedges v. Dixon Cty.*,
   150 U.S. 182 (1893) ..................................................................................... 14

*Hedges v. Obama*,
   724 F.3d 170 (2d Cir. 2013) ........................................................................... 7

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
   724 F.3d 206 (D.C. Cir. 2013) ..................................................................... 11

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ................................................................................. 20

*K.D. ex rel. Duncan v. White Plains Sch. Dist.*,
   921 F. Supp. 2d 197 (S.D.N.Y. 2013) ........................................................... 6

*Knife Rights, Inc. v. Vance*,
   802 F.3d 377 (2d Cir. 2015) ........................................................................... 7

*Liquid Carbonic Indus. Corp. v. FERC*,
   29 F.3d 697 (D.C. Cir. 1994) ....................................................................... 11

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ................................................................... 14

*In re McCormick & Co. Pepper Prods. Mktg. & Sales Practices Litig.*,
    215 F. Supp. 3d 51 (D.D.C. 2016) .............................................................. 11

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ................................................................... 11

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
    774 F.3d 895, 906 (6th Cir. 2014) ............................................................... 14

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ............................................................................... 3, 29

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................................................. 26

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
    522 U.S. 479 (1998) ................................................................................. 11

*New World Radio, Inc. v. FCC*,
    294 F.3d 164 (D.C. Cir. 2002) ................................................................... 10

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ..................................................................... 11

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) .............................................................................. 26

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) .................................................................... 4, 5

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) ............................................................................ 4

*Rent Stabilization Ass'n of N.Y. v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993) .......................................................................... 12

*Robinson v. Gov't of Malay.*,
    269 F.3d 133 (2d Cir. 2001) ........................................................................ 5

*Ross v. Bank of Am., NA*,
    524 F.3d 217 (2d Cir. 2008) ...................................................................... 11

*Schulz v. Williams*,
    44 F.3d 48 (2d Cir. 1994) ................................................................. 8

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ......................................................................... 4

*South Dakota v. Yankton Sioux Tribe*,
    522 U.S. 329 (1998) ......................................................................... 17

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................... 12

*State National Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ........................................................... 10

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ..................................................................... 7

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ........................................................... 11

*In re U.S. Catholic Conference*,
    885 F.2d 1020 (2d Cir. 1989) ........................................................... 9

*United States v. Nixon*,
    418 U.S. 683 (1974) ......................................................................... 29

*United States v. Venturella*,
    391 F.3d 120 (2d Cir. 2004) ............................................................. 17

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ......................................................................... 13

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) ............................................................. 6

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ......................................................................... 13

## STATUTES

15 U.S.C. § 1125(a) ............................................................................ 11

18 U.S.C. § 208 .................................................................................. 27

18 U.S.C. § 202(c) ................................................................................................ 27


**UNITED STATES CONSTITUTION**

U.S. Const. art. II, § 1, cl. 7 ............................................................................... 18


**OFFICE OF COMPTROLLER GENERAL OPINIONS**

*Matter of Lieutenant Colonel Marvin S. Shaffer*,
   62 Comp. Gen. 432 (June 2, 1983) ............................................................... 24

*Retired Marine Corps Officers*,
   B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) ............................ 23


**OFFICE OF LEGAL COUNSEL OPINIONS**

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
   and Decorations Act*,
   6 Op. O.L.C. 156 (1982) ............................................................................... 23

*Applicability of Emoluments Clause to Proposed Serv. of Gov't Employee on
   Comm'n of Int'l Historians*,
   11 Op. O.L.C. 89 (1987) ............................................................................... 23

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*,
   17 Op. O.L.C. 114 (1993) ............................................................................. 24


**HISTORICAL MATERIALS**

Letter from George Washington to the Commissioners for the District of Columbia
   (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 ......... 25

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961) ........................................... 19

The Jimmy Carter Personal Assets Trust, 1977 Pub. Papers 140 (1977) ..................... 27


**SECONDARY AUTHORITIES**

Akhil Amar, *America's Unwritten Constitution* 309 (2012) ........................................ 26

Allen Reddick, *The Making of Johnson's Dictionary, 1746–1773* (1996) .................................. 20

Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358 (2014) ...... 20

James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938 ............................................. 20

Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227 (1999) ........... 20

**OTHER AUTHORITIES**

*The Barnhart Dictionary of Etymology* 326 (1988) ..................................................... 21

GSA, *FY 2017 Congressional Justification*, at GSA-8 (Feb. 9, 2016), https://www.gsa.gov/portal/getMediaData?mediaId= 123414 ................................. 29

GSA, *FY 2018 Congressional Justification*, at GSA-10 (May 23, 2017), https://www.gsa.gov/portal/getMediaData?mediaId= 162214 ................................. 29

Letter from OGE Director, Walter M. Shaub Jr., to Senator Thomas R. Carper, Senate Committee on Homeland Security and Government Affairs (Dec. 12, 2016), https://www.oge.gov/web/oge.nsf/ Congressional % 20Correspondence /092B59EFD6EC27608525808800724288 /$FILE/Carper%20response.pdf?open ............... 27

Michael D. Shear, *For Obama, lack of huge stock portfolio helps avoid need for blind trust*, Wash. Post (Apr. 16, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/04/16/AR2010041603420.html ........................................ 27

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) ............................................ 24

*The Oxford Dictionary of English Etymology* 310 (1966) ........................................... 21

Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242 ................................................... 21

Oxford University Press, *Guide to the Third Edition of the OED*, OED Online ...................... 21

1 *Oxford English Dictionary* xi (1st ed. 1884) ............................................... 21

Restatement (Third) of the Law Governing Lawyers § 123, cmt. B ........................................... 24

*Sales tax exempt organizations*, New York State Department of Taxation and Finance, https://www.tax.ny.gov/bus/st/exempt.htm (last visited September 22, 2017) ........................... 6

vii

Senate Committee on Ethics, Qualified Blind Trusts (Sept. 2015),
https://www.ethics. senate.gov /public/index.cfm/files/serve?File_id=286A4CF9-5AAB-40EF-
9A6C-BF2278E79E38 .................................................................................................... 26

Shear & Lipton, *Ethics Office Praises Donald Trump for a Move He Hasn't Committed
To*, N.Y. Times (Nov. 30, 2016), http://nyti.ms/2spZcdj........................................................ 27

Walter W. Skeat, An Etymological Dictionary of the English Language 189 (1888)................. 21

## INTRODUCTION

The President's Motion to Dismiss (ECF Nos. 34, 35) established that the Second Amended Complaint should be dismissed for four essential reasons.  First, applying the rigorous standing analysis required in cases raising separation of powers concerns, Plaintiffs lack standing to bring this lawsuit because they have alleged only abstract disagreements with the President and speculative future injuries dependent on the possible decisions of third parties not before the Court.  Second, Plaintiffs' asserted injuries do not fall within the zone of interests of the Foreign and Domestic Emoluments Clauses, nor do Plaintiffs have a cause of action in equity to press their claims here.  Third, Plaintiffs' interpretation of the Emoluments Clauses is overbroad and unmoored from the text of the Constitution, history, and actual practice.  Finally, Plaintiffs seek relief that this Court cannot grant because this Court is without jurisdiction to issue injunctive relief against a sitting President in circumstances such as those presented in this case.

Plaintiffs' Opposition (ECF No. 57) fails to adequately rebut any of these arguments.  First, Plaintiffs still have not pointed to any concrete injuries.  CREW's expenditure of resources is a voluntary choice that, as a matter of law, is not a cognizable injury.  CREW cannot rely on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), because CREW cannot show that its supposed diversion of resources is necessary to avoid an actual injury to itself or its members.  The hospitality Plaintiffs fare no better.  They rely entirely on the competitor standing doctrine, which is inapplicable here because the alleged injuries are too speculative given the market conditions of hospitality competition in the relevant cities.  Moreover, the Court cannot redress Plaintiffs' alleged injuries because it has no control over the third parties upon whose actions the alleged injuries necessarily depend.  The mere fact that certain hospitality Plaintiffs might compete with businesses in which the President has interests—which is all that the declarations on which these Plaintiffs rely could possibly show—does not establish Article III standing.

