CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

OFFICE OF CONGRESSIONAL ETHICS
UNITED STATES HOUSE OF REPRESENTATIVES

## REPORT

Review No. 17-1147

The Board of the Office of Congressional Ethics (hereafter "the Board"), by a vote of no less than four members, on June 2, 2017, adopted the following report and ordered it to be transmitted to the Committee on Ethics of the United States House of Representatives (hereafter "the Committee").

SUBJECT:  Delegate Madeleine Z. Bordallo

NATURE OF THE ALLEGED VIOLATION:  Del. Bordallo owns a home in Guam which she may rent to the Japanese Consulate in Hagatna, Guam for a profit.  If Del. Bordallo received profit from a foreign government, then she may have violated House rules, standards of conduct, and federal law.

Del. Bordallo may have received free lodging, meals, and amenities at the Outrigger Guam Beach Resort (the "Resort") for multiple weeks per year during her service in Congress.  If Del. Bordallo accepted gifts of free lodging, meals, and amenities at the Resort, then she may have violated House rules and standards of conduct.

Del. Bordallo may have used official funds from the Members' Representational Allowance to pay for her lodging and meals at the Resort.  If Del. Bordallo used official funds for unauthorized purposes, then she may have violated House rules, standards of conduct, and federal law.

Del. Bordallo may have used her congressional staff to perform personal services related to maintaining her rental property in Guam and assisting a Guam-based beauty pageant.  If Del. Bordallo used congressional staff to perform personal services, then she may have violated House rules, standards of conduct, and federal law.

RECOMMENDATION:  The Board recommends that the Committee further review the allegation that Del. Bordallo received rental profit from the Japanese Consulate in Hagatna, Guam because there is substantial reason to believe that Del. Bordallo received profit from a foreign government.

The Board recommends that the Committee further review the allegation that Del. Bordallo received gifts of free lodging, meals, and amenities at the Resort because there is substantial reason to believe that Del. Bordallo accepted gifts of free lodging, meals, and amenities for multiple weeks per year during her service in Congress.

The Board recommends that the Committee further review the allegation that Del. Bordallo used official funds to pay for her lodging and meals at the Resort because there is substantial reason to believe that Del. Bordallo used official funds for unauthorized purposes.

The Board recommends that the Committee dismiss the allegation that Del. Bordallo used her congressional staff to perform personal services related to maintaining her rental property in

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

Guam and assisting a Guam-based beauty pageant because there is not substantial reason to believe that Del. Bordallo used congressional staff to perform personal services.

VOTES IN THE AFFIRMATIVE:  6

VOTES IN THE NEGATIVE:  0

ABSTENTIONS:  0

MEMBER OF THE BOARD OR STAFF DESIGNATED TO PRESENT THIS REPORT TO THE COMMITTEE ON ETHICS: Omar S. Ashmawy, Staff Director & Chief Counsel.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

## FINDINGS OF FACT AND CITATIONS TO LAW

## TABLE OF CONTENTS

**I.   INTRODUCTION** ................................................................................................. **5**

    A.  Summary of Allegations ..................................................................... 5

    B.  Jurisdiction Statement ........................................................................ 6

    C.  Procedural History .............................................................................. 6

    D.  Summary of Investigative Activity .................................................... 7

**II.  DELEGATE BORDALLO MAY HAVE ACCEPTED RENTAL PROFIT FROM A FOREIGN GOVERNMENT** ................................................................................. **8**

    A.  Applicable Law, Rules, and Standards of Conduct ........................... 8

    B.  Delegate Bordallo May Have Received Rental Profit from a Foreign Government .... 9

    i.   Del. Bordallo's Rental Agreement with the Japanese Government ......................... 9

    ii.  The Emoluments Clause of the U.S. Constitution and Rental Profit from a Foreign Government .................................................................... 12

**III. DELEGATE BORDALLO MAY HAVE ACCEPTED GIFTS OF FREE LODGING, MEALS, AND AMENITIES AT THE OUTRIGGER GUAM RESORT AND MAY HAVE USED OFFICIAL FUNDS TO PAY FOR LIVING EXPENSES IN GUAM ... 13**

    A.  Applicable Law, Rules, and Standards of Conduct ......................... 13

    B.  Delegate Bordallo May Have Accepted Impermissible Gifts at the Outrigger Guam Beach Resort and May Have Used Official Funds for Personal Living Expenses in Guam ................................................................................................. 15

    i.   Free Lodging, Meals, and Amenities at the Resort ................................................. 16

       a.  Ownership of the Resort ........................................................... 16

       b.  Free Lodging at the Resort in Family Units and Other Resort Suites ................. 18

       c.  Free Access to the Voyager Club Hospitality Suite and Other Amenities .......... 22

    ii.  Use of Official Funds to Pay for Del. Bordallo's Meals and Lodging in Guam and Family Disagreement Regarding Del. Bordallo's Resort Access ......................... 26

       a.  Use of Official Funds for Del. Bordallo's Meals in Guam ................................... 26

       b.  Use of Official Funds for Del. Bordallo's Lodging in Guam and Family Disagreement Related to Resort Lodging ............................................................. 27

    iii. Indirect and Direct Gifts of Hospitality from Corporate Entities ......................... 32

    iv.  Approximate Value of Free Gifts of Lodging, Meals, and Amenities.................... 33

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

**IV.   DELEGATE BORDALLO MAY HAVE USED HER CONGRESSIONAL STAFF TO PERFORM  PERSONAL SERVICES RELATED TO HER RENTAL PROPERTY AND A BEAUTY PAGEANT** ........................................................................ **35**

    A.  Applicable Law, Rules, and Standards of Conduct ..................................... 35

    B.  Delegate Bordallo May Have Used Her Congressional Staff to Perform Personal Services ....................................................................................................... 35

        i.   Congressional Staff May Have Overseen Maintenance Work at Del. Bordallo's Rental Property ......................................................................................... 35

        ii.  Congressional Staff Volunteered for the Miss World Guam Pageant .................... 38

**V.    INDIVIDUALS WHO REFUSED TO COOPERATE WITH THE OCE REVIEW** ... **40**

**VI.   CONCLUSION** ................................................................................................ **42**

**VII.  INFORMATION THE OCE WAS UNABLE TO OBTAIN AND RECOMMENDATION FOR THE ISSUANCE OF SUBPOENAS**.............................. **43**

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

OFFICE OF CONGRESSIONAL ETHICS
UNITED STATES HOUSE OF REPRESENTATIVES

**<u>FINDINGS OF FACT AND CITATIONS TO LAW</u>**

Review No. 17-1147

On June 2, 2017, the Board of the Office of Congressional Ethics (hereafter "the Board") adopted the following findings of fact and accompanying citations to law, regulations, rules and standards of conduct (*in italics*).  The Board notes that these findings do not constitute a determination of whether or not a violation actually occurred.

## I.   INTRODUCTION

### A.   <u>Summary of Allegations</u>

1. Del. Bordallo is the Delegate to the U.S. House of Representatives from Guam.  Del. Bordallo owns a home in Guam which she may rent to the Japanese Consulate in Hagatna, Guam for a profit.  If Del. Bordallo received profit from a foreign government, then she may have violated House rules, standards of conduct, and federal law.

2. During her travel to Guam, Del. Bordallo stays almost exclusively at the Outrigger Guam Beach Resort (the "Resort").  Del. Bordallo may have received free lodging, meals, and amenities at the Resort for multiple weeks per year during her service in Congress.  If Del. Bordallo accepted gifts of free lodging, meals, and amenities at the Resort, then she may have violated House rules and standards of conduct.

3. In addition, Del. Bordallo may have used official funds from the Members' Representational Allowance to pay for her lodging and meals at the Resort.  If Del. Bordallo used official funds for unauthorized purposes, then she may have violated House rules, standards of conduct, and federal law.

4. Finally, Del. Bordallo may have used her congressional staff to perform personal services related to maintaining her rental property in Guam and assisting a Guam-based beauty pageant.  If Del. Bordallo used congressional staff to perform personal services, then she may have violated House rules, standards of conduct, and federal law.

5. The Board recommends that the Committee further review the allegation that Del. Bordallo received rental profit from the Japanese Consulate in Hagatna, Guam because there is substantial reason to believe that Del. Bordallo received profit from a foreign government.

6. The Board recommends that the Committee further review the allegation that Del. Bordallo received gifts of free lodging, meals, and amenities at the Resort because there is substantial reason to believe that Del. Bordallo accepted gifts of free lodging, meals, and amenities for multiple weeks per year during her service in Congress.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

7.   The Board recommends that the Committee further review the allegation that Del.
     Bordallo used official funds to pay for her lodging and meals at the Resort because there
     is substantial reason to believe that Del. Bordallo used official funds for unauthorized
     purposes.

8.   The Board recommends that the Committee dismiss the allegation that Del. Bordallo used
     her congressional staff to perform personal services related to maintaining her rental
     property in Guam and assisting a Guam-based beauty pageant because there is not
     substantial reason to believe that Del. Bordallo used congressional staff to perform
     personal services.

### B.  Jurisdiction Statement

9.   The allegations that were the subject of this review concern Delegate Madeleine Z.
     Bordallo, the Delegate to the United States House of Representatives from Guam.  The
     Resolution the United States House of Representatives adopted creating the Office of
     Congressional Ethics (hereafter "OCE") directs that, "[n]o review shall be undertaken…
     by the board of any alleged violation that occurred before the date of adoption of this
     resolution."[1]  The House adopted this Resolution on March 11, 2008.  Because the
     conduct under review occurred after March 11, 2008, review by the Board is in
     accordance with the Resolution.

### C.  Procedural History

10.  The OCE received a written request for preliminary review in this matter signed by at
     least two members of the Board on February 3, 2017.  The preliminary review
     commenced on February 4, 2017.[2]

11.  On February 7, 2017, the OCE notified Del. Bordallo of the initiation of the preliminary
     review, provided her with a statement of the nature of the review, notified her of her right
     to be represented by counsel in this matter, and notified her that invoking her right to
     counsel would not be held negatively against her.[3]

---

[1] H. Res 895, 110th Cong. §1(e) (2008) (as amended).

[2] A preliminary review is "requested" in writing by members of the Board of the OCE.  The request for a
preliminary review is received by the OCE on a date certain.  According to H. Res. 895 of the 110th Congress (as
amended) (hereafter "the Resolution"), the timeframe for conducting a preliminary review is 30 days from the date
of receipt of the Board's request.

[3] Letter from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Del.
Bordallo, February 6, 2017.  On February 6, 2017, the first business day after the commencement of the review, the
OCE delivered an initial letter to Del. Bordallo explaining that the Board of the OCE had taken an action concerning
her and requesting the opportunity to schedule a meeting to discuss the matter and to provide related documents.
Del. Bordallo scheduled a meeting with the OCE on February 7, 2017, during which time she received additional
materials related to the review.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

12. At least three members of the Board voted to initiate a second-phase review in this matter on March 3, 2017.  The second-phase review commenced on March 6, 2017.[4]  The second-phase review was scheduled to end on April 19, 2017.

13. On March 6, 2017, the OCE notified Del. Bordallo of the initiation of the second-phase review in this matter, and again notified her of her right to be represented by counsel in this matter, and that invoking that right would not be held negatively against her.[5]

14. The Board voted to extend the second-phase review by an additional period of fourteen days on April 7, 2017.  The additional period ended on May 3, 2017.

15. The Board voted to refer the matter to the Committee on Ethics for further review and dismissal and adopted these findings on June 2, 2017.

16. The report and its findings in this matter were transmitted to the Committee on Ethics on June 12, 2017.

### D.  <u>Summary of Investigative Activity</u>

17. The OCE requested documentary and in some cases testimonial information from the following sources:

> (1)  Del. Bordallo;
> (2)  Niece A;
> (3)  Del. Bordallo's Sister;
> (4)  Office Manager;
> (5)  Current District Director;
> (6)  Former Chief of Staff;
> (7)  Former District Director;
> (8)  Kaye Lea Custodio;
> (9)  Outrigger Enterprises Group;
> (10) Tanota Partners; and
> (11) Charlene Goo.

18. The following individuals and entities refused to cooperate with the OCE's review:

> (1)  Del. Bordallo;
> (2)  Kaye Lea Custodio;
> (3)  Outrigger Enterprises Group; and
> (4)  Tanota Partners.

---

[4] According to the Resolution, the Board must vote (as opposed to make a written authorization) on whether to conduct a second-phase review in a matter before the expiration of the 30-day preliminary review.  If the Board votes for a second-phase, the second-phase commences the day after the preliminary review ends.

