HAIQCREc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CITIZENS for RESPONSIBILITY
    and ETHICS in WASHINGTON,
4   RESTAURANT OPPORTUNITIES
    CENTERS (ROC) UNITED, INC.,
5   JILL PHANEUF, ERIC GOODE

6                  Plaintiffs

7            v.                        17 Civ. 00458 (GBD)
                                       Motion
8   DONALD J. TRUMP, in his
    official capacity as President
9   of the United States

10                 Plaintiff

11  ------------------------------x
                                       New York, N.Y.
12                                     October 18, 2017
                                       10:30 a.m.
13
    Before:
14
                        HON. GEORGE B. DANIELS
15                                     District Court Judge

16                         APPEARANCES

17  COHEN MILLSTEIN SELLERS & TOLL PLLC
         Attorneys for Plaintiff
18  JOSEPH SELLERS

19  GUPTA WESSLER PLLC
         Attorneys for Plaintiffs
20  DEEPAK GUPTA
    JONATHAN TAYLOR
21  JOSHUA MATZ
    NORM EISEN
22  NOAH BOOKBINDER
    ZEPHYR TEACHOUT
23
    UNITED STATES DEPARTMENT OF JUSTICE
24       Attorneys for Defendant Donald J. Trump
    BRETT A. SHUMATE
25  JEAN LIN

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

HAIQCREc

```
 1              (In open court; case called)

 2              THE DEPUTY CLERK:  Would the parties please rise and

 3     state your appearances starting with the government.

 4              MR. SHUMATE:  Good morning, your Honor.  Brett Shumate

 5     from the Department of Justice on behalf of the President.

 6              THE COURT:  Good morning, Mr. Shumate.

 7              MS. LIN:  Good morning, your Honor.  Jean Lin from the

 8     Department of Justice on behalf of the President.

 9              THE COURT:  Good morning, Ms. Lin.

10              MR. GUPTA:  Good morning, your Honor.  Deepak Gupta

11     for the plaintiffs.  Sitting with me at counsel able are my

12     colleagues Jonathan Taylor, Joshua Matz, Zephyr Teachout, Norm

13     Eisen and Noah Bookbinder.

14              MR. SELLERS:  Your Honor, good morning.  Joseph

15     Sellers also for the plaintiffs.

16              THE COURT:  Good morning.

17              Let me start with the government.  I will hear you,

18     Mr. Shumate, with regard to your motion to dismiss.

19              MR. SHUMATE:  Yes, your Honor.  May I use the podium?

20              THE COURT:  Yes, please use the podium.

21              MR. SHUMATE:  May it please the Court, the Court

22     should dismiss this case challenging the President's compliance

23     with the Constitution Emoluments Clauses for three reasons:

24              First, these plaintiffs lack standing because their

25     supposed injuries are nothing more than abstract disagreements
```

HAIQCREc

1    with the President and speculative fears about increased

2    competition.

3          Second, the Court lacks jurisdiction to issue an

4    injunction against a sitting President of the United States.

5          Third, these plaintiffs have not sufficiently alleged

6    that a federal office holder violates the Emoluments Clauses by

7    owning an interest in a company that does business with a

8    foreign government.

9          Your Honor, the first question, as always, is whether

10   any of the plaintiffs before the Court have standing.  As we've

11   explained in the briefs, none of these plaintiffs have standing

12   because their alleged injuries are too abstract and are too

13   speculative.  If the Court were to find that any of these

14   plaintiffs have standing, it is hard to imagine any plaintiff

15   in the United States that would not have standing.

16         I'd like to walk the Court through our view of why

17   these plaintiffs lack standing, starting with CREW and ending

18   with the other three plaintiffs which we call the Hospitality

19   plaintiffs.

20         First, starting with CREW, your Honor, they claim that

21   they are concerned about the President's compliance with the

22   Emoluments Clauses, that they are spending money to investigate

23   that issue, and that they are diverting resources to bring this

24   lawsuit.  That is not a cognizable Article III harm for a

25   couple of reasons.

HAIQCREc

          First, it is an abstract harm.  It is a generalized
grievance shared in common with the entire public.  And the
case I would point the Court to is the *Schlesinger* case from
1974, a Supreme Court case, in which an organization dedicated
to ending the war in Viet Nam brought suit alleging that
members of Congress were violating the Constitution because
they held memberships in the Armed Forces Reserve at the same
time they were members of Congress.  What these plaintiffs were
concerned about is that these members of Congress were not
faithfully discharging the duties of their office, and that
they might be subject to undue influence by the Executive
Branch.  The Supreme Court said that this is an abstract harm.
It is a generalized grievance shared in common with the entire
public.

          That's exactly what we have in this case with CREW:
CREW is concerned about the President's compliance with the
Emoluments Clause.  And if you look at paragraph 154 of the
Complaint, that's where CREW describes their alleged injuries.
What they say is that they are concerned about the risk of
foreign governments using money to improperly influence the
President.  They are concerned about the President's motives in
making decisions and conflicts in violations that the public
will have insufficient information to judge.  That is an
allegation that any member of the public could bring against
the President and it cannot be sufficient to confer Article III

HAIQCREc

1    standing.

2           Now, CREW tries to get around this by claiming that

3    they are spending money, and they are investigating the

4    President's conduct, and they are diverting resources to focus

5    on this particular issue; but that also is not enough because

6    those are all voluntary decisions and self-inflicted harms.

7           The Supreme Court was quite clear in a case called

8    *Clapper* in 2013 that a plaintiff cannot manufacture harm for

9    Article III standing by inflicting harm on itself in the

10   absence of a certainly impending injury.

11          That's exactly what we've got here.  CREW is spending

12   money.  They are diverting resources to investigate the

13   President's conduct.  But those are all voluntary choices that

14   this organization has made.  To the extent they are suffering

15   any injury at all, it is self-conflicted harm and that does not

16   suffice under Article III standing principles.  If we just walk

17   through a couple allegations in the Complaint, we can see that

18   these are all allegations that any member of the public could

19   bring to allege Article III injury.  Look at paragraph 155 of

20   the Complaint.  CREW alleges they are gathering information

21   about the Emoluments Clause violations in responding to media

22   inquires.  Paragraph 156:  Issuing press releases and

23   statements.  Paragraph 157:  Doing legal research about the

24   Emoluments clauses.  And paragraph 159:  Researching legal

25   claims against the President and drafting the Complaint in this

HAIQCREc

```
 1   lawsuit.  These are all decisions that CREW has made to bring
 2   this lawsuit, and that is not a sufficient harm for purposes of
 3   Article III because any member of the public could do exactly
 4   what CREW is doing and manufacture Article III harm.
 5          Now, CREW also tries to get around this by relying on
 6   a case called Havens.  Havens standing is not available here
 7   because CREW puts the cart before the horse.  Under Havens, a
 8   distinct injury must precede the diversion of resources.  In
 9   Havens, what happened was there were racial steering practices
10   at issue.  What the Court said in that case is that the racial
11   steering practices was causing a distinct harm to the
12   organization.  As a consequence of that distinct harm, the
13   organization was diverting resources to counteract that harm,
14   to avert the harm to the organization.
15          CREW has it exactly backwards because they claim that
16   the diversion of resources itself is a distinct injury, but it
17   is not.  CREW is not taking that action to avert some harm to
18   itself, to counteract some harm to the organization.  They do
19   not have members.  They do not have clients, as the
20   organization in Havens did.  CREW is doing this on behalf of
21   the entire public; and if CREW can do it, then any member of
22   the public can do it.  This case is just like The Sierra Club
23   case in 1972 in which the Supreme Court said just a mere
24   abstract interest in a problem is not enough to confer Article
25   III standing.  So, therefore, in our view, your Honor, CREW
```

HAIQCREc

 1   does not have standing and should be dismissed.

 2          Now, there are three other plaintiffs in the case,

 3   your Honor.  We call them the Hospitality plaintiffs.  What

 4   their allegations are, are that they are competing with the

 5   President's businesses.  Their theory is that foreign

 6   governments are going to the Trump properties rather than their

 7   own, and that this is causing them some harm.  They relied

 8   exclusively on the competitor standing doctrine, but this case

 9   would be a radical expansion of that doctrine far beyond

10   anything the Second Circuit has ever recognized; and if these

11   businesses who claim that they compete with the President's

12   businesses have standing, it's hard to think of any business in

13   Washington D.C. or New York City that would not have standing

14   simply based on an allegation that they compete for the same

15   pool of customers as the President's businesses.  Here, again,

16   all the plaintiffs allege is that they compete with the

17   President's business, but that is not enough to confer Article

18   III standing on an competitive standing doctrine theory because

19   they can't show an increase in competition.  This is not a case

20   where the Court can infer a certainly impending Article III

21   injury in the form of lost business really for two fundamental

22   reasons:

23          First, is that the government is not taking any

24   regulatory action in this case, that is skewing the competitive

25   playing field.  The classic use of the competitor standing

HAIQCREc

doctrine is a situation in which the government controls the

market, and it is taking some regulatory action to skew the

competitive playing field.  For example, allowing a new market

entrant or granting a tax subsidiary or granting a direct

benefit to one competitor over another.  But that is not

happening in this case.

          The President is not controlling access to the market.

The President is a market participant, and it's not the type of

case where the Court could easily infer an increase in

competition or an imminent loss of business to any of these

plaintiffs.  Again, the President is competing in the market.

He is not controlling access to the market.  And this would

be --

          THE COURT:  Why is that necessarily not consistent?

One can be in the market and still control the market.

          MR. SHUMATE:  I don't think there is any allegation

that the President is controlling the market, your Honor.  In

fact, it would be quite difficult for him to control the

market.  That is the other point I would make, is that the

markets here are quite different than any other case that we

have found in which competitor standing has been recognized.

          These are highly excessive markets.  There are

thousands of restaurants in New York City, hundreds of hotels

in Washington D.C. and New York City.  And individuals make

decisions about where to stay and where to eat for any number

HAIQCREc

of different reasons.  It can be the location, the quality of

the food, the quality of the hotel, the brand name.  This is

just not a case where you can easily infer that just because

the President owns an interest in a business, that that is

causing an imminent harm to any of these other competitors.

Again, all they allege is that they compete in the same market,

but these are highly diffuse markets with lots of different

competitors.  It's not the type of case where you've got two

directly competing entities and the government is taking some

direct action to allow a new market entrant or grant a

subsidiary to one business over another.

THE COURT:  Isn't the allegation a little bit more

than they just compete in the same market.  There are some

specific allegations that they have lost business, business

that they previously had; that that business has been lost to

Trump entities.  That is more than just being a competitor in

business.

MR. SHUMATE:  No, I don't think so, your Honor.  I

think they have not attempted to show an actual injury.  They

have exclusively relied on the competitor standing doctrine

which necessarily requires the Court to make an inference, an

inference of a certainly impending loss of business.  And

because of the nature of the market and the involvement of the

government in the market, it's just not an easy case in which

the Court can make that inference.

HAIQCREc

1            So let's take one of the plaintiffs, for example, Jill

2     Phaneuf.  She is an individual who lives in Washington D.C. and

3     works for a company that books events at other hotels in

4     Washington D.C.  She does not own a property that competes with

5     one of the President's businesses.  She does not work for one

6     of the properties that competes with the President's

7     businesses.  She works for a third-party company that seeks to

8     book events at one of the properties in DuPont Circle.  But she

9     is asking the Court to make an inference that she is imminently

10    going to lose commissions based on the mere fact that the

11    President is involved in the market.  That is quite a

12    speculative leap.  She is not alleging that she has actually

13    lost commissions or she has actually lost business.  In fact,

14    she alleges that she has not booked an event for an embassy

15    event at one of these properties, only that she desires to do

16    so.  So what she is asking the Court to infer is a certainly

17    impending injury even though she does not own a business that

18    competes with the President and she does not work for a

19    business that competes with the President.  She merely works

20    for a booking company that seeks to compete in that same

21    market.  So, if Ms. Phaneuf has standing based on those

22    allegations, it's hard to see how any individual who works in

23    the hospitality industry in Washington and New York City would

24    not have standing by making the same allegations.

25            Your Honor, even if you find that any of these

HAIQCREc

1    plaintiffs have standing, the Court should still dismiss the

2    case for lack of jurisdiction for a second reason.  That is

3    because the Court lacks jurisdiction to issue an injunction

4    against a sitting President of the United States.  The Supreme

5    Court held long ago in a case called *Mississippi v. Johnson*

6    that a court lacks jurisdiction to enjoin the President in the

7    performance of his official duties.  That principle is still

8    good law.  The Supreme Court reaffirmed that in a case called

9    *Franklin v. Massachusetts* in 1992.  The Court said in that

10   case, again, issuing an injunction against the President raises

11   significant concerns under the separation of powers and the

12   Court's involvement in Executive Branch functions.  What

13   Justice Scalia explained in his concurring opinion is that a

14   court should hesitate before doing that because no court that

15   we have found has actually issued a injunction against the

16   President in a case where he is the only defendant, as he is in

17   this case.

18          To be clear, this is not some ministerial action that

19   the plaintiffs are asking the Court to could to enjoin the

20   President.  They are asking the Court to order the President to

21   divest all of his businesses and for the Court to be in this

22   court for many years supervising the President's businesses and

23   reviewing the exercise of his judgment and discretion about how

24   to divest those businesses.  That endeavor is fraught with

25   separation of powers concern for a court to be supervising be

HAIQCREc

1    the President's businesses, and is it is not something this

2    Court should take lightly.

3         THE COURT:  Why isn't that a question of remedy at

4    this point?  Injunctive relief is not the only remedy in a

5    lawsuit.  There's also declaratory relief.  Those cases that

6    deal with injunctions against the President don't control

7    whether or not the Court should make a finding one way or the

8    other but whether or not the President is violating the

9    Emoluments Clause.

10         MR. SHUMATE:  I respectfully disagree, your Honor.

11    *Franklin v. Massachusetts* explains that declaratory relief

12    raises same separation of powers concern as injunctive relief.

13         THE COURT:  Not for the same rationale that you just

14    gave.  I don't have to monitor the President's conduct.

15    Whether it is appropriate for this Court to take some action to

16    prevent the President from being engaged in this activity is a

17    different question.  That could be Congress's role.  That could

18    be the Court's role.  It may not be the Court's role.  The

19    President may voluntarily decide that he would comply.  Why is

20    that necessarily an issue that is one of whether or not this

21    case should be initially brought as opposed to what would be

22    the result of this case if in fact it were determined that the

23    President was violating the Emoluments Clause.

24         MR. SHUMATE:  Your Honor, you could look at this

25    question in one of two ways:  You could look at it as a

HAIQCREc

question of remedy or you could look at it as a question of

redressability, which is an aspect of standing.  If we are

correct that the Court lacks jurisdiction to issue a junction

or declaratory relief against the President, then the

plaintiffs lack standing because the Court cannot remedy any of

the supposed injuries that these plaintiffs have.

