MANDATE

1:17-cv-00458-GBD

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of September, two thousand and nineteen.

Before:      John M. Walker, Jr.,
              Pierre N. Leval,
              Christopher F. Droney,
                   *Circuit Judges.*
_____

Citizens for Responsibility and Ethics in
Washington, Restaurant Opportunities Centers
United, Inc., Jill Phaneuf, Eric Goode,

            Plaintiffs- Appellants,

v.

Donald J. Trump, in his official capacity as
President of the United States of America,

            Defendant - Appellee.
_____

**JUDGMENT**

Docket No. 18-474

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/24/2020

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 08/24/2020

18-474-cv
Citizens for Responsibility and Ethics in Washington v. Trump

1:17-cv-00458-GBD

1   UNITED STATES COURT OF APPEALS
2   FOR THE SECOND CIRCUIT
3
4   August Term, 2018
5
6   (Argued: October 30, 2018     Decided: September 13, 2019)
7
8   Docket No. 18-474
9
10  _____
11
12  Citizens for Responsibility and Ethics in Washington, Restaurant
13  Opportunities Centers United, Inc., Jill Phaneuf, and Eric Goode,
14
15  *Plaintiffs-Appellants*,
16
17  v.
18
19  Donald J. Trump, in his official capacity as
20  President of the United States of America,
21
22  *Defendant-Appellee*.
23
24  _____
25
26  Before:
27
28  JOHN M. WALKER, PIERRE N. LEVAL, CHRISTOPHER F. DRONEY,
29  *Circuit Judges*.
30
31  Plaintiffs, who own and operate businesses in the hospitality industry,
32  appeal from the dismissal of their lawsuit by the United States District Court
33  for the Southern District of New York (George B. Daniels, *J*.). The district
34  court dismissed Plaintiffs' suit on the grounds that Plaintiffs lack Article III
35  standing, they fall outside the zone of interests of the Emoluments Clauses,
36  their claims do not present a ripe case or controversy within the meaning of
37  Article III, and the case presents a non-justiciable "political question."
38  VACATED AND REMANDED.
39
40  Judge WALKER dissents in a separate opinion.

1
2             DEEPAK GUPTA, Gupta Wessler PLLC,
3             Washington, D.C. (Jonathan E. Taylor,
4             Joshua Matz, and Daniel Townsend,
5             Gupta Wessler PLLC, Washington, D.C.;
6             Joseph M. Sellers, Daniel A. Small,
7             Cohen Milstein Sellers & Toll PLLC,
8             Washington, D.C.; Norman L. Eisen,
9             Stuart C. McPhail, Adam J. Rappaport,
10            Citizens for Responsibility and Ethics in
11            Washington, Washington, D.C.;
12            Laurence H. Tribe, Harvard Law School,
13            Cambridge, MA, on the brief), *for*
14            *Plaintiffs-Appellants*.
15
16            HASHIM M. MOOPPAN, Department
17            of Justice, Washington, D.C., (Chad A.
18            Readler, Michael S. Raab, Megan
19            Barbero, Department of Justice,
20            Washington, D.C., on the brief), *for*
21            *Defendant-Appellee*.
22

23   LEVAL, Circuit Judge:

24         Plaintiffs—Eric Goode, a restaurateur and hotelier, and Restaurant

25   Opportunities Center United ("ROC"), a non-partisan, member-based

26   organization of restaurants and restaurant workers—appeal from the

27   judgment of the United States District Court for the Southern District of New

28   York (Daniels, J.) dismissing their complaint against Defendant Donald J.

29   Trump, the President of the United States, for lack of subject matter

1    jurisdiction. The complaint seeks declaratory and injunctive relief for the

2    President's alleged violations of the Domestic and Foreign Emoluments

3    Clauses of the United States Constitution. The President moved to dismiss for

4    lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure

5    12(b)(1), arguing that Plaintiffs did not have standing to sue. The district court

6    granted the motion, concluding that Plaintiffs lack Article III standing, they

7    fall outside the zone of interests of the Emoluments Clauses, their claims do

8    not present a ripe case or controversy within the meaning of Article III, and

9    their suit is barred by the political question doctrine. For the reasons below,

10   we vacate the judgment and remand for further proceedings.

11                            A. BACKGROUND

12          Plaintiffs are in the hospitality industry.[1] Plaintiff Goode owns high-

13   end hotels, restaurants, and event spaces in the New York City area. Plaintiff

14   ROC counts among its members over 200 establishments, including high-end

_____

[1] In proceedings before the district court, plaintiffs included Jill Phaneuf, who worked in the
hospitality industry, and Citizens for Responsibility and Ethics in Washington (CREW), a
non-profit government watchdog. In Plaintiffs' appellate briefing, CREW notified the court
it is "no longer appealing the district court's judgment" that CREW lacks standing.
Additionally, Phaneuf left the job wherein she allegedly competed with Defendant's
businesses for diplomatic clientele, and Plaintiffs acknowledge that she "no longer has
Article III standing to pursue her claims, which sought only prospective relief."

3

1    restaurants and event spaces in New York City and Washington, D.C. The

2    Plaintiff establishments cater to foreign and domestic government clientele,

3    and allege that they are direct competitors of hospitality properties owned by

4    the President in Washington D.C. and New York City.

5          The complaint alleges that President Trump, operating through

6    corporations, limited-liability companies, limited partnerships, and other

7    business structures, is effectively the sole owner of restaurants, hotels, and

8    event spaces, which are patronized by foreign and domestic government

9    clientele. The President has announced that, since assuming office, he has

10    turned over day-to-day management of his business empire to his children

11    and established a trust to hold his business assets.[2] However, he maintains

12    sole ownership, receives business updates at least quarterly,[3] and has the

13    ability to obtain distributions from the trust at any time.[4] The facts alleged by

14    Plaintiffs, together with those acknowledged by the President, support the

---

[2] *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8.

[3] Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (March 24, 2017), http://for.tn/2n2MRXa.

[4] Derek Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (April 4, 2017, 5:53 PM), http://bit.ly/2o1OM1C.

4

1    inference that the revenues of the Trump establishments are substantially (or

2    are convertible into) personal revenues of the President.

3         i.    Plaintiffs' Allegations

4         Stated generally, Plaintiffs allege that they have been and will be

5    injured because foreign and domestic government entities that patronize

6    Washington, D.C. and New York hotels, restaurants, and event spaces

7    patronize Trump establishments (in preference to Plaintiffs' establishments)

8    in the hope of enriching the President and earning a reward from him

9    through official Presidential action favorable to their governments, and that

10   such enrichment of the President by foreign and domestic government

11   entities violates the Foreign and Domestic Emoluments Clauses. There are

12   three principal categories of allegations.

13        First, Plaintiffs allege that they directly compete with the President's

14   establishments for foreign, state, and federal government clientele.  Second

15   Amended Complaint (the "Complaint") ¶¶ 13-20. Plaintiffs support this

16   allegation with extensive declarations from hospitality industry experts.[5]

---

[5] Where, as here, a defendant makes a "fact-based" 12(b)(1) motion to dismiss by "proffering
evidence beyond the Pleading," the plaintiff may "need to come forward with evidence of

 1    Rachel Roginsky, a hospitality consultant and professor at the Boston

 2    University School of Hospitality Administration, asserts that certain of

 3    Goode's hotels and one ROC member's hotel-restaurant are "[p]rimary

 4    competitors" with Trump SoHo and Trump International New York because

 5    they "market to and attract customers from essentially the same pool" given

 6    their "similar . . . location, facilities, services, amenities, class, image, and

 7    price." Roginsky Decl. ¶¶ 14-17. Dr. Christopher Muller, former Dean of the

 8    Boston University School of Hospitality Administration, identifies numerous

 9    of Plaintiffs' restaurants in the New York and Washington, D.C. areas that he

10    asserts are "comparable" to various Trump establishments because they are

11    within the same market "segment" and therefore directly compete with one

12    another. Muller Decl. ¶¶ 24-29, 50-56, 67-75. Collectively, the two declarations

13    identify more than a dozen of Plaintiffs' establishments, which, according to

14    Roginsky and Muller, compete directly with roughly half a dozen Trump

---

[its] own to controvert that presented by defendant[.]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (*citing Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). The President's motion to dismiss challenged not only the facial sufficiency of the complaint, but also the factual assertion that Plaintiffs' restaurants directly compete with Trump establishments. Thus, we consider not only the allegations in the complaint but also the expert affidavits submitted in response to Defendant's fact-based motion to dismiss.

1    establishments over the same customer base, including foreign and domestic

2    government customers. Owners of these establishments also submitted

3    declarations attesting that their restaurants and hotels are frequented by

4    foreign, state, and federal officials and that they compete directly with Trump

5    establishments over this customer base. Goode Decl. ¶¶ 4, 23-24, 34, 36, 47-50;

6    Colicchio Decl. ¶¶ 13-14, 20-21, 28-29. Plaintiffs' declarations include evidence

7    of loss of government patronage from Plaintiffs' establishments after the

8    presidential election. ROC alleges that its restaurant and restaurant-employee

9    members have suffered injury due to "lost business, wages, and tips."

10   Complaint ¶ 13. Specifically, James Mallios, managing partner at ROC-

11   member restaurant Amali, testifies that Amali regularly hosts dinners and

12   events for government officials, including foreign leaders, Mallios Decl. ¶¶ 9,

13   20, 24-27, and that its tax-exempt sales declined after November 2016,

14   reflecting a decline in government business. *Id.* ¶ 28.

15      Second, the Complaint cites statements by the President implicitly

16   soliciting the patronage of government officials and apparently

17   acknowledging that, in making governmental decisions, he favors

18   governments that patronize his businesses. *See, e.g.*, Complaint ¶ 96 ("Trump

7

1   said [of the Saudis, in the context of discussing trade negotiations], '. . . They

2   spend $40 million, $50 million. Am I supposed to dislike them? I like them

3   very much.'"); *id.* ¶ 52 (responding to a question about the U.S.'s dispute with

4   China over the South China Sea, "I do deals with [China] all the time.

5   [China's largest bank] is a tenant of mine . . ."). The Complaint alleges that

6   Trump businesses began investing in attracting foreign government business

7   after the election, *id.* ¶¶ 60-63, and further that these efforts have succeeded in

8   attracting post-election patronage from foreign governments. *Id.* ¶¶ 64–87.

9         Third, Plaintiffs allege that foreign governments have taken note of,

10  and been influenced by, the message that enriching the President by giving

11  patronage to his establishments earns his favor. Plaintiffs point to statements

12  by foreign government officials quoted in newspaper articles, including one

13  "Middle Eastern diplomat" who said, "Believe me, all the delegations will go

14  [to Trump establishments]." *Id.* ¶ 62 (*quoting* Jonathan O'Connell & Mary

15  Jordan, *For foreign diplomats, Trump hotel is place to be*, WASH. POST (Nov. 18,

16  2016), http://wapo.st/2oPYggX). Another diplomat reportedly stated, "Why

17  wouldn't I stay at his hotel blocks from the White House[?] . . . Isn't it rude to

18  come to his city and say, 'I am staying at your competitor?'" *Id.* Plaintiffs also

8

1   allege that foreign government official patronage of Trump establishments

2   has increased since the President was elected. *Id.* ¶¶ 56, 60, 64, 68, 72, 79, 82.

3   In particular, Plaintiffs point to one instance in which, shortly after the

4   election, a foreign government switched the venue of an event from a

5   competitor to a Trump establishment. *Id.* ¶ 74.

6          The Complaint asserts that the President's receipt of the revenues he

7   derives from the patronage of foreign and domestic government entities

8   violates the Foreign and Domestic Emoluments Clauses. *Id.* ¶ 1. The Foreign

9   Emoluments Clause provides: "[N]o Person holding any Office of Profit or

10  Trust under [the United States], shall, without the Consent of the Congress,

11  accept of any present, Emolument, Office, or Title, of any kind whatever, from

12  any King, Prince, or foreign State." U.S. Const., Art. I, § 9, Cl. 8. Congress has

13  not consented to Defendant's receipt of the emoluments at issue here.

14  Complaint ¶ 2.  The Domestic Emoluments Clause provides: "The President

15  shall, at stated Times, receive for his Services, a Compensation, which shall

16  neither be increased nor diminished during the Period for which he shall

17  have been elected, and he shall not receive within that Period any other

9

1  Emolument from the United States, or any of them." U.S. Const., Art. II, § 1,

2  Cl. 7.

3     The Complaint seeks both declaratory and injunctive relief. It seeks a

4  declaration, *inter alia*, that, in these circumstances, the patronage of foreign

5  and domestic government entities of the President's establishments violates

6  the Foreign and Domestic Emoluments Clauses. Complaint ¶ 20. As to

7  injunctive relief, the Complaint asks the court to "enjoin[] Defendant from

8  violating both Emoluments Clauses" and to "requir[e] Defendant to release

9  financial records sufficient to confirm that Defendant is not engaging in any

10  further transactions that would violate either Emoluments Clause." *Id*.

11     ii.    Defendant's Motion to Dismiss

12     The President moved to dismiss the Complaint, arguing that Plaintiffs

13  lacked Article III standing and fell outside the zone of interests of the

14  Emoluments Clauses. As to standing, the President argued that Plaintiffs'

15  "allegations of future injuries are premised upon a speculative chain of

16  possibilities, including the decisions of third parties [i.e., prospective

17  government customers] not before the Court." Defendant's Memorandum of

18  Law in Support of the Motion to Dismiss, at 18-19. With respect to the specific

1   evidence of lost government patronage, the President argued that the

2   declarations do not "show that the decline was attributable to" government

3   customers choosing Trump establishments, because the decline could have a

4   different cause. Reply Memorandum of Law in Support of the Motion to

5   Dismiss, at 6. The President did not contest the substance of Plaintiffs' expert

6   testimony that certain of Plaintiffs' establishments compete directly with

7   Trump establishments. As to the zone of interests, President Trump argued

8   that because the Clauses were "intended to guard against the corruption of

9   and foreign influence on federal officials and to ensure the independence of

10  the President," Plaintiffs' alleged injuries "bear no relation to the [Clauses']

11  core concerns," and thus Plaintiffs' claims should be dismissed. Defendant's

12  Memorandum of Law in Support of the Motion to Dismiss, at 25-26.

13      iii.    <u>District Court Decision</u>

14      The district court granted the President's motion to dismiss for lack of

15  jurisdiction under Rule 12(b)(1). While recognizing that Plaintiffs' allegations,

16  supported by expert declarations, satisfied the injury prong of the Article III

17  standing inquiry, the district court found "Plaintiffs have failed to properly

18  allege that Defendant's actions *caused* Plaintiffs competitive injury and that

11

1  such an injury is *redressable* by this Court." *CREW et al. v. Trump*, 276 F. Supp.

2  3d 174, 185 (S.D.N.Y. 2017) (emphasis in original). The district court called it

3  "wholly speculative" whether any lost business was "fairly traceable to

4  Defendant's 'incentives' or instead results from government officials'

5  independent desire to patronize Defendant's businesses." *Id.* at 186.