Second, with respect to the zone-of-interests test, the Emoluments Clauses clearly are not intended to protect an organization's advocacy priorities or a hospitality establishment's market share, and Plaintiffs' reliance on cases involving broad statutorily defined injury or in which a

complainant is directly subject to government regulation is misplaced.  For similar reasons, Plaintiffs also have no cause of action in equity.

Third, Plaintiffs have not stated a claim that the President violates the Emoluments Clauses whenever a business in which he owns an interest engages in a transaction with a foreign or domestic government.  Under Plaintiffs' theory, "anything of value" from such government actors, including "any profit or gain" from any business transaction with such actors, is a prohibited emolument.  But as the President has demonstrated, the term "Emolument" in the Emoluments Clauses refers to profits arising from office or employ and the prohibited benefits must be tendered in exchange for the President's service.  Plaintiffs' Opposition confirms that their interpretation of the Emoluments Clauses is overbroad as well as at odds with itself.  On the one hand, they argue that the Clauses impose a blanket prohibition that must be given the broadest possible scope and applicability.  On the other hand, they acknowledge that there are limitations to this sweeping theory—so called "hard cases [that] lurk at the margins," such as benefits arising from stocks, mutual funds, pensions, and possibly royalties.  Opp'n at 32.  Plaintiffs assert that the Court need not be concerned with those scenarios.  But either an "Emolument" means "anything of value" (or "any profit or gain") or it does not.  Plaintiffs cannot have it both ways.  The inconsistency in Plaintiffs' argument proves that their proposed definition is overbroad and could not have been the intended meaning.  And if the term "Emolument" does not mean "anything of value," then the complaint's allegations, which are all based on this theory, fail to state a claim.

Plaintiffs' Opposition also misreads the President's position.  First, the President did not intend to suggest that a "present" would run afoul of the Foreign Emoluments Clause only if tendered to a covered official because of his or her status as an official.  The President's central position is that a "present" is a gift offered to a covered official without consideration, which would not reasonably include benefits from private commercial transactions or legal entitlements accruing to the official by operation of law.  Second, the President does not contend that payments "funneled" through a corporate entity in exchange for an official's provision of service

2

could not constitute prohibited emoluments.  Instead, there must be plausible allegations that the official has personally provided a service or taken some official action in exchange for such payments.  But such allegations are entirely lacking in the complaint.

Plaintiffs are also wrong in asserting that they have stated a claim under the President's interpretation of the Emoluments Clauses.  Plaintiffs twist the President's position to mean that an "Emolument" could arise if a foreign or domestic government's commercial transactions with the President's businesses were motivated by an intent to influence the President because he is the President.  But the President's position instead is that the term "Emolument" refers only to benefits tendered in exchange for the President's services—which does not encompass benefits arising from the unilateral actions of foreign or domestic government actors.

The President's analysis is grounded in the Constitution's text; the common historical usage of the term emolument in federal employment; the Clauses' history and purpose; and the practice of officials from the founding of the Nation.  Plaintiffs' primary rebuttal is to cite a number of dictionaries that contain Plaintiffs' preferred definition.  But the meaning of emolument in the abstract is not the issue; rather, the issue is its meaning in the Constitution, where its usage is tied to holding office.  The President's definition is the correct reading of the term in context.

Finally, under *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), this Court cannot issue the requested injunctive relief here.  Plaintiffs argue that *Johnson* is no longer good law.  But in the 150 years since the Supreme Court decided *Johnson*, no court has enjoined the President in his official capacity where he is the sole defendant, and this Court should not be the first.

## ARGUMENT

## I.   THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

### A.   CREW Has Not Alleged Injury-in-Fact and *Havens Realty* is Inapposite.

The President demonstrated in his Motion (at 8–11) that CREW's alleged injury of diversion of resources is self-inflicted and not judicially cognizable because it merely reflects CREW's own value judgment about how to prioritize its advocacy activities.  *Havens Realty*

3

does not advance CREW's claim to standing either, because, under that case, an organization must act to avert non-abstract harm that would befall the organization or its members in the absence of such action. *See* Mot. at 11–15. Were the rule otherwise, any organization would have standing to challenge a government policy by directing resources toward that challenge.

CREW responds that its position raises no concern of opening the floodgates to litigation by advocacy groups because CREW is not "some fly-by-night group concocted solely to bring a lawsuit." Opp'n at 29. But CREW's stature as an organization is irrelevant. The Supreme Court has long held that an organization's longstanding interest in, or qualification in evaluating, an issue is insufficient to confer standing on the organization to litigate its abstract concerns. *See* Mot. at 9–10; *see, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 739–40 (1972). *Havens Realty* did not deviate from this fundamental principle—it explicitly recognized and reaffirmed it. *See* 455 U.S. at 379 (distinguishing *Sierra Club* as involving a different situation).

CREW protests that its injury is "real" and is not self-inflicted because CREW did not cause the President to violate the Emoluments Clauses. The relevant consideration, however, is that CREW chose to devote resources to the emoluments issue because it viewed that issue as more important than others, not because it needs to avert any injury to itself. *See* 2d Am. Compl. ¶ 175. The Supreme Court has found that such abstract concerns do not confer standing.

CREW is also wrong that the President's arguments are at odds with Second Circuit precedent. The President's opening brief (Mot. at 12–15) discussed all published Second Circuit cases upon which CREW now relies, as well as numerous decisions by judges of this Court finding no standing in circumstances closely analogous to those presented here. Plaintiffs quote from *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011), the statement that "some circuits have read *Havens Realty* differently than [the Second Circuit] read[s] it in *Ragin* [*v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993)]," but that "*Ragin* remains good law." *Id.* *Ragin* held that an organization had standing to sue in a Fair Housing Act case where the defendant discriminated against the organization's clients, forcing the organization to divert resources from its counseling services to counteract the discriminatory practice. 6 F.3d at 905. The context of

4

the quoted observation from *Nnebe* is that while some circuits have "emphasized that 'litigation expenses alone do not constitute damage sufficient to support standing,'" *Nnebe*, 644 F.3d at 157, such showing might be sufficient under *Ragin* where the resources were expended to avert an injury to the organization or its members.  But there is no disagreement among the circuits that when an organization has simply diverted resources to advance its abstract disagreement with the government, the expenditure of resources is not cognizable injury.

Finally, the Second Circuit's recent decision, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, No. 15-2914-cv, 2017 WL 3596995 (2d Cir. Aug. 22, 2017), similarly does not help Plaintiffs.  There, two organizations dedicated to the rights of day laborers brought a pre-enforcement challenge to a city ordinance restricting road-side solicitation of employment.  *Id.* at *1.  The court found standing based on allegations of an adverse impact on the organization's ability to organize workers, an increased risk that the organization's advocates could be arrested, and a forced diversion of resources to fight the ordinance.  *Id.* at *3. The case thus fits comfortably within *Havens Realty* because it involved an organization expending resources to prevent concrete harm to itself and its members.

**B.     ROC United, Phaneuf, and Goode Have Failed to Establish Standing.**

**1.     The hospitality Plaintiffs' alleged injury is speculative.**

The President's Motion has also shown that the hospitality Plaintiffs have failed to establish injury in fact because the complaint contains no allegations establishing that they have actually lost business to the restaurants and hotels in which the President has financial interests or more important, that any such loss of business is "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).[1]  These Plaintiffs also have not met the traceability or redressability prongs of the standing requirement because their alleged injuries are dependent on

---

[1] Plaintiffs erroneously assert that the facts are "largely undisputed."  Opp'n at 14.  The President's Motion does not concede that the facts alleged in the Second Amended Complaint are true.  *See Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).

the actions of third parties not before the Court.  *See* Mot. at 22–23.  Thus, an order from this Court granting the requested relief is unlikely to remedy the alleged injuries.

Plaintiffs' Opposition offers no response to rebut the traceability and redressability points aside from asserting that when a plaintiff invokes the competitor standing doctrine, these prongs may be assumed to be satisfied.  *See* Opp'n at 15.  Given this concession, if the Court finds that the hospitality Plaintiffs have no competitor standing, then it should dismiss these Plaintiffs.