[5] Letter from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Del. Bordallo, March 6, 2017.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

## II. DELEGATE BORDALLO MAY HAVE ACCEPTED RENTAL PROFIT FROM A FOREIGN GOVERNMENT

### A. Applicable Law, Rules, and Standards of Conduct

19. United States Constitution, Article I, Section 9, Clause 8

*"No title of nobility shall be granted by the United States: and no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state."*

20. House Rules

*House Rule 23, clause 1 states that "[a] Member . . . shall conduct himself at all times in a manner that shall reflect creditably on the House."*

*House Rule 23, clause 2 states that "[a] Member . . . shall adhere to the spirit and the letter of the Rules of the House . . . ."*

21. House Ethics Manual

*The House Ethics Manual states, "[t]he Constitution prohibits any Member or employee of the House (as well as any other federal official) from receiving an 'emolument' of 'any kind whatever' from a foreign government or a representative of a foreign state, without the consent of the Congress (Article I, Section 9, clause 8).  As the Comptroller General has noted, 'it seems clear from the wording of the Constitutional provision that the drafters intended the prohibition to have the broadest possible scope and applicability.'  Thus, an 'emolument' has been defined as any 'profit, gain, or compensation received from services rendered.'"[6]*

*The House Ethics manual also explains, "[a]lthough Congress has consented, in the Foreign Gifts and Decorations Act to the acceptance by federal officers of certain **gifts**, no statute grants a general consent for the receipt of emoluments or other **compensation** from foreign governments."[7]  "Members and employees may **not** therefore receive any payment for services rendered to official foreign interests, such as ambassadors, embassies, or agencies of a foreign government."[8]*

---

[6] House Ethics Manual (2008) at 205 (citing 49 Comp. Gen 819, 821 (1970)).
[7] House Ethics Manual (2008) at 205 (emphasis in original).
[8] *Id.* at 206.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

### B. Delegate Bordallo May Have Received Rental Profit from a Foreign Government

22. Del. Bordallo owns a home in Tamuning, Guam, which she rents to the government of Japan for a profit.  As described below, since March 11, 2008, Del. Bordallo likely received close to $800,000.00 from the government of Japan for this rental property.[9]

#### i.   Del. Bordallo's Rental Agreement with the Japanese Government

23. Del. Bordallo acquired a residential property in Guam in 1990 and initiated a rental agreement with the Consul General of Japan in Hagatna, Guam in 1993.[10]

24. Former District Director, who worked in the District Office as District Director from January 2003 until 2006 and then as a Senior Policy Adviser until September 2013, told the OCE that the Consul General decided to rent the property because of its close proximity to the Japanese Consulate.[11]

25. Former Chief of Staff, who served as Del. Bordallo's Chief of Staff from January 2003 until September 2015, told the OCE that the home has approximately four bedrooms and is located in a "very good neighborhood."[12]  Former District Director described the home as "extremely large."[13]

26. Since 2003, Del. Bordallo has disclosed her income from this rental property on her annual financial disclosure statements with the House of Representatives.[14]  Although the

---

[9] Due to the jurisdictional limits under the Resolution, the OCE focused on conduct that occurred after March 11, 2008.

[10] Affidavit of Real Property, June 7, 1990 (Exhibit 2 at 17-1147_0012); Guam Department of Land Management Certificate of Title, June 18, 1990 (Exhibit 3 at 17-1147_0014); Rental Agreement Between Del. Bordallo and The Hon. Hisatsugu Shimizu, Consul General of Japan, April 1, 2013 – March 31, 2015 ("The April 2013 Rental Agreement") (Exhibit 4 at 17-1147_0017); Transcript of Interview of Former District Director ("Former District Director Transcript"), April 26, 2017 (Exhibit 5 at 17-1147_0030); see also U.S. State Department, Foreign Career Consular Offices and the Honorary Consular Offices in the United States (Spring 2013) at 68 (listing Mr. Hisatsugu Shimizu as Consul General of Japanese Consulate in Guam as of May 30, 2012).

[11] Former District Director Transcript (Exhibit 5 at 17-1147_0029-0030).

[12] Transcript of Interview of Former Chief of Staff ("Former Chief of Staff Transcript"), April 26, 2017 (Exhibit 6 at 17-1147_0050, 0055).  Former Chief of Staff also served as a Special Adviser to Del. Bordallo from March until April 2016.  House of Representatives Chief Administrative Officer, Statement of Disbursements of the House, April 1- June 30, 2016, at 293; House of Representatives Chief Administrative Officer, Statement of Disbursements of the House, Jan. 1 – March 31, 2016, at 296.  Del. Bordallo asked Former Chief of Staff to resign following allegations of criminal misconduct, for which he was later acquitted and his record was expunged.  Following a dispute resolution process pursuant to the Congressional Accountability Act, Former Chief of Staff was temporarily reinstated in the office to allow his pension to vest.  Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0093-0096).  The OCE found that Former Chief of Staff was credible and that his statements were consistent with those of other third party witnesses to this review.

[13] Former District Director Transcript (Exhibit 5 at 17-1147_0030).

[14] Del. Bordallo, 2015 Annual Financial Disclosure Report, filed May 11, 2016 at 2; Del. Bordallo, 2014 Annual Financial Disclosure Report, filed May 11, 2015 at 2; Del. Bordallo, 2013 Annual Financial Disclosure Report, filed May 8, 2014 at 2; Del. Bordallo, 2012 Annual Financial Disclosure Report, filed May 14, 2013 at 4; Del. Bordallo, 2011 Annual Financial Disclosure Report, filed May 1, 2012 at 4; Del. Bordallo, 2010 Annual Financial Disclosure Report, filed May 11, 2011 at 3; Del. Bordallo, 2009 Annual Financial Disclosure Report, filed 2010 (date unreadable) at 3; Del. Bordallo, 2008 Annual Financial Disclosure Report, filed May 12, 2009 at 3; Del. Bordallo,

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

financial disclosure rules require a Member to report the amount of rental income generated from real property, there is no requirement to disclose the source of the rental payments, and thus no requirement to report the name of the tenant.[15]

27. Del. Bordallo provided the OCE with her two most recent rental agreements related to the property, although she did not provide the OCE with all requested agreements for the period of time from March 11, 2008 to the present.[16]

28. The rental agreement is between Del. Bordallo as "landlord" and the Consul General of Japan in Hagatna, Guam as the tenant "acting for the Government of Japan."[17]  Each rental agreement with the government of Japan is for a two-year term and must be re-executed at the conclusion of the two-year term.[18]

> THIS LEASE, entered into this FIRST DAY of APRIL, 2013, by and between MADELEINE Z. BORDALLO, owner, hereinafter referred to as the "LANDLORD" and THE HONORABLE HISATSUGU SHIMIZU, Consul General of Japan in Hagatna, Guam, hereinafter referred to as the "TENANT", acting for the Government of Japan, and by virtue of the authority vested in him by the same, hereby agree to the following:

29. Del. Bordallo did not provide the OCE with records of rental payments for the property or with correspondence with the government of Japan about the property.  Del. Bordallo also refused to interview with the OCE.

30. During Del. Bordallo's time in Congress, Del. Bordallo and the Japanese government renegotiated the rental agreement on several occasions.  Former District Director told the OCE that he advised Del. Bordallo about reasonable changes to the rental payment amount.[19]  Current District Director, who has held that role since 2014 and previously served as a Policy Adviser to Del. Bordallo, also told the OCE that he informed Del.

---

2007 Annual Financial Disclosure Report, filed May 12, 2008 at 3; Del. Bordallo, 2006 Annual Financial Disclosure Report, filed May 15, 2007 at 3; Del. Bordallo, 2005 Annual Financial Disclosure Report, filed May 12, 2006 at 3; Del. Bordallo, 2004 Annual Financial Disclosure Report, filed May 16, 2005 at 3; Del. Bordallo, 2003 Annual Financial Disclosure Report, filed May 17, 2004 at 3; Del. Bordallo, 2002 Annual Financial Disclosure Report, filed May 15, 2003 at 3.

[15] House Committee on Ethics, Instruction Guide: Financial Disclosure Statements and Periodic Transaction Reports for Calendar Year 2016 at 14.

[16] The April 2013 Rental Agreement (Exhibit 4 at 17-1147_0016-0025); Rental Agreement Between Del. Bordallo and The Hon. Hisatsugu Shimizu, Consul General of Japan, April 1, 2015 – March 31, 2017 ("The April 2015 Rental Agreement") (Exhibit 7 at 17-1147_0099-0107).

[17] Id. (Exhibit 7 at 17-1147_0099); The April 2013 Rental Agreement (Exhibit 4 at 17-1147_0016).

[18] Id.; The April 2015 Rental Agreement (Exhibit 7 at 17-1147_0099); Former District Director Transcript (Exhibit 5 at 17-1147_0031); Transcript of Interview of Current District Director ("Current District Director Transcript"), May 1, 2017 (Exhibit 8 at 17-1147_0113).

[19] Former District Director Transcript (Exhibit 5 at 17-1147_0031-0033).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

Bordallo about proposed changes to the rental payment amount and changes to home maintenance provisions.[20]

31. Former District Director told the OCE that Del. Bordallo renegotiated the terms of the lease with the Japanese Consul herself with advice from her staff.[21]  Accordingly, Del. Bordallo played an active role in renegotiating the agreement with the government of Japan while serving in Congress.

32. For the only two rental agreements that the OCE received, for two-year terms commencing on April 2015 and April 2013, the monthly rental payment was $7,000.00 per month.[22]  Over the course of a two-year lease, this amount totals $168,000.00 in rental income.[23]  Former District Director told the OCE that the rental rates in the two-year leases sometimes fluctuated to as low as $6,000.00 per month and as high as $7,500.00 per month depending on economic conditions.[24]  The OCE found that this rental amount fell within a normal range for rental properties in the residential community.

33. Del. Bordallo's annual financial disclosure reports indicate that, since 2003 when she first entered Congress, she generated between $50,001.00 and $100,000.00 a year in income from the property.[25]

34. Without cooperation from Del. Bordallo, the OCE could not determine the exact amount of rental profit Del. Bordallo received from the government of Japan during her time in Congress.  Based on the current rental agreement, Del. Bordallo likely received close to $800,000.00 in rental income from the arrangement with the Japanese government since March 11, 2008.  The Board notes that this rental income is profit from a foreign government.

35. Former Chief of Staff told the OCE that early in Del. Bordallo's time in Congress, he raised concerns with Del. Bordallo about the rental arrangement and suggested they discuss it with the House Ethics Committee.[26]  According to Former Chief of Staff, Del. Bordallo "didn't see anything wrong with the arrangement" because it predated her time in Congress.[27]  Former Chief of Staff told the OCE that Del. Bordallo did not want to discuss the rental arrangement with the House Ethics Committee.[28]

---

[20] Current District Director Transcript (Exhibit 8 at 17-1147_0113-114).
[21] Former District Director Transcript (Exhibit 5 at 17-1147_0032-0033).
[22] The April 2013 Rental Agreement (Exhibit 4 at 17-1147_0016-0017); The April 2015 Rental Agreement (Exhibit 7 at 17-1147_0099).
[23] *Id.*; The April 2013 Rental Agreement (Exhibit 4 at 17-1147_0016-0017).
[24] Former District Director Transcript (Exhibit 5 at 17-1147_0032).
[25] *See supra* note 14 (citing Del. Bordallo's financial disclosure reports since 2003).
[26] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0068).
[27] *Id.*
[28] *Id.*

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

### ii. The Emoluments Clause of the U.S. Constitution and Rental Profit from a Foreign Government

36. Del. Bordallo's receipt of approximately $800,000.00 in rental profit from the government of Japan since March 11, 2008 may implicate the emoluments clause of the U.S. Constitution.[29]   Del. Bordallo receives income from a foreign government and the emoluments clause may preclude the receipt of this profit.

37. The U.S. Constitution prohibits federal employees from accepting "any" emolument of "any kind whatever, from any king, prince, or foreign state."[30]  The House Ethics Manual advises that the emoluments clause should have the "broadest possible scope and applicability."[31]  To this point, the House Ethics Manual unambiguously defines "emolument" to include any "profit, gain, or compensation for services rendered."[32] There is no exception or limitation under this definition in the House Ethics Manual for when the Member generates the profit from a fair market value commercial transaction.

38. This broad application to any profit or gain derived from a foreign government is consistent with Department of Justice precedent supporting an interpretation of the emoluments clause designed to prevent the potential corrupting influence by foreign governments and their agents.  The U.S. Department of Justice Office of Legal Counsel explained in an analysis of the history of the emoluments clause, "[c]onsistent with its expansive language and underlying purpose, the provision has been interpreted as being 'particularly directed against every kind of influence by foreign governments upon offices of the United States, based upon our historic policies as a nation.'"[33]

39. Under the main precedent cited by the House Ethics Manual, the term "emoluments" applies broadly to profit from a foreign government, including when the profit is a reward rather than salary or compensation for official employment.[34]  Office of Legal Counsel precedent also establishes that the emoluments clause applies to federal employees during

---

[29] This is an estimation of gross profit rather than net profit, which would account for any operational expenses.
[30] U.S. CONST. art. I, §9, cl.8.
[31] House Ethics Manual at 205 (citing 49 Comp. Gen 819, 821 (1970)).
[32] House Ethics Manual at 205.
[33] Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians, 11 Op. O.L.C. 89, 90 (1987) (quoting 24 Op. Att'y Gen, 116, 117 (1902)).  In another discussion of the emoluments clause, the Office of Legal Counsel stated, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty.  That judgment might be biased, and that loyalty divided, if they receive financial benefits from a foreign government . . . ." Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994).
[34] For the broad application of the term "emoluments," the House Ethics Manual cites a Comptroller General decision. House Ethics Manual at 205 (citing 49 Comp. Gen 819, 821 (1970)).  This decision clarifies that the emoluments clause would preclude an Air Force Officer, who discovered contraband "by chance" during a training mission with a foreign military team, from accepting a reward from a foreign government for supplying information to public authorities about the contraband.  The Comptroller General found that the emoluments clause prohibits acceptance of the reward, applying a "broad" definition of "emolument" to include "reward monies received for the service of supplying information to public authorities." 49 Comp. Gen 819, 821 (1970).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

their free time, demonstrating that the term "emoluments" is not limited to payments from a foreign government that result from an individual's official duties.[35]

40. Applying the House Ethics Manual's definition of "profit" or "gain" from a foreign government, the receipt of profit from a foreign government for rental property may implicate the constitutional prohibition against receipt of "any emolument" of "any kind whatever" from a foreign state.