        To your Honor's question about could the Court issue

declaratory relief and not order the President to do anything,

that sounds an awful lot like an advisory opinion that does not

require the President to take any action.  It is just a

decision basically in the abstract.  What the Supreme Court

said in Franklin, or perhaps it was Justice Scalia in his

concurring opinion, that that is still fraught with separation

of powers concern because it pits two branches of government

against themselves.  Merely to issue declaratory relief raises

the same concerns about injunctive relief.

        Your Honor, even if the Court finds the plaintiffs

have standing and it has jurisdiction, the Court should still

dismiss the case because the plaintiffs have not sufficiently

alleged that the President is in violation of the Emoluments

Clause simply because he has an interest in a company that does

business with foreign governments.

        Now, the threshold question for the Court is what is

the meaning of the word "emoluments."  There are two

interpretations before the Court.  On the one hand, emolument

HAIQCREc

 1     could mean profit arising from office or employ, as we argue.

 2     Or it could mean, as the plaintiffs argue, anything of value.

 3     Now, I'd like to first explain our interpretation of the word

 4     emolument and why it's rooted in the original public meaning of

 5     the word, a context in which the word appears in the

 6     Constitution, the historical understanding of that term.  And I

 7     would also like to explain why it is a workable and common

 8     sense interpretation.  Then I would like to explain why the

 9     plaintiff's interpretation, anything of value, is not a

10     reasonable construction of the word emolument.  But before I

11     do, your Honor, I would like to just take a moment and identify

12     the three uses of the word "emolument" in the Constitution.

13             First, there is the Foreign Emoluments Clause.  I'll

14     paraphrase here, but I'll do so accurately.  It applies to a

15     holder of any office of profit or trust, and it says that

16     individual cannot accept any presents, emoluments, office or

17     title of any kind whatever from any foreign government without

18     Congress's consent.

19             Second, there's the Domestic Emoluments Clause, often

20     also referred to as the Presidential compensation clause, and

21     applies only to the President.  It says that the President

22     shall receive compensation for his services which can't be

23     increased or decreased, and he cannot receive any other

24     emolument from the United States, or any of them.

25             The third use of the word emolument is in what's

HAIQCREc

1    called the Incompatibility Clause which applies to only members

2    of Congress.  It says:  No senator or representative can be

3    appointed to any civil office if the emoluments have been

4    increased during his or her time in Congress.

5            So, three uses of the word emolument.

6            What is our interpretation of that word?  What does

7    emolument mean?  Well, in our view, it means profit arising

8    from office or employ.  Profit arising from office or employ.

9    In the context of the Constitution what that means specifically

10   is a benefit conferred in exchange for some personal service in

11   an official or employment-like capacity.  A benefit conferred

12   in exchange for personal service in an official or

13   employment-like capacity.  That is the best reading of the word

14   emolument for four reasons.

15           THE COURT:  Why is it that complicated?  If we start

16   with the Domestic Emoluments Clause, it's clear that what it is

17   addressing is the President's compensation.  Why doesn't

18   emolument mean compensation?  Why isn't that the most direct,

19   most accurate definition in its use in all three of these

20   clauses?  It's clear that in the Domestic Emoluments Clause

21   they're addressing the salary compensation that the President

22   should be able to obtain.  That doesn't seem to be a

23   complicated concept.  It says that the President shall receive

24   compensation for being President during his term which can't be

25   reduced or increased during that term, and that he should

HAIQCREc

1   receive no other compensation from the federal government or

2   any other state government.

3        Why do we need a more complicated definition of

4   emoluments than that?  It clearly means compensation.  And in

5   the context of the Domestic Emoluments Clause, it means the

6   President's salary or any other compensation that he is

7   provided for being President.  Why is it more complicated than

8   that?

9        MR. SHUMATE:  Well, your Honor, compensation is

10  certainly one type of emolument, but it is not the only type.

11  At the time of the founding, there were many other types of

12  emoluments that an officeholder might receive.  It could be

13  salary.  It could be horses.  It could be fines, forfeitures,

14  penalties, any number of things.  And so if you look at the

15  Domestic Clause itself, it says, as you said, the President

16  shall receive compensation for his services but not any other

17  emolument.

18       If it only meant compensation, the founders presumably

19  would have just said "no other compensation."  But emolument

20  can mean other things beyond compensation.  And if you look at

21  the Domestic Emoluments Clause, it says "of any kind whatever."

22  What that clause means is that there are no exceptions to the

23  types of emoluments that are excluded from the Foreign

24  Emoluments Clause.  So, again, emolument has a broader meaning

25  than just compensation.  It can be any benefit.  But in our

HAIQCREc

1   view it has a specific context in which the benefit must be

2   conferred, must be conferred in exchange for some personal

3   service in an official or employment-like capacity.

4           THE COURT:  When you say, "it must be conferred in

5   exchange," it's unclear from the position that you take in the

6   brief.  Are you saying that that emolument must be paid with

7   that intent or are you saying that it can't be an emolument

8   unless it is paying the President for something he has actually

9   done?

10          MR. SHUMATE:  The latter, your Honor.  The

11  officeholder needs to be doing some personal service in his

12  capacity as the officeholder or in an employment-like capacity.

13          THE COURT:  Well, suppose the President doesn't follow

14  through.  Suppose a foreign nation says, "We'd like you to sign

15  this treaty that's favorable to this nation.  We will give you

16  a million dollars if you sign the treaty."  Can he accept a

17  million dollars?

18          MR. SHUMATE:  No, because that would be a present,

19  your Honor.

20          THE COURT:  You're saying that's not an emolument.

21          MR. SHUMATE:  It would not be an emolument.  That

22  would be a gift given without consideration.

23          THE COURT:  Clearly, from the foreign country's

24  perspective, that is not giving without consideration.  They

25  are not giving him a gift.  And obviously if he says, "No, I

HAIQCREc

1   will never do that," then it's not considered a gift to the

2   President.  It's difficult for me to understand that what the

3   drafters of the Constitution meant is that it must be an

4   executed bribe before it can become an emolument.

5          MR. SHUMATE:  Our position is that there needs to be

6   an exchange of some kind for it to be an emolument.

7          THE COURT:  It can't just be a promise of some kind?

8          MR. SHUMATE:  I think it would -- I would need to know

9   the facts of the hypothetical, your Honor.

10          THE COURT:  Well, there are only two sets of facts

11   that I'm thinking about:  One, the President would promise to

12   do something in exchange for the money, or they would promise

13   to give the President this money if he did what they asked him

14   to do.  So the question would be, on the day that they're

15   proffering the money -- if they're proffering the money on

16   Monday and the act that they want him to do doesn't happen

17   until Friday, you're saying giving him the money on Monday is

18   not an emolument?

19          MR. SHUMATE:  I think if we look at the entire context

20   in which the these --

21          THE COURT:  That is the entire content.

22          MR. SHUMATE:  If there is no personal service engaged

23   in by the office holder, that would not be an emolument.  There

24   is no exchange involved.  But if the office holder does carry

25   through and take some personal service in an official capacity

HAIQCREc

1    or an employment-like capacity, in our view that would be an

2    emolument.

3            THE COURT:  That's why it's hard for me to understand

4    that concept and where you get that concept from.  If they say

5    that we will give you a million dollars in January for you to

6    do an act in September, you're saying that the President can

7    take that million dollars in January because it's not an

8    emolument?

9            MR. SHUMATE:  Well, your Honor, in that situation it

10   looks a lot like a present but that is far afield from any of

11   the allegations --

12           THE COURT:  It's not a present.  They are not giving

13   him this as a gift.  They are giving this because they expect

14   something in exchange, and that is clearly what the founding

15   fathers intended to prevent.  They didn't intend to punish the

16   President for his taking bribes.  They intended to have a

17   prophylactic rule that would take away the potential conflict

18   by the President taking titles and gifts and emoluments,

19   payments from others.

20           I understand your argument that an emolument is not a

21   gift.  An emolument is some sort of payment for some act to be

22   accomplished, but I don't understand your argument that unless

23   and until the President does the act that they're paying him

24   for, that he can take the money because it doesn't constitute

25   an emolument.

HAIQCREc

1          MR. SHUMATE:  Well, he couldn't take the money because

2     it would be a present, your Honor.  But to your larger point,

3     the subjective intentions of the giver cannot matter.  This is

4     a bright-line test.

5          THE COURT:  Well, what do you consider to be a

6     present?  You're keep saying it's a gift.  If I say to you, if

7     you come and work at the justice department, I will pay you,

8     and I give you your first paycheck, and then you decide

9     tomorrow, you change your mind and you want to work someplace

10    else.  Why is that a gift?

11         MR. SHUMATE:  It's not a gift; that would be an

12    emolument because the payment that you confer on me is an

13    exchange for my services.

14         THE COURT:  But you didn't start work yet, and you

15    never did, and you changed your mind and you never worked

16    there.  That's what I'm saying, I don't understand the argument

17    that somehow the President has to follow through; that what

18    makes it an emolument is not the intent of the payment but

19    whether or not the President satisfied the expectations of the

20    giver of the emolument.  I don't see anywhere where it is

21    intended that a payment in exchange for a promised act does not

22    constitute an emolument even under your definition.

23         If I say I'm going to give you something if you

24    promise to do something for me.  If I'm a foreign government,

25    and I say I will give the President a million dollars if the

HAIQCREc

```
 1    President will promise that he will sign this favorable treaty
 2    to us, your argument is, if he signs the treaty, later on it
 3    becomes an emolument.  If he doesn't sign the treaty, then it's
 4    just a gift.  I don't understand why that defines whether or
 5    not it's an emolument.  Emolument should be the payment with
 6    the expectation that you're giving that payment in exchange for
 7    what you expect back, and whether or not that person breaches
 8    that agreement shouldn't define whether it's an emolument,
 9    should it?
10          MR. SHUMATE:  Well, your Honor, I think it's helpful
11    to go back to the original public meaning of the word
12    emolument.  Barclays defines emolument as profit arising from
13    office or employ.  Inherent in that definition is the concept
14    of an exchange of some kind.  Profit for one's labor.
15          THE COURT:  I'm not sure I agree with that.  What's
16    inherent in there is an exchange of promises just like any
17    other contract.  That's not consistent with basic contract law.
18    You can't say it's not a contract because one side didn't
19    perform.  It's still a contract.
20          So, if the President promises to do something, and
21    they say, "If you do this, we will give you the money," hasn't
22    he breached that contract if he doesn't do it, and isn't that
23    money paid in exchange for the promise that he will follow
24    through with the act that he promised to do?  I don't
25    understand why that's not an emolument.
```

HAIQCREc

|  |  |
|---|---|
| 1 | MR. SHUMATE:  I think what's missing in that |
| 2 | hypothetical, your Honor, is some personal service provided in |
| 3 | a official or employment-like capacity. |
| 4 | THE COURT:  Provided rather than promised? |
| 5 | MR. SHUMATE:  Correct. |
| 6 | THE COURT:  So you say if the President says, "I |
| 7 | promise to sign the treaty," that that's not an emolument. |
| 8 | MR. SHUMATE:  Well, it would still be prohibited by |
| 9 | the clause. |
| 10 | THE COURT:  I know, but I'm putting aside the gift |
| 11 | part of it because I am not even sure how that would fall into |
| 12 | your definition of gift.  As I say, if you say you're going to |
| 13 | sell me your car for $10,000.  I give you the $10,000 today, |
| 14 | you say, "Show up tomorrow, I'll have the car."  I show up |
| 15 | tomorrow, and you don't have the car.  How is what I gave you a |
| 16 | gift? |
| 17 | MR. SHUMATE:  It's certainly a situation -- still, if |
| 18 | you keep the money, it is a gift given without consideration. |
| 19 | There is no consideration exchanged in that circumstance. |
| 20 | THE COURT:  Well, if you keep the money, how is that a |
| 21 | gift?  I'll go into court and sue you to get it back.  I didn't |
| 22 | gift it to you.  As they say, everything that's logical is not |
| 23 | reasonable.  I understand the logic of what you're saying, but |
| 24 | I don't understand the reasonableness of what you're saying |
| 25 | that if I give you something in exchange for you agreeing to |

HAIQCREc

1    commit an official act, why that is not an emolument; that you

2    want to say that that's a gift if I decide that I'm not going

3    to do it, or if I decide -- let me give you another example and

4    see how far the limits are of what you say this argument is.

5              If a foreign government says to the President, "I will

6    give you a million dollars to sign this favorable treaty," and

7    the President says to his staff person, "You know what?  I

8    intend to sign that treaty anyway.  Let's just take the money."

9    Is that an emolument?

10             MR. SHUMATE:  I would think it would be a gift, your

11   Honor.

12             THE COURT:  Which one of the parties believes that to

13   be a gift?

14             MR. SHUMATE:  Belief does not matter, your Honor.

15             THE COURT:  Why do you believe that to be a gift?

16             MR. SHUMATE:  Because it is something that is received

17   without compensation.  So either way --

18             THE COURT:  Because I said, "Well, I only gave it to

19   you because you said you were going to do something.  If you

20   didn't do it, I want it back."  And the President says, "I'm

21   not going to give it back."  Does that still make it a gift?

22             MR. SHUMATE:  It would follow it would either be a

23   present or an emolument, your Honor.