6  Hypothesizing alternative explanations for Plaintiffs' injury, the district court

7  opined that "interest in [Trump] properties" could have "generally increased

8  since he became President" or Plaintiffs may "face a tougher competitive

9  market overall." *Id.* Given that Plaintiffs failed to rule out these alternative

10  explanations for their injury at the pleading stage, the district court concluded

11  the "connection between [] Plaintiffs' alleged injury and Defendant's actions

12  is too tenuous to satisfy Article III's causation requirement." *Id.* For the same

13  reasons, the district court found the injury was not likely to be redressed by

14  any relief the district court could offer. *Id.*

15      The district court also found that Plaintiffs lacked "prudential"

16  standing. Reasoning that standing to sue under the Emoluments Clauses is

17  limited to those parties the Clauses were meant to protect, the district court

18  found that Plaintiffs fell outside the "zone of interests" of the Clauses. *Id.* at

12

1    187–88. The district court reasoned that "[n]othing in the text or the history of

2    the Emoluments Clauses suggests that the Framers intended these provisions

3    to protect anyone from competition." *Id.* at 187. Rather, the district court

4    found, the Emoluments Clauses are meant to prevent corruption and foreign

5    influence, and ensure the President's independence. *Id.* at 188. Contrasting

6    this suit with one brought under the "generous review provisions of the

7    [Administrative Procedure Act]," the district court stated that the zone of

8    interests test "is *more* strictly applied when a plaintiff is proceeding under a

9    constitutional . . . provision." *Id.* at 187 (emphasis in original) (*quoting*

10   *Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting)).[6] Because

11   Plaintiffs are not vindicating an interest in uncorrupted, independent

12   government, the district court reasoned, they do not have standing to sue

13   under the Emoluments Clauses.

14          The district court also found that the suit must be dismissed on two

15   additional grounds, neither of which was raised by the Defendant's motion.

16   These were that the case presents a non-justiciable political question and that

---

[6] The district court appeared to mistakenly rely on Justice Scalia's dissent in *Wyoming* as if it were a statement by the majority about the proper application of the zone of interests test. *See infra* n.13.

1    it is not ripe for adjudication. *Id*. at 193–95. Neither of these grounds is

2    defended by the President on this appeal.

3    B.  DISCUSSION

4    A suit brought in federal court is "properly dismissed for lack of

5    subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

6    the statutory or constitutional power to adjudicate it." *Makarova v. United*

7    *States*, 201 F.3d 110, 113 (2d Cir. 2000). To the extent that a district court's

8    dismissal for lack of subject matter jurisdiction was based on the application

9    of a rule of law,[7] an appellate court construes the allegations of the complaint

10   in the light most favorable to Plaintiffs and reviews the district court's ruling

11   *de novo*, meaning that our inquiry focuses on whether the rules of law were

12   correctly applied. We conclude that the district court did not apply the law

13   correctly in finding that it lacked jurisdiction to decide the case.

-----

[7] In some instances, a district court's dismissal for lack of subject matter jurisdiction under
Rule 12(b)(1) is based in part on factual findings. When such a dismissal is appealed, we
review the relevant factual findings for clear error. *See Rent Stabilization Ass'n of City of New
York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993).  In this case, although the parties presented
disputed factual issues to the district court by evidentiary submissions, the court did not
purport to resolve disputed issues of fact or make factual findings. Its rulings were based
only on the application of rules of law.  Accordingly, our review is *de novo*. *Id*. ("If the trial
court dismissed on the basis of the complaint alone or the complaint supplemented by
undisputed facts evidenced in the record, our standard is *de novo* review[.]").

i.    Article III Standing

1

2    Plaintiffs contend that the district court interpreted the law incorrectly

3    in concluding that they lack standing to bring this action under Article III of

4    the Constitution. There are three prongs to the standing inquiry under Article

5    III. In order to successfully allege standing to bring a suit in federal court, a

6    complaint must plausibly allege the following: *first*, that the plaintiff has

7    suffered an "injury in fact," which the Supreme Court defines as "an invasion

8    of a legally protected interest which is (a) concrete and particularized; and (b)

9    actual or imminent, not [merely] conjectural or hypothetical," *Lujan v.*

10    *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation

11    marks omitted); *second*, that there is a "causal connection between the injury

12    and the conduct complained of," which requires the injury to be "fairly

13    traceable to the challenged action of the defendant, and not the result of the

14    independent action of some third party not before the court;" *id.* (internal

15    quotation marks and alterations omitted); and *third*, that it is "likely, as

16    opposed to merely speculative, that the injury will be redressed by a

17    favorable decision." *Id.* (internal quotation marks omitted). These three

18    components of the Article III "case or controversy" requirement are designed

15

1    to ensure that the "plaintiff has alleged such a personal stake in the outcome

2    of the controversy as to warrant his invocation of federal court jurisdiction

3    and to justify [the] exercise of the court's remedial powers on his behalf."

4    *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1974) (internal

5    quotation marks omitted).

6        We find that Plaintiffs satisfy all three prongs of Article III standing for

7    the reasons set forth below.

8           *a.    Injury*

9        The requirement that Plaintiffs adequately allege an *injury in fact*

10    "serves to distinguish a person with a direct stake in the outcome of a

11    litigation—even though small—from a person with a mere interest in the

12    problem." *United States v. Students Challenging Regulatory Agency Procedures*

13    *(SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (*citing, inter alia,* Kenneth C. Davis,

14    *Standing: Taxpayers and Others*, 35 U. CHI. L. REV. 601, 613 (1968) ("[A]n

15    identifiable trifle is enough for standing to fight out a question of

16    principle.")). Because this appeal arises at the pleading stage, "general factual

17    allegations of injury resulting from the defendant's conduct may suffice, for

18    on a motion to dismiss we presume that general allegations embrace those

1   specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561

2   (internal quotation marks omitted).

3        Plaintiffs' alleged injury meets the well-established Article III threshold

4   for economic competitors who allege that, because of unlawful conduct, their

5   rivals enjoy a competitive advantage in the marketplace. To make an

6   adequate allegation of a competitive injury, plaintiffs must plausibly allege (1)

7   that an illegal act bestows upon their competitors "some competitive

8   advantage," *Fulani v. League of Women Voters Edu. Fund*, 882 F.2d 621, 626 (2d

9   Cir. 1989); and (2) "that [they] personally compete[] in the same arena" as the

10  unlawfully benefited competitor. *In re United States Catholic Conference*, 885

11  F.2d 1020, 1029 (2d Cir. 1989). For standing purposes, it is not necessary to

12  identify specific customers who switched to Plaintiffs' competitors; rather,

13  competitor standing "relies on economic logic to conclude that a plaintiff will

14  likely suffer an injury-in-fact when the [defendant] acts in a way that

15  increases competition or aids the plaintiff's competitors." *Canadian Lumber*

16  *Trade Alliance v. United States,* 517 F.3d 1319, 1332 (Fed. Cir. 2008); *see also*

17  *Cooper* v. *Tex. Alcoholic Beverage Comm'n,* 820 F.3d 730, 738 (5th Cir. 2016) ("It

18  is a basic law of economics that increased competition leads to actual

17

1  economic injury.'') (internal quotation marks omitted); *Sherley v. Sebelius*, 610

2  F.3d 69, 72 (D.C. Cir. 2010) ("[I]ncreased competition almost surely injures a

3  seller in one form or another[.]"); *Kerm Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir.

4  2004) ("A party seeking to establish standing on this basis must demonstrate

5  that it is a direct and current competitor whose bottom line *may be adversely*

6  *affected* by the challenged [] action.") (emphasis added) (internal quotation

7  marks omitted).

8         The Complaint sufficiently alleges that Plaintiffs compete directly with

9  Trump establishments and that the President's allegedly illegal acts favor

10  Plaintiffs' competitors. Specifically, it alleges that Plaintiffs' establishments

11  are harmed in their competition with Trump establishments because, despite

12  being comparable in other relevant respects, the President's establishments

13  offer government patrons something that Plaintiffs cannot: the opportunity,

14  by enriching the President, to obtain favorable governmental treatment from

15  the President and the Executive branch. It alleges that the marketplace is thus

16  skewed in favor of Trump businesses because of his unlawful receipt of

17  payments from government patrons. The Complaint, supported by expert

18  declarations, alleges that this unlawful market skew has caused Plaintiffs

1   economic harm in the form of lost patronage from government entities, and

2   that such harm will continue in the future. For competitor standing, that is

3   sufficient.

4          The President argues that Plaintiffs rely on a "boundless theory of

5   standing" that the Supreme Court has rejected because it would find the

6   Article III injury prong satisfied "*whenever* a competitor benefits from

7   something allegedly unlawful . . . ." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99

8   (2013). He argues that Plaintiffs' theory of injury is over-broad because it

9   would "apply the presumption [of harm to competitors] *whenever* a party acts

10  illegally and thereby distorts competition or the defendant's unlawful

11  conduct confers a benefit on a plaintiff's competitor." Appellee's Br. at 31

12  (emphasis in original) (citing *Already*, 568 U.S. at 99). The Defendant,

13  however, both mischaracterizes Plaintiffs' argument and misses the mark in

14  analogizing the theory of injury in this case to the one the Supreme Court

15  rejected in *Already*.

16         Plaintiffs do not argue that they are injured merely because a

17  competitor benefits; rather, Plaintiffs allege that in competing over the *exact*

18  *same customer base*, Trump establishments secure an unlawful advantage

19

1    because giving patronage to Trump establishments offers, in addition to

2    comparable services, the potential, by enriching the President, of securing his

3    favor in governmental decisions. This unlawful market skew directly affects

4    Plaintiffs' revenue and profits: Every dollar of government patronage drawn

5    to Trump establishments by the hope of currying favor with the President is a

6    lost dollar of revenue that might otherwise have gone to Plaintiffs.

7           These facts have little in common with *Already*. In *Already*, the Supreme

8    Court considered whether Already, LLC could challenge the validity of

9    Nike's "Air Force 1" trademark despite the fact that Nike had issued a

10   covenant that it would refrain from making any claims against Already based

11   on the Air Force 1 trademark, and despite the fact that Already did not plan

12   to sell any product that "would arguably infringe Nike's trademark yet fall

13   outside the scope of the covenant." 568 U.S. at 95. The Court clarified that it

14   was insufficient for standing purposes for Already to claim that any gain to

15   Nike was Already's loss; rather, Already had to show "an injury more

16   particularized and more concrete than the mere assertion that something

17   unlawful benefited [its] competitor." *Id.* Because Already did not face any

18   liability for past conduct arguably infringing the Air Force 1 trademark, and

20

1   because Already had not plausibly alleged any other way in which the

2   trademark's continued validity injured Already, Already lacked an Article III

3   injury.  Here, by contrast, the nature of the injury from the allegedly unlawful

4   conduct is clear and concrete: The Complaint plainly asserts that the Plaintiff

5   establishments are losing, and will continue to lose, business from

6   government patrons based on the patrons' belief that they can obtain official

7   Presidential favor by spending their money in a manner that enriches the

8   President.

9          We conclude that Plaintiffs have satisfied the Article III requirement of

10  alleging an injury in fact.

11              *b.    Causation*

12         Plaintiffs also adequately allege that their injury is fairly *traceable* to the

13  challenged conduct of the Defendant. To satisfy the "traceability" or

14  "causation" prong of the Article III standing test, allegations must provide

15  more than "unadorned speculation" to "connect their injury to the challenged

16  actions." *Simon*, 426 U.S. at 44–45. This, however, does not require ruling out

17  all possible alternative explanations of a plaintiff's injury. The allegations of

18  fact must plausibly support a "substantial likelihood" that the plaintiff's

1   injury was the consequence of the defendant's allegedly unlawful actions

2   (and that prospective relief could mitigate the harm). *Id.* at 45.

3          The district court demanded too much at the pleading stage by

4   requiring allegations that dispel alternative possible explanations for

5   Plaintiffs' injury. The district court identified various alternative theories that

6   *could* explain a decline in Plaintiffs' business: a "general[] increase[]" of

7   "interest in [Trump] properties . . . since he became President," *CREW*, 276 F.

8   Supp. 3d at 186; the possibility that Trump establishments provide better

9   "service, quality, location, price and other factors related to individual

10  preference," *id.*; or "an increase in competition in their respective markets for

11  business from all types of customers[.]" *Id.* The district court found Plaintiffs'

12  pleadings inadequate because they failed to dispel these alternative

13  explanations. In so doing, the district court effectively required plaintiffs to

14  prove, pre-discovery, the facts necessary to win at trial. This was error. *See*

15  *Lujan*, 504 U.S. at 561 (explaining that less is required to support standing at

16  the pleading stage compared to "successive stages of the litigation," when the

17  burden increases). Under the standard applied by the district court, it would

18  be virtually impossible to plead a competitive injury, because a defendant

1    would defeat standing merely by pointing to the possibility that customers'

2    preference for defendant's products or services was attributable to something

3    other than the defendant's illegal conduct.[8]

4         Our precedents, and those of the Supreme Court, make clear that

5    Plaintiffs' allegations are sufficient to plausibly assert a substantial likelihood

6    that their injury is the consequence of the challenged conduct. In *Fulani*, we

7    upheld the standing of a fringe, third-party presidential candidate to

8    challenge the continued grant of tax exemption by the IRS to the League of

9    Women Voters on the ground that the League had engaged in impermissible

10    partisan activities by limiting participation in its televised presidential

11    debates to members of the Republican and Democratic parties. 882 F.2d at

---

[8] We also note that there is no logic to the district court's proposition that, because *some* government patrons might be drawn to Trump establishments by curiosity, this means that *none* of them patronize his establishments in the hope of currying the President's favor by enriching him. In the course of a year, there are thousands of instances in which government representatives patronize hotels and restaurants in New York and Washington. Undoubtedly there are many factors that will influence their selections. The likelihood that some choices of government representatives will be influenced by other factors such as general curiosity in no way undermines Plaintiffs' altogether plausible allegation of a substantial likelihood that, in some significant number of instances, government officials will choose Trump hotels and restaurants in the hope that spending their dollars at Trump establishments will influence the President in their favor in governmental decisions.

23

1    625. The League's criteria for inclusion required, in addition to membership in

2    one of the two major parties, that a candidate be "significant." *Id.* at 625–26.

3           Fulani alleged that she was a "significant" candidate, who would have

4    been included if not for the requirement of membership in either the

5    Republican or Democratic party. *Id.* at 626. In assessing her Article III

6    standing, this court did not probe her allegation that she was a significant

7    candidate despite its dubious merit. We ruled that she had established Article

8    III standing, notwithstanding the obvious improbability that she would make

9    it into the debates as a "significant" candidate. *Id.* ("For purposes of

10   determining Fulani's standing to challenge whether the League's use of [the

11   party membership] requirement was inconsistent with its section 501(c)(3)

12   status, we accept Fulani's contention that she was a 'significant' candidate in

13   this election . . . ."). To satisfy Article III standing, it was sufficient that she

14   had plausibly alleged that she would have qualified. *See also Schulz v.*

15   *Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (finding that a would-be intervenor had

16   Article III standing to prosecute the appeal, where "[t]he district court's

17   decision *could have* caused [an] injury [to the intervenor], and [the] appeal

1    *could have* afforded relief that would have redressed that injury") (emphasis

2    added).