As for injury in fact, Plaintiffs have submitted a collection of declarations in support. Goode and Phaneuf's declarations, however, say nothing about their past injury.  ROC United submits only one declaration concerning injury in fact.  The declarant is an owner of two member restaurants, Amali and Amali Mou, who avers that those restaurants saw a decline in "tax exempt sales" in two separate periods of about one month each: from November 2016 to December 2016 and again in June 2017.  *See* James Mallios Decl. ¶ 28, ECF No. 51.  These new factual allegations are not pled in the Second Amended Complaint and thus cannot properly be considered.[2]  But even assuming the Court could consider this evidence, the Mallios declaration does not show that the decline was attributable to the President's financial interest in the three restaurants with which Mallios' restaurants allegedly compete.  That decline could have been due to normal fluctuations in restaurant business, seasonal or event-related changes in demand, or changes in the restaurants themselves.  Also unclear is whether the lost tax-exempt business was actually from government customers or, instead, other organizations exempt from sales tax, such as charitable, educational, or other 501(c)(3) organizations.[3]  Even if Plaintiffs could demonstrate a loss of government business, it may be difficult to know who gained those patrons.

---

[2] In his Motion, the President demonstrated the deficiencies in the allegations concerning the only ROC United member identified in the complaint, the restaurant COLORS NY.  *See* Mot. at 16.  Instead of responding to this showing, Plaintiffs seek to offer information about sixteen previously unidentified ROC United members.  The law is settled that a plaintiff may not amend its complaint by asserting new facts in opposition briefing to a motion to dismiss.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013).

[3] *See Sales tax exempt organizations*, New York State Department of Taxation and Finance, https://www.tax.ny.gov/bus/st/exempt.htm (last visited Sept. 22, 2017).

And even if the Court were to consider this specific assertion of past injury, Plaintiffs still have not demonstrated certainly impending future injury, which is a prerequisite to their obtaining the equitable relief they seek. *See Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388–89 (2d Cir. 2015). Phaneuf's declaration confirms that she has never booked a foreign government event at either of the hotels she seeks to serve in the six months since she began this type of work. Jill Phaneuf Decl. ¶¶ 1, 20–24, ECF No. 53. Thus, her assertion that she will lose foreign government business to the Trump International Hotel is highly speculative. As for ROC United and Goode, their attempt to establish their competitor status through declarations does not cure the fundamental defect that their potential loss of non-imminent future sales is speculative.[4]  *See* Mot. at 15–19.

### 2.    The hospitality Plaintiffs have no competitor standing.

Apparently recognizing that they are otherwise unable to make the requisite showing to establish Article III standing, the hospitality Plaintiffs rely entirely on the competitor standing doctrine. They argue that the doctrine conveniently distills the standing test to require only a showing that they are competitors with the President's hotels and restaurants. In their view the President's establishments necessarily have a competitive advantage by virtue of his ownership interest. Their declarations thus seek to establish that they are such competitors.

The competitor standing doctrine, however, applies only in the narrow circumstances where, given the relevant market characteristics and the nature of the competition, an actual or imminent increase or change in competition will almost certainly cause an injury in fact by virtue of the laws of economics. *See* Mot. at 20–22. In those narrow circumstances, a plaintiff can be

---

[4] Plaintiffs contend that, in citing *Clapper*'s requirement of certainly impending injury, the President "misstates the law" by omitting the other half of the standard, which is that an allegation of injury suffices if there is a "substantial risk" that the harm will occur. *See* Opp'n at 12 n.3. That standard, from *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014), concerns pre-enforcement challenges where the injury arose from threatened prosecution. As the Second Circuit has explained, in such circumstances, the courts generally will "presume that the government will enforce the law." *Hedges v. Obama*, 724 F.3d 170, 196–97, 199–200 (2d Cir. 2013). This case does not concern a pre-enforcement challenge, and the complaint, in any event, also fails to show that Plaintiffs face a substantial risk of future harm.

deemed to have suffered injury in fact without waiting for the injury to actually occur.  But Plaintiffs characterize the doctrine in terms so permissive that a mere showing of competitor status and allegation of "some competitive advantage" to the defendant would be sufficient. Adopting Plaintiffs' skewed interpretation of competitor standing would allow the exception to swallow the rule that an injury-in-fact must be non-speculative and certainly impending to support Article III standing.  That is not the law and, as discussed below, it is no surprise that the cases Plaintiffs cite refute their assertion of competitor standing.  Indeed, as illustrated by the cases Plaintiffs cite, the doctrine is applicable most often in contexts, unlike this one, where government regulators alter market competition.  Of course, market manipulation by a government regulator often has a direct and predictable impact on the market; in fact, that is often the intent of such manipulation.

The Second Circuit has never directly embraced the type or scope of competitor standing Plaintiffs seek to invoke here.  Rather, the Second Circuit cases generally arise in the political arena and involve what is characterized as competitive advocate standing.  In *Schulz v. Williams*, 44 F.3d 48, 52–53 (2d Cir. 1994), for example, a political party had standing to challenge the inclusion of another party's candidate on the ballot for governor because the party "stood to suffer a concrete, particularized, actual injury—competition on the ballot" from another candidate and "a resulting loss of votes."  Similarly, in *Fulani v. League of Women Voters Education Fund*, 882 F.2d 621, 626 (2d Cir. 1989), a candidate for political office excluded from participating in nationally televised debates had standing to challenge the tax-exempt status of the organizer on the ground that it was favoring other political parties.  The court held that the loss of this advantage "palpably impaired" the candidate's ability to compete for votes.  *Id.*

Applying the competitor standing doctrine in the electoral arena makes sense because injury can be more readily inferred from competition in that arena.  The competition is on a zero sum basis—every vote for a competitor is a loss to the plaintiff.  And changes in competitive advantage among a small pool of candidates—such as access to the ballot as in *Schultz* or participation in nationally televised debates as in *Fulani*—manifestly have direct implications for

the candidates in the race.  By contrast, the competition at issue here concerns only economic competition in diffused markets with numerous competitors and variables.  No law of economics readily allows the inference that the economic activities of a handful of establishments—in New York, four restaurants (although one has closed), one bar, and two hotels, and in D.C., one restaurant and one hotel—will cause almost certain injury to Plaintiffs.

Plaintiffs cite *In re U.S. Catholic Conference* ("*USCC*"), 885 F.2d 1020 (2d Cir. 1989), for the proposition that injury in fact may be established when a government benefit is bestowed on a plaintiff's competitor.  The case did not so hold.  Instead, it holds only that a plaintiff may not rely on "competitive advocate standing" if it does not actually "compete[] in the same arena" as the defendant.  *Id.* at 1029.  Plaintiffs also cite *Center for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002), for the proposition that competition in a relevant market should be broadly construed.  But that case arose in the distinct context of an equal protection challenge, where the government's award of grants in a discriminatory manner is itself the cognizable injury.  *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (in case involving unlawful discrimination in the award of government contracts, plaintiff can show injury if "a discriminatory classification prevents the plaintiff from competing on an equal footing").  Plaintiffs' asserted injury here depends on speculation about the behavior of government consumers, not current injury arising from the government's discriminatory treatment of parties.

Out-of-circuit cases cited by Plaintiffs also illustrate that Plaintiffs have no competitor standing.  *Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993), on which Plaintiffs heavily rely, is instructive.  The case involved a challenge by out-of-state dairy farmers to a protectionist Massachusetts milk pricing order that required Massachusetts dairy distributors to pay a fee into a fund from which only Massachusetts dairy farmers could receive distributions.  *Id.* at 916–17, 919–20.  The court held that this kind of "competitive advantage bestowed on [plaintiff's] direct competitor[s]" by the government rendered it "obvious" that injury would result because it "plainly disadvantages the plaintiff's competitive position in the relevant marketplace."  *Id.* at

922.  The court distinguished the case from a situation where "injury and cause are *not obvious*," in which case "the plaintiff must plead their existence in his complaint with a fair degree of specificity."  *Id.*  A plaintiff "must demonstrate a realistic danger" of sustaining injury, the court explained, which could be shown through application of "standard principles of supply and demand" because "basic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and *probable* market behavior."  *Id.* at 922–23; *cf. Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333–34 (Fed. Cir. 2008) (court could infer injury from government funding of an entity that had already succeeded in reducing plaintiff's market share through past activities).