41. Based on the foregoing information, the Board finds that there is substantial reason to believe that Del. Bordallo received profit from a foreign government in violation of House rules, standards of conduct, and federal law.

## III.   DELEGATE BORDALLO MAY HAVE ACCEPTED GIFTS OF FREE LODGING, MEALS, AND AMENITIES AT THE OUTRIGGER GUAM RESORT AND MAY HAVE USED OFFICIAL FUNDS TO PAY FOR LIVING EXPENSES IN GUAM

### A.   Applicable Law, Rules, and Standards of Conduct

42. Federal Law

*31 U.S.C. § 1301(a) states, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."*

43. House Rules

*House Rule 25, clause 5 provides that, "[a] Member . . . may not knowingly accept a gift except as provided in this clause." Clause 5 defines the term "gift" broadly to include any "gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value," and also "gifts of services, training, transportation, lodging, and meals, whether provided in kind, by purchase of a ticket, payment in advance, or reimbursement after the expense has been incurred."*

*House Rule 25, clause 5(a)(3)(C) creates an exception under the gift rule for, "a gift from a relative."*

*House Rules 25, clause 5(a)(3)(P) creates an exception under the gift rule for, "[a] gift of personal hospitality (as defined in section 109(14) of the Ethics in Government Act) of an individual other than a registered lobbyist or agent of a foreign principal." Pursuant to 5 U.S.C. app. 4 § 109(14), "'personal hospitality of any individual' means hospitality extended for a nonbusiness purpose by an individual, not a corporation or organization, at the personal residence of that individual or his family or on property or facilities owned by that individual or his family."*

---

[35] In a 1982 opinion, the Office of Legal Counsel advised that the emoluments clause would prevent an employee of the U.S. Nuclear Regulatory Commission from receiving payments to perform design work for a Mexican nuclear power plant during his free time. Application of Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act, 6 Op. O.L.C. 156 (1982). The opinion states, "Congress has consented only to the receipt of minimal *gifts* from any foreign state . . . Therefore, any other emolument stands forbidden unless the conclusion can be reached that the payment is not 'from' a foreign government." *Id.* at 158.

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

44. House Ethics Guidance

*The House Ethics Manual explains, "[a] gift from a relative is acceptable," and applies a broad definition of the term relative pursuant to the Ethics in Government Act.[36] The House Ethics Manual also states, "[h]owever, a gift may not be accepted under this provision when a relative of a Member, officer, or employee is merely passing along a gift from some other person."[37]*

*Discussing the personal hospitality exception to the gift rule, the House Ethics Manual explains, "[w]hen the requirements of this provision are satisfied, a Member or staff person may accept, for example, a meal at an individual's residence, and may also accept lodging. It is not required that the host be present; thus, use of a personally owned vacation home is permissible even if the owner is not present. However, this provision does **not** allow the acceptance of either meals or entertainment outside the home, or travel expenses. In addition, in order for this provision to apply, the property or facilities must be **personally owned**. Property or facilities owned by a corporation or a firm may not be used under this provision, even if the corporation or firm is wholly owned by an individual. Likewise, as a general rule, a residence or other property that the individual owner rents out to others or otherwise uses for business purposes may not be used under this provision."[38]*

*The Committee on Ethics has granted a "general waiver of the gift rule to enable a Member, office, or employee to accept the following items incidental to legitimate official activity . . . Local transportation, outside of the District of Columbia, provided by the management of a site being visited in the course of official duties, between the airport or other terminus and the site being visited (e.g. in connection with a tour of a large manufacturing facility)."[39] Regarding the waiver for local transportation provided by a site being visited in the course of official duties, the House Ethics Manual states, "this waiver does **not** extend to car service made available from the same source on a regular basis . . . ."[40]*

45. House Committee on Ethics Financial Disclosure Statements Instruction Guide

*According to the Committee on Ethics, "[t]he personal hospitality exemption is limited. It does not extend to hotel lodging . . . ."[41]*

46. Member's Congressional Handbook

*The Members' Congressional Handbook provides that "Members have two duty stations: their Congressional District and Washington, DC."[42] In addition, "[l]iving expenses and commuting expenses are not reimbursable, except in extraordinary circumstances (e.g.,*

---

[36] House Ethics Manual at 69.
[37] *Id.*
[38] House Ethics Manual at 62 (emphasis in original).
[39] *Id.* at 52.
[40] *Id.* (emphasis in original).
[41] House Committee on Ethics, Calendar Year 2016 Instruction Guide for Financial Disclosure Statements and Periodic Transaction Reports at 33.
[42] Committee on House Administration, Members' Congressional Handbook at 32 (2016).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

*extreme weather conditions, staff working beyond availability of mass transit or rideshare arrangements, etc.) when a Member receives written authorization from the Committee. 'Living expenses' include meals, housing, and other personal expenses incurred at the Member's or employee's residence or duty station."*[43]

**B. Delegate Bordallo May Have Accepted Impermissible Gifts at the Outrigger Guam Beach Resort and May Have Used Official Funds for Personal Living Expenses in Guam**

47. When Del. Bordallo travels to Guam, she stays almost exclusively at the Resort.[44] According to its website, the Resort is the "preeminent deluxe beachfront resort hotel in the Tumon Bay resort district – an exciting, upscale retail and entertainment mecca that also features one of the best stretches of beach on the island."[45]

48. The OCE found evidence that Del. Bordallo may have accepted approximately 663 nights of free lodging at the Resort since March 11, 2008.[46] Del. Bordallo also likely enjoyed hundreds of free breakfasts in the Resort's hospitality suite during her stays and accessed other amenities without charge.

49. In addition, Members of Congress cannot use official funds from the Members' Representational Allowance (the "MRA") to pay for living expenses, such as meals and lodging, at their duty station, which is defined to include their home district.[47] Del. Bordallo appears to have used official funds regularly for her food and beverage expenses at the Resort in her home district. In addition, during a period of time when a family disagreement may have prevented Del. Bordallo from staying at the Resort for free, Del. Bordallo appears to have used MRA funds to pay for her lodging during at least three trips to Guam.

---

[43] *Id.*

[44] *See* Table of Del. Bordallo's Travel to Guam and Resort Lodging ("Exhibit 1") (Exhibit 1 at 17-1147_0002-0010). As represented in Exhibit 1, the OCE used detailed daily schedule reports produced by Del. Bordallo listing Del. Bordallo's activities in Guam between March 11, 2008 and November 14, 2016 to approximate a timeline of Del. Bordallo's travel to Guam and the duration of her stays at the Resort. Del. Bordallo's Schedule Reports, Mar. 11, 2008 - Nov. 14, 2016 (Exhibit 9 at 17-1147_0142-0597). The OCE also utilized two years of partial invoices and other travel records provided by Outrigger Enterprises Group, and congressional delegation travel records included in the congressional record. The OCE requested that Del. Bordallo provide the OCE with all calendars, official, campaign, and personal, from March 11, 2008 during the duration of Del. Bordallo's trips to Guam. The OCE also requested a listing of each instance of travel, official, campaign, or personal, undertaken by Del. Bordallo to Guam between March 11, 2008 and the present, including the date(s) of such travel, the duration of Del. Bordallo's trip, and the location and dates of Del. Bordallo's lodging in Guam during such trip. Del. Bordallo refused to provide the OCE with a listing of her travel, although she produced the schedule reports related to her travel to Guam since March 11, 2008. Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0142-0597).

[45] Outrigger Guam Beach Resort, *Overview*, https://www.outrigger.com/hotels-resorts/guam/tumon-bay/outrigger-guam-beach-resort (last visited May 23, 2017).

[46] *See* Exhibit 1.

[47] Committee on House Administration, Members' Congressional Handbook at 32 (2016).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

### i. Free Lodging, Meals, and Amenities at the Resort

50. Although Del. Bordallo started regularly staying at the Resort in 2003 during her first term in Congress, the OCE only reviewed Del. Bordallo's accommodations at the Resort since March 11, 2008.[48]

51. The Resort is owned by a series of corporate entities and trusts that are ultimately controlled by Del. Bordallo's nephew, nieces, brother-in-law, and sister. The Board carefully considered the family relationships, the relevant corporate ownership structure, and applicable gift rule exceptions in this review. As further explained below, the Board found that Del. Bordallo likely accepted gifts of lodging, meals, and access to other amenities without charge from a corporate entity, Bayview II, LLC, that owns the land and building where the Resort is located and from a hotel management company, Outrigger Guam Limited Partnership ("OGLP"), which oversees the Resort's operations.

### a. Ownership of the Resort

52. Bayview II, LLC owns the Resort building complex and the land on which it is located.[49] Bayview II, LLC has a hotel management agreement with OGLP, a subsidiary of Outrigger Enterprises Group ("Outrigger), an international hospitality company based in Hawaii.[50]

53. The hotel management agreement gives OGLP the "control and discretion in management, operation, marketing, maintenance and supervision" of the Resort.[51]

54. Bayview, II, LLC is part of a family of companies connected to Tanota Partners, a Guam-based company founded by Del. Bordallo's sister and late brother-in-law, Alfred Ysrael.[52] Their son Michael Z. Ysrael currently runs Tanota Partners.[53]

55. According to Michael Z. Ysrael, Bayview II, LLC, which owns the Resort building and land, is a wholly owned subsidiary of Tanota Hotels, LLC.[54] Michael Z. Ysrael stated in

---

[48] *See* Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0070) (explaining that Del. Bordallo started staying at the Resort in 2003). Due to the jurisdictional limits under the Resolution, the OCE focused on conduct that occurred after March 11, 2008.

[49] Letter from Michael Z. Ysrael, Tanota Partners, to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 31, 2017.

[50] Amended and Restated Hotel Management Agreement, Between Bayview II, LLC and Outrigger Guam Limited Partnership, Nov. 1, 2015 ("Hotel Management Agreement") (Exhibit 10 at 17-1147_0599-0601); Letter from Edward E. Case, Senior Vice President & Chief Legal Officer, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017; Letter from Michael Z. Ysrael, Tanota Partners, to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 31, 2017; Outrigger Hotels and Resorts, *Outrigger Enterprises Group*, https://www.outrigger.com/about-us/outrigger-enterprise-group (last visited June 7, 2017). The OCE received representations from multiple counsels to witnesses in this review, and gave those statements appropriate evidentiary weight.

[51] Hotel Management Agreement (Exhibit 10 at 17-1147_0600).

[52] Tanota Partners, *About*, http://tanota.com/about-4/ (last visited May 23, 2017).

[53] *Id*.

[54] Letter from Michael Z. Ysrael, Tanota Partners, to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 31, 2017.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

a letter to the OCE that Tanota Hotels, LLC is owned 19.9% respectively by five trusts set up by himself and his four sisters (Del. Bordallo's nephew and nieces) for the benefit of themselves and their future children.[55]  The five trusts own 99.5% of Tanota Hotels, LLC, and the remaining 0.5% is held by Tanota Corporation.[56]  Tanota Corporation is owned 50% by Alfred Ysrael, 49% by Del. Bordallo's sister, and 1% by Michael Z. Ysrael.[57]



56. In simplest terms, the Resort where Del. Bordallo stays during her trips to Guam is owned by a limited liability company, that is owned by a limited liability company, that is owned by five trusts that benefit Del. Bordallo's nieces and nephews, and by a corporation owned by Del. Bordallo's nephew, sister, and brother-in-law.

---

[55] *Id.*

[56] *Id.*

[57] *Id.*  Michael Z. Ysrael told the OCE that the late Mr. Alfred Ysrael's ownership interest in Tanota Corporation is now in the process of being transferred to Del. Bordallo's sister.

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

### b.  Free Lodging at the Resort in Family Units and Other Resort Suites

57. The OCE found that Del. Bordallo received approximately 663 nights of free lodging at the Resort since March 11, 2008.[58]

58. Office Manager has served in the role of Office Manager for Del. Bordallo's Washington D.C. congressional office for ten years and also has served as Del. Bordallo's Scheduler for fourteen years.[59] Office Manager is responsible for Del. Bordallo's travel reservations.[60] According to Office Manager, Del. Bordallo stays at the Resort 98% of the time when she travels to Guam.[61]  Former Chief of Staff told the OCE that Del. Bordallo stays at the Resort 100% of the time in Guam, unless she is participating in a congressional delegation that is staying at another hotel.[62]

59. According to Office Manager, Del. Bordallo typically travels to Guam during district work periods and stays for "[a] week to two to three weeks" at a time.[63]  Occasionally, Del. Bordallo's travel to Guam coincided with a congressional delegation trip to the island, and almost all these congressional delegations also stayed at the Resort.[64]  When Del. Bordallo participates in a congressional delegation trip, official funds pay for the cost of her lodging in Guam.[65]  In addition, congressional staff who travel to Guam with Del. Bordallo and stay at the Resort pay for their rooms with MRA funds.[66]

60. As evidenced by the timeline of Del. Bordallo's travel to Guam in Exhibit 1, Del. Bordallo spent long periods of time each year at the Resort.[67]  In 2016, Del. Bordallo spent 157 nights at the Resort, 156 of which likely were free of charge.[68]  Del. Bordallo sometimes stays at the Resort for weeks at a time, for example in 2016 she once stayed at the Resort for 53 nights and during another trip she stayed for 33 consecutive nights.[69]

---

[58] *See* Exhibit 1.  In addition, as described later in these Findings of Fact, on at least three occasions Del. Bordallo's room expenses may have been transferred to her congressional staffer's Resort invoices and paid for with MRA funds.  *See infra* Section III.B.ii.b.