24             THE COURT:  It's not a present if I gave it to you --

25   as I said, if I said, "Sell me your car."  It's not a present

HAIQCREc

```
1    if I give you $10,000 and you don't deliver the car, it's not a

2    gift.  There is no definition in logic or in law that defines

3    that as a gift.

4            Now, if I said to you, "Oh, don't worry about it, I

5    wanted to give you $10,000 as a present anyway.  Keep the car."

6    That's a gift.  But if you promised to do something in exchange

7    for that money, there is no definition in law that I know of

8    that qualifies that as a gift.

9            MR. SHUMATE:  Your Honor, all of your hypotheticals

10   involve subjective intentions of the giver.  This is a

11   bright-line test.  The clause says no presents and no

12   emoluments.  It's not a totality of circumstances test.  It's

13   not a subjective intentions of the giver.  It's not an undue

14   influence test.  It's a bright-line rule.  It is a present or

15   emolument.  Those words have to have different meanings.  The

16   plaintiffs give them the exact same meaning.

17           THE COURT:  You give them a third meaning, that's what

18   I'm saying.  There's one meaning to say an emolument is a gift,

19   and your argument makes sense that an emolument must be

20   something other than a gift otherwise it wouldn't prohibit both

21   emoluments and gifts.  But your argument is that an emolument

22   has to be given after the President has already done something

23   that the emolument is compensating him for.  I mean, if you go

24   back to the Domestic Emoluments Clause, the reality is that's

25   not even true of the Domestic Emoluments Clause.
```

HAIQCREc

          If the President's salary is $400,000, if the
President gets paid the first month, that doesn't mean it's not
an emolument because he hasn't done the work for that month
yet.  If he says, "I'm taking next month off," that doesn't
change the definition of whether or not it is compensation and
is defined as an emolument.  It's a little difficult to talk
about it in the context of the presidency because who knows
what is official or not official that the President does?  Some
would argue everything the President does is in an official
capacity not because of the job he has but because of the
status he has.  Everything he says or does has an effect on
world-wide events and on domestic and international events.
          And then the other part of that, the logical question
is, well, am I really supposed to go through that analysis?  I
mean, is anyone, even Congress supposed to go through that
analysis of trying to figure out whether the President really
did do something in exchange for the payment that he was given
where it's clear as to what they expected of him?  And if he
did it, did he do it because of the money?  If he didn't do it,
does that transform it into a gift because they didn't get it
back?  What makes it a gift?  If they demand it back or don't
demand it back, does that change whether it's a gift or an
emolument?  Why should that analysis be gone through by anyone?
The Emoluments Clause is basically prohibiting, as you say,
both gifts and emoluments, so it doesn't matter, does it?  He

HAIQCREc

```
 1    can't take it.  He can't take the money.  And we know he can't

 2    take the money, and he can't take the money if it is a gift.

 3    He can't take the money if it is some compensation for

 4    something that they expect him to do.

 5            This language is intended to be all inclusive.  It

 6    basically says, look, you should not take anything of value

 7    from foreign governments unless Congress consents to it.  Isn't

 8    that basically what the rule says?  So what difference does it

 9    make?  If you say that this is a gift instead of an emolument,

10    it doesn't mean it's not still prohibited by the Emoluments

11    Clause or at least by that provision of the Constitution,

12    right?

13            MR. SHUMATE:  But we have to find the original public

14    meaning of the word emolument.  It has to be different from the

15    word present.  At the time of the founding it's clear there are

16    only two definitions:  Ours, meaning profit arising from office

17    or employ.  Or theirs, anything of value.  So the question is

18    who's right?

19            THE COURT:  I'm not sure that that is.  We just talked

20    about it.  Under the Domestic Emoluments Clause, emolument

21    seems to be compensation.

22            MR. SHUMATE:  Well, compensation for his services

23    which suggests both personal service in an exchange in the

24    President's official capacity.

25            THE COURT:  Well, compensation is always for services,
```

HAIQCREc

 1    isn't it?

 2              MR. SHUMATE:  Which just proves our point; that the

 3    compensation or the emolument is an exchange for some service.

 4    The Domestic Emoluments Clause is an exchange for the

 5    President's services as President.  Therefore, we would expect

 6    the word emolument --

 7              THE COURT:  So you say it is only compensation if in

 8    fact the President does what is expected of him.

 9              MR. SHUMATE:  No, because he holds the office.

10    Because he holds the office, he gets compensation.

11              THE COURT:  Right.  So that is an emolument, whether

12    he sleeps all day or whether he works all day, right?

13              MR. SHUMATE:  That's correct.

14              THE COURT:  It's still an emolument.

15              MR. SHUMATE:  Because the emolument arises out of his

16    office consistent with the original public meaning, profit

17    arising from office or employ.

18              THE COURT:  It doesn't arise out of his conduct, his

19    doing something in exchange.  It arises out of his office.

20              MR. SHUMATE:  Correct.  Let me give you another

21    example of a situation where the President could not do

22    something in an employment-like capacity, or any federal

23    official.

24              So, for example, the classic case that would be

25    covered by the Emoluments Clause would be the President agrees

HAIQCREc

1   to sign a treaty in exchange for compensation.  Clearly, that

2   would be a benefit, compensation, in exchange for some personal

3   service in his official capacity, signing the treaty.

4              THE COURT:  But that's inconsistent with what you

5   already argued because you said he promised to do it.  You

6   didn't say he did it.

7              MR. SHUMATE:  Well, he did it.

8              THE COURT:  I'm trying to make sure I understand your

9   argument.  That's what I'm saying.  It seems to me it does make

10  sense what you just said.  If he promised to do it in exchange

11  for the money, he can't take the money because it constitutes

12  an emolument, right?  And you say no.

13             MR. SHUMATE:  He could not take the money if he

14  engages in some personal service in his official capacity.

15             THE COURT:  As opposed to if he promised to engage in

16  some official duty.

17             MR. SHUMATE:  There would be some question whether

18  that would be a present or an emolument, your Honor.

19             THE COURT:  OK. we have to move past that, but I don't

20  see the logic or the law in defining that as a present.  I

21  don't know of any situation that you could give me where one

22  person promises to do something for a payment, and that is

23  qualified as a gift if the person fails to do what they

24  promised.  I don't know any definition in law or logic that

25  transforms that into a gift when you promise to do something in

HAIQCREc

1   exchange for the payment, I give you the payment, and you

2   breach the agreement.  That doesn't transform it into a gift.

3        You cannot walk into a courtroom and, say, "Oh, he

4   can't sue me.  He gave it to me as a gift."  That doesn't work.

5   There is no legal theory that supports the position that if

6   there is an exchange of activity for payment of money, if the

7   person pays the money with the expectation that the other

8   person will engage in the conduct, and the other person fails

9   to engage in the conduct, I don't know any legal theory or

10  reasonable logic that says I gave you a gift.  I just don't

11  understand how you could make that argument.

12        MR. SHUMATE:  Your Honor, maybe it would be helpful if

13  I moved to history because the hypotheticals we're talking

14  about are far afield from the allegations in the Complaint.

15  The allegations in the Complaint are that the President is

16  receiving emoluments because he holds an interest in a company

17  that may do business with foreign governments.

18        But history is dispositively on our side because there

19  is no discussion in the historical record that the framers had

20  any concern about federal officials engaging in private

21  business pursuits, much less any concern about a federal

22  official holding an interest in a company that may do business

23  with a foreign government.

24        Just to be clear, your Honor, the Domestic Emoluments

25  Clause applies to any holder of an office of profit or trust

HAIQCREc

1    and likely would apply to any --

2              THE COURT:  I'm not sure that's true.  The Domestic

3    Emoluments Clause deals with the President --

4              MR. SHUMATE:  Correct.

5              THE COURT:  -- and his compensation.  There is a

6    difference.  Domestic Emoluments Clause is the activity of the

7    President alone.

8              MR. SHUMATE:  Correct.

9              THE COURT:  The Foreign Emoluments Clause deals with

10   other employees.

11             MR. SHUMATE:  Correct.  The Domestic -- excuse me, I'm

12   sorry -- the Foreign Emoluments Clause says holders of an

13   office of profit or trust, which would likely include judges,

14   retired military officers, and members of Congress.  So that

15   whatever interpretation the Court reaches in this case would

16   likely apply to every holder of an office of profit or trust,

17   but there is no discussion in the historical record that the

18   framers had any concern about private business pursuits.

19             In fact, it was common at the time of the founding for

20   federal officials to be paid very low salaries or no salaries

21   at all, and it was expected and commonplace to engage in a

22   private business to supplement one's income.  We know from the

23   historical record that early presidents like Washington and

24   Jefferson engaged in private business at the time they held the

25   office.

HAIQCREc

1          THE COURT:  But why should that necessarily be taken

2     as the definition of emoluments?  The way that it is written,

3     particularly when we're talking about the Foreign Emoluments

4     Clause, it doesn't say the President can't -- it doesn't say

5     anyone can't do it.  It says they can do it with Congress's

6     consent.  We're not talking about George Washington or Thomas

7     Jefferson.  At that time the fact that Congress did not react,

8     did not find this of concern to them, was silent on the issue,

9     why should that be taken as anything than Congress's lack of

10    concern about the issue, or why shouldn't it simply be taken as

11    Congress's implicit consent, that there were a lot more

12    important things going on in the world at the time that they

13    were concerned about, and they weren't particularly concerned

14    about George Washington selling tobacco.  Even if someone went

15    to Congress and said, "We think this is an emolument.  You

16    ought to prevent it."  They might have simply said, "Well, we

17    don't care.  We're not concerned whether it's an emolument or

18    not.  We have the power to consent and we're going to consent."

19         Why is that silence -- what is it in the history that

20    defines emolument simply because they didn't raise any concern

21    about George Washington's conduct, or why can't that be

22    considered some implicit consent on their part that they did

23    not consider this to be a concern and did not consider it

24    something that they wanted to prevent?  It doesn't mean they

25    couldn't.  I don't read anything that said Congress says, "This

HAIQCREc

```
 1    is not an emolument.  We can't stop the President from doing
 2    this, and we have no power to consent."  I don't see that
 3    written any place.  I don't see anybody saying that.
 4              MR. SHUMATE:  Your Honor, all of that proves my point;
 5    that nobody at the time of the founding up until this President
 6    ever understood the clauses to apply to forbid engaging in
 7    private business pursuits.
 8              THE COURT:  Well, that's interesting, and the way you
 9    characterize it in the abstract may be true, but let's go back
10    to the treaty example.  If a foreign government said to the
11    President, "We'd like you to sign this treaty that's favorable
12    to our country."
13              And the President says, "Well, you know, I can't."
14              And they said, "Well, we'll give you a million
15    dollars."
16              And he says, "Well, you know, I can't accept
17    emoluments for doing this."
18              And then they said to him, "Well, we know you own a
19    hotdog stand.  We'll buy a million dollars worth of your
20    hotdogs."
21              Would you say that that can't be an emolument?
22              MR. SHUMATE:  Well, at some point, your Honor, there
23    may be extreme examples where something like that given--
24              THE COURT:  We don't have to deal with the extreme
25    examples.  We have to deal with the more limited examples
```

HAIQCREc

1    because you want me to define it for all emoluments.  So that

2    either falls within the definition of emolument or it doesn't

3    fall within your definition.

4              MR. SHUMATE:  No, it would not fall in within our

5    definition of emolument.  It may in some cases fall within the

6    definition of a present.  If you give something, give a gift

7    far beyond any reasonable market value, that might be a present

8    in a particular case, but if it's just a business example --

9              THE COURT:  The example I gave, you you're not arguing

10   that that's a present.

11             MR. SHUMATE:  In an extreme example it could be.

12             THE COURT:  The actual example I just gave you, you're

13   not arguing that that would be a present.

14             MR. SHUMATE:  It potentially could be, your Honor.

15             THE COURT:  How would it be a present?  If they said,

16   "We will give you" -- if they said, "We want you to sign this

17   treaty, and if you sign this treaty we'll buy a million dollars

18   worth of your hotdogs, so you could put a million dollars into

19   the bank."  How is that a gift?

20             MR. SHUMATE:  I think I misunderstood the

21   hypothetical.

22             THE COURT:  OK.

23             MR. SHUMATE:  So, if there is a benefit conferred, yes

24   you have a benefit.  If you have personal service by the

25   President signing the treaty, that would be in his official

HAIQCREc

1    capacity, so it wouldn't matter if the payment is just funneled

2    through a hotdog stand.

3        THE COURT:  So it wouldn't matter whether or not it's

4    a business transaction -- because the drafters of the

5    Constitution probably understood that because they wanted to

6    make sure that they said an emolument of any kind.  So just

7    because it's a business transaction doesn't necessarily mean

8    that it can't be an emolument.  Would you agree with that?

9        MR. SHUMATE:  I would agree it would have to meet our

10   definition, and in the hypothetical you provided, there would

11   be a benefit conferred on the President in exchange for a

12   personal service in an official capacity, signing the treaty.

13   So I would be willing to concede if that definition is met, it

14   wouldn't matter if the President were handed the money or if it

15   were funneled through some business.  But that is far afield

16   from what the allegations are in the Complaint here.

17       The allegations in the Complaint here are that the

18   President is engaging in ordinary business transactions not in

19   exchange for anything, and we know from the historical record

20   that early presidents participated in private business

21   transactions.  The Supreme Court said, the practices of the

22   early presidents are entitled to significant weight.

23       What the plaintiffs want the Court to assume is that

24   President Washington was a crook because he engaged in private

25   business with the federal government in 1793.  This is an

HAIQCREc

```
 1    indisputable fact:  That in 1793, President Washington

 2    purchased public lots from the federal government.  Under their

 3    view, anything of value, President Washington received an

 4    emolument that would be prohibited by the Domestic Emoluments

 5    Clause.  Under our definition, it would not be.

 6          But nobody, like you said earlier, your Honor, nobody

 7    had ever understood and nobody was ever concerned about a

 8    President or a federal official engaging in private business.

 9    That is just not what the clause was intended to protect

10    against.  The clause was intended to protect against exchanging

11    for personal services in an official capacity for some benefit.

12    It was not intended to regulate private business conduct.

13          Another example that they cannot explain away is the

14    1810 constitutional amendment that was passed by Congress by a

15    wide margin, ultimately was not ratified by two states, but

16    what that constitutional amendment said was that any citizen

17    that received an emolument from a foreign government would be

18    stripped of their citizenship.

19          There is no discussion in historical record that they

20    intended that constitutional amendment to strip the citizenship

21    of any American engaging in business with a foreign government,

22    foreign trade.  That couldn't possibly be correct.

23          THE COURT:  Well, there is no evidence that they ever

24    ratified that.  So it has absolutely no effect.

25          MR. SHUMATE:  Well, it is significant, your Honor,
```

HAIQCREc

1    because this was still the founding generation.  James Madison

2    was the President at the time.  It was passed by Congress by a

3    wide margin.  Ultimately, was not ratified by two-thirds of the

4    state, but it is a significant historical example.

5         If their interpretation is right -- anything of

6    value -- that a large majority of Congress of the United States

7    intended to strip the citizenship of any American that received

8    anything of value from a foreign diplomat on U.S. soil, that

9    can't be possibly be right. xxx

10        THE COURT:  But the state said that wasn't right.

11   They would not ratify such a provision.

12        MR. SHUMATE:  But Congress did.  You have to assume

13   under their theory that the founding generations were idiots

14   for doing that, and that is not an assumption --

15        THE COURT:  There are people on one side of the issue

16   and there are people on the other side of the issue.  How you

17   want to characterize it is a definition.  I don't know why

18   people voted one way or the other, and I don't know how

19   significant that is in terms of defining -- I'm not sure what

20   you say should be taken from that; that means what about

21   emoluments?