3          The Supreme Court has repeatedly upheld the standing of a plaintiff-

4    competitor who alleges a competitive injury caused by a defendant's

5    unlawful conduct that skewed the market in another competitor's favor,

6    notwithstanding other possible, or even likely, causes for the benefit going to

7    the plaintiff's competition. The Supreme Court has explained that when,

8    among competitors, an allegedly illegal "barrier [] makes it more difficult for

9    members of one group to obtain a benefit than it is for members of another

10   group, a member of the former group seeking to challenge the barrier *need not*

11   *allege that he would have obtained the benefit but for the barrier in order to establish*

12   *standing.*" *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City*

13   *of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (emphasis added); *see also id.*

14   (explaining that an economic competitor meets the standing requirement by

15   plausibly alleging "the inability to compete on an equal footing" without

16   needing to allege the loss of any identifiable piece of business); *Regents of*

17   *Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (upholding standing, based

18   on loss of chance to compete equally, of white male applicant to program that

25

1   reserved 16 of 100 spots for minority applicants); *Schulz*, 44 F.3d at 53 (finding

2   that "under the well-established concept of competitors' standing," "the loss

3   of opportunity to compete equally" is sufficient to establish standing)

4   (internal citation and quotation marks omitted).

5          Plaintiffs satisfied this standard. The complaint adequately pleads a

6   competitive injury of lost patronage directly traceable to the fact that the

7   President's allegedly illegal conduct induces government patrons of the

8   hospitality industry in Washington, D.C. and New York City to patronize

9   Trump establishments in preference to Plaintiffs' establishments.

10         The district court found, and President Trump argues on appeal, that

11  this case is analogous to *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26,

12  38 (1974). *See CREW*, 276 F. Supp. 3d at 185–86 ("The Court [in *Simon*] held

13  that [the] alleged injury lacked traceability and redressability because of

14  intervening causal factors . . . . [A]s in *Simon*, it is wholly speculative whether

15  the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's

16  'incentives[.]'"). In *Simon*, indigent persons and their organizational

17  representatives challenged an IRS revenue ruling that extended favorable tax

18  treatment to non-profit hospitals that offered only emergency room services

1    to indigents, rather than offering services to indigents to the extent of the

2    hospital's financial ability, alleging that "by extending tax benefits to such

3    hospitals despite their refusals fully to serve the indigent, the defendants

4    were 'encouraging' the hospitals to deny services." *Simon*, 426 U.S. at 33. This

5    case is not analogous to *Simon*.

6         In *Simon*, the Court questioned whether the modification of the relevant

7    tax rule actually influenced hospital policymaking regarding the scope of

8    services provided to indigent patients, and therefore held that the plaintiffs

9    had failed to establish a causal connection between the challenged IRS Ruling

10   and the denials of service. Central to the Court's analysis was its skepticism

11   that the previous IRS rule (or its modification) had a material, non-speculative

12   effect on any given hospital's decision to offer non-emergency services to

13   indigents, particularly when the "undetermined financial drain" arising from

14   the costs of supplying such services may have outweighed the benefits of

15   favorable tax treatment. *Id.* at 43. It was therefore "just as plausible that the

16   hospitals to which respondents may apply for service would elect to forgo

17   favorable tax treatment to avoid" the costs of providing those services. *Id.* In

18   view of the countervailing cost consideration which potentially offset the

27

1    effects of the tax rules, and the plaintiff's failure to "establish . . . that [the]

2    hospitals are [categorically] dependent upon [charitable] contributions," the

3    Court reasoned that the causal link between the IRS ruling and the hospitals'

4    decisions to deny services to the plaintiffs was little more than "unadorned

5    speculation." *Id.* at 43–44. Accordingly, the Court held that the plaintiffs had

6    failed to establish that reinstatement of the previous rule would result in the

7    change in hospital policy that would cure the plaintiffs' injury. *Id.* at 45–46.

8         Here, by contrast, the Complaint, supported by expert declarations,

9    alleges that Plaintiffs' establishments offer services comparable to those

10   offered at Trump establishments in every relevant respect, save one: Plaintiffs

11   cannot offer government patrons the opportunity to obtain favorable

12   treatment from the President and the Executive branch in governmental

13   decisions. It is eminently plausible that if two establishments provide

14   otherwise comparable services, but one establishment offers an inducement

15   that the other cannot offer, then the inducement will attract at least some

16   patronage that might otherwise have gone to the other establishment. The

17   Complaint contains numerous factual allegations sufficient to support the

18   conclusion that the President's receipt (and invitation) of allegedly illegal

1  emoluments actually influences at least some government customers'

2  purchasing decisions. And unlike in *Simon*, there is no reason to believe that

3  the competitive skew caused by those patrons' desire to gain influence by

4  patronizing the Trump establishments is offset or annulled by some

5  countervailing consideration.  *Simon* thus sheds little light on this case.

6         *c.    Redressability*

7         We likewise find that Plaintiffs have adequately pleaded the

8  redressability of their alleged injury, an issue that is closely related to the

9  question of causation. When the injury alleged is caused by the illegal

10  conduct, in many instances (at least where continuation of the illegal conduct

11  will continue to cause harm), the cessation of the illegal conduct will be likely

12  to at least diminish further instance of the injury. Because Plaintiffs have

13  successfully alleged a plausible likelihood that President Trump's conduct

14  caused their injuries, and the injury is ongoing, it logically follows that relief

15  would redress their injury—at least to some extent, which is all that Article III

16  requires. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A plaintiff] need

17  not show that a favorable decision will relieve his *every* injury.") (emphasis in

18  original); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) (finding

29

1  redressability is satisfied where "risk of catastrophic harm" could be

2  "reduced *to some extent* if petitioners received the relief they seek") (emphasis

3  added).

4      The Complaint seeks injunctive relief requiring that the President cease

5  the conduct that allegedly violates the Foreign and Domestic Emoluments

6  Clauses. Plaintiffs have plausibly pleaded that the President's ownership of

7  hospitality businesses that compete with them will induce government

8  patrons of the hospitality industry to favor Trump businesses over those of

9  the Plaintiffs so as to secure favorable governmental action from the President

10  and Executive branch. This plausibly alleges that his cessation of the violation

11  would eliminate the inducement to those patrons to favor his businesses, and

12  would therefore eliminate, or at least diminish, the competitive injury that

13  Plaintiffs suffer. These plausible allegations are sufficient to satisfy Article

14  III's requirement of redressability.

15          d.    *The Fourth Circuit's In re Trump Decision and Judge Walker's*
16                *Dissent*

17      We recognize that our colleague Judge Walker disagrees, and that a

18  panel of the Fourth Circuit has also reached the opposite conclusion in a

closely analogous case, *In re Donald J. Trump*, 928 F.3d 360 (4th Cir. 2019).[9]

Judge Walker relies on substantially the same arguments as the Fourth Circuit

panel in *In re Trump*.  Respectfully, we do not find these arguments

persuasive.

As a preliminary note, both opinions seem to be influenced by their

perception that these lawsuits are politically motivated. Judge Walker asserts

that this case is "deeply political" and emphasizes that "President Trump was

democratically elected by the American people . . . with his business holdings

and brand prominence in full view." *See infra*. The Fourth Circuit expressed

skepticism as to "why [the plaintiffs] came to the court for relief in the first

place," implying that their motivation was political and that this cast doubt

on the federal court's jurisdiction. *In re Trump*, 928 F.3d at 377; *see also infra*

(quoting *In re Trump*). While it is certainly possible that these lawsuits are

---

[9] In that case, the District of Columbia and the State of Maryland brought similar claims against the President, alleging violations of the Foreign and Domestic Emoluments Clauses based on factual allegations almost identical to the allegations in this case. *Compare In re Trump*, 928 F.3d at 365–66 *with CREW*, 276 F. Supp. 3d at 182–83. The plaintiffs there argued that they had Article III standing based, *inter alia*, on their "interests in protecting the economic well-being of their residents, who, as competitors of the President, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the President's businesses," as well as based on their "interests as proprietors of businesses that compete with the President's businesses." *In re Trump*, 928 F.3d at 363 (internal quotation marks omitted).

1    fueled in part by political motivations, we do not understand the significance

2    of that fact. It is true that a political motivation for a lawsuit, standing alone,

3    is insufficient to confer Article III standing. *Cf. Flast v. Cohen*, 392 U.S. 83, 106

4    (1968) (noting that the "federal court[s] [cannot be used] as a forum in which

5    to air [] generalized grievances about the conduct of government"). But while

6    the existence of a political motivation for a lawsuit does not supply standing,

7    nor does it defeat standing. "Standing under Article III . . . [depends on] an

8    injury [that is] concrete, particularized, and actual or imminent; fairly

9    traceable to the challenged action; and redressable by a favorable ruling."

10   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v.*

11   *Flores*, 557 U.S. 433, 445 (2009)). Whether a lawsuit has political motivations is

12   irrelevant to these determinative issues.

13                    *1.    Injury-in-Fact*

14         With respect to the "injury-in-fact" requirement, Judge Walker

15   correctly states that to establish an injury through the competitor standing

16   doctrine, a plaintiff must show that she is a "direct competitor" of the

17   defendant and an "actual or imminent increase in competition." *See infra*

18   (citations omitted). As we conclude above, Plaintiffs have clearly met these

32

1    standards. Judge Walker relies on the Supreme Court's decision in *Already*,

2    568 U.S. 85, as demonstrating that "competing businesses [do not] have

3    standing to challenge [] unlawful action simply by virtue of their status as a

4    direct competitor." *See infra* (citing *In re Trump*, 928 F.3d at 377).

5        We readily acknowledge that proposition, but we do not agree that it

6    controls here.  In their allegations, Plaintiffs go further than simply alleging

7    that they directly compete with the Trump establishments; they plausibly

8    allege precisely how the President's allegedly unlawful conduct harms their

9    ability to attract patrons to their establishments. *See, e.g.,* Complaint ¶ 14 ("As

10   a competitor of restaurants located in Defendant's hotels and other properties

11   . . . ROC United has been injured by these payments due to *lost business . . . .*")

12   (emphasis added); *id.* ¶ 199 ("Officials of foreign states and of the United

13   States and various state and local governments have purchased and will use

14   their government's funds to purchase food and services from one or more

15   restaurants owned by Defendant, instead of from competing restaurants that

16   are members of ROC United."). And as we point out above, *Already* involved

17   very different circumstances; the plaintiffs in that case were unable to

1   plausibly allege that Nike's trademark harmed—or threatened to harm—their

2   business prospects. *See* 568 U.S. at 99.[10]

3          Judge Walker also "question[s] the expansive scope" of the competitor

4   standing doctrine, and worries that our approach would confer standing, for

5   example, on a restaurant whose competitor illegally obtained a bank loan or a

6   large tax refund and used its ill-gotten proceeds to hire a better chef or to

7   lower its prices, thereby exposing the plaintiff–restaurant to increased

8   competition. *See infra.* Those hypotheticals are far beyond the scope of our

9   ruling. A plaintiff who establishes an injury-in-fact by alleging direct

10   competition and an "inability to compete [with the defendant] on an equal

11   footing," *City of Jacksonville*, 508 U.S. at 666, must also establish that such

12   injury is "fairly traceable to the defendant's allegedly unlawful conduct" and

13   "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737,

14   751 (1984). Here the connection between the alleged violations of law and

---

[10] The Fourth Circuit also criticized the plaintiffs for "rest[ing] on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met." *In re Trump*, 928 F.3d at 377. The Fourth Circuit rejected that "boundless theory of standing" based on the Supreme Court's holding in *Already*. *See id*. For the reasons expressed above, we do not believe that *Already* precludes Plaintiffs' theory of standing. *See supra*.

1    Plaintiffs' harm is far more direct than in Judge Walker's hypothetical: It is

2    precisely the President's receipt of allegedly illegal emoluments that

3    constitutes Plaintiffs' competitive injury.

4         Lastly, Judge Walker seems to draw a rule that the competitor standing

5    doctrine is limited to "three broad categories of cases"—agency cases, election

6    cases, and unfair competition cases—and that this case "fits into none of

7    [them]." *See infra*. He cites no authority for the proposition that the doctrine is

8    limited to these three categories, and we see no reason why it should be. Even

9    if it were, we note that Plaintiffs' theory of competitive injury in this case is

10   structurally identical to the economic reasoning that often supports standing

11   in the unfair competition context. *Id.* (noting that, in unfair competition cases,

12   standing exists when the parties are "direct competitors" based on a

13   presumption that "[s]ales gained by one are thus likely to come at the other's

14   expense") (quoting *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 825 (9th

15   Cir. 2011)).

16              *2.    Traceability*

17        With respect to traceability, we agree with Judge Walker that "[u]nder

18   the competitor-standing doctrine, . . . traceability flows readily from a

35

1    competitive injury" and that "if the violation would necessarily harm the

2    plaintiff's competitive opportunities, then an unlawful edge to a competitor

3    logically connects to that violation." *See infra* (citations omitted). But we do

4    not understand Judge Walker's conclusion that traceability is lacking here

5    because there are "simply too many variables at play . . . to allow the

6    plaintiffs to rest solely on the bare assertion that the President's acceptance of

7    emoluments has caused them competitive injury." *See infra*. The fact that there

8    are "many different factors [that] influence [government officials'] decision

9    making" does not foreclose Plaintiffs' plausible theory—supported by clear

10   factual allegations—that the President's prior statements and his receipt of

11   allegedly illegal emoluments unduly *influences* some government officials to

12   patronize his establishments, thereby causing a competitive harm to Plaintiffs.

13   *Id.* Judge Walker's suggestion that the existence of alternate explanations for

14   the Plaintiffs' competitive injury defeats traceability would deny Article III

15   standing to plaintiffs alleging antitrust, unfair competition, or trademark

16   infringement claims who seek to enjoin conduct that unduly influences

17   buyers in a marketplace. In each of these categories of cases, there exist

18   "myriad reasons" why a consumer might favor a defendant's product,

36

including, for example, "service, quality, location, price and other factors

related to individual preference." *CREW*, 276 F. Supp. 3d. at 186. But these

bona fide competitive reasons do not bar a plaintiff from demanding that a

court enjoin illegal conduct that skews the marketplace by inserting an

additional unlawful competitive advantage.

Similarly, the Fourth Circuit panel found that the *In re Trump* plaintiffs

had failed to establish traceability because their "conclusion that government

customers are patronizing the [Trump International] Hotel because the Hotel

distributes profits or dividends to the President . . . requires speculation into

the subjective motives of independent actors who are not before the court."

928 F.3d at 375. Such speculation, the court held, "undermin[es] a finding of

causation." *Id*.[11] We respectfully disagree. That Plaintiffs' theory of harm

results from decisions of third parties does not preclude finding the

cognizable link between the challenged action and the alleged harm that

Article III requires. *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia,

---

[11] The President makes the same argument on appeal in this case. *See* Appellee's Br. at 15–17 ("[P]laintiffs cannot establish traceability and redressability where the alleged injury-in-fact depends on the decisions of independent third parties whose actions the court can neither predict nor control.").