   The facts presented here are a far cry from *Adams*.  The basic laws of supply and demand allowed the court in *Adams* to view the government's subsidization of one set of competitors as a market distortion that almost inevitably would lead to competitive advantage for one group of competitors and economic injury to the other.  But there is no such obvious connection here between the conduct complained of and the claimed economic injury to the hospitality Plaintiffs.  Instead, Plaintiffs hypothesize injury based on the possible behavior of unknown third-party consumers and their subjective views about the President, including the desirability of patronizing the establishments in which he owns interests in metropolitan markets containing hundreds of other similar establishments.  This is no basis to support competitor standing here.

   *State National Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015), illustrates why the competitor standing doctrine cannot apply when the claimed injury depends on the subjective views of third parties.  There the plaintiff challenged a regulatory designation of its competitor financial institution as "too big to fail" on the basis that such a "reputational subsidy" allowed the competitor to raise money at lower costs than it otherwise could have.  *See id.* at 54, 55.  The court found no competitor standing because the link between the alleged reputational benefit to the competitor and any harm to the plaintiff was "simply too attenuated and speculative to show the causation necessary to support standing."  *Id.* at 55.  Likewise here, no Article III injury may be presumed because the claimed injury depends on speculation about third parties' perceptions

10

of the value of patronizing the President's businesses.  *Cf. New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (alleged injury dependent on the "independent actions of third parties" is unlike that in competitor standing cases where the court may "simply acknowledge a chain of causation 'firmly rooted in the basic law of economics'") (citation omitted).

Finally, Plaintiffs also cite other cases falling into categories entirely distinct from this case.  One group involves government regulation permitting or encouraging new entrants to the market—*i.e.*, increased competition caused by the government acting as a regulator.[5]  But here Plaintiffs do not allege that there are new competitors entering the markets due to any government regulatory activities.  Indeed, one of the restaurants in New York alleged to have gained a competitive advantage because of the President's alleged financial interest has closed, reportedly due to poor performance following the election.  *See* Mot. at 16.  Another set of cases cited by Plaintiffs involve past injury, which presents a very different situation from competitor standing cases that infer future injury solely on the basis of market conditions and laws of supply and demand.[6]  Still two more cases involve claims arising under the Lanham Act.  *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011); *In re McCormick & Co. Pepper Prods. Mktg. & Sales Practices Litig.*, 215 F. Supp. 3d 51 (D.D.C. 2016).  That Act

---

[5] *See Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 737–38 (5th Cir. 2016) (removal of a state residency restriction on mixed-beverage permits), *cert. denied* 137 S. Ct. 494 (2016); *Mendoza v. Perez*, 754 F.3d 1002, 1009, 1011–14 (D.C. Cir. 2014) (regulatory regime that allegedly incentivized hiring foreign born workers); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013) ("pilot program allow[ed] Mexico-domiciled trucks to compete with members of" plaintiffs); *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 701 (D.C. Cir. 1994) (agency certification of facilities, allegedly incentivizing and allowing them to enter the relevant market); *cf. Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 484–85, 488 & n.4 (1998) (existing competitor was permitted access to new pool of potential customers by agency action).

[6] *See Clinton v. City of N.Y.*, 524 U.S. 417, 432 (1998) ("[Plaintiff] also suffered an immediate injury when the President canceled the limited tax benefit" from which they would have benefited and which provided a "bargaining chip" to Plaintiff); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 45 (1970) ("Petitioners allege that as a result they have lost substantial business . . . ."); *Ross v. Bank of Am., NA*, 524 F.3d 217, 223–24 (2d Cir. 2008) (injuries claimed by the plaintiffs—reduced consumer choice and diminished credit card services—were "present anti-competitive effects"); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 448–49 (6th Cir. 2007) (plaintiff "was injured" when it lost various accounts to the defendant).

protects persons engaged in commerce against unfair competition and authorizes anyone believing that he or she is "likely" to be injured to bring suit, 15 U.S.C. § 1125(a). "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Here, Plaintiffs invoke no statute that might relax or modify their burden to meet the injury-in-fact requirement. Thus, these statutory cases do not help them.

In sum, the hospitality Plaintiffs have no standing.

### C. ROC United Has Failed to Show Associational Standing.

As explained in the President's Motion (at 23–24), an organization can only invoke associational standing where adjudication of the claims asserted and the relief requested does not require the participation of its individual members. Here, ROC United's allegations of injury necessarily depend on the particular circumstances of its members. Indeed, in the course of briefing this very motion, Plaintiffs have submitted declarations concerning 16 different purported ROC United member restaurants that were not identified in the Second Amended Complaint. This is an acknowledgment that ROC United's standing depends on the fact and extent of any injury suffered by these entities and possibly others, and thus that associational standing is inappropriate. The Court's determination of the proper scope of relief will also depend on the particular injuries of the affected entities, including their geographic locations.

Plaintiffs argue that they seek a "purely legal ruling," and thus, individualized proof is unnecessary. *See* Opp'n at 25 n.16. But the complaint seeks injunctive relief to remedy certain individuals' and entities' injuries purportedly caused by the President's conduct. The law is clear that their participation is required to determine the precise scope of relief. *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 715–16 (2d Cir. 2004) (participation of individual property owners required where plaintiff organization sought equitable relief of environmental remediation of members' property); *Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 596–97 (2d Cir. 1993). ROC United therefore has no associational standing.

## II.   PLAINTIFFS ARE OUTSIDE THE EMOLUMENTS CLAUSES' ZONE OF INTERESTS AND HAVE NO EQUITABLE CAUSE OF ACTION.

The President's Motion (at 25–26) also demonstrated that Plaintiffs' asserted injuries fall outside the zone of interests of the Emoluments Clauses.  Plaintiffs argue that the zone-of-interests test is primarily used in statutory cases and is not particularly stringent.  *See* Opp'n at 55.  Not only does the test apply to challenges under the Constitution, *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982), but the Supreme Court "ha[s] indicated that [the test] is more strictly applied when a plaintiff is proceeding under a 'constitutional . . . provision'" than a statutory one under the APA's deferential review standard.  *Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting) (emphasis omitted) (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987)).  Moreover, it is indisputable that the zone-of-interests test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the [constitutional provision]."  *Clarke*, 479 U.S. at 394, 399.  And here, Plaintiffs' interests in protecting an organization's advocacy priorities or a business's market share do not relate to the Clauses' purposes of preventing official corruption and ensuring Presidential independence.

*Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017), upon which Plaintiffs rely, underscores the deficiency of Plaintiffs' zone-of-interests assertion.  That case involved a challenge under the Fair Housing Act ("FHA"), which authorizes a statutorily defined "aggrieved person" to challenge discriminatory housing practices.  *Id.* at 1303.  The Court held that the plaintiff's claim of financial injuries "arguably [fell] within the FHA's zone of interests" because the Court's precedent had broadly construed the FHA's definition of "aggrieved person."  *Id.* at 1303, 1305.  Here, however, there is no legislatively conferred cause of action, let alone one with a broad ambit like the FHA.

*Bond v. United States*, 564 U.S. 211, 223 (2011), is similarly inapposite.  It involved a criminal defendant's challenge to a statute on the ground that the statute contravened the federalism principles protected by the Tenth Amendment.  The Court held that the defendant

satisfied the zone-of-interests test, relying on cases holding that an individual suffering an otherwise judicially cognizable injury may object when "the constitutional structure of our Government that protects individual liberty is compromised." *Id.* But here, no individual liberty interests are implicated by the alleged violation of the Emoluments Clauses, and Plaintiffs stand on an entirely different footing than the criminal defendant in *Bond* because they are not themselves directly subject to regulation by law.