[59] Transcript of Interview of Office Manager ("Office Manager Transcript"), May 1, 2017 (Exhibit 11 at 17-1147_0604).

[60] *Id.*

[61] *Id.* (Exhibit 11 at 17-1147_0610).

[62] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0070).

[63] Office Manager Transcript (Exhibit 11 at 17-1147_0609, 0617).

[64] *See* Exhibit 1; Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0069).

[65] *Id.* (Exhibit 6 at 17-1147_0072-0073); Emails between Guest Service Manager, Resort Staff and Office Manager, May 25, 2015 (Exhibit 12 at 17-1147_0658-0659) (indicating that Del. Bordallo's  room and tax during a congressional delegation trip were posted in the delegation account and her room and tax after the delegation concluded were posted separately).

[66] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0075); Office Manager Transcript (Exhibit 11 at 17-1147_0625).

[67] *See* Exhibit 1.

[68] *See, i.d.*

[69] *See, i.d.*; Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661).  The OCE notes that in the middle of the 53-day stay, Del. Bordallo may have left the Resort for three nights to travel to Singapore, but the Resort appears to have kept her room for her during her travels. Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0572-0573).

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

2016 is not an outlier.  In 2012 Del. Bordallo spent 119 total nights at the Resort, all of which were likely free, and one stay was for 47 consecutive nights.[70]

61. Typically, Del. Bordallo stays in specific suites that the Ysrael family uses whenever the family needs housing, but which sometimes are rented to guests for a fee or used by Resort staff.  On other occasions, Del. Bordallo stays for free in standard hotel rooms that are not a part of these designated family units.

62. The top floor of the Resort, the 21st floor, contains suites and rooms that Former Chief of Staff described as "better than the normal room."[71]  Niece A is Del. Bordallo's niece and one of the holders of the five trusts that control Tanota Hotels, LLC.[72]  According to Niece A, who once lived in the family units, the 21st floor includes approximately 12 to 15 rooms in total.[73]

63. The Ysrael family and Outrigger consider four of the rooms on the 21st floor of the Resort (room numbers 2101, 2102, 2108, and 2109) to be Ysrael family units.[74]  Two of the family units have three bedrooms and two of the units are one-bedroom suites.[75]  The four units all have kitchenettes and receive daily cleaning services from the Resort's housekeeping staff.[76]

64. According to Outrigger, these four family units are not included in the hotel management agreement as part of the Resort's 600-room inventory.[77]  Outrigger told the OCE that the hotel management agreement does not discuss the use of these four family units on the 21st floor.[78]  Outrigger refused to provide the complete hotel management agreement to allow the OCE to confirm whether these rooms are in the inventory.

---

[70] *See* Exhibit 1.
[71] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0071).
[72] Transcript of Interview of Niece A ("Niece A Transcript"), April 25, 2017 (Exhibit 14 at 17-1147_0664-665). Niece A cooperated with the OCE's requests for information and participated in an interview with the OCE regarding this matter.  Although the OCE informed Niece A that 18 U.S.C. § 1001, commonly known as the False Statements Act, applied to her statements to the OCE during the interview, after repeated emails Niece A failed to provide the OCE with a signed acknowledgement form that the OCE provides witnesses pursuant to Rule 4(A) of the OCE's Rules for the Conduct of Investigations, acknowledging a witness's understanding that the False Statements Act applies to their testimony.  The OCE also provided Niece A with a copy of her transcript to allow her to complete an errata form, which Niece A never returned to the OCE.
[73] Niece A Transcript (Exhibit 14 at 17-1147_0668, 0675).
[74] *Id.* (Exhibit 14 at 17-1147_0668); Letter from Edward E. Case, Senior Vice President & Chief Legal Office, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.
[75] Niece A Transcript (Exhibit 14 at 17-1147_0668, 0676).
[76] *Id.* (Exhibit 14 at 17-1147_0668, 0672); Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0079).
[77] Letter from Edward E. Case, Senior Vice President & Chief Legal Office, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.
[78] *Id.*

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

65. Niece A told the OCE that the family constructed the Resort with the intention of maintaining family access to the family units, and that she and other members of the family occasionally live in the units.[79]

66. According to Outrigger, the four units "are reserved to the Ysrael family and hotel administrative uses."[80]  Outrigger also stated that "[t]he rooms are very occasionally used by the hotel in overcapacity situations."[81]

67. Niece A told the OCE that when the family is not staying in the rooms, that the "hotel uses them for whatever they deem fit."[82]  Niece A specifically recalled that Secretary Rumsfeld stayed in the family units, as have members of congressional delegations.[83]  She also said that the Resort uses the family units for "specialized parties, or weddings."[84]  Niece A told the OCE that she does not receive any payments when regular Resort guests stay in the family units.[85]

68. Office Manager also explained to the OCE that she thought that other guests stay in the family units when the family is not using them.[86]

69. At the time of the review, no members of the Ysrael family occupied the units and one was occupied by the Resort's General Manager Steve Solberg.[87]  Outrigger told the OCE that "with the exception of the Delegate, the Ysrael family does not routinely use [the family units]."[88]

70. Niece A, Former Chief of Staff, Current District Director, and Office Manager all confirmed to the OCE that Del. Bordallo stays at the Resort for free.[89]

71. According to Former Chief of Staff, Del. Bordallo has had an arrangement with the Resort's management staff since 2003 allowing her to reserve free lodging at the Resort during her trips to Guam.[90]

---

[79] Niece A Transcript (Exhibit 14 at 17-1147_0668-0670).
[80] Letter from Edward E. Case, Senior Vice President & Chief Legal Office, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.
[81] *Id.*
[82] Niece A Transcript (Exhibit 14 at 17-1147_0670).
[83] *Id.* (Exhibit 14 at 17-1147_0680).
[84] *Id.* (Exhibit 14 at 17-1147_0670).
[85] *Id.* (Exhibit 14 at 17-1147_0671).
[86] Office Manager Transcript (Exhibit 11 at 17-1147_0619).
[87] Letter from Edward E. Case, Senior Vice President & Chief Legal Office, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.
[88] *Id.*
[89] Niece A Transcript (Exhibit 14 at 17-1147_0678-0679); Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0071-0072); Current District Director Transcript (Exhibit 8 at 17-1147_0126); Office Manager Transcript (Exhibit 11 at 17-1147_0624-0625).  *See infra* Section III.B.ii.b for a discussion of three instances in which MRA funds may have paid for Del. Bordallo's lodging.
[90] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0070-0072).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

72. After Office Manager contacts the appropriate Resort staff to request a reservation for Del. Bordallo, Office Manager appears to receive a reservation confirmation in which the room rate for Del. Bordallo states "COMP" indicating that there is no cost for the lodging.[91]  Each stay also generates a Resort invoice that notes the room number in which Del. Bordallo stayed and lists the cost of the room as zero.[92]  The Resort records Del. Bordallo's reservations just like any other guest reservation with a confirmation number, and logs these records into the Resort's reservation system.[93]

```
>
> Name: Madeline Bordallo
>
> Confirmation: 194012 //staff: 194257
>
> Arrival: July 17, 2016
> Depart: July 22, 2016
> Category: Penthouse 2109
> Room Rate: COMP
> Special(s): voyager's access
>
```

73. According to Former Chief of Staff, Del. Bordallo "generally stayed in those [family] suites. On occasion there'd be somebody in the suite she preferred or there's . . . we did a quick trip and without advance notice. We're there in two days and the family suites are taken up, but they would comp her a room that's comparable to the family suites."[94]

74. In the two years of partial Resort invoices that the OCE received from Outrigger for 2015 and 2016, the OCE found that Del. Bordallo usually stayed in family units 2109 or 2108.[95]  However, the OCE found that Del. Bordallo sometimes stayed in regular hotel rooms separate from the family units.  For example, in 2015 Del. Bordallo spent at least eighteen nights in room 1905 during three separate trips to Guam, and two nights in room 2018 during another trip to Guam.[96]  For at least one trip, Del. Bordallo stayed in room 1905 because the 21st floor was being renovated.[97]

[91] Email between Reservations Coordinator and Office Manager, Sept. 25, 2015 (Exhibit 15 at 17-1147_0689); Email between Reservation Coordinator and Office Manager, July 7, 2016 (Exhibit 16 at 17-1147_0695); Email between Reservation Coordinator and Office Manager, Mar. 29, 2016 (Exhibit 17 at 17-1147_0698); Email between Reservation Coordinator and Office Manager, April 17, 2016  (Exhibit 18 at 17-1147_0705); Email between Reservation Coordinator and Office Manager, March 23, 2016 (Exhibit 19 at 17-1147_0708).
[92] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).
[93] Id.; Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729).
[94] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0071).
[95] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732); Office Manager Transcript (Exhibit 11 at 17-1147_0619); Current District Director Transcript (Exhibit 8 at 17-1147_0126).
[96] Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729).
[97] Email between Guest Service Manager and Office Manager, May 25, 2015 (Exhibit 23 at 17-1147_0734-0735).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

75. Without cooperation from Outrigger or Del. Bordallo, the OCE could not determine how many additional nights Del. Bordallo stayed in Resort rooms that were not a part of the family units.  The OCE did not receive guest records for Del. Bordallo from Outrigger from before January 2015.

76. In Office Manager's communications with the Resort staff about reservations, the Resort staff goes out of its way to accommodate Del. Bordallo's requests for rooms, even when there is no availability at the Resort.  Office Manager told the OCE that when there were issues about availability, Resort General Manager Steve Solberg always found a way to accommodate Del. Bordallo.[98]  Office Manager could not recall a single instance in which there was an availability issue and Mr. Solberg did not ensure that Del. Bordallo secured a reservation.[99]

77. In one email that the OCE reviewed, a Reservations Coordinator at the Resort explained to Office Manager "[a]s of today we do not have the penthouse or any ocean front rooms available, however we will try our best to accommodate their usual."[100]  Office Manager told the OCE that a room on the 21st floor later became available.[101]

78. In the Resort records for Del. Bordallo from 2015 and 2016, Del. Bordallo's room revenue always states $0.00.[102]  The only charges for Del. Bordallo are for food and beverage expenses purchased in the Resort's restaurants or as room service.[103]

c. Free Access to the Voyager Club Hospitality Suite and Other Amenities

79. In addition to lodging at the Resort, Del. Bordallo also enjoys free access to the Resort's Voyager 47 Club Lounge (the "Voyager Club").[104]  According to the Resort's website, the Voyager Club is available to guests who "reserve our finest accommodations."[105]

80. The Voyager Club is on the 21st floor of the Resort, offering "exceptional views and exclusive privileges" such as a continental breakfast and early evening hors d'oeuvres and cocktails.[106]

81. Niece A told the OCE that Voyager Club access is complimentary for anybody staying in the family units, but that there is a fee for other hotel guests.[107]

---

[98] Office Manager Transcript (Exhibit 11 at 17-1147_0647-0648).

[99] Id.

[100] Emails between Reservations Coordinator and Office Manager, April 17, 2016 (Exhibit 24 at 17-1147_0737-0738).

[101] Office Manager Transcript (Exhibit 11 at 17-1147_0627).

[102] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).

[103] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).

[104] Outrigger Guam Beach Resort, *Voyager 47 Club Lounge*, https://www.outrigger.com/landing-pages/services/ogm-voyager-47-club (last visited May 23, 2017).

[105] Id.

[106] Id.

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

82. Former Chief of Staff told the OCE, "[y]ou know, all the guests on the 20th and 21st floors are offered the complimentary use of their hospitality suite, called the Voyager. The hospitality suite was offered to all the guests on the 20th and 21st floors, kind of like, as you've seen in many hotels, there's for the business travelers, where there's free breakfast, and then complimentary hors d'oeuvres in the evening, that kind of stuff."[108]

83. According to Office Manager, Del. Bordallo enjoys Voyager Club access every time she stays at the Resort.[109]

84. Del. Bordallo's schedule reports since March 11, 2008 show that she ate breakfast at the Voyager Club on most mornings during her travel to Guam.[110]

85. The OCE reviewed the two years of invoices at the Resort for 2015 and 2016 and found no indication that the Resort charged Del. Bordallo for Voyager Club access.[111]

86. Del. Bordallo routinely uses the Voyager Club during breakfast hours for meetings with her congressional staff or to meet with constituents.  Former Chief of Staff explained that, "[g]enerally, we'd start the day with a breakfast meeting."[112]  He told the OCE that staff traveling with Del. Bordallo and district staff sometimes meet at Voyager Club to "look out at the day's plan."[113]  In addition, Former Chief of Staff explained that "sometimes we would do meetings with constituents at the Voyager."[114]

87. According to Former Chief of Staff, constituents who meet with Del. Bordallo also can partake in the Voyager Club breakfast.[115]  When the OCE asked him if the congressional staff ate the free breakfast, Former Chief of Staff explained, "[s]ure.  The staff, or other people that we're meeting with, if they come up for a breakfast meeting, then it was okay that they would have the buffet breakfast, and get some coffee and juice, and join us."[116]

88. Current District Director told the OCE that "[n]ot every day, but most occasions" congressional staff would meet Del. Bordallo in the morning for briefings or just as a meeting place before the day's events.[117]  According to Current District Director, Del. Bordallo also held breakfast meetings with constituents at the Voyager Club.[118]  He

---

[107] Niece A Transcript (Exhibit 14 at 17-1147_0674).