22        MR. SHUMATE:  That if their interpretation is correct,

23   then the founding generation reached an absurd -- passed an

24   absurd constitutional amendment that would have restricted

25   trade within the country.  That would have stripped the

HAIQCREc

1   citizenship of any American that received anything of value

2   from any foreign diplomat.  No American can rent a room to an

3   foreign diplomat on U.S. soil.  That may have been a violation

4   of international law at the time.

5        THE COURT:  I'm not sure what you say that they were

6   attempting to do.

7        MR. SHUMATE:  They were attempting to prevent, I

8   think, Americans from engaging in employment-like relationships

9   with foreign governments.  They didn't want divided loyalty.

10  They wanted Americans to be working not for a foreign embassy

11  on U.S. soil but working in some other capacity.  That is a

12  much more logical interpretation of what the founders intended.

13       THE COURT:  Why does that define what the rules are?

14  Why is that relevant to the rules for employees of the federal

15  government?  Just as you argued, this is an anti-bribery,

16  anticorruption provision.  This is not a provision primarily

17  put into place for some competitive purpose, anti-competition

18  provision.  This has to do with making sure that your

19  government is not corrupt.

20       What does that have to do with whether or not you

21  strip a citizen who may or may not be a government employee of

22  their citizenship particularly with regard to a provision that

23  was never enacted into law?  I'm not sure I understand what

24  intent you say that that demonstrates on the part of Congress

25  at the time that translates into their application of the

HAIQCREc

1    Emoluments Clause.

2         MR. SHUMATE:  Well, the word emolument is used in both

3    clauses, both provisions, and the constitutional amendment

4    would have applied that restriction to any American, not just

5    the holders of an office of profit or trust.

6         The point I'm making is that it shows the absurdity of

7    the plaintiff's interpretation.  If emolument means anything of

8    value, then we have to assume that Congress by a large margin

9    which involved members of the founding generation, intended to

10   strip the citizenship of any American who received anything of

11   value from a foreign government, and that just seems

12   implausible.

13        If I can, I'd like to explain a few more points why

14   the plaintiff's interpretation of the word emolument, meaning

15   anything of value, is not a reasonable interpretation.  The

16   first reason is that it leads to redundancy in the clause

17   itself.  Again, your Honor, the Foreign Emoluments Clause lists

18   four things:  Present, emolument, office and title.

19        We give present and emolument different definitions.

20   The plaintiffs give them the same definition.  They interpret

21   emolument to mean anything of value, anything of value.

22        THE COURT:  Well, the way I read your papers is that

23   you say that certain things are emoluments.  If it's not an

24   emolument, it must be a gift.  They say certain things are

25   gifts.  If it's not a gift, it must be an emolument.

HAIQCREc

1          MR. SHUMATE:  But their definition of emolument is

2     anything of value.

3          THE COURT:  Your definition of gift is anything that's

4     not an emolument.

5          MR. SHUMATE:  No, our definition of gift is a present

6     given.

7          THE COURT:  Well, a gift is anything that is not an

8     emolument.

9          MR. SHUMATE:  A gift is a present a gift given without

10    consideration.  An emolument is something different.  I can't

11    think of an example, but there may be something that falls

12    within neither definition.

13         THE COURT:  But every example I gave you was with

14    consideration, and you said that that was a gift.

15         MR. SHUMATE:  The promise in the hypothetical.

16         THE COURT:  Right.  That's not what you said to me.

17    You didn't say if it's without consideration, it's a gift,

18    because every example I gave you has consideration in it as we

19    define it in legal terms.  It is an exchange of promises which

20    both parties are expected to be bound by, and that is legally

21    the consideration.

22         MR. SHUMATE:  I don't think the framers were concerned

23    about an exchange of promises.  They were concerned about some

24    personal service being provided.

25         THE COURT:  Well, I don't know why you would say that.

HAIQCREc

```
 1   I don't know why it would be logical for them not to be
 2   concerned about an exchange of promises.  Why they wouldn't
 3   naturally say to themselves, look, not only do we not want the
 4   President to take this money for things he does for foreign
 5   governments; we want him to not take this money for things he
 6   promises to foreign governments.  Why would that not be the
 7   more logical reading of what they did here?  They said "an
 8   emolument of any kind."  Are you really arguing that what they
 9   meant to do is say, you could promise them anything you want.
10   As long as you don't follow through, you can take the money.
11   But that can't be what they intended.  They were smarter than
12   that.
13            MR. SHUMATE:  Your Honor, that hypothetical is far
14   afield from this case.
15            THE COURT:  I know, but the problem is the reason why
16   the hypothetical is far afield from this case is because you
17   give me a rule that I'm trying to apply to the situations you
18   say that they should be applied to.  The rule you just gave me
19   I can't apply to that situation.  So that rule is not a
20   workable rule.  So the rule must be different than just, well,
21   the President can promise anything he wants to a foreign
22   government and then take money in exchange for those promises
23   from foreign governments as long as he doesn't follow through
24   with that promise or as long as they can't prove that why he
25   did it was because of the money.  That's not what they
```

HAIQCREc

1    intended.

2            MR. SHUMATE:  Your Honor, let me tell you what would

3    not be workable – their definition, anything of value.  If

4    they're right, if emolument means anything of value, no federal

5    officer could hold stock in a company that receives income from

6    a foreign government.  No federal official could own Treasury

7    bonds that pays interest from the federal government because

8    that would be an emolument, something of value, received from

9    the federal government.  No official could receive royalties

10   from the sale of books if a purchaser of that book happened to

11   be a foreign government representative.  No federal officer

12   could receive a driver's license, a trademark, a copyright, a

13   tax deduction.  All of those things --

14           THE COURT:  Wouldn't an extension of your argument be

15   this, particularly parts of other argument.  You argue that

16   that is really a political question; that, look, they wrote the

17   Constitution not to prohibit this for all time, but to say you

18   can't do it unless Congress says it's OK.  So the answer to

19   that question, your answer to that question would be, no, as

20   long as Congress says it's OK, it doesn't matter.  It doesn't

21   matter.  They don't say that they're preventing the President

22   from doing all these things.  They're just saying that, "Look,

23   if the other branch of government thinks that this is an

24   emolument and decides that they are not going to consent, then

25   you're going to have to rethink this."

HAIQCRE c

1          MR. SHUMATE:  That's exactly right.  Only Congress can

2     grant exceptions to the Emoluments Clause.  But the plaintiffs

3     grant their own ad hoc exceptions that don't fit their theory.

4     They have these absurd situations that fall within the

5     definition of emolument.  They try to carve them out with ad

6     hoc exceptions, but they can't do that because, as you said,

7     only Congress can grant those exceptions.  And Congress has

8     granted exceptions in several circumstances, with the Foreign

9     Gifts and Decorations Act grant and de minimis exceptions for

10    circumstances, but the question is whether something is an

11    emolument or not.  It's not a totality of the circumstances

12    test.  It's a bright-line rule.  Is this an emolument or is it

13    not?  And that is problem under their definition because

14    anything of value sweeps in everything.  Again, this clause

15    applies to judges.  It applies to retired military officers.

16    Nobody ever thought that retired miliary officers could not

17    engage in private business.  That would be the consequence of

18    their interpretation.

19         So, your Honor, respectfully, if you agree with our

20    interpretation of the word emolument, the plaintiffs have

21    failed to state a claim because there is no allegation in the

22    Complaint that the President is receiving a benefit in exchange

23    for personal service in his official capacity or in an

24    employment capacity.