1    J.) ("It is impossible to maintain, of course, that there is no standing to sue

2    regarding action of a defendant which harms the plaintiff only through the

3    reaction of third parties."); *see also Dep't of Commerce v. New York*, 139 S.Ct.

4    2551, 2566 (2019) (holding that plaintiffs had Article III standing where their

5    "theory of standing . . . relies [] on the predictable effect of Government action

6    on the decisions of third parties") (citing, *inter alia*, *Block*, 793 F.2d at 1309));

7    *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (warning against "wrongly

8    equat[ing] injury 'fairly traceable' to the defendant with injury as to which the

9    defendant's actions are the very last step in the chain of causation"). Virtually

10   every suit for trademark infringement, unfair competition, or violation of the

11   antitrust laws involves harm that results from the decisions of third-party

12   customers. *See TrafficSchool*, 653 F.3d at 825 (noting that "[i]n a false

13   advertising suit, a plaintiff establishes Article III injury if 'some consumers

14   who bought the defendant['s] product under [a] mistaken belief' fostered by

15   the defendant 'would have otherwise bought the plaintiff['s] product," and

16   that such an injury may be proven by the "probable market behavior" of

17   independent third parties) (quoting *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266

18   F.3d 164, 177 (3d Cir. 2001); *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)).

1       When the "injury hinges on the reactions of [] third parties [to the

2    challenged conduct]," the plaintiff "need not prove a cause-and-effect

3    relationship with absolute certainty; substantial likelihood of the alleged

4    causality meets the test." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety*

5    *Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). For example, "common sense and

6    basic economics," along with admissions from the third parties in question

7    that the challenged action would "affect [their] business decisions," are

8    generally enough to establish the requisite third-party causation. *Id.* at 105

9    (internal quotation marks and citations omitted).

10      Accordingly, to establish traceability, Plaintiffs need only establish a

11   substantial likelihood that the President's receipt of emoluments—and his

12   statements and actions impliedly soliciting such emoluments, *see, e.g.*,

13   Complaint ¶¶ 52, 96—has some favorable effect on government officials'

14   demand for the Trump establishments (and, by extension, some unfavorable

15   effect on their demand for Plaintiffs' competing properties). Plaintiffs need

16   not prove that *every* government official who chooses a Trump establishment

17   does so to curry favor with the President by enriching him, nor need Plaintiffs

18   prove that a particular government official chose or will choose a Trump

1   establishment for the sole or even the primary reason of earning the

2   President's favor. *Dep't of Commerce*, 139 S.Ct. at 2566 (holding that

3   "traceability is satisfied" when plaintiffs established that the third-party

4   action leading to the alleged harm was "likely attributable *at least in part*" to

5   the challenged action, noting that "Article III requires no more than *de facto*

6   causality") (emphasis added) (internal quotation marks omitted). Plaintiffs

7   need only plausibly allege that the President's receipt of emoluments

8   generates an unlawful competitive advantage for the Trump establishments.

9          The allegations in the Complaint are sufficient to meet this burden.

10  Plaintiffs point to statements by foreign diplomats that they and others in

11  their position have been or will be motivated to choose Trump establishments

12  to earn the President's favor, or to avoid his disfavor. *See, e.g.,* Complaint ¶¶

13  62, 74. Moreover, the President's statements to the effect that he favors

14  governments that spend money at his establishments increase the likelihood

15  that government patrons will choose Trump establishments in the hopes of

16  winning influence. *See, e.g., id.* ¶ 96 (alleging that the President publicly stated

17  that he "very much" likes and "get[s] along great with" foreign officials who

1    do business with him). Without the benefit of discovery, the Plaintiffs need

2    not go further to establish causation for the purposes of Article III.

3                        *3.*    *Redressability*

4            Both Judge Walker's dissent and the Fourth Circuit's *In re Trump*

5    opinion deny that any injunctive relief can be fashioned that would help

6    Plaintiffs' predicament. *See In re Trump*, 928 F.3d at 376; *infra* ("[T]here is no

7    allegation that [the requested relief] would cause diplomatic patrons to book

8    at other establishments."). The Fourth Circuit expressed the view that "even if

9    government officials were patronizing [the President's] Hotel to curry [his]

10   favor, there is no reason to conclude that they would cease doing so were the

11   President enjoined from receiving income from the Hotel . . . [given that] the

12   Hotel would still be publicly associated with the President, would still bear

13   his name, and would still financially benefit members of his family." *In re*

14   *Trump*, 928 F.3d at 376. Accordingly, the Fourth Circuit found that "the

15   likelihood that an injunction . . .  would not cause government officials to

16   cease patronizing the Hotel demonstrates a lack of redressability." *Id.*

17           Again, we disagree. Where customers favor a defendant's product or

18   service over that of a plaintiff because of that defendant's violation of law,

41

1   which is often the case in trademark infringement, unfair competition, or

2   antitrust cases, the mere possibility that customers might continue to favor

3   the defendant's product or service after a court enjoins the violation does not

4   defeat Article III standing. If it did, such claims could never be heard before

5   Article III courts.

6        Plaintiffs' requested remedy need only remove from the equation the

7   *improper* competitive advantage arising from the possibility that, by

8   patronizing Trump establishments, government officials can earn favor from

9   the President. "[C]ommon sense and basic economics" indicate that the

10   elimination of any illegal competitive advantage that motivated government

11   officials to give more business to the Trump establishments will cause at least

12   some to cease to give preference to those businesses, thereby redressing the

13   claimed injury. *Nat. Res. Def. Council*, 894 F.3d at 104.

14        Moreover, the Fourth Circuit's suggestion that, notwithstanding a

15   court's grant of the requested relief, some government officials would likely

16   continue to patronize Trump establishments to curry the President's favor is

17   besides the point. *In re Trump*, 928 F.3d at 376. The Supreme Court made clear

18   in *Mass. v. EPA* that a remedy that "will not by itself reverse" the alleged

1    injury would still satisfy the redressability requirement if it "reduced [that

2    injury] to some extent." 549 U.S. at 525–26 (emphasis omitted); *see also Larson*,

3    456 U.S. at 243 n.15 ("[A plaintiff] need not show that a favorable decision will

4    relieve his *every* injury.").

5         We see no justification for the assertion of Judge Walker and the Fourth

6    Circuit that no injunction can be fashioned that would diminish the plaintiffs'

7    injury. *See In re Trump*, 928 F.3d 376–77; *infra*. Injunctive relief could be

8    fashioned along many different lines that would adequately reduce the

9    incentive for government officials to patronize Trump establishments in the

10   hope of currying favor with the President.[12]

11                    4.      *Relevance of the Purpose of the Emoluments Clauses*

---

[12] For example, a court could bar the Trump establishments from selling services to foreign
and domestic governments during the President's tenure in office, which would fully
redress Plaintiffs' injury. A court could require the President to establish a blind trust or
otherwise prevent him from receiving information about government patronage of his
establishments, which could indicate to government officials that patronizing those
establishments is no longer an effective way to earn Presidential favor. A court could
require public disclosure of the President's private business dealings with government
officials through the Trump establishments, which may discourage Presidential action that
appears to improperly reward such patronage. *Cf. Buckley v. Valeo*, 424 U.S. 1, 67 (1976)
(noting the tendency of disclosure requirements to "avoid the appearance of corruption by
exposing [information] to the light of publicity").

1        Judge Walker also concludes that the "Emoluments Clauses . . . were

2   never designed to, and nor do they, directly regulate the marketplace or the

3   market player as it functions in the marketplace," and draws the inference

4   that a plaintiff who seeks to enjoin a violation of the Emoluments Clauses

5   cannot establish standing to sue if that plaintiff's injury is competitive in

6   nature. *See infra.* This appears to confuse the question whether the Complaint

7   sufficiently states a cause of action with the question of Article III standing. In

8   *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28

9   (2014), Justice Scalia's majority opinion clarified that the question "whether [a

10  plaintiff] has a cause of action" is separate and distinct from the issue of

11  whether the case "presents a case or controversy that is properly within

12  federal courts' Article III jurisdiction." Neither this court, nor the Supreme

13  Court (nor any other) has ruled that a competitive injury-in-fact, fairly

14  traceable to the challenged action and likely redressable by the requested

15  relief, fails to confer Article III standing unless the claims are based on a law

16  specifically designed to regulate competition. Consideration of the purposes

17  of the clauses may be relevant to whether the Complaint states an actionable

18  claim, or whether a particular plaintiff is within the law's "zone of interests,"

44

1   *see infra*, but are not relevant to whether the Plaintiffs have met the three

2   elements that form the "irreducible constitutional minimum of standing."

3   *Lujan*, 504 U.S. at 560.

4        We therefore conclude that Plaintiffs have satisfied the Article III

5   requirements of traceability and redressability.

6        ii.      Zone of Interests

7        The district court also erred in dismissing the Complaint on the theory

8   that Plaintiffs' injuries fall outside the "zone of interests" of the Emoluments

9   Clauses.  This is for two reasons. First, the zone of interests test does not, as

10  the district court believed, implicate the court's subject matter jurisdiction.

11  Further, the Supreme Court's precedents make clear that Plaintiffs' injuries

12  are not outside the zone of interests of the Emoluments Clauses.

13       Turning first to the question whether zone of interests is a test of Article

14  III standing, the Supreme Court has recently clarified that it is not. In *Lexmark*

15  *Int'l Inc. v. Static Control Components*, the Supreme Court, while

16  acknowledging that past decisions had characterized the zone of interests test

17  as part of a "'prudential' branch of standing," reconsidered the question and

18  clarified both that the "prudential" label is a misnomer and that the test does

45

1    not implicate Article III standing. 572 U.S. 118, 126–27 (2014). Rather, the

2    Court explained that the test asks whether the plaintiff "has a cause of action

3    under the [law]" on the basis of the facts alleged. *Id.* at 128. The Court

4    emphasized that the test is not "jurisdictional" because "the absence of a valid

5    . . . cause of action does not implicate subject-matter jurisdiction." *Id.* at 128

6    n.4 (internal quotation marks omitted). In *Bank of America v. City of Miami*, 137

7    S.Ct. 1296 (2017), the Court reaffirmed that the zone of interests test asks

8    whether the complaint states an actionable claim under a statute (and not

9    whether the plaintiff has standing and the court has subject matter

10   jurisdiction). The *City of Miami* majority reiterated that the Article III standing

11   requirements are injury, causation, and redressability, and reinforced

12   *Lexmark*'s essential point that the zone of interests question is "whether the

13   statute grants the plaintiff the cause of action that he asserts." *Id.* at 1302.

14          Accordingly, while it had previously been appropriate to consider

15   whether plaintiffs fall within the zone of interests in deciding whether a

16   plaintiff has standing and the court has subject matter jurisdiction, the

17   Supreme Court has unambiguously rejected that approach. The district court

18   thus misconstrued the nature of the zone of interests doctrine.

1    The district court's analysis erred on the merits as well. Every Supreme

2    Court decision construing the zone of interests test as it pertains to

3    competitors' suits supports the view that Plaintiffs satisfy the zone of interests

4    test. Without exception, the Court has held that a plaintiff who sues to enforce

5    a law that limits the activity of a competitor satisfies the zone of interests test

6    even though the limiting law was not motivated by an intention to protect

7    entities such as plaintiffs from competition. *See Nat'l Credit Union Admin. v.*

8    *First Nat. Bank & Tr. Co.*, 522 U.S. 479, 495–96 (1998) (*NCUA*) ("[Defendants

9    argue] that there is no evidence that Congress . . . was at all concerned with

10   the competitive interests of commercial banks [such as plaintiffs], or indeed at

11   all concerned with competition . . . . The difficulty with this argument is that

12   similar arguments were made unsuccessfully in [every case construing the

13   zone of interests of a statute vis-à-vis a plaintiff competitor].").  After *Lexmark*,

14   consistent with the longstanding view that the test is "not meant to be

15   especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), the

16   Court reaffirmed that plaintiffs who allege secondary economic injuries due

17   to conduct that violates a limiting law can satisfy the zone of interests test,

18   notwithstanding that the statute violated was not intended to protect against

1    the type of injury suffered by the plaintiffs. *City of Miami*, 137 S.Ct. at 1304–05

2    (finding that a municipality fell within the zone of interests of the Fair

3    Housing Act where it alleges an injury due to discriminatory lending causing

4    an increase in foreclosures, which allegedly cause decreased tax revenues and

5    increased expenditures to remedy blight).

6          The line of cases supporting Plaintiffs' satisfaction of the zone of

7    interests test stretches back to *Ass'n of Data Processing Orgs., Inc. v. Camp*, 397

8    U.S. 150 (1970) (*Data Processing*). In *Data Processing*, plaintiffs were sellers of

9    data-processing services. *Id.* at 151. They sued to set aside a ruling of the

10   Comptroller of the Currency, which allowed national banks to offer data-

11   processing services to other banks and bank customers. *Id.* The complaint,

12   alleging a violation of the Administrative Procedure Act, asserted that the

13   Comptroller's rule inflicted a competitive injury on the plaintiffs by allowing

14   banks to exceed the "legitimate scope of [bank] activities," as dictated by the

15   National Bank Act and § 4 of the Bank Service Corporation Act. *Id.* at 157; *see*

16   *also id.* at 155 ("No bank service corporation may engage in any activity other

17   than the performance of bank services for banks."). The Court did not even

18   consider whether the purpose of the statutory restriction was to protect

48

1   competitors. Despite noting that the statutes did not "in terms protect a

2   specified group" from competition, the Court found the zone of interests test

3   satisfied because "§ 4 arguably brings a competitor within the zone of

4   interests protected by it." *Id.* at 156–57. The Court reasoned that the "general

5   policy [of the statute]" of limiting banks' activities "is apparent" and

6   permitted the claim to proceed because plaintiffs' "[financial] interests are

7   directly affected by a broad or narrow interpretation of the Acts." *Id.* at 157.

8   The Court concluded that plaintiffs were within the zone of interests because

9   a party alleging a financial injury is a "reliable private attorney general to

10  litigate the issues of the public interest . . . ." *Id.* at 154; *see also Arnold Tours,*

11  *Inc. v. Camp*, 400 U.S. 45, 46 (1971) (clarifying that "*Data Processing* . . . did not

12  rely on any legislative history showing that Congress desired to protect data

13  processors" and finding plaintiff travel agencies who competed with banks

14  are "arguably . . . within the zone of interests" of a limiting law despite the

15  fact that Congress had not contemplated protecting their competitive

16  interests) (internal quotation marks omitted).