Plaintiffs are also wrong that they have a cause of action in equity. To be sure, the Supreme Court has indicated that "relief may be given in a court of equity" to enjoin unconstitutional actions by public officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citation omitted). But such relief is available only in "a proper case," *id.*, which makes sense because it is a "judge-made remedy," *id.*, and is subject to the court's "broad discretionary power to withhold equitable relief as it reasonably sees fit," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1214 (D.C. Cir. 2004); *see also eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Thus, contrary to Plaintiffs' suggestion, they are not entitled as a matter of right to injunctive relief simply because they have challenged a structural constitutional provision. Indeed, equity requires dismissal here. First, Plaintiffs are not preemptively asserting a defense to a potential government enforcement action against them, which is the paradigmatic situation where implied equitable claims against the Government have been recognized. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010); *cf. Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws . . . . But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword.*"). Second, equity "may not be used to create new substantive rights." *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (citing *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893)). To the extent that the Emoluments Clauses could be seen to create private rights in any circumstances, they do not create a personal right as to these Plaintiffs, whose alleged interests are entirely unrelated to

14

the Clauses' purposes.  Third, Plaintiffs can obtain relief only by suing the President himself, which, as discussed below, if not legally foreclosed, is at a minimum grounds for extreme equitable restraint.  Finally, as will also be discussed below, Congress is far better equipped than the courts to address the emoluments issues raised here.

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM.

The President's opening brief showed that Plaintiffs' interpretation of the Emoluments Clauses is overly broad, encompassing "anything of value" or "any profit or gain" that may be received by a federal official from a foreign or domestic government regardless of context.  The President demonstrated that benefits prohibited by the Foreign Emoluments Clause must either be gifts given to an officeholder without consideration or benefits tendered in exchange for the officeholder's provision of service in his official capacity or in a capacity akin to an employee of the foreign government.  And benefits from a federal or state instrumentality prohibited by the Domestic Emoluments Clause must arise from the President's provision of service as President.  Plaintiffs' Opposition not only misconstrues the President's position and largely ignores the historical evidence the President proffered, but also makes arguments that are in significant tension with each other, thereby confirming that Plaintiffs' theory is overbroad and untenable.

### A.    Plaintiffs' Interpretation of the Text of the Emoluments Clauses is Overbroad and Unreasonable.

Plaintiffs first argue that the President's reading of the Emoluments Clauses fails to account for the term "present" in the Foreign Emoluments Clause, ignores the original public meaning of the term "Emolument," and defies the surrounding text of the Clauses.  As an initial matter, Plaintiffs are wrong in contending that profits arising from the commercial transactions alleged in the complaint constitute "presents" under the Foreign Emoluments Clause.  Not only does that interpretation defy a common sense understanding of "present," but it would also render superfluous the term "Emolument" in the Clause, which, according to Plaintiffs, would have essentially the same meaning.  A prohibited "present" is "something bestowed on another without price or exchange," and cannot naturally be read to include benefits arising from

commercial transactions or accruing by operation of law.  *See* Mot. at 31–32.  Thus, as will be
discussed later, trademarks received by an official from a foreign government would not be
"presents."  The Court should reject at the outset Plaintiffs' claim that benefits from the business
transactions alleged in the complaint are "presents."

Where the parties truly join issue is over the meaning of "Emolument" in the
Emoluments Clauses.  The President's Motion showed (at 27–30) that, in light of the common
usage in the founding era and thereafter, the term "Emolument" refers to a "profit arising from
an office or employ," and that this definition fits most appropriately within the context of the
Clauses and its usage by the founders.  Specifically, this definition fits harmoniously with the
other prohibited categories in the Foreign Emoluments Clause, which are all things conferred or
bestowed on the officeholder personally.  *See* Mot. at 28–31 (applying the doctrine of *noscitur a*
*sociis*).  Moreover, the President's interpretation appropriately takes into account the nature of all
constitutional provisions in which the term "Emolument" appears—which are all tied to holding
office.  *See id.* at 29–30.  Finally, the President showed that Plaintiffs' interpretation of the
Emoluments Clauses would lead to absurd results and thus, is unreasonable.  *See id.* at 46–48.

Plaintiffs' various rejoinders are unpersuasive.  First, as to the Foreign Emoluments
Clause, Plaintiffs argue that the phrase "of any kind whatever" compels their broader definition
of "Emolument."  But it would be circular to say that the phrase expands the definition of the
term "Emolument" itself when its purpose is to emphasize the Clause's prohibition of any type
of "present," "Office," "Title," and "Emolument."  Plaintiffs also argue that in the other two
instances where the term "Emolument" is used in the Constitution (the Incompatibility Clause
and Domestic Emoluments Clause), it did not appear next to the phrase "of any kind whatever,"
but is tied to "office-related compensation."  Opp'n at 37.  But those two other clauses actually
serve to underscore the President's interpretation that "Emolument" in the Foreign Emoluments
Clause similarly should be viewed as office-related.  It makes little sense that the term
"Emolument" would have different meanings throughout the Constitution, when all three clauses
in which the term appears are tied to holding office and regulate the conduct of officeholders.

Plaintiffs have no persuasive rebuttal to the President's illustration that absurd results would flow from their interpretation.  Most telling is Plaintiffs' lack of response to the President's discussion of the proposed constitutional amendment in 1810, which would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens.  As the President explained (*see* Mot. at 39–40), applying Plaintiffs' definition would have meant that no one could engage in commercial transactions with foreign governments or provide hospitality services to visiting foreign diplomats without losing his or her citizenship—the penalty specified in the proposed amendment.  Such a reading is implausible.

To the extent Plaintiffs offer any response, it is in conflict with itself.  For example, in response to the President's argument that, under Plaintiffs' definition of "Emolument," covered officials would be prohibited from owning stock in companies that conduct business globally, *see* Mot. at 46–47, Plaintiffs concede that there are exceptions to their "anything of value theory"—such as benefits derived from publicly traded stock (as well as pensions, mutual funds, and possibly royalties from foreign book sales).  *See id.* at 1, 46, 47 n.24.  But Plaintiffs offer no persuasive explanation of why that is so, when their position is that the Clause must be given "the broadest possible scope and applicability" and is "a clean prohibition on foreign-government emoluments 'of any kind whatever,'" to which only Congress may create "pragmatic exceptions."  *See id.* at 36, 40, 42.  While Plaintiffs also seem to invoke a "functionalist" and "pragmatic, purpose-driven inquiry," *see id.* at 46–47, that is again contrary to Plaintiffs' own "prophylactic" theory.

Plaintiffs urge that the Court need not "delineate the outer reaches of the [Foreign Emoluments] Clause, or decide whether to adopt the broadest conceivable interpretation of it." *Id.* at 32.  But Plaintiffs have offered only one definition: "Emolument" means "anything of value, monetary or nonmonetary" (or, as phrased in the dictionaries they cite, "advantage," "profit," or "gain").  That definition either applies in all circumstances or not at all.  Plaintiffs cannot apply the definition when it suits their purposes but ignore those circumstances where applying the same definition would lead to absurd results.  Plaintiffs' need to selectively apply

their definition confirms that it is not the intended definition.  *Cf. South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 346 (1998) (construing statute to avoid an "absurd conclusion"); *United States v. Venturella*, 391 F.3d 120, 126–27 (2d Cir. 2004) ("The 'absurd results' canon . . . is a rule of statutory construction that serves 'to help resolve . . . ambiguity.'") (citation omitted).

Indeed, Plaintiffs' attempt to deal with the "hard cases" at the "margins" is not only unpersuasive, but tends to support the President's theory.  For example, they contend that an official's receipt of royalties from the sale of books to foreign instrumentalities while in office would not constitute "acceptance" of an emolument because the payments likely are passed through at least two intermediaries, the foreign wholesaler and the American publisher, who may provide a fraction of royalties to an American officeholder.  *See* Opp'n at 47 n.24.  But that is also how at least some of the business transactions alleged in the complaint may work— payments for transactions or services may pass through intermediaries and only a portion of the profits may be received by the President.  And, again, under Plaintiffs' own theory, which imposes a broad, blanket prohibition, there is no basis to so elastically construe the term "accept[ed]" in the Foreign Emoluments Clause to cover some kinds of business transactions but not others having the same economic characteristics.