[108] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0074).

[109] Office Manager Transcript (Exhibit 11 at 17-1147_0634).

[110] Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0142-0597).

[111] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).

[112] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0075).

[113] Id.

[114] Id.

[115] Id. (Exhibit 6 at 17-1147_0076).

[116] Id. (Exhibit 6 at 17-1147_0074).

[117] Current District Director Transcript (Exhibit 8 at 17-1147_0127).

[118] Id. (Exhibit 8 at 17-1147_0129).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

confirmed that congressional staff and constituents also sometimes ate breakfast in the Voyager Club.[119]

89. Office Manager told the OCE that district staffers attend meetings with Del. Bordallo at the Voyager Club "[w]hen the Member calls."[120] Office Manager said the district staffers "sometimes" eat breakfast during these meetings.[121]

90. Thus, in addition to Del. Bordallo, constituents, congressional staffers staying at the Resort, and district staffers who live in Guam and are not staying at the Resort, all sometimes enjoy free access to the Voyager Club.

91. Office Manager often traveled to Guam and said that every time she stayed at the Resort, she received a welcome letter providing her Voyager Club access.[122] Office Manager told the OCE that she typically stays on the ninth floor of the Resort,[123] which likely is not one of the floors with complimentary Voyager Club access.[124]

92. Former Chief of Staff explained to the OCE that it is standard for congressional staff staying at the Resort to have Voyager Club access and there is no extra payment.[125]

93. In the limited number of emails between Office Manager and Resort staff provided by Outrigger, the OCE found that in reservation confirmation emails for Del. Bordallo and congressional staff, "voyagers access" was sometimes listed as "Special(s)"[126] or as "Requests: Voyagers access and upgrade."[127]

94. At the entrance to the Voyager Club, the Resort positions staff to check the room number for any individual who enters.[128] Current District Director told the OCE that when he arrived at the Voyager Club he would tell the Resort staff at the check-in counter, "I'm going to be meeting the Congresswoman."[129] According to Former District Director, "we

---

[119] *Id.* (Exhibit 8 at 17-1147_17-1147_0128-0129).

[120] Office Manager Transcript (Exhibit 11 at 17-1147_0630-0631).

[121] *Id.* (Exhibit 11 at 17-1147_0631).

[122] *Id.* (Exhibit 11 at 17-1147_0609, 0628). Office Manager traveled to Guam four times in 2016.

[123] *Id*. (Exhibit 11 at 17-1147_0628).

[124] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0074) (explaining that guests on the 20th and 21st floors of the Resort enjoyed complimentary Voyager Club access). Office Manager told the OCE "[m]y understanding is certain floors of the Outrigger are accommodated with Voyager access and certain floors are not." Office Manager Transcript (Exhibit 11 at 17-1147_0633). She explained "I would say it's from the 16th. Just saying from staying there for so long, I believe it's the 16th floor. I may be wrong. JTB and up, they would give accommodations to a hotel guest." *Id.* Office Manager's counsel wrote the OCE a letter following her interview to clarify that to Office Manager's knowledge, JTB is a travel service that utilizes the 16th floor of the Resort. Office Manager's counsel said that Office Manager "is unaware whether higher or lower floor numbers influence access to Voyager." Letter from William Pittard, Counsel to Office Manager, to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, May 15, 2017.

[125] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0076-0077).

[126] Email between Reservations Coordinator and Office Manager, July 7, 2017 (Exhibit 16 at 17-1147_0692-0696); Email between Reservation Coordinator and Office Manager, Mar. 29, 2016 (Exhibit 17 at 17-1147_0698).

[127] Email between Reservations Coordinator and Office Manager, Sept. 25, 2015 (Exhibit 15 at 17-1147_0689).

[128] Current District Director Transcript (Exhibit 8 at 17-1147_0128); Office Manager Transcript (Exhibit 11 at 17-1147_0628).

[129] Current District Director Transcript (Exhibit 8 at 17-1147_0128).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

would tell whoever was there, the staffer, the Outrigger staff, that we were there to meet with the Congresswoman. And they would let us in, and would clear us. After a while, they just got to know us, and we never got questioned."[130]  As such, even district staffers who do not stay at the Resort receive Voyager Club access.

95.  Former Chief of Staff told the OCE that when the entire Voyager Club was used for a congressional delegation event or for a congressional event with constituents, the expense was paid for with MRA or campaign funds.[131]

96.  In addition to free meals, the OCE found that Del. Bordallo may have received free transportation from the Resort for which other guests paid a fee.[132]

97.  As far as other amenities at the Resort, Former Chief of Staff told the OCE that Del. Bordallo paid for items like dry cleaning as incidental charges from the MRA.[133] However, the only charges on the invoices that the OCE received from Outrigger were for food and beverages.[134]  The Resort may not charge Del. Bordallo for other amenities such as dry cleaning.

98.  Since March 11, 2008, Del. Bordallo likely received hundreds of free breakfasts at the Voyager Club and may have accepted other complimentary amenities.

---

[130] Former District Director Transcript (Exhibit 5 at 17-1147_0043).

[131] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0077-0078); *see, e.g.,* Former Chief of Staff Resort Invoice, June 2015 (Exhibit 25 at 17-1147_0741) (indicating that Former Chief of Staff paid for expenses associated with a meeting room during a congressional delegation trip).

[132] According to Office Manager, Del. Bordallo only started utilizing the Resort's airport shuttle in the last two years. Office Manager Transcript (Exhibit 11 at 17-1147_0635).  She did not recall Del. Bordallo ever paying for the shuttle. *Id.* (Exhibit 11 at 17-1147_0634).  Former Chief of Staff, who left the office in 2016, said that using a hotel pick-up service was rare and that district staff typically provided transportation to Del. Bordallo from the airport. Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0073).  In the limited number of emails that Outrigger produced, the OCE found an example of Office Manager requesting airport pick up for herself, Del. Bordallo, and Del. Bordallo's daughter in September 2016.  Emails between Office Manager and Resort Staff, September 2015 (Exhibit 26 at 17-1147_0743-0744).  Del. Bordallo's schedule reports also include an entry on August 31, 2015: "Member & [Office Manager] depart Outrigger in Outrigger Van." Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0499).  On another occasion, Office Manager told the General Manager of the Resort that Del. Bordallo "would not require airport pick up." Emails between Office Manager, Steve Solberg, and Resort Staff, June 2015 (Exhibit 27 at 17-1147_0748).  The General Manager replied, "[i]f airport pick [sic] arrangements change just let me know and we will handle." *Id.*  This demonstrates that Del. Bordallo does not always use the Resort's airport transportation. In the two years of invoices the OCE was able to review, the OCE found no indication that Del. Bordallo paid for the airport shuttle.  Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).  One-way airport transportation at the hotel costs $10.00 per person including tax.  Email between Reservations Coordinator and Office Manager, May 28, 2015 (Exhibit 28 at 17-1147_0751-0754).  Without cooperation from Outrigger, the OCE could not determine how frequently Del. Bordallo may have received airport transportation services without charge.

[133] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0078).

[134] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

### ii. Use of Official Funds to Pay for Del. Bordallo's Meals and Lodging in Guam and Family Disagreement Regarding Del. Bordallo's Resort Access

99. The OCE found that Del. Bordallo may have misused official MRA funds to pay for food and lodging at her "duty station" on the island of Guam.

#### a. Use of Official Funds for Del. Bordallo's Meals in Guam

100. The two years of partial invoices and detailed annual guest reports for Del. Bordallo from Outrigger indicate that the Resort charged her $117.50 in 2015 and $1,517.50 in 2016 for food and beverages.[135]  According to the itemized invoices, many of these charges were for room service and some were from the Resort's restaurants.[136]

101. According to Office Manager, Del. Bordallo used MRA funds to pay for all her meals at the Resort.[137]  Office Manager handles the congressional office's finances and reviews the invoices for Del. Bordallo's meals at the Resort.[138]  According to Office Manager, Del. Bordallo uses her officially issued congressional travel card to pay for meals at the Resort.[139]  Office Manager recalled seeing the congressional staff use campaign funds to pay for Del. Bordallo's campaign-related meals in Guam.[140]  She could not recall Del. Bordallo using personal funds to pay for meals in Guam.[141]

102. Former Chief of Staff told the OCE that charges for room service and "food for [Del. Bordallo]" are paid with MRA funds.[142]

103. A Member can "be reimbursed for food and beverage expenses incidental to an official and representational meeting that includes one or more person(s) who are not a Member or employee of the House."[143]  Without cooperation from Del. Bordallo, the OCE could not verify if any of the meals at the Resort restaurants met these criteria.  Room service expenses incurred at Del. Bordallo's duty station very likely had no official or representational purpose or the requisite number of non-congressional attendees.

104. Accordingly, Del. Bordallo may have misused official funds by purchasing restaurant meals and room service at the Resort while in her home district.

---

[135] Del. Bordallo 2016 Resort Detailed Annual Guest Report (Exhibit 13 at 17-1147_0661); Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729).
[136] Del. Bordallo's 2016 Resort Invoices (Exhibit 20 at 17-1147_0713- 0726); Del. Bordallo 2015 Resort Invoice (Exhibit 22 at 17-1147_0731-0732).
[137] Office Manager Transcript (Exhibit 11 at 17-1147_0635-0637).
[138] *Id.*
[139] *Id.*
[140] *Id.* (Exhibit 11 at 17-1147_0636).
[141] *Id.*
[142] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0079).
[143] Committee on House Administration, Members' Congressional Handbook at 15 (2016).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

      b.  Use of Official Funds for Del. Bordallo's Lodging in Guam and Family
           Disagreement Related to Resort Lodging

105.  The OCE learned that there was a period of time from approximately the middle of 2014 until the middle of 2015 when Del. Bordallo's brother-in-law, Alfred Ysrael, may have prohibited Del. Bordallo from staying at the Resort for free.

106.  Both Office Manager and Former Chief of Staff told the OCE that in approximately July or August 2014,[144] Charlene Goo, the former General Manager of the Resort in Guam, who became Vice President of Brand Performance at Outrigger in Hawaii,[145] contacted Office Manager and explained that Del. Bordallo could no longer stay at the Resort.[146] According to Office Manager, Ms. Goo told her that "[Del. Bordallo's] brother-in-law has an issue with it."[147]  Office Manager relayed this message to Former Chief of Staff.[148] Former Chief of Staff told the OCE that he believed that Mr. Ysrael did not know that Del. Bordallo stayed at the Resort for free and that Mr. Ysrael was upset when he learned about the arrangement.[149]

107.  Niece A told the OCE she was unaware of any concerns raised by her parents about Del. Bordallo staying at the Resort.[150]  Current District Director told the OCE that he was not aware of any period of time when Mr. Ysrael and Del. Bordallo had conflict about her staying at the Resort.[151]

---

[144] Former Chief of Staff told the OCE that Office Manager received this phone call from Ms. Goo in July or August 2014. Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0082).  Office Manager initially thought she had received the call six or eight years ago, but later recalled that it was two or three years ago. Office Manager Transcript (Exhibit 11 at 17-1147_0610, 0612, 0643).

[145]  The OCE identified Ms. Goo as a third party witness to this review. Ms. Goo was in the process of leaving employment at Outrigger headquarters in Hawaii when the OCE requested information from Outrigger. Email from Helen Eisner, Investigative Counsel, Office of Congressional Ethics, to Edward E. Case, Senior Vice President & Chief Legal Officer, Outrigger Enterprises Group, March 9, 2016; Letter from Edward E. Case, Senior Vice President & Chief Legal Office, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.  Outrigger told the OCE that "Ms. Goo has not been the general manager of the hotel since 2012.  She returned to Honolulu then was not thereafter involved with the hotel." *Id.*  The OCE sent a Request for Information to Ms. Goo at her personal address via Federal Express and she signed for this letter upon receipt.  Federal Express Tracking Email to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, April 7, 2017.  Ms. Goo never contacted the OCE in response to this Request for Information. Contrary to Outrigger's claim that Ms. Goo was "not thereafter involved with the hotel" after 2012, the OCE found that Ms. Goo was involved in accommodating requests from Office Manager after 2012. *See, e.g.,* Email from Office Manager to Charlene Goo, March 24, 2015 (Exhibit 29 at 17-1147_0757). According to Former Chief of Staff, Ms. Goo continued to be the congressional office's "conduit for requests" even after she took on a role at Outrigger corporate headquarters. Former Chief of Staff Transcript (Exhibit 6 at17-1147_0080).

[146] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0082-0083); Office Manager Transcript (Exhibit 11 at 17-1147_0638-0640); Outrigger Enterprises Group "Saturday Briefing" (Aug. 10, 2013), *available at* http://saturdaybriefing.outrigger.com/wp-content/uploads/2011/01/sb-0810131.pdf.

[147] Office Manager Transcript (Exhibit 11 at 17-1147_0639-0640).

[148] *Id.* (Exhibit 11 at 17-1147_0640).

[149] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0082-0083).

[150] Niece A Transcript (Exhibit 14 at 17-1147_0679-0680).