25         Your Honor, if I may reserve some time for rebuttal.

HAIQCREc

```
 1                THE COURT:  Surely.

 2                Mr. Gupta, did you want to start?

 3                MR. GUPTA:  Good morning, your Honor.  Deepak Gupta.

 4                THE COURT:  Let's take a short break.  I want to take

 5      a five minute break.  Our equipment may not be functioning

 6      properly.  Take literally five minutes.

 7                (Recess)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HAIACRE2ps

1          MR. GUPTA:  Good morning, your Honor.

2          I'd like to address three issues.  I would first like

3    to start by explaining why the plaintiffs have standing.

4          Then I want to address the government's view that the

5    president is above the law and the extreme suggestion that we

6    just heard that the Court lacks even the power to declare what

7    the law is with respect to the President.

8          Then I want to address the government's contrived

9    reading of the emoluments clause, which would, as some of your

10   Honor's questions suggested, transform a broad prophylactic

11   anti-corruption rule into effectively a bribery prohibition,

12   something that is elsewhere addressed in the Constitution.

13         And then I would like to turn the podium over to my

14   colleague, Mr. Sellers, who will address the way, if the Court

15   were to deny the motion to dismiss, we would approach discovery

16   in this case, how we would try and litigate the case, and how

17   we would approach the question of remedy.

18         So first, why the plaintiffs have standing.  Now, most

19   of the plaintiffs are proceeding under a theory of competitor

20   injury, so I think it makes sense to start there.

21         The purpose of the emoluments clauses is to ensure

22   that public officials do not profit at the expense of the

23   citizenry.  Now, of course that harms all citizens, but it

24   uniquely harms competitors in the marketplace who are doing

25   business with a public official who is profiting from that

HAIACRE2ps

1       office in the market.  And that is why these plaintiffs are the

2       ideal plaintiffs, along with CREW, to come forward and assert

3       these violations.

4              Now, in the government's motion to dismiss, it largely

5       alleges that the competition we claim is speculative; there are

6       lots of restaurants and hotels in New York, in Washington,

7       D.C., and so we can't possibly show competitor standing.  But

8       by the time of the reply brief, the government, faced with the

9       unrebutted expert testimony that we've provided, from experts

10      in the hotel and restaurant industries in New York and

11      Washington, largely retreats into an attack on the competitor

12      standing doctrine itself.  Because they can't deny that we have

13      standing under the law as it exists, they attack that law.

14             The competitor standing doctrine is a well-established

15      doctrine.  It comes from the Supreme Court.  It's been

16      recognized by the Second Circuit and by circuits around the

17      country.  And we cite over a dozen cases recognizing the

18      doctrine and allowing standing in circumstances where the

19      competition is much less substantiated than it is here, where

20      you have competition, for example, in a national market and

21      somebody shows that they participated in that market and there

22      is some action either by the government or by a competitor that

23      allegedly harms them.

24             Here, what we've shown is much more specific and much

25      more direct.  And, again, it's unrebutted.  We have expert

HAIACRE2ps

1    declarations, experts on the hotel and restaurant industry,

2    including the former dean of the Boston University hospitality

3    school, who explain in detail why specific hotel and restaurant

4    plaintiffs in this case are competing with the defendant's

5    properties.

6           And so I thought it would be useful to give you just a

7    few examples to show how concrete and how specific the

8    competition is.  So imagine that you are at a United Nations

9    permanent mission here in New York.  You want to plan an

10   embassy function.  You want to rent out a room.  And you want

11   it to be in a high-end restaurant in Midtown Manhattan, a

12   restaurant ranked by Michelin as two or three stars.  The

13   number of choices you have at that point is down to a universe

14   of seven restaurants.  If you don't want sushi, you're down to

15   four restaurants.  One of those restaurants is Jean Georges at

16   the Trump International Hotel in New York, and a few blocks

17   away, one of those restaurants is The Modern, one of the ROC

18   restaurants, under which ROC is asserting standing in this

19   case.

20          So already the universe is very, very small, and we

21   know that those restaurants compete for foreign government and

22   domestic government business.  If you go to Jean Georges, there

23   is a prix fixe menu for $208.  If you go to the Modern, there

24   is a prix fixe menu for $208.  The prices are the same, which

25   shows not only are they in direct competition, but they show

HAIACRE2ps

1    that they are in direct competition.

2            If you want to hold an event downtown, again, for a

3    foreign or domestic government and you want to do it at a

4    hotel, let's say you are looking at the Trump Soho Hotel.  The

5    Trump Soho Hotel is four blocks from Houston Street.  Another

6    four blocks from Houston Street is the Bowery Hotel, owned by

7    plaintiff Eric Goode.  Condé Nast recently did ratings of

8    hotels in New York.  The Trump property was ranked 35.  Eric

9    Goode's property, the Bowery, was ranked 33.  They have almost

10   an identical raw score.  If you wanted to book a room, a

11   king-sized bedroom, at one of these hotels tonight, the price

12   would differ by only one dollar.  That shows again, these

13   hotels are not just in direct competition, but they recognize

14   that they are in direct competition.  They have the bed spaces.

15   They have meals they can offer.  But what our clients can't

16   offer is the ability to curry favor with the President of the

17   United States.

18           THE COURT:  Where do they get that right?  If this

19   isn't -- you don't have a claim for unfair competition -- and

20   let's talk about first the zone of interest.  That is not the

21   intent of this provision of the Constitution.  It is not an

22   anti-competitive provision.  It's not a provision to protect

23   competition.  It is an anti-corruption provision.  So it's not

24   intended to protect, provide a right specifically to protect

25   individuals from competition.  In fact, it really does very

HAIACRE2ps

1    little about that issue, because, as you indicated, you're only

2    talking about asserting, under the provision, an injury that

3    you say arises out of government -- U.S. and non-U.S.

4    government patrons.

5            MR. GUPTA:  Right.

6            THE COURT:  I would assume that you have, all of the

7    plaintiffs have a great number of individual claims.  If most

8    of the people in this room who don't work for the federal

9    government decide they want to go to one of the other hotels,

10   the President's hotel, because they would like to get his

11   autograph or curry favor or whatever reason that they want to

12   go to his hotel, this provision doesn't protect you from that

13   unfair competition, that you can't compete with the President

14   because the person who lives in Kansas and decides he wants to

15   go visit Washington, D.C., decides, you know what, I've got two

16   choices, I could stay at the plaintiff's hotel or I could stay

17   at the President's hotel, you know what, he's the President

18   right now, so let's go stay at the President's hotel.  This

19   provision doesn't protect any of the plaintiffs from that.

20   Where do you get this into the zone of interest and where do

21   you get this as the injury caused by his violation of the

22   emoluments clause, when it's clear that, as they say, as unfair

23   as the plaintiffs may think it is that they can't compete with

24   the President's hotel because people are going to have that

25   other incentive to go to his hotel or his restaurant rather

HAIACRE2ps

1    than theirs, the law doesn't protect them from that, and you

2    don't claim the law protects them from that.  So how is this

3    within the zone of interest and how is this an injury that's

4    caused by his violation of the emoluments clause, when they're

5    going to suffer that injury anyway?  It's not going to be less

6    competitive in that regard.  It doesn't eliminate or reduce the

7    competition or patrons simply by saying a foreign government,

8    or the U.S. government, under your theory, shouldn't be able to

9    book into his hotel because of the emoluments clause.

10            MR. GUPTA:  Sure.  So, your Honor, you addressed a

11   number of topics: the purpose of the clause, the zone of

12   interest test, and also the issue of causation.  So let me take

13   them in turn.

14            First, I think you're right that this is a broad

15   anti-corruption provision.  That was the purpose of the

16   amendment.  It's pretty clear from the ratification debates and

17   all of the history.  It was a clause aimed at preventing

18   officials from profiting at the expense of the citizenry.

19            THE COURT:  That's too broad a statement.  A lot of

20   things are intended to do that.  It's intended to do that in a

21   particular way.

22            MR. GUPTA:  That's right.

23            THE COURT:  And the only way that it intends to do

24   that, as articulated, is that it doesn't want foreign

25   governments to influence a federal government official, not

HAIACRE2ps

1    just the President.  And it doesn't want -- it was clear at the

2    time, when there was great debate about these united states, it

3    was clear at the time that they did not want particular states

4    to have undue influence.  They didn't want the state of

5    Virginia to get more advantages because the President was from

6    Virginia.  That was the intent.  It wasn't about whether or not

7    the tobacco farmer who was in the market when George Washington

8    was in the market was saying, well, wait a minute, that's the

9    President, how am I supposed to compete against him?  You're

10   going to go over there and buy your tobacco from George

11   Washington instead of buying it from John Doe.  John Doe

12   doesn't have a complaint under the emoluments clause.

13            MR. GUPTA:  Right.  So if I understand what your Honor

14   is saying, I think it's basically right, that the clause had a

15   purpose.  The framers of the Constitution probably weren't

16   thinking particularly about competitors, individuals when they

17   drafted the clause.  We've alleged a violation of the clause.

18   And we have alleged that those violations harm us.  I want to

19   get to explaining exactly why that is.  But your question is,

20   even if you have all of that, how do you have a federal case if

21   you're not within the zone of interest of the clause?

22            And I think you could ask the same question about the

23   plaintiffs in the *Free Enterprise Fund*, where an accounting

24   firm was alleging that the way that an accounting regulatory

25   body was constructed violated the separation of powers.  You

HAIACRE2ps

could have asked the same question in *INS v. Chadha*, where an

immigrant who would have been sent out of the country was

complaining that the way the law had been promulgated violated

the bicameralism and presentment clauses in the Constitution.

You could have said the same thing in *Bond v. United States*

where a criminal defendant was complaining about Tenth

Amendment questions.  These are all examples where a litigant

is invoking structural provisions of the Constitution.

And when the framers drafted those provisions, they

weren't intending to confer particular rights.  It's not alike

a provision in the Bill of Rights.  And what the Supreme Court

said -- and I think the best case to look to this, your Honor,

is *Bond* -- when you otherwise have a justiciable case or

controversy, in other words, if you otherwise have plaintiffs,

as we do under the competitor standing doctrine and the

organization standing doctrine, who have been injured, who have

a harm that they're pointing to, it's caused by the violations

and the court can do something about it with either a

declaration or an injunction, then you can hear that case and

you don't ask, is this within the zone of interest.

Another case I would point to is the Supreme Court's

recent decision in *Lexmark*, which makes clear that whatever

else the court may have said in the past about the zone of

interest test, that it's now largely a matter of statutory

interpretation.  And so if we were proceeding under a typical

HAIACRE2ps

statute and we weren't the sort of person Congress intended to

proceed under that statute, then that question would be

relevant.  But it's not relevant here, where we're alleging a

violation of a structural provision of the Constitution.

And I want to be clear; you're right that the

President is also visiting his properties one out of every few

days in office, he's promoting his properties, and there are a

lot of folks who are going to be going to his properties

because of that, and we can't do anything about that.  That

doesn't violate the emoluments clauses, because they're not

foreign-government officials or domestic officials.  But we are

in competition with his properties for that government

business, and it unquestionably harms us.

If you look at plaintiff Jill Phaneuf, who the

government started with in their presentation today, her only

job is booking events at these hotels in Embassy Row in

Washington, D.C., that are with governments, either foreign

governments or domestic governments.  So she is unquestionably

harmed.  When the Trump International hotel hires --

THE COURT:  She is theoretically harmed.  She's not

unquestionably harmed, because you have made no allegation that

she has lost any business.

MR. GUPTA:  I want to be clear about that, because I

think that's a misstatement that the government made today,

that I think is really important to unpack.  If you look at the

HAIACRE2ps

1    competitor standing doctrine cases -- and I would especially

2    recommend the *Traffic School* case, *Adams v. Watson*, and the

3    *Canadian Lumber* case, what they explain is that you don't come

4    into court with competitor standing and have to show lost

5    sales, because of course that's often going to be very hard to

6    do, whether it's an antitrust case or an unfair competition

7    case.  Instead what you have to show is that you are a

8    competitor in the market with the defendant and that there is

9    some advantage that the defendant is getting as a result of

10   what you claim is illegal.  And under those circumstances,

11   there is a presumption that the plaintiff has been harmed.

12          THE COURT:  Well, what is the assertion that she's a

13   competitor in the market with the President?  What is that

14   fact?  What is the fact that that conclusion would be based on?

15          MR. GUPTA:  Well, we have other declaration where she

16   explains that she is in this market.

17          THE COURT:  Well, she explains what?

18          MR. GUPTA:  She explains that her job is booking

19   events for --

20          THE COURT:  Right.  That doesn't tell me she's in

21   competition with the President.

22          MR. GUPTA:  Well, with respect to the hotel and

23   restaurant plaintiffs, we have expert declarations that explain

24   in detail -- these are experts on competition in the hotel and

25   restaurant industry.  And they have explained, in detail, how

HAIACRE2ps

1    competition works in those industries and how you isolate all

2    the variables, as I was doing with those restaurants in New

3    York and the hotels in New York.  It is undeniable that these

4    businesses are in direct competition with one another.

5              THE COURT:  Well, when you say that, that's not my

6    analysis.  My analysis is, is it undeniable that the

7    President's restaurants are in competition with the plaintiff.

8              MR. GUPTA:  Yes.

9              THE COURT:  So what is it that I should extrapolate

10   from the experts that's supposed to give me a factual basis to

11   say that she is one of those in competition with the President?

12             MR. GUPTA:  Right.  Well, it's true that the expert

13   declarations don't address her business to the same degree that

14   they address the hotels and restaurants.  But --

15             THE COURT:  Well, to what extent -- just give me an

16   example of what the experts say that would be a basis on which

17   I should find that she is in direct competition with the

18   President.

19             MR. GUPTA:  Well, the experts explain that the Trump

20   businesses, the Trump International Hotel in Washington and its

21   restaurants, are seeking out government business, particularly

22   foreign government business.  You also have the allegations in

23   the complaint which show that they have hired a director of

24   diplomatic sales.  They did a briefing for embassies where they

25   sought their business.

HAIACRE2ps

1          THE COURT:  Based on a factor like that, you could ask

2     me to conclude that somebody who has a restaurant in Japan is

3     in competition with the President.

4          MR. GUPTA:  No, not at all, your Honor.

5          THE COURT:  So wouldn't that advance her argument that

6     she is a proper plaintiff because she has suffered a concrete

7     and particularized injury?

8          MR. GUPTA:  So what the experts explain is that not