17      The Court's next major zone of interests case, *Investment Company*

18  *Institute v. Camp*, 401 U.S. 617 (1971) (*ICI*), is especially pertinent because the

1    purpose of the statute involved there was similar in relevant respects to that

2    of the Emoluments Clauses. The plaintiffs were investment companies that

3    sought to enjoin a regulation promulgated by the Comptroller of the

4    Currency which permitted banks to operate mutual funds. *Id.* at 618–19.

5    Plaintiffs argued that the ruling violated § 21 of the Glass-Steagall Act, which

6    made it unlawful "[f]or any person, firm, [or] corporation . . . engaged in the

7    business of issuing . . . securities, to engage at the same time to any extent

8    whatever in the business of receiving deposits." 12 U.S.C. § 378(a). Discussing

9    the purpose of Glass-Steagall, the Court concluded that "Congress [] had in

10    mind . . . [the] hazards that arise when a commercial bank *goes beyond the*

11    *business of acting as fiduciary* or managing agent and enters the investment

12    banking business . . . by establishing an affiliate to hold and sell particular

13    investments." *ICI*, 401 U.S. at 630 (emphasis added). The Court found that

14    Congress's purpose in enacting § 21 was to prevent corruption of the banking

15    function and impairment of the ability of banks to function impartially. *Id.* at

16    630–34; *cf. CREW*, 276 F. Supp. 3d at 187 (describing the purpose of the

17    Emoluments Clauses as protecting uncorrupted, impartial, and independent

18    governance). Notwithstanding that the intention of § 21 was to protect

50

1    systemic integrity and was not even arguably intended to benefit competitors,

2    the Court nonetheless found that the investment company plaintiffs were

3    within its zone of interests. *ICI*, 401 U.S. at 621 ("There can be no real question

4    . . . of the [plaintiff investment companies'] standing in the light of the *Data*

5    *Processing* case."). The dissent argued that plaintiffs fell outside the zone of

6    interests because "the Glass–Steagall Act [did not] evidence *any congressional*

7    *concern for . . . freedom from competition.*" *Id.* at 640 (Harlan, J., dissenting)

8    (emphasis added). The majority of the Court rejected that argument without

9    discussion. *See also Clarke*, 479 U.S. at 399–400 (1987) ("[T]here need be *no*

10   *indication* of congressional purpose to benefit the would-be plaintiff.")

11   (emphasis added).

12           *NCUA* also recognized competitor injury as within the zone of interests

13   of the law that was allegedly violated, notwithstanding that the law was not

14   intended to protect the plaintiffs in their competitor role. 522 U.S. 479. The

15   plaintiffs were banks that challenged a revision in the interpretation of § 109

16   of the Federal Credit Union Act ("FCUA") by its administering agency, the

17   National Credit Union Administration ("NCUA"). *Id.* at 483. Section 109

18   restricted federal credit union membership to "groups" that had a "common

51

1     bond of occupation or association." 12 U.S.C. § 1759(b). The revision that the

2     plaintiffs challenged extended membership eligibility to groups that lacked a

3     single common bond between all members, if the credit union comprised

4     multiple distinct employer sub-groups within which all members had a

5     common bond. *NCUA*, 522 U.S. at 484. The plaintiffs contended that the

6     NCUA's revised interpretation was contrary to the requirements of the Act.

7     *Id.* at 483. The defendants sought dismissal of the suit on the ground that the

8     competitive injury alleged by the plaintiff banks was outside the zone of

9     interests sought to be protected by Congress in enacting the FCUA. The

10    Supreme Court rejected defendants' argument, explaining that "[a]s

11    competitors of federal credit unions, [the plaintiff banks] certainly have an

12    interest in limiting the markets that federal credit unions can serve, and the

13    NCUA's interpretation has affected that interest by allowing federal credit

14    unions to increase their customer base." *Id.* at 493–94. In response to

15    defendants' argument that the plaintiffs' injuries were outside the FCUA's

16    zone of interests because "banks were simply not in the picture" when the

17    relevant statute was drafted, the Court dismissed it as "irrelevant." *Id.* at 496,

18    499.

1　　　　As stated above, the Supreme Court recently reaffirmed substantially

2　the same position post-*Lexmark*. In *City of Miami*, the Court found that a

3　plaintiff alleging an economic injury due to allegedly unlawful conduct was

4　within the zone of interests of the law that regulated the conduct in question.

5　137 S.Ct. at 1304–05. The City had brought an action against housing lenders,

6　alleging they had violated the Fair Housing Act ("FHA") by issuing risky

7　mortgages on unfavorable terms to minority customers. *Id.* at 1301. The City

8　claimed to have suffered economic injury from lost tax revenue and increased

9　municipal expenses due to higher incidence of mortgage foreclosure and

10　increased demand for services to remedy the resulting urban blight. *Id.* at

11　1302. The district court had dismissed the suit under Rule 12(b)(6) for failure

12　to state a claim on the ground that "the harms alleged, being economic and

13　not discriminatory, fell outside the zone of interests the FHA protects." *Id*.

14　The Supreme Court rejected that position. It ruled that the City's "financial

15　injuries fall within the zone of interests that the FHA protects." *Id.* at 1304.

16　The Supreme Court reasoned that, notwithstanding the absence of any

17　indication that the FHA was intended to protect municipal budgets, it was

18　"highly relevant" that the lenders' conduct allegedly "diminish[ed] the City's

1    property-tax revenue and increas[ed] demand for municipal services." *Id*.

2    Thus, consistent with the longstanding view that a plaintiff's economic injury

3    usually makes her a "reliable private attorney general to litigate the issues of

4    the public interest," *Data Processing*, 397 U.S. at 154, the Supreme Court found

5    the City's economic injuries to be within the zone of interests of the FHA. *See*

6    *also Bennett*, 520 U.S. at 161 (finding that plaintiff ranchers who asserted an

7    economic injury from a new water management plan adopted by the

8    Secretary of the Interior fell within the zone of interests of the Endangered

9    Species Act "notwithstanding that the interests they seek to vindicate are

10   *economic rather than environmental*") (emphasis added); *Mova Pharm. Corp. v.*

11   *Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("[The zone of interests] analysis

12   focuses . . . on *those who in practice can be expected to police the interests* that the

13   [law] protects.") (emphasis added).

14          While most cases addressing whether the plaintiff's injury is outside

15   the zone of interests of the law alleged to be violated have concerned the zone

16   of interests of a *statute*, and this suit alleges violations of the *Constitution*, we

17   can see no reason why the reasoning of the precedents reviewed above are

18   not equally applicable here. The one instance in which the Supreme Court has

1 ruled on an argument resembling a zone of interests challenge to a

2 Constitutional provision is consistent with the above precedents and suggests

3 that our Plaintiffs satisfy the test. In *Wyoming v. Oklahoma*, 502 U.S. 437 (1992),

4 Wyoming brought suit against Oklahoma within the original jurisdiction of

5 the Supreme Court, alleging that Oklahoma violated the Dormant Commerce

6 Clause by passing a statute requiring that 10% of the coal used by coal-fired

7 Oklahoma producers of electric power be mined in Oklahoma. Wyoming did

8 not mine or sell coal. *Id.* at 442. The only injury Wyoming claimed as a result

9 of the Oklahoma statue was a diminution in its tax revenues because

10 Wyoming coal producers, which paid taxes to Wyoming, suffered diminution

11 in the volume of coal they sold to Oklahoma producers of electric power. *Id.*

12 at 447–48. Oklahoma sought to have the case dismissed on the ground that

13 the tax loss alleged by Wyoming was too remote from the Dormant

14 Commerce Clause's purposes as well as too insignificant. *See id.* at 448, 455.

15 The Court rejected Oklahoma's arguments and granted summary judgment

16 in favor of Wyoming. *Id.* at 461.

17     The Supreme Court ruled that Wyoming's loss of tax revenue caused

18 by Oklahoma's alleged violation of the Dormant Commerce Clause was a

1    proper basis for Wyoming's suit, notwithstanding that its loss of tax revenue

2    was remote from the purposes of the Dormant Commerce Clause. *See id.* at

3    448–50. The majority did not explicitly discuss the zone of interests test, but in

4    upholding Wyoming's standing, it rejected the argument in Justice Scalia's

5    dissent that Wyoming fell outside the zone of interests.[13] To the extent it

6    considered whether the alleged injury was too remote from the activity

7    proscribed by the Dormant Commerce Clause, it did so as part of its analysis

8    of the injury and causation requirements of Article III. *Id.* at 448–49

9    (concluding that the alleged diminution in revenues was "directly linked" to

10    the allegedly unlawful tax); *see also Bond v. United States*, 564 U.S. 211, 218

11    (2011) (explaining, in holding that an individual prosecuted under federal law

12    has standing to bring a Tenth Amendment claim, that "[i]f . . . the person

13    alleging injury is remote from the zone of interests a [law] protects, whether

14    there is a legal injury at all and whether the particular litigant is one who may

---

[13] Puzzlingly, the district court cited a passage from Justice Scalia's dissenting opinion in *Wyoming* seemingly as though it were the holding of the case and without recognizing that the Court's majority opinion implicitly rejected Justice Scalia's argument. Justice Scalia wrote in his dissent that the test is "*more* strictly applied when a plaintiff is proceeding under a constitutional . . . provision instead of the generous review provisions of the APA." *Wyoming*, 502 U.S. at 469 (Scalia, J., dissenting) (emphasis in original). The majority did not explicitly discuss this argument, but in upholding Wyoming's standing, it evidently rejected Justice Scalia's contention.

1     assert it can involve similar inquiries"); *INS v. Chadha,* 462 U.S. 919, 935–36

2     (1983) (holding that individual may challenge a "legislative veto" on

3     separation-of-powers grounds).

4         Thus, while the district court may be correct that "[n]othing in the text

5     or history of the Emoluments Clauses suggests that the Framers intended

6     these provisions to protect anyone from competition[,]" *CREW,* 276 F. Supp.

7     3d at 187, these precedents make clear that the zone of interests test does not

8     require the plaintiff to be an intended beneficiary of the law in question.

9     Plaintiffs who are injured by the defendant's alleged violation of a limiting

10     law may sue to enforce the limitation under the longstanding zone of interests

11     test the Court has articulated.

12         iii.     <u>"Prudential Considerations"—Political Question and Ripeness</u>

13         Plaintiffs also challenge the district court's dismissal of their Foreign

14     Emoluments Clause claim on two further grounds: (i) that it presents a non-

15     justiciable political question, and (ii) that the issues it raises are not ripe for

16     adjudication. The district court described these as "prudential reasons" for

17     dismissing the claim. *CREW,* 276 F. Supp. 3d at 193–95. These grounds were

18     not argued by the President in his motion to dismiss, and the Department of

1   Justice, acting as counsel to the President, does not defend them in this

2   appeal.[14]  We do not find the district court's reasoning persuasive.

3          For both rulings, the district court relied on the fact that the Foreign

4   Emoluments Clause bars the receipt of emoluments "without the Consent of

5   Congress[.]" U.S. Const. art. I, § 9, cl. 8. For its non-justiciability ruling, the

6   court reasoned that, as Congress is "the only political branch with the power

7   to consent to violations of the Foreign Emoluments Clause, Congress is the

8   appropriate body to determine whether, and to what extent, [the President's]

9   conduct unlawfully infringes on that power." *CREW*, 276 F. Supp. 3d at 193.

10  According to the district court's reasoning, the courts can never adjudicate

11  whether the Clause has been violated because a suit alleging such a violation

12  will always present a non-justiciable political question. We respectfully

13  disagree and find Plaintiffs' arguments in rebuttal more persuasive.

14         The prohibition stated in the constitutional text renders the President's

15  receipt of "emoluments" unlawful, unless Congress consents to it. In the

---

[14] Notwithstanding that the President neither sought nor defends these aspects of the district court's ruling, we discuss them because of the obligation of federal courts to consider whether they have subject matter jurisdiction to adjudicate a dispute. *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994).

1   undisputed absence of Congressional consent, the President has violated this

2   provision of the Constitution, if, as charged by the Complaint, he has

3   accepted what the Constitution describes as "emoluments." The federal

4   courts have the responsibility to resolve "Cases and Controversies" arising

5   under the Constitution and laws of the United States. That responsibility

6   entails finding the facts and interpreting the Constitution and laws. It is not

7   affected by the Constitution's grant of authority to Congress to authorize the

8   President to receive emoluments where Congress has not exercised that

9   authority. The mere possibility that Congress *might* grant consent does not

10  render the dispute non-justiciable. The district court's reasoning treated the

11  Clause's authorization to Congress as if it said, "Congress alone shall have the

12  authority to determine whether the President acts in violation of this Clause."

13  It says nothing like that.

14        Furthermore, while challenges to complaints alleging the

15  unconstitutionality of conduct that the Constitution gives Congress the power

16  to authorize are relatively infrequent, they are not unprecedented. When such

17  challenges have arisen, the federal courts, including the Supreme Court, have

18  adjudicated them.  *See, e.g., C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511

1   U.S. 383 (1994) (Dormant Commerce Clause); *Cuyler v. Adams*, 449 U.S. 433

2   (1981) (Compact Clause).

3        The district court also concluded that the dispute was not ripe for

4   review. It reached that conclusion in reliance on the prospect of future

5   Congressional action and on the reasoning of Justice Powell's concurrence in

6   the Supreme Court's order of dismissal in *Goldwater v. Carter*, 444 U.S. 996

7   (1979).

8        *Goldwater* was a dispute over the Constitution's allocation of

9   governmental power between two of the branches of our federal government.

10  President Carter, in the exercise of his constitutional authority to conduct the

11  foreign relations of the United States, and coincident with his recognition of

12  the People's Republic of China as the "sole government of China," announced

13  an intention to abrogate a mutual defense treaty made in a previous

14  administration with the Taiwanese government of the "Republic of China."

15  *Goldwater v. Carter*, 617 F.2d 697, 700–01 (D.C. Cir. 1979), *vacated by* 444 U.S.

16  996. The Constitution empowers the President to make treaties and requires

17  Senatorial consent before the treaties become effective; however, it says

18  nothing about whether Senatorial consent is required to abrogate a treaty.

60

1    Individual Members of Congress, who disagreed with President Carter's

2    decision to abrogate the treaty, brought suit for declaratory and injunctive

3    relief, contending that the President lacked authority to abrogate the treaty

4    unilaterally without congressional consent.

5           Four Justices, through Justice Rehnquist's concurrence accompanying

6    an order granting certiorari, vacating the judgment below, and remanding,

7    voted to dismiss the suit on the ground that it raised a non-justiciable political

8    question. *Goldwater*, 444 U.S. at 1002 (Rehnquist, J., concurring). Justice

9    Rehnquist explained his view that the suit was non-justiciable "because it

10   involves the authority of the President in the conduct of our country's foreign

11   relations and the extent to which the Senate or the Congress is authorized to

12   negate the action of the President." *Id*.

13          The main thrust of Justice Powell's concurrence was to disagree with

14   Justice Rehnquist's conclusion that such a dispute over the Constitution's

15   allocation of governmental power is nonjusticiable. *Id.* at 996 (Powell, J.,

16   concurring). Justice Powell pointed to the need for a Supreme Court decision

17   to break an otherwise paralyzing governmental stalemate. *Id.* Nonetheless,

18   Justice Powell agreed with the decision to dismiss the action—not because it

61

1    was nonjusticiable, but rather because it was unripe, as the disputing

2    branches had not yet reached the "impasse" that would justify their resorting

3    to the courts to interpret the Constitution and break the stalemate. He

4    emphasized the importance of not "encourag[ing] small groups or even

5    individual Members of Congress to seek judicial resolution of issues before

6    the normal political process has the opportunity to resolve the conflict." *Id*.