As for the Domestic Emoluments Clause, Plaintiffs' analysis is similarly convoluted, parsing various phrases to defy a straightforward reading.  *See id.* at 38–39.  The Domestic Emoluments Clause provides that the President shall receive "for his Services" a fixed "Compensation" "during the Period for which he shall have been elected" and that "he shall not receive within that Period any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.  The President contends that the term "Emolument" in this Clause only refers to compensation and other benefits for his services as President.  Plaintiffs counter that the phrase "for his Services" describes only *why* the President receives compensation and does not affect the meaning of the term "Emolument."  That makes little sense.  The phrase "for his Services" clearly qualifies both "Compensation" and "any other Emolument."  Indeed, the Clause's reference to "any *other* Emolument" demonstrates that "Compensation" is a type of

18

"Emolument" and that the two terms should be read in concert—meaning that the President may not receive additional benefits as compensation for his services while in office.

Plaintiffs also argue that because the Clause already prohibits the President from receiving any other emolument "within that Period" he is in office, the President's interpretation would render this time limitation superfluous if emolument were qualified by "for his Services." But according to that view, the Clause's similar statement that the President's compensation shall be fixed "during the Period for which he shall have been elected" would also be superfluous because the President may only receive "for his Services, a Compensation" while in office. More reasonably, the use of the two phrases "within that Period" and "for his Services" are meant to provide different emphases. Read together, they mean simply that beyond his fixed compensation, the President cannot receive additional benefits for his services while in office.

Plaintiffs further argue that if "Emolument" were limited to compensation and other benefits arising from the President's service, there would be no need to prohibit "any other Emolument" from the United States, "since the federal government is *already* barred from [increasing] the [P]resident's compensation." Opp'n at 39. But that is wrong because the phrase "any other Emolument" is to ensure that the President receives no more benefits for his service than the "Compensation" *fixed by Congress* when the President takes office. *See* Alexander Hamilton, *The Federalist* No. 73, 493–94 (Jacob E. Cooke ed., 1961) ("Neither the Union, nor any of its members, will be at liberty to give, nor will [the President] be at liberty to receive, any other emolument than that which may have been determined *by the first act*." (emphasis added)).

Ultimately, Plaintiffs fall back on the number of dictionaries containing their favored definition of "Emolument" for the proposition that the definition comports with the "original public meaning" of the term. Opp'n at 1; *see also id.* at 31, 33. According to Plaintiffs, "every English dictionary definition of 'emolument' from 1604 to 1806 gives the word a different meaning than the one pressed by the defendant," while the President's proposed definition "appears in less than 8%" of the forty dictionaries Plaintiffs cited. *Id.* at 34–35.

19

But this tabulation is beside the point.  Plaintiffs concede that emolument had different definitions during the founding era.  The relevant question, then, is which definition is best attributed to the term "Emolument" when it is read in context in the Constitution as it pertains to federal officeholders.  "[I]t is a fundamental canon of statutory construction" that a term "cannot be construed in a vacuum" but "must be read in [its] context."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context") (citation omitted).  The context provided by the Constitution—in concert with the President's significant demonstration regarding the history of the Clauses and founding-era practices—shows that the President's proposed definition should apply.

In any event, the sole linguistic authority upon which Plaintiffs rely has significant limitations for the interpretive task here, and its conclusions have been criticized as "based on inaccurate assumptions about [founding-era] dictionaries and about the semantic inquiry at hand."[7]  First, lexicographers of the time "could not and did not engage in a systematic attempt to discern all of the meanings of words."[8]  Thus, founding-era dictionaries may not have recorded all meanings of the words listed.[9]  Second, Plaintiffs' position fails to account for the possibility that dictionaries may have copied one another.[10]  Third, founding-era dictionaries also were generally more prescriptive about how language *should* be used, rather than descriptive of how it was actually used at the time.[11]

---

[7] *See* James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938, at 13.

[8] *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 371 (2014).

[9] *Id.*

[10] *See, e.g.*, Allen Reddick, *The Making of Johnson's Dictionary, 1746–1773*, at 11 (1996); Maggs, *supra* note 8, at 382.

[11] Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227, 242 (1999).

Contrary to Plaintiffs' suggestion that the President's proposed definition is "gerrymandered" and divorced from the original public meaning of emolument, the dictionaries Plaintiffs cite actually show that his definition is closely related to the etymology of emolument, which is profit from labor, or more specifically, from grinding corn.[12]  As confirmed by these dictionaries, the term "emolument" derives from the Latin "emolumentum," *see* Attachs. to Opp'n, Table 1, nos. 4, 11, 15, 21, 23, 35, which was the combination of "mola," meaning "a mill," and "emolo," meaning "to grind thoroughly," *id.* nos. 15, 35.  Excerpts from six of the dictionaries cited by Plaintiffs thus include variations of the definition of "profit gotten properly by grist; hence, by any labor and cost," *id.* no. 15; *see also id.* nos. 5, 7, 8, 11, 15, 35.  By ignoring these definitions, Plaintiffs understate the percentage of dictionaries containing a definition supporting the President's position.  That the President's proposed definition is historically rooted is further shown by the Oxford English Dictionary's listing of that definition first, before the broader one proposed by Plaintiffs.[13]  The OED lists each definition in the order it appeared in the English language to "illustrate the word's development over time."[14]

### B.    The Purposes of the Emoluments Clauses Do Not Compel Plaintiffs' Broad Reading of the Clauses.

Plaintiffs next argue that to effectuate the Emoluments Clauses' purposes of protecting against undue influence by foreign and domestic governments and ensuring Presidential

---

[12] Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Dictionary of Etymology* 326 (1988) (emolument: "*n.* profit from an office or position.  1435, *in Proceedings of the Privy Council*; borrowed through Middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn, from *émolere* grind out (*é*-out + *molere* to grind; see MEAL grain)"); *The Oxford Dictionary of English Etymology* 310 (1966) (similar).

[13] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.

[14] Oxford University Press, *Guide to the Third Edition of the OED*, OED Online; *see also* 1 *Oxford English Dictionary* xi (1st ed. 1884) (stating that a definition is "placed first which was actually the earliest in the language: the others follow in the order in which they appear to have arisen").

independence, the Emoluments Clauses must be read as broadly as possible.  But the reasons they offer do not justify such a reading.

First, Plaintiffs assert that the Clauses were intended to prohibit the types of transactions alleged in the complaint because the Framers were concerned about foreign influence and corruption.  That is not so.  While the Framers weighed concerns that public officials would be influenced by pecuniary inducements, it was common at the time for federal officials to have private business pursuits, and yet the Framers said nothing about requiring officials to divest their private commercial interests in order to assume federal office.  *See* Mot. at 35–36.

Second, Plaintiffs' contention that the Clauses' purposes can *only* be served by their broad reading of the Clauses is not persuasive.  *See* Opp'n at 39–40.  The President's reading of the Clauses also serves their purposes of preventing foreign influence and corruption and ensuring Presidential independence by focusing on whether the President's personal service or official conduct is actually at issue in a transaction.  Moreover, the "purposes" of the Clauses do not in themselves support Plaintiffs' sweeping requirement; indeed, Plaintiffs concede that "constitutional provisions, like legislation, do not pursue their purposes at all costs."  *Id.* at 42.

Plaintiffs also contend that the President's reading is unworkable because it allegedly would require the court to conduct "after-the-fact mind-reading exercises to assess whether a particular payment was provided in exchange for 'decisions favorable to the paying foreign power.'"  *Id.* at 42 (quoting Mot. at 29).  To the contrary, the Framers have imposed a blanket prohibition on foreign government payments for services rendered by an officeholder in his official capacity or in an employee-like capacity.  The President's position calls for some plausible allegations of such conduct and does not require any "mind-reading."[15]

---

[15] Plaintiffs posit that under the President's reading, the President would be prohibited from being paid for shining a foreign diplomat's shoes but would able to own a business that provides the same service to many more diplomats.  *See* Opp'n at 41–42.  But as explained herein, the Clause is directed at the provision of personal service by the officeholder.