[151] Current District Director Transcript (Exhibit 8 at 17-1147_0130-0131).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

108. After her conversation with Ms. Goo, Office Manager stopped making Del. Bordallo's lodging arrangements for an approximately six to eight month period.[152] Former Chief of Staff told the OCE that Del. Bordallo continued to stay at the Resort during this period of time.[153]

109. Former Chief of Staff said that because Del. Bordallo could not stay at the Resort for free, he "asked the Congresswoman whether she was willing to pay for the room herself and she was not willing to do that. She told me to figure it out, take care of it."[154]

110. Former Chief of Staff told the OCE that for at least one trip, in approximately August 2014, he paid for Del. Bordallo's lodging for eight to ten nights at the Resort, either with MRA funds or campaign committee funds.[155] The OCE reviewed Del. Bordallo's campaign committee expenditures in 2014, and found that all of the Resort expenditures during this time period are described as "meeting expense" and none appear to be for lodging.[156] Consequently, the OCE found that Former Chief of Staff likely utilized MRA funds for Del. Bordallo's lodging.

111. The OCE also found evidence that on at least three occasions, during the six to eight month period when Del. Bordallo may have been prohibited from staying at the Resort for free, Del. Bordallo's room expenses may have been transferred to her congressional staffers' invoices.

112. Del. Bordallo and Office Manager arrived in Guam on January 14, 2015 and departed on January 19, 2015.[157] During this period, Del. Bordallo's schedule reports show that she stayed at the Resort.[158] However, Del. Bordallo's detailed annual guest report from Outrigger does not list this January 2015 stay, nor did Outrigger provide an itemized invoice for Del. Bordallo's January 2015 stay.[159]

113. The OCE reviewed a January 17, 2015 email, with a subject line that references Del. Bordallo's room payment, in which a Resort Guest Service Manager wrote to other Resort staff: "[a]s instructed by Accounting, room and tax will be paid by [Office Manager] upon check out."[160] The email that Outrigger provided to the OCE cuts off some of the relevant language. In a follow up message in the same email chain, the

---

[152] Office Manager Transcript (Exhibit 11 at 17-1147_0641).

[153] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0085). Office Manager recalled that during this period of time, Del. Bordallo stayed at another hotel on one occasion, although the OCE did not receive records related to this stay. Office Manager Transcript (Exhibit 11 at 17-1147_0640).

[154] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0086).

[155] *Id.* (Exhibit 6 at 17-1147_0086-0087).

[156] Comm. to Elect Madeleine Z. Bordallo, Calendar Year 2015 FEC Reports of Receipts and Disbursements, filed July 15, 2014, August 18, 2014, Oct. 23, 2014 and Dec. 4, 2014.

[157] Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0476-0478).

[158] *See id.* (indicating that during the January 2015 stay, Del. Bordallo dined at the Voyager Club, was picked up at the Outrigger bell desk, and departed from the Resort when she left for the airport).

[159] 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729).

[160] Emails between Resort Staff, January 2015 (Exhibit 30 at 17-1147_0759-0761).

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

Guest Service Manager stated, "[p]lease review [Office Manager's] account tomorrow night and add any additional charges."[161]

| | |
|---|---|
| **From:** | Jessaray Iglesias ███████████████████████████ |
| **Sent:** | Saturday, January 17, 2015 6:08 AM |
| **To:** | Chris Sannicolas ███████████████████████████ |
| **Cc:** | Cassie Peredo ██████████████████████████, Christina Judicpa |
| | <adrian.papa██████████████ Jason Lacap ████████ Jeannie Gamino |
| | Nicolas <phillip.sannicolas ██████████ 'Rose Mathiot' █████ 99██████ |
| | Iglesias <jessaray.iglesias ██████████ |
| **Subject:** | RE: Congresswoman Bordaalo's // 10001292554 // 01/14-01/19 - Room payment |
| **Attach:** | MENOTLA.xls |

Hafa Adai Chris,

As per your instructions, room and tax for Congresswoman Bordallo will be transferring to Ms. Meno's room, whic from Epitome indicating both room/tax and will issue the attached TLA (subject to change) that combines both roo

**MOD's:** Please review Ms. Meno's account tomorrow night and add any additional room charges. I have flaggec can assist her. She must sign the folio that is printed from Epitome and provide the attach TLA as she requested. her the TLA receipt. Any questions, please see Jeannie or myself.

Jessaray Iglesias
Guest Service Manager

114. The same internal email includes an incomplete chart of Del. Bordallo's expenses for the January 2015 stay. The chart indicates that Del. Bordallo stayed in room 1905, which is not a part of the family units, and the chart includes the notation: "TRANSFER TO ACCOUNT 10001292555."[162] The same email also includes a screen shot of Office Manager's expenses listed as account number 10001292555.[163] For Office Manager, the nightly room fee for her stay was listed in a chart in the email as $159.00 with an additional $17.49 in taxes.[164]

115. A reservation confirmation email with Office Manager and Resort staff for the January 2015 stay states that the rate for each of Del. Bordallo and Office Manager's rooms was $159.00/night plus an 11 percent tax.[165] This email is noteworthy because it includes a $159.00/night plus tax fee for Del. Bordallo's room instead of the typical reservation email, which would list Del. Bordallo's room as "COMP" or free of charge.[166]

116. The OCE reviewed Office Manager's final expense invoice at the Resort for her stay from January 14, 2015 until January 19, 2015.[167] The final invoice for Office Manager lists a room fee of $318.00 per night with an additional $34.98 in tax for each night of her five night stay from January 14, 2015 until January 19, 2015.[168] All of the expenses on the invoice are listed under a single room occupied by Office Manager.[169] As such, the

---

[161] *Id.*
[162] *Id.*
[163] *Id*
[164] *Id.*
[165] Email from Reservations Supervisor to Office Manager, Jan. 9, 2015, (Exhibit 31 at 17-1147_0764).
[166] *Id.*
[167] Office Manager Resort Invoice, Jan. 14, 2015 – Jan. 19, 2015 (Exhibit 32 at 17-1147_0768).
[168] *Id.*
[169] *Id.*

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

invoice appears to include double charges for each night of Office Manager's stay, likely incorporating Del. Bordallo's lodging expenses into Office Manager's bill. Del. Bordallo submitted these January 2015 lodging expenses, charged to Office Manager's official travel card, for payment with official funds.[170]

117. The OCE found that Former Chief of Staff's invoices, during the same six to eight month period, also likely include expenses for Del. Bordallo's lodging at the Resort from February 14, 2015 until February 22, 2015,[171] and from March 11, 2015 until March 15, 2015.[172] Former Chief of Staff's February 2015 invoice includes the notation "(For RM#1905)" which was the room that Del. Bordallo stayed in during that trip.[173]

118. Accordingly, Del. Bordallo likely transferred lodging expenses to her staff during the period of time when Mr. Ysrael may have prohibited her from staying at the Resort for free.

119. Washington D.C.-based staff can use official funds to pay for lodging in Guam, and staff who travel to Guam with Del. Bordallo pay for their travel expenses with MRA funds.[174] In contrast, Del. Bordallo cannot use official funds to pay for lodging in her home district.[175] Transferring Del. Bordallo's Resort expenses to Office Manager and Former Chief of Staff may have obscured the fact that MRA funds likely paid for Del. Bordallo's lodging at her duty station in her home district.

---

[170] Office Manager's January 14, 2015 through January 19, 2015 stay at the Outrigger generated an invoice for $2,155.75, incorporating the double lodging expenses. Office Manager's official credit card statement for that time period includes a $2,155.75 charge at the Resort. This amount was incorporated into a February 13, 2015 reimbursement voucher for $7,566.23 that was submitted to the U.S. House of Representatives with Del. Bordallo's signature. Office Manager February 2015 Travel Subsistence Voucher and Records (Exhibit 33 at 17-1147_0770-0774).

[171] Former Chief of Staff's Resort invoice for February 13, 2015 through February 21, 2015 includes seven separate room charges of $318.00 in addition to $34.98 in taxes. Former Chief of Staff Resort Invoice, Feb. 13, 2015 –Feb. 21, 2015 (Exhibit 34 at 17-1147_0776-0778). The invoice also includes individual charges of $159.00 plus $17.49 in tax for the one night when Former Chief of Staff stayed at the Resort before Del. Bordallo arrived in Guam on February 14, 2015. *Id.* Former Chief of Staff left Guam on February 21, 2015 and Del. Bordallo left Guam on February 22, 2015. *Id.*; Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729). Former Chief of Staff's invoice includes a charge of $159.00 plus $17.49 in tax for a night when he had already left the Resort, but Del. Bordallo continued to stay there.

[172] Former Chief of Staff stayed at the Resort for six nights from March 8, 2015 through March 14, 2015. Former Chief of Staff Resort Invoice, March 8, 2015 – March 14, 2015 (Exhibit 35 at 17-1147_0780-0782). Del. Bordallo stayed at the Resort for four nights from March 11, 2015 through March 15, 2015. Del. Bordallo 2015 Resort Detailed Annual Guest Report (Exhibit 21 at 17-1147_0728-0729). Del. Bordallo's 2015 Detailed Annual Guest Report does not include any room revenue for this stay. *Id.* On Former Chief of Staff's first night at the Resort, when Del. Bordallo had not yet arrived, he was charged $199.00 plus $21.89 in tax for his room. For the next five nights he was charged $358.00 plus $39.38 in tax for his stay. As such, there was an additional $159.00 plus $17.49 in tax on his invoice for each of these five nights, representing an additional government rate room. Although these charges were for five nights rather than the four night duration of Del. Bordallo's stay, the OCE found that Former Chief of Staff's invoice likely included Del. Bordallo's lodging expenses.

[173] Former Chief of Staff Resort Invoice, Feb. 13, 2015 –Feb. 21, 2015 (Exhibit 34 at 17-1147_0777).

[174] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0075); Office Manager Transcript (Exhibit 11 at 17-1147_0625).

[175] Committee on House Administration, Members' Congressional Handbook at 32 (2016).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

120. Former Chief of Staff told the OCE that at the end of the period of family disagreement, "the Congresswoman had one morning announced to us that she solved it. That she took care of it. She talked to Mr. Solberg and she will not have to pay for her rooms anymore."[176]

121. The OCE asked Former Chief of Staff about this resolution and he believed that Del. Bordallo presented information to Mr. Solberg about the value of business she brought to the Resort through congressional delegations and congressional travel. Former Chief of Staff stated:

> She had a personal meeting with Mr. Solberg, one-on-one, without the involvement of any staff or myself. But I would say that prior to that meeting, she had raised in our meeting at the Voyager, more than once, but specifically once in front of everybody, she turned to one of the staffers and said, I believe she said to a district director, to go add up how much business we bring to the Outrigger, and shouldn't we be getting a free room for all that business?
>
> . . .
>
> And I had warned her not to do that. So we never provided that information to her. She said "Well, it must be $200-300,000 a year."[177]

122. Office Manager recalled that Del. Bordallo told her that she had spoken with Mr. Solberg who said that Mr. Ysrael said "it's okay for the Congresswoman to stay there."[178] Office Manager told the OCE that she was not aware of Del. Bordallo asking anyone to find out how much money the office generated for the Resort.[179]

123. Current District Director did not recall any conversation between Del. Bordallo and Mr. Solberg about continuing to stay at the Resort.[180] He also told the OCE that he did not recall any conversations with Del. Bordallo about the amount of business Del. Bordallo brought to the Resort or Del. Bordallo asking staff to gather information about this business.[181]

124. Del. Bordallo's schedule reports list a meeting with Mr. Solberg at the Voyager Club at 7:30 A.M. on May 28, 2015.[182] Office Manager did not know if that was a meeting where Del. Bordallo might have discussed continued lodging arrangements.[183] According to Office Manager, Del. Bordallo is friendly with Mr. Solberg's wife.[184] The

---

[176] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0083).
[177] *Id.* (Exhibit 6 at 17-1147_0088).
[178] Office Manager Transcript (Exhibit 11 at 17-1147_0643).
[179] *Id.* (Exhibit 11 at 17-1147_0644).
[180] Current District Director Transcript (Exhibit 8 at 17-1147_0134).
[181] *Id.* (Exhibit 8 at 17-1147_0134-0135).
[182] Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0486).
[183] Office Manager Transcript (Exhibit 11 at 17-1147_0645).
[184] *Id.*

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

OCE found various calendar entries for events scheduled with Mr. Solberg such as cocktails and dinner.[185]

125. Former Chief of Staff told the OCE that after Del. Bordallo spoke with Mr. Solberg, "when [Office Manager] needed to make a room arrangement, she would tell Mr. Solberg."[186]

126. Outrigger provided the OCE with a limited number of emails since January 1, 2015 from the account of the Director of Revenue Management.[187] According to Outrigger, "Steve Solberg does not routinely communicate in any way with Delegate Bordallo and her staff; he has reviewed his own emails back to January 2015 and does not believe he has any emails that are not included in the [emails produced]."[188]

127. Office Manager told the OCE that Mr. Solberg was included on emails when there were issues about room availability.[189] The OCE found that Mr. Solberg was copied on many of the emails it received from Outrigger involving reservations.[190] On June 18, 2015, around the approximate period of time when the possible family disagreement was resolved, Office Manager reached out directly to Mr. Solberg and asked "who should I book [Del. Bordallo's] reservations with" for an upcoming visit.[191] Mr. Solberg responded to Office Manager directly saying "[l]ook forward to welcoming you back" and explaining who to contact.[192]

128. Consequently, the OCE found that during a six to eight month period from 2014 until 2015, Del. Bordallo may have used MRA funds for lodging expenses at the Resort.