9     every hotel or every restaurant in the city are competing with

10    one another, certainly not one in Japan.  Instead, competition

11    breaks down into a few factors, and they break them down.  One

12    is geographic proximity.  The other is the class of the

13    restaurant, the prices, the ratings by objective rating

14    services.

15         THE COURT:  She doesn't have a restaurant.

16         MR. GUPTA:  No.  She works for the Kimpton Hotels,

17    which are high-end hotels in Washington, D.C., that are in

18    Embassy Row.  And those hotels attract foreign government

19    business, just as José Andrés' restaurants, that are within

20    three blocks of the Trump International Hotel -- these are very

21    high-end restaurants, that have foreign government business.

22    And that is explained in the declaration.

23         THE COURT:  But if she is never -- if the President

24    doesn't have one of her former customers, she can't say that

25    she sought customer A and the President also sought customer A

HAIACRE2ps

1    and customer A went to the President.  If she just says, well,

2    you know, I do catering, so take all the experts' testimony and

3    extrapolate from that that he must be taking business from me.

4    I can't make it on that basis.

5           MR. GUPTA:  I totally agree.  There is a spectrum.

6    And we are not saying, oh, we're just kind of in the same

7    business.  Nor are we saying, for every one of these plaintiffs

8    you can point to a particular customer that the President took

9    away.  And if you read the competitor standing cases, they're

10   all about this spectrum and where you draw the line.

11          THE COURT:  So where does she fit on that spectrum?

12          MR. GUPTA:  She is a competitor of the Trump --

13          THE COURT:  Well, how?  Tell me how she is a

14   competitor.

15          MR. GUPTA:  Because she is seeking to secure events at

16   two high-end embassy hotels in Washington D.C. that have in the

17   past had foreign government business and can be expected to

18   continue to do so.  Same thing with the restaurant --

19          THE COURT:  That means, since this President, she has

20   gotten less business, or you want me to extrapolate that she

21   would have gotten more business than she was getting in the

22   past had it not been for this President?  How am I supposed to

23   make that?

24          MR. GUPTA:  If you read the cases about competitor

25   standing, and especially I would recommend *Adams v. Watson*,

HAIACRE2ps

what they say is, in any case like this, like -- take a typical

antitrust case where somebody is alleging monopoly competition,

right, you walk into court.  It's always going to be about a

counterfactual world, right, your Honor.  It's always going to

be about what would have happened had this person not had legal

monopolization, had they not been taking bribes.  Imagine that

I am a construction company and I am competing for construction

contracts with the government, and somebody else's construction

company is engaging in kickbacks or bribes.  Now, can I prove

that I would have got the contract had they not engaged in

those kickbacks?  I may not be able to prove that, certainly

not at the pleadings stage.

          THE COURT:  But otherwise you would have to

demonstrate that you are in fact in competition.

          MR. GUPTA:  Exactly.  That's what we have to do.

          THE COURT:  So I'm trying to figure out in what way I

am supposed -- if the experts say nothing about this plaintiff,

make no conclusions about this individual plaintiff, am I

supposed to take from that that everybody who is in the

restaurant or hotel business who happens to be in D.C. is a

potential plaintiff?

          MR. GUPTA:  No.  No.  I mean, for most of the

plaintiffs, the experts have specific conclusions.  I think

you're only asking about Jill Phaneuf.  But she is in some ways

the most obvious, if you're just looking at the allegations in

HAIACRE2ps

1  the complaint, the most obvious competition, because the only

2  thing that she does -- and her compensation comes as a

3  percentage of revenue -- the only thing that she does is these

4  kind of high-end embassy events at an Embassy Row hotel.

5       Now, we also have Eric Goode's hotels in New York, and

6  I already discussed the Bowery Hotel.  We have the Restaurant

7  Opportunities Center, which is an association of hundreds of

8  restaurants, including some very high-end restaurants in New

9  York City, including one I mentioned and many in D.C.

10       So if you take a look at the expert declarations,

11  which, again, are unrebutted, I think they more than show what

12  we need at the pleadings stage.

13       And government hasn't pointed to a single case from

14  anywhere in the country in which any court has tossed out a

15  case proceeding on competitor injury standing where you have

16  this kind of unrebutted evidence of direct market competition.

17       What they say in their reply brief is really an attack

18  of the competitor standing doctrine itself.  They say that we

19  don't have standing because it relies on the actions of third

20  parties, meaning buyers in the marketplace.  Well, of course

21  that's always going to be true in any competitor standing case.

22  And the only case they rely on for that proposition is actually

23  one where the alleged competitor that was being sued was doing

24  worse than the plaintiff.  So, you know, of course they don't

25  have competitor standing.

HAIACRE2ps

1              And if I can, if your Honor doesn't have any more

2      questions about competitor standing, I would like to turn to

3      the *Havens* standing, which is CREW's standing.  So CREW's

4      standing is based -- and, again, the pattern is similar here.

5      The government's arguments are really ultimately an attack on

6      the doctrine itself, on the law as it's been established both

7      in the Supreme Court and in the Second Circuit.  The Second

8      Circuit has been clear since *Havens* that there is a test for

9      how you determine whether a nonprofit organization that is

10     carrying out its established mission and has to divert

11     resources as a result of alleged legal violations, have they

12     got standing.  And the test is, is there a perceptible

13     impairment on their resources?  In some of these cases, like

14     *Nnebe v. Daus*, the Second Circuit has said, even if the

15     impairment is scant, if the organization spent some resources

16     through the course of the year because of those legal

17     violations, that's sufficient.

18              So here you have CREW.  It's an established

19     organization.  It's a nonpartisan group in Washington that is

20     headed by the top ethics lawyer from the Obama White House and

21     from the Bush White House?  And what it does is conflicts of

22     interest in government.  It would be a complete abdication of

23     CREW's established mission if, in the face of the unprecedented

24     conflicts of interest, CREW did nothing.

25              THE COURT:  Let's start with a basic proposition, a

HAIACRE2ps

1  legal proposition, and see if you agree with it.  "An

2  organization cannot manufacture an injury for the purpose of

3  standing by incurring litigation costs or simply choosing to

4  spend money fixing a problem that otherwise would not affect

5  the organization at all.  It must instead show that it would

6  have suffered some other injury if it had not diverted

7  resources to counteracting the problem."  Do you agree with

8  that proposition?

9          MR. GUPTA:  No.  That's where the government goes

10  astray.  You've isolated exactly where they go wrong.  And

11  frankly they make that up.

12          THE COURT:  They didn't make that up.  I just quoted

13  it from the Ninth Circuit.

14          MR. GUPTA:  Right.  But that's not the rule in the

15  Second Circuit.

16          THE COURT:  I understand that.

17          MR. GUPTA:  They would like that to be the law in the

18  Second Circuit.  But the Second Circuit has consistently

19  rejected that rule.

20          THE COURT:  All right.  But let me ask you this with

21  regard to the rule.  You don't meet that rule.  You don't

22  allege any injury other than the money you have to spend suing

23  the President.

24          MR. GUPTA:  Well, that's basically right.  We

25  allege -- no, no, it's not just suing the President.  It's the

HAIACRE2ps

1   research activities that we've engaged in, the communications

2   activities and legal activities that are not just this raw

3   suit.

4            THE COURT:  But you don't allege any other injury

5   that's caused by the President's action to CREW, other than the

6   fact that CREW is expending energy to fight and litigate this

7   issue with the President.

8            MR. GUPTA:  I would say it differently, but I don't

9   want to punch you too hard.

10           THE COURT:  You could say it differently, but I'm just

11  trying to figure out where you're defining the injury.  You're

12  not claiming that CREW -- in most cases, the examples that we

13  have are situations where a statute or some rule has put a

14  burden on a particular plaintiff.  And that burden is defined

15  as the injury that the plaintiff has the right to sue about.

16  You would agree that you don't have standing to sue simply

17  because you don't like what's going on.

18           MR. GUPTA:  Absolutely.

19           THE COURT:  And you can't change it into standing by

20  saying, well, it forced me to have to sue the person who was

21  doing what I didn't like.  That's not standing.

22           MR. GUPTA:  That's not our theory of standing.  Our

23  theory of standing is just like the *CREW* case itself and the

24  Second Circuit cases interpreting *CREW*.  Some of those are

25  constitutional cases like this one.  They're not just statutory

HAIACRE2ps

1    cases.  And in one of those cases, for example, you have an

2    organization, what they do, their typical activity, consistent

3    with their established mission -- this is the *Ragin* case, the

4    leading case in the Second Circuit -- is to do information

5    sessions for the community about housing discrimination, much

6    like CREW's job is to put out information about conflicts of it

7    with the government.

8              THE COURT:  Well, CREW's job hasn't been, for the 200

9    years, to put out issues about whether the President violated

10   the emoluments clause.

11             MR. GUPTA:  If you define it at that level of

12   generality, no.  But that's only because, you know, I mean, the

13   last White House, when they had an emoluments issue, they

14   sought an Office of Legal Counsel opinion.  Had that President

15   been violating the emoluments clause, CREW would have been

16   saying the same thing.

17             THE COURT:  Right.  But that's their choice.  They're

18   not forced to do that.  That is their argument --

19             MR. GUPTA:  That is their argument, yes.

20             THE COURT:  -- that you can't simply say that they

21   made a choice, that they disagree with it, so it's the

22   President's fault that they have to put resources into trying

23   to defeat him on this issue.

24             MR. GUPTA:  You have accurately characterized their

25   argument.  And let me tell you what the problem with their

HAIACRE2ps

1    argument is.  You could say the same thing about just about all

2    of the *Havens* cases.

3              THE COURT:  Well, no, that's not true.  In most of the

4    *Havens* cases you can't, if not all of the *Havens* cases, you

5    can't say the same thing, because there is a direct injury that

6    the organizations can point to that is a result of whatever

7    independent action has been taken and not as a result of their

8    simply saying, well, I want to sue them because I don't like

9    what's going on.

10             MR. GUPTA:  I don't think that's true.  If you look at

11   the *Ragin* case, for example, it's a housing organization.  It

12   put out information to the community about how to fight housing

13   discrimination.  And then this developer, that they hadn't been

14   dealing with before, started putting out ads that the

15   organization thought were racially discriminatory.  And they

16   diverted their resources to investigating that problem and

17   counteracting it.  And part of that included an effort to,

18   ultimately, to challenge those practices in court.  And the

19   Second Circuit said you have standing.

20             THE COURT:  But what the courts concentrated on was

21   not the nature of the fight with the defendant.  It was the

22   nature of the consequences of the act by the defendant that

23   they found, that the plaintiff had to respond to protect

24   people's rights, individually, because what was being done was

25   violative of those individual rights.  And the only way to

HAIACRE2ps

1    vindicate that was to expend money that they would have used

2    for another purpose.  I'm not sure what you say that CREW is

3    doing to protect whom, other than suing the President to prove

4    that he is wrong.

5              MR. GUPTA:  Oh, it's not just suing the President to

6    prove that he is wrong.  This is an organization that polices

7    conflicts of interest rules.  That's what it does.  These

8    violations came about.  And they're fulfilling their

9    established mission.

10             THE COURT:  Right.  But then this is part of their

11   established mission.

12             MR. GUPTA:  Exactly.

13             THE COURT:  It's not diverting resources.  They want

14   to play police.  If they're policemen, then they're going to --

15   you can't say, well, our role as policemen gives us the

16   standing to sue anybody that we decide, as police, we want to

17   arrest.

18             MR. GUPTA:  Yes, that's right.  But I think, if you

19   look at the Second Circuit cases, like *Ragin*, like *Nnebe*, they

20   fail the government's test.  And that proves that that's not

21   the law of the Second Circuit.  If you look at the facts of

22   those cases, you will not find some harm to those organizations

23   that preexisted the distraction of resources.  And the Second

24   Circuit doesn't identify that as something that's required.

25             THE COURT:  That's true.  But the distraction of

HAIACRE2ps

1    resources is pointed to as something else other than the

2    litigation.  And the only thing I hear you saying about how

3    CREW has been injured, in the way that they have been injured

4    by diverting their resources, is that before -- somehow there

5    is an injury separate from the litigation that amounts to some

6    extra research that they had to do to figure out whether the

7    President was violating the emoluments clause.

8         MR. GUPTA:  Let me be much clear, then, because I

9    misspoke if that's the impression that I left you with.  So,

10   for example, before the emoluments violations, CREW had put out

11   17 reports about money in politics, what they were doing.

12   Since the emoluments clause violations, they have put out two.

13   All of their research staff has had to be diverted to these

14   issues.

15        THE COURT:  Well, it didn't have to be diverted to

16   these issues.  They made a choice to divert them.  That's the

17   biggest distinction that I see in this case and the cases that

18   you've cited, is the "has to" question.

19        MR. GUPTA:  But it's not a distinction with the cases,

20   right.  In all of those cases you could have said, look, that

21   organization didn't have to deal with those racially

22   discriminatory ads, they didn't have to deal with what that

23   housing developer was doing, they made a choice, because of the

24   illegality, to do something about it.

25        THE COURT:  No.  But in each of those cases they

HAIACRE2ps

articulated a way in which they or their constituents were

being harmed other than their diverting their resources to

opine on this issue.

          MR. GUPTA:  I think it's important, if you go back to

*Havens* –– you mentioned constituents, your Honor –– if you go

back to *Havens*, the court rejected, in an alternative basis of

standing, which would have been representational standing, that

standing would have relied on the injury to members or clients

or constituents.  That wasn't the theory that the court

adopted.  The *Havens* theory that we're relying on is the

injured organization itself and its distraction of resources.

And it includes organizations, you know, in the Second

Circuit's cases, like the New York Civil Liberties Union, like

a mental health law clinic.

          THE COURT:  So any organization that is a, quote, good

government organization, why couldn't they make the same

argument and say, well, we're a plaintiff too?  Why does that

just make them a plaintiff, because they're a good government

organization and they say, well, we've got ten things that are

bad government, we're going to put out a report on nine of

them, but we don't like this one, so we won't do our nine

reports on this one, we'll do one report, and then we'll do

nine other reports on emoluments?  So why is that an injury?

          MR. GUPTA:  You could have said about the same thing

about the New York Civil Liberties Union, which has a much

HAIACRE2ps

broader mission, and in that case was helping with First

Amendment rights relating to taxicab proceedings in New York.

THE COURT:  Right.  But they were specifically taking

action that would redress or benefit taxi drivers because of

the circumstance that had been forced upon them.  That's not

this kind of situation.  It's clear that the harm is not an

individual harm that they are trying to redress on behalf of

any other representative or individual plaintiffs, who have to

respond to what the President is doing because they've been

harmed, in and of itself, by what the President is doing.