7          The differences between this case and *Goldwater* are such that *Goldwater*

8    does not provide useful guidance for resolving this dispute. The *Goldwater*

9    litigation arose from a dispute over the allocation of Constitutional powers to

10   two competing branches of government. The Congressional plaintiffs took the

11   position that, by unilaterally abrogating a treaty, which had become effective

12   by virtue of the Senate's exercise of consent, the President was acting illegally

13   and in so doing, was undermining the Constitutional authority of the Senate.

14   This interbranch clash in claims of governmental authority seemed to Justice

15   Powell to offer a likelihood of ripening into either a political resolution or a

16   need for adjudication to break a governmental impasse. The circumstances of

17   this case are very different. There is no interbranch clash in claims of

1    Constitutional authority in this case.[15] The Presidential conduct that is

2    challenged by this suit is the President's private conduct. There is no claim on

3    the part of the Congress, or any of its members, that the President's private

4    conduct of his business affairs usurps power allocated to Congress by the

5    Constitution. While the Constitution empowers Congress to legitimize a

6    President's otherwise unlawful conduct, the President's conduct absent

7    Congressional authorization does not usurp or challenge a Congressional

8    prerogative. In fact, it is not members of Congress who are complaining. In

9    this circumstance, in which Congress's defense of its Constitutional power is

10   not at issue, there is no reason to expect or await either the impasse or the

11   political resolution that Justice Powell saw as the justification for waiting in

12   *Goldwater*. If the challenged conduct falls within what the Constitution

13   describes as the receipt of "emoluments," the conduct is prohibited by the

14   Constitution in the absence of congressional consent—and unlike in

15   *Goldwater*, it is likely simply to continue to occur without a court ruling. This

16   would not be as the result of a "political resolution," but simply because of

---

[15] Members of Congress have brought a separate action against President Trump, alleging violations of the Foreign Emoluments Clause, which is currently pending. *Blumenthal v. Trump*, 382 F. Supp. 3d 77 (D.D.C. 2019).

1    the absence of an adjudicator to tell the President whether his conduct is, or is

2    not, permitted by the Constitution he serves.

3    We therefore think the district court misconstrued Justice Powell's

4    *Goldwater* concurrence in believing that it provided "particularly instructive"

5    guidelines for the resolution of this case. *CREW*, 276 F. Supp. 3d at 194. Justice

6    Powell's reasoning does not justify deferring adjudication to await a ripening

7    that will not happen.

8                              C.  CONCLUSION

9    For the foregoing reasons, the judgment of the district court is

10   VACATED and the case is REMANDED for further proceedings consistent

11   with this opinion.

1  JOHN M. WALKER, JR., *Circuit Judge*, dissenting:

2       I would affirm the district court. The remaining plaintiffs in this
3  case have failed to specify that any actual injury was caused by the
4  President's alleged violation of the Emoluments Clauses, or how this
5  Court could redress such an injury. None of this matters, they say,
6  because the competitor standing doctrine allows us to ignore these
7  pleading failures and to find standing anyway. I disagree and would
8  hold that the complaint fails to sufficiently allege Article III standing.

9       Invoking constitutional provisions never directly litigated in
10 the 230-year history of our Republic prior to the Trump presidency,
11 the plaintiffs in this case claim that the President has inflicted
12 competitive injury on their businesses by maintaining ownership
13 over the Trump Organization's high-end hotels and restaurants and
14 accepting the business of foreign and state official clientele in
15 contravention of both the Foreign Emoluments Clause[1] and the
16 Domestic Emoluments Clause.[2] The plaintiffs, who are owners of
17 other high-end hotels and restaurants in New York City and
18 Washington, D.C.,[3] allege that their businesses have suffered because

---

[1] "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. 1, § 9, cl. 8.

[2] "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

[3] Only two plaintiffs remain in the appeal: Eric Goode and ROC United. Goode is the owner of "several celebrated hotels, restaurants, bars, and event spaces in New York," which include the Maritime Hotel, the Bowery Hotel, the Ludlow Hotel, the Jane Hotel, and the Park, Waverly Inn, and Gemma restaurants. Compl. ¶ 228. ROC United is a nonprofit organization that advocates for wages and

1    foreign and state government officials want what only the Trump-
2    owned establishments can offer: "access to, influence on, and the
3    good will of the President of the United States."[4]

4          As this case comes to us now, it is about constitutional standing,
5    not the precise meaning of the Emoluments Clauses. The meaning of
6    the Clauses may be addressed elsewhere in due course, but even in
7    their unresolved state, a few (largely uncontroversial) observations
8    about the Clauses are in order. First, nothing in the plain text of either
9    Emoluments Clause addresses competition in the marketplace or the
10   conduct of business competitors generally. And neither can the
11   Clauses be considered sweeping anti-corruption provisions. Facially,
12   the Foreign Emoluments Clause concerns only the receipt of
13   "emoluments" from foreign governments or their officials by those
14   "holding any Office of Profit or Trust" on behalf of the United States
15   and the Domestic Emoluments Clause only prohibits the President
16   from receiving "emoluments" beyond the salary of the office from
17   "the United States, or any or them." Neither Clause addresses the
18   receipt of benefits (whether or not they are "emoluments") by the
19   President from members of the public, private businesses, or private

---

working conditions for restaurant workers; it is made up of restaurant members
and restaurant-employee members. **[A66]** The complaint alleges that several of
ROC United's restaurant members compete directly with the Trump International
Hotel & Tower in New York, the Trump International Hotel Washington, D.C.,
and the restaurants inside the Trump Tower and Trump World Tower located in
New York City. **[A67]** A declaration from an industry expert submitted by the
plaintiffs names several restaurants associated with ROC United that compete
directly with Trump-owned properties. In New York City, these establishments
include: The Modern, Gramercy Tavern, Craft, and Riverpark. **[A312–15]** In
Washington, D.C., the ROC United competitor restaurants are: the Riggsby,
Minibar, Jaleo, Casolare Ristorante, and Zaytinya. **[A319–22]**

    [4] Compl. ¶ 150.

parties who seek government favors.[5] Thus neither competition nor ordinary corruption are targeted by the Clauses or lie anywhere near the heart of this case.

What is meant by the term "emolument" in the Emoluments Clauses has yet to be determined by any federal court. Regardless of whether the Emoluments Clauses encompass, as the plaintiffs have urged, anything of value,[6] or whether the Clauses capture a narrower range of exchanges,[7] the text and historical meaning plainly do not evidence concern for protecting fair competition in the marketplace.

Of course, none of these observations foreclose the possibility (however slim) that parties may pursue a private right of action (should such a right be recognized) to remedy commercial harms

---

[5] *See* U.S. Const. art. I, § 9, cl. 8; art. II, § 1, cl. 7.

[6] *See* Appellants' Br. at 6–7; *see also* Norman L. Eisen, Richard Painter & Laurence H. Tribe, Brookings, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* 11 (Dec. 16, 2016), https://www.brookings.edu/wp-content/uploads/2016/12/gs_121616_emoluments-clause1.pdf (arguing that the Emoluments Clause warrants the "broadest possible construction to the payments it encompasses" and thus "unquestionably reaches any situation in which a federal officeholder receives money, items of value, or services from a foreign state"); Zephyr Teachout, Opinion, *Trump's Foreign Business Ties May Violate the Constitution*, N.Y. Times, Nov. 17, 2016, https://www.nytimes.com/roomfordebate/2016/11/17/would-trumps-foreign-business-ties-be-constitutional/trumps-foreign-business-ties-may-violate-the-constitution.

[7] *See* Amandeep S. Grewel, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 641–42 (2017) (arguing that the Foreign Emoluments Clause covers only "office-related compensation"); *see also* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 Ga. L. Rev. 1 (2017) (arguing that "emolument[s] in the Constitution meant compensation with financial value, received by reason of public office"); Eugene Kontorovich, Opinion, *Did George Washington Take 'Emoluments'?*, Wall St. J., Apr. 17, 2017, http://www.wsj.com/articles/did-george-washington-take-emoluments-1492123033 (arguing that George's Washington's private business dealings while in office cast doubt on whether President Trump's business holdings violate the Foreign Emoluments Clause).

wrought by violations of the Emoluments Clauses or exclude the prospect that the Clauses as applied to a particular case could somehow affect market competition. Neither clause on its face, however, gives any indication that it is concerned with maintaining competition, or that it protects a right enforceable in the manner the plaintiffs have chosen to pursue.

Finally, this case is deeply political and thus finds itself in an area where federal courts ought to tread lightly. President Trump was democratically elected by the American people—and he was elected with his business holdings and brand prominence in full view. What's more, it is evident from the text of the Emoluments Clauses that they pertain to questions of separation of powers and, in particular, the relationship between the President and the Congress. Whether the courts should properly play any role pertaining to that relationship in the context of the Clauses will have to be determined in the future.

## I.

Whatever the resolution of these various background questions, only one issue is before us now: have the plaintiffs sufficiently alleged constitutional standing to challenge the President's alleged violations of the Emoluments Clauses? The tripartite test for standing under Article III is well known: "an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[8] A plaintiff's obligation to meet this test is an immovable feature of our constitutional structure; constitutional standing is a "bedrock requirement" and "an irreducible minimum" without

---

[8] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

which there is no case or controversy under Article III of the Constitution.[9] And, the standing inquiry is "especially rigorous" when the dispute implicates, as it does here, the separation of powers.[10]

The plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing constitutional standing.[11] At the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element."[12] The "reviewing court[] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."[13]

Here the pleadings do not particularize any direct injury actually caused by violations of the Emoluments Clauses, much less how such injury might actually be redressed by the courts. Rather, the plaintiffs (and the majority) rely entirely on a shortcut known as the competitor standing doctrine. This doctrine allows a competitor-plaintiff the presumption of injury in fact, traceability, and redressability when the plaintiff is almost sure to suffer a competitive injury as a matter of "economic logic."[14]

---

[9] *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 472 (1982); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (articulating that Article III's "Cases" and "Controversies" requirement is a "fundamental limitation" and is "founded in concern about the proper—and properly limited—role of courts in a democratic society" (internal quotation marks and citations omitted)).

[10] *Clapper*, 568 U.S. at 408 (internal quotation marks omitted).

[11] *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016).

[12] *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

[13] *Warth*, 422 U.S. at 501.

[14] *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008).

The question of whether the competitor standing doctrine finds any traction in private suits brought under the Emoluments Clauses was recently addressed in *In re Donald J. Trump* by the Fourth Circuit, the first circuit to do so.[15] In that case, the District of Columbia and the State of Maryland sued the President alleging that he violated the Emoluments Clauses and that, among other injuries, those violations harmed their proprietary interests as businesses competing with the Trump Organization.[16] The Fourth Circuit held, correctly in my view, that the plaintiffs could not invoke the competitor standing doctrine to achieve Article III standing.[17]

*Injury in fact.* The competitor standing doctrine "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors."[18] The doctrine allows plaintiffs to proceed if the economically logical cause and effect between a government action and increased competition is strong enough to support an inference of injury in fact to the competitor, "even though empirical analysis might conceivably have provided a higher level of certainty."[19] Of course, this doctrinal exception does not excuse the plaintiff from satisfying all three Article III standing requirements; all it does is exempt the plaintiff from showing an actual or imminent injury when the alleged harm arises in a market context where the actual injury may be difficult to demonstrate but is almost sure to

---

[15] *In re Donald J. Trump*, 928 F.3d 360, 363, 366 (4th Cir. 2019).

[16] *Id.* at 363.

[17] *Id.* at 377.

[18] *Canadian Lumber*, 517 F.3d at 1332 (citing *Clinton v. City of New York*, 524 U.S. 417, 433 (1998)).

[19] *Canadian Lumber*, 517 F.3d at 1333.

occur.[20] It bears repeating that the plaintiffs here rely on the competitor standing doctrine because they cannot show (and have not alleged) that they have suffered any particularized injury caused by the violations they allege.

Well-established precedent gives a competitor standing plaintiff latitude to allege competitive injury, but the competitive injury pleading exception, based as it is on economic logic, cannot be universally applied to every competitor. "[T]o establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit."[21] Other courts have correctly indicated that the plaintiff must be a "direct competitor[]."[22] The plaintiff must also show "an actual or imminent increase in competition, which increase [the court] recognize[s] will almost certainly cause an injury in fact."[23]

Taken in isolation, the phrase from Second Circuit precedent—injury is shown if the plaintiff "competes in the same arena"[24]—can be read to suggest that a minimal allegation of direct competition is sufficient. In light of this seemingly low injury-in-fact bar, the majority opinion maintains that the plaintiffs have met this

---

[20] *See, e.g., El Paso Nat. Gas Co. v. F.E.R.C.*, 50 F.3d 23, 27 (D.C. Cir. 1995); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825–26 (9th Cir. 2011).

[21] *In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989); **[JON (diss.), ALK, RJC]** *see also Ctr. for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). **[JMcL, PNL, SS]**

[22] *TrafficSchool*, 653 F.3d at 826; *see also Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993) (noting that the Supreme Court's competitor standing cases "are all premised on a plaintiff's *status* as a *direct competitor*" (emphasis in original)).

[23] *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *see also Inv. Co. Inst. v. F.D.I.C.*, 815 F.2d 1540, 1543 (D.C. Cir. 1987) (competitor standing satisfied when increased competition "'plainly threatens' economic injury").

[24] *USCC*, 885 F.2d at 1029.

standard.[25] I agree with the majority that our prior cases are capable of this broad reading, but after the Supreme Court's decision in *Already, LLC v. Nike, Inc.*,[26] and upon close examination of the kinds of cases that have applied the competitor standing doctrine, it is more than evident to me that the doctrine does not, and should not, reach this case.

In *Already*, the plaintiff, a shoe company, sought to challenge one of Nike's trademarks even after Nike issued a broad covenant promising not to pursue trademark claims against potentially infringing Already products and any future similar products manufactured by Already.[27] The Court rejected the theory that Already had standing to challenge the validity of Nike's trademark simply because it was Nike's competitor: "Taken to its logical conclusion, the theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on. We have never accepted such a boundless theory of standing."[28]

Already's theory of competitive injury was that the continued existence of Nike's allegedly unlawful mark, notwithstanding Nike's covenant with Already, deterred investment in its company, thereby placing Already at a competitive disadvantage.[29] Already argued that a large company like Nike used its allegedly invalid trademark to

---

[25] *See* Maj. Op. 18.

[26] 568 U.S. 85 (2013).

[27] *Id.* at 88–89.

[28] *Id.* at 99.

[29] *Id.* at 97–99; *see also* Br. for Petitioner, *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) (No. 11-982), 2012 WL 3613367 at *33–34.

"bully small innovators" and that Nike's broad covenant not to sue could not "eradicate" the market effect of a "registered but invalid mark."[30] Thus Already's theory of competitor standing did not turn on whether Already planned to create a shoe to compete with a particular Nike shoe not covered by the covenant not to sue,[31] but was instead a broader claim about competitive injury. Already's allegations of Nike's intimidation tactics, if true, would have had a negative competitive impact on Already's business. Nike's allegedly unlawful conduct, in other words, would have placed Already on an unlevel playing field.