**C.      The President's Position is Consistent with Prior Interpretations of the Emoluments Clauses.**

Finally, Plaintiffs' reliance on opinions by the Office of Legal Counsel ("OLC") and Comptroller General to counter the President's interpretation is misplaced.  First, Plaintiffs argue that OLC opinions refute the President's supposed assertion that the Emoluments Clauses do not reach an official's conduct in his "private capacity."  Opp'n at 42.  But the President consistently has explained that an officeholder is prohibited from accepting foreign government benefits arising from service rendered not only in his official capacity but also in a capacity akin to an employee of the foreign government—*i.e.* in his private capacity.  The two OLC opinions Plaintiffs cite indeed involved *personal service* rendered by the federal official to the foreign government in his private capacity.[16]

Second, Plaintiffs argue that the President's interpretation would "allow[] foreign states to make unlimited payments to the [P]resident in his private capacity (or laundered through a company he owns)," when OLC and the Comptroller General have said that the use of a corporate entity to pass through foreign benefits would not shield an officeholder from emoluments violations.  Opp'n at 31.  But Plaintiffs have misunderstood the President's position again.  Under the President's view, the Foreign Emoluments Clause would indeed prohibit an arrangement whereby the President is providing service in his official capacity or in an employee-like capacity to a foreign government in exchange for payments, even if such payments are passed through a company the President owns.  Again, this position is not inconsistent with the Comptroller General and OLC opinions cited by Plaintiffs (*see id* at 32, 46), each of which involved the provision of service by a federal official, with the question being

---

[16] *See Applicability of Emoluments Clause to Proposed Serv. of Gov't Emp. on Comm'n of Int'l Historians*, 11 Op. O.L.C. 89, 90–91 (1987) (a National Archives employee could not in "his private capacity" serve on an international commission established and funded by the Austrian Government); *Application of the Emoluments Clause of the Constitution & the Foreign Gifts & Decorations Act*, 6 Op. O.L.C. 156, 156–57 (1982) (a Nuclear Regulatory Commission employee could not "on his leave time" work for an American consulting firm on a project for the Mexican government where the firm secured the contract based solely on the employee's expertise and would pay the employee using foreign funds).

whether a foreign government should be deemed the source of payment for such service despite the existence of corporate intermediaries.  *See, e.g., Matter of Lieutenant Colonel Marvin S. Shaffer*, 62 Comp. Gen. 432, 432, 434 (June 2, 1983).

In *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *4 (Comp. Gen. Mar. 11, 1985), for example, the Comptroller General determined that retired military officers who were attorneys employed by or who served as "of counsel" to an incorporated law firm could not serve as legal counsel for a foreign government because "professional corporations differ significantly from ordinary business corporations," *id.*, and under relevant state law, "an attorney's professional relationship with his clients remains unchanged notwithstanding the existence of a professional corporation."  *Id*. at *1.  There, the officeholders at issue were unquestionably providing a direct and personal service to the foreign government in exchange for payments, notwithstanding the corporate structure in which they worked.  Plaintiffs' allegations here are not comparable.

Similarly, in *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993), OLC determined that members of the Administrative Conference of the United States ("ACUS") could not receive a distribution from their law partnerships that included revenues from foreign governments.  Again, that opinion concerned services provided by an ACUS member's law partners, and situations involving law partners and their profit sharing are unique and distinct from the financial interests at issue in this case.  As the President has explained, "a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client" and "each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."  Mot. at 43–44 n.62 (citing Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983); Restatement (Third) of the Law Governing Lawyers § 123, cmt. B).  The ACUS opinion does not purport to address all types of business transactions, and again, the President does not contend that payments made through a corporate structure could never constitute prohibited emoluments.

24

Finally, Plaintiffs cite OLC's opinion concerning President Ronald Reagan's state retirement benefits as being consistent with their position.  Specifically, they argue that President Reagan's retirement benefits were not prohibited "Emoluments" under the Domestic Emoluments Clause because they vested before he was elected and, thus, were not "received" while in office.  But again, there is no basis to elastically construe the term "received" under Plaintiff's broad theory; nor is there any doubt that the retirement benefits which were being received while President Reagan was in office fell within Plaintiffs' "anything of value" definition of an "Emolument."  Moreover, for the same reasons the retirement benefits were not deemed emoluments—the benefits were previously earned and vested—it could also be said that they were not in exchange *for the President's services as President*.  Thus, OLC's opinion does not undercut the President's interpretation of the Domestic Emoluments Clause.

> ### D.    History Refutes Plaintiffs' Interpretation of the Clauses.

The President showed in his opening brief that his interpretation is consistent with the practices of early Presidents and that such practices contradict Plaintiffs' interpretation.  Mot. at 36–38.  Specifically, the President has put forth evidence of President George Washington purchasing public land from the Federal Government as a private citizen without any concerns about violating the Domestic Emoluments Clause.  The President has also proffered evidence of early Presidents engaging in commerce and exporting their farm products overseas without any concerns of violating the Emoluments Clauses.  Plaintiffs offer no serious response to the President's showing.

First, Plaintiffs argue that Washington's business transaction with the Federal Government was distinguishable because it was a public sale, Washington indicated that he "had no desire to 'stand on a different footing from every other purchaser,'" and he was supposedly "'ready to relinquish' the property if necessary."  Opp'n at 49.[17]  But Plaintiffs do not explain

---

[17] Contrary to Plaintiffs' representation (*see* Opp'n at 49), Washington did not say that he was ready to relinquish the several lots of land he had already purchased.  *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289.

why the factors they identified would exempt Washington's transactions from the broad scope of the Domestic Emoluments Clause as they interpret it, which permits no exceptions, whether the transaction is a public sale and whether the officeholder stands on the same footing as any other private citizen.  In fact, Plaintiffs' interpretation of the term "Emolument" is directly undermined by President Washington's conduct.  This is significant because Washington's conduct has been accorded great weight.  *See* Akhil Amar, *America's Unwritten Constitution* 307–09 (2012) ("Washington set precedents from his earliest moments [as President] . . . .  Over the ensuing centuries, the constitutional understandings that crystallized during the Washington administration have enjoyed special authority over a wide range of issues.").  And as the Supreme Court has taught, "significant weight" must be placed on "historical practice," *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014), including on "contemporaneous practice by the Founders themselves," *Mistretta v. United States*, 488 U.S. 361, 399 (1989).  Plaintiffs' definition of "Emolument" is unmoored from this historical practice.

Plaintiffs also argue that the President has not put forth evidence clearly indicating that the early Presidents actually sold their farm products to foreign or domestic governments.  But while the extant farm records of those early Presidents are limited and inconclusive on the question, there is no question that private business pursuits by federal officials, including by early Presidents, were common at the time of the Nation's founding.  It is reasonable to infer that at least some of their transactions may have been with foreign or domestic government actors, including foreign state-chartered trading companies.  Given this possibility, it is also telling that there is *no* historical record of any concerns being raised about possible Emoluments Clauses violations by Presidents if they were to transact business with foreign or domestic government instrumentalities.  That the Clauses were not intended to prohibit such transactions is further confirmed by the historical incident of the proposed 1810 constitutional amendment, which would have extended the prohibitions of the Foreign Emoluments Clause to all citizens and, if Plaintiffs' definition of "Emolument" were correct, would have precluded all citizens from transacting business with any foreign government.

26

The only evidence of historical practice proffered by Plaintiffs is that "every other [P]resident in the past four decades" has put his financial holdings in a "blind trust," Opp'n at 48, or what Plaintiffs called an "independent trust," *id.* at 5.[18]  But this "history" is inapposite because under Plaintiffs' interpretation of the Emoluments Clauses, even blind trusts would not cure any violation because the officeholder would continue to receive something of value from a government.  And the Clauses do not contain an exception for blind trusts, nor has Congress consented to the use of blind trusts to avoid Foreign Emoluments Clause violations.  Blind trusts are *optional* measures to satisfy the principal *statutory* conflict of interest law, 18 U.S.C. § 208, which requires officials to recuse themselves from participating in governmental matters affecting their personal financial interest.  The President is expressly exempted from its coverage, *see id.* § 202(c), and any voluntary compliance by any prior Presidents has no bearing on the constitutional issue before this Court.[19]

### E.    Plaintiffs Do Not State a Claim Under the President's Interpretation.

Finally, in a last-ditch effort to salvage their complaint, Plaintiffs argue that they have stated a claim even under the President's interpretation of the Emoluments Clauses.  *See* Opp'n at 50–52.  That is not so.  According to Plaintiffs, the President has interpreted the Clauses to

---

[18] At least two Presidents in the last four decades did not put their assets in a blind trust. President Obama converted most of his assets into U.S. Treasury bonds.  Michael D. Shear, *For Obama, lack of huge stock portfolio helps avoid need for blind trust*, Wash. Post (Apr. 16, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/04/16/AR2010041603420.html, and President Carter's trust prohibited the sale of his interest in the Carter Farm, which is inconsistent with a blind trust, *see* The Jimmy Carter Personal Assets Trust, 1977 Pub. Papers 140, 143 (1977); Senate Committee on Ethics, Qualified Blind Trusts, at 2–3 (Sept. 2015), https://www.ethics. senate.gov /public/index.cfm/files/serve?File_id=286A4CF9-5AAB-40EF-9A6C-BF2278E79E38.