### iii.     Indirect and Direct Gifts of Hospitality from Corporate Entities

129. Whether or not the Ysrael family had knowledge that Del. Bordallo stayed at the Resort for free has no bearing on whether Del. Bordallo could accept a gift from a corporate source. Based on the foregoing information, Del. Bordallo may have received gifts from OGLP, the management company overseeing the Resort's operations, and from Bayview II, LLC, the limited liability company that owns the Resort property and building.

---

[185] Del. Bordallo's Schedule Reports (Exhibit 9 at 17-1147_0489, 0523, 0533).

[186] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0089).

[187] Letter from Edward E. Case, Senior Vice President & Chief Legal Officer, Outrigger Enterprises Group to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017

[188] Id.

[189] Office Manager Transcript (Exhibit 11 at 17-1147_0647).

[190] Emails between Resort Staff, Steve Solberg, and Office Manager, Sept. 25, 2015 – Oct. 8, 2015 (Exhibit 15 at 17-1147_0688-0690); Emails between Resort Staff, Steve Solberg, and Office Manager, May 25, 2015 – May 26, 2015 (Exhibit 23 at 17-1147_0734-0735); Emails between Resort Staff, Steve Solberg, and Office Manager, August 21, 2015 – August 24, 2015 (Exhibit 36 at 17-1147_0784-0786); Emails between Resort Staff, Steve Solberg, and Office Manager, March 8, 2016 (Exhibit 37 at 17-1147_0788-0789); Email between Resort Staff, Steve Solberg, and Office Manager, Oct. 5, 2016 (Exhibit 38 at 17-1147_0791-0792).

[191] Emails between Resort Staff, Steve Solberg, and Office Manager, June 18, 2015 – June 26, 2015 (Exhibit 27 at 17-1147_0747-0749).

[192] Id.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

130. OGLP manages Del. Bordallo's reservations, hires the staff that maintains and cleans the rooms that Del. Bordallo occupies, oversees preparation of breakfast at the Voyager Club, and may lose profit when Del. Bordallo utilizes hotel services that would otherwise generate revenue from other guests. As such, Del. Bordallo may have received gifts of free lodging, meals, and amenities from OGLP.

131. The source of some of the gifts, particularly access to the family units, may have been Bayview II, LLC. The exception under House rules for gifts from relatives does not apply "when a relative of a Member, officer, or employee is merely passing along a gift from some other person."[193] As such, when the ultimate source of the gift is a corporate entity, the relative gift exception likely does not cure a gift that is being "passed along" by the family from the true corporate source.

132. The most closely analogous gift rule exception, for gifts of personal hospitality, also prohibits indirect gifts that ultimately are from a corporate source. According to the House Ethics Manual, for the provision to apply, the property or facilities "must be **personally owned**. Property or facilities owned by a corporation or a firm may not be used under this provision, even if the corporation or firm is wholly owned by an individual."[194]

133. The House Ethics Manual explains, under the personal hospitality exception, "a residence or other property that the individual owner rents out to others or otherwise uses for business purposes may not be used."[195] This further demonstrates that the personal hospitality gift exception does not apply to facilities, like hotels, that customarily generate business revenue for the owner of the property. A gift of access to a location that customarily is rented for profit is no longer a gift of personal hospitality, but rather a free commercial benefit.

### iv. Approximate Value of Free Gifts of Lodging, Meals, and Amenities

134. The OCE used the Resort's reservation portal to view available government rates for the only listed suite with Voyager Club access at the Resort, the "Voyager Club 1 Bedroom Oceanfront Suite."[196] The family suites that Del. Bordallo stayed in on the 21st floor appear most similar to the Voyager Club 1 Bedroom Oceanfront Suites. The average nightly government rate for the suite was $459.00 two months from the date of the OCE's search, $549.00 three months from the date of the OCE's search, and $468.00 four months from the date of the search.[197] Using the average of these three numbers and adding an 11 percent tax, the average price for a Voyager Club 1 Bedroom Oceanfront Suite is $546.12 per night.

---

[193] House Ethics Manual at 69.
[194] *Id.* at 62 (emphasis in original).
[195] *Id.* at 62.
[196] Outrigger Hotels and Resorts, *Make A Reservation*, https://reservations.outrigger.com/rez.aspx?chain=18497&hotellist=OHR&locale=en-US.
[197] On May 2, 2017, the OCE searched for rates for the Voyager Club 1 Bedroom Oceanfront Suites for July 2, 2017, August 2, 2017 and September 2, 2017.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

135. The OCE notes that the typical government rate at the Resort for congressional staff was $159.00 plus $17.49 in taxes, which was also the applicable rate on the one occasion, in the materials that the OCE reviewed, when Del. Bordallo's reservation confirmation email included a room fee, which was for a "1-Bedroom Oceanfront Suite."[198]

136. Approximating the value of Del. Bordallo's free lodging since March 11, 2008 is difficult because Del. Bordallo sometimes stayed in rooms that were not part of family units, and the OCE never received completed invoices or records for her lodging to indicate the room type during each of her stays.  In some cases, it may be appropriate to apply a government rate to rooms that are not on the 21st floor.  However, if Del. Bordallo stayed in suites that were comparable to rooms on the 21st floor, as Former Chief of Staff explained was the practice when family units were unavailable, those rooms may not have been government rate eligible or may have required a higher rate.[199]

137. As further described in Exhibit 1, the OCE found that between March 11, 2008 and December 31, 2016, Del. Bordallo stayed for free at the Resort for approximately 663 nights.[200]  Applying the average market rate for the suites she customarily stayed in, the maximum value of 663 nights of free lodging is $362,077.56.  Applying the government rate to her free lodging, the minimum value of the 663 nights is $117,012.87.

138. Additionally, during her stays at the Resort, Del. Bordallo also likely received hundreds of free breakfasts and likely received other free amenities.[201]

139. Based on the foregoing information, the Board finds that there is substantial reason to believe that Del. Bordallo accepted gifts of free lodging, meals, and amenities for multiple weeks per year during her service in Congress in violation of House rules and standards of conduct.

140. Based on the foregoing information, the Board finds that there is substantial reason to believe that Del. Bordallo used official funds from the Members' Representational Allowance to pay for her lodging and meals at the Resort in violation of House rules, standards of conduct, and federal law.

---

[198] Email from Reservations Supervisor to Office Manager, Jan. 9, 2015, (Exhibit 31 at 17-1147_0764); Emails between Resort Staff, January 2015 (Exhibit 30 at OH_0116-0118); Emails between Office Manager and Resort Staff, Sept. 25, 2016 – Oct. 24, 2016 (Exhibit 39 at 17-1147_0799-0802).
[199] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0071).
[200] *See* Exhibit 1.
[201] The OCE could not determine the total value of these hundreds of free breakfasts and amenities, but the Board notes that the total value was certainly more than *de minimis*.

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

## IV.   DELEGATE BORDALLO MAY HAVE USED HER CONGRESSIONAL STAFF TO PERFORM  PERSONAL SERVICES RELATED TO HER RENTAL PROPERTY AND A BEAUTY PAGEANT

### A.   Applicable Law, Rules, and Standards of Conduct

141.   Federal Law

*31 U.S.C. § 1301(a) states, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."*

142.   House Ethics Manual

*The House Ethics Manual advises that, "House resources acquired with [official] funds – including the office telephones, computers fax machines and other equipment, office supplies, office space, and staff while on official time – are to be used for the conduct of official House business."[202]*

*The Manual further provides: "The [Members' Representational Allowance ("MRA")] may only be used for official and representational expenses. The MRA may not be used to pay for any expenses related to activities or events that are primarily social in nature, personal expenses, campaign or political expenses, or House committee expenses.  Members may be personally liable for misspent funds or expenditures exceeding the MRA."[203]*

### B.   Delegate Bordallo May Have Used Her Congressional Staff to Perform Personal Services

143.   Del. Bordallo's congressional staff oversees maintenance issues related to her rental property and performs volunteer work for the Miss World Guam pageant, a beauty competition for which Del. Bordallo is the franchise holder and honorary president.[204]

#### i.   Congressional Staff May Have Overseen Maintenance Work at Del. Bordallo's Rental Property

144.   The OCE found that Del. Bordallo's current and past district directors have been responsible for overseeing maintenance at the rental property in Guam that Del. Bordallo rents to the government of Japan.

---

[202] House Ethics Manual at 197.

[203] *Id.* at 323 (citing to Comm. on House Admin., *Members' Congressional Handbook*).

[204] Miss Guam World, *Message From the Honorary President*, http://www.missguamworld.com/ (last visited May 9, 2017) (Guam and World are inverted in this web address); Miss World Guam 2015, *About*, http://www.missworldguam.com/about.html (last visited May 9, 2017); 2012 Miss World License for Beauty World Guam Limited (Exhibit 40 at 17-1147_0804); Email from Beauty World Guam Organization to Miss World Limited, Feb. 2, 2012 (Exhibit 41 at 17-1147_0806)(attaching a copy of the Miss World Guam exclusive license signed by Del. Bordallo); 2015 Miss World License Summary for Beauty World Guam Limited (Exhibit 42 at 17-1147_0808); 2016 Miss World License Fee Invoice (Exhibit 43 at 17-1147_0810).

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

145. Del. Bordallo did not provide any documents, records, or emails to the OCE related to services performed, or requested to be performed, by any current or former members of her congressional staff, regarding the rental property.

146. The OCE spoke with present and former congressional staff to determine their role in maintaining Del. Bordallo's rental property.  Both Former District Director and Current District Director told the OCE that the district directors act as intermediaries for concerns related to the property from the Japanese Consulate that need to be relayed to Del. Bordallo.[205]

147. Former Chief of Staff confirmed that, "if something happened, like a minor repair or something needed to be painted, or the air conditioner broke, then the Consul General's office would reach out to our office, and our office would inform the Congresswoman that they have an issue, then she would reach back to [her District Director] . . . to help her deal with the issue."[206]

148. Former Chief of Staff told the OCE that the Former District Director often communicated with the Office Manager, who would relay the messages to and from Del. Bordallo.[207] According to Former Chief of Staff, the District Director would then "hire the person, arrange for the repair, arrange for the payment.  I guess on very, very minor things, it would not be unusual that they would, on their off-time, go up and check on the house and do something small."[208]

149. Office Manager confirmed that she had conversations with Former District Director and Former Chief of Staff "relating that this is what's happening at the Consul General's home or the Congresswoman's home and the Member needs to address the issues.  There are repairs that need to be done."[209]

150. During his time in the congressional office, Former District Director recalled overseeing work at the rental property related to the collapse of the footing of a bed, changing a utility sink, changing carpet and drapes, and house painting.[210]  He did not recall spending "very much" time on issues related to the house per month.[211]

151. Former Chief of Staff told the OCE that he raised concerns with Del. Bordallo about Former District Director leaving the office "for hours at a time" to take "care of something at the house."[212]  Former Chief of Staff also stated that district office staff would "tell me that the [Former District Director] spent the whole week away from the

[205] Former District Director Transcript (Exhibit 5 at 17-1147_0033-0034); Current District Director Transcript (Exhibit 8 at 17-1147_0115-0117).
[206] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0057).
[207] Id. (Exhibit 6 at 17-1147_0058).
[208] Id.
[209] Office Manager Transcript (Exhibit 11 at 17-1147_0651).
[210] Former District Director Transcript (Exhibit 5 at 17-1147_0035).
[211] Id. at 9.
[212] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0064).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

office.  People are trying to reach him, people come in for appointments, and he's not there because he's doing something at the house."[213]

152.   During an interview with the OCE, Former District Director said, "[m]y concern is if [Former Chief of Staff] had told me that, just make sure that you do nothing on company time, I would try as hard as I can, business with the house would normally conduct during lunchtime or after work."[214]

153.   Current District Director stated that Former District Director, "was the one handling the property on his personal time."[215]  He said that he noticed Former District Director only visited the house "during his lunch break or he would go there after hours."[216]

154.   Former District Director told the OCE that he was not paid for his work related to the rental property.[217]  At first, Former District Director told the OCE that he "just assumed that that was part of my obligation or my responsibility as her Chief of Staff."[218]  Former District Director was Del. Bordallo's Chief of Staff when she served as Lieutenant Governor of Guam prior to entering Congress.[219]  He further clarified that the "Congresswoman's late husband is a very close family member, or member of my family."[220]  Former District Director explained "I mean Madeleine Bordallo and I were, because of her husband, were essentially family and so a lot of this work I was doing, she would ask me to do it, but I would do it because of, not because of my duties as District Director or Senior Policy Adviser, but primarily because of my relationship with her as family."[221]

155.   Former District Director said he never felt required to perform work related to the rental property because of his duties as District Director.[222]  He also told the OCE that he did not raise any concerns with the Former Chief of Staff about the amount of work he was performing related to the rental property.[223]

156.   Current District Director explained to the OCE that he naturally assumed the role of intermediary to Del. Bordallo on issues related to the rental property during a period of time when Former District Director was sick.[224]  In his interview with the OCE, Current District Director explained "for me personally as well, I've developed a relationship with

---

[213] *Id.* (Exhibit 6 at 17-1147_0062).
[214] Former District Director Transcript (Exhibit 5 at 17-1147_0036).
[215] Current District Director Transcript (Exhibit 8 at 17-1147_0111).
[216] *Id*. (Exhibit 8 at 17-1147_0114).
[217] Former District Director Transcript (Exhibit 5 at 17-1147_0034).
[218] *Id.*
[219] *Id.* (Exhibit 5 at 17-1147_0029).
[220] *Id*. (Exhibit 5 at 17-1147_0034).
[221] *Id.* (Exhibit 5 at 17-1147_0036).
[222] *Id*. (Exhibit 5 at 17-1147_0037).
[223] *Id.* (Exhibit 5 at 17-1147_0036).
[224] Current District Director Transcript (Exhibit 8 at 17-1147_0115).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

the Congresswoman separate from my official duties as her district director.  And this
was something that I did on my own time to assist when she wasn't on island."[225]

157. According to Former Chief of Staff, Office Manager would relay concerns to him about
the amount of time that Former Chief of Staff spent working on the rental property.[226]
Office Manager told the OCE that Former Chief of Staff and Former District Director did
not express concerns about the amount of time that was spent on maintenance work at the
rental property.[227]  She did not remember Former District Director ever stating that he did
not want to perform work or be involved in maintenance issues related to the rental
property.[228]

158. The OCE found that Del. Bordallo's district directors took an active role in overseeing
maintenance issues related to the rental property.  Both Former District Director and
Current District Director told the OCE that they performed these services because of their
personal relationship with Del. Bordallo and did not feel obligated to perform the work as
part of their congressional duties.  The OCE found these explanations credible and found
that both likely took efforts to perform work during their personal time.