They're not taking that position.  There are others who are

taking that position.  But CREW is not taking that.  CREW is

not -- I don't know who has ever thought about the emoluments

clause before this.  Most people have not.  So I don't know

what made CREW, forced CREW, how did the President force CREW

into suffering all of this expenditure of resources simply

because they want to pick a fight with the President?

MR. GUPTA:  Right.  Well, believe it or not, CREW is

an organization that has people that are experts in these

clauses.  They have government ethics lawyers who dealt with

this as a matter of practice within the government.  So if any

organization is going to be well situated to address this

problem, it's CREW.

I think your Honor understands the arguments on CREW's

standing, and I think you understand the objections from the

HAIACRE2ps

 1    other side.  They are arguments that could be made in the

 2    Supreme Court, in a higher court, about whether to limit *Havens*

 3    standing, but as the standing doctrine has been developed in

 4    the Second Circuit, I think we fall squarely within that

 5    doctrine.

 6             And so unless you have other questions about *Havens*

 7    standing, what I would like to turn to is the argument that we

 8    heard from the government this morning, that this Court lacks

 9    the power to issue relief against the President.

10             THE COURT:  Well, the only other thing I wanted to

11    address, before you get there, or after you do that, is still

12    the question of causation.  If there's still an

13    anti-competitive effect by the President being able to appeal

14    to patrons who may want to come his restaurant and hotels

15    instead of the plaintiff, and that is going to occur, no matter

16    what, how do you trace that as an injury caused by a violation

17    of the emoluments clause, when they will have to suffer that

18    injury regardless?

19             MR. GUPTA:  I think you're asking a question about

20    causation and redressability, right?

21             THE COURT:  Yes.

22             MR. GUPTA:  And so causation, the competitor standing

23    cases explain this.  Take an example, an easy example that's

24    sort of an abstract unrealistic one.  Imagine that there are

25    only two companies in a market.  And one company is doing

HAIACRE2ps

1    something anti-competitive and illegal.  It's obvious.  Nobody

2    in their right mind would deny, you don't have to have a Ph.D.

3    in economics to know that that's going to harm the other person

4    in the market and they can sue.  So the relevant question

5    becomes what's the market and how diffuse can the market be.

6    And so you have competitor standing cases like the *Association*

7    *of Data Processing* case from the Supreme Court where it's a

8    national market, and the Supreme Court says, they're all in the

9    same market, this might harm you, good enough.  What we have

10   here is much more granular.  We've shown competition in the

11   same market.  And what these cases -- and I point to the

12   *Traffic School* case.  That was a case where you had companies

13   that ran online training programs, driving schools, and one of

14   the schools, the defendant, was claiming an affiliation with

15   the government.  Now, the plaintiffs couldn't prove that they

16   had lost, at least at the pleadings stage, couldn't prove that

17   they had lost specific sales.  But what the court said is that,

18   you know, you've shown that you're competing in the same

19   marketplace and the laws of economics are such that that is a

20   competitive harm.  And that competitive harm is an actual harm

21   you're suffering.

22        THE COURT:  But the laws of economics doesn't support

23   a conclusion that the competitive injury, as I'll call it, is

24   caused by the violation of the emoluments clause, when we know

25   that that competition, competitive injury, is going to have to

HAIACRE2ps

1    be suffered in any event, because the emoluments clause doesn't

2    decide who gets to patronize your hotel.

3            MR. GUPTA:  No.  I think the point is you have to look

4    at the relevant conduct.  And the conduct is that the

5    defendants' properties are receiving payments from foreign

6    governments -- and you don't have to speculate about this, your

7    Honor; we have allegations in the complaint that are specific

8    about this -- where if diplomats are bragging that they're

9    going to the President's hotel to curry favor with him, if you

10   were in that marketplace and your job was to try to get

11   diplomatic sales, you've lost sales because people are making

12   those payments that are prohibited by the Constitution.

13           THE COURT:  I'm not sure I can articulate it that way.

14   You've lost sales because the President of the United States is

15   in this business.  That's why you're losing sales.  Because

16   you're losing sales even if you're not violating the

17   emoluments, even if he's not violating the emoluments clause.

18   So the loss of sales is not directly attributable to the

19   emoluments clause.  The loss of sales is attributable to the

20   fact that he is now the President and people want to patronize,

21   for whatever reason, they want to patronize his facilities

22   rather than your facilities.  To trace the injury, the injury

23   would have to be more accurately characterized as an injury

24   that is suffered because he is now the President, not an injury

25   that is suffered because he's violating the emoluments clause,

HAIACRE2ps

1      because even when he's not violating the emoluments clause,

2      you're still suffering that injury.

3           MR. GUPTA:  To be perfectly precise, the relevant

4      market is the market for government business, for foreign

5      government business, for domestic government business.

6           THE COURT:  Why is that the relevant market?  Only

7      because that's the only one that fits into the emoluments

8      clause?  Why isn't the relevant market the patrons who

9      patronize the hotel?

10          MR. GUPTA:  No, because that's where the alleged legal

11     violations were.  If this was a regular commercial case and you

12     had two competitors and you were alleging the kind of kickback

13     scenario I described earlier, let's say I sell to different

14     kinds of -- I do all sorts of construction jobs, right, but the

15     relevant market between the two competitors, if you were trying

16     to determine whether there was standing, would be their

17     competition for government business, let's say in Rhode Island,

18     OK, where those kickbacks were occurring.  And you would have

19     to determine, are they relevant competitors in that

20     marketplace.  There's nothing strange or exotic about this.

21     This happens all the time in antitrust cases, unfair

22     competition cases, cases involving regulations.  And the

23     government hasn't suggested that this kind of well-established

24     standing doctrine shouldn't apply in this circumstance.

25          THE COURT:  But it's sort of like saying, well, the

HAIACRE2ps

1    bridge is out and we drove off the bridge, and everybody died.

2    You were driving a Ford, I was driving a GM car.  You want to

3    say that what caused us to drive off the bridge and to drown is

4    because you were driving a Ford.  That's not the reason that

5    you suffered that injury.  It may be consistent with that

6    happening.  But the reason you suffered the injury is because

7    the bridge was out.  Here, the reason that the plaintiff is

8    suffering injury is not because the President is violating the

9    emoluments cause, because even if he doesn't violate the

10   emoluments clause you're still suffering this -- you concede

11   that they're suffering an anti-competitive injury.  And the

12   same injury other -- I guess other than -- well, I'd have to

13   evaluate other than CREW's -- I don't know if it would apply to

14   CREW.  But if the injury is really traceable to the lack of

15   competition that is engendered by the President's owning

16   hotels, to sort of say, well, there's a bunch of hotels that he

17   has that have his name on it, so we say, it's the hotel that

18   has his name on it that's causing us injury -- no, that's not

19   what causing injury.  It could be the hotel that doesn't have

20   his name on it, it's still causing you injury.  So how do you

21   trace that injury to the emoluments clause?

22          MR. GUPTA:  I think, to give you a concrete example

23   involving this case and what we're going to prove if the case

24   moves forward -- so the Trump International Hotel in D.C. has

25   much higher rates than comparable hotels in -- much, much

HAIACRE2ps

1    higher rates than comparable hotels in D.C., and the rates have

2    gone up substantially since the election.

3              THE COURT:  For both foreign government and U.S.

4    citizens.

5              MR. GUPTA:  This is the point that I want to make.

6    The occupancy at that hotel has gone down -- not down, I mean,

7    it's just opened -- but is much, much lower than comparable

8    hotels.  So they're making a high profit, but there are not a

9    lot of people there.  And what we'll show, as the case moves

10   forward, if we withstand this motion, is that that is because

11   it is an emoluments magnet, because it is getting business from

12   governments, particularly foreign governments, and that is

13   driving their business.  And they knew this.  It's why they

14   hired a director of diplomatic sales to pitch their business to

15   embassies.

16             So it's not speculative.  We have allegations already

17   in the complaint.

18             THE COURT:  Except that will not get you all the way

19   there, because the question is not why are his profits higher.

20   The question is, how do you define that as an injury to the

21   plaintiff, that somehow it is a loss to the plaintiff.  It is

22   not evaluated by whether it's a greater profit to the

23   President.  It's evaluated by whether or not it has inflicted

24   an injury upon plaintiff.  And the injury that's been

25   inflicted, I don't even know if the allegations are such that

HAIACRE2ps

1   you say that the injury is clearly not exclusively because of

2   foreign business.  And I'm not even sure whether at this point

3   you're even in a position to allege that it is primarily --

4   because I'm not even sure you're relying on an actual loss of

5   business with regard to any of these, as you say, your experts

6   and what you want to extrapolate with regard to the

7   competition, you want that to be a logical conclusion, that

8   they're in direct competition so that should be good enough.

9   That's good enough for part of the test, but that's not good

10  enough for all of it.

11          MR. GUPTA:  Right.  It's not just a logical

12  conclusion.  We have empirical evidence.  We've shown, there's

13  unrebutted testimony that there is direct competition.  And

14  what those cases say, what the competitor standing cases say,

15  is, where you are competitors in the relevant arena and there

16  is an alleged illegal competitive benefit to the defendant,

17  even if there might be other things -- there are always going

18  to be other things going on in the market -- that's enough to

19  get your foot in the door.

20          THE COURT:  Well, but it's not other things going on

21  in the market.  It's the same thing that's going on in the

22  market.  It is that people, both foreign governments, U.S.

23  government, and nongovernment patrons are being affected in the

24  same way as you are.

25          MR. GUPTA:  That's another argument the government is

HAIACRE2ps

1   making, the idea that some people who are not governments who

2   don't have particular reasons to curry favor with the President

3   as governments, that they are going to the President's hotel

4   and that defeats the chain of causation.  That's not even

5   something they've argued in their papers.

6          THE COURT:  Well, you have argued injury.  They have

7   argued broader, that you cannot trace the injury to a violation

8   of the emoluments clause.

9          MR. GUPTA:  Right.  They have alleged that.  They have

10   argued that.  And I think, you know, what these cases show is,

11   standing is not Mount Everest, right.  We're at the pleading

12   stage.  We have done more at the pleading stage than I've seen

13   in any of these other competitor standing cases, to show that

14   there is direct relevant competition in this market for foreign

15   and domestic government business.  And as the case moves

16   forward, the quantum of evidence is going to go up.  And if

17   there's time, I would like my colleague, Mr. Sellers, to

18   explain how we intend to prove the case and show that these

19   competitive events are actually being realized by the

20   plaintiffs.

21          And so in the time I have left, let me briefly turn to

22   the argument that the government made that you lack the power

23   to issue any relief against the President.

24          Now, the government relies on this case *Mississippi v.*

25   *Johnson*.  It's a case from just after the civil war, where the

HAIACRE2ps

1    state of Mississippi was suing the President and trying to

2    restrain the President from acting as commander in chief and

3    putting Mississippi under military government.  And the Supreme

4    Court said, in a case that has since been understood as a

5    political question case, that we are not going to restrain the

6    President in the exercise of his discretion as commander in

7    chief and as executive in political functions.

8          Now, right after that case, they went back and they

9    brought another lawsuit that the Supreme Court dismissed

10   explicitly on political question doctrine grounds.  So the

11   argument they're making is that you don't have the power even

12   to declare what the law is with respect to the President or

13   issue an injunction.

14         And the problem for that is, there are actually plenty

15   of cases where courts have issued both declaratory and

16   injunctive relief against the President since *Mississippi v.*

17   *Johnson*.  You can find some of these cases in a *Law Review*

18   article cited at page 56 of our brief, the Siegel article.  I'm

19   also going to site you a case, your Honor, that we neglected to

20   site in our papers, because I think it's helpful.  It's the

21   *National Treasury Employees Union Case v. Nixon*, 492 F.2d 587.

22   And that case says, it would elevate form over substance to say

23   that there is some difference between enjoining the President

24   and enjoining, say, the Attorney General or the Secretary of

25   Defense, which, courts do that every day.

1          So there are plenty of cases in which courts are

2     issuing relief against the President.  So that shows that the

3     reading of *Mississippi v. Johnson* is wrong.  And it's basically

4     a political question case.

5          And the problem for the government is that they can't

6     invoke the political question doctrine.  And that's why they

7     haven't done so.

8          THE COURT:  Why does the political question doctrine

9     not apply to the foreign emoluments clause?  We have a

10    situation where clearly the framers of the Constitution gave

11    the initial power to determine what's an emolument and the

12    choice of whether to consent to an emolument to Congress.  And

13    if the President had gone to Congress and said, this is an

14    issue I'm concerned about, you may or may not think it's an

15    emolument, but I would like your consent, why is that a legal

16    question at this point, for the courts?  Why isn't that an

17    issue between two branches of government that doesn't lend

18    itself to a strict legal analysis?  Because, one, as you say,

19    we have no defined definition from Congress as to what they

20    think an emolument is.  And they would have to determine that,

21    whether they were satisfied with that.  And then they would

22    have to determine whether they were going to consent.  And

23    whether or not your clients were injured by that would become

24    irrelevant.  Your clients would not have a cause of action,

25    regardless of how severely they were injured, if Congress

HAIACRE2ps

1    decided that it wanted to consent.

2              MR. GUPTA:  Right.

3              THE COURT:  So how is this not an issue that should be

4    addressed by the political question doctrine?  And how is this

5    an issue, when it is not a dispute presently between Congress

6    and the President?  And clearly the Constitution is written so

7    that the Congress would make the determination whether or not

8    they were going to consent or not consent to a foreign

9    emolument.  Why is that not the most appropriate application of

10   the political question doctrine?

11             MR. GUPTA:  That would completely turn the clause on

12   its head.  The clause sets a broad prophylactic anti-corruption

13   rule, you may not accept emoluments.  And then Congress in its

14   discretion can decide to consent.  But that's a different

15   question.

16             THE COURT:  No, I can't agree with that.  That is not

17   a strict anti-corruption rule.  If it was a strict

18   anti-corruption rule, then Congress wouldn't be able to consent

19   to it.  It is an area, just like when the government argues

20   about whether or not you have to take the money or it has to be

21   a bribe or it can't be -- that's not the issue.  If that was

22   the issue, that would be a clearly justiciable issue, of

23   whether or not the President is violating the law by doing this

24   and doesn't have any ability to do it.  The President has an

25   ability to do this.  He has the ability to do this whether or

HAIACRE2ps