In rejecting Already's claim that this type of competitive injury was sufficient to establish Article III standing, the Supreme Court was quite clear that such a "boundless theory" of competitor standing is unacceptable under Article III.[32] Not every competitive injury—even though a competitor's allegedly unlawful actions may in fact skew the competitive field to the plaintiff's disadvantage—gives a competitor standing to challenge that action.

The plaintiffs' claim in this case is very much like the competitor standing claim in *Already*. Already and Nike were competitors (albeit mismatched in size) in the athletic-shoe market.[33] Already's theory of competitive standing was that Nike's allegedly invalid trademark deterred investment in Already and thus improperly chilled competition in that market. In this case, the plaintiffs claim similarly that the President's alleged constitutional

---

[30] *Already*, 568 U.S. at 99, 98.

[31] *See* Maj. Op. 20–21.

[32] *Already*, 568 U.S. at 99.

[33] *Id.* at 88.

1    violations are unlawfully skewing the competitive environment to his

2    advantage.

3          The majority distinguishes *Already* on the basis that the

4    plaintiffs here compete with the Trump-owned properties for

5    identical consumers.[34] But that is the wrong inquiry, and in any case

6    does not distinguish this case from *Already*. Already and Nike

7    competed for at least some identical consumers, "in the same arena";[35]

8    otherwise, there would have been no competitor issue in the case.

9    Competitors, by definition, are always seeking to attract buyers who

10   want the same goods or services. It is necessary rather to ask whether

11   that competition is such that the harm will likely occur, as a matter of

12   economic logic, from the violation of law alleged. Here, there is no

13   logical connection between the President's alleged receipt of

14   emoluments and the competitive success of the Trump-owned

15   businesses. With or without the President's receipt of "emoluments,"

16   there are myriad reasons why a non-Trump establishment would face

17   the same competition.

18         Moreover, it cannot be the case that, every time a competitor

19   achieves some benefit through allegedly unlawful conduct that has

20   no direct relationship to competition, competing businesses have

21   standing to challenge that unlawful action simply by virtue of their

22   status as a direct competitor.[36] Any number of potential illegal actions

23   by a business could cause its rivals to face stiffer competition without

24   giving rise to Article III standing. Take the example of an owner of a

---

[34] Maj. Op. 20–21.

[35] *USCC*, 885 F.2d at 1029.

[36] *See In re Donald J. Trump*, 928 F.3d at 377 ("At bottom, the [plaintiffs'] are left to rest on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met.").

high-end restaurant in a competitive marketplace who fraudulently applies for and receives a bank loan from an FDIC-insured bank, or fraudulently applies for and receives a large tax refund. The restaurant's illegally obtained funds might allow it to achieve a market benefit available to no other competitor: the restaurant is able to hire a superior chef and undercut competitors on menu pricing. As a result, that restaurant's law-abiding competitors find themselves facing increased competition. But do the restaurant's competitors have competitor standing to hold the restaurant liable for its unlawful action simply because they "compete[] in the same arena"?[37] As the Supreme Court made clear in *Already*, the answer is no. The economic logic necessary for competitor standing is measured between the violation and the competitive harm, and in the hiring of the chef that economic logic is non-existent. Such is the situation here. The mere fact of competition is insufficient. Otherwise, courts would have to entertain every claim by a competitor in which the defendant received some unlawful benefit—a benefit unrelated to competition—simply because that benefit could have an effect on competition.

All of this leads me to question the expansive scope of our circuit's earlier precedent. To say that all a competitive injury requires is a showing that the plaintiff "competes in the same arena" conflicts with *Already*'s admonition that a market participant has not suffered constitutionally significant injury "whenever a competitor benefits from something allegedly unlawful."[38] Our formulation of this standing theory needs to be construed in light of the Supreme Court's limitations in *Already*. At any rate, even if our precedents required us to conclude that plaintiffs sufficiently alleged a competitive injury in

---

[37] *USCC*, 885 F.2d at 1029.

[38] *Already*, 568 U.S. at 99.

1    fact, I have little doubt that they fail to satisfy the remaining,
2    indispensable Article III requirements of traceability and
3    redressability.

4        *Traceability*. For there to be Article III standing, the plaintiffs
5    must plausibly allege that their injury is "*fairly traceable* to the
6    challenged action of the defendant."[39] Under the competitor-standing
7    doctrine, courts have typically found that traceability flows readily
8    from a competitive injury.[40] In these cases causation logically follows
9    given the nature of the violation: if the violation would necessarily
10   harm the plaintiff's competitive opportunities, then an unlawful edge
11   to a competitor logically connects to that violation.[41]

12       But, again, this case is no ordinary competitor standing case.
13   The Emoluments Clauses do not regulate business or market activity
14   *as* business or market activity, nor would their violation as a general
15   matter be expected to affect competition.[42] Conventional competitor
16   standing cases do not present difficult traceability questions precisely
17   because the allegedly unlawful action is directed at markets or market
18   behavior, and thus the connection between a market-affecting action
19   and a market effect is tight. The Emoluments Clauses were never

---

[39] *Lujan*, 504 U.S. at 560 (emphasis added) (internal quotation marks omitted).

[40] *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (finding that causation and redressability are "easily satisfied" in a competitor standing case); *New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 172 (D.C. Cir. 2002) (noting that, in "garden variety competitor standing cases" the "chain of causation" is "firmly rooted in the basic law of economics" (internal quotation marks omitted)).

[41] *See Sherley*, 610 F.3d at 72 (competitive injury caused when "agencies lift regulatory restriction on [the plaintiff's] competitors or otherwise allow increased competition against them" (internal citation and quotation marks omitted)).

[42] *See infra* Part II.

intended to regulate market behavior, and thus economic logic is absent.

The recognition that traffic increased at Trump-owned establishments following President Trump's election is not enough to show traceability. The plaintiffs must allege, beyond pure speculation, that the unlawful acceptance of emoluments from foreign and state government officials—not just the popularity of Trump-owned establishments for a myriad of reasons—is causing the plaintiffs' lost opportunity to compete on equal footing.[43] The plaintiffs have not plausibly alleged that the desire to confer a relatively modest[44] financial benefit on the President is the driving force behind increased competition.[45] And this must be plausibly

---

[43] In *Schulz v. Williams*, we held that traceability was satisfied as long as the challenged action (a district court injunction, in that case) "could have caused [the plaintiffs'] injury." 44 F.3d 48, 53 (2d Cir. 1994). But the bar is not as low, *see* Maj. Op. at 24, as this isolated language suggests. In *Schulz*, there was no speculation that the district court's injunction caused the plaintiffs' alleged electoral injury because there was no other action to which the asserted injury could have been traced. *Schulz* does not stand for the proposition that any action that theoretically "could have" caused the plaintiffs' injury will suffice. At this stage, the plaintiffs must allege a plausible causal route, not merely a possible one.

[44] The Trump Organization claims it donated approximately $150,000 in profit from foreign-government business to the U.S. Treasury in 2016 and approximately $191,000 in 2017 to offset financial gains to the President. Rebecca Ballhaus, *Trump Organization Details Level of Profits from Foreign Governments*, Wall St. J., Feb. 25, 2019, https://www.wsj.com/articles/trump-organization-details-level-of-profits-from-foreign-governments-11551116974. This is an infinitesimal amount in relation to the President's reported net worth of $3 billion in 2019. Shahien Nasiripour & Caleb Melby, *Trump's Net Worth Rises to $3 Billion Despite Business Setbacks*, Bloomberg, June 12, 2019, https://www.bloomberg.com/news/articles/2019-06-12/trump-s-net-worth-rises-to-3-billion-despite-business-setbacks. Of course, these specific amounts remain untested and unconfirmed.

[45] *See In re Donald J. Trump*, 928 F.3d at 375 ("To begin, the District and Maryland's theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividends*

1    alleged because it stands to reason that diplomats who patronize
2    high-end hotels and restaurants do not make their choices solely
3    based on profit distribution, but as people with wide-ranging tastes
4    and varying interests. The plaintiffs' and the President's
5    establishments exist in a virtual sea of luxury hotels and restaurants[46]
6    in which many different factors influence decision making and freely
7    affect competition. There are simply too many variables at play (name
8    recognition, boasting rights, better food, better service, more
9    comfortable beds, reputation for quality, location close to the seats of
10   power, to name a few)[47] to allow the plaintiffs to rest solely on the

---

*to the President*, rather than due to any of the Hotel's other characteristics. Such a conclusion, however, requires speculation into the subjective motives of independent actors who are not before the court, undermining a finding of causation." (emphasis in original) (citing *Clapper*, 568 U.S. at 413)).

[46] The plaintiffs' establishments, it should be noted, represent only a few of the many upscale restaurants and hotels located in New York City and Washington, D.C. By a rough count, there are approximately 115 five-star hotels in New York City and 47 in Washington D.C.. *See* Five Star Alliance, https://www.fivestaralliance.com. And when this lawsuit was filed in 2017, there were 77 Michelin star restaurants in New York City and 12 in Washington D.C. *See Michelin Guide 2017: New York's Best Restaurants*, Michelin Travel, https://travelguide.michelin.com/reportage/michelin-guide-2017-new-yorks-best-restaurants; *Michelin Guide Washington 2017: 12 Restaurants Earn Stars*, Michelin Travel, https://travelguide.michelin.com/north-america/united-states/district-columbia/washington-dc/reportage/michelin-guide-washington-2017. This count does not include the numerous high-end restaurants—like the ROC United restaurants Craft, Riverpark, Casolare Ristorante, and Zaytinya—that are not Michelin-starred. None of these other establishments have joined in this lawsuit to account for any possible competitive deprivation.

[47] *See In re Donald J. Trump*, 928 F.3d at 376 ("And, even if government officials were patronizing the [Trump International] Hotel to curry the President's favor, there is no reason to conclude that they would cease doing so were the President enjoined from receiving income from the Hotel. After all, the Hotel would still be publicly associated with the President, would still bear his name, and would still financially benefit members of his family. In short, the link between government

bare assertion that the President's acceptance of emoluments has caused them competitive injury.

On this point, the majority criticizes the district court for an error it did not make: requiring the plaintiffs to "dispel alternative possible explanations" for their asserted injury.[48] Of course, the majority is correct that a plaintiff need not disprove alternative causal routes, but the district court required of the plaintiffs no such thing. The district court instead listed factors that may influence whether a diplomatic patron will or will not frequent a Trump-owned property—"service, quality, location, price, and other factors related to individual preference"[49]—to illustrate why the causal chain in this case is speculative.

That the plaintiffs are not required to disprove alternative causation does not cure that they failed to plausibly allege *any* causal chain. I agree with the majority that "allegations of fact must plausibly support a 'substantial likelihood' that the plaintiff's injury was the consequence of the defendant's allegedly unlawful actions."[50] A review of the complaint, however, reveals few (if any) specific allegations that diplomatic patrons are motivated by the desire to confer emoluments on the President.[51] The most that is plausibly

---

officials' patronage of the Hotel and the Hotel's payment of profits or dividends to the President himself is simply too attenuated.").

[48] Maj. Op. 22–23.

[49] *Citizens for Responsibility & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 185–86 (S.D.N.Y. 2017).

[50] Maj. Op. 22 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1974)).

[51] And, as the Fourth Circuit points out, "there is a distinct possibility . . . that certain government officials might *avoid* patronizing the [Trump International]

1   alleged is that Trump-owned properties attract diplomatic clientele,
2   and that the President has publicly sought and encouraged such
3   patronage.[52] But these allegations fall short of plausibly alleging (or
4   permitting a reasonably plausible inference) that increased
5   competition is caused by the President's acceptance of emoluments.

6       The plaintiffs rely on a Washington Post article in which
7   diplomats are quoted stating that they and their colleagues will favor
8   Trump-owned properties.[53] None of these statements reveal a specific
9   motivation to confer a financial benefit on President Trump. They
10  indicate nothing more than that the primary motivator is Trump-
11  brand loyalty. The plaintiffs' strongest argument cites a line from that
12  same article: "In interviews with a dozen diplomats . . . some said
13  spending money at Trump's hotel is an easy, friendly gesture to the
14  new president."[54] This allegation is too scant to satisfy plaintiffs'
15  burden to affirmatively plead that their competitive injury is traceable
16  to the President's acceptance of emoluments.[55]

17      Even if a government official were actually motivated to
18  "enrich[]"[56] the President by staying at a Trump-owned hotel, the
19  plaintiffs must plausibly allege that it is the acceptance of emoluments

---

Hotel because of the President's association with it." *In re Donald J. Trump*, 2019 928 F.3d at 376.

[52] Compl. ¶¶ 56, 58–87, 109, 196–97, 199–203, 206–11, 230–33.

[53] Appellants' Br. 38 ("Believe me, all the delegations will go there.") ("Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!'").

[54] Appellants' Reply Br. 12 (quoting Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post, Nov. 18, 2016).

[55] In my view, this is the case even after we accept the plaintiffs' (highly debatable) broad definition of emoluments.

[56] Maj. Op. 19, 21.

that is unlawfully distorting competition. The plaintiffs must affirmatively allege that conferring a direct benefit on the President makes a material difference when placed alongside all of the other reasons for patronizing Trump properties. Without allegations to that effect, the causal chain remains too speculative. To be sure, the plaintiffs need not disprove all alternative causal routes, but the plaintiffs still remain obligated to plead a casual chain that rises above speculation.[57] This they have not done.

*Redressability*. Finally, the plaintiffs must show that it is "likely . . . that the injury will be redressed by a favorable decision."[58] Like traceability, redressability frequently follows closely on the heels of a competitive injury in fact, but it is still a distinct component of Article III standing and must be plausibly alleged.

Wholly absent from the complaint are any plausible, non-conclusory allegations that the sought-after remedy will lessen the plaintiffs' competitive injury.[59] At the point in the complaint at which the reader might expect to be told how the remedy sought would redress the competitive injury, the reader is left empty-handed. The plaintiffs simply request that the court issue a declaratory judgment that broadly defines the Emoluments Clauses as the plaintiffs would like,[60] and ask for "[i]njunctive relief, enjoining [the President] from

---

[57] *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976) ("[U]nadorned speculation will not suffice to invoke the federal judicial power.").

[58] *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

[59] *Iqbal*, 556 U.S. at 678.

[60] The plaintiffs request, among other things, that "Emolument . . . of any kind whatever" under the Foreign Emoluments Clause be defined to "cover anything of value," and "any other Emolument" in the Domestic Emoluments Clause be defined to encompass "monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal

violating the Foreign and Domestic Emoluments Clauses, as construed by this Court, and requiring [the President] to release financial records sufficient to confirm that [he] is not engaging in any further transactions that would violate the Emoluments Clauses."[61] As for how this relief will remedy the plaintiffs' competitive injury, the complaint only asserts in conclusory fashion that "the declaratory and injunctive relief . . . would provide a remedy for the many injuries described above."[62]

It comes as no surprise that the pleadings are insufficient as to redressability because they do not connect the relief requested to any effect on competition. The amicus brief by former national-security officials, relied upon by the plaintiffs,[63] cuts in the opposite direction from the argument that the plaintiffs use it to support. The brief highlights the plaintiffs' redressability problem, pointing out the obvious: "our adversaries and even our allies seek every advantage that is available on the international stage."[64] The various articles and statements cited by the plaintiffs demonstrate that diplomats choose to patronize Trump-owned properties for a variety of reasons—and most likely several reasons at the same time. None of them single out the conferral of emoluments. But, more to the point, there is no allegation that removing any one of the many possible incentives would cause diplomatic patrons to book at other establishments. To the contrary, as the former national-security officials point out,

---

cost . . . ." They ask the court to declare that the President's conduct violates both provisions. *See* Compl. VI(a).