[19] The newspaper article relied upon by Plaintiffs also cites the "legal advice" of the Office of Government Ethics ("OGE") to the then-President-elect concerning the divestiture of his assets. *See* Shear & Lipton, *Ethics Office Praises Donald Trump for a Move He Hasn't Committed To*, N.Y. Times (Nov. 30, 2016), http://nyti.ms/2spZcdj.  The advice concerned only voluntary compliance with Section 208 and not the Emoluments Clauses.  As OGE has informed Congress, "OGE lacks authority and expertise to advise on issues arising under those clauses."  Letter from OGE Director, Walter M. Shaub Jr., to Senator Thomas R. Carper, Senate Committee on Homeland Security and Government Affairs (Dec. 12, 2016).

mean that an emolument would be office-related and prohibited where a foreign or domestic government actor unilaterally sought to influence the President through a commercial transaction with the President's businesses. Plaintiffs believe that they have alleged commercial transactions falling within that interpretation. But Plaintiffs have distorted the President's position. As the President explained at length in his Motion, an "Emolument" must be tendered in exchange for personal services rendered by the officeholder. The complaint contains no plausible allegations of such exchange, and thus has failed to state a claim under the President's theory.

Nor have Plaintiffs stated a claim that the President has received prohibited "presents" under the Foreign Emoluments Clause through the commercial transactions alleged in the complaint. As the President's Motion (at 3, 31–32) made clear, the interpretation of "present" as encompassing benefits arising from commercial transactions and legal entitlements accruing by operation of law is patently meritless. Plaintiffs' assertion, for example, that the President has received prohibited "presents" in the form of Chinese trademarks, therefore, does not state a claim under the President's theory. *See* Opp'n at 8, 33–34, 51.

Such trademarks also do not state a claim as "Emoluments." Leaving aside that none of the hospitality Plaintiffs could even have standing to raise such a claim, the complaint sets forth no plausible allegation that China awarded trademark protections to the President in exchange for the President's adherence to the United States' longstanding "One-China" policy. Plaintiffs' own sources indicate that the Chinese government began the process for granting the trademarks before the election, in September 2016, rendering implausible Plaintiffs' assertion that China granted the trademark protections in exchange for adherence to the "One-China" policy. *See* 2d Am. Compl. at 26 n.37. Beyond that, Plaintiffs simply offer their own speculations about the Chinese government's motive in granting the trademark protections. The Court should not permit a fishing expedition based on such speculations.

With respect to the Domestic Emoluments Clause, Plaintiffs argue that they have stated a plausible claim because they have alleged that GSA has forgiven the President's alleged breach of the Old Post Office Building lease due to "[his] position as president." *Id.* at 52. But

Plaintiffs have not plausibly alleged that the GSA's alleged forgiveness of the supposed breach of contract was to compensate for the President's service as President.  Although Plaintiffs claim that the President increased the budget request for GSA in exchange for such a determination, *see* Opp'n at 52, the President's budget request for GSA actually represented a total decrease of roughly $80 million from FY 2017 to FY 2018, which subsumed the requested increase in the significantly smaller discretionary budget authority.[20]  Plaintiffs' other allegations suggesting that domestic governments will engage in commercial transactions with the President's businesses or extend regulatory benefits to them similarly do not state a claim.  Again, under the President's theory, his mere receipt of benefits because of his status as President is insufficient to trigger the Domestic Emoluments Clause.  There must be plausible allegations that the President has performed an official act in exchange.  There are none.

For the forgoing reasons, Plaintiffs have failed to state any plausible claim for relief.

## IV.   THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.

The President's Motion (at 48–50) also explained that under *Mississippi v. Johnson*, federal courts cannot issue an injunction that runs against the President himself in the exercise of his official duties.  Plaintiffs contend that *Johnson* no longer has vitality.  *See* Opp'n at 56–57.  Plaintiffs are wrong.  In the 150 years since *Johnson*, no court has issued an injunction against the President in his official capacity where he is the sole defendant.  This is so because separation-of-powers concerns are most acute when a federal court acts to enjoin the Chief Executive.  Thus, rather than losing its vitality, *Johnson* remains good law, as is also evidenced by the recent case law cited in the President's Motion (at 49).

*Boumediene v. Bush*, 553 U.S. 723 (2008) and *United States v. Nixon*, 418 U.S. 683 (1974), cited by Plaintiffs, are not to the contrary.  *Boumediene*, 553 U.S. at 771, held that the

---

[20] *Compare* GSA, *FY 2017 Congressional Justification*, at GSA-8 (Feb. 9, 2016), https://www.gsa.gov/portal/getMediaData?mediaId=123414 (FY 2017 appropriations request of $10,540,077 thousand), *with* GSA, *FY 2018 Congressional Justification*, at GSA-10 (May 23, 2017), https://www.gsa.gov/portal/getMediaData?mediaId=162214 (FY 2018 appropriations request of $10,459,953 thousand).

Suspension Clause of the Constitution extended to the U.S. Naval Station at Guantanamo Bay, Cuba.  No injunction was issued against the President in that case, nor were any constitutional writs of habeas corpus later issued against the President as the only respondent.  As for *Nixon*, it merely held that a President may be required to respond to a subpoena to produce evidence relevant to an ongoing criminal case, which is simply a ruling that the President, like any other citizen, may be subject to judicial process to produce information in his possession.  418 U.S. at 702.  The relief sought here, in contrast, would effectively impose a condition on the President's ability to serve as President and to perform the duties he is duly elected to perform, implicating core separation of powers concerns.  Thus, contrary to Plaintiffs' suggestion (*see* Opp'n at 56– 57), the nature of the relief sought here is, in fact, "executive or political."

Plaintiffs also argue that "courts that have found it 'improper' to issue relief running against the [P]resident have done so for a reason wholly inapplicable here"—which is that there were subordinate officials who could be enjoined from carrying out the President's directive, obviating the need to enjoin the President himself.  *See* Opp'n at 57.  But the very source they cite, Justice Scalia's concurrence in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), suggests that where there are no subordinate officials to enjoin, a court would have no jurisdiction to issue an injunction.  As Justice Scalia explained in *Franklin*, "[the Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees' constitutional claims should be dismissed."  *Id.* at 829 (Scalia, J., concurring).

## CONCLUSION

For the foregoing reasons and those stated in the President's Memorandum of Law in Support of his Motion to Dismiss, the President respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Dated:  September 22, 2017                    Respectfully submitted,

                                              CHAD A. READLER
                                              Acting Assistant Attorney General

                                              BRETT A. SHUMATE
                                              Deputy Assistant Attorney General

                                              JENNIFER D. RICKETTS
                                              Director, Federal Programs Branch

                                              ANTHONY J. COPPOLINO
                                              Deputy Director

                                              /s/ *Jean Lin*_____
                                              JEAN LIN
                                              Special Counsel
                                              JAMES R. POWERS
                                              Trial Attorney
                                              U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              20 Massachusetts Ave. NW
                                              Washington, DC  20530
                                              Phone: (202) 514-3716
                                              Fax: (202) 616-8202
                                              Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2017, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *Jean Lin*</u>
JEAN LIN