### ii.        Congressional Staff Volunteered for the Miss World Guam Pageant

159. The Miss World Guam pageant is an annual beauty competition that is part of the global
Miss World pageant franchise.[229]  The Miss World Guam pageant is organized by Beauty
World Guam, a Guam-based non-profit organization.[230]  The Miss World Guam pageant
was dormant for a long period of time until it was reinstated by Del. Bordallo in 2011.[231]

160. Del. Bordallo serves as the Franchise Owner and Honorary President of the Miss World
Guam pageant.[232]  Del. Bordallo did not disclose this position as Franchise Owner on her
financial disclosure reports.[233]

161. The Beauty World Guam Organization's Bylaws require that "all financial resources of
the organization shall be kept in a central fund to be donated to non-profit
organizations/worthwhile projects."[234]  In addition, the Bylaws state that "[n]o part of the

---

[225] *Id.*

[226] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0064).

[227] Office Manager Transcript (Exhibit 11 at 17-1147_0651).

[228] *Id*.

[229] Miss Guam World, *Message From the Honorary President*, http://www.missguamworld.com/ (last visited May
9, 2017); Miss Guam World, *The Miss World History*, http://www.missguamworld.com/ (last visited May 9, 2017);
Miss World Guam 2015, *About*, http://www.missworldguam.com/about.html (last visited May 9, 2017).

[230] *Id.*; Guam Department of Revenue and Taxation, "Tax Exempt Organizations" (Updated Aug. 2016).

[231] Sabrina Salas Matanane, Kuam News, "Guam's rich Miss World Pageant history," June 12, 2011, *available at*
http://www.kuam.com/story/14890873/2011/06/12/guams-rich-miss-world-pageant-history?clienttype=printable.

[232] *See supra* note 204 (citing Del. Bordallo's franchise interest in and position with the pageant).

[233] A Member of Congress must disclose all positions, even uncompensated positions, as a trustee or proprietor of a
non-profit organization.  While positions of a strictly honorary nature do not need to be disclosed, Del. Bordallo's
role as franchise holder and thus as the proprietor of the Guam-based pageant, may have been reportable.  House
Committee on Ethics, Calendar Year 2016 Instruction Guide for Financial Disclosure Statements and Periodic
Transaction Reports at 31.

[234] Beauty World Guam Organization, Amended By - Laws (July 30, 2011) (Exhibit 44 at 17-1147_0812-0818).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

net earnings of the organization shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons . . . ."[235]

162. The OCE found that three members of Del. Bordallo's congressional staff are involved in work related to the pageant.  The Current District Director first started volunteering to conduct public speaking workshops for the pageant in approximately 2013, and in 2015 or 2016 he assumed the unpaid role of President of the pageant.[236]  Current District Director told the OCE that the pageant's Board hired him as President and that Del. Bordallo does not play a role in the Board's decision making process.[237]

163. The District Office's Constituent Services Representative, Kaye Lea Custodio, has served as the Pageant Director since 2012.[238]  Ms. Custodio previously was a contestant in the pageant and her mother-in-law previously was an officer for the pageant.[239]

164. In addition, the District Office's Press Secretary serves as the Assistant Pageant Director.[240]

165. According to Current District Director, he, Ms. Custodio, and the District Office's Press Secretary, do not receive compensation for their work on behalf of the pageant.[241]

166. Besides providing the OCE with the Beauty World Guam Organization's Bylaws and Constitution, and a small number of publicly-available articles and internet postings, Del. Bordallo refused to provide the OCE with any additional information about the pageant. In addition, Ms. Custodio cancelled a scheduled interview with the OCE.

167. Without the opportunity to ask Del. Bordallo or Ms. Custodio about services performed by congressional staff on behalf of the pageant, or review emails and records requested from Del. Bordallo, the OCE relied on the testimony of other third party witnesses.

168. Current District Director told the OCE that Del. Bordallo was involved in the process of deciding whether to renew the contract on an annual basis, but that the Miss World Guam

---

[235] Amended Constitution of Beauty World Guam Organization (Aug. 21, 2011) (Exhibit 45 at 17-1147_ 0820-0823).

[236] Current District Director Transcript (Exhibit 8 at 17-1147_0118); *see also* Miss World Guam, Facebook Posting, Aug. 30, 2015, https://www.facebook.com/pg/missworldguam/photos/ (last visited June 7, 2017) (introducing the Miss World Guam Board of Directors and Pageant Committee).

[237] Current District Director Transcript (Exhibit 8 at 17-1147_0119-0120).

[238] Letter from William Pittard, Counsel to Kaye Lea Custodio, to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, April 7, 2017; Miss World Guam, Facebook Posting, Aug. 30, 2015, https://www.facebook.com/pg/missworldguam/photos/ (last visited June 7, 2017).

[239] Former District Director Transcript (Exhibit 5 at 17-1147_0039).

[240] Current District Director Transcript (Exhibit 8 at 17-1147_0118); Miss World Guam, Facebook Posting, Aug. 30, 2015, https://www.facebook.com/pg/missworldguam/photos/ (last visited June 7, 2017).

[241] Current District Director Transcript (Exhibit 8 at 17-1147_0119); Letter from William Pittard, Counsel to Kaye Lea Custodio, to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, April 7, 2017 (stating that Ms. Custodio does not receive a salary for her work for the pageant).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

pageant's Board was responsible for the operation of the pageant.[242]  Current District Director told the OCE that Del. Bordallo does not assign tasks to pageant staff.[243]

169. Former Chief of Staff told the OCE that Del. Bordallo gave direction to staff to perform work on the pageant during phone calls or through messages relayed through Office Manager.[244]

170. Current District Director told the OCE that he did not feel an obligation to work on the pageant because of his congressional position.[245]

171. Office Manager told the OCE that she never heard Current District Director, Ms. Custodio or the District Office's Press Secretary express that they were having difficulty with the amount of time they spent on their pageant work.[246]  Current District Director also told the OCE that congressional staff did not express dissatisfaction about the amount of time they worked on the pageant.[247]

172. Current District Director told the OCE that Ms. Custodio performed work related to the pageant "outside her work time."[248]

173. Although the OCE did not receive requested documentation from Del. Bordallo or Ms. Custodio, the OCE found the explanations from current congressional staff that district staffers provide their services to the non-profit organization voluntarily and that Del. Bordallo does not assign them work to be credible.

174. Based on the foregoing, the Board finds that there is not substantial reason to believe that Del. Bordallo used congressional staff to perform personal services in violation of House rules, standards of conduct, and federal law.

## V.    INDIVIDUALS WHO REFUSED TO COOPERATE WITH THE OCE REVIEW

### *Del. Bordallo*

175. The OCE received one production from Del. Bordallo that was missing large categories of requested information.  The production did not contain any emails.  Del. Bordallo also declined to produce any records related to her payments or reservations at the Resort or payments from the government of Japan.  After informing Del. Bordallo of the incompleteness of her initial production, Del. Bordallo's attorney told OCE that Del.

---

[242] Current District Director Transcript (Exhibit 8 at 17-1147_0120).
[243] *Id.*
[244] Former Chief of Staff Transcript (Exhibit 6 at 17-1147_0092).
[245] Current District Director Transcript (Exhibit 8 at 0122).
[246] Office Manager Transcript (Exhibit 11 at 17-1147_0654).
[247] Current District Director Transcript (Exhibit 8 at 17-1147_0122).
[248] *Id.* (Exhibit 8 at 17-1147_0121).

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

Bordallo did not plan to further cooperate with the requests.[249] Del. Bordallo also declined the OCE's request for an interview.[250]

### *Kaye Lea Custodio*

176. The OCE requested information from Kaye Lea Custodio related to services performed by her or members of the congressional staff related to the Miss World Guam competition and payments to her or congressional staff from the competition.[251] Ms. Custodio provided the OCE with two productions of responsive documents, but never provided the OCE with a complete production of responsive materials.

177. The OCE also requested the opportunity to interview Ms. Custodio and, although Ms. Custodio initially scheduled an interview with the OCE, Ms. Custodio cancelled the interview.[252]

### *Outrigger Enterprises Group*

178. The OCE requested information from Outrigger related to Del. Bordallo and the Resort, including invoices, receipts, emails, and other materials.[253] The OCE received a small production from Outrigger containing limited traveler records for Del. Bordallo and her staff from 2015 and 2016, and emails collected from the account of one Outrigger employee since December 2014.[254]

179. The OCE never received, among other categories, complete information from Outrigger regarding Del. Bordallo's payments and reservations at the Resort or email communications between Del. Bordallo and her staff, and hotel management. Outrigger also stated an unwillingness to complete the required certification affirming that it had not knowingly or willfully withheld responsive information.[255] Outrigger never provided the OCE with a complete production of responsive materials.

### *Tanota Partners*

180. The OCE requested information from Tanota Partners related to Bayview II, LLC and any Tanota Partners-related entity's ownership interest in the Resort, agreements with

---

[249] Letter from Letter from Omar S. Ashmawy, Chief Counsel and Staff Director to Del. Bordallo, April 11, 2017; Letter from Brian G. Svoboda, Counsel to Del. Bordallo, to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, April 18, 2017.

[250] Email from Brian G. Svoboda, Counsel to Del. Bordallo, to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, April 28, 2017.

[251] Request for Information from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Kaye Lea Custodio, Feb. 14, 2017.

[252] Email from William Pittard, Counsel to Kaye Lea Custodio to Helen Eisner, Investigative Counsel, Office of Congressional Ethics, April 26, 2017.

[253] Request for Information from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Outrigger Enterprises Group, Feb. 9, 2017.

[254] Letter from Edward E. Case, Senior Vice President and Chief Legal Officer, Outrigger Enterprises Group, to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 15, 2017.

[255] *Id.*

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

Outrigger related to use of Resort units or facilities by members of the Ysrael family, and Del. Bordallo's use and payments for lodging or other Resort amenities.[256]

181. The OCE received a letter from Michael Z. Ysrael on behalf of Tanota Partners in which he described the Tanota business and ownership structure, but declined to provide the OCE with any requested documents.[257]  The OCE reiterated its request for responsive materials, and Tanota Partners never produced the requested information to the OCE.[258]

## VI.   CONCLUSION

182. Based on the foregoing information, the Board finds that there is substantial reason to believe that Del. Bordallo received profit from a foreign government.

183. The Board finds that there is substantial reason to believe that Del. Bordallo accepted gifts of free lodging, meals, and amenities for multiple weeks per year during her service in Congress.

184. The Board finds that there is substantial reason to believe that Del. Bordallo used official funds for unauthorized purposes.

185. The Board finds that there is not substantial reason to believe that Del. Bordallo used congressional staff to perform personal services.

186. Accordingly, the Board recommends that the Committee further review the allegation that Del. Bordallo received rental profit from the Japanese Consulate in Hagatna, Guam in violation of House rules, standards of conduct, and federal law.

187. The Board recommends that the Committee further review the allegation that Del. Bordallo received gifts of free lodging, meals, and amenities at the Resort in violation of House rules and standards of conduct.

188. The Board recommends that the Committee further review the allegation that Del. Bordallo used official funds to pay for her lodging and meals at the Resort in violation of House rules, standards of conduct, and federal law.

189. The Board recommends that the Committee dismiss the allegation that Del. Bordallo used her congressional staff to perform personal services related to maintaining her rental property in Guam and assisting a Guam-based beauty pageant in violation of House rules, standards of conduct, and federal law.

---

[256] Request for Information from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Tanota Partners, March 21, 2017.
[257] Letter from Tanota Partners to Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, March 31, 2017.
[258] Letter from Omar S. Ashmawy, Chief Counsel and Staff Director, Office of Congressional Ethics, to Tanota Partners, April 7, 2017.

CONFIDENTIAL

Subject to the Nondisclosure Provisions of H. Res. 895 of the 110th Congress as Amended

## VII.  INFORMATION THE OCE WAS UNABLE TO OBTAIN AND RECOMMENDATION FOR THE ISSUANCE OF SUBPOENAS

190.  The following witnesses, by declining to provide requested information to the OCE, did not cooperate with the OCE review:

    a.  Del. Bordallo;

    b.  Kaye Lea Custodio;

    c.  Outrigger Enterprises Group; and

    d.  Tanota Partners.

191.  The Board recommends the issuance of subpoenas to Del. Bordallo, Kaye Lea Custodio, Outrigger Enterprises Group, and Tanota Partners.