```
 1   not -- the Constitution doesn't say you weigh who's being hurt

 2   by it.  It doesn't say that Congress has to weigh whether or

 3   not it is anti-competitive.

 4                MR. GUPTA:  That's right.

 5                THE COURT:  It says -- it doesn't give any reason at

 6   all -- that they have to consent.

 7                MR. GUPTA:  Exactly.  Congress doesn't have to give

 8   any reason.

 9                THE COURT:  Congress can simply say, you asked if you

10   could keep this.  And we know what they intended originally.

11   It wasn't just talking about emoluments, but with regard to

12   emoluments, you know, Presidents and other government

13   officials, ambassadors, they go places and they're given gifts,

14   foreign governments.  And there is a certain protocol.  And

15   sometimes it looks bad.  Sometimes it is bad, you know.

16   Sometimes it looks bad but it's really not indicative of

17   criminal intent.  But the framers of the Constitution said, you

18   don't even have to analyze that, because we're going to say,

19   look, we know there are circumstances that you may want to say,

20   yes, the President or other government officials can keep these

21   gifts or keep this compensation, and you make the judgment

22   about that.  That's not a legal question.  That's for you to

23   decide.  If you want to consent to it -- as a matter of fact,

24   I'm not sure there's anything in the Constitution or in law

25   that would prevent Congress from consenting to the President
```

1    taking an emolument even if they concluded that it was a bribe.

2    There's nothing in the emoluments clause which says they can't

3    do that.  It says that they can consent.  And they can exercise

4    that consent the same way they can exercise any consent power

5    that the Constitution gives them with regard to judges, cabinet

6    members, declaring war, treaties.  They can exercise this

7    power.  They have the authority to exercise this power.  They

8    can make this an issue between them and the President that has

9    to be resolved by the third branch of government.  They have

10   not presently done so.  Why is it appropriate, given the

11   political question doctrine, why is it appropriate for the

12   judiciary to have the President fight this out with

13   individuals, as they say, in a street brawl, rather than

14   letting the Constitutional provision decide whether or not, as

15   they argue, whether or not they're concerned about this or not

16   concerned about this, whether they should decide whether it is

17   an emolument or isn't an emolument, whether they should decide

18   whether they want to consent to it or not consent to it?  Those

19   are not legal questions.  They have the authority to do that

20   for any reason that they want.  Why isn't that the most

21   appropriate application or applicability of what we define as

22   the political question doctrine?

23       MR. GUPTA:  So the political question doctrine, it's

24   not just an ad hoc test about, you know, does this seem

25   political.  Right.  That's a test.  And *Zivotofsky* gives us the

HAIACRE2ps

1    most recent formulation of the test.  You've got to ask, is

2    there a textually demonstrable commitment to another branch.

3    And I think what you're suggesting is, what you're asking is,

4    does the consent-of-Congress clause represent such a textually

5    demonstrable commitment.

6              THE COURT:  In most cases the answer would be yes.

7              MR. GUPTA:  No.

8              THE COURT:  In most cases the answer would be no?

9              MR. GUPTA:  Oh --

10             THE COURT:  If it gives Congress the ability to

11   consent?

12             MR. GUPTA:  Well, actually, there are other clauses in

13   the Constitution that we've cited where there is a consent-of-

14   Congress exception but there is a default rule.  Courts hold

15   those rules to be justiciable.

16             And what this would do is turn the clause on its head.

17   Rather than ban emoluments unless Congress has consented to

18   them, the clause would permit emoluments unless Congress bans

19   them.  That would flip the script.

20             The other problem here is that what you don't have is

21   a lack of judicially discoverable and manageable standards.

22             THE COURT:  But that happens all the time.  I mean, if

23   the President -- there are a number of treaties that Presidents

24   have signed that Congress has not approved, not acted upon.  It

25   may affect the enforceability of that treaty.  It may affect

HAIACRE2ps

1    the viability of that treaty.  But it doesn't mean that

2    somebody could sue the President because he signed the treaty.

3             MR. GUPTA:  No, right.  But we're not suing over

4    whether Congress has consented or Congress's failure to consent

5    and exercise its discretion in that way.  The problem here, of

6    course, is, the President hasn't told Congress what payments

7    he's accepting and asked for consent.  He can certainly do

8    that.

9             THE COURT:  If Congress had a concern about it, they

10   certainly have the power to request that information, to hold

11   hearings, to enact legislation, to pass a resolution.  They

12   have the power to act if they were concerned about acting.  I

13   can only assume that back in the early 1800s they had the same

14   conversation, that Congress can act if they want.  They are a

15   coequal branch of government.  They don't have to sit on their

16   hands if they think there's a problem.  They can do something

17   about it.  And sometimes they do, sometimes they don't.

18            The President can't declare war without the consent of

19   Congress.  We haven't declared war since World War II.  Does

20   that mean that somehow the President is violating the

21   Constitution because the military actions the Presidents have

22   taken over the last 70, 80 years, they didn't go to Congress

23   and ask Congress to approve all this?

24            MR. GUPTA:  No, of course not.  But the fact that

25   Congress has the ability to consent in its discretion and make

HAIACRE2ps

1    exceptions to a broad rule doesn't mean that the rule is one

2    that lacks judicially discoverable and manageable standards.

3              And the best place to look, maybe, for those

4    judicially manageable and discovery standards is the

5    significant body of precedent that has developed interpreting

6    this clause.  And you notice, in the government's argument,

7    they didn't once mention their own department's body of

8    precedent, the Office of Legal Counsel's precedent.  We have an

9    amicus brief from government ethics officials that shows,

10   people in the government are constantly interpreting this

11   clause, applying it.  And so there is a body of judicially

12   discoverable and manageable precedent that can be applied here.

13   And our interpretation of the clause is fully consistent with

14   that body of precedent.  The problem for the government is

15   that, given the facts of this case, they've got to run away

16   from that interpretation.

17             And I thought your hotdog-stand hypothetical kind of

18   illustrated this.  I think what that hypothetical did is

19   extracted a fairly major concession from the government that

20   this clause does indeed extend to business transactions.  And

21   we know that because it has been extended that way in opinions.

22   So, for example, there is a 1993 Office of Legal Counsel

23   opinion that I recommend the Court take a look at, where you

24   have partners in a law firm.  The partners are getting

25   distributions from the firm.  They haven't personally done any

HAIACRE2ps

services for a foreign government.  They are simply getting

profits that are coming from foreign governments.  And that was

sufficient to constitute a prohibited acceptance of an

emolument under the emoluments clause.

        We have also sent you, as a notice of supplemental

authority, a very recent example where the emoluments clause

was violated by the rental of rooms for the Consulate of Japan

in Guam.

        So there are ways to discover what this clause means,

and it is, as you said, a broad prophylactic rule.  And what

the government has done, particularly in its reply brief, is

retreat and come up with a contrived interpretation,

inconsistent with its own precedent, to try to fit the facts of

this case.  And in the motion to dismiss, they suggested that

the emoluments clause was about whether or not it's related to

office.  And we've showed you the problem with that

understanding is, it's completely inconsistent with all the

dictionary definitions, which, as you said, is much simpler.

It just means profit gain or advantage.

        And so we showed, in the opposition to the motion to

dismiss, that actually we state a claim, under the emoluments

clause, even under their interpretation.  So they tightened the

interpretation in the reply brief.  Now they say there have

also got to be personal services in exchange for the payment;

the President has to do something.  And so here's a

HAIACRE2ps

1   hypothetical that I think illustrates, like your hotdog

2   example, how extreme their position might be.  If the merchant

3   ambassador comes to the Oval Office with a check for $100,000

4   made out to The Trump Organization and says, this is for a

5   block of rooms that we have rented at the Trump International

6   Hotel.  We consider this to be a fair market exchange.  We're

7   giving this to you because you're the President and we like

8   you, and now let's sit down and discuss matters of state.  In

9   their view, that is not an emolument.  Why?  Because the

10  President isn't performing any personal services in response to

11  the check.  But presumably if he went down to the Trump

12  International Hotel and opened the doors and turned down the

13  sheets personally, he would be receiving an emolument.  That is

14  an absurd reading of the clause.

15          THE COURT:  I'm not even sure why that's necessarily a

16  relevant discussion, because even the government concedes that

17  if it was -- it wouldn't be an emolument, it would be a gift.

18  And the emoluments clause prohibits both.

19          MR. GUPTA:  It does.

20          THE COURT:  So it doesn't make it any more or less

21  prohibited.  If it's a gift or an emolument, it's prohibited.

22  Now, if you want to define it as something other than a gift or

23  an emolument, then the emoluments clause, at least the foreign

24  emoluments clause, wouldn't apply.  But I'm not sure why that

25  makes a distinction, to define it -- the argument can't be that

HAIACRE2ps

1     it's not an emolument but it's a gift.  It's got to be that

2     it's not an emolument or a gift, in order for it not to violate

3     the clause.

4                MR. GUPTA:  I think something could be both.

5                THE COURT:  It could be both.

6                MR. GUPTA:  If I bribed you through -- if I pay you

7     $50,000 for a hotdog, is that a present or is that an

8     emolument?  Does it really matter?  I think the point of the

9     clause, of any kind, whatever language, is to sweep very

10    broadly.

11               THE COURT:  I would define that as an emolument.

12    Because if you expect something for it, it is not a gift.

13               MR. GUPTA:  Right.  I think that's right.  That's the

14    common-sense understanding.  I give you a gift, I'm not

15    expecting anything in exchange for it.  I give you an

16    emolument -- but that's not a word we use -- but I give you an

17    emolument, and I'm expecting something in exchange.  That could

18    include the fair market value for a good or service.  And as

19    your hotdog example shows, the $50,000 hotdog shows, it's very

20    hard to detect the difference between a bribe embedded in a

21    commercial transaction and a totally honest commercial

22    transaction.  And that's exactly why we have this broad

23    prophylactic rule.

24               THE COURT:  Is there anything in your complaint that

25    alleges that the President is accepting an emolument for

HAIACRE2ps

1      another reason, other than he is doing a legitimate business

2      transaction?  I don't read anything in your complaint as

3      accusing the President of doing anything other than engaging in

4      a legitimate business transaction.

5              MR. GUPTA:  Well, the whole point of this rule, the

6      whole point of making it a broad prophylactic rule, is, it is

7      very difficult to prove quid pro quo.  That doesn't mean that

8      we don't think that some of these payments raise the inference

9      of quid pro quo.  For example, the Chinese trademark sequence

10     that's described in the complaint and the idea that these

11     diplomats are saying, we're bringing business there, that

12     suggests an inference, they think they're getting something for

13     it.  And the President has said -- this is at paragraph 96 of

14     the complaint -- of Saudi Arabia, "I get along great with them.

15     They buy apartments from me.  They spend 40 million, 50

16     million.  Am I supposed to dislike them?"  He says comments

17     like this about countries that patronize his businesses.  It at

18     least raises an inference that they have sought to curry favor

19     with the President and they have obtained favor from the

20     President.

21             THE COURT:  But is it your argument, as the Justice

22     Department has articulated, that you believe that the

23     President's simply engaging in a business transaction, that

24     that in and of itself is a violation of the emoluments clause?

25             MR. GUPTA:  The acceptance of profits or gain from

HAIACRE2ps

1    foreign governments without the consent of Congress is a

2    violation of the foreign emoluments clause.

3          THE COURT:  That was a long answer to a yes-or-no

4    question.

5          MR. GUPTA:  No, it would be -- the answer is --

6          THE COURT:  Is it your position that the President's

7    being simply engaged in a business transaction while he is

8    President is a violation of the emoluments clause?  Yes or no.

9          MR. GUPTA:  Yes, it certainly can be.  The government

10   just conceded that it can be.  They conceded --

11         THE COURT:  Well, not that it can be.  Is it

12   automatically a violation of the emoluments clause?

13         MR. GUPTA:  If it includes the taking of profits or

14   gains from a foreign government, yes, absolutely.  That's what

15   the clause is --

16         THE COURT:  You give me an "if."  I'm trying to get an

17   affirmative answer from you.  It's not with an "if."  Is it

18   your position that the President is prohibited from engaging in

19   any business transaction, personally, in which he sells goods

20   or services and gets paid market value for those goods or

21   services, that that is prohibited by the emoluments clause?

22         MR. GUPTA:  Yes.  So long as he is accepting them from

23   a foreign state.  Yes.  That's right.

24         And that's not just our view.  That is the view -- I

25   would recommend taking a careful look at the amicus brief by

HAIACRE2ps

1    the government ethics lawyers.  It's the consistent view of a

2    body of -- I mean, I want to make it clear.  This may be the

3    first case in court involving alleged violations of the foreign

4    emoluments clause.  But it is not the first case in which

5    careful lawyers have analyzed these clauses and say what they

6    mean.

7          And that matters a lot in Constitutional

8    interpretation.  If there's a settled interbranch understanding

9    that has developed, as we've shown in the two examples I cited,

10   the 1993 OLC opinion, that example involving the rooms rented

11   in Guam, this is not some new interpretation.  The government's

12   interpretation is a new interpretation.

13         And the problem for the government is, let's remember

14   the purpose of the clause.  How do they square their

15   interpretation with the purpose of the clause?  I think your

16   exchange with my client --

17         THE COURT:  That question is an important question for

18   both of you.  How do you square the purpose of the clause with

19   the kind of lawsuit that you want to bring?  That's a critical

20   question for both of you, because both of you are in uncharted

21   water with regard to that issue.

22         MR. GUPTA:  Right.  But when it comes to the merits,

23   when it comes to how you interpret this clause, if you look at

24   the OLC opinions, they are clear, every sing of one of them

25   virtually is clear, the purpose of this clause was to have a

HAIACRE2ps

1    broad prophylactic rule against corruption, against payments

2    from foreign governments.  And what you have from the

3    government today, what's so different from all of the Justice

4    Department's opinions about the clause, is a tortured rule that

5    has been devised for this case, because they need to develop a

6    rule that fits the facts, and suggest that there aren't any

7    alleged violations.  And the difficulty for them particularly

8    is the violations surrounding the Trump International Hotel,

9    where people are saying, we're patronizing these businesses

10   because he's the President, we want to curry favor with him.

11   Now, we don't have to prove all of that for a broad

12   prophylactic rule, right?  The rule is violated, is triggered

13   when there are payments made by foreign governments where the

14   President profits or gains.  It's a simple rule.  It doesn't

15   have a scienter requirement.  It's easy to administer.  It's

16   been administered across the federal government.  And it's

17   embodied in those Office of Legal Counsel opinions.

18          So for those reasons, we have stated a claim

19   sufficient to withstand a motion to dismiss.  You don't need

20   to, in writing an opinion denying the motion to dismiss, you

21   don't need to interpret all of the many hypotheticals that

22   could come up.  In any Constitutional provision, there are

23   going to be difficult problems that could come up another day.

24   As long as there is a sensible interpretation, consistent with

25   all of the precedent, and we have stated a claim based on that

HAIACRE2ps

1  interpretation, we should be allowed to proceed with the case.

2          And so unless you have further questions on the

3  merits, your Honor, I would like to turn it over to my

4  colleague, Mr. Sellers.

5          THE COURT:  How much time do you want to spend,

6  Mr. Sellers?

7          BACK TABLE ATTY:  Five minutes or less.

8          THE COURT:  OK.  And, Mr. Shumate, do you want to

9  respond after that or before that?

10          MR. SHUMATE:  If I could respond now, I think that

11  would be helpful.  I'll try and be quick, your Honor.

12          First I would like, your Honor, to respond to this

13  point about whether this is a political question or whether the

14  Court should excise its equitable power.  I think that's what

15  the Court should focus on.  Is this an appropriate case to

16  exercise the Court's equitable power to enjoin the President of

17  the United States?

18          They try to relegate *Mississippi v. Johnson* to an

19  historical footnote.  The Supreme Court, in *Franklin v.*

20  *Massachusetts*, reaffirmed that ruling.  It is still good law.

21  If I may, I will quote from the court's opinion.  "The District

22  Court's grant of injunctive relief against the President

23  himself is extraordinary, and should have raised judicial

24  eyebrows.  We have left open the question whether the President

25  might be subject to a judicial injunction requiring the

HAIACRE2ps

1    performance of a purely 'ministerial' duty.  We have held that

2    the President may be subject to a subpoena to provide

3    information relevant to an ongoing criminal prosecution.  But

4    in general 'this court has no jurisdiction of a bill to enjoin

5    the President in the performance of his official duties.'"  And

6    Justice Scalia concurs that an injunction, declaratory relief,

7    doesn't matter, it's not appropriate against the President.  So

8    the question the Court should ask is, is this really an

9    appropriate case, to enjoin a sitting President of the United

10   States?  We would respectfully submit that, yes, this is a

11   question that should be resolved by the political branch, not a

12   court sitting in equity.

13            If I could go to the question of competitor standing,

14   we don't dispute all the existing case law.  We don't dispute

15   *Havens*.  We don't dispute that the Second Circuit has

16   recognized competitive standing in certain cases.  But the

17   question that is central to that analysis is whether the Court

18   can infer a "certainly impending" competitive harm, loss of

19   business.  And they cannot reach that conclusion.  It is

20   entirely speculative, whether Ms. Phaneuf is going to receive

21   lost commission.

22            I think it quite telling that they rely on her as

23   their lead example of a competitor suffering harm, because she

24   clearly is not, and they ask the Court to speculate about

25   competitive harm.

HAIQCRE3

1          MR. SHUMATE:  (Continued) If I can go to the question

2     of proper interpretation of emoluments, your Honor, I think

3     it's quite extraordinary that their position is that no federal

4     officer can engage in private business.  That is their

5     position.  If they are right, other presidents, other federal

6     officers have engaged in prohibited transactions than the

7     Emoluments Clauses.  President Obama, we know he received

8     royalties from the sale of books during his presidency.  Did he

9     violate the Emoluments Clause because he likely would have

10    received royalties from the sale of the books to foreign

11    government representatives?  Did the Secretary of Commerce

12    Penny Pritzger violate the Emoluments Clause merely because she

13    held stock in the Hyatt Hotels during her time in office, and

14    very likely there were foreign government customers that stayed

15    at Hyatt Hotels during her tenure.  For all of these absurd

16    reasons, we respectfully submit that the proper interpretation

17    of the word emolument is profit arising from office or employ.

18          I just wanted to correct the record on one thing I may

19    have misspoke during my previous discussion.  I think when I

20    was talking about the absurdities from the plaintiff's

21    interpretation, I may have said no federal official could

22    receive income from Treasury bonds.  I meant, the President.  I

23    was using a hypothetical applying Domestic Emoluments Clause.

24          One final thing, on your hypothetical involving the

25    promise to take some official act, your Honor, I had some time

HAIQCRE3

1    to reflect on that.  I think you will be pleased to know that

2    you persuaded me to come around to your point of view, and the

3    reason --

4            THE COURT:  Neither pleased, nor unhappy.

5            MR. SHUMATE:  The reason, your Honor, if I may, is

6    because in that situation, the President would be taking some

7    official act.  A promise by the President would be something

8    that the President would make in his official capacity, and I

9    think that would be, in our view, an emolument if it was in

10   exchange for something else.

11           Just to be clear, for purposes of this motion, we are

12   assuming the President is subject to the Domestic Emoluments

13   Clause.  We have conceded that question, but it's not relevant

14   to the resolution of the motion to dismiss.

15           Thank you, your Honor.

16           THE COURT:  Thank you.

17           Mr. Sellers.

18           MR. SELLERS:  Your Honor, I know the hour is late.  I

19   really want to just comment on a few things that might help the

20   Court in anticipating, in the event it were to deny the motion

21   to dismiss in any respect, what would lay ahead of us.  And in

22   some respects because of the Court's inquiries about remedies,

23   I want to address the nature of the remedies we might be

24   seeking in the event we are given that opportunity.

25           Let me begin with the proposition that we would intend

HAIQCRE3

1    to undertake a brief period of discovery if we were permitted

2    to do so, after the Court were to rule, primarily focused on

3    evidence of the violations of the Emoluments Clause as to which

4    the commercial plaintiffs and CREW might have claimed that they

5    have been injured, and keeping in mind that we are seeking both

6    declaratory and potential injunctive relief, as the Court

7    observed, the declaration that this conduct is unlawful is a

8    very significant ruling that we would attach, we would regard

9    as a substantial remedy for our clients, and indeed, if the

10   Court were to so rule, we would hope that we could make some

11   arrangements with the President in which he would in fact take

12   appropriate steps to avoid the receipt of emoluments, illegal

13   emoluments in the future, and may or may not require the need

14   for injunctive relief.

15           In the event we were to seek injunctive relief, we

16   would be proceeding on a well-trod path.  This is certainly not

17   the first time that a senior executive of the federal

18   government has been called upon to have to take action to

19   eliminate conflicts, and there are approaches including the

20   segregation of profits and income from businesses.  That would

21   be one approach that could be taken to avoid receipt of

22   emoluments.

23           Another, of course, which has been used even in this

24   administration by senior executives nominated for cabinet

25   positions, is divesture.  I want to assure the Court, because I

HAIQCRE3

1    think counsel for the government suggested perhaps otherwise,

2    we in no way expect if that were to occur that this would

3    require the Court's oversight over any period of time of the

4    President's businesses.  There are ways in which, of course, as

5    long as the businesses are sufficiently opaque that we are not

6    in a position to recommend particular steps that would be taken

7    to achieve the divesture, but we would expect there are ways,

8    and indeed there are ways, in which using third parties and

9    neutrals they can oversee the sale of assets and the placement

10   of those proceeds in a truly blind trust that would eliminate

11   the risk of ongoing conflicts.

12       So I would like to just assure the Court that if we

13   were permitted to proceed, we would expect to undertake a

14   period of perhaps at most, three, four, five months of

15   discovery and ask the Court to consider a trial that might last

16   about a week sometime as soon as its schedule would permit

17   after that.

18       As the Court is aware, we have alleged not only

19   violations of the Emoluments Clause in the past, but we contend

20   that there continue to be ongoing violations of the Emoluments

21   Clause, and as a result we believe that there is a sense of

22   urgency about reaching the means by which to eliminate this

23   conflict of interest if the Court were to permit us to proceed.

24       I'm happy to answer any questions, but I wanted to

25   make sure the Court understood that.

HAIQCRE3

1          THE COURT:  Thank you, sir.

2          Thank you very much, ladies and gentlemen.  I am going

3     to try to make sure that I can get you a decision within the

4     next 30 to 60 days at the latest.  I will try to move as

5     quickly as possible.

6          This has been helpful.  I want to get the transcript

7     to review.  Thank you very much.

8          (Adjourned)