[61] Compl. VI(b). One suspects that obtaining the President's financial records may be the true reason for this lawsuit.

[62] Compl. ¶¶ 239; 243; *see also* Compl. ¶ 242.

[63] *See* Appellants' Reply Br. 12–13 (citing Br. of Former Nat'l Sec. Officials 21).

[64] Br. of Former Nat'l Sec. Officials 21.

1   officials are likely to continue to seek "every advantage"—and
2   continue to book at Trump-owned properties.

3       It is evident that the complaint fails to adequately plead
4   redressability because it is virtually impossible to plausibly connect
5   the purported cause of the plaintiffs' alleged harm to the remedy they
6   claim to seek (but have not specified in the complaint)—an improved
7   competitive environment. Even if "the mere possibility that
8   customers might continue to favor the defendant's product or service
9   after a court enjoins the violation does not defeat Article III
10  standing,"[65] plaintiffs here have not particularized any causal
11  connection between the alleged violation of the Emoluments Clauses
12  and their market disadvantage. When plaintiffs come before a court
13  unable to specify how the relief they seek will redress their injury,
14  "one must wonder why they came to the court for relief in the first
15  place."[66] In any event, the fact that the plaintiffs plainly fail to do so
16  in the complaint is telling and is itself sufficient to defeat standing.

17                                  II.

18      As I have already noted, that the application of the competitor
19  standing doctrine in this case will not satisfy the requirements of
20  Article III standing is not surprising given the absence of economic
21  logic between the violation alleged (the transgression of the
22  Emoluments Clauses) and harm to the plaintiffs (competitive
23  disadvantage). The nature of the cases in this area merits further
24  elaboration. Only in certain categories has the economic logic been
25  tight enough for courts to permit competitor-plaintiffs to shortcut the
26  usual requirement of pleading injury in fact, traceability, and

---

[65] Maj. Op. 42.
[66] *In re Donald J. Trump*, 928 F.3d at 377.

1  redressability with particularity. These cases fall generally into three
2  categories: agency cases, election cases, and unfair competition cases.
3  It is only within these three categories that the cases relied upon by
4  the plaintiffs (and the majority) to support their competitive standing
5  theory can be found. In each of these three categories, the challenged
6  governmental action or non-action is directed at parties in their
7  capacity as a market player. This emoluments case, by contrast, fits
8  into none of these three categories, and it is not analogous to any of
9  them.

10     *Agency cases.* The competitor standing doctrine originated with
11  agency cases. The first of these cases before the Supreme Court,
12  *Investment Company Institute v. Camp*, involved banking regulations
13  that allowed new institutions to enter certain financial sectors.[67]

14     Following that decision, competitor standing cases premised
15  on a challenge to agency action have become common.[68] In *Adams v.*
16  *Watson*, the First Circuit held that out-of-state milk producers had
17  competitive standing to challenge state dairy regulations.[69]    In
18  *Canadian Lumber Trade Alliance v. United States*, the Federal Circuit
19  determined that Canadian wheat producers could employ competitor
20  standing to challenge United States customs regulations designed to

---

[67] *See Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1970) (investment companies had standing to challenge the regulation of national banks); *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 403 (1987) (competitor brokerage trade association had standing to sue over banking regulations); *Nat. Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (banks and bankers association had standing to sue over credit union regulations).

[68] Some cases in this category could fall under the broader heading of "governmental action." *See Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998) (farmers' cooperative had competitor standing to challenge the President's line item veto of a bill provision that would have benefitted the cooperative).

[69] *Adams*, 10 F.3d at 920, 925.

1    aid American wheat producers.[70] The D.C. Circuit, in *Sherley v.*
2    *Sebelius,* held that adult stem cell researchers had competitive
3    standing to challenge new regulations authorizing the National
4    Institutes of Health to fund embryonic stem cell research.[71] I could go
5    on.

6         In the agency context, where the government regulators are
7    effectively choosing winners and losers in the marketplaces that they
8    regulate, affording the plaintiff the presumption of injury,
9    traceability, and redressability makes sense. There is no doubt, for
10   example, that when the government allows a commercial bank to
11   operate in a sector previously occupied only by investment firms,[72]
12   the investment firms will suffer negative competitive effects because
13   more actors occupy the field. In these cases, the challenged
14   government action is directed at a *particular marketplace* with the aim
15   of regulating one or more of the players in *that market* in some way.
16   The government's decision to act in a way that gives a boost to some
17   players in that market or allows a new player to enter it, will, as a
18   matter of *economic logic*, be to the detriment of others.

19        *Election cases.* Competitor standing cases in the Second Circuit
20   have arisen in the election context. In *Fulani v. League of Women Voters*
21   *Education Fund*, the plaintiff, a presidential candidate, alleged that the
22   League of Women Voters violated its tax-exempt status by hosting a
23   primary debate that imposed certain admission requirements on the
24   debate candidates, thereby causing the plaintiff-candidate a

---

[70] *Canadian Lumber*, 517 F.3d at 1332.

[71] *Sherley*, 610 F.3d at 73.

[72] *See, e.g., Camp*, 401 U.S. at 620.

1   competitive injury when she was  excluded from the debate.[73] We

2   held that she had competitor standing to challenge the League's tax-

3   exempt status.[74] The plaintiff in *Fulani* alleged that a law (aimed at

4   preventing *political* abuse of an organization's tax-exempt status in the

5   political marketplace) caused a competitive injury to her *political*

6   candidacy which plainly would be redressed if she were permitted to

7   debate. Her injury and its causation and redressability were self-

8   evident as a matter of logic.

9          Likewise, *Schulz v. Williams* involved an action by the

10  Libertarian Party to enjoin the operation of a New York election law

11  that had blocked its candidates from getting on the state ballot.[75] The

12  district judge granted the Libertarian Party an injunction. The

13  competitor-intervenor Conservative Party appealed on the basis that

14  the district court's injunction improperly placed Libertarian

15  candidates on the ballot and thereby siphoned votes away from it.[76]

16  We held that the intervenor-Conservative Party had standing to

17  challenge the election law ruling that had allegedly caused it an

18  electoral injury.[77]

19         Finally, in *In re U.S. Catholic Conference*, pro-choice advocates

20  had competitive standing to challenge the tax-exempt status of the

21  Catholic Church on the grounds that the Catholic Church had

22  unlawfully engaged in partisan activities by campaigning for pro-life

---

[73] *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 624 (2d Cir. 1989).
**[EVG, RJC, *LWP*]**

[74] *Id.* at 626.

[75] *Schulz*, 44 F.3d at 51–52.

[76] *Id*. at 52–53.

[77] *Id*. at 53.

1  causes.[78] By logic parallel to the agency cases, in each election case the
2  competitor-plaintiff sought to challenge election-related action that
3  allegedly had an obvious and direct negative impact on the plaintiffs'
4  own political activities.

5  *Unfair competition cases.* The third context in which the
6  competitor standing doctrine has arisen is in unfair competition
7  claims.[79] Courts routinely recognize constitutional standing for
8  competitors seeking to redress antitrust injury.[80] Suits by competitors
9  brought under the Lanham Act are also commonly allowed based on
10 competitor standing. In *TrafficSchool.com, Inc. v. Edriver, Inc.*, both
11 parties ran online traffic-school courses in the same market. The
12 plaintiff alleged that the defendant had engaged in false advertising
13 in violation of Lanham Act and state unfair competition laws—a
14 violation, unlike that here, that directly relates to competition.[81] The
15 Ninth Circuit determined the competitor-plaintiff had standing
16 because they were direct competitors and "[s]ales gained by one are
17 thus likely to come at the other's expense."[82] This case exemplifies
18 those cases in which, as a matter of economic logic, a competitor had

---

[78] *USCC*, 885 F.2d at 1022.

[79] *See TrafficSchool*, 653 F.3d at 825–26.

[80] *See, e.g., NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc) (recognizing Article III standing for a plaintiff allegedly injured by a competitor's antitrust violations). The plaintiffs suggest that standing for competitors in these cases supports their broad proposition that "courts have upheld Article III standing when the illegal acts of private parties increase or distorted competition against a plaintiff" and evinces the doctrine's application in "many other contexts." Appellants' Br. 28–29. But the plaintiffs miss the thread that ties all three categories of cases together: economic logic. The same economic logic that connects agency, election, and unfair competition competitor standing cases is absent in this case.

[81] *Id.* at 824.

[82] *Id.* at 825.

1   standing to challenge a rival's noncompliance with laws plainly
2   designed to regulate their competition in the common marketplace.

3                                   * * *

4        These are the three broad categories of cases in which courts
5   have extended to plaintiffs a presumption of competitive injury based
6   on common-sense market logic. The cases in each of these three
7   categories deal with challenged regulations, laws, and actions that
8   were directed at market players *in their role as market players*, which is
9   the key determinant that may warrant utilization of the competitor
10  standing exception. These cases stand for the proposition that
11  competitive injury in fact, together with causation and redressability,
12  can be presumed when the plaintiff can point to some government
13  action or inaction that *directly* regulates the conduct of a market player
14  operating in the same market. In other words, plaintiffs in these cases
15  were afforded competitor standing when they asserted a competitive
16  injury as a result of an unlawful activity that was itself directly related
17  to, and intended to regulate, the commercial or political marketplace.

18       The case before us is markedly different. The competitor
19  standing suit against the President has little in common with these
20  three categories of cases. Even accepting the plaintiffs' broad
21  construction of the Emoluments Clauses, the Clauses were never
22  designed to, and nor do they, directly regulate the marketplace or the
23  market player as it functions in the marketplace. The Emoluments
24  Clauses have never been characterized as market-oriented, no case
25  has ever stretched the competitor standing exception this far, and, as
26  is evident from the Supreme Court's decision in *Already*, such a stretch
27  goes further than the competitor-standing pleading exception can
28  bear.

1    In sum, because the plaintiffs lack standing to challenge the
2    President's alleged acceptance of emoluments under either
3    traditional standing principles or the competitor standing doctrine, I
4    respectfully dissent.

1  UNITED STATES COURT OF APPEALS
2  FOR THE SECOND CIRCUIT
3
4  August Term, 2018
5
6  (Argued: October 30, 2018      Decided: March 20, 2020)
7
8  Docket No. 18-474
9
10  _____
11
12  Citizens for Responsibility and Ethics in Washington, Restaurant
13  Opportunities Centers United, Inc., Jill Phaneuf, and Eric Goode,
14
15  *Plaintiffs-Appellants*,
16
17  v.
18
19  Donald J. Trump, in his official capacity as
20  President of the United States of America,
21
22  *Defendant-Appellee*.
23  _____
24
25  Before:
26
27  JOHN M. WALKER, PIERRE N. LEVAL, *Circuit Judges*.[1]
28
29          DEEPAK GUPTA, Gupta Wessler PLLC,
30          Washington, D.C. (Jonathan E. Taylor,
31          Joshua Matz, and Daniel Townsend,
32          Gupta Wessler PLLC, Washington, D.C.;
33          Joseph M. Sellers, Daniel A. Small,
34          Cohen Milstein Sellers & Toll PLLC,

_____

[1] Judge Christopher F. Droney, who was originally part of the panel assigned to hear this case, retired from the Court effective January 1, 2020. The remaining two members of the panel are in agreement regarding this order. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

1          Washington, D.C.; Norman L. Eisen,
2          Stuart C. McPhail, Adam J. Rappaport,
3          Citizens for Responsibility and Ethics in
4          Washington, Washington, D.C.;
5          Laurence H. Tribe, Harvard Law School,
6          Cambridge, MA, on the brief), *for*
7          *Plaintiffs-Appellants*.

8

9          HASHIM M. MOOPPAN, Department
10        of Justice, Washington, D.C., (Chad A.
11        Readler, Michael S. Raab, Megan
12        Barbero, Department of Justice,
13        Washington, D.C., on the brief), *for*
14        *Defendant-Appellee*.

15

16  PER CURIAM:

17       It is hereby ORDERED that the chapter of the panel opinion of September

18  13, 2019 captioned "Zone of Interests" is amended by deleting the passage from

19  its fourth paragraph (beginning "The district court's analysis erred on the

20  merits . . .") to the end of the chapter. The chapter is further amended in the

21  first and second paragraphs so that they are consistent with the above deletion,

22  and at the end of the chapter by addition of a footnote acknowledging and

23  explaining the deletion. The chapter in amended form shall read as follows:

24      ii.     <u>Zone of Interests</u>

25       The district court also erred in its reliance on the zone of

26      interests test as a basis for finding lack of jurisdiction. The

1    Supreme Court has recently clarified that the zone of interests test

2    is not a test of subject matter jurisdiction. In *Lexmark Int'l Inc. v.*

3    *Static Control Components*, the Supreme Court, while

4    acknowledging that past decisions had characterized the zone of

5    interests test as part of a "'prudential' branch of standing,"

6    reconsidered the question and clarified both that the "prudential"

7    label is a misnomer and that the test does not implicate Article III

8    standing. 572 U.S. 118, 126–27 (2014). Rather, the Court explained

9    that the test asks whether the plaintiff "has a cause of action under

10   the [law]" on the basis of the facts alleged. *Id.* at 128. The Court

11   emphasized that the test is not "jurisdictional" because "the

12   absence of a valid . . . cause of action does not implicate subject-

13   matter jurisdiction." *Id.* at 128 n.4 (internal quotation marks

14   omitted). In *Bank of America v. City of Miami*, 137 S.Ct. 1296 (2017),

15   the Court reaffirmed that the zone of interests test asks whether

16   the complaint states an actionable claim under a statute (and not

17   whether the plaintiff has standing and the court has subject matter

18   jurisdiction). The *City of Miami* majority reiterated that the Article

3

1      III standing requirements are injury, causation, and redressability,

2      and reinforced *Lexmark*'s essential point that the zone of interests

3      question is "whether the statute grants the plaintiff the cause of

4      action that he asserts." *Id.* at 1302.

5      Accordingly, while it had previously been appropriate to

6      consider whether plaintiffs fall within the zone of interests in

7      deciding whether a plaintiff has standing and the court has subject

8      matter jurisdiction, the Supreme Court has unambiguously

9      rejected that approach. The district court thus misconstrued the

10      nature of the zone of interests doctrine.[FN]

11

12

---

13      Footnote — The original published version of this opinion
14      contained, in this chapter, a discussion of the merits of the zone-
15      of-interests question. That discussion is deleted in order that it not
16      serve as a precedent on the question whether the Complaint states
17      a claim upon which relief may be granted. Because, under *Lexmark*,
18      the merits of the zone-of-interests question do not bear on the
19      court's subject matter jurisdiction, that discussion had no
20      pertinence to whether the district court erred in granting the
21      President's motion under Rule 12(b)(1).

4